APPEAL,MARTIN,PROTO,TERMED

# United States District Court
# Northern District of Illinois – CM/ECF LIVE, Ver 5.1.1 (Chicago)
# CIVIL DOCKET FOR CASE #: 1:12–cv–02353
# *Internal Use Only*

Seiser v. City of Chicago et al

Assigned to: Honorable James F. Holderman

Demand: $300,000

Case in other court:  13–01985

Cause: 42:1983 Civil Rights Act

Date Filed: 03/29/2012

Date Terminated: 04/29/2013

Jury Demand: Both

Nature of Suit: 440 Civil Rights: Other

Jurisdiction: Federal Question

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 03/29/2012 | 2 | 5 | CIVIL Cover Sheet (Flaxman, Kenneth) (Entered: 03/29/2012) |
| 04/17/2012 | 5 | 6 | MOTION by Defendant City of Chicago for extension of time to file answer regarding complaint 1 *AGREED MOTION* (Vanorny, Lindsey) (Entered: 04/17/2012) |
| 04/25/2012 | 8 | 8 | MINUTE entry before Honorable James F. Holderman: City's agreed motion to extend time to answer or otherwise plead 5 is granted. Defendant has to and including 5/15/2012 to answer or otherwise plead to the complaint. Status hearing set for 5/22/2012 at 9:00 AM. Mailed notice (am) (Entered: 04/25/2012) |
| 05/15/2012 | 9 | 9 | ANSWER to Complaint with Jury Demand by City of Chicago, Debra Kirby(Vanorny, Lindsey) (Entered: 05/15/2012) |
| 05/29/2012 | 13 | 19 | MOTION by Plaintiff Michael Seiser to strike answer to complaint 9 (Flaxman, Kenneth) (Entered: 05/29/2012) |
| 06/11/2012 | 14 | 37 | RESPONSE by City of Chicago, Debra Kirbyin Opposition to MOTION by Plaintiff Michael Seiser to strike answer to complaint 9 13 (Jebson, Scott) (Entered: 06/11/2012) |
| 06/18/2012 | 15 | 53 | RESPONSE by Michael Seiserin Support of MOTION by Plaintiff Michael Seiser to strike answer to complaint 9 13 (Flaxman, Kenneth) (Entered: 06/18/2012) |
| 06/26/2012 | 16 | 56 | EXECUTIVE COMMITTEE ORDER: Case referred to the Honorable Morton Denlow for discovery supervision and settlement conference. Signed by Executive Committee on 06/26/2012. (et, ) (Entered: 06/27/2012) |
| 06/26/2012 | 18 | 59 | MINUTE entry before Honorable James F. Holderman:Scheduling conference held on 6/26/2012. Discovery ordered closed by 11/26/2012. Parties are to meet with Magistrate Judge Denlow at the end of discovery for a settlement conference. Dispositive motions with supporting memoranda due by 1/7/2013; responses due by 3/18/2013. Replies due by 4/1/2013. Final Pretrial Order due by 4/16/2013. Motions in limine with supporting memoranda due by 4/16/2013; responses due by 4/19/2013. Final Pretrial Conference set for 4/30/2013 at 4:00 PM. Jury Trial set for 5/6/2013 at 9:00 AM. Mailed notice |

| | | | |
|---|---|---|---|
| | | | (am) (Entered: 06/28/2012) |
| 06/27/2012 | 17 | 58 | MINUTE entry before Honorable Morton Denlow:Status hearing set for 7/19/2012 at 10:00 A.M. in Courtroom 1350. Parties shall deliver a copy of an initial status report to chambers, Room 1356, five business days before the initial status hearing. If the parties have recently prepared and filed an initial status report, the submission of the previously filed initial status report is sufficient. The parties are directed to review and to comply with Judge Denlow's standing order setting initial status report. Copies are available in chambers or through Judge Denlow's web page at www.ilnd.uscourts.gov.. Mailed notice (ldg, ) (Entered: 06/27/2012) |
| 06/28/2012 | 19 | 60 | WRITTEN Opinion entered by the Honorable James F. Holderman on 6/28/2012:For the reasons explained in the Statement section of the order, "Plaintiff's Motion to Strike Answer" 13 is denied. Signed by the Honorable James F. Holderman on 6/28/2012: Mailed notice (am) (Entered: 06/28/2012) |
| 07/12/2012 | 20 | 62 | STATUS Report *[JOINT]* by Michael Seiser (Flaxman, Kenneth) (Entered: 07/12/2012) |
| 07/19/2012 | 21 | 65 | MINUTE entry before Honorable Morton Denlow:Magistrate Judge Status hearing held on 7/19/2012 and continued to 12/13/2012 at 10:00 AM. Plaintiff to submit written itemization of damages and settlement demand by 8/31/2012. Defendant to submit written settlement offer by 10/31/2012. Copies of the demand and offer are to be sent to Judge Denlow's successor.Mailed notice (ldg, ) (Entered: 07/19/2012) |
| 08/29/2012 | 22 | 66 | MOTION by Defendants City of Chicago, Debra Kirby for protective order (Attachments: # 1 Parties Agreed Confidentiality Order)(Vanorny, Lindsey) (Entered: 08/29/2012) |
| 08/31/2012 | 24 | 83 | MINUTE entry before Honorable Morton Denlow: Defendants' agreed motion for entry of protective order [ 22 ] is granted. No appearance is required on the 9/10/2012 notice date. Enter Parties' Agreed Confidentiality Order. (For further detail see separate order). Mailed notice. (et, ) (Entered: 09/05/2012) |
| 08/31/2012 | 25 | 84 | PARTIES' AGREED Confidentiality Order Signed by the Honorable Morton Denlow on 8/31/2012. (et, ) (Entered: 09/05/2012) |
| 10/01/2012 | 26 | 96 | EXECUTIVE COMMITTEE ORDER: It appearing that Daniel G. Martin has entered on duty as a Magistrate Judge for the Northern District of Illinois, with a duty station in Chicago, Illinois, effective October 1, 2012; therefore Pursuant to Internal Operating Procedure 17, the attached list of civil cases previously pending before Magistrate Judge Morton Denlow are hereby reassigned to Magistrate Judge Martin. It is further ordered that the attached list of civil referrals previously before Magistrate Judge Denlow are hereby transferred to Magistrate Judge Martin. It is further ordered that Magistrate Judge Martin is to become the designated magistrate judge pursuant to Local Rule 72.1 in any pending civil or criminal case where Magistrate Judge Denlow was the designated magistrate judge as of September 30, 2012. It is further ordered that, unless otherwise ordered by Magistrate Judge Martin, all hearing dates, deadlines, and schedules set by Magistrate Judge Denlow in the attached list of cases are to remain in effect. IT IS FURTHER ORDERED that this order is to become effective on October 1, 2012. Case referred to the Honorable Daniel G. Martin. Signed by Executive Committee on 10/1/2012. |

| | | | |
|---|---|---|---|
| | | | Mailed notice (td, ) (Entered: 10/03/2012) |
| 10/31/2012 | 27 | 101 | MINUTE entry before Honorable Daniel G. Martin: The deadlines for submitting settlement demand and offer letters to the magistrate judge 21 are stricken. When a settlement conference date is set by Judge Martin at the end of discovery, new deadlines for the exchange of settlement demand and offer letters will be set per Judge Martin's Standing Order for Settlement Conference. Status hearing set for 12/13/2012 stands. The time of the 12/13/2012 status hearing is changed from 10:00 a.m. to 9:30 a.m. in Courtroom 1350.Mailed notice (lxs, ) (Entered: 10/31/2012) |
| 12/03/2012 | 28 | 102 | MOTION by Defendants City of Chicago, Debra Kirby for extension of time to complete discovery *(Parties' Joint Motion to Extend the Discovery Period and the Deadline for the Parties to File Dispositive Motions)* (Vanorny, Lindsey) (Entered: 12/03/2012) |
| 12/04/2012 | 30 | 104 | MINUTE entry before Honorable James F. Holderman: Parties' joint motion to extend discovery period and the deadline for the parties to file dispositive motions 28 is granted. Fact discovery is extended to 1/31/13. Dispositive motions with supporting memoranda is extended to 2/15/13. Motion hearing date of 12/11/12 is stricken. Notice mailed by judge's staff (ntf, ) (Entered: 12/04/2012) |
| 12/13/2012 | 31 | 105 | MINUTE entry before Honorable Daniel G. Martin: Status hearing held. Settlement conference is set for 3/5/2013 at 2 p.m. The parties are reminded that Magistrate Judge Martin requires compliance with his Standing Order for Settlement Conferences, which is available on Magistrate Judge Martins web page at www.ilnd.uscourts.gov. Each party is required to email a copy of its settlement letter to Magistrate Judge Martins settlement conference inbox on the same day that it is provided to opposing counsel. The email address is Settlement_Correspondence_Martin@ilnd.uscourts.gov. Do not file copies of these letters on the court docket. Mailed notice (lxs, ) (Entered: 12/13/2012) |
| 01/28/2013 | 32 | 106 | MINUTE entry before Honorable Daniel G. Martin:In light of the 3/5/2013 settlement conference set to begin at 2:00 p.m., plaintiff's settlement letter is due 2/19/2013; defendant's settlement letter is due 2/26/2013. The parties are reminded that Magistrate Judge Martin requires compliance with his Standing Order for Settlement Conferences, which is available on Magistrate Judge Martin's web page at www.ilnd.uscourts.gov. Each party is required to email a copy of its settlement letter to Magistrate Judge Martin's settlement conference inbox on the same day that it is provided to opposing counsel. The email address is Settlement_Correspondence_Martin@ilnd.uscourts.gov. Do not file copies of these letters on the court docket. Mailed notice (lxs, ) (Entered: 01/28/2013) |
| 02/15/2013 | 33 | 107 | MOTION by Defendants City of Chicago, Debra Kirby for summary judgment (Vanorny, Lindsey) (Entered: 02/15/2013) |
| 02/15/2013 | 34 | 108 | MEMORANDUM by City of Chicago, Debra Kirby in support of motion for summary judgment 33 (Vanorny, Lindsey) (Entered: 02/15/2013) |
| 02/26/2013 | 37 | 123 | MINUTE entry before Honorable James F. Holderman: At the court's direction, motion hearing previously set 2/26/13 is stricken and reset to 3/5/13 at 9:00 a.m.Notice mailed by judge's staff (ntf, ) (Entered: 02/26/2013) |

| 02/27/2013 | 38 | 124 | MINUTE entry before Honorable Daniel G. Martin:Telephone status hearing set for 2/27/2013 at 04:00 p.m. The Court will contact counsel for the status hearing set for this afternoon.Mailed notice (lxs, ) (Entered: 02/27/2013) |
|---|---|---|---|
| 02/27/2013 | 39 | 125 | MINUTE entry before Honorable Daniel G. Martin: Settlement conference held with counsel only on 2/27/2013. Counsel for Plaintiff and Defendants jointly advised that a settlement conference with the parties would not be productive until after a ruling on Defendants' summary judgment motion. If this case reaches the post–summary judgment motion stage, counsel may request that the case be re–referred to Magistrate Judge Martin for a settlement conference. Settlement conference set for 3/5/2013 is hereby stricken. All matters relating to the referral of this action having been concluded, the referral is closed and the case is returned to the assigned district judge.Mailed notice (lxs, ) (Entered: 02/28/2013) |
| 03/05/2013 | 40 | 126 | MINUTE entry before Honorable James F. Holderman: Motion hearing held. Defendant's motion for summary judgment 33 is taken under advisement. Plaintiff's response to defendant's motion for summary judgment shall be filed by 3/18/13. Defendant's reply in support shall be filed by 4/1/13. All other previously set dates are stricken. Notice mailed by judge's staff (ntf, ) (Entered: 03/05/2013) |
| 03/18/2013 | 41 | 127 | MEMORANDUM by Michael Seiser in Opposition to motion for summary judgment 33 (Flaxman, Kenneth) (Entered: 03/18/2013) |
| 03/18/2013 | 42 | 143 | RULE 56.1(b)(3) Statement by Michael Seiser regarding motion for summary judgment 33 (Flaxman, Kenneth) (Entered: 03/18/2013) |
| 04/01/2013 | 43 | 244 | REPLY by Defendants City of Chicago, Debra Kirby to Rule 56 statement 42 (Vanorny, Lindsey) (Entered: 04/01/2013) |
| 04/01/2013 | 44 | 262 | RESPONSE by Defendants City of Chicago, Debra Kirby to Rule 56 statement 42 (Attachments: # 1 Exhibit Supplemental Exhibits)(Vanorny, Lindsey) (Entered: 04/01/2013) |
| 04/01/2013 | 45 | 286 | REPLY by City of Chicago, Debra Kirby to memorandum in opposition to motion 41 (Vanorny, Lindsey) (Entered: 04/01/2013) |
| 04/29/2013 | 48 | 301 | MEMORANDUM Opinion and Order Signed by the Honorable James F. Holderman on 4/29/2013:Judicial staff mailed notice(gl, ) (Entered: 04/29/2013) |
| 04/29/2013 | 49 | 314 | ENTERED JUDGMENT.Judicial staff mailed notice(gl, ) (Entered: 04/29/2013) |
| 05/07/2013 | 50 | 316 | NOTICE of appeal by Michael Seiser regarding orders 49 Filing fee $ 455, receipt number 0752–8321369. (Flaxman, Kenneth) (Entered: 05/07/2013) |
| 05/07/2013 | 51 | 318 | DOCKETING Statement by Michael Seiser regarding notice of appeal 50 (Flaxman, Kenneth) (Entered: 05/07/2013) |

JS 44
(Rev. 3/99)

Case 1:12-cv-02353   Document 2   Filed 03/29/12   Page 1 of 1   PageID 5
Case: 13-1985    Document: 5-2    Filed: 05/23/2013    Pages: 319

# CIVIL COVER SHEET

The JS -- 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I.(a) PLAINTIFFS**
Michael Seiser

**DEFENDANTS**
City of Chicago, and Debra Kirby

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF_Cook___
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT_____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT
OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Kenneth N. Flaxman
200 S Michigan Ave, Ste 1240
Chicago, IL 60604
(312) 427-3200

ATTORNEYS (IF KNOWN)

**II. BASIS OF JURISDICTION** (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government
   Plaintiff

☐ 2 U.S. Government
   Defendant

☒ 3 Federal Question
   (U.S. Government Not a
   Party)

☐ 4 Diversity
   (Indicate Citizenship of
   Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND
ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury - Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 850 Securities/Commodities/Exchange |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS – Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☒ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

**V. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

■ 1 Original
   Proceeding

☐ 2 Removed from
   State Court

☐ 3 Remanded from
   Appellate Court

☐ 4 Reinstated or
   Reopened

Transferred from
☐ 5 another district
   (specify)

☐ 6 Multidistrict
   Litigation

Appeal to District
Judge from
☐ Magistrate
   Judgment

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

false arrest, malicious prosecution

**VII. REQUESTED IN COMPLAINT:**   CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

**DEMAND $**
300,000

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ YES   ☐ NO

**VIII. RELATED CASE(S) IF ANY**   (See instructions)
JUDGE _____   DOCKET NUMBER _____

DATE   03/29/2012

SIGNATURE OF ATTORNEY OF RECORD
/s/ Kenneth N. Flaxman

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Michael Seiser, | ) | |
| | ) | 12 C 2353 |
| Plaintiff, | ) | |
| | ) | Judge Holderman |
| v. | ) | |
| | ) | |
| City of Chicago and Debra Kirby, | ) | |
| | ) | |
| Defendant. | ) | |

<u>**CITY'S AGREED MOTION TO EXTEND TIME TO ANSWER
OR OTHERWISE PLEAD**</u>

Defendant City of Chicago (the "City"), by its attorney, Stephen R. Patton,
pursuant to Federal Rule of Civil Procedure 6(b)(1)(B), respectfully requests this
Honorable Court to extend the time through and including May 15, 2012 for it to file its
responsive motion or other pleading in this action.  In support of this motion, the City
states as follows:

1.      Plaintiff filed the Complaint in this case against the City and Debra Kirby
on March 29, 2012.  (Docket No. 1.)  The undersigned attorney for the City filed her
appearance on April 17, 2012.  (Docket No. 4.)

2.      The undersigned attorney has not yet been able to obtain all relevant
records from the Chicago Police Department relating to the alleged incident which is the
subject of this lawsuit.

3.      Further, the undersigned attorney has not yet had the opportunity to meet
with the individual defendant.

4.      In order to investigate the content of Plaintiff's factual allegations and to
form the most appropriate and complete answer or other responsive pleading, the City

requests additional time through and including May 15, 2012 to file an appropriate

motion or responsive pleading to this lawsuit.

     5.     This motion is in no way brought for the purpose of undue delay, but

rather to allow the City to prepare the most appropriate responsive pleading in light of the

allegations contained in Plaintiff's Complaint.  No prejudice will result to Plaintiff by the

granting of this motion.

     6.     On April 12, 2012, Attorney Lindsey Vanorny contacted Attorney

Kenneth Flaxman and received his agreement for an extension of time for the City to

answer or otherwise plead through and including May 15, 2012.

     **WHEREFORE**, the City respectfully requests that this Court extend the time for

it to file its responsive motion or pleading in this action through and including May 15,

2012.

                            Respectfully Submitted,

                            Stephen Patton
                            Corporation Counsel of the City of Chicago

              By:     /s/ Lindsey Vanorny
                            Assistant Corporation Counsel
                            City of Chicago Department of Law
                            30 North LaSalle Street, Suite 900
                            Chicago, Illinois 60602
                            (312) 742-0234
                            Attorney No. 6303642

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 5.0.3**
**Eastern Division**

Michael Seiser

                              Plaintiff,

v.                                          Case No.: 1:12–cv–02353
                                            Honorable James F. Holderman

Debra Kirby, et al.

                              Defendant.

---

**NOTIFICATION OF DOCKET ENTRY**

This docket entry was made by the Clerk on Wednesday, April 25, 2012:

        MINUTE entry before Honorable James F. Holderman: City's agreed motion to
extend time to answer or otherwise plead [5] is granted. Defendant has to and including
5/15/2012 to answer or otherwise plead to the complaint. Status hearing set for 5/22/2012
at 9:00 AM. Mailed notice (am)

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of
Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was
generated by CM/ECF, the automated docketing system used to maintain the civil and
criminal dockets of this District. If a minute order or other document is enclosed, please
refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our
web site at ***www.ilnd.uscourts.gov***.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL SEISER, | ) | |
| | ) | **Case No. 12 C 2353** |
| Plaintiff, | ) | |
| | ) | JUDGE HOLDERMAN |
| vs. | ) | |
| | ) | Magistrate Judge Ashman |
| CITY OF CHICAGO and DEBRA KIRBY, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' ANSWER TO PLAINTIFF'S COMPLAINT

Defendants City of Chicago and Debra Kirby ("Defendants"), by one of their attorneys,

Lindsey Vanorny, Assistant Corporation Counsel for the City of Chicago, hereby state for their

Answer, Defenses and Jury Demand to Plaintiff's Complaint as follows:

1.     This is a civil action arising under 42 U.S.C. §1983.  The jurisdiction of this Court
is conferred by 28 U.S.C. §1343 and 28 U.S.C. §1367.

**ANSWER**:

Defendants admit that Plaintiff is attempting to bring a claim pursuant to 42 U.S.C. §1983,

but deny that Plaintiff has a viable claim.  Defendants admit that this Court has jurisdiction over this

matter.

2.     Plaintiff Michael Seiser is a resident of the Northern District of Illinois who is
employed by defendant City of Chicago as a police officer.

**ANSWER**:

Defendants admit the allegations contained in paragraph 2.

3.      Defendant City of Chicago is an Illinois municipality.

**ANSWER**:

Defendants admit the allegations contained in paragraph 3.

4.      Defendant Debra Kirby was at all times relevant a Deputy Superintendent of the Chicago Police Department.  Plaintiff sues Kirby in her individual capacity.

**ANSWER**:

Defendants admit that Debra Kirby was a Deputy Superintendent of the Chicago Police Department at all relevant times as alleged in the complaint and admit that Plaintiff is attempting to sue Defendant Kirby in her individual capacity, but deny that Plaintiff has a viable claim against her.

5.      On March 29, 2011, the Chicago police department received a civilian complaint that plaintiff had been driving his personal vehicle in police uniform while drinking what appeared to be an alcoholic beverage.

**ANSWER**:

Defendants admit that on March 29, 2011, the Chicago Police Department received a complaint from a citizen that Plaintiff had been driving a non-police vehicle in police uniform while drinking what appeared to be an alcoholic beverage.  Defendants deny that this was the only complaint regarding Plaintiff's actions on March 29, 2011.  Defendants lack sufficient knowledge or information to admit or deny the remaining allegations contained in this complaint, and therefore, those allegations are deemed denied.

6.      Chicago police officers investigated the above referred complaint.

**ANSWER**:

Defendants admit that members of the Chicago Police Department, including police officers, investigated complaints from citizens regarding Plaintiff's actions on March 29, 2011, including the

2

above-referred complaint.

7.     The officers who conducted this investigation were unable to corroborate the civilian's complaint that there was open alcohol in plaintiffs vehicle.

**ANSWER**:

Defendants deny that Plaintiff has accurately and fully described the complaints the Chicago Police Department received from citizens regarding Plaintiff's actions on March 29, 2011.  To the extent that the allegations contained in this paragraph are alleging that after the Illinois State Crime Lab tested the bottled recovered from Plaintiff's vehicle that one of the results of those tests was that the bottle did not contain alcohol, that allegation is admitted.  To the extent that Plaintiff's allegations contained in this paragraph are alleging that the investigation of citizen complaints that Plaintiff was driving a non-police vehicle while apparently drinking an alcohol beverage revealed no evidence to substantiate those complaints, those allegations are denied.  Defendants deny the remaining allegations contained in this paragraph.  Defendants deny that they committed any wrongdoing alleged in the complaint.

8.     After the officers were unable to obtain credible evidence to believe that plaintiff had violated any law or ordinance, the officers requested plaintiff to consent to a warrantless search of his vehicle.

**ANSWER**:

Defendants deny that Plaintiff has accurately alleged the facts and sequence of the incident, deny that Plaintiff has accurately alleged the facts that led to there being probable cause to believe Plaintiff violated the law or ordinance, deny that Plaintiff has accurately alleged the facts of the investigation of Plaintiff's actions, deny that Plaintiff has accurately alleged the facts and interactions between Defendants, other police personnel and Plaintiff, deny that Plaintiff has

3

accurately set out the proper sequence of events that led to there being probable cause to believe

Plaintiff violated the law or ordinance, and therefore, deny the allegations contained in this

paragraph. On information and belief, Defendants admit that Plaintiff was asked to consent to a

search of his vehicle and that Plaintiff at one point denied that consent, but Defendants deny that a

search warrant was required to search Plaintiff's vehicle.  Defendants deny that they committed any

wrongdoing complained of in this complaint.

      9.     Plaintiff refused to consent to the warrantless search of his vehicle.

**ANSWER**:

      On information and belief, Defendants admit that Plaintiff was asked to consent to a search

of his vehicle and that Plaintiff at one point refused to consent, but Defendants deny that a search

warrant was required to search Plaintiff's vehicle.  Defendants deny that they committed any

wrongdoing complained of in this complaint.

      10.    After being informed that plaintiff had refused to consent to the warrantless search
of his vehicle, defendant Kirby directed a Chicago police sergeant to order plaintiff to allow the
search of his vehicle.

**ANSWER**:

      Defendants deny that Plaintiff has accurately alleged the facts and sequence of the incident,

deny that Plaintiff has accurately alleged the facts that led to there being probable cause to believe

Plaintiff violated the law or ordinance, deny that Plaintiff has accurately alleged the facts of the

investigation of Plaintiff's actions, deny that Plaintiff has accurately alleged the facts and

interactions between Defendants, other police personnel and Plaintiff, deny that Plaintiff has

accurately set out the proper sequence of events that led to there being probable cause to believe

Plaintiff violated the law or ordinance, and therefore, deny the allegations contained in this

paragraph.

11.    Plaintiff complied with this order.

**ANSWER**:

Defendants deny that Plaintiff has accurately alleged the facts and sequence of the incident,

deny that Plaintiff has accurately alleged the facts that led to there being probable cause to believe

Plaintiff violated the law or ordinance, deny that Plaintiff has accurately alleged the facts of the

investigation of Plaintiff's actions, deny that Plaintiff has accurately alleged the facts and

interactions between Defendants, other police personnel and Plaintiff, deny that Plaintiff has

accurately set out the proper sequence of events that led to there being probable cause to believe

Plaintiff violated the law or ordinance, and therefore, deny the allegations contained in this

paragraph.

12.    The search of plaintiffs vehicle revealed a large clear bottle containing water.

**ANSWER**:

Defendants admit that after personnel from the Chicago Police Department retrieved a  bottle

from Plaintiff's car that the bottle was sent to the Illinois State Crime Lab to test the contents of the

bottle and that one of the results of those tests was that the contents contained in the bottle did not

contain alcohol.  Defendants deny that the entire bottle was "clear" and Defendants deny that they

knew that the contents of the bottle did not contain alcohol prior to the contents of the bottle being

tested by the Illinois State Crime lab.  Defendants lack sufficient knowledge or information to admit

or deny the remaining allegations contained in this paragraph, and therefore, those allegations are

deemed denied.

13.    After being informed that the search of plaintiffs vehicle had revealed a water bottle,

defendant Kirby ordered that plaintiff be held in custody and processed criminally as a person who been driving under the influence of alcohol.

**ANSWER**:

Defendants deny that Plaintiff has accurately alleged the facts and sequence of the incident, deny that Plaintiff has accurately alleged the facts that led to there being probable cause to believe Plaintiff violated the law or ordinance, deny that Plaintiff has accurately alleged the facts of the investigation of Plaintiff's actions, deny that Plaintiff has accurately alleged the facts and interactions between Defendants, other police personnel and Plaintiff, deny that Plaintiff has accurately set out the proper sequence of events that led to there being probable cause to believe Plaintiff violated the law or ordinance, and therefore, deny the allegations contained in this paragraph.

14.     At the time she ordered that plaintiff be held in custody and processed criminally as a person who been driving under the influence of alcohol, defendant Kirby could not have reasonably believed that plaintiff had committed an offense.

**ANSWER**:

Defendants deny the allegations contained in this paragraph.

15.     As required by Kirby's order, plaintiff was required to submit to field sobriety tests. Plaintiff passed each and every field sobriety test.

**ANSWER**:

Defendants admit that Plaintiff passed the field sobriety tests given to him, but deny that Plaintiff has accurately alleged the facts and sequence of the incident, and therefore, deny the remaining allegations contained in this paragraph.

16.     After passing the field sobriety tests, and as required by Kirby's order, plaintiff was required to submit to a Breathalyzer test. The Breathalyzer showed that plaintiffs blood alcohol level was zero.

**ANSWER**:

Defendants admit that Plaintiff passed the field sobriety tests and that the results of the Breathalyzer showed Plaintiff's blood alcohol level at the time of the test was zero, but deny that Plaintiff has accurately alleged the facts and sequence of the incident, and therefore, deny the remaining allegations contained in this paragraph.

17.   As required by Kirby's order, plaintiff was charged with the possession of liquor with a broken seal in his motor vehicle.

**ANSWER**:

Defendants admit that Plaintiff was issued a traffic citation for possession of liquor with a broken seal in his motor vehicle, but deny that Plaintiff has accurately alleged the facts and sequence of the incident, and therefore, deny the remaining allegations contained in this paragraph.

18.   At the time she caused plaintiff to be charged with possession of liquor with a broken seal in his motor vehicle, defendant Kirby knew that there was no basis for this charge, which was dismissed at plaintiffs first court appearance on May 18, 2011.

**ANSWER**:

Defendants deny that Plaintiff has accurately alleged the facts and sequence of the incident, and therefore, deny allegations contained in this paragraph.

19.   As a result of the foregoing, plaintiff was deprived of rights secured by the Fourth and Fourteenth Amendments to the Constitution of the United States, and was subjected to false arrest, false imprisonment, and malicious prosecution in violation of Illinois law.

**ANSWER**:

Defendants deny that they committed the wrongdoing complained of in this complaint and deny the allegations contained in this paragraph.

20.   Plaintiff demands trial by jury.

**ANSWER**:

Defendants admit that Plaintiff is demanding a trial by jury.

### FEDERAL RULE 12(B)(6) DEFENSES

Plaintiff attempts to bring his claim, in part, under the Fourteenth Amendment to the

United States Constitution.  However, the proper standard for analyzing Plaintiff's federal claims

is a Fourth Amendment standard and not a Fourteenth Amendment substantive due process

standard.  *See, e.g., Graham v. Conner*, 490 U.S. 386, 394 (1989).  As such, Plaintiff's claims

under the Fourteenth Amendment should be dismissed.

Moreover, the City of Chicago cannot be held vicariously liable for Plaintiff's Section

1983 claims.  *Monell v. Department of Social Services for the City of New York*, 436 U.S. 658

(1978).

### AFFIRMATIVE DEFENSES

### First Affirmative Defense

Defendant Debra Kirby is a government officials, namely a police officer, who performs

discretionary functions.  At all times material to the events alleged in Plaintiff's complaint, a

reasonable police officer objectively viewing the facts and circumstances that confronted

Defendant Debra Kirby could have believed her actions to be lawful, in light of clearly

established law and the information that Defendant Debra Kirby possessed.  Defendant Debra

Kirby is therefore entitled to qualified immunity as to Plaintiff's federal claims.

### Second Affirmative Defense

As to the state law claims, at the time of the incident alleged in Plaintiff's complaint,

Defendant Debra Kirby was and is a City of Chicago employee, namely a police officer, who was

engaged in the execution and enforcement of the law.  Under the Tort Immunity Act, an employee

or agent of the City of Chicago is not liable for his or her acts or omissions in the execution or

enforcement of the law, unless such act or omission constitutes wilful and wanton conduct.  745

ILCS 10/2-202 (2002).  The acts and/or omissions of Defendant Debra Kirby were not willful and

wanton.  Therefore, Defendant Debra Kirby and the City of Chicago are not liable to Plaintiff for his

stated claims.

### Third Affirmative Defense

As to the state law claims, under the Tort Immunity Act, and to the extent that Plaintiff is

attempting to hold Defendant Debra Kirby liable for the acts or omissions of other individuals,

that claim is barred under Section 2-204 of the Illinois Tort Immunity Act because a public

employee, as such and acting within the scope of her employment, is not liable for an injury

caused by the act or omission of another person.  745 ILCS 10/2-204 (2002).

### Fourth Affirmative Defense

As to the state law claims, under the Tort Immunity Act, Defendants Debra Kirby and the

City of Chicago are not liable to Plaintiff because Defendant Debra Kirby's decisions as it relates

to Plaintiff were decisions that involved the exercise of discretion for which she is immune from

liability. 745 ILCS 10/2-201 (2002).

### Fifth Affirmative Defense

As to the state law claims, where Defendants Debra Kirby and the City of Chicago may be

liable in damages, the total amount of damages to which Plaintiff would otherwise be entitled must

be reduced by application of principles of comparative fault in proportion to the amount of negligent,

willful and wanton, reckless and/or intentional conduct of the Plaintiff's which was the proximate

cause of Plaintiff's injuries.

### Sixth Affirmative Defense

As to the state law claims, and to the extent Plaintiff is claiming that Defendants are liable

in the way police service was provided, those claims are barred by Section 4-102 of the  Illinois Tort

Immunity Act.  745 ILCS 10/4-102 (2002).

### Seventh Affirmative Defense

Under Section 10/2-109 of the Tort Immunity Act, the City of Chicago is not liable to

Plaintiff if its employees are not liable to Plaintiff.  745 ILCS 10/2-109 (2004).

### Eighth Affirmative Defense

Under Section 10/2-102 of the Tort Immunity Act, the City of Chicago is not required

to pay punitive or exemplary damages in any action brought directly or indirectly against it by the

injured party or a third party.  745 ILCS 10/2-102 (2004).

### JURY DEMAND

Defendants request a trial by jury.

Respectfully submitted,


/s/ Lindsey Vanorny
Lindsey Vanorny
Assistant Corporation Counsel
30 North LaSalle, Suite 900
Chicago, Illinois 60602
(312) 742-0234
Attorney No. 6303642

10

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Michael Seiser, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| -vs- | ) | No. 12 CV 2353 |
| | ) | |
| City of Chicago and Debra Kirby, | ) | *(Judge Holderman)* |
| | ) | |
| *Defendants.* | ) | |

## PLAINTIFF'S MOTION TO STRIKE ANSWER

Plaintiff, by counsel, moves the Court to strike defendants' answer to paragraphs 5-13 and 15-18 of plaintiff's complaint. (Plaintiff attaches a copy of the answer as Exhibit 1.)

Grounds for this motion are as follows:

1.      Rule 8(b)(1)(B) of the Federal Rules of Civil Procedure requires than an answer to a complaint must "admit or deny the allegations asserted against it." Rule 8(b)(2) requires that a denial "must fairly respond to the substance of the allegations." Defendants flout these rules in their response to paragraphs 5-13 and 15-18 of plaintiff's complaint.

2.      Plaintiff alleges as follows in paragraph 5 of his complaint:

> 5. On March 29, 2011, the Chicago police department received a civilian complaint that plaintiff had been driving his personal vehicle in police uniform while drinking what appeared to be an alcoholic beverage.

3.     Rather than simply admit or deny all of part of these allegations, defendants offer the following as their answer:

> 5. Defendants admit that on March 29, 2011, the Chicago Police Department received a complaint from a citizen that Plaintiff had been driving a non-police vehicle in police uniform while drinking what appeared to be an alcoholic beverage. Defendants deny that this was the only complaint regarding Plaintiff's actions on March 29, 2011. Defendants lack sufficient knowledge or information to admit or deny the remaining allegations contained in this complaint, and therefore, those allegations are deemed denied.

4.     The first sentence of this response admits the allegations of paragraph 5. The second sentence, however, is an affirmative allegation that is not authorized by Rule 8. The final sentence ("lack sufficient knowledge or information to admit or deny") is also not authorized by Rule 8. "Unless a defendant is without sufficient knowledge to form a belief as to the truth of an allegation, he is required to admit or deny the averments of the complaint." *National Acceptance Co. of America v. Bathalter*, 705 F.2d 924, 926 (7th Cir. 1983). The Court should strike each sentence and require defendants to simply admit or deny paragraph 5.

5.     Defendants also refuse to admit or deny the allegations set out in paragraph 6. There, plaintiff alleges that "Chicago police officers investigated the above referred complaint." Rather than admit this contention, defendants provide the Court with a narrative that may or may

not be admission. The Court should require defendants to comply with Rule 8(b) and admit or deny allegations.

6.      Defendants offer similar narrative responses to paragraphs 7-13 and 15-18. Rule 8(b) does not permit a defendant to respond to a complaint with the affirmative allegations that a numbered paragraph fails to "accurately and fully describe the complaints the Chicago Police Department received from citizens." (Answer, par. 7.) Nor does Rule 8(b) permit a defendant to respond that a numbered paragraph fails to "accurately allege[] the facts and sequence of the incident." (Answer, par. 8.) Finally, Rule 8(b) does not permit a defendant to respond to the allegations that "Plaintiff refused to consent to the warrantless search of his vehicle" with the denial "that a search warrant was required to search Plaintiff's vehicle." (Answer, par. 9.)

7.      Defendants' response to paragraphs 10 and 11 of the complaint also flout Rule 8(b). Plaintiff alleges the following in paragraph 10 of his complaint:

> 10. After being informed that plaintiff had refused to consent to the warrantless search of his vehicle, defendant Kirby directed a Chicago police sergeant to order plaintiff to allow the search of his vehicle.

Instead of responding to these contentions, defendants offer the following gobbledygook:

10. Defendants deny that Plaintiff has accurately alleged the facts and sequence of the incident, deny that Plaintiff has accurately alleged the facts that led to there being probable cause to believe Plaintiff violated the law or ordinance, deny that Plaintiff has accurately alleged the facts of the investigation of Plaintiff's actions, deny that Plaintiff has accurately alleged the facts and interactions between Defendants, other police personnel and Plaintiff, deny that Plaintiff has accurately set out the proper sequence of events that led to there being probable cause to believe Plaintiff violated the law or ordinance, and therefore, deny the allegations contained in this paragraph.

8.      Paragraph 11 of the complain consists of five words:

11. Plaintiff complied with this order.

Rather than the simple "admit" or "deny" required by Rule 8(b),

defendants offer yet more gobbledygook:

11.    Defendants deny that Plaintiff has accurately alleged the facts and sequence of the incident, deny that Plaintiff has accurately alleged the facts that led to there being probable cause to believe Plaintiff violated the law or ordinance, deny that Plaintiff has accurately alleged the facts of the investigation of Plaintiff's actions, deny that Plaintiff has accurately alleged the facts and interactions between Defendants, other police personnel and Plaintiff, deny that Plaintiff has accurately set out the proper sequence of events that led to there being probable cause to believe Plaintiff violated the law or ordinance, and therefore, deny the allegations contained in this paragraph.

9.    Paragraph 12 is also a simple declarative sentence:

12. The search of plaintiff's vehicle revealed a large bottle containing water.

Again, rather than admit or deny this sentence, defendants offer the
following incomprehensible paragraph:

> 12. Defendants admit that after personnel from the Chicago
> Police Department retrieved a bottle from Plaintiff's car that
> the bottle was sent to the Illinois State Crime Lab to test the
> contents of the bottle and that one of the results of those tests
> was that the contents contained in the bottle did not contain
> alcohol. Defendants deny that the entire bottle was "clear"
> and Defendants deny that they knew that the contents of the
> bottle did not contain alcohol prior to the contents of the
> bottle being tested by the Illinois State Crime lab. Defendants
> lack sufficient knowledge or information to admit or deny the
> remaining allegations contained in this paragraph, and
> therefore, those allegations are deemed denied.

10.   Paragraph 13 of plaintiff's complaint contains a crucial

allegation about the personal involvement of defendant Kirby in the false

arrest:

> 13. After being informed that the search of plaintiff's
> vehicle had revealed a water bottle, defendant Kirby
> ordered that plaintiff be held in custody and processed
> criminally as a person who [had] been driving under the
> influence of alcohol.

Rule 8(b) allows defendants to admit (or deny) that Kirby was

informed that the search of plaintiff's vehicle had revealed a water bottle.

The rule also allows defendants to admit (or deny) that Kirby ordered that

plaintiff be held in custody, and to admit (or deny) that she ordered that

plaintiff be processed criminally as a person who had been driving under

the influence of alcohol. Rather than comply with the rule, defendants seek

to avoid confronting the allegations of the complaint:

> 13. Defendants deny that Plaintiff has accurately alleged the facts and sequence of the incident, deny that Plaintiff has accurately alleged the facts that led to there being probable cause to believe Plaintiff violated the law or ordinance, deny that Plaintiff has accurately alleged the facts of the investigation of Plaintiff's actions, deny that Plaintiff has accurately alleged the facts and interactions between Defendants, other police personnel and Plaintiff, deny that Plaintiff has accurately set out the proper sequence of events that led to there being probable cause to believe Plaintiff violated the law or ordinance, and therefore, deny the allegations contained in this paragraph.

> 11.   Defendants offer a flat denial of paragraph 14 of the

complaint, but then include in their answer to paragraphs 15-18 the

unauthorized "denial" that "Plaintiff has accurately alleged the facts and

sequence of the incident." The Court should strike each of these "denials."

For the reasons above stated, the Court should strike defendnts'

answer and require that defendants file an amended answer within 14

days.

> /s/  Kenneth N. Flaxman
> KENNETH N. FLAXMAN
> ARDC No. 830399
> 200 S Michigan Ave Ste 1240
> Chicago, IL 60604-2430
> (312) 427-3200
>
> *Attorney for Plaintiff*

-6-

**Exhibit 1**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

MICHAEL SEISER,                               )
                                              )     **Case No. 12 C 2353**
                    Plaintiff,                )
                                              )     JUDGE HOLDERMAN
         vs.                                  )
                                              )     Magistrate Judge Ashman
CITY OF CHICAGO and DEBRA KIRBY,              )
                                              )
                    Defendants.               )

### DEFENDANTS' ANSWER TO PLAINTIFF'S COMPLAINT

Defendants City of Chicago and Debra Kirby ("Defendants"), by one of their attorneys,

Lindsey Vanorny, Assistant Corporation Counsel for the City of Chicago, hereby state for their

Answer, Defenses and Jury Demand to Plaintiff's Complaint as follows:

1.      This is a civil action arising under 42 U.S.C. §1983.  The jurisdiction of this Court
is conferred by 28 U.S.C. §1343 and 28 U.S.C. §1367.

**ANSWER**:

Defendants admit that Plaintiff is attempting to bring a claim pursuant to 42 U.S.C. §1983,

but deny that Plaintiff has a viable claim.  Defendants admit that this Court has jurisdiction over this

matter.

2.      Plaintiff Michael Seiser is a resident of the Northern District of Illinois who is
employed by defendant City of Chicago as a police officer.

**ANSWER**:

Defendants admit the allegations contained in paragraph 2.

3.      Defendant City of Chicago is an Illinois municipality.

**ANSWER**:

Defendants admit the allegations contained in paragraph 3.

4.      Defendant Debra Kirby was at all times relevant a Deputy Superintendent of the Chicago Police Department.  Plaintiff sues Kirby in her individual capacity.

**ANSWER**:

Defendants admit that Debra Kirby was a Deputy Superintendent of the Chicago Police Department at all relevant times as alleged in the complaint and admit that Plaintiff is attempting to sue Defendant Kirby in her individual capacity, but deny that Plaintiff has a viable claim against her.

5.      On March 29, 2011, the Chicago police department received a civilian complaint that plaintiff had been driving his personal vehicle in police uniform while drinking what appeared to be an alcoholic beverage.

**ANSWER**:

Defendants admit that on March 29, 2011, the Chicago Police Department received a complaint from a citizen that Plaintiff had been driving a non-police vehicle in police uniform while drinking what appeared to be an alcoholic beverage.  Defendants deny that this was the only complaint regarding Plaintiff's actions on March 29, 2011.  Defendants lack sufficient knowledge or information to admit or deny the remaining allegations contained in this complaint, and therefore, those allegations are deemed denied.

6.      Chicago police officers investigated the above referred complaint.

**ANSWER**:

Defendants admit that members of the Chicago Police Department, including police officers, investigated complaints from citizens regarding Plaintiff's actions on March 29, 2011, including the

2

above-referred complaint.

      7.     The officers who conducted this investigation were unable to corroborate the civilian's complaint that there was open alcohol in plaintiffs vehicle.

**ANSWER**:

      Defendants deny that Plaintiff has accurately and fully described the complaints the Chicago Police Department received from citizens regarding Plaintiff's actions on March 29, 2011. To the extent that the allegations contained in this paragraph are alleging that after the Illinois State Crime Lab tested the bottled recovered from Plaintiff's vehicle that one of the results of those tests was that the bottle did not contain alcohol, that allegation is admitted. To the extent that Plaintiff's allegations contained in this paragraph are alleging that the investigation of citizen complaints that Plaintiff was driving a non-police vehicle while apparently drinking an alcohol beverage revealed no evidence to substantiate those complaints, those allegations are denied. Defendants deny the remaining allegations contained in this paragraph. Defendants deny that they committed any wrongdoing alleged in the complaint.

      8.     After the officers were unable to obtain credible evidence to believe that plaintiff had violated any law or ordinance, the officers requested plaintiff to consent to a warrantless search of his vehicle.

**ANSWER**:

      Defendants deny that Plaintiff has accurately alleged the facts and sequence of the incident, deny that Plaintiff has accurately alleged the facts that led to there being probable cause to believe Plaintiff violated the law or ordinance, deny that Plaintiff has accurately alleged the facts of the investigation of Plaintiff's actions, deny that Plaintiff has accurately alleged the facts and interactions between Defendants, other police personnel and Plaintiff, deny that Plaintiff has

3

accurately set out the proper sequence of events that led to there being probable cause to believe

Plaintiff violated the law or ordinance, and therefore, deny the allegations contained in this

paragraph. On information and belief, Defendants admit that Plaintiff was asked to consent to a

search of his vehicle and that Plaintiff at one point denied that consent, but Defendants deny that a

search warrant was required to search Plaintiff's vehicle. Defendants deny that they committed any

wrongdoing complained of in this complaint.

        9.      Plaintiff refused to consent to the warrantless search of his vehicle.

**ANSWER**:

        On information and belief, Defendants admit that Plaintiff was asked to consent to a search

of his vehicle and that Plaintiff at one point refused to consent, but Defendants deny that a search

warrant was required to search Plaintiff's vehicle. Defendants deny that they committed any

wrongdoing complained of in this complaint.

        10.     After being informed that plaintiff had refused to consent to the warrantless search
of his vehicle, defendant Kirby directed a Chicago police sergeant to order plaintiff to allow the
search of his vehicle.

**ANSWER**:

        Defendants deny that Plaintiff has accurately alleged the facts and sequence of the incident,

deny that Plaintiff has accurately alleged the facts that led to there being probable cause to believe

Plaintiff violated the law or ordinance, deny that Plaintiff has accurately alleged the facts of the

investigation of Plaintiff's actions, deny that Plaintiff has accurately alleged the facts and

interactions between Defendants, other police personnel and Plaintiff, deny that Plaintiff has

accurately set out the proper sequence of events that led to there being probable cause to believe

Plaintiff violated the law or ordinance, and therefore, deny the allegations contained in this

paragraph.

     11.    Plaintiff complied with this order.

**ANSWER**:

Defendants deny that Plaintiff has accurately alleged the facts and sequence of the incident, deny that Plaintiff has accurately alleged the facts that led to there being probable cause to believe Plaintiff violated the law or ordinance, deny that Plaintiff has accurately alleged the facts of the investigation of Plaintiff's actions, deny that Plaintiff has accurately alleged the facts and interactions between Defendants, other police personnel and Plaintiff, deny that Plaintiff has accurately set out the proper sequence of events that led to there being probable cause to believe Plaintiff violated the law or ordinance, and therefore, deny the allegations contained in this paragraph.

     12.    The search of plaintiffs vehicle revealed a large clear bottle containing water.

**ANSWER**:

Defendants admit that after personnel from the Chicago Police Department retrieved a bottle from Plaintiff's car that the bottle was sent to the Illinois State Crime Lab to test the contents of the bottle and that one of the results of those tests was that the contents contained in the bottle did not contain alcohol. Defendants deny that the entire bottle was "clear" and Defendants deny that they knew that the contents of the bottle did not contain alcohol prior to the contents of the bottle being tested by the Illinois State Crime lab. Defendants lack sufficient knowledge or information to admit or deny the remaining allegations contained in this paragraph, and therefore, those allegations are deemed denied.

     13.    After being informed that the search of plaintiffs vehicle had revealed a water bottle,

5

defendant Kirby ordered that plaintiff be held in custody and processed criminally as a person who been driving under the influence of alcohol.

**ANSWER**:

Defendants deny that Plaintiff has accurately alleged the facts and sequence of the incident, deny that Plaintiff has accurately alleged the facts that led to there being probable cause to believe Plaintiff violated the law or ordinance, deny that Plaintiff has accurately alleged the facts of the investigation of Plaintiff's actions, deny that Plaintiff has accurately alleged the facts and interactions between Defendants, other police personnel and Plaintiff, deny that Plaintiff has accurately set out the proper sequence of events that led to there being probable cause to believe Plaintiff violated the law or ordinance, and therefore, deny the allegations contained in this paragraph.

14.     At the time she ordered that plaintiff be held in custody and processed criminally as a person who been driving under the influence of alcohol, defendant Kirby could not have reasonably believed that plaintiff had committed an offense.

**ANSWER**:

Defendants deny the allegations contained in this paragraph.

15.     As required by Kirby's order, plaintiff was required to submit to field sobriety tests. Plaintiff passed each and every field sobriety test.

**ANSWER**:

Defendants admit that Plaintiff passed the field sobriety tests given to him, but deny that Plaintiff has accurately alleged the facts and sequence of the incident, and therefore, deny the remaining allegations contained in this paragraph.

16.     After passing the field sobriety tests, and as required by Kirby's order, plaintiff was required to submit to a Breathalyzer test. The Breathalyzer showed that plaintiffs blood alcohol level was zero.

6

**ANSWER**:

Defendants admit that Plaintiff passed the field sobriety tests and that the results of the Breathalyzer showed Plaintiff's blood alcohol level at the time of the test was zero, but deny that Plaintiff has accurately alleged the facts and sequence of the incident, and therefore, deny the remaining allegations contained in this paragraph.

17.     As required by Kirby's order, plaintiff was charged with the possession of liquor with a broken seal in his motor vehicle.

**ANSWER**:

Defendants admit that Plaintiff was issued a traffic citation for possession of liquor with a broken seal in his motor vehicle, but deny that Plaintiff has accurately alleged the facts and sequence of the incident, and therefore, deny the remaining allegations contained in this paragraph.

18.     At the time she caused plaintiff to be charged with possession of liquor with a broken seal in his motor vehicle, defendant Kirby knew that there was no basis for this charge, which was dismissed at plaintiffs first court appearance on May 18, 2011.

**ANSWER**:

Defendants deny that Plaintiff has accurately alleged the facts and sequence of the incident, and therefore, deny allegations contained in this paragraph.

19.     As a result of the foregoing, plaintiff was deprived of rights secured by the Fourth and Fourteenth Amendments to the Constitution of the United States, and was subjected to false arrest, false imprisonment, and malicious prosecution in violation of Illinois law.

**ANSWER**:

Defendants deny that they committed the wrongdoing complained of in this complaint and deny the allegations contained in this paragraph.

20.     Plaintiff demands trial by jury.

7

**ANSWER**:

Defendants admit that Plaintiff is demanding a trial by jury.

## FEDERAL RULE 12(B)(6) DEFENSES

Plaintiff attempts to bring his claim, in part, under the Fourteenth Amendment to the United States Constitution.  However, the proper standard for analyzing Plaintiff's federal claims is a Fourth Amendment standard and not a Fourteenth Amendment substantive due process standard.  *See, e.g., Graham v. Conner*, 490 U.S. 386, 394 (1989).  As such, Plaintiff's claims under the Fourteenth Amendment should be dismissed.

Moreover, the City of Chicago cannot be held vicariously liable for Plaintiff's Section 1983 claims.  *Monell v. Department of Social Services for the City of New York*, 436 U.S. 658 (1978).

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

Defendant Debra Kirby is a government officials, namely a police officer, who performs discretionary functions.  At all times material to the events alleged in Plaintiff's complaint, a reasonable police officer objectively viewing the facts and circumstances that confronted Defendant Debra Kirby could have believed her actions to be lawful, in light of clearly established law and the information that Defendant Debra Kirby possessed.  Defendant Debra Kirby is therefore entitled to qualified immunity as to Plaintiff's federal claims.

### Second Affirmative Defense

As to the state law claims, at the time of the incident alleged in Plaintiff's complaint, Defendant Debra Kirby was and is a City of Chicago employee, namely a police officer, who was

8

engaged in the execution and enforcement of the law.  Under the Tort Immunity Act, an employee

or agent of the City of Chicago is not liable for his or her acts or omissions in the execution or

enforcement of the law, unless such act or omission constitutes wilful and wanton conduct.  745

ILCS 10/2-202 (2002).  The acts and/or omissions of Defendant Debra Kirby were not willful and

wanton.  Therefore, Defendant Debra Kirby and the City of Chicago are not liable to Plaintiff for his

stated claims.

### Third Affirmative Defense

As to the state law claims, under the Tort Immunity Act, and to the extent that Plaintiff is

attempting to hold Defendant Debra Kirby liable for the acts or omissions of other individuals,

that claim is barred under Section 2-204 of the Illinois Tort Immunity Act because a public

employee, as such and acting within the scope of her employment, is not liable for an injury

caused by the act or omission of another person.  745 ILCS 10/2-204 (2002).

### Fourth Affirmative Defense

As to the state law claims, under the Tort Immunity Act, Defendants Debra Kirby and the

City of Chicago are not liable to Plaintiff because Defendant Debra Kirby's decisions as it relates

to Plaintiff were decisions that involved the exercise of discretion for which she is immune from

liability. 745 ILCS 10/2-201 (2002).

### Fifth Affirmative Defense

As to the state law claims, where Defendants Debra Kirby and the City of Chicago may be

liable in damages, the total amount of damages to which Plaintiff would otherwise be entitled must

be reduced by application of principles of comparative fault in proportion to the amount of negligent,

willful and wanton, reckless and/or intentional conduct of the Plaintiff's which was the proximate

9

cause of Plaintiff's injuries.

### Sixth Affirmative Defense

As to the state law claims, and to the extent Plaintiff is claiming that Defendants are liable in the way police service was provided, those claims are barred by Section 4-102 of the Illinois Tort Immunity Act.  745 ILCS 10/4-102 (2002).

### Seventh Affirmative Defense

Under Section 10/2-109 of the Tort Immunity Act, the City of Chicago is not liable to Plaintiff if its employees are not liable to Plaintiff.  745 ILCS 10/2-109 (2004).

### Eighth Affirmative Defense

Under Section 10/2-102 of the Tort Immunity Act, the City of Chicago is not required to pay punitive or exemplary damages in any action brought directly or indirectly against it by the injured party or a third party.  745 ILCS 10/2-102 (2004).

### JURY DEMAND

Defendants request a trial by jury.

Respectfully submitted,

/s/ Lindsey Vanorny
Lindsey Vanorny
Assistant Corporation Counsel
30 North LaSalle, Suite 900
Chicago, Illinois 60602
(312) 742-0234
Attorney No. 6303642

10

# CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of May, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:  Lindsey Vanorny, ACC, 30 N LaSalle St., Ste 900, Chicago, IL 60602, and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants:  none.


/s/ Kenneth N. Flaxman
_____
Kenneth N. Flaxman
ARDC Number 08830399
200 S Michigan Ave, Ste 1240
Chicago, IL 60604-2430
(312) 427-3200 (phone)
(312) 427-3930 (fax)
knf@kenlaw.com (email)

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL SEISER, | ) | |
| | ) | **Case No. 12 C 02353** |
| Plaintiff, | ) | |
| | ) | JUDGE HOLDERMAN |
| vs. | ) | |
| | ) | Magistrate Judge Ashman |
| CITY OF CHICAGO and DEBRA KIRBY, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION TO STRIKE
DEFENDANTS' ANSWER**

Defendants City of Chicago and Debra Kirby ("Defendants"), by one of their attorneys, Scott Jebson, Chief Assistant Corporation Counsel for the City of Chicago, in Response to Plaintiff's motion to strike Defendants' answer, state as follows:

**INTRODUCTION**[1]

On March 29, 2011, Plaintiff was a uniformed police officer who was assigned to work at Tilden High School under Operation Safe Student. While Plaintiff was on duty as a uniformed police officer, the Chicago Police Department dispatched a sergeant in response to citizens' complaints about Plaintiff's actions. Multiple citizens told the responding investigating sergeant that they observed Plaintiff drinking what they believed to be an alcoholic beverage out of large clear bottle with a red and white label while Plaintiff was driving a civilian vehicle. The investigating sergeant relocated to where Plaintiff was assigned and saw Plaintiff and the car which matched the description given by the complainants. The investigating sergeant saw a large clear bottle with a red and white label and red top containing a clear liquid on the passenger seat of Plaintiff's vehicle. The investigating sergeant saw that the seal to the bottle appeared to be broken with only a minimal

---

[1] Defendants set out the facts as they know it to date. Defendants set out a brief summary of the facts so that this Honorable Court will have a context to the Defendants' position as it relates to their Answer to Plaintiff's Complaint.

amount of the liquid left in the bottle.   Plaintiff refused to tell the investigating sergeant what was in the bottle.  The sergeant requested that Plaintiff open his car door so that the sergeant could see what was in the bottle, but Plaintiff refused.   Plaintiff was then brought to the police station. Thereafter, based on the civilian complaints that Plaintiff was drinking while driving, a decision was made to begin processing Plaintiff for driving under the influence of alcohol.  While at the police station, Plaintiff was given and passed certain sobriety tests.  Plaintiff was not charged with driving under the influence of alcohol, but was issued a traffic citation for having an alcoholic beverage in a vehicle with a broken seal.

The clear bottle with a red and white label which contained the suspect alcohol was retrieved from Plaintiff's vehicle.  The bottle was labeled "TGI Friday's Mudslide" and the front of the label stated "The liquor is in it."  The seal to the bottle was broken.  The Chicago Police Department sent the liquid that was in the bottle to the Illinois State Crime Lab to determine if the liquid contained alcohol.  A month later, the Illinois State Crime Lab results revealed that the liquid in the bottle did not contain alcohol.

Plaintiff filed a complaint against the City of Chicago and Debra Kirby alleging that Plaintiff was falsely arrested and maliciously prosecuted. Defendants filed an Answer to Plaintiff's Complaint.   Plaintiff has moved to strike Defendants' Answer.  Plaintiff argues that Defendants' Answer contains "gobbledygook" and that Defendants fail to give a blanket admission or denial to Plaintiff's allegations.  Contrary to Plaintiff's assertions, Plaintiff's allegations are not simple and straight forward.  Rather, many of the paragraphs in Plaintiff's Complaint contain compound argumentative allegations which are premised upon each other and which either contain inaccurate facts and/or misstate the correct chronological order of events, all of which make it impossible for Defendants to make a blanket admission or denial of Plaintiff's allegations.  Moreover, many of Plaintiff's allegations in his Complaint are vague and without a factual foundation as to when the alleged events took place, which is another reason why it would be impossible for Defendants to make a blanket admission or denial of Plaintiff's allegations.   Because of this, many times

2

Defendants were forced to admit certain portions of the allegations, while denying others because

Plaintiff had not accurately set out the facts of the indent and/or misstated the chronology of the

events.  As such, Defendants respectfully request that this Honorable Court deny Plaintiff's request

that Defendants be forced to make blanket admissions and/or denials to Plaintiff's allegations in light

of the fact that such blanket admissions and/or denials would not be possible.

<div align="center">

**PLAINTIFF'S ALLEGATIONS AND DEFENDANTS' ANSWER
TO THOSE ALLEGATIONS**

</div>

Plaintiff takes issue with Defendants' answers to paragraphs 5-13 and 15-18 of Plaintiff's

Complaint.

*Paragraph 5 of Plaintiff's Complaint*

Plaintiff makes the following allegations in Paragraph 5 and Defendants provide the

following Answer:

> 5.     On March 29, 2011, the Chicago police  department  received a civilian complaint
> that plaintiff had been driving his personal vehicle in police uniform while drinking
> what appeared to be an alcoholic beverage.
>
> **ANSWER**:
>
>         Defendants admit that on March 29, 2011, the Chicago Police Department
> received a complaint from a citizen that plaintiff had been driving a non-police
> vehicle in police uniform while drinking what appeared to be an alcoholic beverage.
> Defendants deny that this was the only complaint regarding plaintiff's actions on
> March 29, 2011.  Defendants lack sufficient knowledge or information to admit or
> deny the remaining allegations contained in this complaint, and therefore, those
> allegations are deemed denied.

As shown above, the Defendants admit the allegation that the police Department received

a complaint from a citizen that Plaintiff had been driving a non-police vehicle in police uniform

while drinking what appeared to be an alcoholic beverage.  However, the way the Plaintiff presents

the allegations in paragraph 5 it could be implied from those allegations that the Chicago Police

Department only received a single citizen complaint that the Plaintiff had been drinking and driving

when in fact the Police Department received multiple citizen complaints. Therefore, Defendants had

<div align="center">3</div>

to make it clear in their answer that they were in no way admitting that the police department only received "one" citizen complaint regarding Plaintiff drinking and driving.  Had the Defendants simply answered the allegations in paragraph 5 with a blanket admission, that admission could be improperly construed as the Defendants admitting there was only a single citizen complaint. The reason why Defendants lack sufficient knowledge and information as the remaining allegations is because the Defendants lack sufficient knowledge or information if the civilian complainant that Plaintiff is referring to in  paragraph 5 knew that the non-police car that Plaintiff was driving was "his personal vehicle."   To put it another way, the Defendants could admit that one of the citizen complaints was that Plaintiff was in a civilian car when he was drinking what appeared to be an alcoholic beverage, but Defendants lack sufficient knowledge or information if the citizen complainant knew the civilian car that Plaintiff was driving was in fact his "personal vehicle."

### Paragraph 6 of Plaintiff's Complaint

Plaintiff makes the following allegations in Paragraph 6 and Defendants provide the following Answer:

6.    Chicago police officers investigated the above referred complaint.

**ANSWER**:

Defendants admit that members of the Chicago Police Department, including police officers, investigated complaints from citizens regarding plaintiff's actions on March 29, 2011, including the above-referred complaint.

In this case, various ranks within the police department were involved in the investigation of the citizen complaints, including, among others, police *sergeants* and police *officers*.  The Defendants wanted to make clear in their answer that police *officers* were not the only ones who were involved in the investigation of the citizen complaints.

### Paragraph 7 of Plaintiff's Complaint

Plaintiff makes the following allegations in Paragraph 7 and Defendants provide the following Answer:

7.      The officers who conducted this investigation were unable to corroborate the civilian's complaint that there was open alcohol in plaintiffs vehicle.

**ANSWER**:

The Defendants deny that plaintiff has accurately and fully described the complaints the Chicago Police Department received from citizens regarding plaintiff's actions on March 29, 2011.  To the extent that the allegations contained in this paragraph are alleging that after the Illinois State Crime Lab tested the bottled recovered from plaintiff's vehicle that one of the results of those tests was that the bottle did not contain alcohol, that allegation is admitted.  To the extent that plaintiff's allegations contained in this paragraph are alleging that the investigation of citizen complaints that plaintiff was driving a non-police vehicle while apparently drinking an alcohol beverage revealed no evidence to substantiate those complaints, those allegations are denied.  The defendants deny the remaining allegations contained in this paragraph.  Defendants deny that they committed any wrongdoing alleged in the complaint.

There are multiple problems with the allegations contained in paragraph 7.  First, the allegations incorrectly state that there was only one citizen complaint.  Second, the allegations in the paragraph do not accurately state the complaint made by the multiple citizens.  The complaint by the citizens were not simply that there was open alcohol in Plaintiff's vehicle.  The complaints included that Plaintiff was "drinking" what appeared to be an alcoholic beverage while driving.  Moreover, the investigation revealed that there was a complaint by a civilian that he had a confrontation with Plaintiff outside his vehicle and that Plaintiff smelled of alcohol.  Third, Plaintiff refers to "police officers" not being able to corroborate the civilian's complaint.  Again, the investigation by the police department involved many different ranks within the police department, including sergeants.  Fourth, the allegations contain absolutely no time-frame as to when the "police officers" allegedly failed to "corroborate the citizen complaint."   In this case, the Defendants admit that a month after the liquid was sent to the Illinois State Crime Lab that the Police Department received word that the liquid in the bottle did not contain alcohol.  However, the Defendants certainly did not know when it was decided to process Plaintiff for driving under the influence of alcohol that the liquid in the bottle in Plaintiff's vehicle did not contain alcohol.  Moreover, even if Plaintiff referenced a time

5

frame in his allegations, the Defendants would still not be able to simply admit or deny the allegations because there are multiple facts to the multiple complaints by the citizens. One complaint by the citizen was that Plaintiff appeared to be drinking what appeared to be alcohol out of a bottle that appeared to be a liquor bottle which had a red and white label on it. The investigation in this case confirmed that a clear bottle with a white and red label on it which had a clear substance was found in the front passenger side of Plaintiff's car and that the front of the label stated "The liquor is in it." Therefore, while the Police Department found out a month later that the liquid was not alcohol, the bottle found in Plaintiff's car did corroborate the multiple complaints by citizens that Plaintiff had a clear bottle in his car that contained a liquid and that the bottle resembled or in fact was a liquor bottle. As such, it would be impossible for the Defendants to have simply made a blanket admission or blanket denial of Plaintiff's loaded allegations. Plaintiff would obviously like the Defendants to make a blanket admission because Plaintiff would then argue that by admitting this paragraph, the Defendants did not have probable cause to process Plaintiff for driving under the influence of alcohol.

### *Paragraph 8 of Plaintiff's Complaint*

Plaintiff makes the following allegations in Paragraph 8 and Defendants provide the following Answer:

> 8.     After the officers were unable to obtain credible evidence to believe that plaintiff had violated any law or ordinance, the officers requested plaintiff to consent to a warrantless search of his vehicle.

> **ANSWER**:

> Defendants deny that plaintiff has accurately alleged the facts and sequence of the incident, deny that plaintiff has accurately alleged the facts that led to there being probable cause to believe plaintiff violated the law or ordinance, deny that plaintiff has accurately alleged the facts of the investigation of plaintiff's actions, deny that plaintiff has accurately alleged the facts and interactions between defendants, other police personnel and plaintiff, deny that plaintiff has accurately set out the proper sequence of events that led to there being probable cause to believe plaintiff violated the law or ordinance, and therefore deny the allegations contained in this paragraph. On information and belief, the defendants admit that plaintiff was

asked to consent to a search of his vehicle and that plaintiff at one point denied that consent, but defendants deny that a search warrant was required to search plaintiff's vehicle.  Defendants deny that they committed any wrongdoing complained of in this complaint.

As shown above, the main allegation in paragraph number 8, that the officers requested plaintiff to consent to a warrantless search of his vehicle" is premised on the truth of the first part of the allegation, "that officers were unable to obtain credible evidence to believe that plaintiff had violated any law or ordinance."  In essence, Plaintiff is incorporating his allegations in paragraph 7 into paragraph 8.  Plaintiff argues that Defendants should have simply admitted the allegation or denied the allegation.  However, that would be impossible because Defendants absolutely disagree with the premise of the allegations, i.e., Defendants do not agree that "officers were unable to obtain credible evidence to believe that plaintiff had violated any law or ordinance."  In fact, Defendants did obtain credible evidence that Plaintiff had violated the law in the form of multiple complaints by civilians that Plaintiff was drinking while driving.  Defendants do admit, on information and belief, that plaintiff was asked to consent to a search of his vehicle and that plaintiff at one point denied that consent. However, Defendants deny the premise of the allegation.  And that is exactly how the Defendants answered the allegations contained in paragraph 8.

### Paragraph 9 of Plaintiff's Complaint

Plaintiff makes the following allegations in Paragraph 9 and Defendants provide the following Answer:

9.    Plaintiff refused to consent to the warrantless search of his vehicle.

**ANSWER**:

On information and belief, the defendants admit that plaintiff was asked to consent to a search of his vehicle and that plaintiff at one point refused to consent, but defendants deny that a search warrant was required to search plaintiff's vehicle.  Defendants deny that they committed any wrongdoing complained of in this complaint.

7

Arguably, Plaintiff's allegations can be construed that consent or a search warrant was required before Defendants could search Plaintiff's vehicle. Defendants disagree with that proposition and simply state that in their answer. Clearly, Defendants specifically admit that Plaintiff did not consent to the search.

### *Paragraph 10 of Plaintiff's Complaint*

Plaintiff makes the following allegations in Paragraph 10 and Defendants provide the following Answer:

> 10.     After being informed that plaintiff had refused to consent to the warrantless search of his vehicle, defendant Kirby directed a Chicago police sergeant to order plaintiff to allow the search of his vehicle.
>
> **ANSWER**:
>
> Defendants deny that plaintiff has accurately alleged the facts and sequence of the incident, deny that plaintiff has accurately alleged the facts that led to there being probable cause to believe plaintiff violated the law or ordinance, deny that plaintiff has accurately alleged the facts of the investigation of plaintiff's actions, deny that plaintiff has accurately alleged the facts and  interactions between defendants, other police personnel and plaintiff, deny that plaintiff has accurately set out the proper sequence of events that led to there being probable cause to believe plaintiff violated the law or ordinance, and therefore deny the allegations contained in this paragraph.

As shown above, the main allegation in paragraph 10, that "defendant Kirby directed a Chicago police sergeant to order plaintiff to allow the search of his vehicle," is premised on the fact that the such alleged direction by Kirby came as the direct and sole result of Kirby being told "that plaintiff had refused to consent to the warrantless search." Defendants deny that Kirby gave the alleged directions as the direct and sole result of Kirby being allegedly told that Plaintiff had refused to consent to a warrantless search. In fact, Defendants deny that Plaintiff's allegations accurately set out the facts and sequence of the incident. And because of that, Defendants deny the allegations of the paragraph. Frankly, Defendants don't see why Plaintiff has a problem with Defendants' answer. Defendants denied the allegations and stated the reasons why they deny the allegations.

***Paragraph 11 of Plaintiff's Complaint***

Plaintiff makes the following allegations in Paragraph 11 and Defendants provide the following Answer:

11.     Plaintiff complied with this order.

**ANSWER**:

Defendants deny that plaintiff has accurately alleged the facts and sequence of the incident, deny that plaintiff has accurately alleged the facts that led to there being probable cause to believe plaintiff violated the law or ordinance, deny that plaintiff has accurately alleged the facts of the investigation of plaintiff's actions, deny that plaintiff has accurately alleged the facts and  interactions between defendants, other police personnel and plaintiff, deny that plaintiff has accurately set out the proper sequence of events that led to there being probable cause to believe plaintiff violated the law or ordinance, and therefore deny the allegations contained in this paragraph.

Plaintiff's allegations in paragraph 11 are premised on the Defendants' admitting the allegations of paragraph 10.  If the Defendants admit the allegations of paragraph 11, then they would be admitting the allegations of paragraph 10.  However, the Defendants denied the allegations contained in paragraph 10 because Plaintiff did not  accurately set out the facts and sequence of the incident.  Defendants make it clear in their answer to paragraph 11 that they are denying the allegations contained in paragraph 11 and set out reasons why they are denying those allegations.

***Paragraph 12 of Plaintiff's Complaint***

Plaintiff makes the following allegations in Paragraph 12 and Defendants provide the following Answer:

12.     The search of plaintiffs vehicle revealed a large clear bottle containing water.

**ANSWER**:

Defendants admit that after personnel from the Chicago Police Department retrieved a  bottle from plaintiff's car that the bottle was sent to the Illinois State Crime Lab to test the contents of the bottle and that one of the results of those tests was that the contents contained in the bottle did not contain alcohol.  Defendants deny that the entire bottle was "clear" and

9

Defendants deny that they knew that the contents of the bottle did not contain alcohol prior to the contents of the bottle being tested by the Illinois State Crime lab. Defendants lack sufficient knowledge or information to admit or deny the remaining allegations contained in this paragraph, and therefore, those allegations are deemed denied.

Defendants first note that Plaintiff, in his motion to strike Defendants' Answer, misstates the Plaintiff's allegations in paragraph 12 of his complaint. In his motion, Plaintiff states that paragraph 12 of his Complaint contains "a simple declarative sentence: 12. The search of Plaintiff's vehicle revealed a large bottle containing water." That is NOT what the paragraphs states. Plaintiff fails to inform this Court of an important word that is alleged in paragraph 12 of his complaint, and that word is "clear." As shown above, the allegations of paragraph 12 are that "[t]he search of plaintiff's vehicle revealed a large *"clear"* bottle containing water. However, the main problem with the allegations in paragraph 12 is that the allegations completely lack foundation as to *when* the Defendants knew what the contents of the bottle were. The allegations of this paragraph make it seem like as soon as the police department retrieved the bottle from Plaintiff's vehicle they knew the bottle contained water and not alcohol. The facts of this incident are that when it was decided that Plaintiff was to be processed for driving under the influence of alcohol, the police department had information from multiple citizens that Plaintiff was drinking what appeared to be alcohol from a large bottle that appeared to be a liquor bottle. When the police retrieved the bottle from Plaintiff's car, the bottle and liquid in the bottle were consistent with information provided by the citizens, that the bottle contained alcohol. The police officers certainly did not believe that the contents of the bottle contained water when they retrieved the bottle from the car and they certainly did not know that the contents of the bottle did not contain alcohol when the bottle was retrieved from the car. Rather, it was not until a month later that the test results from the Illinois State Crime Lab revealed that the liquid did not contain alcohol. Moreover, the test results from the Illinois State Crime Lab did not conclude that the liquid was "water." Therefore, all the Defendants could say as to their *present* knowledge of the contents of the bottle is that they *now* know the liquid in the bottle was

10

not alcohol, but they lack knowledge of information as to whether the contents contained "water."

Defendants answer to paragraph 12 sets out in detail what they are admitting and what they are

denying and what they lack knowledge or information of.   Specifically they admit that when the test

results of the contents of the bottle came back from the Illinois State Crime Lab, that the result of

the tests was that the contents of the bottle did not contain alcohol.   The defendants lack sufficient

knowledge even as it stands today whether the bottle contained water. In terms of the bottle being

"clear", the Defendants in their answer to this allegation denied that the bottle was entirely clear

because the bottle had a white and red label on it.

### Paragraph 13 of Plaintiff's Complaint

Plaintiff makes the following allegations in Paragraph 13 and Defendants provide the

following Answer:

> 13.   After being informed that the search of plaintiffs vehicle had revealed a water
> bottle,   defendant Kirby ordered that plaintiff be held in custody and
> processed criminally as a person who been driving under the influence of
> alcohol.
>
> **ANSWER**:
>
> Defendants deny that plaintiff has accurately alleged the facts and
> sequence of the incident, deny that plaintiff has accurately alleged the facts
> that led to there being probable cause to believe plaintiff violated the law or
> ordinance, deny that plaintiff has accurately alleged the facts of the
> investigation of plaintiff's actions, deny that plaintiff has accurately alleged
> the facts and  interactions between defendants, other police personnel and
> plaintiff, deny that plaintiff has accurately set out the proper sequence of
> events that led to there being probable cause to believe plaintiff violated the
> law or ordinance, and therefore deny the allegations contained in this
> paragraph.

As shown above, the main part of the allegations in paragraph 13, that "defendant Kirby

ordered that plaintiff be held in custody and processed criminally as a person who been driving under

the influence of alcohol," is premised on the first part of the allegations being true, which is that

defendant Kirby was informed that the search of Plaintiff's vehicle had revealed a water bottle.

Essentially, Plaintiff is incorporating paragraph 12 into paragraph 13. Defendants deny that defendant Kirby was informed that the search of Plaintiff's vehicle revealed the bottle contained water. In fact, Defendants deny that any police personnel knew that the bottle did not contain alcohol until a month later when the results from the Illinois State Crime Lab came in. In short, Defendants in their answer to these allegations correctly denied that the Plaintiff accurately set out the facts and sequence of the events as alleged in paragraph 13, and because of that, Defendants denied the allegations in that paragraph.

### *Paragraph 15 of Plaintiff's Complaint*

Plaintiff makes the following allegations in Paragraph 15 and Defendants provide the following Answer:

> 15.    As required by Kirby's order, plaintiff was required to submit to field sobriety tests. Plaintiff passed each and every field sobriety test.
>
> **ANSWER**:
>
>    Defendants admit that plaintiff passed the field sobriety tests given to him, but deny that plaintiff has accurately alleged the facts and sequence of the incident, and therefore, deny the remaining allegations contained in this paragraph.

The beginning of Plaintiff's allegations in paragraph 15 start of with the false assumption that Plaintiff has accurately set out what Kirby's order was, and the sequence of events that led to any order by Kirby. In other words, built into the allegations of paragraphs 15 of Plaintiff's complaint is the acceptance as true the allegations in paragraphs 12 and 13 of Plaintiff's Complaint. However, Defendants denied that Plaintiff accurately set out the facts and sequence of events as alleged in those paragraphs and Defendants stated so in their answers to those paragraphs. Defendants' answer to paragraph 15 could not be more straight forward. Defendants admit that plaintiff passed the sobriety tests given to him, but deny that Plaintiff has accurately alleged the facts and sequence of the incident. If Defendants made a blanket admission to paragraph 15, then they would be admitting

the truth of paragraphs 12 and 13, which Defendants denied. Therefore, Defendants cannot make

a blanket admission or denial of the allegations contained in paragraph 15.

> ### Paragraph 16 of Plaintiff's Complaint

Plaintiff makes the following allegations in Paragraph 16 and Defendants provide the

following Answer:

> 16.     After passing the field sobriety tests, and as required by Kirby's order,
> plaintiff was required to submit to a Breathalyzer test. The Breathalyzer
> showed that plaintiffs blood alcohol level was zero.

> **ANSWER**:
>> Defendants admit that plaintiff passed the field sobriety tests and that
>> the results of the Breathalyzer showed plaintiff's blood alcohol level at the
>> time of the test was zero, but deny that plaintiff has accurately alleged the
>> facts and sequence of the incident, and therefore, deny the remaining
>> allegations contained in this paragraph.

Plaintiff once again references Kirby's alleged order in this paragraph. Therefore, by

referencing Plaintiff's characterization of Kirby's order, and the factual sequence of what Plaintiff

claims led up to Kirby's order, Plaintiff is incorporating his allegations in paragraphs 12, 13 and 15

into this paragraph 16. As previously noted, Defendants deny that Plaintiff accurately set out the

facts and sequence of events alleged in paragraphs 12, 13 and 15. Therefore, by extension,

Defendants deny that Plaintiff has accurately set out the facts and sequence of events alleged in this

paragraph 16. Defendants cannot simply admit or deny the allegations contained in paragraph 16

because Defendant admit part of the allegations but deny the remaining allegations, which is exactly

what Defendants stated in their answer to paragraph 16.

> ### Paragraph 17 of Plaintiff's Complaint

Plaintiff makes the following allegations in Paragraph 17 and Defendants provide the

following Answer:

> 17.     As required by Kirby's order, plaintiff was charged with the possession of

liquor with a broken seal in his motor vehicle.

**ANSWER**:

Defendants admit that plaintiff was issued a traffic citation for possession of liquor with a broken seal in his motor vehicle, but deny that plaintiff has accurately alleged the facts and sequence of the incident, and therefore, deny the remaining allegations contained in this paragraph.

Plaintiff once again references Kirby's alleged order in this paragraph Therefore, by referencing Plaintiff's characterization of Kirby's order, and the factual sequence of what Plaintiff claims led up to Kirby's order, Plaintiff is incorporating his allegations in paragraphs 12, 13 and 15 into this paragraph 17. As previously noted, Defendants deny that Plaintiff accurately set out the facts and sequence of events alleged in paragraphs 12, 13 and 15. Therefore, by extension, Defendants deny that Plaintiff has accurately set out the facts and sequence of events alleged in this paragraph 17. Defendants cannot simply admit or deny the allegations contained in paragraph 17 because Defendants admit part of the allegations but deny the remaining allegations, which is exactly what Defendants stated in their answer to paragraph 17.

### *Paragraph 18 of Plaintiff's Complaint*

Plaintiff makes the following allegations in Paragraph 18 and Defendants provide the following Answer:

18.    At the time she caused plaintiff to be charged with possession of liquor with a broken seal in his motor vehicle, defendant Kirby knew that there was no basis for this charge, which was dismissed at plaintiffs first court appearance on May 18, 2011.

**ANSWER**:

Defendants deny that plaintiff has accurately alleged the facts and sequence of the incident, and therefore, deny allegations contained in this paragraph.

Once again, Plaintiff has loaded allegations in this paragraph. Plaintiff's allegations assume

14

a number of things: that Kirby was the one who "charged" Plaintiff with possession of liquor with a broken seal as opposed to being issued a traffic citation.   Defendants deny that that was the case. Therefore, defendants in their answer denied that Plaintiff accurately alleged the facts of the incident and therefore, they denied the allegations of the paragraph.

 For the reasons set out in this Response, Defendants request that this Honorable Court deny Plaintiff's motion.



     Respectfully submitted,


      /s/ Scott Jebson
     SCOTT JEBSON
     Chief Assistant Corporation Counsel
     One of Defendants Attorneys


30 N. LaSalle Street
Suite 900
Chicago, Illinois 60602
(312) 744-6959
(312) 744-6566 (FAX)
Atty. No. 6225243

**NOTICE OF FILING AND CERTIFICATE OF SERVICE**

I hereby certify that I have caused true and correct copies of the above and foregoing **Defendants Response to Plaintiff's Motion to Strike Defendants' Answer** to be filed in the Northern District of Illinois via e-filing and sent via e-filing to the persons who have filed appearances pursuant to Case Management/Electronic Case Files, on June 11, 2012, in accordance with the rules on electronic filing of documents.

  /s/ Scott Jebson
SCOTT JEBSON
Chief Assistant Corporation Counsel
Attorney for individual defendants

30 N. La Salle St.
Suite 900
Chicago, IL  60602
(312) 744-6959
Atty. No. 6225243

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Michael Seiser, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| -*vs*- | ) | No. 12 CV 2353 |
| | ) | |
| City of Chicago and Debra Kirby, | ) | *(Judge Holderman)* |
| | ) | |
| *Defendants.* | ) | |

## PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF MOTION TO STRIKE ANSWER

Defendants assert that they were unable to comply with Rule 8(b) of the Federal Rules of Civil Procedure because plaintiff's complaint "is not simple and straight forward." (Def.Mem. 2.) There is, however, no "complexity exception" to the simple command Rule 8(b)(1)(B) that a party must "admit or deny the allegations asserted against it by an opposing party." Defendants are unable to cite any authority for their "complexity exception" and omit any reference to Rule 8 of the Federal Rules of Civil Procedure in the 4720 words which comprise their answering memorandum.

Instead of explaining their disregard of the plain language of Rule 8(b), defendants offer an extensive "white heart/empty head" explanation for their evasive and non-responsive answer. The Seventh Circuit rejected similar arguments when advanced to support "lengthy recitations of additional facts" in opposition to a motion for summary judgment in

*Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 644 (7th Cir. 2008). As was true for the Local Rule 56.1 response in *Ciomber*, defendants' answer in this case includes "several extremely long, argumentative paragraphs," in which defendants "simultaneously denied the veracity of [the complaint] and presented additional facts of [their] own." *Id.*

Defendants seek to extend to Rule 8(b) the improper procedure of attempting "to smuggle new facts into its response to a party's Local Rule 56.1 Statement of facts." *Only the First, Ltd. v. Seiko Epson, Corp.*, 822 F.Supp.2d 767, 772 n.1 (N.D.Ill. 2001). This Court should apply to Rule 8(b) the same "strict compliance" it demands for Local Rule 56.1, *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 883-84 (7th Cir. 2012), and require defendants to comply with Rule 8(b) and "admit or deny the allegations asserted against it by an opposing party."

For the reasons above stated and those previously advanced, the Court should strike defendants' answer and require defendants to file an amended answer within 14 days.

Respectfully submitted,

/s/  Kenneth N. Flaxman
KENNETH N. FLAXMAN
ARDC No. 830399
200 S Michigan Ave Ste 1240
Chicago, IL 60604-2430
(312) 427-3200
*Attorney for Plaintiff*

# CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of June, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:  Lindsey Vanorny, ACC, Scott Jebson, ACC, 30 N LaSalle St., Ste 900, Chicago, IL 60602, and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants:  none.


/s/ Kenneth N. Flaxman

_____
Kenneth N. Flaxman
ARDC Number 08830399
200 S Michigan Ave, Ste 1240
Chicago, IL 60604-2430
(312) 427-3200 (phone)
(312) 427-3930 (fax)
knf@kenlaw.com (email)

# United States District Court
# Northern District of Illinois

In the Matter of

Michael Seiser

<div align="right">Magistrate Judge Morton Denlow</div>

v.                                        Case No. 12-CV-2353

Debra Kirby et al

## TRANSFER OF CASE TO THE EXECUTIVE COMMITTEE FOR A REFERRAL TO MAGISTRATE JUDGE

The above captioned case is currently pending on my calendar. I recommend to the Executive Committee that this case be referred to a magistrate judge of this Court. The reasons for my recommendation are indicated on the reverse of this form.

_____
**Judge James F. Holderman**

Date: Tuesday, June 26, 2012

---

## ORDER OF THE EXECUTIVE COMMITTEE

IT IS HEREBY ORDERED that the above captioned case be referred by lot to a magistrate judge of this Court in accordance with the Rules.

## ENTER

## FOR THE EXECUTIVE COMMITTEE

_____
**Chief Judge James F. Holderman**

Dated:Tuesday, June 26, 2012

# CIVIL PROCEDURES

**Conduct hearings and enter appropriate orders on the following pretrial motion/matter:**

- Discovery Supervision

- Settlement Conference

EXCEPTIONS OR ADDITIONS:

District Referral - By Lot to a Magistrate Judge

## UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 5.0.3
### Eastern Division

Michael Seiser

                           Plaintiff,

v.                                    Case No.: 1:12–cv–02353
                                    Honorable James F. Holderman

Debra Kirby, et al.

                           Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Wednesday, June 27, 2012:

      MINUTE entry before Honorable Morton Denlow:Status hearing set for 7/19/2012 at 10:00 A.M. in Courtroom 1350. Parties shall deliver a copy of an initial status report to chambers, Room 1356, five business days before the initial status hearing. If the parties have recently prepared and filed an initial status report, the submission of the previously filed initial status report is sufficient. The parties are directed to review and to comply with Judge Denlow's standing order setting initial status report. Copies are available in chambers or through Judge Denlow's web page at www.ilnd.uscourts.gov.. Mailed notice(ldg, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 5.0.3**
**Eastern Division**

Michael Seiser
                                        Plaintiff,

v.                                                          Case No.: 1:12−cv−02353
                                                            Honorable James F. Holderman

Debra Kirby, et al.
                                        Defendant.

---

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Tuesday, June 26, 2012:

      MINUTE entry before Honorable James F. Holderman:Scheduling conference held on 6/26/2012. Discovery ordered closed by 11/26/2012. Parties are to meet with Magistrate Judge Denlow at the end of discovery for a settlement conference. Dispositive motions with supporting memoranda due by 1/7/2013; responses due by 3/18/2013. Replies due by 4/1/2013. Final Pretrial Order due by 4/16/2013. Motions in limine with supporting memoranda due by 4/16/2013; responses due by 4/19/2013. Final Pretrial Conference set for 4/30/2013 at 4:00 PM. Jury Trial set for 5/6/2013 at 9:00 AM. Mailed notice (am)

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

Order Form (01/2005)

Case 1:12-cv-02353   Document 19   Filed 06/28/12   Page 1 of 2   PageID 67
Case: 13-1985   Document: 5-2   Filed: 05/23/2013   Pages: 319

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James F. Holderman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 12 C 2353 | **DATE** | 6/28/2012 |
| **CASE TITLE** | Michael Seiser vs. Debra Kirby et al. | | |

**DOCKET ENTRY TEXT**

For the reasons explained in the Statement section of the order, "Plaintiff's Motion to Strike Answer" [13] is denied.

■[ For further details see text below.]                                                    Docketing to mail notices.

---

## STATEMENT

      Plaintiff Michael Seiser moves (Dkt. No. 13) under Fed. R. Civ. P. 12(f) for the Court to strike paragraphs 5-13 and 15-18 of the defendants' answer to Seiser's complaint (Dkt. No. 9) because they violate Fed. R. Civ. P. 8(b)(1)(B)'s admonition that an answer must "admit or deny the allegations asserted against it by an opposing party." Seiser's objections to the answer essentially fall into two categories.

      First, he objects to answers that include additional facts that were not included in the original allegation. For example, in paragraph 5 of the answer, the defendants respond to an allegation that the Chicago police department received a civilian complaint about Seiser's conduct by responding that "Defendants deny that this was the only complaint regarding Plaintiff's actions." (Dkt. No. 9 ¶ 5.) Second, Seiser objects to several answers that include additional information explaining why the defendants are denying a particular allegation. For example, paragraph 10 of the complaint reads as follows: "10. After being informed that plaintiff had refused to consent to the warrantless search of his vehicle, defendant Kirby directed a Chicago police sergeant to order plaintiff to allow the search of his vehicle." Instead of simply denying the allegation, the defendants respond:

      10. Defendants deny that Plaintiff has accurately alleged the facts and sequence of the incident, deny that Plaintiff has accurately alleged the facts that led to there being probable cause to believe Plaintiff violated the law or ordinance, deny that Plaintiff has accurately alleged the facts of the investigation of Plaintiff's actions, deny that Plaintiff has accurately alleged the facts and interactions between Defendants, other police personnel and Plaintiff, deny that Plaintiff has accurately set out the proper sequence of events that led to there being probable cause to believe Plaintiff violated the law or ordinance, and therefore, deny the allegations contained in this paragraph.

      Rule 12 allows a court to strike a portion of a pleading if it is "redundant, immaterial, impertinent, or

scandalous." However, "motions to strike under Rule 12(f) are not favored and a federal court will not exercise its discretion under the rule to strike a pleading unless the matters sought to be omitted have no possible relationship to the controversy, may confuse the issues, or otherwise prejudice a party." Charles Alan Wright et al., *Federal Practice & Procedure* § 1261 (rev. 2012).

    In this case, the court finds that although the defendants' answer is not a model of clarity, the extraneous material in the answer does not in any way prejudice Seiser. To the contrary, the extra material, particularly in combination with the defendants' response to Seiser's motion to strike (Dkt. No. 14), provides greater detail about the points on which the parties disagree. The answer thus serves the purpose of the pleading process to identify the facts that are at issue. *See* Wright, *supra* § 1261 ("As long as the answer gives reasonable notice of those allegations sought to be put in issue, the pleading will be effective as a denial."). Moreover, Seiser has not indicated in his motion how he will be prejudiced by the defendants' answer. The court thus sees no reason to strike it. *Warner & Swasey Co. v. Held,* 256 F. Supp. 303, 313 (E.D. Wis. 1966) ("In its discretion, however, the Court will not strike [a subparagraph] of defendants' answer simply because defendants have chosen to amplify their pleading somewhat and give the Court and the plaintiff more information than perhaps would have been necessary. It is difficult to perceive how the plaintiff could be prejudiced by allowing the allegations . . . to remain.").

*James F. Holderman*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Michael Seiser, | ) | |
| | ) | 1:12-cv-02353 |
| *Plaintiff,* | ) | |
| *-vs-* | ) | Judge Holderman |
| | ) | |
| City of Chicago and Debra Kirby, | ) | Magistrate Judge Denlow |
| | ) | |
| *Defendants.* | ) | |

**INITIAL STATUS REPORT**

The parties submit the following as their joint initial status report:

**I.     Description of Claims and Relief Sought**

Plaintiff, a Chicago police officer, contends that he was subjected to a false arrest, falsely

imprisoned, and maliciously prosecuted at the direction of defendant Kirby, a Deputy

Superintendent of the Chicago Police Department. Defendant Kirby and her employer deny all

wrongdoing, and assert that Kirby acted with sufficient probable cause to detain Plaintiff and to

proceed with the charges against him, and further, that even if there was not probable cause, she

is entitled to qualified immunity.

Plaintiff claims that he was deprived of his liberty for several hours, required to defend

against criminal charges, and is facing a five day suspension. Plaintiff believes that, if he

prevails, a jury will award modest compensatory damages but significant punitive damages

against defendant Kirby.

**II.     Discovery Schedule**

The district court set a schedule in its order of June 28, 2012: Initial discovery closes on

November 26, 2012 and defendant's expected motion for summary judgment is due on January

7, 2013. The district court allowed plaintiff until March 18, 2013 to respond, on the expectation

that plaintiff will depose some or all of the persons whose affidavits (or unsworn declarations)

are part of defendant's summary judgment motion.  The parties do not anticipate that they will

conduct any expert discovery.

### III.    Consideration of Issues Concerning Electronically Stored Information ("ESI")

The parties do not anticipate discovery of ESI in this case.

### IV.    Settlement

The district court ordered that the parties meet with this Court at the end of discovery for

a settlement conference.

### V.    Magistrate Judge Consent

All parties are not willing to consent to trial before a magistrate judge.

### VI.    Pending Motions

None.

| | |
|---|---|
| /s/ Kenneth N. Flaxman | /s/ Lindsey M. Vanorny (with consent) |
| KENNETH N. FLAXMAN | Lindsey M. Vanorny |
| ARDC No. 830399 | Assistant Corporation Counsel |
| 200 S Michigan Ave Ste 1240 | City of Chicago Department of Law |
| Chicago, IL 60604-2430 | 30 North LaSalle Street, Suite 900 |
| (312) 427-3200 | Chicago, Illinois 60602 |
| *Attorney for Plaintiff* | (312) 742-0234 |
| | *An attorney for defendants* |

# CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of July, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:  Lindsey Vanorny, ACC, Scott Jebson, ACC, 30 N LaSalle St., Ste 900, Chicago, IL 60602, and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants:  none.


/s/  Kenneth N. Flaxman
_____
Kenneth N. Flaxman
ARDC Number 08830399
200 S Michigan Ave, Ste 1240
Chicago, IL 60604-2430
(312) 427-3200 (phone)
(312) 427-3930 (fax)
knf@kenlaw.com (email)

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 5.0.3**
**Eastern Division**

Michael Seiser

                  Plaintiff,

v.                             Case No.: 1:12–cv–02353
                             Honorable James F. Holderman

Debra Kirby, et al.

                  Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Thursday, July 19, 2012:

      MINUTE entry before Honorable Morton Denlow:Magistrate Judge Status hearing held on 7/19/2012 and continued to 12/13/2012 at 10:00 AM. Plaintiff to submit written itemization of damages and settlement demand by 8/31/2012. Defendant to submit written settlement offer by 10/31/2012. Copies of the demand and offer are to be sent to Judge Denlow's successor.Mailed notice(ldg, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Michael Seiser, | ) | |
| | ) | No.      12 C 2353 |
| Plaintiff, | ) | |
| | ) | JUDGE HOLDERMAN |
| v. | ) | |
| | ) | Magistrate Judge Denlow |
| City of Chicago and Debra Kirby, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

<u>**DEFENDANTS' AGREED MOTION FOR ENTRY OF PROTECTIVE ORDER**</u>

Defendant City of Chicago, by and through Stephen R. Patton, Corporation Counsel of the City of Chicago, and Defendant Debra Kirby (collectively "Defendants"), by her attorneys, Scott Jebson, Chief Assistant Corporation Counsel, and Lindsey Vanorny, Assistant Corporation Counsel, respectfully move this Honorable Court, pursuant to Federal Rule of Civil Procedure 26(c) and 45 C.F.R. §§ 160 and 164, for entry of the attached "Confidentiality Order."

In support thereof, Defendants state as follows:

1.      The parties anticipate that documents pertaining to the parties and non-parties will be sought and produced in this matter, including personnel file-related information such as disciplinary history.  In addition, on August 1, 2012, Defendants produced the Complaint Register file related to the incident that is the subject of this lawsuit based on the parties' agreement that the documents contained in this file would be considered "Confidential Information" under the attached "Confidentiality Order."  Complaint Register files contain personnel record information regarding police officers and other Chicago Police Department personnel (including third-parties), including but not limited to personal identifiers of officers and their families, disciplinary histories, medical information, reports and other actions, as well as

1

other information of unrelated civilian parties and witnesses that is sensitive or of a non-public

nature related to discipline, confidential statements, medical information, and personal

identifiers.

        2.       Personnel files, disciplinary histories and related information are protected by the

Illinois Personnel Records Review Act, 820 ILCS 40/0.01 (West 2010) and the Illinois Freedom

of Information Act, 5 ILCS 140/7 (West 2010), as amended.

        3.       Defendants' proposed "Confidentiality Order," attached hereto, prohibits use of

personnel files and other personnel and disciplinary information, and Complaint Register files

for any purpose other than litigation of this case, prohibits their dissemination to parties outside

this litigation, and requires their return to the producing party at the end of this litigation.  Such

an order would ensure the protection of such information, consistent with the principles of

federal and Illinois law.  This order will also protect against improper dissemination of

confidential information and unfairness in the trial process.

        4.       Defendants do not object to the disclosure of relevant production to

other respective parties in accordance with the Federal Rules of Civil Procedure, but only seeks

to limit the use of the production to this litigation and protect confidential information from

dissemination to third parties.

        5.       Defendants have received the agreement of Plaintiff's Counsel, Kenneth Flaxman,

for the entry of the attached "Confidentiality Order."

       **WHEREFORE,** Defendants request that this Court enter the attached "Confidentiality

Order" in this matter.

Respectfully submitted,

Stephen Patton
Corporation Counsel of the City of Chicago

By:    <u>/s/ Scott Jebson</u>
Chief Assistant Corporation Counsel
City of Chicago Law Department
30 North LaSalle Street, Suite 900
Chicago, Illinois 60602
(312) 744-6959
Attorney No. 6225243

<u>/s/ Lindsey Vanorny</u>
Assistant Corporation Counsel
City of Chicago Department of Law
30 North LaSalle Street, Suite 900
Chicago, Illinois 60602
(312) 742-0234
Attorney No. 6303642

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Michael Seiser, | ) | |
| | ) | No.     12 C 2353 |
| Plaintiff, | ) | |
| | ) | JUDGE HOLDERMAN |
| v. | ) | |
| | ) | Magistrate Judge Denlow |
| City of Chicago and Debra Kirby, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

### PARTIES' AGREED CONFIDENTIALITY ORDER

The parties to this Agreed Confidentiality Order, Plaintiff Michael Seiser, by his attorney,
Kenneth Flaxman, and Defendant City of Chicago, by and through Stephen R. Patton,
Corporation Counsel of the City of Chicago, and Defendant Debra Kirby, by her attorneys, Scott
Jebson, Chief Assistant Corporation Counsel, and Lindsey Vanorny, Assistant Corporation
Counsel, have agreed to the terms of this Order; accordingly, it is ORDERED:

**1**. **Scope**. All materials produced or adduced in the course of discovery, including, initial
disclosures, responses to discovery requests, deposition testimony and exhibits, and information
derived directly therefrom (hereinafter collectively "documents"), shall be subject to this Order
concerning Confidential Information as defined below. This Order is subject to the Local Rules
of this District and the Federal Rules of Civil Procedure on matters of procedure and calculation
of time periods.

**2**. **Confidential Information**. As used in this Order, "Confidential Information" means
information designated as "CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER" by the
producing party that falls within one or more of the following categories: (a) information
protected from disclosure by statute, including the Illinois Freedom of Information Act (FOIA),

1

5 ILCS 140/1, *et seq*; (b) information that reveals trade secrets; (c) research, technical,

commercial or financial information that the party has maintained as confidential; (d) medical

information concerning any individual; (e) personal identity information; (f) income tax returns

(including attached schedules and forms), W-2 forms and 1099 forms; (g) personnel or

employment records of a person who is not a party to this case; or (h) employment, disciplinary,

financial, medical or other information that is of a sensitive or non-public nature regarding

plaintiff, defendants, non-party witnesses, and non-party employees of the City of Chicago.

Such information includes, but is not limited to, private information in personnel files, such as

employment applications, performance evaluations, tax forms, requests for medical leave and the

like; records relating to a public body's adjudication of employee grievances or disciplinary

cases (generally referred to as "Complaint Register" files), and related information protected

from disclosure by the Illinois Personnel Records Review Act, 820 ILCS 40/0.01 *et seq.*  (West

2004), consistent with the Illinois Freedom of Information Act, 5 ILCS 140/1 *et seq.* (West

2010), as amended, as well as personal and family information of police officers, including

residential information.

          The "final outcome of cases in which discipline is imposed," i.e. final outcome of

disciplinary actions generated by the investigation of complaints of misconduct by Chicago

police officers (generally referred to as "Complaint Register" files) where discipline has been

imposed is not considered "Confidential Information", but shall be released only in the manner

consistent with the Illinois Freedom of Information Act, 5 ILCS 140/7, *et seq.*, as described

below, after thirty (30) days' notice to the producing party to ensure that proper redactions are

made prior to release.  If agreement cannot be found as to those proper redactions, the Court,

upon motion and an *in camera* review, shall make the final determination.  In such cases, the

2

"final outcome" information derived from such City of Chicago Police Department Complaint Register File(s) shall be released consistent with the Illinois Freedom of Information Act, 5 ILCS 140/1 *et seq.* (West 2010), as amended, including the following redactions: (i) All complainant, witness and third-party identifying information; and (ii) All private and personal information regarding defendant officers, CPD employees and their families, plaintiffs, witnesses or other non-parties, including, but not limited to, social security numbers, home addresses, telephone numbers, medical and financial information, driver's license and employee numbers.

Information or documents that are available to the public may not be designated as Confidential Information.

Complaint Register File No. 1044352, which is associated with the investigation of Plaintiff Michael Seiser's conduct at issue in this case, shall be considered "Confidential Information" under this Order.

**3**. **Designation**.

(a)  A party may designate a document as Confidential Information for protection under this Order by placing or affixing the words "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" on the document and on all copies in a manner that will not interfere with the legibility of the document. As used in this Order, "copies" includes electronic images, duplicates, extracts, summaries or descriptions that contain the Confidential Information. The marking "CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER" shall be applied prior to or at the time of the documents are produced or disclosed. Applying the marking "CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER" to a document does not mean that the document has any status or protection by statute or otherwise except to the extent and for the purposes of this Order. Any copies that are made of any documents marked "CONFIDENTIAL - SUBJECT TO

3

PROTECTIVE ORDER" shall ~~be~~ also be so marked, except that indices, electronic databases or lists of documents that do not contain substantial portions or images of the text of marked documents and do not otherwise disclose the substance of the Confidential Information are not required to be marked.

(b) The designation of a document as Confidential Information is a certification by an attorney or a party appearing *pro se* that the document contains Confidential Information as defined in this order. 3

**4. Depositions**.

~~Alternative A.~~ Deposition testimony is protected by this Order only if designated as "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" on the record at the time the testimony is taken. Such designation shall be specific as to the portions that contain Confidential Information. Deposition testimony so designated shall be treated as Confidential Information protected by this Order until fourteen days after delivery of the transcript by the court reporter to any party or the witness. Within fourteen days after delivery of the transcript, a designating party may serve a Notice of Designation to all parties of record identifying the specific portions of the transcript that are designated Confidential Information, and thereafter those portions identified in the Notice of Designation shall be protected under the terms of this Order. The failure to serve a timely Notice of Designation waives any designation of deposition testimony as Confidential Information that was made on the record of the deposition, unless otherwise ordered by the Court.

~~Alternative B. Unless all parties agree on the record at time the deposition testimony is taken, all deposition testimony taken in this case shall be treated as Confidential Information for a period of fourteen days after the conclusion of the deposition. No later than the fourteenth day~~

4

after the conclusion of the deposition, a party may serve a Notice of Designation to all parties of record as to specific portions of the testimony that are designated Confidential Information, and thereafter those portions identified in the Notice of Designation shall be protected the terms of this Order. The failure to serve a timely Notice of Designation shall waive any designation of testimony taken in that deposition as Confidential Information.

**5. Protection of Confidential Material**.

  **(a) General Protections**. Confidential Information shall not be used or disclosed by the parties, counsel for the parties or any other persons identified in subparagraph (b) for any purpose whatsoever other than in this litigation, including any appeal thereof.

  **[INCLUDE IN PUTATIVE  CLASS ACTION CASE**: In a putative class action, Confidential Information may be disclosed only to the named plaintiff(s) and not to any other member of the putative class unless and until a class including the putative member has been certified.**]**

  **(b) Limited Third-Party Disclosures**. The parties and counsel for the parties shall not disclose or permit the disclosure of any Confidential Information to any third person or entity except as set-forth in subparagraphs (1)-(9). Subject to these requirements, the following categories of persons may be allowed to review Confidential Information:

    **(1) Counsel**. Counsel for the parties and employees of counsel who have responsibility for the preparation and trial of the action;

    **(2) Parties**. Individual parties and employees of a party but only to the extent counsel determines in good faith that the employee's assistance is reasonably necessary to the conduct of the litigation in which the information is disclosed;

    **(3) The Court and its personnel;**

**(4) Court Reporters and Recorders**. Court reporters and recorders engaged for depositions;

**(5) Contractors**. Those persons specifically engaged for the limited purpose of making copies of documents or organizing or processing documents, including outside vendors hired to process electronically stored documents;

**(6) Consultants and Experts**. Consultants, investigators, or experts employed by the parties or counsel for the parties to assist in the preparation and trial of this action but only after such persons have completed the certification contained in Attachment A, Acknowledgment of Understanding and Agreement to Be Bound; and

**(7) Witnesses at depositions**. During their depositions, witnesses in this action to whom disclosure is reasonably necessary. Witnesses shall not retain a copy of documents containing Confidential Information, except witnesses may receive a copy of all exhibits marked at their depositions in connection with review of the transcripts. Pages of transcribed deposition testimony or exhibits to depositions that are designated as Confidential Information pursuant to the process set out in this Order must be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Order.

**(8) Author or recipient.** The author or recipient of the document (not including the person who received the document in the course of the litigation); and

**(9) Others by Consent**. Other persons only by written consent of the producing party or upon order of the Court and on such conditions as may be agreed or ordered.

6

**(c) Control of Documents**. Counsel for the parties shall make reasonable efforts to prevent unauthorized or inadvertent disclosure of Confidential Information. Counsel shall maintain the originals of the forms signed by persons acknowledging their obligations under this Order for a period of three years after the termination of the case.

**6. Inadvertent Failure to Designate**. An inadvertent failure to designate a document as Confidential Information does not, standing alone, waive the right to so designate the document; provided, however, that a failure to serve a timely Notice of Designation of deposition testimony as required by this Order, even if inadvertent, waives any protection for deposition testimony. If a party designates a document as Confidential Information after it was initially produced, the receiving party, on notification of the designation, must make a reasonable effort to assure that the document is treated in accordance with the provisions of this Order. No party shall be found to have violated this Order for failing to maintain the confidentiality of material during a time when that material has not been designated Confidential Information, even where the failure to so designate was inadvertent and where the material is subsequently designated Confidential Information.

**7. Filing of Confidential Information**. This Order does not, by itself, authorize the filing of any document under seal. Any party wishing to file a document designated as Confidential Information in connection with a motion, brief or other submission to the Court must comply with Local Rule 26.2.

**8. No Greater Protection of Specific Documents**. Except on privilege grounds not addressed by this Order, no party may withhold information from discovery on the ground that it requires protection greater than that afforded by this Order unless the party moves for an order providing such special protection.

7

**9. Challenges by a Party to Designation as Confidential Information**. The designation of any material or document as Confidential Information is subject to challenge by any party. The following procedure shall apply to any such challenge.

**(a)** Meet and Confer. A party challenging the designation of Confidential Information must do so in good faith and must begin the process by conferring directly with counsel for the designating party. In conferring, the challenging party must explain the basis for its belief that the confidentiality designation was not proper and must give the designating party an opportunity to review the designated material, to reconsider the designation, and, if no change in designation is offered, to explain the basis for the designation. The designating party must respond to the challenge within five (5) business days.

**(b)** Judicial Intervention. A party that elects to challenge a confidentiality designation may file and serve a motion that identifies the challenged material and sets forth in detail the basis for the challenge. Each such motion must be accompanied by a competent declaration that affirms that the movant has complied with the meet and confer requirements of this procedure. The burden of persuasion in any such challenge proceeding shall be on the designating party. Until the Court rules on the challenge, all parties shall continue to treat the materials as Confidential Information under the terms of this Order.

**10. Action by the Court**. Applications to the Court for an order relating to materials or documents designated Confidential Information shall be by motion. Nothing in this Order or any action or agreement of a party under this Order limits the Court's power to make orders concerning the disclosure of documents produced in discovery or at trial.

**11. Use of Confidential Documents or Information at Trial**. Nothing in this Order shall be construed to affect the admissibility of any document, material, or information at any trial or hearing. A party that intends to present or which anticipates that another party may present Confidential information at a hearing or trial shall bring that issue to the Court's and parties' attention by motion or in a pretrial memorandum without disclosing the Confidential Information. The Court may thereafter make such orders as are necessary to govern the use of such documents or information at trial.

**12.  Confidential Information Subpoenaed or Ordered Produced in Other Litigation**.

(a)  If a receiving party is served with a subpoena or an order issued in other litigation that would compel disclosure of any material or document designated in this action as Confidential Information, the receiving party must so notify the designating party, in writing, immediately and in no event more than three court days after receiving the subpoena or order. Such notification must include a copy of the subpoena or court order.

(b) The receiving party also must immediately inform in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is the subject of this Order. In addition, the receiving party must deliver a copy of this Order promptly to the party in the other action that caused the subpoena to issue.

(c) The purpose of imposing these duties is to alert the interested persons to the existence of this Order and to afford the designating party in this case an opportunity to try to protect its Confidential Information in the court from which the subpoena or order issued. The designating party shall bear the burden and the expense of seeking protection in that court of its Confidential Information, and nothing in these provisions should be construed as authorizing a receiving party

9

in this action to disobey a lawful directive from another court. The obligations set forth in this paragraph remain in effect while the party has in its possession, custody or control Confidential Information by the other party to this case.

**13. Challenges by Members of the Public to Sealing Orders**. A party or interested member of the public has a right to challenge the sealing of particular documents that have been filed under seal, and the party asserting confidentiality will have the burden of demonstrating the propriety of filing under seal.

**14. Obligations on Conclusion of Litigation**.

**(a)** Unless otherwise agreed or ordered, this Order shall remain in force after dismissal or entry of final judgment not subject to further appeal.

**(b)** Within thirty days after dismissal or entry of final judgment not subject to further appeal, all Confidential Information and documents marked "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" under this Order, including copies as defined in ¶3(a), shall be returned to the producing party unless: (1) the document has been offered into evidence or filed without restriction as to disclosure; (2) the parties agree to destruction in lieu of return; or (3) as to documents bearing the notations, summations, or other mental impressions of the receiving party, that party elects to destroy the documents and certifies to the producing party that it has done so. Notwithstanding the above requirements to return or destroy documents, counsel may retain attorney work product, including an index which refers or relates to designated Confidential Information so long as that work product does not duplicate verbatim Substantial portions of Confidential Information, and one complete set of all documents filed with the Court including those filed under seal. Any retained Confidential Information shall continue to be protected

10

under this Order. An attorney may use his or her work product in subsequent litigation

provided that its use does not disclose or use Confidential Information.

**(c) Deletion of Documents Filed under Seal from ECF System**. Filings under seal shall

be deleted from the ECF system only upon order of the Court.

**15. Order Subject to Modification**. This Order shall be subject to modification by the

Court on its own initiative or on motion of a party or any other person with standing concerning

the subject matter.

**16. No Prior Judicial Determination**. This Order is entered based on the representations

and agreements of the parties and for the purpose of facilitating discovery. Nothing herein shall

be construed or presented as a judicial determination that any document or material designated

Confidential Information by counsel or the parties is entitled to protection under Rule 26(c) of the

Federal Rules of Civil Procedure or otherwise until such time as the Court may rule on a specific

document or issue.

**17. Persons Bound**. This Order shall take effect when entered and shall be binding upon

all counsel of record and their law firms, the parties, and persons made subject to this Order by

its terms.


*So Ordered.*

Dated: _____        _____
                               MORTON DENLOW
                               United States Magistrate Judge


**[Delete signature blocks if not wholly by agreement]**


11

**WE SO MOVE**
**and agree to abide by the**
**terms of this Order**

/s/ Kenneth Flaxman
Kenneth Flaxman
200 S. Michigan Ave. Ste. 1240
Chicago, Illinois 60604-2430
(312) 427-3200
Attorney No. 830399


Counsel for: Plaintiffs

Dated:  August 29, 2012


**WE SO MOVE**
**and agree to abide by the**
**terms of this Order**

/s/ Lindsey Vanorny
Lindsey Vanorny
Assistant Corporation Counsel
30 North LaSalle, Suite 900
Chicago, Illinois 60602
 (312) 742-0234
Attorney No. 6303642


Counsel for: Defendants

Dated:  August 29, 2012

12

**ATTACHMENT A**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Michael Seiser, | ) | |
| | ) | No.     12 C 2353 |
| Plaintiff, | ) | |
| | ) | JUDGE HOLDERMAN |
| v. | ) | |
| | ) | Magistrate Judge Ashman |
| City of Chicago and Debra Kirby, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND**

The undersigned hereby acknowledge that he/she has read the Confidentiality Order dated _____in the above-captioned action and attached hereto, understands the terms thereof, and agrees to be bound by its terms.  The undersigned submits to the jurisdiction of the United States District Court for the Northern District of Illinois in matters relating to the Confidentiality Order and understands that the terms of the Confidentiality Order obligate him/her to use materials designated as Confidential Information in accordance with the Order solely for the purposes of the above-captioned action, and not to disclose any such Confidential Information to any other person, firm or concern.

The undersigned acknowledges that violation of the Confidentiality Order may result in penalties for contempt of court.

Name:      _____

Job Title:  _____

Employer:  _____

13

Business
Address:    _____

_____

_____

Date:  _____    Signature: _____


Order Form (01/2005)



# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James F. Holderman | Sitting Judge if Other than Assigned Judge | Morton Denlow |
|---|---|---|---|
| **CASE NUMBER** | 12 C 2353 | **DATE** | 8/31/2012 |
| **CASE TITLE** | Michael Seiser vs. City of Chicago, et al | | |

**DOCKET ENTRY TEXT**

Defendants' agreed motion for entry of protective order [22] is granted. No appearance is required on the 9/10/2012 notice date. Enter Parties' Agreed Confidentiality Order.

■ [ For further detail see separate order(s).]

Docketing to mail notices.

| | | Courtroom Deputy Initials: | LG |
|---|---|---|---|

12AUG31 AM10:59

12C2353 Michael Seiser vs. City of Chicago, et al

Page 1 of 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| Michael Seiser, | ) | |
| | ) | No.    12 C 2353 |
| Plaintiff, | ) | |
| | ) | JUDGE HOLDERMAN |
| v. | ) | |
| | ) | Magistrate Judge Denlow |
| City of Chicago and Debra Kirby, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

### PARTIES' AGREED CONFIDENTIALITY ORDER

The parties to this Agreed Confidentiality Order, Plaintiff Michael Seiser, by his attorney,

Kenneth Flaxman, and Defendant City of Chicago, by and through Stephen R. Patton,

Corporation Counsel of the City of Chicago, and Defendant Debra Kirby, by her attorneys, Scott

Jebson, Chief Assistant Corporation Counsel, and Lindsey Vanorny, Assistant Corporation

Counsel, have agreed to the terms of this Order; accordingly, it is ORDERED:

1. **Scope**. All materials produced or adduced in the course of discovery, including, initial

disclosures, responses to discovery requests, deposition testimony and exhibits, and information

derived directly therefrom (hereinafter collectively "documents"), shall be subject to this Order

concerning Confidential Information as defined below. This Order is subject to the Local Rules

of this District and the Federal Rules of Civil Procedure on matters of procedure and calculation

of time periods.

2. **Confidential Information**. As used in this Order, "Confidential Information" means

information designated as "CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER" by the

producing party that falls within one or more of the following categories: (a) information

protected from disclosure by statute, including the Illinois Freedom of Information Act (FOIA), 5

ILCS 140/1, *et seq*; (b) information that reveals trade secrets; (c) research, technical, commercial

or financial information that the party has maintained as confidential; (d) medical information

concerning any individual; (e) personal identity information; (f) income tax returns (including

attached schedules and forms), W-2 forms and 1099 forms; (g) personnel or employment records

of a person who is not a party to this case; or (h) employment, disciplinary, financial, medical or

other information that is of a sensitive or non-public nature regarding plaintiff, defendants, non-

party witnesses, and non-party employees of the City of Chicago. Such information includes, but

is not limited to, private information in personnel files, such as employment applications,

performance evaluations, tax forms, requests for medical leave and the like; records relating to a

public body's adjudication of employee grievances or disciplinary cases (generally referred to as

"Complaint Register" files), and related information protected from disclosure by the Illinois

Personnel Records Review Act, 820 ILCS 40/0.01 *et seq.* (West 2004), consistent with the

Illinois Freedom of Information Act, 5 ILCS 140/1 *et seq.* (West 2010), as amended, as well as

personal and family information of police officers, including residential information.

The "final outcome of cases in which discipline is imposed," i.e. final outcome of

disciplinary actions generated by the investigation of complaints of misconduct by Chicago

police officers (generally referred to as "Complaint Register" files) where discipline has been

imposed is not considered "Confidential Information", but shall be released only in the manner

consistent with the Illinois Freedom of Information Act, 5 ILCS 140/7, *et seq.*, as described

below, after thirty (30) days' notice to the producing party to ensure that proper redactions are

made prior to release. If agreement cannot be found as to those proper redactions, the Court,

upon motion and an *in camera* review, shall make the final determination. In such cases, the

"final outcome" information derived from such City of Chicago Police Department Complaint

Register File(s) shall be released consistent with the Illinois Freedom of Information Act, 5 ILCS

140/1 *et seq.* (West 2010), as amended, including the following redactions: (i) All complainant,

witness and third-party identifying information; and (ii) All private and personal information

regarding defendant officers, CPD employees and their families, plaintiffs, witnesses or other

non-parties, including, but not limited to, social security numbers, home addresses, telephone

numbers, medical and financial information, driver's license and employee numbers.

Information or documents that are available to the public may not be designated as Confidential Information.

Complaint Register File No. 1044352, which is associated with the investigation of Plaintiff Michael Seiser's conduct at issue in this case, shall be considered "Confidential Information" under this Order.

### 3. Designation.

(a) A party may designate a document as Confidential Information for protection under this Order by placing or affixing the words "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" on the document and on all copies in a manner that will not interfere with the legibility of the document. As used in this Order, "copies" includes electronic images, duplicates, extracts, summaries or descriptions that contain the Confidential Information. The marking "CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER" shall be applied prior to or at the time of the documents are produced or disclosed. Applying the marking "CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER" to a document does not mean that the document has any status or protection by statute or otherwise except to the extent and for the purposes of this Order. Any copies that are made of any documents marked "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" shall also be so marked, except that indices, electronic databases or lists of documents that do not contain substantial portions or images of the text of marked documents and do not otherwise disclose the substance of the Confidential Information are not required to be marked.

(b) The designation of a document as Confidential Information is a certification by an attorney or a party appearing *pro se* that the document contains Confidential Information as defined in this order. 3

### 4. Depositions.

Deposition testimony is protected by this Order only if designated as "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" on the record at the time the testimony is taken. Such designation shall be specific as to the portions that contain Confidential Information. Deposition

testimony so designated shall be treated as Confidential Information protected by this Order until

fourteen days after delivery of the transcript by the court reporter to any party or the witness.

Within fourteen days after delivery of the transcript, a designating party may serve a Notice of

Designation to all parties of record identifying the specific portions of the transcript that are

designated Confidential Information, and thereafter those portions identified in the Notice of

Designation shall be protected under the terms of this Order. The failure to serve a timely Notice

of Designation waives any designation of deposition testimony as Confidential Information that

was made on the record of the deposition, unless otherwise ordered by the Court.

**5. Protection of Confidential Material**.

(a) **General Protections**. Confidential Information shall not be used or disclosed by the

parties, counsel for the parties or any other persons identified in subparagraph (b) for any

purpose whatsoever other than in this litigation, including any appeal thereof.

(b) **Limited Third-Party Disclosures**. The parties and counsel for the parties shall not

disclose or permit the disclosure of any Confidential Information to any third person or

entity except as set-forth in subparagraphs (1)-(9). Subject to these requirements, the

following categories of persons may be allowed to review Confidential Information:

(1) **Counsel**. Counsel for the parties and employees of counsel who have

responsibility for the preparation and trial of the action;

(2) **Parties**. Individual parties and employees of a party but only to the extent

counsel determines in good faith that the employee's assistance is reasonably

necessary to the conduct of the litigation in which the information is disclosed;

(3) **The Court and its personnel**;

(4) **Court Reporters and Recorders**. Court reporters and recorders engaged for

depositions;

(5) **Contractors**. Those persons specifically engaged for the limited purpose of

making copies of documents or organizing or processing documents, including

outside vendors hired to process electronically stored documents;

**(6) Consultants and Experts**. Consultants, investigators, or experts employed by the parties or counsel for the parties to assist in the preparation and trial of this action but only after such persons have completed the certification contained in Attachment A, Acknowledgment of Understanding and Agreement to Be Bound; and

**(7) Witnesses at depositions**. During their depositions, witnesses in this action to whom disclosure is reasonably necessary. Witnesses shall not retain a copy of documents containing Confidential Information, except witnesses may receive a copy of all exhibits marked at their depositions in connection with review of the transcripts. Pages of transcribed deposition testimony or exhibits to depositions that are designated as Confidential Information pursuant to the process set out in this Order must be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Order.

**(8) Author or recipient.**  The author or recipient of the document (not including the person who received the document in the course of the litigation); and

**(9) Others by Consent**. Other persons only by written consent of the producing party or upon order of the Court and on such conditions as may be agreed or ordered.

**(c) Control of Documents**. Counsel for the parties shall make reasonable efforts to prevent unauthorized or inadvertent disclosure of Confidential Information. Counsel shall maintain the originals of the forms signed by persons acknowledging their obligations under this Order for a period of three years after the termination of the case.

**6. Inadvertent Failure to Designate**. An inadvertent failure to designate a document as Confidential Information does not, standing alone, waive the right to so designate the document; provided, however, that a failure to serve a timely Notice of Designation of deposition testimony as required by this Order, even if inadvertent, waives any protection for deposition testimony. If a party designates a document as Confidential Information after it was initially produced, the

receiving party, on notification of the designation, must make a reasonable effort to assure that the document is treated in accordance with the provisions of this Order. No party shall be found to have violated this Order for failing to maintain the confidentiality of material during a time when that material has not been designated Confidential Information, even where the failure to so designate was inadvertent and where the material is subsequently designated Confidential Information.

**7. Filing of Confidential Information**. This Order does not, by itself, authorize the filing of any document under seal. Any party wishing to file a document designated as Confidential Information in connection with a motion, brief or other submission to the Court must comply with Local Rule 26.2.

**8. No Greater Protection of Specific Documents**. Except on privilege grounds not addressed by this Order, no party may withhold information from discovery on the ground that it requires protection greater than that afforded by this Order unless the party moves for an order providing such special protection.

**9. Challenges by a Party to Designation as Confidential Information**. The designation of any material or document as Confidential Information is subject to challenge by any party. The following procedure shall apply to any such challenge.

(a) Meet and Confer. A party challenging the designation of Confidential Information must do so in good faith and must begin the process by conferring directly with counsel for the designating party. In conferring, the challenging party must explain the basis for its belief that the confidentiality designation was not proper and must give the designating party an opportunity to review the designated material, to reconsider the designation, and, if no change in designation is offered, to explain the basis for the designation. The designating party must respond to the challenge within five (5) business days.

(b) Judicial Intervention. A party that elects to challenge a confidentiality designation may file and serve a motion that identifies the challenged material and sets forth in detail the basis for the challenge. Each such motion must be accompanied by a competent

declaration that affirms that the movant has complied with the meet and confer requirements of this procedure. The burden of persuasion in any such challenge proceeding shall be on the designating party. Until the Court rules on the challenge, all parties shall continue to treat the materials as Confidential Information under the terms of this Order.

**10. Action by the Court**. Applications to the Court for an order relating to materials or documents designated Confidential Information shall be by motion. Nothing in this Order or any action or agreement of a party under this Order limits the Court's power to make orders concerning the disclosure of documents produced in discovery or at trial.

**11. Use of Confidential Documents or Information at Trial**. Nothing in this Order shall be construed to affect the admissibility of any document, material, or information at any trial or hearing. A party that intends to present or which anticipates that another party may present Confidential information at a hearing or trial shall bring that issue to the Court's and parties' attention by motion or in a pretrial memorandum without disclosing the Confidential Information. The Court may thereafter make such orders as are necessary to govern the use of such documents or information at trial.

**12. Confidential Information Subpoenaed or Ordered Produced in Other Litigation**.

**(a)** If a receiving party is served with a subpoena or an order issued in other litigation that would compel disclosure of any material or document designated in this action as Confidential Information, the receiving party must so notify the designating party, in writing, immediately and in no event more than three court days after receiving the subpoena or order. Such notification must include a copy of the subpoena or court order.

**(b)** The receiving party also must immediately inform in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is the subject of this Order. In addition, the receiving party must deliver a copy of this Order promptly to the party in the other action that caused the subpoena to issue.

(c) The purpose of imposing these duties is to alert the interested persons to the existence of this Order and to afford the designating party in this case an opportunity to try to protect its Confidential Information in the court from which the subpoena or order issued. The designating party shall bear the burden and the expense of seeking protection in that court of its Confidential Information, and nothing in these provisions should be construed as authorizing a receiving party in this action to disobey a lawful directive from another court. The obligations set forth in this paragraph remain in effect while the party has in its possession, custody or control Confidential Information by the other party to this case.

**13. Challenges by Members of the Public to Sealing Orders**. A party or interested member of the public has a right to challenge the sealing of particular documents that have been filed under seal, and the party asserting confidentiality will have the burden of demonstrating the propriety of filing under seal.

**14. Obligations on Conclusion of Litigation**.

(a) Unless otherwise agreed or ordered, this Order shall remain in force after dismissal or entry of final judgment not subject to further appeal.

(b) Within thirty days after dismissal or entry of final judgment not subject to further appeal, all Confidential Information and documents marked "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" under this Order, including copies as defined in ¶3(a), shall be returned to the producing party unless: (1) the document has been offered into evidence or filed without restriction as to disclosure; (2) the parties agree to destruction in lieu of return; or (3) as to documents bearing the notations, summations, or other mental impressions of the receiving party, that party elects to destroy the documents and certifies to the producing party that it has done so. Notwithstanding the above requirements to return or destroy documents, counsel may retain attorney work product, including an index which refers or relates to designated Confidential Information so long as that work product does not duplicate verbatim Substantial portions of Confidential Information, and one complete set of all documents filed with the Court including those

filed under seal. Any retained Confidential Information shall continue to be protected under this Order. An attorney may use his or her work product in subsequent litigation provided that its use does not disclose or use Confidential Information.

**(c) Deletion of Documents Filed under Seal from ECF System**. Filings under seal shall be deleted from the ECF system only upon order of the Court.

**15. Order Subject to Modification**. This Order shall be subject to modification by the Court on its own initiative or on motion of a party or any other person with standing concerning the subject matter.

**16. No Prior Judicial Determination**. This Order is entered based on the representations and agreements of the parties and for the purpose of facilitating discovery. Nothing herein shall be construed or presented as a judicial determination that any document or material designated Confidential Information by counsel or the parties is entitled to protection under Rule 26(c) of the Federal Rules of Civil Procedure or otherwise until such time as the Court may rule on a specific document or issue.

**17. Persons Bound**. This Order shall take effect when entered and shall be binding upon all counsel of record and their law firms, the parties, and persons made subject to this Order by its terms.

*So Ordered.*

Dated:   August 31, 2012

MORTON DENLOW
United States Magistrate Judge

**WE SO MOVE**
**and agree to abide by the**
**terms of this Order**

/s/ Kenneth Flaxman
Kenneth Flaxman
200 S. Michigan Ave. Ste. 1240
Chicago, Illinois 60604-2430
(312) 427-3200
Attorney No. 830399


Counsel for: Plaintiffs

Dated: August 29, 2012

**WE SO MOVE**
**and agree to abide by the**
**terms of this Order**

/s/ Lindsey Vanorny
Lindsey Vanorny
Assistant Corporation Counsel
30 North LaSalle, Suite 900
Chicago, Illinois 60602
(312) 742-0234
Attorney No. 6303642


Counsel for: Defendants

Dated: August 29, 2012

ATTACHMENT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

Michael Seiser,                    )
                                   )     No.    12 C 2353
                    Plaintiff,     )
                                   )     JUDGE HOLDERMAN
        v.                         )
                                   )     Magistrate Judge Ashman
City of Chicago and Debra Kirby,   )
                                   )
                                   )
                    Defendants.    )

**ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND**

The undersigned hereby acknowledge that he/she has read the Confidentiality Order dated

_____ in the above-captioned action and attached hereto, understands the terms thereof,

and agrees to be bound by its terms. The undersigned submits to the jurisdiction of the United States

District Court for the Northern District of Illinois in matters relating to the Confidentiality Order and

understands that the terms of the Confidentiality Order obligate him/her to use materials designated

as Confidential Information in accordance with the Order solely for the purposes of the above-

captioned action, and not to disclose any such Confidential Information to any other person, firm or

concern.

The undersigned acknowledges that violation of the Confidentiality Order may result in

penalties for contempt of court.

Name:           _____

Job Title:      _____

Employer:       _____

Business
Address:        _____

                _____

                _____

Date: _____     Signature: _____

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

# ORDER OF THE EXECUTIVE COMMITTEE

It appearing that Daniel G. Martin has entered on duty as a Magistrate Judge for the Northern District of Illinois, with a duty station in Chicago, Illinois, effective October 1, 2012; therefore

Pursuant to Internal Operating Procedure 17, the attached list of civil cases previously pending before Magistrate Judge Morton Denlow are hereby reassigned to Magistrate Judge Martin.

It is further ordered that the attached list of civil referrals previously before Magistrate Judge Denlow are hereby transferred to Magistrate Judge Martin.

It is further ordered that Magistrate Judge Martin is to become the designated magistrate judge pursuant to Local Rule 72.1 in any pending civil or criminal case where Magistrate Judge Denlow was the designated magistrate judge as of September 30, 2012.

It is further ordered that, unless otherwise ordered by Magistrate Judge Martin, all hearing dates, deadlines, and schedules set by Magistrate Judge Denlow in the attached list of cases are to remain in effect.

IT IS FURTHER ORDERED that this order is to become effective on October 1, 2012.


**ENTER:**

**FOR THE COURT**

Chief Judge


Dated at Chicago, Illinois this ___1st___ day of October, 2012.

## Civil Consent Cases to be Reassigned to Magistrate Judge Daniel G. Martin Martin

| Case Number | Case Title |
| --- | --- |
| 09 C 02803 | Carrillo v. City of Chicago |
| 10 C 03574 | Posey v. Pruger, et al. |
| 10 C 03859 | Perkins v. Strogers, et al. |
| 10 C 03958 | Jones v. City of Chicago, et al. |
| 10 C 07392 | Case v. Town of  Cicero, et al. |
| 11 C 04237 | Graziani v. Target Corporation |
| 11 C 05282 | Moreno v. Berwyn Fruit Market, Inc., et al, |
| 11 C 05412 | Moore v. Astrue |
| 11 C 06127 | Carmer v. Sunmist Restaurant, Inc. et al, |
| 11 C 07025 | Enright v. G.R. Signagra Corporation, et al. |
| 11 C 07080 | Richardson v. Astrue |
| 11 C 07093 | Gallardo, et al. v. Southwest Airlines Co. |
| 11 C 07146 | Gillim v. Astrue |
| 11 C 07471 | Avery v. Astrue |
| 11 C 09044 | Redman v. Take Care Health Systems, LLC, et al. |
| 11 C 09086 | Klein v. CDW Corporation |
| 11 C 09198 | Furch v. Astrue |
| 12 C 00215 | Martin v. Dun &  Bradstreet, Inc., et al. |
| 12 C 00423 | Marquis v. Avalonbay Communities, Inc., et al. |
| 12 C 01397 | Brinkman v. Astrue |
| 12 C 01750 | Brown v. Astrue |

| 12 C 02907 | Mazzucca v. Astrue |
| 12 C 03298 | Warren v. Commissioner of Social Security |
| 12 C 04024 | BC-USA, Inc., et al. vs. Churny Company, Inc. |
| 12 C 04147 | Passarella v. NFI Interactive Logistics, LLC |
| 12 C 04323 | McFee v. Menard, Inc. |
| 12 C 05272 | Myers v. Astrue |
| 12 C 05488 | Harvard v. Astrue |

## Referrals to be Transferred to Magistrate Judge Daniel G. Martin

| Case Number | Case Title | District Judge |
| --- | --- | --- |
| 05 C 07097 | In re: Ameriquest Mortgage Company | Aspen |
| 08 C 04206 | Baig v. The Coca-Cola Company | Lee |
| 08 C 05127 | DH Holdings, LLC v. Meridian Link, Inc. | Coleman |
| 08 C 07464 | Carter v. Dolan | Zagel |
| 09 C 01521 | Edge Capture LLC v. Barclays Bank | Norgle |
| 09 C 06379 | Allstate Ins. v. Electrolux Home Prod. | Dow |
| 09 C 06914 | Snap-on Inc. v. Robert Bosch, LLC | Kocoras |
| 10 C 02101 | Davidson v. Schneider | Lefkow |
| 10 C 02121 | Centerpoint Energy v. WR Property | Kendall |
| 10 C 03176 | United Central Bank v. Dany Investment | Nordberg |
| 10 C 03327 | Humphrey v. United States of America | Nordberg |
| 10 C 03502 | Guirola de David v. Alaron Trading Corp. | Gettleman |

| | | |
|---|---|---|
| 10 C 03699 | Jamal Taylor v. Warden Ramos | Coleman |
| 10 C 03700 | Taylor v. Stateville Dept of Correction | Coleman |
| 10 C 04529 | Divane, Jr. v. Power & Lighting Systems | Manning |
| 10 C 04603 | Lippert v. Ghosh | Castillo |
| 10 C 04962 | Anderson v. Dart | Chang |
| 10 C 05135 | Ezell, et al., v. City of Chicago | Kendall |
| 10 C 07046 | Allison v. Board of Education of Plainfield | Marovich |
| 10 C 07340 | Palmer v. Dollar Tree | Dow |
| 10 C 08137 | Sutton v. Wiles | Nordberg |
| 11 C 00034 | Reliford v. Trotter's | Nordberg |
| 11 C 00720 | Miche Bag, LLC v. Be You, LLC | Aspen |
| 11 C 01005 | Johnson v. Hoover Schrum School Dist. 157 | Shadur |
| 11 C 03621 | Collazo v. East-West University, Inc. | Coleman |
| 11 C 03873 | Jubeh v. Dart | Tharp |
| 11 C 04016 | Amer. Nat'l. Ins. v. Amer. Nat' Investment | Lee |
| 11 C 04560 | White v. United Credit Union | Shadur |
| 11 C 04599 | Lopez v. Pactiv Corporation | Feinerman |
| 11 C 04990 | Hernandez-Martinez v. Chipotle Grill | Gottschall |
| 11 C 06040 | Metropolitan Life Insurance v. Elium | Lee |
| 11 C 06546 | Rodriguez v. Best Buy Stores | Lee |
| 11 C 06860 | Dixon v. Schaefer | Manning |
| 11 C 07298 | State Farm  v. Whirlpool Corporation | Nordberg |
| 11 C 07601 | Shepard v. Lustig | Darrah |

| | | |
|---|---|---|
| 11 C 08465 | Ballou v. I-Talk Wireless, LLC | Tharp |
| 11 C 09295 | Aguilar v. El Ranchito Restaurant Corp. | Bucklo |
| 12 C 00218 | Rolowicz v. Circ. Court Cook County Clerk | Lefkow |
| 12 C 00344 | Dixon v. Burkybile | Manning |
| 12 C 00465 | Rodgers v. Randle | Darrah |
| 12 C 01201 | O'Brien v. Anderson | Chang |
| 12 C 01203 | Prestige Capital Corp. v. Cooney & Corso | St. Eve |
| 12 C 01216 | Patterson v. Leading Edge Recovery | Coleman |
| 12 C 01255 | Woods v. Commonwealth Edison | Pallmeyer |
| 12 C 01276 | Stellar Records, Inc. v. Roberson | Feinerman |
| 12 C 02353 | Seiser v. City of Chicago | Holderman |
| 12 C 02431 | U.S. CFTCv. WorthBullion Group, Inc. | Nordberg |
| 12 C 02498 | Smart Options, LLC v. Jump Rope, Inc. | St. Eve |
| 12 C 02546 | Qtopia Incorporated v. Trend Micro, Inc. | Lee |
| 12 C 03012 | Roden v. CF Management IL, LLC | Nordberg |
| 12 C 03496 | FDIC v. Geras | Chang |
| 12 C 04987 | Hu v. U of I Chicago Board of Trustees | Pallmeyer |
| 12 C 05138 | DePeralta v. Donahoe | Manning |
| 12 C 05991 | Hancock v. J.D. Corporation | Kendall |

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 5.0.3**
**Eastern Division**

Michael Seiser

                          Plaintiff,

v.                                          Case No.: 1:12–cv–02353
                                            Honorable James F. Holderman

Debra Kirby, et al.

                          Defendant.

---

# NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Wednesday, October 31, 2012:

        MINUTE entry before Honorable Daniel G. Martin: The deadlines for submitting settlement demand and offer letters to the magistrate judge [21] are stricken. When a settlement conference date is set by Judge Martin at the end of discovery, new deadlines for the exchange of settlement demand and offer letters will be set per Judge Martin's Standing Order for Settlement Conference. Status hearing set for 12/13/2012 stands. The time of the 12/13/2012 status hearing is changed from 10:00 a.m. to 9:30 a.m. in Courtroom 1350.Mailed notice(lxs, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Michael Seiser, | ) | |
| | ) | 12 C 2353 |
| *Plaintiff,* | ) | |
| | ) | Judge Holderman |
| v. | ) | |
| | ) | |
| City of Chicago and Debra Kirby, | ) | |
| | ) | |
| *Defendants.* | ) | |

**PARTIES' JOINT MOTION TO EXTEND
THE DISCOVERY PERIOD AND THE DEADLINE FOR
THE PARTIES TO FILE DISPOSITIVE MOTIONS**

Defendants City of Chicago and Debra Kirby (collectively, "Defendants"), by one of their attorneys, Lindsey Vanorny, Assistant Corporation Counsel, and Plaintiff Michael Seiser, by his attorney, Kenneth Flaxman, respectfully request this Honorable Court to extend the fact discovery period to January 31, 2013 and the deadline for the parties to file dispositive motions to February 15, 2013. This proposal leaves unchanged the remainder of the pre-trial schedule as well as the trial date.

Grounds for this motion are as follows:

1. Plaintiff filed the Complaint in this case against the City and Debra Kirby on March 29, 2012. (Docket No. 1.) On June 26, 2012, this Court held a scheduling conference. (Dkt. No. 26.) At the scheduling conference, Defendants indicated that they expected to file a motion for summary judgment at the close of discovery. Moreover, Plaintiffs' counsel represented that he did not intend to take any depositions prior to the close of the discovery period. At the request of Plaintiff's counsel, the Court set a longer than usual period for Plaintiff to respond to any dispositive motion to permit Plaintiff to

depose any witnesses on whose affidavits Defendants had relied. The Court ordered that

discovery closed on November 26, 2012, that dispositive motions with supporting

memoranda be filed by January 7, 2013, and that responses be filed by March 18, 2013.

(Dkt. No. 18.) The Court set April 1, 2013 for the filing of any replies.

    2.    Plaintiff altered his litigation strategy after Defendants deposed the

civilian witnesses. Plaintiff has taken six depositions; two additional depositions (which

were scheduled before the close of discovery), should go forward in the next two weeks.

    3.    The parties agree that the original schedule is no longer appropriate and

propose that the Court extend the deadline for the close of discovery through January 31,

2013 and the deadline for dispositive motions through February 15, 2013. This

adjustment leaves unchanged the remainder of the pre-trial schedule and the trial date.

    **WHEREFORE**, the parties respectfully request that this Court extend the fact

discovery period through January 31, 2013 and the deadline for the parties to file

dispositive motions through February 15, 2013.

Respectfully Submitted,


| /s/ Kenneth Flaxman | /s/ Lindsey Vanorny |
|---|---|
| Kenneth Flaxman | Lindsey Vanorny |
| Attorney for Plaintiff | Attorney for Defendants |
| 200 S. Michigan Ave. Ste. 1240 | 30 North LaSalle, Suite 900 |
| Chicago, Illinois 60604-2430 | Chicago, Illinois 60602 |
| (312) 427-3200 | (312) 742-0234 |
| Attorney No. 830399 | Attorney No. 6303642 |

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 5.0.3**
**Eastern Division**


Michael Seiser

                          Plaintiff,

v.                                          Case No.: 1:12–cv–02353
                                            Honorable James F. Holderman

Debra Kirby, et al.

                          Defendant.

---

## NOTIFICATION OF DOCKET ENTRY


This docket entry was made by the Clerk on Tuesday, December 4, 2012:


     MINUTE entry before Honorable James F. Holderman: Parties' joint motion to extend discovery period and the deadline for the parties to file dispositive motions [28] is granted. Fact discovery is extended to 1/31/13. Dispositive motions with supporting memoranda is extended to 2/15/13. Motion hearing date of 12/11/12 is stricken. Notice mailed by judge's staff (ntf, )


**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 5.0.3**
**Eastern Division**

Michael Seiser
                        Plaintiff,

v.                                      Case No.: 1:12–cv–02353
                                        Honorable James F. Holderman

Debra Kirby, et al.
                        Defendant.

---

**NOTIFICATION OF DOCKET ENTRY**


This docket entry was made by the Clerk on Thursday, December 13, 2012:


        MINUTE entry before Honorable Daniel G. Martin: Status hearing held.
Settlement conference is set for 3/5/2013 at 2 p.m. The parties are reminded that
Magistrate Judge Martin requires compliance with his Standing Order for Settlement
Conferences, which is available on Magistrate Judge Martins web page at
www.ilnd.uscourts.gov. Each party is required to email a copy of its settlement letter to
Magistrate Judge Martins settlement conference inbox on the same day that it is provided
to opposing counsel. The email address is
Settlement_Correspondence_Martin@ilnd.uscourt s.gov. Do not file copies of these letters
on the court docket. Mailed notice(lxs, )



**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of
Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was
generated by CM/ECF, the automated docketing system used to maintain the civil and
criminal dockets of this District. If a minute order or other document is enclosed, please
refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our
web site at ***www.ilnd.uscourts.gov***.

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 5.1.1**
**Eastern Division**

Michael Seiser

                              Plaintiff,

v.                                          Case No.: 1:12–cv–02353
                                            Honorable James F. Holderman

Debra Kirby, et al.

                              Defendant.

---

# NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Monday, January 28, 2013:

     MINUTE entry before Honorable Daniel G. Martin:In light of the 3/5/2013 settlement conference set to begin at 2:00 p.m., plaintiff's settlement letter is due 2/19/2013; defendant's settlement letter is due 2/26/2013. The parties are reminded that Magistrate Judge Martin requires compliance with his Standing Order for Settlement Conferences, which is available on Magistrate Judge Martin's web page at www.ilnd.uscourts.gov. Each party is required to email a copy of its settlement letter to Magistrate Judge Martin's settlement conference inbox on the same day that it is provided to opposing counsel. The email address is Settlement_Correspondence_Martin@ilnd.uscourt s.gov. Do not file copies of these letters on the court docket. Mailed notice(lxs, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Michael Seiser, | ) | |
| | ) | 12 C 2353 |
| Plaintiff, | ) | |
| | ) | Judge Holderman |
| v. | ) | |
| | ) | |
| City of Chicago and Debra Kirby, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants City of Chicago (the "City"), by its attorney, Stephen R. Patton, and

Debra Kirby (collectively, "Defendants"), by her attorneys, Lindsey Vanorny, Assistant

Corporation Counsel, and Scott Jebson, Chief Assistant Corporation Counsel, respectfully

request that this Court grant summary judgment to Defendants on all claims of Plaintiff's

Complaint.  In support of this motion, Defendants submit the attached Memorandum, Rule 56.1

Statement of Undisputed Material Facts, and Exhibits, which are incorporated herein by

reference.

Respectfully Submitted,

Stephen Patton
Corporation Counsel of the City of Chicago

By:    /s/ Lindsey Vanorny
Assistant Corporation Counsel
City of Chicago Department of Law
30 North LaSalle Street, Suite 900
Chicago, Illinois 60602
(312) 742-0234
Attorney No. 6303642

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Michael Seiser, | ) | |
| | ) | 12 C 2353 |
| Plaintiff, | ) | |
| | ) | Judge Holderman |
| v. | ) | |
| | ) | |
| City of Chicago and Debra Kirby, | ) | |
| | ) | |
| Defendants. | ) | |

<u>**DEFENDANTS' MEMORANDUM IN SUPPORT OF**</u>
<u>**THEIR MOTION FOR SUMMARY JUDGMENT**</u>

Defendants City of Chicago (the "City"), by its attorney, Stephen R. Patton, and

Deputy Superintendent Debra Kirby ("Deputy Kirby") (collectively, "Defendants"), by her

attorneys, Lindsey Vanorny, Assistant Corporation Counsel, and Scott Jebson, Chief Assistant

Corporation Counsel, hereby submit this memorandum of law in support of their motion for

summary judgment on all counts of Plaintiff's Complaint and state as follows:

<u>**INTRODUCTION**</u>

On March 29, 2012, Plaintiff Officer Michael Seiser ("Plaintiff") filed his Complaint

against Deputy Kirby and the City alleging that he was falsely arrested and maliciously

prosecuted.  (Dkt. No. 1.)  Specifically, Plaintiff brought a Fourth Amendment claim for false

arrest under 42 U.S.C. §1983 and claims for false arrest, false imprisonment, and malicious

prosecution under Illinois common law against Deputy Kirby.  (Compl. at ¶ 19.)  Furthermore,

Plaintiff asserted a respondeat superior claim against the City.  *Id.*

Summary judgment is appropriate here on Plaintiff's Section 1983 claim for false arrest

and state law claims for false arrest, false imprisonment, and malicious prosecution because

Deputy Kirby had probable cause to arrest Plaintiff.  Moreover, even if Deputy Kirby lacked

probable cause for Plaintiff's arrest, she is entitled to qualified immunity.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment should be granted "if

the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is

no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

law." *Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 503 (7th Cir. 2010) (citing Fed. R. Civ.

P. 56(c)(2)).  In determining whether summary judgment is appropriate, the court should

construe all facts and reasonable inferences in the light most favorable to the non-moving party.

*See Thayer v. Chiczewski*, 2012 WL 4074417, at *6 (7th Cir. 2012).  The United States Supreme

Court has held that Rule 56(c) "mandates the entry of summary judgment, after adequate time for

discovery and upon motion, against any party who fails to make a showing sufficient to establish

the existence of an element essential to that party's case, and on which that party would bear the

burden of proof at trial." *Green v. Whiteco Industries, Inc.*, 17 F. 3d 199, 201 (7th Cir. 1994)

(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## STATEMENT OF FACTS

On March 29, 2011, Plaintiff was working as a police officer assigned to the Operation

Safe Schools Program at Tilden Career Community Academy High School, which is located at

4747 South Union Avenue.  (Defendants' Rule 56.1(a)(3) Statement of Facts (hereinafter,

"SOF") ¶ 16.)  Plaintiff was stationed at the southwest corner of 50th Street and Union Avenue

and was scheduled to work from 1:00 p.m. through 4:00 p.m.  SOF ¶ 17.  When Plaintiff was

driving southbound on Union Avenue to his post, he was drinking from a 1.75 liter T.G.I.

2

Friday's Mudslide bottle. SOF ¶ 18. T.G.I. Friday's Mudslide is an alcoholic beverage. SOF ¶¶ 18-19.

At 2:18 p.m., a civilian made a 911 call stating that a Caucasian male in a silver Grand Am was chugging from a bottle of vodka while driving near the intersection of 50th Street and Union Avenue. SOF ¶ 20. The caller provided the driver's license plate number to the dispatcher. SOF ¶ 20. The driver's license plate number was ran and it was determined that the owner of the car was Plaintiff. At 2:29 p.m., a civilian, Kathleen Glassford, called 911 and reported that the DUI driver was a police officer. SOF ¶ 22. Also, she requested that a police supervisor be sent to the scene of the incident. *Id*.

Sergeant Verta of the 9th District Police Station responded to Kathleen Glassford's request for a police supervisor. SOF ¶¶ 22-23. At approximately 2:50 p.m., Sergeant Verta met with Gail Glassford at 4849 South Union Avenue. SOF ¶¶ 5, 24. Gail Glassford told Sergeant Verta that she saw a police officer driving a gray car while chugging a gallon-sized bottle of vodka. SOF ¶ 25. Roseann Anderson said that she observed the same incident as Gail Glassford. SOF ¶ 26. One of the women pointed to Plaintiff, identifying him as the DUI driver. SOF ¶ 26.

Sergeant Verta went to the location where the Plaintiff was standing outside of his car. SOF ¶¶ 27-28. On Plaintiff's front passenger seat, Sergeant Verta observed a gallon-sized bottle with a red and white label and a broken seal. SOF ¶ 27. The bottle contained a clear liquid. *Id*. When Sergeant Verta asked Plaintiff about the bottle, he initially acted as if he didn't know what Sergeant Verta was referring to. SOF ¶ 28. Sergeant Verta then asked the Plaintiff to open his car door and to get the bottle that was lying on his front passenger seat. *Id*. Plaintiff refused to

retrieve the bottle.  *Id*.  In response to Sergeant Verta's multiple requests, Plaintiff exclaimed,

"No. Get a warrant.  I know my rights." *Id*.

Sergeant Verta then called the 9th District Watch Commander, Captain Johnson, to advise

him of the situation.  SOF ¶ 29.  Captain Johnson told Sergeant Verta that he would contact the

Chicago Police Department's Internal Affairs Division ("IAD") and asked Sergeant Verta to

bring Plaintiff into the 9th District Police Station.  SOF ¶ 29.  Captain Johnson called IAD and

told Lieutenant Naleway of IAD that there was an allegation that an officer was drinking on

duty.  SOF ¶ 30.  Lieutenant Naleway said that he would send a sergeant from IAD to the 9th

District Police Station.  SOF ¶ 31.

Lieutenant Naleway assigned Sergeants Price and Cochran from IAD to investigate the

allegations made against Plaintiff.  SOF ¶¶ 31-32.  Sergeant Price arrived at the 9th District

Police Station first and was informed of the witnesses' accounts by the 9th District officers.  SOF

¶¶ 35-36.  Sergeant Verta went to the scene of the incident to talk to the witnesses.  SOF ¶ 37.

He met with Roseann Anderson, Gail Glassford, and Gary Anderson.  *Id*.

Roseann Anderson stated that she saw a police officer, in uniform, driving a Pontiac

southbound on Union Avenue while drinking from what appeared to be an alcoholic beverage

bottle with a red and white label.  SOF ¶ 39.  Roseann Anderson also signed a sworn affidavit

attesting to the truth of her statement.  SOF ¶ 40.

Gail Glassford also met with Sergeant Price.  SOF ¶ 41.  She said that she had observed a

police officer taking several large gulps from what appeared to be an alcoholic beverage bottle

with a red and white label and red lid while he was driving.  *Id*.

Gary Anderson informed Sergeant Price that he had observed an on-duty police officer

driving while drinking from what appeared to be an alcoholic beverage container.  SOF ¶ 42.

4

Gary Anderson also told Sergeant Price that Plaintiff had gotten into an altercation with him after

he had attempted to record the Plaintiff's license plate number.  SOF ¶ 43.  Gary Anderson also

said that he could smell the odor of alcohol on Plaintiff.  SOF ¶ 44.

Next, Sergeant Price drove to the location where Plaintiff's vehicle was parked and

observed what appeared to be an alcoholic beverage bottle lying on Plaintiff's front passenger

seat.  SOF ¶ 45.  The bottle was partially filled with a clear liquid.  *Id*.  At this time, Sergeant

Price called Lieutenant Naleway of IAD and told him about the witnesses' reports and his own

observations.  SOF ¶ 46.  After receiving this information, Lieutenant Naleway walked to Chief

Rivera's office and conveyed all of the information to him.  SOF ¶ 47.  Chief Rivera told

Lieutenant Naleway that he would inform Deputy Kirby about the incident and get back to him.

SOF ¶ 48.  Chief Rivera walked to Deputy Kirby's office and conveyed all of the same

information to her.  SOF ¶¶ 49-52.

In response to learning this information, Deputy Kirby told Chief Rivera that Plaintiff

was to be processed criminally for the offense of driving under the influence.  SOF ¶ 54.  In

addition, she said that the 9th District Police Station was to handle the criminal portion of the

investigation and that IAD was to handle the administrative portion of the investigation once the

criminal investigation had concluded.  *Id*.  Lastly, Deputy Kirby said that the bottle should be

retrieved from Plaintiff's car.  SOF ¶ 55.  Chief Rivera passed this information onto Lieutenant

Naleway, who called Sergeants Price and Cochran, who were at the 9th District Police Station, to

inform them about Deputy Kirby's instructions.  SOF ¶¶ 56-57.  Next, Sergeant Cochran

informed Captain Johnson and Sergeant Verta at the 9th District Police Station about Deputy

Kirby's instructions.  SOF ¶ 58.

Officers Kral and Madsen were ordered to come to the 9th District Police Station to complete the criminal investigation. SOF ¶¶ 59-60. Officer Madsen administered field sobriety tests and then a breathalyzer on Plaintiff. SOF ¶ 61. Plaintiff passed all of the field sobriety tests and the breathalyzer test showed that Plaintiff had a Blood Alcohol Content ("BAC") of 0.000. *Id*. Plaintiff was issued a citation for transporting alcoholic liquor in a container with the seal broken pursuant to 625 ILCS 5/11-502. SOF ¶ 62. At the time the citation was issued, it was unknown whether the bottle observed in Plaintiff's vehicle contained any alcohol. SOF ¶¶ 64, 75. Plaintiff was released without being charged for driving under the influence of alcohol. SOF ¶ 65.

At this point, the criminal investigation had concluded and the administrative investigation by IAD began. SOF ¶ 67. Plaintiff was provided with an administrative consent to search form to permit the officers to retrieve the bottle from his car. SOF ¶ 68. Plaintiff refused to sign the consent form. *Id*. However, Plaintiff did agree to open the door and retrieve the bottle after he was given a written order. SOF ¶¶ 69-70. Accordingly, Plaintiff went back to the scene of the incident to retrieve the bottle. SOF ¶ 70. Sergeant Verta placed the bottle in the trunk of his car and drove it to the 9th District Police Station. *Id*. The contents of the bottle were poured into a vial and the bottle was inventoried. SOF ¶ 71. The vial was sent to the Illinois State Police for testing. SOF ¶ 74.

On May 27, 2011, the Chicago Police Department learned that the liquid in Paintiff's bottle tested negative for the presence of alcohol. SOF ¶ 74. Officer Madsen attended court for the citation and informed the prosecutor that the bottle did not contain alcohol. SOF ¶ 75. Accordingly, the court dismissed the ticket. *Id.*

<u>ARGUMENT</u>

I.    **DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON ALL COUNTS OF PLAINTIFF'S COMPLAINT.**

A.    **Deputy Kirby had probable cause to arrest Plaintiff on March 29, 2011.**

i. **False arrest claim related to driving under the influence of alcohol**

In his Complaint, Plaintiff alleges that Deputy Kirby could not have reasonably believed that he had committed an offense at the time she ordered his arrest.  (Compl. at ¶ 14.)  Moreover, Plaintiff claims that Deputy Kirby caused Plaintiff to be charged with "possession of liquor with a broken seal in his motor vehicle" without probable cause.  (Compl. at ¶ 18.)

"An officer may arrest an individual without violating the Fourth Amendment if there is probable cause to believe that the offender has committed even a very minor criminal offense in the officer's presence."  *Atwater v. City of Chicago*, 532 U.S. 318, 322 (2001).  The existence of probable cause is an absolute bar to any claim under Section 1983 against a police officer for false arrest, false imprisonment, or malicious prosecution.  *Mustafa v. City of Chicago*, 442 F. 3d 544, 547 (7th Cir. 2006).  A police officer has probable cause to arrest an individual "if, at the moment the arrest was made, the facts and circumstances within the officer's knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent person in believing that an offense has been committed."  *Hughes v. Meyer*, 880 F. 2d 967, 969 (7th Cir. 1989).  Probable cause exists "[s]o long as the totality of the circumstances, viewed in a common sense manner, reveals a probability or substantial chance of criminal activity on the suspect's part."  *United States v. Sawyer,* 224 F.3d 675, 679 (7th Cir. 2000).

Likewise, under Illinois common law, a plaintiff must show the absence of probable cause in order to establish a false arrest or false imprisonment claim.  *See Bronzino v. Sheldon*, 2012 WL 28752, at *6 (N.D. Ill. 2012) (citing *Gauger v. Hendle*, 954 N.E. 2d 307, 327 (Ill. App.

2 Dist., 2011)); *see also Strong v. Jackson*, 2012 WL 3151315, at *8 (N.D. Ill. 2012) (noting that the probable cause inquiry is the same for Section 1983 false arrest claims and false imprisonment/illegal detention claims under Illinois common law.)

In this case, Deputy Kirby did not actually physically seize or arrest Plaintiff. SOF ¶ 72. In fact, she was never present at the scene of the incident or at the 9th District Police Station where the Plaintiff was held in custody. *Id*. Nonetheless, Plaintiff is alleging that Deputy Kirby lacked probable cause to direct his arrest for driving under the influence of alcohol.

"When a superior officer, in communication with an inferior officer, orders that officer to make an arrest, it is proper to consider the superior's knowledge in determining the overall reasonableness of the police conduct as it relates to probable cause." *U.S. v. Swift*, 220 F. 3d 502, 508 (7th Cir. 2000). Under the collective knowledge doctrine, an "arrest is proper so long as the knowledge of the officer directing the arrest, or the collective knowledge of the agency he works for, is sufficient to constitute probable cause." *Krupa v. Naleway*, 2010 WL 145784, at *5 (N.D. Ill. 2010) (quoting *U.S. v. Randall*, 947 F. 2d 1314, 1319 (7th Cir. 1991)). The collective knowledge doctrine is premised on the fact that effective law enforcement requires that police officers act on directions and information transmitted by other officers. *See United States v. Hensley*, 469 U.S. 221, 231 (1985).

Accordingly, under the collective knowledge doctrine, the relevant inquiry is whether the information possessed by Deputy Kirby at the time she ordered Plaintiff's arrest was a sufficient basis to reasonably believe that Plaintiff had committed a criminal offense. In addition, the probable cause determination depends on the elements of the statute that was allegedly violated. *See Thayer*, 2012 WL 6621169, at *7. Here, Plaintiff was arrested for driving under the influence of alcohol in violation of 625 ILCS 5/11-501, which provides that "[a] person shall not

8

drive or be in the actual physical control of any vehicle in this State while … under the influence of alcohol."  625 ILCS 5/11-501(a)(2).

In this case, a report from a single credible witness that Plaintiff was driving under the influence of alcohol would preclude any false arrest claim against Deputy Kirby.  *See Anderer v. Jones*, 385 F. 3d 1043, 1048-49 (7th Cir. 2004) ("a complaint of a single credible witness can be a basis for probable cause"); *see also Spiegel v. Cortese*, 196 F. 3d 717, 723 (7th Cir. 1999) ("[A]s long as a reasonably credible witness or victim informs the police that [the suspect] has committed …a crime, the officers have probable cause to place the alleged culprit under arrest…in absence of evidence that the information, or the person providing it, is not credible."); *Woods v. City of Chicago*, 234 F. 3d 979, 996 (7th Cir. 2000) ("we have consistently held that an identification or a report from a single, credible victim or eyewitness can provide the basis for probable cause.")

Here, the totality of the facts known to Deputy Kirby at the time she ordered Plaintiff's arrest provide more than an ample basis for probable cause to believe that Plaintiff was driving under the influence of alcohol.  At the time she made the order, Deputy Kirby was aware that several civilian witnesses had reported that they observed Plaintiff drinking what appeared to be an alcoholic beverage while operating a motor vehicle.  SOF ¶¶ 50-52.  Additionally, Plaintiff cannot point to any evidence in the records which suggests that Deputy Kirby had any information available to suggest that these witnesses were not credible.  SOF ¶ 53.

In particular, on March 29, 2011, Deputy Kirby was informed by Chief Rivera that at least two civilian witnesses observed Plaintiff, an on-duty police officer in uniform, while driving his personal vehicle up and down a street near a school while drinking from what appeared to be an alcoholic beverage container.  SOF ¶ 50.  Furthermore, Deputy Kirby learned

from Chief Rivera that Plaintiff had a confrontation with one of the civilian witnesses and that

the witness stated that he had smelled alcohol on Plaintiff. SOF ¶ 51. Finally, Chief Rivera told

Deputy Kirby that a supervisor from the 9th District Police Station went to the scene of the

incident and observed what appeared to be a partially full bottle of vodka inside Plaintiff's

vehicle and that Plaintiff refused to retrieve the bottle for the supervisor. SOF ¶ 52. These facts,

taken together, are sufficient to warrant a reasonable person to believe that Plaintiff had

committed the offense of driving under the influence of alcohol. Therefore, Deputy Kirby's

order that Plaintiff be arrested was supported by probable cause and Plaintiff's false arrest claims

under Section 1983 and Illinois common law fail as a matter of law.

Moreover, Plaintiff cannot defeat summary judgment by claiming that the police officers

involved in this incident failed to adequately investigate the witnesses' claims. Once a police

officer receives information from a reasonably credible eyewitness, the officer has no

constitutional duty to conduct any further investigation. *Woods v. City of Chicago*, 234 F. 3d

979, 997 (7th Cir. 2000). It is also irrelevant to the probable cause analysis that an eyewitness is

later determined to be incorrect. *Kelley v. Myler*, 149 F. 3d 641, 648 (7th Cir. 1998); *see also*

*Woods*, 234 F. 3d 979 at 987 ("once such a reasonably credible complaint has been made, the

existence of probable cause to arrest does not depend upon the actual truth of the complaint.")

### ii. False arrest claim related to transporting alcoholic liquor in a container with a broken seal

In his complaint, Plaintiff also alleges that Deputy Kirby caused him "to be charged with

possession of liquor with a broken seal in his motor vehicle" despite the fact that she knew that

there was no basis for this charge. (Compl. at ¶ 18.) However, the undisputed material facts

establish that Deputy Kirby had no knowledge of the fact that Plaintiff was issued a citation until

it had already been issued. SOF ¶ 73. Accordingly, Deputy Kirby cannot be subject to liability

for the decision to issue Plaintiff the citation because she was not personally involved in the

decision.  *See Backes v. Village of Peoria Heights, Ill.*, 662 F. 3d 866, 869-870 (7th Cir. 2011)

(noting that it is well-established that a defendant must be personally responsible for conduct

giving rise to a constitutional deprivation in order to be subject to liability under Section 1983);

*see also Matthews v. City of East St. Louis*, 675 F. 3d 703, 708 (stating that to hold a supervisor

liable under Section 1983 for the actions of her subordinates, the supervisor must know about the

conduct and condone it.)

Nonetheless, even if we were to assume for the sake of argument that Deputy Kirby had

participated in the decision to issue Plaintiff a citation for transporting alcoholic liquor in a

container with a broken seal, probable cause would still exist to support that decision.  Section

5/11-502(a) of Chapter 11 of the Illinois Vehicle Code provides:

> …no driver may transport, carry, possess or have any alcoholic liquor within the
> passenger area of any motor vehicle upon a highway in this State except in the
> original container and with the seal unbroken.

625 ILCS 5/11-502(a).

In this case, Deputy Kirby would have had probable cause to direct that Plaintiff be

issued a citation for violating Section 5/11-502(a) based on the information that she learned from

Chief Rivera, including that a sergeant from the 9th District Police Station went to the scene of

the incident and observed a partially full bottle of what appeared to be vodka inside Plaintiff's

car.  SOF ¶ 50-52.  In addition, the existence of probable cause to issue the citation is further

supported by the fact that several civilian witnesses reported that Plaintiff was driving while

drinking from what appeared to be an alcoholic beverage and that one of the witnesses stated that

he smelled alcohol on the Plaintiff.  *Id.*  Accordingly, Plaintiff's false arrest claims relating to the

transport of alcoholic liquor in a container with a broken seal under Section 1983 and Illinois law
fail as a matter of law.

As a final note, even if probable cause existed for only one of the offenses, Plaintiff
would still be barred from asserting a false arrest claim. *See Urbanski v. City of Chicago*, 2011
WL 1103866, at *4 (N.D. Ill. 2011) (noting that "[o]nce probable cause relating to an offense is
established, all § 1983 liability against the arresting officer(s) is barred, 'even if the person was
arrested on additional or different charges for which there was probable cause.'")

In sum, the undisputed material facts establish that Deputy Kirby had probable cause to
direct Plaintiff's arrest; therefore, summary judgment should be granted in her favor on
Plaintiff's false arrest claim under Section 1983 and on Plaintiff's false arrest and false
imprisonment claims under Illinois common law.

### iii. Malicious prosecution claim

In his Complaint, Plaintiff also asserted a malicious prosecution claim under Illinois law.
(Compl. at ¶ 19.)  To establish a malicious prosecution claim, a plaintiff must show "(1) the
commencement or continuance of an original criminal or civil judicial proceeding by the
defendant; (2) termination of the proceeding in favor of the plaintiff; (3) the absence of probable
cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff."
*Dishman v. Cleary*, 2011 WL 1261098, at *10 (N.D. Ill. 2011).  Summary judgment on
Plaintiff's malicious prosecution claim is appropriate if Plaintiff fails to show that a genuine
issue of material fact exists as to any one of these factors.  *See Glessner v. Rybaski*, 2013 WL
389006, at *4 (N.D. Ill. 2013) (citing *Joiner v. Benton Cmty. Bank*, 82 Ill. 2d 40, 44 (Ill. 1980)).

In the instant case, Plaintiff's malicious prosecution claim fails as a matter of law because
Plaintiff cannot establish the absence of probable cause.  *See Holmes v. Village of Hoffman*

*Estate*, 511 F. 3d 673, 682 (7th Cir. 2007) (stating that under Illinois law, "a finding of probable cause is an absolute bar to such a claim.") As outlined above, Deputy Kirby had probable cause to direct that Plaintiff be arrested for driving under the influence of alcohol. Likewise, there was probable cause to issue Plaintiff a citation for transporting alcoholic liquor in a container with a broken seal. In addition, Plaintiff cannot establish that Deputy Kirby acted with malice, which is another essential element on which Plaintiff bears the burden of proof. *See Barrientos v. Haritos*, 836 F. Supp. 2d 670, 676 (N.D. Ill., 2011). The record is devoid of any affirmative evidence of malice. Finally, Deputy Kirby played no role in Plaintiff's prosecution after she instructed Chief Rivera that Plaintiff should be processed criminally for the offense of driving under the influence of alcohol. SOF ¶ 54. To prevail on a malicious prosecution claim, a plaintiff must do more than merely establish that he was arrested and detained without probable cause. *Lipscomb v. Knapp*, 2009 WL 3150745, at *12 (N.D. Ill. 2009) (granting summary judgment on malicious prosecution claim where defendant arrested and interrogated plaintiff, but played no role in his prosecution.) Accordingly, summary judgment should be granted in favor of Deputy Kirby on Plaintiff's malicious prosecution claim. Additionally, the City should be granted summary judgment as a matter of law because the City cannot be liable for any state law claims for which its employees are not liable to Plaintiff. 745 ILCS 10/2-109.

> **B.** **Even if Deputy Kirby did not have probable cause to detain Plaintiff on March 29, 2011, she is entitled to qualified immunity.**

Under the doctrine of qualified immunity, government officials are shielded from civil damages unless the official violated a statutory or constitutional right that was clearly established at the time the challenged conducted occurred. *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012). Qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from

harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

In a false arrest case, an officer is entitled to qualified immunity when there is no probable cause, but "a reasonable officer could have mistakenly believed that probable cause existed." *Thayer*, 2012 WL 4074417, at *6. Qualified immunity is applicable regardless of whether an officer's error constitutes a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact. *Pearson*, 555 U.S. at 231. In addition, under the collective knowledge doctrine, an officer that reasonably relies in good faith on another officer as to the justification for arrest will be entitled to qualified immunity. *See Hardiman v. Ford*, 1994 WL 585409, at *4 (7th Cir. 1994) (stating that "[s]o long as the officer's reliance on the "collective knowledge" is objectively reasonable, he will be accorded qualified immunity."); *see also Lipscomb v. Knapp*, 2009 WL 3150745, at *11 (N.D. Ill. 2009) (holding that police officers enjoy qualified immunity when the reasonably rely upon information from a fellow officer.)

Once a defendant raises the affirmative defense of qualified immunity, the plaintiff bears the burden of showing that the constitutional right that was allegedly violated was clearly established at the time of the incident. *Purvis v. Oest*, 614 F. 3d 713, 717-718 (7th Cir. 2010). A plaintiff may prevail by establishing that "the conduct [at issue] is so egregious that no reasonable person could have believed that it would not violate clearly established rights." *Id.*

In this case, Deputy Kirby is entitled to qualified immunity in relation to Plaintiff's Section 1983 claim for false arrest because she reasonably relied upon information provided to her by other police officers. There is no evidence in the record to suggest that it was unreasonable for Deputy Kirby to rely on the information provided by Chief Rivera. SOF ¶¶ 50-53. Furthermore, the undisputed material facts establish that a reasonable police officer could

have mistakenly believed that probable cause existed to arrest Plaintiff for driving under the

influence of alcohol and to issue him a citation for transporting alcoholic liquor in a container

with a broken seal.  Deputy Kirby learned of multiple reports that Plaintiff was drinking while

driving, that Plaintiff had an altercation with one of the witnesses, and that a sergeant observed

what appeared to be a partially full vodka bottle in Plaintiff's vehicle.  SOF ¶¶ 50-52.  Therefore,

in light of the facts that she knew at the time she ordered Plaintiff's arrest, Deputy Kirby is

entitled to qualified immunity.

**WHEREFORE**, for the reasons stated in their memorandum in support of this motion

for summary judgment, there are no genuine issues of material fact and Defendants are entitled

to judgment as a matter of law.  Therefore, Defendants respectfully requests this Court to grant

summary judgment in their favor on all claims contained in Plaintiff's Complaint.

Respectfully Submitted,

Stephen Patton
Corporation Counsel of the City of Chicago

By:   /s/ Lindsey Vanorny
Assistant Corporation Counsel
City of Chicago Department of Law
30 North LaSalle Street, Suite 900
Chicago, Illinois 60602
(312) 742-0234
Attorney No. 6303642

By:   /s/ Scott Jebson
Chief Assistant Corporation Counsel
City of Chicago Department of Law
30 North LaSalle Street, Suite 900
Chicago, Illinois 60602
(312) 744-6959
Attorney No. 6225243

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 5.1.1**
**Eastern Division**

Michael Seiser

                   Plaintiff,

v.                                   Case No.: 1:12−cv−02353

                                   Honorable James F. Holderman

Debra Kirby, et al.

                   Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Tuesday, February 26, 2013:

       MINUTE entry before Honorable James F. Holderman: At the court's direction, motion hearing previously set 2/26/13 is stricken and reset to 3/5/13 at 9:00 a.m.Notice mailed by judge's staff (ntf, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 5.1.1**
**Eastern Division**

Michael Seiser

                              Plaintiff,

v.                                          Case No.: 1:12−cv−02353
                                            Honorable James F. Holderman

Debra Kirby, et al.

                              Defendant.

---

**NOTIFICATION OF DOCKET ENTRY**

This docket entry was made by the Clerk on Wednesday, February 27, 2013:

      MINUTE entry before Honorable Daniel G. Martin:Telephone status hearing set
for 2/27/2013 at 04:00 p.m. The Court will contact counsel for the status hearing set for
this afternoon.Mailed notice(lxs, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of
Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was
generated by CM/ECF, the automated docketing system used to maintain the civil and
criminal dockets of this District. If a minute order or other document is enclosed, please
refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our
web site at ***www.ilnd.uscourts.gov***.

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 5.1.1**
**Eastern Division**

Michael Seiser

Plaintiff,

v.                                        Case No.: 1:12–cv–02353
                                          Honorable James F. Holderman

Debra Kirby, et al.

Defendant.

**NOTIFICATION OF DOCKET ENTRY**

This docket entry was made by the Clerk on Wednesday, February 27, 2013:

MINUTE entry before Honorable Daniel G. Martin: Settlement conference held
with counsel only on 2/27/2013. Counsel for Plaintiff and Defendants jointly advised that
a settlement conference with the parties would not be productive until after a ruling on
Defendants' summary judgment motion. If this case reaches the post–summary judgment
motion stage, counsel may request that the case be re–referred to Magistrate Judge Martin
for a settlement conference. Settlement conference set for 3/5/2013 is hereby stricken. All
matters relating to the referral of this action having been concluded, the referral is closed
and the case is returned to the assigned district judge.Mailed notice(lxs, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of
Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was
generated by CM/ECF, the automated docketing system used to maintain the civil and
criminal dockets of this District. If a minute order or other document is enclosed, please
refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our
web site at ***www.ilnd.uscourts.gov***.

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 5.1.1**
**Eastern Division**

Michael Seiser

                        Plaintiff,

v.                                              Case No.: 1:12−cv−02353

                                                Honorable James F. Holderman

Debra Kirby, et al.

                        Defendant.

---

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Tuesday, March 5, 2013:

     MINUTE entry before Honorable James F. Holderman: Motion hearing held. Defendant's motion for summary judgment [33] is taken under advisement. Plaintiff's response to defendant's motion for summary judgment shall be filed by 3/18/13. Defendant's reply in support shall be filed by 4/1/13. All other previously set dates are stricken. Notice mailed by judge's staff (ntf, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Michael Seiser, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| *-vs-* | ) | No. 12 CV 2353 |
| | ) | |
| City of Chicago and Debra Kirby, | ) | *(Judge Holderman)* |
| | ) | |
| *Defendants.* | ) | |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

In March of 2011, plaintiff, a Chicago police officer, was trying to lose weight by increasing his daily water intake.[1] (Plaintiff's Additional Fact, par. 1.) To accomplish this goal, plaintiff carried water during his workday in a repurposed plastic bottle that had originally contained an alcoholic beverage; by March 29, 2011, the bottle did not contain any trace of alcohol. (Rule 56.1(a)(3) Statement, par. 74.)

Several persons saw plaintiff drinking from his repurposed water bottle while driving his personal vehicle in police uniform on March 29, 2011. (Rule 56.1(a)(3) Statement, pars. 4-7, 39-44.) One of those witnesses,

---

[1] "The apparent weight loss effects of water are still a subject for further research, but there is some evidence that suggests that drinking water can be associated with appetite reduction (for middle-aged and older people), consuming fewer calories, burning slightly more calories, and eating more fruits and vegetable."
http://en.wikipedia.org/wiki/Weight_loss_effects_of_water (visited March 17, 2013).

mistakenly believing that plaintiff had been drinking an alcoholic beverage while driving, complained to the Chicago police department. (Rule 56.1(a)(3) Statement, pars. 20, 22.)

Police Sergeant Verta investigated this report (Rule 56.1(a)(3) Statement, par. 23), and verified that plaintiff was the subject of the complaint. (Rule 56.1(a)(3) Statement, par. 27.) Verta looked into plaintiff's car, saw a plastic bottle containing a clear liquid, and asked plaintiff to permit a search of his vehicle. (Rule 56.1(a)(3) Statement, pars. 27, 28.) Plaintiff told Verta that the bottle did not contain alcohol but refused to permit Verta to examine the bottle. (Rule 56.1(a)(3) Statement, pars. 28.) After consulting with his watch commander, Verta ordered plaintiff to accompany him to the police station. (Rule 56.1(a)(3) Statement, pars. 29.)

Plaintiff does not advance any claim concerning Verta's order to go to the police station.[2] Thus, nothing in this case turns on whether there was probable cause to arrest plaintiff for transporting open alcohol.[3]

After plaintiff and Sergeant Verta returned to the police station, the watch commander, Captain Johnson, referred the matter to the Internal

---

[2] Plaintiff is intentionally waiving any false arrest claim arising from Verta's order to go to the police station.

[3] Plaintiff's state law malicious prosecution claim turns on whether there had been probable cause to believe that plaintiff would be found guilty of transporting open alcohol. See *infra* at 14-15.

Affairs Division of the Chicago Police Department ("IAD"). (Rule 56.1(a)(3) Statement, par. 30.)

IAD Sergeant Price arrived on the scene at about 4:00 p.m. and secured the sworn affidavit required by state law from one of the civilian witnesses.[4] (Rule 56.1(a)(3) Statement, par. 40.)

The matter was presented to defendant Debra Kirby in the afternoon of March 29, 2011. (Plaintiff's Additional Fact, par. 2.) Kirby, the Deputy Superintendent of the Bureau of Professional Standards (Rule 56.1(a)(3) Statement, pars. 49-52), ordered that plaintiff was "to be processed criminally for the offense of driving under the influence of alcohol." (Rule 56.1(a)(3) Statement, par. 54.)

Plaintiff's Fourth Amendment claim in this case arises from Kirby's order that plaintiff "was to be processed criminally." Kirby's order resulted in an unreasonable search and detention to secure evidence of a crime, and thereby caused a violation of the Fourth Amendment. See *infra* at 7-10.

To implement Kirby's order that plaintiff "was to be processed criminally," Chicago police officers Madsen and Kral required plaintiff to submit to DUI performance tests and, after plaintiff passed each test, to

---

[4] 50 ILCS 725/3.8 requires a "sworn affidavit" for a misconduct complaint against a sworn police officer.

submit to a breathalyzer test. (Rule 56.1(a)(3) Statement, par. 61.) The re-sults of the breathalyzer (.000) confirmed the performance tests and exon-erated plaintiff of any DUI charge. (Plaintiff's Additional Facts, par. 14.)

After plaintiff had been exonerated of the DUI charge, the IAD ser-geants requested plaintiff to agree to a search of his car. (Rule 56.1(a)(3) Statement, par. 61.) Plaintiff refused to consent. *Id.*

Plaintiff signed the refusal form at 8:10 p.m. (Plaintiff's Additional Facts, par. 15.) At 8:15 p.m., the IAD sergeants ordered plaintiff to consent to a search of his car. (Plaintiff's Additional Facts, par. 16.)

At 8:17 p.m., shortly after he had been ordered to submit to the ad-ministrative search of his car, plaintiff was released on his personal recog-nizance (Plaintiff's Additional Facts, par. 19), on the charge of transporting open alcohol in violation of 625 ILCS 5/11-502(a). (Plaintiff's Additional Facts, par. 17.)

Plaintiff complied with the administrative order and the IAD ser-geants seized the repurposed water bottle from plaintiff's car. (Rule 56.1(a)(3) Statement, par. 70.) One or both of the IAD sergeants examined

the contents of the bottle and concluded that it contained water.[5] (Plaintiff's Additional Facts, par. 20.)

Plaintiff appeared in court to answer the transporting open alcohol charge; that charge was dismissed at plaintiff's first court appearance. Rule 56.1(a)(3) Statement, par. 75.)

## I.    Plaintiff's Claims

Plaintiff asserts one federal claim and one state law claim. Plaintiff brings his federal claim against defendant Kirby in her individual capacity; the core of this claim is Kirby's order that plaintiff was "to be processed criminally for the offense of driving under the influence of alcohol." (Rule 56.1(a)(3) Statement, par. 54.) This order resulted in an unreasonable search and was "for the purpose of gathering additional evidence to justify the arrest." *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991). Plaintiff shows in Part III below that Kirby's order caused a deprivation of plaintiff's clearly established Fourth Amendment rights.[6]

Plaintiff's state law claim is for malicious prosecution. Plaintiff brings this claim against the City of Chicago, which is responsible under

---

[5] A sample of the water was subsequently sent to the police crime lab, which also concluded that the liquid did not contain alcohol. (Rule 56.1(a)(3) Statement, par. 74.)

[6] Plaintiff also shows below at 11-12 that Kirby is not entitled to assert the affirmative defense of qualified immunity.

the doctrine of *respondeat superior* for the actions of its police officers.[7]
The core of plaintiff's malicious prosecution claim is the fact that the City
prosecuted plaintiff for transporting open alcohol when it knew that plain-
tiff was not guilty of that offense. Plaintiff shows in Part IV below that the
information known to the City failed to meet the high standard required
for probable cause to prosecute a criminal case.

## II.  Defendants' Motion for Summary Judgment Misap-
prehends Plaintiff's Claims

Defendants devote the bulk of their summary judgment motion to an
unasserted false arrest claim, and focus on the non-issue of whether there
had been probable cause to arrest. (Def.Mem. 7-12.)   Plaintiff, however,
does not complain of a false arrest.[8] Plaintiff's Section 1983 claim is in the
nature of false imprisonment: irrespective of whether plaintiff had been
lawfully arrested, he was falsely imprisoned and unreasonably searched
while being held at the police station pursuant to defendant Kirby's order
that he be "processed criminally for the offense of driving under the influ-
ence of alcohol." (Rule 56.1(a)(3) Statement, par. 54.)

---

[7] Defendants mistakenly read the complaint as asserting a malicious prosecution claim
against Kirby in her individual capacity. (Def.Mem. 13.)

[8] "False arrest and false imprisonment overlap; the former is a species of the latter."
*Wallace v. Kato*, 549 U.S. 384, 388 (2007)

Defendant Kirby also contends that she is entitled to qualified immunity for any constitutional violation. (Def.Mem. 13-15.) This defense fails because Kirby is not entitled to assert qualified immunity. In the alternative, the rights involved had been clearly established by *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991) and *Skinner v. Railway Labor Executives' Association*, 489 U.S. 602, 616-17 (1989).

Defendant City of Chicago raises a variety of meritless objections to plaintiff's state law malicious prosecution claim. Plaintiff responds to these objections in Part IV below.

### III.  A Trial Is Required on Plaintiff's Fourth Amendment Claim

#### A. Unreasonable Search and Detention to Gather Evidence

In *Lopez v. City of Chicago*, 464 F.3d 711 (7th Cir. 2006), the Court of Appeals made plain that delays in processing an arrest "for the purpose of gathering additional evidence are per se unreasonable under [*County of Riverside v.] McLaughlin*." 464 F.3d at 714. This rule applies in this case.

The summary judgment record in this case shows that plaintiff was held in custody while Officers Kral and Madsen followed Kirby's order to attempt to secure evidence that plaintiff was intoxicated. To implement Kirby's order, Kral and Madsen subjected plaintiff to a warrantless search: "a breathalyzer test, which generally requires the production of alveolar or

-7-

'deep lung' breath for chemical analysis, implicates similar concerns about bodily integrity and, like the blood-alcohol test we considered in *Schmerber [v. California*, 384 U.S. 757 (1966), and] should also be deemed a search." *Skinner v. Railway Labor Executives' Association*, 489 U.S. 602, 616-17 (1989).

Defendants argue that it was reasonable to require plaintiff to submit to this search because the police had received a complaint from "a single credible witness." (Def.Mem. 9.) The record, viewed in the light most favorable to plaintiff, fails to show the reasonableness of acting on the report from this "single credible witness."

Civilian witness Gail Glassford told Sergeant Verta that she had observed plaintiff driving his car "erratically five to ten miles over the limit" (Plaintiff's Additional Facts, par. 4), while drinking from a bottle that "was clearly marked 'vodka' in red letters." (Plaintiff's Additional Facts, par. 3.)

Glassford's report was contradicted by another civilian witness Roseann Anderson, who told Sergeant Price that plaintiff had been driving very slowly down the middle of the street. (Plaintiff's Additional Facts, par. 6.)

The third civilian witness, Gary Anderson, told Sergeant Price that he had smelled "an odor of alcohol" on plaintiff's breath. (Rule 56.1 State-

ment, par. 44.) Anderson was the only person who made this claim. (Plaintiff's Additional Facts, par. 21.) Plaintiff's partner, Chicago Police Officer Krzysztof Gniedziejko, did not detect the odor of an alcoholic beverage from plaintiff. (Plaintiff's Additional Facts, par. 2.) Nor did Gniedziejko observe any indicia of intoxication, such as slurred speech or difficulty in walking. *Id.* Sergeant Verta similarly did not observe anything about plaintiff that caused Verta to believe that plaintiff was under the influence of alcohol. (Plaintiff's Additional Facts, par. 5.) The same is true for Officers Kral and Madsen. (Plaintiff's Additional Facts, pars. 11-13.)

The cases cited by defendants (Def.Mem. 9) recognize that the "single credible witness" rule is not absolute, but requires only that the "complaint of a single credible witness *can* be a basis for probable cause." *Anderer v. Jones*, 385 F. 3d 1043, 1048-49 (7th Cir. 2004). (emphasis supplied) As the Seventh Circuit made plain in *Gramenos v. Jewel Companies, Inc.*, 797 F.2d 432 (7th Cir. 1986), "[w]e need not say that police *always* are entitled to act on the complaint of an eyewitness."[9] (emphasis supplied)

Whether it was reasonable to subject plaintiff to the breathalyzer search on statements from the three civilian witnesses presents a jury

---

[9] The eyewitness in *Gramenos* was a security guard at a supermarket, who was deemed to be reliable eyewitness.

question. Although one witness told the police that plaintiff had been speeding, another witness told the police that plaintiff had been driving at an exceedingly slow rate of speed. The third witness told the police that he smelled alcohol on plaintiff's breath; this claim was contradicted by all of the police officers who had an opportunity to smell plaintiff's breath. Finally, none of the police officers who observed plaintiff saw any indication that plaintiff was intoxicated – none of the officers heard slurred speed, and none of the officers observed any difficulty in walking. Compare *Qian v. Kautz*, 168 F.3d 949, 954 (7th Cir. 1999) (probable cause to arrest when plaintiff was unsteady on his feet and his speech seemed slurred).

Defendants are mistaken in relying on *Devenpeck v. Alford*, 543 U.S. 146 (2004) and its progeny.[10] The existence of probable cause to arrest plaintiff for transporting open alcohol would not authorize the police to hold plaintiff in custody for DUI testing without probable cause to believe that the test would yield evidence of crime. *Schmerber v. California*, 384 U.S. 757, 769 (1966); *Herzog v. Village of Winnetka*, 309 F.3d 1041, 1044 (7th Cir. 2002). Without probable cause to arrest for DUI, holding plaintiff in custody to subject him to the breathalyzer search also runs afoul of *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991) and its condem-

---

[10] Defendants are also mistaken in their citation for *Urbanski v. City of Chicago* (Def.Mem. 12), which appears at 2011 WL 1103886, rather than 1103866.

-10-

nation of detention "for the purpose of gathering additional evidence to justify the arrest."

### B. Defendant Kirby Is Not Entitled to Assert the Affirmative Defense of Qualified Immunity

Defendant Kirby asserts that she is entitled to qualified immunity "because she reasonably relied upon information provided to her by other police officers." (Def.Mem. 14.) Plaintiff shows in Parts C and D below that this defense fails because the rights involved were clearly established and because a reasonable police officer could not have reasonably believed that it was lawful to detain plaintiff for the purpose of gathering additional evidence to justify the arrest. The threshold question, however, is whether defendant Kirby is entitled to assert this affirmative defense.

Qualified immunity applies to "[g]overnment officials performing discretionary functions." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This is an extension of the common law rule providing immunity for "[g]ood-faith performance of a discretionary duty." *Scheuer v. Rhodes*, 416 U.S. 232, 239 n.4 (1974).

Defendant Kirby was a high level supervisor when she ordered that plaintiff should be processed criminally for DUI. She "oversaw the Internal Division, the Education Division, the Office of Management and Accountability, and the inspectors and Auditing Control Division." (Plaintiff's

Additional Facts, par. 9.) Defendant Kirby, who "bears the initial burden of demonstrating that the conduct of which the plaintiff complains falls within the scope of the defendant's duties," *Henry v. Purnell*, 501 F.3d 374, 377 n. 2 (4th Cir.2007) (internal quotation omitted), is unable to show that her official duties included instructing police officers to require arrestees to submit to a breathalyzer.

Qualified immunity protects "the government's ability to perform its traditional functions." *Wyatt v. Cole*, 504 U.S. 158, 167 (1992). In this case, defendant Kirby usurped the traditional function of the street police officers when she ordered that plaintiff be processed criminally for DUI. The Court should therefore refuse to permit Kirby to rely on qualified immunity.

### C. The Rights Involved Were Clearly Established

The Supreme Court held in *Skinner v. Railway Labor Executives' Association*, 489 U.S. 602, 616-17 (1989) that a requiring a person to submit to a breathalyzer was a search under the Fourth Amendment. The Court also made clear in *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991) that the police officers violate the Fourth Amendment when they hold a person in custody "for the purpose of gathering additional evidence

to justify the arrest." Defendant Kirby's order that plaintiff be criminally

processed implicated each of these clearly established rights.

### D. A Reasonable Police Officer Could Not Have Believed that It Was Reasonable to Hold Plaintiff in Custody for DUI Testing

Whether a reasonable police officer could have believed that it was

reasonable to hold plaintiff in custody for DUI testing turns on the disput-

ed facts discussed above at 7-10. Summary judgment should therefore be

denied because "[w]hen the qualified immunity inquiry cannot be disen-

tangled from disputed facts, the issue cannot be resolved without a trial."

*Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir.2009).

### IV.   A Trial Is Required on Plaintiff's State Law Malicious Prosecution Claim

#### A. Malice

Defendant City of Chicago (the only defendant on the malicious

prosecution claim), offers a cursory argument about malice (Def.Mem. 13):

> Plaintiff cannot establish that Deputy Kirby acted with mal-
> ice, which is another essential element on which Plaintiff bears
> the burden of proof. *See Barrientos v. Haritos*, 836 F. Supp. 2d
> 670, 676 (N.D. Ill., 2011). The record is devoid of any affirma-
> tive evidence of malice.

Although the Court would be justified in rejecting this cursory and

undeveloped argument, *Smith v. Northeastern Illinois Univ.*, 388 F.3d

559, 569 (7th Cir. 2004), malice is obvious from the City's decision to re-

-13-

quire plaintiff to answer the charge of transporting open alcohol after the City knew that plaintiff's repurposed bottle contained only water. (Plaintiff's Additional Facts, par. 20.) Moreover, even before learning that the bottle contained only water, the City knew that *Garrity v. New Jersey*, 385 U.S. 493 (1967) barred use of the contents of the bottle against plaintiff at a criminal proceeding pursuant to at trial under. The Court should reject the "no malice" argument.

### B. Probable Cause to Prosecute

Defendant mistakenly seeks to apply the Fourth Amendment standard for probable cause to arrest to the Illinois tort of malicious prosecution. (Def.Mem. 12-13.) Illinois law, however, requires a different and stricter standard.

"Probable cause" for the Illinois tort of malicious prosecution demands a reasonable belief "that the person accused is guilty of the offense charged." *William M. Ross & Co. v. Innis*, 35 Ill. 487, 1864 WL 3081 *1 (1864). This belief in guilt, *Johnson v. Saville*, 575 F.3d 656, 659 (7th Cir. 2009), is a much stricter standard than probable cause to arrest under the Fourth Amendment.

Rather than the "probability or a substantial chance of criminal activity" for probable cause to arrest, *Purvis v. Oest*, 614 F.3d 713, 722-23

(7th Cir. 2010), the Illinois tort of malicious prosecution requires facts "as would lead a man of ordinary caution and prudence to believe or to entertain an honest and strong suspicion that the person arrested is guilty." *Glenn v. Lawrence*, 280 Ill. 581, 117 N.E. 757, 759 (1917). This "honest belief … that the accused is probably guilty of the offense," *Turner v. City of Chicago*, 91 Ill.App.3d 931, 415 N.E.2d 481, 485 (1980), is the standard applicable here.

The City of Chicago could not have believed that plaintiff could be convicted of transporting open alcohol when it knew that the repurposed bottle contained only water. Viewed in the light most favorable to plaintiff, the summary judgment record establishes a lack of probable cause for the prosecution.

### V.   Conclusion

For the reasons above stated, the Court should deny defendants' motion for summary judgment.

Respectfully submitted,

/s/  Kenneth N. Flaxman
KENNETH N. FLAXMAN
ARDC No. 830399
200 S Michigan Ave Ste 1240
Chicago, IL 60604-2430
(312) 427-3200
*Attorney for Plaintiff*

-15-

# CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of March, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:  Lindsey Vanorny, ACC, Scott Jebson, ACC, 30 N LaSalle St., Ste 900, Chicago, IL 60602, and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants:  none.

/s/ Kenneth N. Flaxman
_____
Kenneth N. Flaxman
ARDC Number 08830399
200 S Michigan Ave, Ste 1240
Chicago, IL 60604-2430
(312) 427-3200 (phone)
(312) 427-3930 (fax)
knf@kenlaw.com (email)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Michael Seiser, | ) |
| | ) |
| *Plaintiff,* | ) |
| *-vs-* | )          *(Judge Holderman)* |
| | ) |
| City of Chicago and Debra Kirby, | ) |
| | ) |
| *Defendants.* | ) |

## PLAINTIFF'S RESPONSE TO DEFENDANTS'
## RULE 56.1(a)(3) STATEMENT

Plaintiff submits the following pursuant to Local Rule 56.1(b)(3):

1.   Plaintiff Officer Michael Seiser ("Plaintiff") brought this action pursuant to 42 U.S.C. § 1983 and Illinois common law. Jurisdiction is proper under 28 U.S.C. §§ 1331, 1343 and 1367. Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391 (b).

Response: Agree.

2.   Plaintiff currently is and at all times relevant to his Complaint, was a resident of the Northern District of Illinois and employed by the City as a police officer.

Response: Agree.

3.   At all times relevant to Plaintiff's Complaint, Defendant Debra Kirby ("Deputy Kirby") was acting as the Deputy Superintendent of the Bureau of Professional Standards of the Chicago Police Department, with her office located at the Chicago Police Department Headquarters.

Response: Agree.

4.    Kathleen Glassford (deceased) witnessed the incident that
is the subject of this lawsuit when she was standing on the porch
of her house at 4849 South Union Avenue, in Chicago, Illinois.

Response: Agree.


5.    Gail Glassford, witnessed this incident when she was
standing in front of her house at 4849 South Union Avenue, in
Chicago, Illinois

Response: Agree.


6.    Roseann Anderson witnessed the incident that is the subject
of this lawsuit when she was standing on the sidewalk in front of
4849 South Union Avenue, in Chicago, Illinois.

Response: Agree.


7.    Gary Anderson witnessed the incident that is the subject of
this lawsuit while he was working as a school security guard with
the company Blackstar Project at Tilden High School.

Response: Agree.


8.    Sergeant John Verta ("Sergeant Verta") was a sergeant with
the 9th District at the time of the incident. Sergeant Verta
reported to Watch Commander Johnson.

Response: Agree.


9.    Watch Commander Robert Johnson ("Commander Johnson") was
the watch commander for the 9th District Police Station at the
time of the incident.

Response: Agree.


10.   Officer Andrew Kral ("Officer Kral") was a police officer
in the 9th District Police Station at the time of the incident.
He was supervised by Captain Johnson.

Response: Agree.

11. Officer Brian Madsen ("Officer Madsen") was a police
officer in the 9th District Police Station at the time of the
incident. He was supervised by Captain Johnson.

Response: Agree.


12. Lieutenant David Naleway ("Lieutenant Naleway") was a
lieutenant with the Internal Affairs Division, with his office
located at the Chicago Police Department Headquarters, at the
time of the incident. He supervised Sergeants Cochran and Price.

Response: Agree.


13. Sergeant Matthew Price ("Sergeant Price") was a sergeant
with the Internal Affairs Division at the time of the incident.
Lieutenant Naleway supervised Sergeant Price.

Response: Agree.


14. Sergeant Terrance Cochran ("Sergeant Cochran") was assigned
to the Internal Affairs Division at the time of the incident.
Lieutenant Naleway supervised Sergeant Cochran.

Response: Agree.


15. Chief Juan Rivera ("Chief Rivera") was the Chief of the
Internal Affairs Division, with his office located at the Chicago
Police Department Headquarters, at the time of the incident.
Chief Rivera reported to Deputy Kirby.

Response: Agree.


16. On the date of the incident, March 29, 2011, Plaintiff was
an on-duty police officer, in uniform, assigned to the Operation
Safe Schools Program at Tilden Career Community Academy High
School, which is located at 4747 South Union Avenue.

Response: Agree.


17. Plaintiff was stationed at the southwest corner of 50th
Street and Union Avenue. Plaintiff's shift was from 1:00 p.m.
through 4:00 p.m. that on that date.

-3-

Response: Agree.


18.   Plaintiff drove southbound on Union Avenue to reach his
post while at the same time, drinking from a 1.75 liter T.G.I.
Friday's Mudslide bottle. Plaintiff drove by two women on Union
Avenue as he was drinking from the bottle.

Response: Agree.


19.   The bottle that Plaintiff was drinking from contained
alcohol at the time it was purchased. The bottle contained a
label which stated, "The liquor is in it."

Response: Agree.


20.   At 2:18 p.m. on March 29, 2011, the Chicago Police
Department received a phone call from an unknown individual who
reported that a Caucasian male in a silver Grand Am was observed
chugging from a bottle of vodka while driving near the
intersection of 50th Street and Union Avenue in Chicago,
Illinois. The caller stated that the driver had an Illinois
license plate and provided six digits of the driver's license
plate number. Also, the caller indicated that the driver had just
pulled over near the intersection of 50th Street and Union Avenue
and was sitting in his car.

Response: Agree.


21.   After the driver's license plate number was checked, it was
determined that the owner of the car was Plaintiff.

Response: Agree.


22.   At 2:29 p.m. on March 29, 2011, the same civilian, Kathleen
Glassford, called the Chicago Police Department again and stated
that the "DUI driver" was a police officer and requested a police
supervisor.

Response: Agree.


23.   Sergeant Verta responded to the request for a supervisor
from the Office of Emergency Management and Communications'
(OEMC) dispatch personnel.

-4-

Response: Agree.


24.   Sergeant Verta met outside with the complainant, Gail
Glassford, and another witness, Roseann Anderson, at
approximately 2:50 p.m. at the same address from which the call
was made.

Response: Agree.


25.   The complainant, Gail Glassford, informed Sergeant Verta
that she observed a police officer driving a gray vehicle while
he was chugging a gallon-sized bottle of vodka.

Response: Agree.


26.   The other witness, Roseann Anderson, substantiated the
claim of the complainant and also stated that she observed the
individual driving over the speed limit.

Response: Agree.


27.   Before Sergeant Verta approached Plaintiff, he looked into
Plaintiff's vehicle from the passenger side and observed what
appeared to be an alcoholic beverage bottle. The bottle was
gallon-sized with a red and white label with the seal broken. The
bottle contained a clear liquid.

Response: Agree.


28.   Sergeant Verta said, "What's in the bottle?" Plaintiff
said, "What bottle?" Sergeant Verta responded, "The bottle on
your front seat." Plaintiff claims that he told Sergeant Verta
that alcohol was not in the bottle. Sergeant Verta asked
Plaintiff to open his door and to give him the bottle. Plaintiff
refused to open the door, stating, "No. Get a warrant. I know my
rights." Sergeant Verta reiterated his request again to Plaintiff
again and Plaintiff refused.

Response: Agree.


29.   Sergeant Verta then called the Watch Commander at the 9th
District Police Station, Captain Johnson, to advise him of the
situation. Captain Johnson asked Sergeant Verta to bring

Plaintiff into the 9th District Police Station and stated that the Chicago Police Department's Internal Affairs Division would be contacted.

Response: Agree.


30.  After speaking to Sergeant Verta, Captain Johnson called Lieutenant Naleway of the Internal Affairs Division and stated that there was an allegation that a police officer had been drinking while on duty.

Response: Agree.


31.  In response, Lieutenant Naleway stated that he would send a sergeant from the Internal Affairs Division to the 9th District Police Station. Lieutenant Naleway assigned Sergeant Price of the Internal Affairs Division, who was on his way to work, to respond to the incident and told him to report directly to the 9th District Police Station.

Response: Agree.


32.  After assigning Sergeant Price to investigate the allegations made against Plaintiff, Lieutenant Naleway called Sergeant Cochran while he was on his way to the Chicago Police Headquarters and told him to report directly to the 9th District Police Station in order to assist Sergeant Price with the administrative investigation of Plaintiff's conduct.

Response: Agree.


33.  Sergeant Verta drove Plaintiff to the 9th District Police Station.

Response: Agree.


34.  When Sergeant Verta and Plaintiff arrived at the 9th District Police Station, Seiser was placed in a viewing room.

Response: Agree.


35.  Once Sergeant Price of the Internal Affairs Division arrived at the 9th District Police Station, either Captain

Johnson or Sergeant Verta informed him that several witnesses had observed an on-duty uniformed police officer, who was assigned to the Operation Safe Schools Program at Tilden High School, drinking an alcoholic beverage while in his personal vehicle.

Response: Agree.


36.  Sergeant Price was also informed that Sergeant Verta of the 9th District had observed the bottle on the passenger's side of Plaintiff's vehicle. Sergeant Price also learned that when the officer in question was asked to open the door and to retrieve the bottle he refused because Sergeant Verta did not have a search warrant.

Response: Agree.


37.  After learning about the allegations made against Plaintiff, Sergeant Price met with Roseann Anderson, Gail Glassford, and Gary Anderson at the scene of the incident to discuss their observations.

Response: Agree.


38.  In addition, as a part of the investigation, Evidence Technician Kamal Judeh ("Evidence Technician Judeh") took photographs of what appeared to be an alcoholic beverage container lying on the front passenger seat of Plaintiff's car while it was located at the scene of the incident. The bottle lying on Plaintiff's front passenger seat was clearly visible through Plaintiff's car window.

Response: Agree.


39.  When Sergeant Price met with Roseann Anderson, she told him that she observed a police officer, in uniform, driving a Pontiac southbound, while drinking from what appeared to be an alcoholic beverage bottle with a red and white label.

Response: Agree.


40.  On the same day as the incident, March 29, 2011, Roseann Anderson signed a sworn affidavit, which documented the information that she provided to Sergeant Price. The sworn affidavit provided:

It is alleged by the Complainant, Roseann Anderson, that on the above date and time at said location the Complainant observed an unknown male white police officer in full uniform driving S/B in a gray Pontiac with Illinois license plate [redacted] while drinking from a large clear bottle with a red and white label that appeared to be an alcoholic beverage. Ex. R.

Response: Agree.

41.   Gail Glassford told Sergeant Price that she observed the police officer driving and taking several large gulps from what appeared to be an alcoholic beverage bottle with a red and white label and a red lid.

Response: Agree.

42.   Gary Anderson told Sergeant Price that he had observed an on-duty officer driving and drinking from what appeared to be an alcoholic beverage container.

Response: Agree.

43.   Gary Anderson also told Sergeant Price that he had a confrontation with the Plaintiff after attempting to obtain the Plaintiff's license plate number.

Response: Agree.

44.   Finally, Gary Anderson informed Sergeant Price that he smelled an odor of alcohol on Plaintiff's breath.

Response: Agree.

45.   While Sergeant Price was at scene of the incident, he drove to the location where Plaintiff's vehicle was parked. Sergeant Price observed what appeared to be an alcoholic beverage bottle lying on the passenger's seat of Plaintiff's vehicle. Sergeant Price also observed that the bottle was partially filled with a clear liquid.

Response: Agree.

46.   After talking to the three witnesses, Sergeant Price called Lieutenant Naleway, who was at his office at the Chicago Police Department Headquarters, to inform him about the content of each of the witnesses' statements and that he had observed inside the officer's vehicle what appeared to be an alcoholic beverage bottle with a broken seal, containing a clear liquid.

Response: Agree.


47.   After receiving this information from Sergeant Price, Lieutenant Naleway walked to Chief Rivera's office and told Chief Rivera all of the information that Sergeant Price had provided to him.

Response: Agree.


48.   Chief Rivera told Lieutenant Naleway that he would inform Deputy Kirby about the incident and get back to him.

Response: Agree.


49.   After receiving this information, Chief Rivera walked to Debra Kirby's office and conveyed all of the information that he had learned from Lieutenant Naleway to Deputy Kirby.

Response: Agree.


50.   Specifically, Chief Rivera informed Deputy Kirby that there was an incident in the 9th District in which an on-duty uniformed officer was observed by at least two civilian witnesses driving his personal vehicle up and down a street near a school while drinking from what appeared to be an alcoholic beverage container.

Response: Agree.


51.   Chief Rivera also informed Deputy Kirby that the officer had a confrontation with one of the witnesses and that the same witness stated that he smelled alcohol on the officer.

Response: Agree.

52.  Furthermore, Chief Rivera told Deputy Kirby that the 9th District had sent a supervisor to the scene of the incident and that the supervisor had observed a partially full bottle of what appeared to be vodka inside the car. Chief Rivera also informed Deputy Kirby that the officer had refused to allow the supervisor to retrieve the bottle.

Response: Agree.


53.  Deputy Kirby, Chief Rivera, Lieutenant Naleway, and Sergeant Price each testified that they did not possess any information that would lead them to believe that the aforementioned witnesses' accounts were unreliable.

Response: Agree.


54.  In response to learning this information, Deputy Kirby told Chief Rivera that the officer was to be processed criminally for the offense of driving under the influence of alcohol. In addition, Deputy Kirby informed Chief Rivera that the 9th District Police Station was to handle the criminal portion of the investigation and that Internal Affairs Division was to handle the administrative portion of the investigation once the criminal investigation had concluded.

Response: Agree.


55.  Deputy Kirby also told Chief Rivera that the bottle should be retrieved from the officer's car.

Response: Agree.


56.  Next, Chief Rivera went to Lieutenant Naleway's office and told him that at the direction of Deputy Kirby, the 9th District Police Station was to handle the criminal portion of the investigation and the Internal Affairs Division was to handle the administrative portion of the investigation once the criminal investigation had concluded.

Response: Agree.


57.  After speaking to Chief Rivera, Lieutenant Naleway called Sergeant Cochran and Sergeant Price, who were at the 9th District Police Station, and informed them that Deputy Kirby had

instructed that the 9th District Police Station was to handle the criminal portion of the investigation and the Internal Affairs Division was to handle the administrative portion of the investigation once the criminal investigation had concluded.

Response: Agree.

58. Sergeant Cochran then told Captain Johnson and Sergeant Verta that Deputy Kirby had instructed that the 9th District was to handle the criminal part of the investigation and that the Internal Affairs Division was to handle the administration part of the investigation.

Response: Agree.

59. In response, Captain Johnson stated that he would find officers that could handle the criminal phase of the investigation. Captain Johnson ordered Officers Kral and Madsen to conduct the criminal investigation.

Response: Agree.

60. Officers Kral and Madsen arrived at the 9th District Police Station to conduct the criminal investigation.

Response: Agree.

61. Plaintiff was administered field sobriety tests and then a breathalyzer test by Officer Madsen. Plaintiff passed all of the field sobriety tests and the breathalyzer test showed that Plaintiff had a Blood Alcohol Content ("BAC") of 0.000.

Response: Agree.

62. Plaintiff was issued a citation for transporting alcoholic liquor in a container with the seal broken pursuant to 625 ILCS 5/11-502.

Response: Agree.

63. Sergeants Cochran and Verta participated in the decision to issue Plaintiff the citation.

Response: Agree.


64.   At the time the citation was issued, it was unknown whether
the bottle observed in Plaintiff's vehicle contained alcohol.

Response: Agree.


65.   Plaintiff was released without being charged for driving
under the influence of alcohol.

Response: Agree.


66.   Plaintiff was not handcuffed at any point on March 29,
2011.

Response: Agree.


67.   After the criminal phase of the investigation was complete,
the administrative investigation began.

Response: Agree.


68.   Plaintiff was presented with an administrative consent to
search form for his personal vehicle by either Sergeant Price or
Sergeant Cochran. Plaintiff refused to sign the consent to search
form.

Response: Disputed. The form provided to plaintiff is entitled "Consent to

Search" and, on its face, has nothing to do with administrative proceedings.

(Defendants' Exhibit V, Document 35-8 at 4.) Although the word

"Administrative" is handwritten at the top of the form, there is nothing to

distinguish the form from that used in criminal investigations.


69.   Next, Plaintiff was given a written direct order by
Sergeant Price to provide access to the passenger's side of his
vehicle to allow the bottle to be recovered. Plaintiff agreed to

-12-

comply with the direct order and signed a copy of the written
direct order form.

Response: Agree.


70.   Next, Plaintiff went to the location where his car was
parked and retrieved the bottle. Sergeant Verta took possession
of the bottle and placed it in his trunk in order to transport it
to the 9th District Police Station.

Response: Agree.


71.   After arriving back at the 9th District Police Station,
Sergeant Cochran poured the contents of the bottle into a vial,
which were later sent to the Illinois State Police for testing,
and inventoried the bottle.

Response: Agree.


72.   On March 29, 2011, Deputy Kirby never went to the 9th
District Police Station or to the scene of the incident.

Response: Agree.


73.   Deputy Kirby was not informed that a citation had been
issued to Plaintiff until after it had already been issued and
the criminal investigation had concluded.

Response: Agree.


74.   On May 27, 2011, the Internal Affairs Division received a
facsimile from the Illinois State Police which indicated that the
contents of the vial tested negative for the presence of alcohol.

Response: Agree.


75.   Officer Madsen attended court for the citation that was
issued to Plaintiff and informed the prosecutor that the contents
of the bottle tested negative for the presence of alcohol. The
court dismissed the ticket.

Response: Agree.

## PLAINTIFF'S ADDITIONAL MATERIAL FACTS

1.     In March of 2011, plaintiff, a Chicago police officer, was trying to lose weight by increasing his daily water intake. (Plaintiff's Exhibit 1, Seiser Dep. 328:15-20.)

2.     Plaintiff's partner in the afternoon of March 29, 2011 was Chicago Police Officer Krzysztof Gniedziejko. (Plaintiff's Exhibit 2, Gniedziejko Dep. 5:4-6.) Gniedziejko did not detect the odor of an alcoholic beverage from plaintiff. (Plaintiff's Exhibit 2, Gniedziejko Dep. 8:11-15, 12:16-19.) Gniedziejko did not hear any slurred speech from plaintiff. (Plaintiff's Exhibit 2, Gniedziejko Dep. 8:16-18.) Nor did Gniedziejko see plaintiff have any difficulty in walking. (Plaintiff's Exhibit 2, Gniedziejko Dep. 8:19-21.) Gniedziejko did not detect anything about plaintiff's speech, movement, or the way he looked that suggested that plaintiff was under the influence of alcohol. (Plaintiff's Exhibit 2, Gniedziejko Dep. 12:16-19.)

3.     During the conversation referred to in Defendants' Rule 56.1 Statement, par. 25, Gail Glassford told Sergeant Verta that she had seen the police officer (later identified as plaintiff), drinking from a bottle that "was clearly marked 'vodka' in red letters." (Defendants' Exhibit E, Document 35-4 at 6, Glassford Dep. 18:4-5.)

4.     Glassford told Verta that plaintiff had been "driving his personal car erratically five to ten miles over the limit" (Defendants' Exhibit H, Document 35-4 at 30, Verta Dep. 9:9-10.)

5.     In his initial conversation with plaintiff on March 29, 2011, Sergeant Verta did not smell the odor of any alcoholic beverage from plaintiff. (Verta Dep. 13:15-17.) Nor did Verta hear plaintiff utter any slurred speech. (Verta Dep. 13:18-20.) Verta did not observe anything about plaintiff that caused Verta to believe that plaintiff was under the influence of alcohol. (Verta Dep. 15:20-16:2; Verta Dep. 17:11-16.)

6.     During the conversation referred to in Defendants' Rule 56.1 Statement, par. 39, Roseanne Anderson told Sergeant Price that she had observed plaintiff driving very slowly down the middle of the street. (Defendants' Exhibit F, Document 35-4 at 12, Roseanne Anderson Dep. 11:15-16.)

7.     The occurrence giving rise to this lawsuit was presented to defendant Debra Kirby in the afternoon of March 29, 2011. (Defendants' Exhibit C, Kirby Deposition 7:21-23, Document 35-3 at 3.)

8.     As the Deputy Superintendent of the Bureau of Professional Standards, Kirby "oversaw the Internal Division, the Education Division, the Office of Management and Accountability, and the inspectors and

Auditing Control Division." (Defendants' Exhibit C, Document 35-3 at 3, Kirby Dep. 5:23-6:5.)

9.     At 4:45 p.m. on March 29, 2011, Chicago police officers began to implement Kirby's order that plaintiff was to be charged criminally for driving under the influence ("DUI"). (Plaintiff's Exhibit 3, Verta To/From Report, March 29, 2011, at 2.) (Defendants have agreed to the public filing of this document, with addresses and date of birth information redacted.)

10.    As part of implementing Kirby's order, the IAD sergeants (Cochran and/or Price) ordered Chicago Police Officers Kral and Madsen to process plaintiff for a DUI. (Plaintiff's Exhibit 4, Kral Dep. 5:21-6:3; Plaintiff's Exhibit 5, Madsen Dep. 6:7-10.)

11.    Officer Kral was close enough to plaintiff to smell any odor of an alcoholic beverage and was unable to do so. (Plaintiff's Exhibit 4, Kral Dep. 8:5-10.) There was nothing that Kral perceived which indicated that plaintiff had recently consumed alcohol. (Plaintiff's Exhibit 4, Kral Dep. 8:11-13.) Nor did Kral perceive anything that indicated that plaintiff was under the influence of an alcoholic beverage. (Plaintiff's Exhibit 4, Kral Dep. 10:11-14.)

12.    Plaintiff did not appear intoxicated to Officer Madsen. (Plaintiff's Exhibit 5, Madsen Dep. 9:1-2.)

13.     Madsen did not have any basis to believe that plaintiff was under the influence of alcohol when he administered the breathalyzer test to plaintiff. (Plaintiff's Exhibit 5, Madsen Dep. 10:5-9.)

14.     The results of the breathalyzer (.000) confirmed the performance tests and exonerated plaintiff of any DUI charge. (Defendants' Exhibit I, Johnson Deposition 20:9-16, Document 35-5 at 6.)

15.     Plaintiff refused to consent to a search of his vehicle at 8:10 p.m. on March 29, 2011. (Defendants' Exhibit V, Document 35-8 at 4.)

16.     At 8:15 p.m., the IAD sergeants (Sergeant Cochran and Price) ordered plaintiff to consent to a search of his car. (Defendants' Exhibit W, Document 35-8.)

17.     Plaintiff was formally charged with transporting open alcohol in violation of 625 ILCS 5/11-502(a). (Defendants' Exhibit T, Document 35-7 at 13.)

18.     Officer Madsen, who prepared the open alcohol complaint, believes that he had been ordered to write the ticket by a supervisor, but is unable to recall which supervisor gave that order. (Plaintiff's Exhibit 5, Madsen Dep. 16:11-15.)

19.     At 8:17 p.m. on March 29, 2011, plaintiff was released on his personal recognizance on the open alcohol charge. (Plaintiff's Exhibit 6, Recognizance Bond I7386202.)

20.     After the IAD sergeants obtained possession of plaintiff's repurposed water bottle, one or both of the IAD sergeants examined the contents of the bottle and concluded that it contained water. (Plaintiff's Exhibit 7, Email from Kirby to Rivera, March 29, 2011.)

21.     Gary Anderson is the only person who claims to have detected the odor of an alcoholic beverage about plaintiff. (Defendants' Exhibit M, Document 35-6 at 4, Price Dep. 10:19-24.)

/s/   Kenneth N. Flaxman
KENNETH N. FLAXMAN
ARDC No. 830399
200 S Michigan Ave Ste 1240
Chicago, IL 60604-2430
(312) 427-3200
*Attorney for Plaintiff*

## INDEX TO EXHIBITS

Excerpt of Deposition of Michael Seiser  .......................................................... 1

Deposition of Krzysztof Gniedziejko .................................................................. 2

To/From Report, Verta to Jarmusz, March 29, 2011  ...................................... 3

Deposition of Andrew Kral .................................................................................. 4

Deposition of Brian Madsen  ............................................................................... 5

Recognizance Bond, I7386202  ........................................................................... 6

Email, Kirby to Rivera, March 29, 2011  ........................................................... 7

**Exhibit 1**

**Deposition of MICHAEL SEISER, 8/14/2012**

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION
 3     MICHAEL SEISER,                    )
                                          )
 4                    Plaintiff,          )
                                          )
 5              vs.                       ) No. 12 C 2353
                                          )
 6     CITY OF CHICAGO and DEBRA          )
       KIRBY,                             )
 7                                        )
                      Defendants.         )
 8
 9              The videotaped deposition of MICHAEL

10     SEISER, taken pursuant to notice of taking

11     deposition, before Suzanne Thalji, CSR No.

12     084-002337, Certified Shorthand Reporter and a

13     notary public within and for the County of Cook,

14     State of Illinois at 30 North LaSalle Street,

15     Suite 900, Chicago, Illinois, on August 14, 2012,

16     commencing at 11:17 o'clock a.m.

17          APPEARANCES:

18              LAW OFFICES OF KENNETH N FLAXMAN, PC, by
                MR. KENNETH N. FLAXMAN
19              (200 South Michigan Avenue, Suite 1240
                 Chicago, Illinois  60604
20               knf@kenlaw.com)
                    appeared on behalf of the plaintiff;
21

22

23

24
```

**Deposition of MICHAEL SEISER, 8/14/2012**

1        A.     No.

2        Q.     Do you know who signed the ticket for

3    alcoholic liquor in vehicle with seal broken?

4        A.     I'm speculating, but the officer's

5    signature most likely is Officer Madsen's.

6        Q.     Was he one of the officers who

7    processed the DUI test?

8        A.     Yes.

9        Q.     Did you ever ask him why he was writing

10   a ticket for alcoholic liquor in vehicle with seal

11   broken?

12       A.     I don't recall.  I may have.

13       Q.     Okay.  You said you lost about 10

14   pounds since the day of this incident.

15              Was drinking water part of losing

16   weight for you?

17       A.     Yes.

18       Q.     How much weight did you lose drinking

19   water?

20       A.     10 to 15 pounds.

21       Q.     Have you ever written a ticket for

22   alcoholic liquor in vehicle with seal broken?

23       A.     Yes.

24       Q.     Did you ever -- did you look at the

**Exhibit 2**

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHAEL SEISER,                    )
                                   )
              Plaintiff,           )
                                   )
     vs.                           )   No. 12-cv-2353
                                   )
CITY OF CHICAGO, et al.,           )
                                   )
              Defendants.          )


        The deposition of KRZYSZTOF

GNIEDZIEJKO, called for examination pursuant to the

Rules of Civil Procedure for the United States

District Courts pertaining to the taking of

depositions, taken before Kathy Hendrix, Certified

Shorthand Reporter, within and for the County of

Cook and State of Illinois, at 200 South Michigan,

Suite 1240, Chicago, Illinois, on November 19, 2012,

at the hour of 11:10 o'clock a.m.

e79b4ac3-638e-4cfa-9f39-1c0963af7bb7

Case 1:12-cv-02353   Document 42   Filed 03/18/13   Page 25 of 101   PageID 363
Case: 13-1985   Document: 5-2   Filed: 05/23/2013   Pages: 319

Page 2

```
 1    A P P E A R A N C E S:

 2

 3

 4

 5        KENNETH N. FLAXMAN, P.C.
          200 South Michigan Avenue
 6        Suite 1240
          Chicago, Illinois  60604
 7        BY:  KENNETH N. FLAXMAN, ESQ.
          (312) 427-3200
 8
               Appeared on behalf of the Plaintiff;
 9
          CITY OF CHICAGO
10        30 North LaSalle Street
          Suite 900
11        Chicago, Illinois 60602
          BY:  MR. THOMAS J. PLATT
12        (312) 744-4833

13             Appeared on behalf of the Defendants.

14

15

16

17

18

19

20

21

22

23

24
```

Page 3

1                    (Witness duly sworn.)

2                    KRZYSZTOF GNIEDZIEJKO

3    called as a witness herein, having been first duly

4    sworn on oath, was examined and testified as

5    follows:

6                         EXAMINATION

7    BY MR. FLAXMAN:

8         Q.    State your name and spell your last

9    name for us, please.

10        A.    Gniedziejko, G-n-i-e-d-z-i-e-j-k-o.

11   Star number 18696, assigned to the 19th District,

12   first watch.

13        Q.    And what is your business or

14   occupation, Officer?

15        A.    Chicago police officer.

16        Q.    And how long have you been a Chicago

17   police officer?

18        A.    Eighteen years.

19        Q.    Do you know the man sitting to my

20   right?

21        A.    Yes.

22        Q.    How -- it's Michael Seiser?

23        A.    Yes, sir.

24        Q.    How long have you known Mr. Seiser?

Case 1:12-cv-02353   Document 42   Filed 03/18/13   Page 27 of 101   PageID 365
Case: 13 1985   Document: 5 2   Filed: 05/23/2013   Pages: 319

Page 4

1          A.      I believe since '96 when I worked

2     25th District and he came in as a PPO patrol

3     officer.

4          Q.      Before coming here today, did you have

5     a chance to look at any documents?

6          A.      Just the pictures of the vehicle.

7          Q.      Okay.  Do you have -- as you sit here

8     today do you recall an incident that occurred in

9     March of 2011, actually March 29th of 2011?

10         A.      Yes, sir.

11         Q.      Do you remember working secondary

12    employment that day?

13         A.      Yes, sir.

14         Q.      What was your -- what was that job?

15         A.      It's safe students passage at Tilden

16    High School.

17         Q.      And did you have a particular post

18    that you were working?

19         A.      Yes.

20         Q.      What was that?

21         A.      That was at 49th and Union.

22         Q.      Were you in uniform that day?

23         A.      Yes.

24         Q.      What was your assignment?

Page 5

```
 1          A.      Making sure that the students pass by
 2   safely home and there is no -- any kind of acts of
 3   violence happening there on Union Avenue.
 4          Q.      Was there any other officers assigned
 5   to the same position?
 6          A.      Officer Seiser.
 7          Q.      Anybody else?
 8          A.      No.
 9          Q.      Do you remember what time your
10   assignment started that day?
11          A.      1300 hours.
12          Q.      And when you got to the scene, to your
13   assignment, did you get there at 1300 hours or
14   before or after?
15          A.      1300 hours.
16          Q.      Exactly?
17          A.      I believe so, yes.
18          Q.      When you got there was Officer Seiser
19   there?
20          A.      I don't remember but he was there.
21          Q.      Was he in uniform that day?
22          A.      Yes.
23          Q.      Do you remember what the weather was
24   like that day?
```

Page 6

1          A.        Chilly.

2          Q.        When you first got there, was Officer

3     Seiser standing at the post or in his vehicle or

4     something else?

5          A.        We met first at Tilden High School.

6          Q.        Did you go together --

7          A.        And additional three officers

8     including Officer Seiser, we call came to Tilden

9     High School and met with the school security

10    personnel.  And we got the radios from them, and you

11    waited until about quarter to 2:00, I believe, and

12    then we went to our posts.

13         Q.        How did you get to your posts?

14         A.        Drove our personal vehicles.

15         Q.        Did you get to your post before

16    Officer Seiser did or after he did?

17         A.        Same time we got there.

18         Q.        Okay.  Did anything unusual happen

19    after you got to your post that day?

20         A.        We were at the post ten minutes or

21    15 minutes, and then Officer Seiser came up to me

22    and said that he had to run an errand in the

23    immediate area.  And I just told him to make sure he

24    came back for school dismissal when students come

Page 7

1    out.  And in 10 or 20 minutes he came back to the

2    post.

3           Q.     And did you see him drive away?

4           A.     Yes.

5           Q.     And did you see him return?

6           A.     Yes.

7           Q.     Was he in the same vehicle when he

8    drove away as when he returned?

9           A.     Yes.

10          Q.     Did anything unusual happen after

11   Officer Seiser returned?

12          A.     He returned.  I met him outside.  I

13   had something to drink coffee or tea and we were

14   standing chatting, and then he said he was going to

15   go to his car and get a drink.

16          Q.     And did he say what kind of drink he

17   was going to get?

18          A.     I believe he said he was going to get

19   a drink of water out of his car.

20          Q.     And you how far away were you and he

21   when he said that -- how far away from his car?  Let

22   me start over again.

23                 When Officer Seiser said I'm going

24   to get something to drink or going to get some water

Page 8

```
 1   to drink, you saw him walk to his car?

 2          A.     Yes.

 3          Q.     How far away was his car?

 4          A.     About 75 feet.

 5          Q.     Did he then return from his car?

 6          A.     Yes.

 7          Q.     Did he have any water with him?

 8          A.     No.

 9          Q.     Did he have anything with him?

10          A.     No.

11          Q.     Had you been -- well, before Officer

12   Seiser left to walk to his car to get something to

13   drink, had you observed the odor of an alcoholic

14   beverage from Officer Seiser?

15          A.     No.

16          Q.     Had you observed or heard any slurred

17   speech from Officer Seiser?

18          A.     No.

19          Q.     Did you see him having trouble walking

20   around?

21          A.     No.

22          Q.     After Officer Seiser came back from

23   his car, anything unusual happen after that?

24          A.     Yes.   The sergeant arrived on the
```

e79b4ac3-638e-4cfa-9f39-1c0963af7bb7

1    scene.  He looked into his vehicle from the driver's

2    side, passenger side.  Moments later he came up and

3    motioned for Officer Seiser to follow him to his

4    vehicle.

5          Q.     When you said he looked into his

6    vehicle, the sergeant looked into Officer Seiser's

7    vehicle?

8          A.     Yes.

9          Q.     And was that Sergeant Verta?

10         A.     I never met him there, he never

11   approached me, he never identified to me so.

12         Q.     And when the sergeant -- it was a

13   sergeant though?

14         A.     Yes.

15         Q.     When the sergeant came and spoke to

16   Officer Seiser, can you tell us as best you can

17   exactly what the sergeant said?

18         A.     I was a distance away, so there is no

19   way I know what their exchange, verbal wise, was.

20         Q.     Had you seen any civilians exchange

21   any words with Officer Seiser up to that point that

22   day?

23         A.     No.

24         Q.     Did you see Officer Seiser then walk

e79b4ac3-638e-4cfa-9f39-1c0963af7bb7

1    with the sergeant back to Officer Seiser's car?

2          A.    Yes.

3          Q.    Then what happened?

4          A.    I kept on looking.  I don't know what

5    was happening at that point, and they had a lengthy

6    conversation.  After a while sergeant put Officer

7    Seiser in the back of the squad car.

8          Q.    And then what happened?

9          A.    Sergeant was on the scene.  There was

10   additional officers arrived on the scene where the

11   sergeant arrived.  And at that point one of the

12   officers, Officer Bosl stayed on the scene and

13   Officer Seiser was taking to the station by another

14   squad car.

15         Q.    Could you spell Officer Bosl?

16         A.    B-o-s-l, I believe.

17         Q.    He stayed on the scene, was he helping

18   you in your work at Tilden High School?

19         A.    He was to assist me and also watch the

20   vehicle, so it doesn't move.

21         Q.    By "the vehicle," you mean Officer

22   Seiser's vehicle?

23         A.    Yes.

24         Q.    Did you ever look inside Officer

Page 11

1    Seiser's vehicle that day?

2            A.      Yes.

3            Q.      Why?

4            A.      Just wanted to verify what was the

5    actual accusation of Officer Seiser.

6            Q.      And when was this, that you looked

7    inside?

8            A.      When?

9            Q.      When, right.

10           A.      When the sergeant left and Officer

11   Seiser left.

12           Q.      When you looked inside of Officer

13   Seiser's vehicle, what did you see, if anything?

14           A.      I could see a clear bottle.

15           Q.      Could you see the words vodka on the

16   bottle.

17           A.      I don't remember.  But there was a

18   label of some unknown brand of drink or vodka.

19           Q.      Were you able to read the label?

20           A.      No, because I think it was sideways or

21   upside down, so I wasn't able to read it.

22           Q.      Did you ever see the bottle again?

23           A.      Afterwards, no.

24           Q.      Did you see -- am I correct that as

e79b4ac3-638e-4cfa-9f39-1c0963af7bb7

Page 12

1    best you can recall you never saw Officer Seiser

2    with that bottle outside of the vehicle?

3         A.     That day, yes.  I did see him retrieve

4    the bottle and drink from the vehicle by his vehicle

5    and then put it back in the vehicle and walk over to

6    me.

7         Q.     And how far away from you was he when

8    you saw him drink from the bottle?

9         A.     75 feet.

10        Q.     And after he came back, did you ever

11   ask him what was in the bottle?

12        A.     No.

13        Q.     Do you recall Officer Seiser ever

14   offering you some water from the bottle?

15        A.     No.

16        Q.     When Officer Seiser came back after

17   drinking from the bottle, did you detect the smell

18   of an alcoholic beverage about him?

19        A.     No.

20        Q.     Did you ever at all that day detect

21   anything from Officer Seiser's speech or movement or

22   the way he looked, his appearance, that suggested

23   that he was under the influence of alcohol?

24        A.     No.

Page 13

```
 1          Q.      Did he ever tell you what that errand
 2     was that he had to run?
 3          A.      He mentioned, but I don't remember
 4     because the length of time of where he went.  He
 5     said it was in the immediate area, he had to run
 6     somewhere and do something.
 7          Q.      Did you ever see any of the security
 8     people from Tilden High School on the scene that
 9     day?
10          A.      Yes, they were walking up and down
11     Union, north and south.
12          Q.      Did you see any of them exchange words
13     with Mr. Seiser?
14          A.      No, I wasn't looking that direction
15     when -- if it happened.
16          Q.      Did the sergeant who came out and
17     looked into Officer Seiser's car, did he ever talk
18     with you?
19          A.      No.
20          Q.      Did he ask you your name?
21          A.      No.
22          Q.      Did any supervisors talk with you on
23     the day of the incident about what you had seen or
24     heard with Officer Seiser that day?
```

e79b4ac3-638e-4cfa-9f39-1c0963af7bb7

Page 14

1          A.     No.

2          Q.     After the incident did any supervisor

3    ever talk to you about what happened that day?

4          A.     No.

5          Q.     Were you interviewed by an internal

6    affairs officer?

7          A.     No.

8                 MR. FLAXMAN:  Let's take a break.

9                      (Whereupon, a short break was

10                     taken and the proceedings resumed

11                     as follows:)

12   MR. FLAXMAN:

13         Q.     I asked you about supervisors talking

14   to you about the incident, did you ever write a

15   to/from memorandum or any report about the events

16   that we've been talking about on March 29th of 2011

17   and Officer Seiser?

18         A.     No.

19                MR. FLAXMAN:  I have nothing further.

20                     EXAMINATION

21   BY MR. PLATT:

22         Q.     When Sergeant Verta arrived you were

23   still at your post; is that correct?

24         A.     Yes.

Page 15

```
 1          Q.      Where exactly was your post when you
 2    were situated at the time Sergeant Verta arrived?
 3          A.      We were standing at the corner of 49th
 4    and Union right next to a firehouse.
 5          Q.      And where did the sergeant go when he
 6    arrived?
 7          A.      Directly to Officer Seiser's car.
 8          Q.      And where was his car located?
 9          A.      About 75 feet south of us on Union
10    Street, by the driveway to the parking lot to the
11    firehouse.
12          Q.      So you were right at the corner, were
13    you on 49th or were you on Union?
14          A.      Union at the intersection of 49th and
15    Union.
16          Q.      That's a T intersection there?
17          A.      Yes.
18          Q.      Okay.  After Mr. Seiser got back from
19    his errand -- withdraw the question.
20                  Before Mr. Seiser got back, did
21    you hear anything over the radio about an incident
22    involving a citizen complaining about a police
23    officer?
24          A.      Yes.
```

e79b4ac3-638e-4cfa-9f39-1c0963af7bb7

Page 16

1        Q.     What did you hear?

2        A.     I was sitting in the car and I heard

3   over the radio, come out of the car, that officer is

4   driving down Halsted Street and he's drinking inside

5   the vehicle.

6        Q.     And did you make -- did you hear

7   anymore about it after that point?

8        A.     Can you rephrase?

9        Q.     Did you hear anymore about that

10  complaint after that point?

11       A.     The only thing I heard of complained

12  was from Officer Bosl's hearsay after the sergeant

13  said that he verified that claim, that he also heard

14  the call come over the radio.

15       Q.     When Officer Seiser came back from his

16  errand, did he comment about any members of the

17  citizen's patrol with you when you were standing

18  with him?

19       A.     After he took a drink from his bottle

20  and put it back in the vehicle and came back to me,

21  he said that the school patrol people were looking

22  at him drinking from the bottle, they were making

23  comments and they were not trustworthy, they were

24  checking on us and they were calling in this

1    complaint.  And at that point I dismissed it because

2    we were doing nothing wrong, just being present at

3    the post.

4         Q.    When you saw Officer Seiser drinking

5    out of the bottle could you tell whether it was an

6    alcoholic bottle or not?

7         A.    Yes.

8         Q.    What about it made you believe that it

9    was an alcoholic drink bottle?

10        A.    I have similar bottles at my house.

11        Q.    So what about this bottle that Officer

12   Seiser was drinking out of indicated to you that it

13   was an alcoholic drink bottle?

14        A.    Yes, 100 percent, definitely was an

15   alcoholic bottle.

16        Q.    But what about it?  How did it appear

17   to you --

18        A.    The shape of the bottle, I have

19   similar bottles at home.

20        Q.    Okay.

21             MR. PLATT:  That's all I've got.

22             MR. FLAXMAN:  I have nothing further.

23             MR. PLATT:  Signature is reserved.

24                  (The deposition concluded at

e79b4ac3-638e-4cfa-9f39-1c0963af7bb7

**Exhibit 3**


Patrol Division
009th District

29 March 2011

**TO:** David Jarmusz
Commander
009th District

**FROM:** John D. Verta #892
Sergeant
009th District

**SUBJECT:** Complaint Log # 1044352

**Log #:**1044352

**Event #:** 08888 for original call of DUI Driver, Event # 09082 For Request for Supervisor

**Allegation:** Drinking on Duty

**Accused:** Seiser, Michael # 4615, Employee #42601, Seniority Date 10 Jul 1995

**Date, Day and Time**: 29 March 2011, Tuesday, 1418 Hours

**Location:** 5000 South Union

**Date Complainant & Witness Interviewed:** 29 March 2011

**Complainant:** Glassford, Gail, F/W, 15 23 Yoa, Union, Chicago, Illinois, Home-7 Cell #

**Witness:** Anderson, Roseann, F/W, 18 31 Yoa, Union, Chicago, Illinois, Home-

**Vehicle Involved:** Pontiac Grand Am, barring Illinois Plate , registered to Accused.

**Notifications:** Captain Johnson (3rd Watch, Watch Commander), Lt. Naleway #367 (I.A.D.) at 1510hrs, Sgt. Matt Price #2147(I.A.D.)

CONFIDENTIAL
Document Produced Pursuant to
Protective Order in 12 C 2353

Investigation/Narrative: R/S responded to 48     South Union reference a Request for a Supervisor. Upon arrival the Complainant and Witness related to R/S that "a gray grand am, with license plate       , was driving down the middle of the street going anywhere from 5-10 miles over the speed limit." The Complainant further added the "driver of the vehicle was drinking from a gallon bottle of what appeared to be vodka, with a red and white label. The car stopped about a block down in front of the firehouse and a uniformed Chicago Police Officer was the driver. The driver then took post on the corner of 50th & Union by the firehouse. " The Complainant advised there were no other occupants in the vehicle. The Witness was interviewed and in effect substantiated

R/S responded to 5000 South Union and observed the Accused/Officer Seiser standing on his assigned foot post, and the vehicle matching the description given by the Complainant parked at 5032 South Union. R/S looked inside the vehicle and observed a gallon size glass bottle, with a red and white label, containing a clear liquid, laying on the front passenger seat in plain view. The seal of the bottle had been obviously broken and there was a minimal amount of liquid on the bottom of the bottle. R/S asked for Officer Seiser to speak with R/S. At this time, R/S asked Officer Seiser if he was involved in a confrontation with anyone, to wit he responded, "No, I have not." R/S asked Officer Seiser if he had been drinking to which he replied, "No." R/S then asked what was inside the bottle lying on his front passenger seat. Officer Seiser responded "What bottle?" R/S then walked with Officer Seiser to his vehicle and asked once again, "What is inside the bottle?" Officer Seiser responded "do you have a signed affidavit?" R/S said, "Open the door so I can see what is inside the bottle." Officer Seiser responded, "Do you have a search warrant? Do you have a signed affidavit?" R/S indicated that he did not, to wit Officer Seiser said, "Sorry Sergeant but I have rights and I am not opening my car." R/S repeated his request for the Officer to open his door to wit he refused, repeating his previous statement.

R/S then instructed Officer to sign the rear of the squad and notified the on-duty watch commander, Captain Robert Johnson. At this time, R/S was instructed to transport the Officer into the 009th District. Upon arrival Captain Johnson indicated that IAD, Lt. Naleway was advised of the situation and that a sergeant would be responding. Officer Seiser was instructed into the viewing room within the 009th District. Sgt. Price arrived at 1600hrs in the 009th District and was advised by R/S of the preceding events. Sgt. Price was given the Complainant's and Witness information and advised that he would seek for them to sign sworn affidavits before proceeding further. Officer Seiser was allowed to use the rest room during this time and offered to use the telephone.

At 1645hrs Sgt. Cochran #894 from IAD arrived in the 009th District and advised the following to R/S and Captain Johnson in the Watch Commanders Office: Sgt. Cochran verbally stated that Deputy Superintendent Kirby ordered that Officer Seiser was to be charged criminally for driving under the influence based upon the witness' statements. In addition, Sgt. Cochran advised that Officer Seiser's vehicle was to be impounded and the contents inventoried. In addition, Sgt. Cochran indicated to the Watch Commander to have two Officers come into the station to process the "DUI." At this time, Officer Madsen and Officer Kral were dispatched to the 009th District for processing. Officer

Seiser was advised by IAD Sgt. Price that he was being charged criminally for the "DUI" and then IAD would proceed administratively. Sgt. Price and Sgt. Cochran then ordered Officer Seiser to turn over his weapon to them. Officer Seiser was escorted to the Processing Area by Sgt. Verta, Officer Madsen and Officer Kral.

Officer Madsen performed the field sobriety tests within the 009th District Processing Area, with Officer Kral as a witness. Officer Madsen read the Warning to Motorist and Implied Consent reports and a breath exam was offered which Officer Seiser agreed to take. The results of the exam indicated a 000 reading. At this time Captain Johnson was advised of these results. Based upon Officer Madsen's observations and Officer Seiser's breath test result the determination was made to release Officer on the charge of DUI and that he would be issued a traffic citation for having an open bottle of alcohol inside his vehicle. R/S advised Officer Seiser of this determination.

John D. Verta #892
Sergeant
009th District

Approved:

CONFIDENTIAL Document Produced Pursuant to Protective Order in 12 C 2353

**Exhibit 4**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


MICHAEL SEISER,                    )
                    Plaintiff;    )
                                   )
                                   )
                                   )
                                   )
     -v-                           )No. 12 CV 02353
                                   )
                                   )
                                   )
CITY OF CHICAGO and DEBRA          )
KIRBY,                             )
                    Defendants.    )



        The Discovery Deposition of ANDREW KRAL,

taken before Beth C. Radtke, C.S.R. within and for

the State of Illinois, pursuant to the provisions of

the Federal Rules of Civil Procedure of the United

States District Court, pertaining to the taking of

depositions, taken at 200 South Michigan Avenue,

Suite 1240, Chicago, Illinois, commencing at the hour

of approximately 12:00 p.m. on the 6th day of

November, 2012.

```
 1                      APPEARANCES

 2


 3    LAW OFFICE OF KENNETH N. FLAXMAN
      By Mr. Kenneth N. Flaxman
 4        200 South LaSalle Street
          Suite 1240
 5        Chicago, Illinois  60604
          312.427.3200
 6        knf@kenlaw.com
          Appeared on behalf of the Plaintiff;
 7

 8    CORPORATION COUNSEL
      By Mr. Thomas Platt
 9       Ms. Lindsey Vanorny
          30 North LaSalle Street
10        Suite 1400
          Chicago, Illinois  60602
11        312.744.4833
          thomas.platt@cityofchicago.org
12        lindsey.vanorny@cityofchicago.org
          Appeared on behalf of the Defendants.
13

14

15

16

17

18

19

20

21

22

23

24
```

Page 3

```
 1              (Witness sworn.)
 2                        ANDREW KRAL,
 3     having been first duly sworn, was examined and
 4     testified as follows:
 5                        EXAMINATION
 6     BY MR. FLAXMAN:
 7         Q.    Could you state your name and spell your
 8     last name for us, please?
 9         A.    Andrew Kral, K-r-a-l.
10         Q.    And you're a Chicago police officer.  For
11     how long have you been a Chicago police officer?
12         A.    Seven years.
13         Q.    Have you ever met the man to my right?
14         A.    Not before this.
15         Q.    Well, did you meet him on March 29, 2011?
16         A.    Yes.
17         Q.    How did you have occasion to meet him?
18         A.    I was ordered to come in to the station.
19         Q.    What -- were you ordered to do something at
20     the station?
21         A.    At first I was ordered just to come in.
22         Q.    Were you working with a partner?
23         A.    Yes, I was.
24         Q.    And who was that?
```

Page 4

1     A.    Officer Madsen.

2     Q.    And did you both -- were you both ordered to

3  come in?

4     A.    Yes.

5     Q.    When you came in, does that mean you went to

6  the 9th District police station?

7     A.    Yes.

8     Q.    And what did you do when you got there?

9     A.    Spoke with somebody at the front desk.

10    Q.    Do you remember who that was?

11    A.    Sergeant Hitney.

12    Q.    Can you spell that for us?

13    A.    I cannot.

14    Q.    What did Sergeant Hitney tell you to do?

15    A.    Go in back and see the captain.

16    Q.    And who was the captain?

17    A.    Captain Johnson.

18    Q.    And did you follow that order?

19    A.    Yes.

20    Q.    And did you see the captain?

21    A.    Yes.

22    Q.    And what did the captain say?

23    A.    I don't remember.

24    Q.    Okay.  Was anybody else present besides you

1    when you spoke with the captain?

2        A.    Sergeant Verta and two other officers,

3    plainclothes.

4        Q.    Did you ever learn that they were IAD

5    sergeants?

6        A.    Yes.

7        Q.    Was Officer Madsen with you also?

8        A.    I don't recall.

9        Q.    Okay.  What did do you after that

10   conversation?

11       A.    I don't understand.

12       Q.    Well, let me go back.  You don't remember

13   what the captain said.  Do you remember what anybody

14   said during that -- when you went back to see the

15   captain?

16       A.    When I went back there, I met with the

17   captain and the two plainclothes officers.  They

18   informed me that they were from IAD.

19       Q.    And did anybody else say anything?

20       A.    In terms of?

21       Q.    In terms of what you should do, why you were

22   there?

23       A.    We were then informed by the two officers

24   from IAD, which I learned they were sergeants, there

Page 6

1    had been allegations of a DUI and that we were

2    ordered to process the subject for a DUI.  It had

3    been an off-duty police officer.

4         Q.   Now had you ever processed anyone for DUI

5    before?

6         A.   Yes.

7         Q.   How often have you -- do you do a lot of

8    DUIs?

9         A.   I wouldn't say a lot, no.

10        Q.   Do you do more than one a year?

11        A.   Yes.

12        Q.   Are you a certified Breathalyzer person?

13        A.   No.

14        Q.   Is your partner certified?

15        A.   I believe so, yes.

16        Q.   Did you -- when you were told there was an

17   allegation of DUI, were you given any other

18   information about what the allegation -- about the

19   nature of the allegation?

20        A.   Yes.

21        Q.   What were you told?

22        A.   I was informed that there had been witnesses

23   on scene and -- who had seen an open container of

24   alcohol in the car, seen the subject driving, and one

1    of the sergeants, I don't recall his name, informed

2    me that there was -- one of the witnesses smelled

3    alcohol on his breath.

4         Q.   Anything else that you can recall about this

5    conversation?

6         A.   No.

7         Q.   What did you do after -- after you left that

8    conversation?  Where did you go?

9         A.   We went to the processing room.

10        Q.   And you say "we," who is the "we?"

11        A.   My partner, officer Madsen.

12        Q.   What did you do in the processing room?

13        A.   Conducted our investigation per orders for a

14   DUI.

15        Q.   And what did that -- what did you actually

16   do as part of that investigation?

17        A.   Some field sobriety tests.

18        Q.   And did you administer those or did your

19   partner?

20        A.   My partner did.

21        Q.   Did you observe?

22        A.   Yes.

23        Q.   Did you observe Officer Seiser pass all the

24   field sobriety tests?

4a590725-88e5-4db3-b86b-53f415594ce8

Page 8

1      A.    Yes.

2      Q.    Were you -- did you speak with Officer

3   Seiser?

4      A.    Not that I remember.

5      Q.    Did you get close enough to Officer Seiser

6   to smell the odor of alcoholic beverages about him?

7      A.    Yes.

8      Q.    Did you smell the odor of alcoholic

9   beverages?

10     A.    No.

11     Q.    Was there anything about Officer Seiser that

12  indicated that he had recently consumed alcohol?

13     A.    No.

14     Q.    Did he tell you he had recently consumed

15  alcohol?

16     A.    I don't recall that.

17     Q.    Do you recall anything that Officer Seiser

18  said to you at that time?

19     A.    At that time, no.

20     Q.    Did you fill out a field sobriety test

21  report?

22     A.    My partner did.

23     Q.    Is there anything in that report that

24  requires a statement of probable cause for

1    administering the field sobriety test?

2         A.    I'm not familiar with the form enough to

3    know.

4         Q.    Okay.  What happened after Officer Seiser

5    passed all the field sobriety tests?

6         A.    We read him his warning to motorist.

7         Q.    When you say "we read him," who is the "we?"

8         A.    My partner.

9         Q.    And those -- who are those warnings to

10   motorists?

11        A.    It's a warning that if you submit to

12   chemical testing and you're found guilty of a DUI,

13   there will be a suspension of your driver's license

14   for three months; if you don't submit to chemical

15   testing and found guilty, there will be a suspension,

16   I believe, for six months of your driver's license.

17        Q.    Are you aware of any rule or regulation in

18   the Chicago Police Department that requires that

19   there be probable cause before a police officer

20   administers those warnings to a motorist?

21        A.    Sure.

22        Q.    And was there probable cause -- well, did

23   you believe that there was probable cause that

24   Officer Seiser had committed a DUI?

Page 10

```
 1      A.   Yes.

 2      Q.   And what was the -- why did you believe

 3  that?

 4      A.   Based on what people from IAD, the two

 5  sergeants were telling me and the witness statements

 6  that they had.

 7      Q.   Had you spoken to any of those witnesses?

 8      A.   No.

 9      Q.   Had you seen any written witness statements?

10      A.   No.

11      Q.   Was there anything about Officer Seiser that

12  indicated to you that he was under the influence of

13  alcoholic beverage?

14      A.   No.

15      Q.   Do you remember which IAD sergeant told you

16  these things?

17      A.   Yes, but I don't recall his name.

18      Q.   Well, does Sergeant Price refresh your

19  recollection?

20      A.   If he's the male white, bald.

21      Q.   I think they're both male whites.  No?

22  Okay, was one IAD sergeant white and one was black?

23      A.   Yes.

24      Q.   And was it the white IAD sergeant who told
```

Page 11

1    you that -- the facts that -- that there was -- well,

2    was it the white sergeant who spoke during the

3    meeting?

4        A.   At first, yes.

5        Q.   And what did the African American sergeant

6    say?

7        A.   He informed us that we were to take the

8    officer in back and process him as a DUI.

9        Q.   And as a police officer in the Chicago

10   Police Department, it's your duty to follow orders

11   from a sergeant, is that right?

12       A.   Yes.

13       Q.   Have you ever seen the alcohol drug

14   influence report that was prepared that day?

15       A.   Yes.

16       Q.   When's the -- did you see it back on the day

17   it was prepared?

18       A.   I'm sorry?

19       Q.   Did you see -- it was prepared on March 29,

20   2011.  Did you see it then?

21       A.   Yes.

22       Q.   Did you -- does your handwriting appear on

23   it anywhere?

24       A.   I don't believe so.

Page 12

1    Q.   How did you have occasion to see it?

2    A.   My partner was preparing it.

3    Q.   Did you look at it?

4    A.   Yes.

5    Q.   Okay.  Well, after Officer Seiser passed the

6    performance test, then what did you do?

7         MR. PLATT:  You mean the field sobriety?

8         MR. FLAXMAN:  That's what I meant.  Let me

9    rephrase the question.

10   BY MR. FLAXMAN:

11   Q.   After Officer Seiser passed the field

12   sobriety test, what, if anything, did you do?

13   A.   Read the warning to motorist.

14   Q.   And did you read it or did your partner?

15   A.   My partner.

16   Q.   And did Officer Seiser respond to the

17   warning?

18   A.   How so?

19   Q.   Did he say yes, I will submit to the test?

20   A.   I believe so.

21   Q.   What happened next?

22   A.   He was sat next to the machine and my

23   partner performed the test.

24   Q.   And where was Officer Seiser when he took

Page 13

1    the test?  Where in the station?

2        A.    The 9th District processing room.

3        Q.    Were there other people present besides you,

4    Officer Madsen and Officer Seiser?

5        A.    Not that I recall.

6        Q.    Are there prisoners in the processing room?

7        A.    I don't recall any at the time.

8        Q.    Are there detention cells adjacent to the

9    processing room?

10       A.    That would be in another room.

11       Q.    Do you recall if Officer Seiser had his

12   firearm when he was taking the Breathalyzer test?

13       A.    He did not.

14       Q.    Had you seen someone take the firearm from

15   Officer Seiser?

16       A.    No.

17       Q.    I used the word detention cells.  Are

18   detention cells different than holding cells, or do

19   you understand them to be different?  Let me ask you

20   the right question.

21       A.    Okay.

22       Q.    Were there holding cells adjacent to the

23   processing area where the Breathalyzer was

24   administered?

Page 14

1     A.    No.

2     Q.    How long did it take to administer the

3  Breathalyzer?

4     A.    I don't know.

5     Q.    Do you remember what the results were of the

6  Breathalyzer?

7     A.    0.000.

8     Q.    What, if anything, did you do after that?

9     A.    I informed my sergeant, sergeant Verta what

10  I had.

11    Q.    And what did Sergeant Verta tell you?

12    A.    I don't recall.

13    Q.    What did you do after you informed sergeant

14  Verta what you had?

15    A.    I believe I talked to the captain and we did

16  a release without charging.

17    Q.    Did you have to fill out paperwork for the

18  release without charging?

19    A.    I completed the arrest report.

20    Q.    Were you involved in issuing a traffic

21  citation to Officer Seiser?

22    A.    No.

23    Q.    Do you know who -- did you know -- well, as

24  you sit here now, do you know that a traffic citation

Case 1:12-cv-02353   Document 42   Filed 03/18/13   Page 60 of 101   PageID 398
Case: 13 1985   Document: 5 2   Filed: 05/23/2013   Pages: 319

Page 15

1    was issued?

2         A.    Yes.

3         Q.    Do you know who issued it?

4         A.    My partner.

5         Q.    Were you present when he issued it?

6         A.    Yes.

7         Q.    Do you know why he issued it?

8         A.    I believe it was for open container,

9    transportation of open container.

10        Q.    Did someone tell him to write a traffic

11   citation?

12        A.    I don't remember.

13        Q.    Did you see him write the citation?

14        A.    Yes.

15        Q.    Did he write the citation after the

16   Breathalyzer or before the Breathalyzer?

17        A.    I don't recall when that was written.

18        Q.    Did he write the -- well, was Officer Seiser

19   -- did you ever see Officer Seiser get his firearm

20   back that day?

21        A.    No.

22        Q.    What did do you with Officer Seiser -- well,

23   after the Breathalyzer, I think you said you left to

24   speak with -- do you know where Officer Seiser went

4a590725-88e5-4db3-b86b-53f415594ce8

Page 16

1     after the Breathalyzer?

2          A.    No.

3          Q.    Was Officer Seiser ever handcuffed?

4          A.    No.

5          Q.    Was he ever restrained?

6          A.    No.

7          Q.    Was he ever told he's under arrest when you

8     were present?

9          A.    When I was present, no.

10         Q.    Did anybody ever tell him in your presence

11    that you're not free to leave, sir?

12         A.    Not in my presence.

13         Q.    Did you go to court on the traffic citation?

14         A.    I did not.

15         Q.    Do you know if your partner did?

16         A.    I believe he did.

17         Q.    Do you know who the complaining witness was

18    in the traffic citation?

19         A.    Not offhand, no.

20         Q.    Did either of the IAD -- did anybody ever

21    give you the names of the persons who had complained

22    about Officer Seiser?

23         A.    Yes.

24         Q.    Who gave you those names?

Page 17

1      A.    The white -- I can't remember his name.   The

2    white IAD sergeant.

3      Q.    Okay.

4      A.    That was Sergeant Cochran.

5      Q.    Was there -- were you present when there was

6    any kind of a lineup or a showup involving Officer

7    Seiser?

8      A.    No.

9      Q.    Did you see any civilian witnesses at the

10   police station?

11     A.    No.

12     Q.    Did you go out to the scene where Officer

13   Seiser's car was that day?

14     A.    No.

15     Q.    Did you ever see the -- the bottle or the

16   object that was recovered from Officer Seiser's car?

17     A.    No.

18     Q.    Were you ever told that Officer Seiser would

19   be processed administratively?

20     A.    Yes.

21     Q.    Who told you that?

22     A.    Sergeant Cochran.

23     Q.    Was that before the Breathalyzer or after

24   the Breathalyzer?

Page 18

```
 1      A.   I don't recall.

 2      Q.   What did it mean to you that Officer Seiser

 3   was being processed administratively?

 4      A.   I don't know.

 5      Q.   What did you do before becoming a police

 6   officer?

 7      A.   I worked for a YMCA.

 8      Q.   How long did you do that?

 9      A.   I think seven or eight years.

10      Q.   Is there a form that's involved in DUIs

11   called a warning to motorist form?

12      A.   Yes.

13      Q.   Did you see that form filled out for Officer

14   Seiser?

15      A.   No.

16      Q.   Do you know why -- well, do you know whether

17   or not it was filled out?

18      A.   I don't know.

19      Q.   What's -- what is the -- can you tell us

20   what that form is used for?

21      A.   Like I stated before, if -- you read them

22   the warnings that if they submit to chemical testing

23   and they're found guilty of a DUI -- I'm summarizing

24   -- you will have a license suspension, I believe it's
```

Page 19

1    three months.

2       Q.   Is that form filled out whenever there is a

3    DUI stop?

4       A.   Whenever there's a DUI stop?

5       Q.   When is that form filled out?

6       A.   Usually during -- I don't understand your

7    question.

8       Q.   Is that form filled out -- is it the

9    standard procedure to fill out that form every time

10   that a motorist is asked to consent to a

11   Breathalyzer?

12      A.   Yes.

13      Q.   Do you know whether or not that form was

14   filled out for Officer Seiser back in March of 2011?

15      A.   It was not.

16      Q.   Do you know why it was not?

17      A.   I believe because we were going to do a

18   release without charging.

19      Q.   Is it the practice to fill that form out

20   before the Breathalyzer is administered?

21      A.   I don't know.

22      Q.   Well, have you ever -- have you used that

23   form before in your work as a Chicago police officer?

24      A.   Yes.

Page 20

1      Q.    Have you ever filled that form out -- strike

2    that.

3           Is that form something that you give to the

4    motorist before the motorist is asked to submit to

5    the Breathalyzer?

6      A.    You don't give them the form.  I haven't

7    given them the form.

8      Q.    Do you read from the form?

9      A.    You read from the form.

10     Q.    Do you fill in the motorist's name in the

11   form?

12     A.    Yes.

13     Q.    And do you do that before the Breathalyzer

14   is administered?

15     A.    I have -- repeat the question, please.

16     Q.    Do you fill out the form with the motorist's

17   name before the motorist is offered the opportunity

18   to take a Breathalyzer?

19          MR. PLATT:  You're asking in general,

20   correct?

21          MR. FLAXMAN:  Yes.

22          MR. PLATT:  You can answer.

23   BY THE WITNESS:

24     A.    Yes.

Page 21

1    BY MR. FLAXMAN:

2         Q.    And that wasn't done for Officer Seiser back

3    in March of 2011, was it?

4         A.    No.

5         Q.    Do you know why it wasn't done?

6         A.    I do not.

7         Q.    Could it -- was that -- was that form not

8    filled out before Officer Seiser was offered the

9    opportunity to take a Breathalyzer because Officer

10   Seiser wasn't read warnings?

11        A.    No.

12        Q.    Are you familiar with the offense of

13   transporting alcohol with liquor in a vehicle with

14   the seal broken?

15        A.    Yes.

16        Q.    Have you ever written a ticket for that

17   before March of 2011?

18        A.    Yes.

19        Q.    How many times?

20        A.    I couldn't tell you offhand.

21        Q.    More than once?

22        A.    Yes.

23        Q.    Has there ever been a time when you wrote a

24   ticket for alcoholic liquor in a vehicle with seal

Page 22

1    broken when you had not recovered the alcoholic

2    liquor in a vehicle with seal broken?

3        A.   Yes.

4        Q.   Well, is there any particular time you can

5    recall, other than this case?

6        A.   A specific time, no.

7        Q.   Can you recall any of the specifics about

8    that incident?

9        A.   Not offhand.

10       Q.   Back in March of 2011, did you believe that

11   Officer Seiser had transported alcoholic liquor in a

12   vehicle with the seal broken?

13       A.   Based on what was told to me, yes.

14       Q.   And what, if anything, was told to you that

15   caused you to believe that there was alcohol in that

16   container that was said to be in his car?

17       A.   It was some sort of alcoholic beverage

18   container.

19       Q.   Anything else?

20       A.   I think I answered.

21       Q.   Well, is it an ordinance violation to

22   transport an open alcoholic beverage container that

23   does not contain alcohol?

24       A.   Yes.

Page 23

1      Q.   And what -- is that the same ordinance that

2   makes it unlawful to transport an alcoholic beverage

3   container if it does contain alcohol?

4           MR. PLATT:  Objection to form of the

5   question.  Do you understand?

6           THE WITNESS:  Pardon me?

7           MR. PLATT:  Do you understand the question?

8           THE WITNESS:  Yes.

9           MR. PLATT:  Go ahead and answer.

10  BY MR. FLAXMAN:

11     Q.   Is it unlawful in the City of Chicago to

12  transport an open container in a vehicle that at one

13  time contained alcohol but does not at the time it is

14  being transported contain alcohol?

15     A.   I believe so.

16     Q.   And so -- and let me be -- so is it your

17  understanding that it's unlawful to carry -- to

18  transport an empty container in a vehicle in the City

19  of Chicago if that container at one time contained

20  alcohol?

21     A.   Yes.

22     Q.   Have you ever arrested anybody for that or

23  -- strike that.

24          Have you ever charged anyone with that other

4a590725-88e5-4db3-b86b-53f415594ce8

Page 24

1    than Officer Seiser?

2        A.    Yes.

3        Q.    Were you ever with Officer Madsen when a

4    motorist was given a citation for transporting

5    alcoholic liquor in a vehicle -- or strike that.

6            Were you ever with Officer Madsen when a

7    motorist was charged with an offense where the

8    offense involved transporting a container that at one

9    time contained alcohol but no longer did in a

10   vehicle?

11       A.    I couldn't recall.

12       Q.    Do you know what ordinance or statute makes

13   it unlawful to transport an open container that at

14   one time contained alcohol but no longer does?

15       A.    Do I know the -- do I know the statute

16   offhand?

17       Q.    Right.

18       A.    No, I don't.

19       Q.    If you were writing a citation for that

20   offense, would you have to fill in the citation for

21   that statute?

22       A.    Yes.

23       Q.    And how would you determine what statute to

24   fill in?

Page 25

```
 1       A.   I believe that's on the citation itself.

 2  It's preprinted.

 3       Q.   Okay.

 4            MR. FLAXMAN:  We'll take a break.

 5            (A short break was taken.)

 6  BY MR. FLAXMAN:

 7       Q.   We've just taken a break.  After reflecting

 8  on your answers to the questions, is there anything

 9  you'd like to change or clarify before we continue?

10       A.   Not that I can think of.

11       Q.   Okay.  When the performance tests -- when

12  you administered the performance tests to Officer

13  Seiser, was anybody else present besides you?

14       A.   Not that I recall.

15       Q.   Do you recall Sergeant Verta being there?

16       A.   No.

17       Q.   When your partner administered the

18  Breathalyzer to Officer Seiser, was anybody else

19  present besides you?

20       A.   Not that I remember.

21       Q.   Do you remember Sergeant Verta being there?

22       A.   No.

23       Q.   Do you remember any conversations you had

24  with Officer Seiser that day?
```

Page 26

1      A.    No.

2      Q.    Do you remember asking him, "Why don't you

3  just give the bottle to the sergeant?"

4      A.    Say that again, please.

5      Q.    Do you remember asking Officer Seiser

6  anything in substance about why don't you just give

7  the sergeant the bottle?

8      A.    No.

9      Q.    Did you know that Officer Seiser was being

10  processed because there was a bottle observed in his

11  car?

12      A.    Yes.

13      Q.    You never saw that bottle, did you?

14      A.    No.

15      Q.    Did Officer Seiser ever tell you that there

16  was water in the bottle?

17      A.    I don't recall.

18      Q.    Anybody ever tell you that there was water

19  in the bottle?

20      A.    No.

21      Q.    Did you ever tell Officer Seiser that you're

22  under arrest for DUI?

23      A.    Not that I remember.

24      Q.    In the processing room, are there any rooms

Page 27

1    that look onto it where detainees can be held?

2        A.    Yes.

3        Q.    What do you call those rooms?

4        A.    There's three or I believe four rooms that

5    they're labeled interview rooms.

6        Q.    Do you remember any non-police officer being

7    present in any of those interview rooms while Officer

8    Seiser was back there with you?

9        A.    No.

10           MR. FLAXMAN:  All right.  Nothing further.

11                   EXAMINATION

12   BY MR. PLATT:

13       Q.    Let me ask you, earlier you were asked

14   questions about whether or not someone could be

15   guilty of having an open alcohol container or in

16   violation of the open alcohol container statute if

17   the container does not contain alcohol.  Do you

18   remember being asked those questions?

19       A.    Yes.

20       Q.    Do you know whether or not someone can be

21   guilty of that one way or the other?

22       A.    No, I don't.

23           MR. PLATT:  That's all I have.

24           MR. FLAXMAN:  Signature?

Page 28

1              MR. PLATT:  Reserved.

2              MR. FLAXMAN:  All right.

3              (Deposition concluded at 12:43 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

4a590725-88e5-4db3-b86b-53f415594ce8

**Exhibit 5**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


MICHAEL SEISER,                    )
                  Plaintiff;       )
                                   )
                                   )
                                   )
                                   )
      -v-                          )No. 12 CV 02353
                                   )
                                   )
                                   )
CITY OF CHICAGO and DEBRA          )
KIRBY,                             )
                  Defendants.      )



        The Discovery Deposition of BRIAN MADSEN,

taken before Beth C. Radtke, C.S.R. within and for

the State of Illinois, pursuant to the provisions of

the Federal Rules of Civil Procedure of the United

States District Court, pertaining to the taking of

depositions, taken at 200 South Michigan Avenue,

Suite 1240, Chicago, Illinois, commencing at the hour

of approximately 12:45 p.m. on the 6th day of

November, 2012.

60f43f15-0837-44bd-b0a4-a55730c5b5af

Page 2

```
 1                    APPEARANCES

 2

 3   LAW OFFICE OF KENNETH N. FLAXMAN
     By Mr. Kenneth N. Flaxman
 4       200 South LaSalle Street
         Suite 1240
 5       Chicago, Illinois  60604
         312.427.3200
 6       knf@kenlaw.com
         Appeared on behalf of the Plaintiff;
 7

 8   CORPORATION COUNSEL
     By Mr. Thomas Platt
 9      Ms. Lindsey Vanorny
        30 North LaSalle Street
10       Suite 1400
         Chicago, Illinois  60602
11       312.744.4833
         thomas.platt@cityofchicago.org
12       lindsey.vanorny@cityofchicago.org
         Appeared on behalf of the Defendants.
13

14

15

16

17

18

19

20

21

22

23

24
```

60f43f15-0837-44bd-b0a4-a55730c5b5af

Page 3

```
1                    INDEX

2

3    WITNESS:                        PAGE:

4    BRIAN MADSEN
       Examination by Mr. Flaxman          4
5      Examination by Ms. Vanorny          17
       Further Examination by Mr. Flaxman  18
6

7

8    EXHIBITS:

9     Deposition Exhibit No. 1            15
        Citation
10
               EXHIBIT RETAINED BY COUNSEL
11
                      * * * * *
12

13

14

15

16

17

18

19

20

21

22

23

24
```

60f43f15-0837-44bd-b0a4-a55730c5b5af

1          (Witness sworn.)

2                    BRIAN MADSEN,

3    having been first duly sworn, was examined and

4    testified as follows:

5                    EXAMINATION

6    BY MR. FLAXMAN:

7        Q.   Could you state your name and spell your

8    last name?

9        A.   Madsen, Brian.   B-r-i-a-n M-a-d-s-e-n.

10       Q.   And you're a Chicago police officer.   For

11   how long have you been a Chicago police officer?

12       A.   This year is nine years.

13       Q.   Back in March of 2011, do you remember what

14   your assignment was?

15       A.   I am not sure.

16       Q.   Do you remember -- were you working assigned

17   to the 9th District?

18       A.   Correct.

19       Q.   Do you recall being ordered to come into the

20   9th District on March 29, 2011?

21       A.   Yes.

22       Q.   How did you get that order?

23       A.   Over the radio.

24       Q.   And do you remember what the order was?

60f43f15-0837-44bd-b0a4-a55730c5b5af

Page 5

```
 1      A.   I am not sure.  See the desk.

 2      Q.   Did you -- and were you working with a

 3   partner that day?

 4      A.   Yes, correct.

 5      Q.   Who were you working with?

 6      A.   Andy Kral.

 7      Q.   Is that the same officer who left as you

 8   came in?

 9      A.   Yes.

10      Q.   What did you do after getting that order?

11      A.   Spoke to the desk or --

12      Q.   Did you go to the police station?

13      A.   Yes.

14      Q.   And you went with your partner?

15      A.   Correct.

16      Q.   When you got to the police station, you

17   spoke with the desk.  What did you do after speaking

18   with the desk?

19      A.   I think we went in the back and the

20   supervisors were in the back and we spoke with them.

21      Q.   Do you remember with whom you spoke?

22      A.   Captain Johnson.  There was a couple people

23   from IAD there, sergeants.

24      Q.   And one was black and one was white?
```

60f43f15-0837-44bd-b0a4-a55730c5b5af

Case 1:12-cv-02353   Document 42   Filed 03/18/13   Page 80 of 101   PageID 418
Case: 13 1985     Document: 5 2     Filed: 05/23/2013     Pages: 319

Page 6

1      A.    Correct.

2      Q.    Was there a Sergeant Verta there?

3      A.    Yes.

4      Q.    Do you remember who spoke during that

5   gathering?

6      A.    I think a little bit of everyone.

7      Q.    Well, did you get any orders during that

8   meeting?

9      A.    Yeah, I mean, we were supposed to process

10   Officer Seiser as a DUI.

11      Q.    Had you ever met Officer Seiser before?

12      A.    No.

13      Q.    Did anyone tell you -- well, do you remember

14   who it was who gave that you instruction to process

15   Officer Seiser as a DUI?

16      A.    I'm not really sure.

17      Q.    Did whoever gave you that instruction tell

18   you why you should be processing Officer Seiser as a

19   DUI?

20      A.    I'm not sure.  Can you ask the question

21   again?

22      Q.    Did anybody tell you why Officer Seiser was

23   there to be processed for a DUI?

24      A.    I think it was, like, he was working off

Page 7

1    duty and he was doing the school crossing guard.  I'm

2    not sure.

3        Q.   Well, what did you do after getting the

4    instruction to process Officer Seiser as a DUI?

5        A.   I think we did the fields and, you know, did

6    that kind of stuff.

7        Q.   Where were you -- well, did you perform the

8    field sobriety test?

9        A.   Yes.

10       Q.   Did you do it in the police station?

11       A.   Correct.

12       Q.   Where did you do it in the police station?

13       A.   I think it was the processing room.

14       Q.   And was anybody present when you

15   administered the field sobriety test to Officer

16   Seiser?

17       A.   I believe my partner was.  I'm not sure if

18   anybody else was.

19       Q.   Was Sergeant Verta there?

20       A.   I don't recall.

21       Q.   Either of the IAD sergeants there?

22       A.   I don't recall.

23       Q.   Were there any detainees who were able to

24   observe what you were doing?

60f43f15-0837-44bd-b0a4-a55730c5b5af

Page 8

```
 1        A.    I don't believe so, but...

 2        Q.    Before you administered the field sobriety

 3   test, did you have any conversation with Officer

 4   Seiser?

 5        A.    I am not sure.

 6        Q.    Did you say anything to him?

 7        A.    I don't recall.

 8        Q.    Did you tell him what to do during the field

 9   sobriety test?

10        A.    Oh, yeah.

11        Q.    What's the first thing you remember telling

12   him?

13        A.    I'm not sure which one we performed first,

14   but...

15        Q.    Okay.  After you -- did you go through all

16   -- all of the standard field sobriety tests?

17        A.    Yes.

18        Q.    And how did Officer Seiser do?

19              MS. VANORNY:  Would it help if you had your

20   report?

21              MR. FLAXMAN:  I'll do that if I want to.

22   BY MR. FLAXMAN:

23        Q.    Do you remember how he did?

24        A.    He did well.
```

60f43f15-0837-44bd-b0a4-a55730c5b5af

Page 9

```
 1        Q.    He passed all the field sobriety tests?

 2        A.    He did not appear intoxicated.

 3        Q.    Were you able to smell the odor of any

 4   alcoholic beverage about Officer Seiser?

 5        A.    At no time.

 6        Q.    Did you detect any slurred speech?

 7        A.    No.

 8        Q.    After Officer Seiser passed the field

 9   sobriety test, did you administer a Breathalyzer

10   test?

11        A.    Yes.

12        Q.    Why?

13        A.    I'm not sure.

14        Q.    Were you ordered to administer the

15   Breathalyzer?

16        A.    I'm not sure.

17        Q.    Is there a form that the officers fill out

18   before administering a Breathalyzer, a warning to

19   motorist form?

20        A.    Yes.

21        Q.    Is there a box on that form or a line in

22   that form where the officer fills out what the

23   probable cause was to administer the field sobriety

24   test?
```

Page 10

1      A.    I'm not sure.

2      Q.    Did you administer a Breathalyzer test to

3   Officer Seiser?

4      A.    Yes.

5      Q.    At the time you administered the

6   Breathalyzer test, did you have any basis to believe

7   that Officer Seiser was under the influence of

8   alcohol?

9      A.    No.

10     Q.    And do you remember how Officer Seiser did

11   on the Breathalyzer test?

12     A.    It was triple zeros.

13     Q.    Did you write a traffic citation that day?

14     A.    Yes, sir.

15     Q.    Why did you write the traffic citation?

16     A.    I'm unsure.

17     Q.    Did somebody order you to do it?

18     A.    Possibly.

19     Q.    Well, do you remember what the traffic

20   citation was that you wrote?

21     A.    I think it was open alcohol.

22     Q.    Had you observed open alcohol in Officer

23   Seiser's vehicle?

24     A.    No, sir.

60f43f15-0837-44bd-b0a4-a55730c5b5af

Page 11

1      Q.    Had anyone told you that they had observed

2   open alcohol?

3      A.    I think Sergeant Verta related that there

4   was an open bottle or an open container and there was

5   a witness that saw him drinking from it.  I'm not

6   sure.

7      Q.    Did somebody -- did you ever speak to that

8   witness?

9      A.    No, sir.

10     Q.    Did somebody ever tell you that there was

11  alcohol in that bottle?

12     A.    No, sir.

13     Q.    Was it your understanding back in March of

14  2011 that the offense of transporting open alcohol

15  required that there be alcohol in the container that

16  was being transported?

17     A.    I'm not sure.

18     Q.    Well, if you had a container that formerly

19  contained alcohol but now contained water which was

20  open in a vehicle, would that be a violation of any

21  ordinance or statute of which you are aware?

22     A.    No, I'm not sure.

23     Q.    Okay.  Do you remember who it was who told

24   you the name of the complainant to write in that

60f43f15-0837-44bd-b0a4-a55730c5b5af

Page 12

1    ticket you wrote?

2        A.    It was a lot of people there.  I'm really

3    not sure, sir.

4        Q.    Did you go to court on the ticket?

5        A.    Yes, sir.

6        Q.    And did you testify?

7        A.    I spoke with a state's attorney ahead of

8    time and I learned that it was just water in there,

9    so...

10       Q.    Well, how did you learn that it was just

11   water in there?

12       A.    I'm not sure if it went to the chemical lab

13   and came back negative or -- I'm not sure.

14       Q.    Do you remember telling the state's attorney

15   at the -- at Mr. Seiser's court appearance that the

16   container had water in it?

17       A.    Correct.

18       Q.    Had you done anything to notify the

19   complaining witness to -- whose name was on the

20   ticket to come to the court hearing for Mr. Seiser?

21       A.    I'm not sure.

22       Q.    Did you stand up and tell the judge that it

23   was water in the --

24       A.    It never got to that point, sir.

60f43f15-0837-44bd-b0a4-a55730c5b5af

Page 13

```
 1        Q.   Well, were you present -- were you present
 2   in court when the case was called?
 3        A.   Yes, sir.
 4        Q.   And did you stand up?
 5        A.   I'm not sure.
 6        Q.   Do you remember what happened?
 7        A.   I believe they dismissed the ticket, sir.
 8        Q.   Okay.  Do you remember if the prosecutor was
 9   a state's attorney or a corporation counsel or
10   somebody else?
11        A.   I'm really not sure.
12        Q.   Do you remember -- do you recall any
13   conversations you had with Mr. Seiser back on
14   March 29, 2011?
15        A.   No.
16        Q.   Did you ever ask him, "Why don't you just
17   give the sergeant the bottle?"
18        A.   I don't know.
19        Q.   Did Mr. Seiser ever tell you that day that
20   the bottle had water in it?
21        A.   I don't think so.
22        Q.   Did he ever tell you that day that it had
23   alcohol in it?
24        A.   I don't think so.
```

60f43f15-0837-44bd-b0a4-a55730c5b5af

Page 14

1      Q.   Anything that you recall that he told you?

2      A.   No.

3      Q.   Did you write the ticket before you had the

4    results of the Breathalyzer?

5      A.   I'm unsure.

6      Q.   Did you ever tell the captain that you were

7    writing a ticket?

8      A.   Unknown.

9      Q.   What do you mean unknown?

10     A.   I'm not sure.

11     Q.   Would you -- well, do you remember if you

12   wrote in the arrest report anything about issuing the

13   ticket?

14           MS. VANORNY:  Do you want to look at your

15   report?

16           THE WITNESS:  Sure.

17   BY MR. FLAXMAN:

18     Q.    If you don't remember, you don't remember.

19   If you don't remember, say you don't remember and I

20   may or may not ask you to look at the report, but if

21   you don't remember, you don't remember.  Please don't

22   look at the Corporation Counsel for an answer.

23           MS. VANORNY:  You can just answer based on

24   what you remember.

60f43f15-0837-44bd-b0a4-a55730c5b5af

Page 15

```
 1            THE WITNESS:  I'm not sure.

 2   BY MR. FLAXMAN:

 3       Q.   Did you ever hear anybody tell Officer

 4   Seiser that he was under arrest back in March of

 5   2011?

 6       A.   I don't think so.  I'm not sure.

 7       Q.   Did you hear Officer Seiser say anything

 8   back that day?

 9       A.   I don't recall.

10       Q.   Okay.  Do you know someone named Roseanne

11   Anderson?

12       A.   No, sir.

13       Q.   Did you ever hear that name before?

14       A.   I don't recall, sir.

15       Q.   Do you know someone named Gary Anderson?

16       A.   No, sir.

17       Q.   Do you know someone named Gail Glassford?

18       A.   I believe that was the name on the ticket,

19   sir.

20       Q.   Did you ever meet them?

21       A.   No, sir.

22            MR. FLAXMAN:  Can we mark this as Exhibit 1?

23            (Exhibit No. 1 was marked as requested.)

24
```

60f43f15-0837-44bd-b0a4-a55730c5b5af

Page 16

1    BY MR. FLAXMAN:

2        Q.   Can you tell us what Exhibit 1 is?

3        A.   It's a ticket that was issued to Michael

4    Seiser.

5        Q.   Does your handwriting appear on it?

6        A.   Yes, sir.

7        Q.   On the left is the name Gail Glassford?

8        A.   Yes, sir.

9        Q.   Did you write that?

10       A.   Yes.

11       Q.   Why did you write that?

12       A.   I believe I was told to by a supervisor.

13       Q.   Do you know which supervisor told you to

14   write that?

15       A.   No, sir.

16       Q.   Okay.  Did you ever see the bottle that was

17   seized -- recovered from Mr. Seiser's car?

18       A.   I don't believe so.

19       Q.   Do you remember who it was who told you that

20   the bottle contained water?

21       A.   I'm not sure.

22       Q.   Did you ever see a crime lab report about

23   the bottle containing water?

24       A.   I don't recall.

60f43f15-0837-44bd-b0a4-a55730c5b5af

Page 17

1      Q.   Did you ever have any discussions other than

2   what you've told us with Captain Johnson about this

3   incident?

4      A.   I don't believe so.

5      Q.   Did you ever hear the name Debra Kirby back

6   on the day of -- when you gave the Breathalyzer to

7   Mr. Seiser?

8      A.   Yes.

9      Q.   When did you hear that name?

10     A.   That was the day.

11     Q.   Do you remember who said it?

12     A.   I'm not sure.

13     Q.   Do you know Debra Kirby?

14     A.   No.

15     Q.   Did you ever speak with her on the phone?

16     A.   No.

17          MR. FLAXMAN:   I have nothing further.

18          MS. VANORNY:   I have a few questions.

19                    EXAMINATION

20   BY MS. VANORNY:

21     Q.   Earlier you said you didn't have an

22   independent basis to believe that Michael Seiser was

23   under the influence, is that correct?

24     A.   Correct.

60f43f15-0837-44bd-b0a4-a55730c5b5af

1     Q.   Did you rely upon the information that you

2   received from other officers in order for your basis

3   for administering the DUI?

4     A.   Yes.

5     Q.   And also for issuing the ticket?

6     A.   Yes.

7          MS. VANORNY:  Nothing further.

8               FURTHER EXAMINATION

9   BY MR. FLAXMAN:

10     Q.   You said you relied on information from

11   other officers.  Could you tell us the names of those

12   other officers?

13     A.   I believe Sergeant Verta, two sergeants from

14   IAD.  I'm not sure about Captain Johnson.  I'm really

15   not sure, sir.

16     Q.   Okay.  Do you remember what Sergeant Verta

17   -- what information Sergeant Verta relayed to you

18   that was -- that indicated that Officer Seiser had --

19   was guilty of DUI?

20     A.   I'm not sure.

21     Q.   Can you tell us what information either of

22   the IAD officers related to you that Sergeant Verta

23   -- strike that -- that Officer Seiser had committed a

24   DUI?

Page 19

1        A.    I'm not sure.

2        Q.    Can you tell us what information, if any,

3   Captain Johnson related to you that indicated that

4   Officer Seiser had committed a DUI?

5        A.    I'm not sure, sir.

6        Q.    So am I correct that you can't specify what

7   information any of those officers gave you that

8   indicated that Officer Seiser committed a DUI?

9        A.    I'm not sure.

10       Q.    Okay.  And was there anything that you saw

11  on the day of the incident, March 29, 2011, that

12  indicated to you that Officer Seiser had committed a

13  DUI?

14       A.    No.  I'm not sure.

15       Q.    Well, was there anything about Officer

16  Seiser that indicated he had consumed an alcoholic

17  beverage?

18       A.    No, sir.

19       Q.    Anything about Officer Seiser that indicated

20  he was under the influence of an alcoholic beverage?

21       A.    No.

22       Q.    Did you ever see Officer Seiser's gun being

23  taken away from him?

24       A.    No.

60f43f15-0837-44bd-b0a4-a55730c5b5af

Page 20

1     Q.   When you administered the Breathalyzer, did

2   Officer Seiser have his firearm?

3     A.   No, sir.

4     Q.   Did you fill out a warning to motorist form

5   for Officer Seiser on March 29, 2011?

6     A.   I'm not sure.

7     Q.   What is a warning to motorist form?

8     A.    It's just a form that states that if you

9   don't consent to the Breathalyzer, then your driver's

10  license would be suspended for a certain amount of

11  time.

12    Q.   Is that a form -- have you ever filled that

13  form out?

14    A.   Yes.

15    Q.   Do you always fill that form out before you

16  administer a Breathalyzer?

17    A.   I believe so.

18    Q.   Do you remember filling out that form in

19  connection with the Breathalyzer you administered to

20  Officer Seiser?

21    A.   No.

22    Q.   Have you ever seen a form that you filled

23  out or anybody filled out about warning to motorist

24  for Officer Seiser?

60f43f15-0837-44bd-b0a4-a55730c5b5af

Page 21

1      A.    I'm not sure.

2      Q.    Well, what do you mean you're not sure?

3      A.    I mean, I could look.  If you've got

4    paperwork in front of you, I could --

5      Q.    Well, I'll tell you that none of the

6    paperwork in front of me contains a warning to

7    motorist form.  Before you came here today, did you

8    have a chance to look over documents with the

9    corporation counsel?

10     A.    Yes, sir.

11     Q.    And did any of those documents include a

12   warning to motorist form?

13     A.    I'm unsure.

14     Q.    Okay.  Well, is there any -- do you have

15   those documents in front of you that you looked at to

16   prepare for the deposition?

17     A.    I believe so.

18     Q.    Well, could you take a look through them and

19   see if you could find the warning to motorist form?

20   Do you have them?

21     A.    No, sir, I'm sorry, I don't.

22     Q.    Okay.  Is that a one-page form or a two-page

23   form or something else if you recall?

24     A.    I think it's a bunch of pages and then you

Page 22

1    kind of tear it apart.

2         Q.    And is that the form that requires that you

3    fill out what the probable cause was for the test?

4         A.    I'm not sure.

5               MR. FLAXMAN:  All right.  I have nothing

6    further.

7               MS. VANORNY:  Nothing further.

8               MR. FLAXMAN:  We're done.  Signature?

9               MS. VANORNY:  We'll reserve.

10              MR. FLAXMAN:  Thank you.

11              (Deposition concluded at 1:04 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

**Exhibit 6**

# THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

## RECOGNIZANCE - CRIMINAL (CRIMINAL)

Bail Bond Rules of the Illinois Supreme Court

ORIGIN OF BOND

USING AGENCY NO. _CPD_

By _____ (PRINT NAME OF JUDGE)    (JUDGE'S NO.)    (OFFICE USE)

**DEFENDANT: YOUR RELEASE ON THIS BOND DOES NOT REQUIRE POSTING OF CASH OR SECURITIES FOR BAIL**

BAIL AMOUNT    $ [X][X][X]1,500.00/100    _One Thousand Five Hundred Dollars_ 00/100

**DEFENDANT (Person Preparing Bond - Always complete this section)**

Full Name (PRINT): _GEISER, MICHAEL_
(Last)    (First)    (MI)

Address (PRINT): _OTTAWA_

City and State (PRINT): _CHICAGO, IL_    Zip Code (PRINT): _60651_

**STATEMENT OF DEFENDANT:** I understand and accept the terms and conditions set forth below. Further, I hereby certify that I understand the consequences of failure to appear for trial as required.

Defendant's Signature X _M_

| COURT COMPLAINT OR INDICTMENT NUMBER(S) | | CHARGE | DISPOSITION |
|---|---|---|---|
| _TW256778_ | | _5/11-502_ | |

DISPOSITION entered by (Signature of Deputy Clerk) _____    Br. or Sub. CT _____    Court Date ___/___/___ MO DAY YEAR

**COURT APPEARANCE:** Defendant named above shall appear in the Circuit Court of Cook County, Illinois located at:

Address (Number and Street) _50 W WASHINGTON_    City/Town/Village _CHICAGO_, Illinois,

Branch No. _710_    in Room No. _0102_ on _MAY 18, 2011_ at _11:00_ ☐ a.m. ☐ p.m.

**CONDITIONS OF BOND:** The defendant is hereby released on the conditions as indicated below:

☑ Appear to answer the charge in court until discharge or final order of court.
☑ Obey all court orders and process; not leave this State without permission of court and report changes of address to the Clerk within 24 hours.
☑ Not commit any criminal offenses while awaiting final order in this case.
☑ If on appeal, prosecute the appeal, and surrender to custody if the judgment is affirmed or a new trial is ordered.
☐ Surrender (725 ILCS 5/110-10(a)(5)) OR not possess any firearms or dangerous weapons until final order in this case.
☐ Not contact or communicate with any complaining witnesses or members of their immediate families or:

☐ Not go to the area or premises of victims/complaining witnesses home, work, school or:

☐ Not to indulge in intoxicating liquors, illegal drugs or certain drugs, to-wit:

☐ Undergo alcoholism or drug addiction treatment as ordered by the court.

☐ Undergo medical or psychiatric treatment as ordered by the court.
☐ If you are charged with a criminal offense and the victim is a family or household member, you are ordered to refrain from all contact or communication with:

for a minimum of 72 hours following release, and further ordered to refrain from entering and/or remaining at the location of:

for a minimum of 72 hours following release.

☐ Reside with parents or in a foster home, attend school or nonresidential program for youths, contribute to his/her support at home or in a foster home, observe curfew set by court:

☐ Report to and remain under the pretrial supervision of such agency or third-party custodian as ordered by the court:

☐ Other conditions: _____

**FAILURE TO APPEAR - TRIAL IN ABSENTIA**

If you have been charged with an offense that is classified as a felony, your failure to appear constitutes a waiver of your rights to confront witnesses and to be present at your trial. A trial could proceed and if found guilty the court could impose a sentence in your absence.

**FAILURE TO APPEAR - BAIL JUMPING:**

Your failure to appear may result in the filing of an additional charge of Bail Jumping. Sentences imposed upon conviction for this offense shall be served consecutively to sentences imposed for convictions related to the original offenses for which you were admitted to bail.

**VIOLATION OF OTHER CONDITIONS - POSSIBLE PENALTIES:**

Violating any of the conditions indicated on bond may result in the issuance of an arrest warrant for your arrest, forfeiture of bail, judgment for the full amount of the bail set by the court, revocation of this bail, imposition of additional conditions, an increase in the bail amount and/or the filing of an additional charge of violation of the conditions of bail. Felony offenses committed while admitted to bail are subject to consecutive sentencing upon conviction relative to a sentence imposed upon conviction of the original offenses for which you were admitted to bail.

☐ a.m. ☐ p.m. Hour _8:17_

Date _2/27/11_
Month Day Year

## TWO
I 7386202

**DEFENDANT'S COPY**

This bail bond form was prepared by:

_____ (Signature of Peace Officer)    Star No. _13789_    Police Dept. _CPD 009_
(CPD District No. or Suburban City, Town, or Village)

Or Clerk of the Circuit Court of Cook County, by _____ (Signature of Deputy Clerk)    Loc. _____    (Branch or Suburban Court)

**DEFENDANT NOTICE:** Any inquiries should be directed as follows:
MUNIC. { Clerk of Court
DEPT. { C/O the headquarters of
BONDS { the Municipal District to which your case is assigned.

CRIM. { Clerk of Court
DIV. { Criminal Division, County Dept., Room 526
BONDS { 2650 S. California Avenue, Chicago, IL 60608

CCG N697-3.5M-10/08(K3350039)

**Exhibit 7**

## Rivera, Juan J.

| | |
|---|---|
| **From:** | Kirby, Debra K. |
| **Sent:** | Tuesday, March 29, 2011 10:40 PM |
| **To:** | Rivera, Juan J. |
| **Subject:** | Re: Officer Seiser |

```
10-4.   Thank you. We can talk tomorrow. Set up?
```

```
Debra Kirby
Deputy Superintendent
Bureau of Professional Standards
Chicago Police Department

----- Original Message -----
From: Rivera, Juan J.
Sent: Tuesday, March 29, 2011 10:28 PM
To: Kirby, Debra K.
Subject: Officer Seiser

Fyi, after receiving a direct order the officer allowed IAD personnel to retrieve the
liquor bottle. The liquor bottle contained water. The bottle and it's content's were
inventoried. Officer Seiser was released without charging.
```

1

# CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of March, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:  Lindsey Vanorny, ACC, Scott Jebson, ACC, 30 N LaSalle St., Ste 900, Chicago, IL 60602, and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants:  none.


/s/ Kenneth N. Flaxman
_____
Kenneth N. Flaxman
ARDC Number 08830399
200 S Michigan Ave, Ste 1240
Chicago, IL 60604-2430
(312) 427-3200 (phone)
(312) 427-3930 (fax)
knf@kenlaw.com (email)

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Michael Seiser, | ) | |
| | ) | Case No. 12 CV 02353 |
| Plaintiff, | ) | |
| | ) | JUDGE HOLDERMAN |
| v. | ) | |
| | ) | |
| City of Chicago and Debra Kirby, | ) | |
| | ) | |
| Defendants. | ) | |

<u>**DEFENDANTS' REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANTS'
LOCAL RULE 56.1(a)(3) STATEMENT OF UNDISPUTED MATERIAL FACTS**</u>

Defendants City of Chicago (the "City"), by its attorney, Stephen R. Patton, and Deputy
Superintendent Kirby ("Deputy Kirby") (collectively, "Defendants"), by her attorneys, Lindsey
Vanorny, Assistant Corporation Counsel, and Scott Jebson, Chief Assistant Corporation Counsel,
for their reply to Plaintiff's response to Defendant's Statement of Undisputed Material Facts,
state as follows:

1.      Plaintiff Officer Michael Seiser ("Plaintiff") brought this action pursuant to 42
U.S.C. § 1983 and Illinois common law.  Jurisdiction is proper under 28 U.S.C. §§ 1331, 1343
and 1367.  Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391(b).

<u>Plaintiff's Response</u>:  Agree.

**<u>Defendant's Reply</u>**:   **None.**

2.      Plaintiff currently is and at all times relevant to his Complaint, was a resident of
the Northern District of Illinois and employed by the City as a police officer.

<u>Plaintiff's Response</u>:  Agree.

**<u>Defendant's Reply</u>**:   **None.**

1

3.      At all times relevant to Plaintiff's Complaint, Defendant Debra Kirby ("Deputy Kirby") was acting as the Deputy Superintendent of the Bureau of Professional Standards of the Chicago Police Department, with her office located at the Chicago Police Department Headquarters.

Plaintiff's Response:  Agree.

**Defendant's Reply**:  **None.**

4.      Kathleen Glassford (deceased) witnessed the incident that is the subject of this lawsuit when she was standing on the porch of her house at 4849 South Union Avenue, in Chicago, Illinois.

Plaintiff's Response:  Agree.

**Defendant's Reply**:  **None.**

5.      Gail Glassford, witnessed this incident when she was standing in front of her house at 4849 South Union Avenue, in Chicago, Illinois

Plaintiff's Response:  Agree.

**Defendant's Reply**:  **None.**

6.      Roseann Anderson witnessed the incident that is the subject of this lawsuit when she was standing on the sidewalk in front of 4849 South Union Avenue, in Chicago, Illinois.

Plaintiff's Response:  Agree.

**Defendant's Reply**:  **None.**

7.      Gary Anderson witnessed the incident that is the subject of this lawsuit while he was working as a school security guard with the company Blackstar Project at Tilden High School.

Plaintiff's Response:  Agree.

**Defendant's Reply**:   **None.**

8.      Sergeant John Verta ("Sergeant Verta") was a sergeant with the 9th District at the time of the incident. Sergeant Verta reported to Watch Commander Johnson.

Plaintiff's Response:   Agree.

**Defendant's Reply**:   **None.**

9.      Watch Commander Robert Johnson ("Commander Johnson") was the watch commander for the 9th District Police Station at the time of the incident.

Plaintiff's Response:   Agree.

**Defendant's Reply**:   **None.**

10.      Officer Andrew Kral ("Officer Kral") was a police officer in the 9th District Police Station at the time of the incident. He was supervised by Captain Johnson.

Plaintiff's Response:   Agree.

**Defendant's Reply**:   **None.**

11.      Officer Brian Madsen ("Officer Madsen") was a police officer in the 9th District Police Station at the time of the incident. He was supervised by Captain Johnson.

Plaintiff's Response:   Agree.

**Defendant's Reply**:   **None.**

12.      Lieutenant David Naleway ("Lieutenant Naleway") was a lieutenant with the Internal Affairs Division, with his office located at the Chicago Police Department Headquarters, at the time of the incident. He supervised Sergeants Cochran and Price.

Plaintiff's Response:   Agree.

**Defendant's Reply**:   **None.**

13.      Sergeant Matthew Price ("Sergeant Price") was a sergeant with the Internal

3

Affairs Division at the time of the incident. Lieutenant Naleway supervised Sergeant Price.

Plaintiff's Response:  Agree.

**Defendant's Reply**:  **None.**

14.    Sergeant Terrance Cochran ("Sergeant Cochran") was assigned to the Internal Affairs Division at the time of the incident. Lieutenant Naleway supervised Sergeant Cochran.

Plaintiff's Response:  Agree.

**Defendant's Reply**:  **None.**

15.    Chief Juan Rivera ("Chief Rivera") was the Chief of the Internal Affairs Division, with his office located at the Chicago Police Department Headquarters, at the time of the incident. Chief Rivera reported to Deputy Kirby.

Plaintiff's Response:  Agree.

**Defendant's Reply**:  **None.**

16.    On the date of the incident, March 29, 2011, Plaintiff was an on-duty police officer, in uniform, assigned to the Operation Safe Schools Program at Tilden Career Community Academy High School, which is located at 4747 South Union Avenue.

Plaintiff's Response:  Agree.

**Defendant's Reply**:  **None.**

17.    Plaintiff was stationed at the southwest corner of 50th Street and Union Avenue. Plaintiff's shift was from 1:00 p.m. through 4:00 p.m. on that date.

Plaintiff's Response:  Agree.

**Defendant's Reply**:  **None.**

18.    Plaintiff drove southbound on Union Avenue to reach his post while at the same time, drinking from a 1.75 liter T. G. I. Friday's Mudslide bottle. Plaintiff drove by two women

on Union Avenue as he was drinking from the bottle.

Plaintiff's Response:  Agree.

**Defendant's Reply**:  **None.**

      19.    The bottle that Plaintiff was drinking from contained alcohol at the time it was purchased. The bottle contained a label which stated, "The liquor is in it."

Plaintiff's Response:  Agree.

**Defendant's Reply**:  **None.**

      20.    At 2:18 p.m. on March 29, 2011, the Chicago Police Department received a phone call from an unknown individual who reported that a Caucasian male in a silver Grand Am was observed chugging from a bottle of vodka while driving near the intersection of 50th Street and Union Avenue in Chicago, Illinois. The caller stated that the driver had an Illinois license plate and provided six digits of the driver's license plate number. Also, the caller indicated that the driver had just pulled over near the intersection of 50th Street and Union Avenue and was sitting in his car.

Plaintiff's Response:  Agree.

**Defendant's Reply**:  **None.**

      21.    After the driver's license plate number was checked, it was determined that the owner of the car was Plaintiff.

Plaintiff's Response:  Agree.

**Defendant's Reply**:  **None.**

      22.    At 2:29 p.m. on March 29, 2011, the same civilian, Kathleen Glassford, called the Chicago Police Department again and stated that the "DUI driver" was a police officer and requested a police supervisor.

5

<u>Plaintiff's Response</u>:  Agree.

**<u>Defendant's Reply</u>**:  **None.**

23.     Sergeant Verta responded to the request for a supervisor from the Office of Emergency Management and Communications' (OEMC) dispatch personnel.

<u>Plaintiff's Response</u>:  Agree.

**<u>Defendant's Reply</u>**:  **None.**

24.     Sergeant Verta met outside with the complainant, Gail Glassford, and another witness, Roseann Anderson, at approximately 2:50 p.m. at the same address from which the call was made.

<u>Plaintiff's Response</u>:  Agree.

**<u>Defendant's Reply</u>**:  **None.**

25.     The complainant, Gail Glassford, informed Sergeant Verta that she observed a police officer driving a gray vehicle while he was chugging a gallon-sized bottle of vodka.

<u>Plaintiff's Response</u>:  Agree.

**<u>Defendant's Reply</u>**:  **None.**

26.     The other witness, Roseann Anderson, substantiated the claim of the complainant and also stated that she observed the individual driving over the speed limit.

<u>Plaintiff's Response</u>:  Agree.

**<u>Defendant's Reply</u>**:  **None.**

27.     Before Sergeant Verta approached Plaintiff, he looked into Plaintiff's vehicle from the passenger side and observed what appeared to be an alcoholic beverage bottle. The bottle was gallon-sized with a red and white label with the seal broken. The bottle contained a clear liquid.

<u>Plaintiff's Response</u>:  Agree.

**Defendant's Reply**:   **None.**

28.     Sergeant Verta said, "What's in the bottle?" Plaintiff said, "What bottle?" Sergeant Verta responded, "The bottle on your front seat." Plaintiff claims that he told Sergeant Verta that alcohol was not in the bottle. Sergeant Verta asked Plaintiff to open his door and to give him the bottle. Plaintiff refused to open the door, stating, "No. Get a warrant. I know my rights." Sergeant Verta reiterated his request again to Plaintiff again and Plaintiff refused.

Plaintiff's Response:   Agree.

**Defendant's Reply**:   **None.**

29.     Sergeant Verta then called the Watch Commander at the 9th District Police Station, Captain Johnson, to advise him of the situation. Captain Johnson asked Sergeant Verta to bring Plaintiff into the 9th District Police Station and stated that the Chicago Police Department's Internal Affairs Division would be contacted.

Plaintiff's Response:   Agree.

**Defendant's Reply**:   **None.**

30.     After speaking to Sergeant Verta, Captain Johnson called Lieutenant Naleway of the Internal Affairs Division and stated that there was an allegation that a police officer had been drinking while on duty.

Plaintiff's Response:   Agree.

**Defendant's Reply**:   **None.**

31.     In response, Lieutenant Naleway stated that he would send a sergeant from the Internal Affairs Division to the 9th District Police Station. Lieutenant Naleway assigned Sergeant Price of the Internal Affairs Division, who was on his way to work, to respond to the incident and told him to report directly to the 9th District Police Station.

<u>Plaintiff's Response</u>:  Agree.

**<u>Defendant's Reply</u>:  None.**

32.      After assigning Sergeant Price to investigate the allegations made against Plaintiff, Lieutenant Naleway called Sergeant Cochran while he was on his way to the Chicago Police Headquarters and told him to report directly to the 9th District Police Station in order to assist Sergeant Price with the administrative investigation of Plaintiff's conduct.

<u>Plaintiff's Response</u>:  Agree.

**<u>Defendant's Reply</u>:  None.**

33.      Sergeant Verta drove Plaintiff to the 9th District Police Station.

<u>Plaintiff's Response</u>:  Agree.

**<u>Defendant's Reply</u>:  None.**

34.      When Sergeant Verta and Plaintiff arrived at the 9th District Police Station, Seiser was placed in a viewing room.

<u>Plaintiff's Response</u>:  Agree.

**<u>Defendant's Reply</u>:  None.**

35.      Once Sergeant Price of the Internal affairs Division arrived at the 9th District Police Station, either Captain Johnson or Sergeant Verta informed him that several witnesses had observed an on-duty uniformed police officer, who was assigned to the Operation safe schools Program at Tilden High school, drinking an alcoholic beverage while in his personal vehicle.

<u>Plaintiff's Response</u>:  Agree.

**<u>Defendant's Reply</u>:  None.**

36.      Sergeant Price was also informed that Sergeant Verta of the 9th District had observed the bottle on the passenger's side of Plaintiff's vehicle. Sergeant Price also learned that

8

when the officer in question was asked to open the door and to retrieve the bottle he refused because Sergeant Verta did not have a search warrant.

<u>Plaintiff's Response</u>:  Agree.

**<u>Defendant's Reply</u>**:  **None.**

37.    After learning about the allegations made against Plaintiff, Sergeant Price met with Roseann Anderson, Gail Glassford, and Gary Anderson at the scene of the incident to discuss their observations.

<u>Plaintiff's Response</u>:  Agree.

**<u>Defendant's Reply</u>**:  **None.**

38.    In addition, as a part of the investigation, Evidence Technician Kamal Judeh ("Evidence Technician Judeh") took photographs of what appeared to be an alcoholic beverage container lying on the front passenger seat of Plaintiff's car while it was located at the scene of the incident. The bottle lying on Plaintiff's front passenger seat was clearly visible through Plaintiff's car window.

<u>Plaintiff's Response</u>:  Agree.

**<u>Defendant's Reply</u>**:  **None.**

39.    When Sergeant Price met with Roseann Anderson, she told him that she observed a police officer, in uniform, driving a Pontiac southbound, while drinking from what appeared to be an alcoholic beverage bottle with a red and white label.

<u>Plaintiff's Response</u>:  Agree.

**<u>Defendant's Reply</u>**:  **None.**

40.    On the same day as the incident, March 29, 2011, Roseann Anderson signed a sworn affidavit, which documented the information that she provided to Sergeant Price.  The

sworn affidavit provided:

> It is alleged by the Complainant, Roseann Anderson, that on the above date and time at said location the Complainant observed an unknown male white police officer in full uniform driving S/B in a gray Pontiac with Illinois license plate [redacted] while drinking from a large clear bottle with a red and white label that appeared to be an alcoholic beverage. Ex. R.

Plaintiff's Response:  Agree.

**Defendant's Reply**:  **None.**

41.     Gail Glassford told Sergeant Price that she observed the police officer driving and taking several large gulps from what appeared to be an alcoholic beverage bottle with a red and white label and a red lid.

Plaintiff's Response:  Agree.

**Defendant's Reply**:  **None.**

42.     Gary Anderson told Sergeant Price that he had observed an on-duty officer driving and drinking from what appeared to be an alcoholic beverage container.

Plaintiff's Response:  Agree.

**Defendant's Reply**:  **None.**

43.     Gary Anderson also told Sergeant Price that he had a confrontation with the Plaintiff after attempting to obtain the Plaintiff's license plate number.

Plaintiff's Response:  Agree.

**Defendant's Reply**:  **None.**

44.     Finally, Gary Anderson informed Sergeant Price that he smelled an odor of alcohol on Plaintiff's breath.

Plaintiff's Response:  Agree.

10

**Defendant's Reply**: **None.**

45. While Sergeant Price was at scene of the incident, he drove to the location where Plaintiff's vehicle was parked. Sergeant Price observed what appeared to be an alcoholic beverage bottle lying on the passenger's seat of Plaintiff's vehicle. Sergeant Price also observed that the bottle was partially filled with a clear liquid.

Plaintiff's Response: Agree.

**Defendant's Reply**: **None.**

46. After talking to the three witnesses, Sergeant Price called Lieutenant Naleway, who was at his office at the Chicago Police Department Headquarters, to inform him about the content of each of the witnesses' statements and that he had observed inside the officer's vehicle what appeared to be an alcoholic beverage bottle with a broken seal, containing a clear liquid.

Plaintiff's Response: Agree.

**Defendant's Reply**: **None.**

47. After receiving this information from Sergeant Price, Lieutenant Naleway walked to Chief Rivera's office and told Chief Rivera all of the information that Sergeant Price had provided to him.

Plaintiff's Response: Agree.

**Defendant's Reply**: **None.**

48. Chief Rivera told Lieutenant Naleway that he would inform Deputy Kirby about the incident and get back to him.

Plaintiff's Response: Agree.

**Defendant's Reply**: **None.**

49. After receiving this information, Chief Rivera walked to Debra Kirby's office and

11

conveyed all of the information that he had learned from Lieutenant Naleway to Deputy Kirby.

<u>Plaintiff's Response</u>:  Agree.

**<u>Defendant's Reply</u>**:  **None.**

50.      Specifically, Chief Rivera informed Deputy Kirby that there was an incident in the 9th District in which an on-duty uniformed officer was observed by at least two civilian witnesses driving his personal vehicle up and down a street near a school while drinking from what appeared to be an alcoholic beverage container.

<u>Plaintiff's Response</u>:  Agree.

**<u>Defendant's Reply</u>**:  **None.**

51.      Chief Rivera also informed Deputy Kirby that the officer had a confrontation with one of the witnesses and that the same witness stated that he smelled alcohol on the officer.

<u>Plaintiff's Response</u>:  Agree.

**<u>Defendant's Reply</u>**:  **None.**

52.      Furthermore, Chief Rivera told Deputy Kirby that the 9th District had sent a supervisor to the scene of the incident and that the supervisor had observed a partially full bottle of what appeared to be vodka inside the car. Chief Rivera also informed Deputy Kirby that the officer had refused to allow the supervisor to retrieve the bottle.

<u>Plaintiff's Response</u>:  Agree.

**<u>Defendant's Reply</u>**:  **None.**

53.      Deputy Kirby, Chief Rivera, Lieutenant Naleway, and Sergeant Price each testified that they did not possess any information that would lead them to believe that the aforementioned witnesses' accounts were unreliable.

<u>Plaintiff's Response</u>:  Agree.

**Defendant's Reply**:  **None.**

54.     In response to learning this information, Deputy Kirby told Chief Rivera that the officer was to be processed criminally for the offense of driving under the influence of alcohol. In addition, Deputy Kirby informed Chief Rivera that the 9th District Police Station was to handle the criminal portion of the investigation and that Internal Affairs Division was to handle the administrative portion of the investigation once the criminal investigation had concluded.

Plaintiff's Response:  Agree.

**Defendant's Reply**:  **None.**

55.     Deputy Kirby also told Chief Rivera that the bottle should be retrieved from the officer's car.

Plaintiff's Response:  Agree.

**Defendant's Reply**:  **None.**

56.     Next, Chief Rivera went to Lieutenant Naleway's office and told him that at the direction of Deputy Kirby, the 9th District Police Station was to handle the criminal portion of the investigation and the Internal Affairs Division was to handle the administrative portion of the investigation once the criminal investigation had concluded.

Plaintiff's Response:  Agree.

**Defendant's Reply**:  **None.**

57.     After speaking to Chief Rivera, Lieutenant Naleway called Sergeant Cochran and Sergeant Price, who were at the 9th District Police Station, and informed them that Deputy Kirby had instructed that the 9th District Police Station was to handle the criminal portion of the investigation and the Internal Affairs Division was to handle the administrative portion of the investigation once the criminal investigation had concluded.

13

<u>Plaintiff's Response</u>:   Agree.

**<u>Defendant's Reply</u>**:   **None.**

58.    Sergeant Cochran then told Captain Johnson and Sergeant Verta that Deputy Kirby had instructed that the 9th District was to handle the criminal part of the investigation and that the Internal Affairs Division was to handle the administration part of the investigation.

<u>Plaintiff's Response</u>:   Agree.

**<u>Defendant's Reply</u>**:   **None.**

59.    In response, Captain Johnson stated that he would find officers that could handle the criminal phase of the investigation. Captain Johnson ordered Officers Kral and Madsen to conduct the criminal investigation.

<u>Plaintiff's Response</u>:   Agree.

**<u>Defendant's Reply</u>**:   **None.**

60.    Officers Kral and Madsen arrived at the 9th District Police Station to conduct the criminal investigation.

<u>Plaintiff's Response</u>:   Agree.

**<u>Defendant's Reply</u>**:   **None.**

61.    Plaintiff was administered field sobriety tests and then a breathalyzer test by Officer Madsen. Plaintiff passed all of the field sobriety tests and the breathalyzer test showed that Plaintiff had a Blood Alcohol Content ("BAC") of 0.000.

<u>Plaintiff's Response</u>:   Agree.

**<u>Defendant's Reply</u>**:   **None.**

62.    Plaintiff was issued a citation for transporting alcoholic liquor in a container with the seal broken pursuant to 625 ILCS 5/11-502.

<u>Plaintiff's Response</u>:  Agree.

**Defendant's Reply**:  **None.**

63.     Sergeants Cochran and Verta participated in the decision to issue Plaintiff the citation.

<u>Plaintiff's Response</u>:  Agree.

**Defendant's Reply**:  **None.**

64.     At the time the citation was issued, it was unknown whether the bottle observed in Plaintiff's vehicle contained alcohol.

<u>Plaintiff's Response</u>:  Agree.

**Defendant's Reply**:  **None.**

65.     Plaintiff was released without being charged for driving under the influence of alcohol.

<u>Plaintiff's Response</u>:  Agree.

**Defendant's Reply**:  **None.**

66.     Plaintiff was not handcuffed at any point on March 29, 2011.

<u>Plaintiff's Response</u>:  Agree.

**Defendant's Reply**:  **None.**

67.     After the criminal phase of the investigation was complete, the administrative investigation began.

<u>Plaintiff's Response</u>:  Agree.

**Defendant's Reply**:  **None.**

68.     Plaintiff was presented with an administrative consent to search form for his personal vehicle by either Sergeant Price or Sergeant Cochran. Plaintiff refused to sign the

consent to search form.

Plaintiff's Response: Disputed. The form provided to plaintiff is entitled "Consent to Search" and, on its face, has nothing to do with administrative proceedings.   (Defendants' Exhibit V, Document 35-8 at 4.) Although the word "Administrative" is handwritten at the top of the form, there is nothing to distinguish the form from that used in criminal investigations.

**Defendant's Reply**:   Plaintiff's response does not state any material disagreement with the facts contained in this paragraph and therefore, these facts should be deemed admitted.  Although at the time of this incident, the Consent to Search Form contained in Exhibit V was used by the Chicago Police Department to obtain consent to search in both criminal and administrative investigations, Sergeants Cochran and Price stated that in this case, the form was used only for the purpose of requesting Plaintiff's consent to an administrative search of his vehicle.  *See* Ex. Supp. N at 40:1-41:11; Ex. M at 19:5-21:10.   Moreover, the word "administrative" was handwritten on the consent to search form prior to the time that Seiser was provided a copy of the form.  *See* Defendants' Ex. M at 19:5-21:10.

69.    Next, Plaintiff was given a written direct order by Sergeant Price to provide access to the passenger's side of his vehicle to allow the bottle to be recovered. Plaintiff agreed to comply with the direct order and signed a copy of the written direct order form.

Plaintiff's Response:  Agree.

**Defendant's Reply**:  **None.**

70.    Next, Plaintiff went to the location where his car was parked and retrieved the bottle. Sergeant Verta took possession of the bottle and placed it in his trunk in order to transport it to the 9th District Police Station.

Plaintiff's Response:  Agree.

**Defendant's Reply**:  **None.**

71.     After arriving back at the 9th District Police Station, Sergeant Cochran poured the contents of the bottle into a vial, which were later sent to the Illinois State Police for testing, and inventoried the bottle.

Plaintiff's Response:  Agree.

**Defendant's Reply**:   **None.**

72.     On March 29, 2011, Deputy Kirby never went to the 9th District Police Station or to the scene of the incident.

Plaintiff's Response:  Agree.

**Defendant's Reply**:   **None.**

73.     Deputy Kirby was not informed that a citation had been issued to Plaintiff until after it had already been issued and the criminal investigation had concluded.

Plaintiff's Response:  Agree.

**Defendant's Reply**:   **None.**

74      On May 27, 2011, the Internal Affairs Division received a facsimile from the Illinois State Police which indicated that the contents of the vial tested negative for the presence of alcohol.

Plaintiff's Response:  Agree.

**Defendant's Reply**:   **None.**

75.     Officer Madsen attended court for the citation that was issued to Plaintiff and informed the prosecutor that the contents of the bottle tested negative for the presence of alcohol. The court dismissed the ticket.

Plaintiff's Response:  Agree.

**Defendant's Reply**:   **None**

17

Respectfully Submitted,

Stephen Patton
Corporation Counsel of the City of Chicago

By:    /s/ Lindsey Vanorny
         Assistant Corporation Counsel
         City of Chicago Department of Law
         30 North LaSalle Street, Suite 900
         Chicago, Illinois 60602
         (312) 742-0234
         Attorney No. 6303642

By:    /s/ Scott Jebson
         Chief Assistant Corporation Counsel
         City of Chicago Department of Law
         30 North LaSalle Street, Suite 900
         Chicago, Illinois 60602
         (312) 744-6959
         Attorney No. 6225243

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Michael Seiser, | ) | |
| | ) | Case No. 12 CV 02353 |
| Plaintiff, | ) | |
| | ) | JUDGE HOLDERMAN |
| v. | ) | |
| | ) | |
| City of Chicago and Debra Kirby, | ) | |
| | ) | |
| Defendants. | ) | |

<u>**DEFENDANTS' RESPONSE TO PLAINTIFF'S LOCAL RULE 56.1(b)(3)(C)
STATEMENT OF ADDITIONAL MATERIAL FACTS**</u>

Defendants City of Chicago (the "City"), by its attorney, Stephen R. Patton, and Deputy

Superintendent Kirby ("Deputy Kirby") (collectively, "Defendants"), by her attorneys, Lindsey

Vanorny, Assistant Corporation Counsel, and Scott Jebson, Chief Assistant Corporation Counsel,

pursuant to Local Rule 56.1(a)(3), hereby submit this response to Plaintiff's L.R. 56.1(b)(3)(C)

Statement of Additional Material Facts:

<u>**GENERAL OBJECTIONS**</u>

Local Rule 56.1(b)(3)(C) provides that a party opposing a motion for summary judgment

should file a statement consisting of "any additional facts that require denial of summary

judgment, including references to affidavits, parts of the record and other supporting materials

relied upon." *See* N.D. Ill. L.R. 56.1. "The Seventh Circuit has repeatedly held that a district

court is entitled to expect strict compliance with Local Rule 56.1." *See Barth v. Village of

Mokena*, 2006 WL 862673, at *1 (N.D. Ill. 2006).

In this case, Plaintiff's Additional Statement of Facts contains many facts that that are

immaterial and do not preclude this Court from granting Defendants' summary judgment motion.

*See Outlaw v. Newkirk*, 259 F. 3d 833, 837 (7th Cir. 2001) ("irrelevant or unnecessary facts do

not preclude summary judgment even when they are in dispute."); *Malec v. Sanford*, 191 F.R.D.

581, 583 (N.D. Ill. 2000) (noting that "material facts includes 'facts pertinent to the outcome of

the issues identified in the summary judgment motion.'")  Moreover, Plaintiff's Statement of

Additional Facts contains facts that mischaracterize the evidence upon which they purport to rely

and therefore, should be stricken.  *See Brown v. Advocate South Suburban Hosp.,* 2011 WL

6753995, at *4 (N.D. Ill. 2011); *see also Cady v. Sheahan*, 457 F. 3d 1057, 1060 (7th Cir. 2006)

(Rule 56.1 statements that contain "irrelevant information, legal arguments, and conjecture" may

be stricken.)

1.     In March of 2011, plaintiff, a Chicago police officer, was trying to lose weight by increasing his daily water intake. (Plaintiffs Exhibit 1, Seiser Dep. 328:15-20.)

**Response**:     Paragraph number 1 should be stricken as it is improper under Local Rule

56.1(b)(3)(C) because it does not raise a genuine issue of material fact requiring

denial of Defendants' Motion for Summary Judgment.  Notwithstanding and

without waiving this objection, Defendants admit.

2.     Plaintiffs partner in the afternoon of March 29, 2011 was Chicago Police Officer Krzysztof Gniedziejko. (Plaintiffs Exhibit 2, Gniedziejko Dep. 5:4-6.) Gniedziejko did not detect the odor of an alcoholic beverage from plaintiff. (Plaintiffs Exhibit 2, Gniedziejko Dep. 8:11-15, 12:16-19.) Gniedziejko did not hear any slurred speech from plaintiff. (Plaintiffs Exhibit 2, Gniedziejko Dep. 8:16-18.) Nor did Gniedziejko see plaintiff have any difficulty in walking. (Plaintiffs Exhibit 2, Gniedziejko Dep. 8:19-21.) Gniedziejko did not detect anything about plaintiffs speech, movement, or the way he looked that suggested that plaintiff was under the influence of alcohol (Plaintiffs Exhibit 2, Gniedziejko Dep. 12:16-19.)

**Response**:     Paragraph number 2 should be stricken as it is improper under Local Rule

56.1(b)(3)(C) because it does not raise a genuine issue of material fact requiring

denial of Defendants' Motion for Summary Judgment.  Notwithstanding and

without waiving this objection, Defendants admit.

3.     During the conversation referred to in Defendants' Rule 56.1 Statement, par. 25, Gail Glassford told Sergeant Verta that she had seen the police officer (later identified as

plaintiff), drinking from a bottle that "was clearly marked 'vodka' in red letters." (Defendants' Exhibit E, Document 35-4 at 6, Glassford Dep. 18:4-5.)

**Response**:       Paragraph number 3 should be stricken as it is improper under Local Rule

56.1(b)(3)(C) because it does not raise a genuine issue of material fact requiring

denial of Defendants' Motion for Summary Judgment.  Defendants further object

that the cited testimony does not support the assertion that Gail Glassford told

Sergeant Verta during their conversation that the bottle "was clearly marked

'vodka' in red letters."  Notwithstanding and without waiving this objection,

Defendants admit that while Gail Glassford testified at her deposition that she

observed a police officer drinking from a bottle that "was clearly marked 'vodka'

in red letters," she never conveyed this information to Sergeant Verta.  Rather,

Gail Glassford only conveyed to Sergeant Verta that she observed Plaintiff

drinking what she believed to be an "alcoholic beverage."  *See* Ex. E at 23:6-14.

4.       Glassford told Verta that plaintiff had been "driving his personal car erratically five to ten miles over the limit" (Defendants' Exhibit H, Document 35-4 at 30, Verta Dep. 9:9-10.)

**Response**:       Paragraph number 4 should be stricken as it is improper under Local Rule

56.1(b)(3)(C) because it does not raise a genuine issue of material fact requiring

denial of Defendants' Motion for Summary Judgment.   Notwithstanding and

without waiving this objection, Defendants admit.

5.       In his initial conversation with plaintiff on March 29, 2011, Sergeant Verta did not smell the odor of any alcoholic beverage from plaintiff. (Verta Dep. 13:15-17.) Nor did Verta hear plaintiff utter any slurred speech. (Verta Dep. 13:18-20.) Verta did not observe anything about plaintiff that caused Verta to believe that plaintiff was under the influence of alcohol. (Verta Dep.15:20-16:2; Verta Dep. 17:11-16.)

**Response**:       Paragraph number 5 should be stricken as it is improper under Local Rule

56.1(b)(3)(C) because it does not raise a genuine issue of material fact requiring

denial of Defendants' Motion for Summary Judgment.   Notwithstanding and

without waiving this objection, Defendants admit.

6.     During the conversation referred to in Defendants' Rule 56.1 Statement, par. 39, Roseann Anderson told Sergeant Price that she had observed plaintiff driving very slowly down the middle of the street. (Defendants' Exhibit F, Document 35-4 at 12, Roseann Anderson Dep. 11:15-16.)

**Response**:     Paragraph number 6 should be stricken as it is improper under Local Rule

56.1(b)(3)(C) because it does not raise a genuine issue of material fact requiring

denial of Defendants' Motion for Summary Judgment.  Defendants further object

that the cited testimony does not support the assertion that Roseanne Anderson

told Sergeant Price that she had observed Plaintiff driving very slowly down the

middle of the street.   Notwithstanding and without waiving these objections,

Defendants admit that while Roseann Anderson testified at her deposition that she

observed Plaintiff driving very slowly down the middle of the street, she never

conveyed this information to Sergeant Price.

7.     The occurrence giving rise to this lawsuit was presented to defendant Debra Kirby in the afternoon of March 29, 2011. (Defendants' Exhibit C, Kirby Deposition 7:21-23, Document 35-3 at 3.)

**Response**:     Paragraph number 7 should be stricken as it is improper under Local Rule

56.1(b)(3)(C) because it does not raise a genuine issue of material fact requiring

denial of Defendants' Motion for Summary Judgment.   Notwithstanding and

without waiving this objection, Defendants admit.

8.     As the Deputy Superintendent of the Bureau of Professional Standards, Kirby "oversaw the Internal Division, the Education Division, the Office of Management and Accountability, and the inspectors and Auditing Control Division." (Defendants' Exhibit C, Document 35-3 at 3, Kirby Dep. 5:23-6:5.)

**Response**:     Paragraph number 8 should be stricken as it is improper under Local Rule

56.1(b)(3)(C) because it does not raise a genuine issue of material fact requiring

denial of Defendants' Motion for Summary Judgment.   Notwithstanding and

without waiving this objection, Defendants admit.   However, Defendants deny

that these are Deputy Kirby's only official duties.   Deputy Kirby's official duties

also include making probable cause determinations when a Chicago Police

Officer is accused of committing a crime while on duty.   *See* Supp. C at 73:20-

75:13.

9.      At 4:45 p.m. on March 29, 2011, Chicago police officers began to implement
Kirby's order that plaintiff was to be charged criminally for driving under the influence ("DUI").
(Plaintiffs Exhibit 3, Verta To/From Report, March 29, 2011, at 2.) (Defendants have agreed to
the public filing of this document, with addresses and date of birth information redacted.)

**Response**:      Paragraph number 9 should be stricken as it is improper under Local Rule

56.1(b)(3)(C) because it does not raise a genuine issue of material fact requiring

denial of Defendants' Motion for Summary Judgment.   Notwithstanding and

without waiving this objection, Defendants admit.

10.      As part of implementing Kirby's order, the IAD sergeants (Cochran and/or Price)
ordered Chicago Police Officers Kral and Madsen to process plaintiff for a DUI. (Plaintiffs
Exhibit 4, Kral Dep. 5:21-6:3; Plaintiffs Exhibit 5, Madsen Dep. 6:7-10.)

**Response**:      Paragraph number 10 should be stricken as it is improper under Local Rule

56.1(b)(3)(C) because it does not raise a genuine issue of material fact requiring

denial of Defendants' Motion for Summary Judgment.   Notwithstanding and

without waiving this objection, Defendants admit.

11.      Officer Kral was close enough to plaintiff to smell any odor of an alcoholic
beverage and was unable to do so. (Plaintiffs Exhibit 4, Kral Dep. 8:5-10.) There was nothing
that Kral perceived which indicated that plaintiff had recently consumed alcohol (Plaintiffs
Exhibit 4, Kral Dep. 8:11-13.) Nor did Kral perceive anything that indicated that plaintiff was
under the influence of an alcoholic beverage. (Plaintiffs Exhibit 4, Kral Dep.10:11-14.)

**Response**:      Paragraph number 11 should be stricken as it is improper under Local Rule

56.1(b)(3)(C) because it does not raise a genuine issue of material fact requiring

denial of Defendants' Motion for Summary Judgment.  Notwithstanding and

without waiving this objection, Defendants admit.

12.    Plaintiff did not appear intoxicated to Officer Madsen. (Plaintiffs Exhibit 5, Madsen Dep. 9:1-2.)

**Response**:    Paragraph number 12 should be stricken as it is improper under Local Rule

56.1(b)(3)(C) because it does not raise a genuine issue of material fact requiring

denial of Defendants' Motion for Summary Judgment.  Notwithstanding and

without waiving this objection, Defendants admit.

13.    Madsen did not have any basis to believe that plaintiff was under the influence of alcohol when he administered the breathalyzer test to plaintiff. (Plaintiffs Exhibit 5, Madsen Dep. 10:5-9.)

**Response**:    Paragraph number 13 should be stricken as it is improper under Local Rule

56.1(b)(3)(C) because it does not raise a genuine issue of material fact requiring

denial of Defendants' Motion for Summary Judgment.  Furthermore, Defendants

object to this paragraph because Plaintiff is attempting to take Officer Madsen's

testimony as a definitive legal conclusion that there was no probable cause to

arrest Plaintiff for driving under the influence of alcohol.  *See Malec v. Sanford*,

191 F.R.D. 581, 583 (N.D. Ill. 2000) (noting that it is inappropriate to include

legal conclusions in a statement of material facts "on the off-chance that one's

opponent might not file a correct response.")  Notwithstanding and without

waiving these objections, Defendants deny the facts contained in this paragraph

because Plaintiff misstates the testimony of Officer Madsen.  In his deposition,

Officer Madsen testified that he did not have an independent basis to believe that

Plaintiff was under the influence of alcohol; instead, he relied upon the

6

information that he received from other police officers as his basis for processing

Plaintiff for a DUI. *See* Ex. Supp. K at 17:21-18:6.

14.    The results of the breathalyzer (.000) confirmed the performance tests and exonerated plaintiff of any DUI charge. (Defendants' Exhibit I, Johnson Deposition 20:9-16, Document 35-5 at 6.)

**Response**:    Paragraph number 14 should be stricken as it is improper under Local Rule

56.1(b)(3)(C) because it does not raise a genuine issue of material fact requiring

denial of Defendants' Motion for Summary Judgment.  Defendants further object

to the use of the term "exonerated" as argumentative and conclusory. *See Kleban*

*v. S.Y.S. Restaurant Management, Inc*., 994 F.Supp. 932, 936 (N.D. Ill., 1998)

(noting that argumentative language is inappropriate in a statement of facts and

should be stricken.); *City of Country Club Hills v. U.S. Dept. of Housing and*

*Urban Development*, 2001 WL 1117276, at *1 (N.D. Ill. 2001) (holding that

conclusions of law have no place in a statement of facts and should be stricken.)

Notwithstanding and without waiving this objection, Defendants admit.

15.    Plaintiff refused to consent to a search of his vehicle at 8:10 p.m. on March 29, 2011. (Defendants' Exhibit V, Document 35-8 at 4.)

**Response**:    Paragraph number 15 should be stricken as it is improper under Local Rule

56.1(b)(3)(C) because it does not raise a genuine issue of material fact requiring

denial of Defendants' Motion for Summary Judgment.   Notwithstanding and

without waiving this objection, Defendants admit.

16.    At 8:15 p.m., the IAD sergeants (Sergeant Cochran and Price) ordered plaintiff to consent to a search of his car. (Defendants' Exhibit W, Document 35-8.)

**Response**:    Paragraph number 16 should be stricken as it is improper under Local Rule

56.1(b)(3)(C) because it does not raise a genuine issue of material fact requiring

denial of Defendants' Motion for Summary Judgment.   Notwithstanding and

without waiving this objection, Defendants admit.

17.     Plaintiff was formally charged with transporting open alcohol in violation of 625
ILCS 5/11-502(a). (Defendants' Exhibit T, Document 35-7 at 13.)

**Response**:     Paragraph number 17 should be stricken as it is improper under Local Rule

56.1(b)(3)(C) because it does not raise a genuine issue of material fact requiring

denial of Defendants' Motion for Summary Judgment.   Notwithstanding and

without waiving this objection, Defendants admit the facts contained in this

paragraph.   However, to clarify, Plaintiff was issued the citation contained in

Defendants' Exhibit T at 5:15 p.m. on March 29, 2011, which was prior to the

time that the IAD sergeants ordered Plaintiff to consent to a search of his car at

8:15 p.m. as part of the administrative investigation.  *See* Ex. T and W.

18.     Officer Madsen, who prepared the open alcohol complaint, believes that he had
been ordered to write the ticket by a supervisor, but is unable to recall which supervisor gave that
order. (Plaintiffs Exhibit 5, Madsen Dep. 16:11-15.)

**Response**:     Paragraph number 18 should be stricken as it is improper under Local Rule

56.1(b)(3)(C) because it does not raise a genuine issue of material fact requiring

denial of Defendants' Motion for Summary Judgment.   Notwithstanding and

without waiving this objection, Defendants admit.

19.     At 8:17 p.m. on March 29, 2011, plaintiff was released on his personal
recognizance on the open alcohol charge. (Plaintiff's Exhibit 6, Recognizance Bond 17386202.)

**Response**:     Paragraph number 19 should be stricken as it is improper under Local Rule

56.1(b)(3)(C) because it does not raise a genuine issue of material fact requiring

denial of Defendants' Motion for Summary Judgment.   Notwithstanding and

without waiving this objection, Defendants admit.

20.   After the IAD sergeants obtained possession of plaintiff's re-purposed water bottle, one or both of the IAD sergeants examined the contents of the bottle and concluded that it contained water. (Plaintiff's Exhibit 7, Email from Kirby to Rivera, March 29, 2011.)

**Response**:   Paragraph number 20 should be stricken as it is improper under Local Rule 56.1(b)(3)(C) because the record does not support these facts.  Plaintiff's Exhibit 7 does not establish that either of the IAD sergeants determined conclusively that the bottle contained water.  Rather, after the bottle was obtained from Plaintiff's car, Sergeant Cochran informed Chief Rivera that the bottle "probably" contained water; however, the liquid contained in the bottle was later tested for the presence of alcohol.  *See* Ex. O at 11:3-12:15; Ex. Supp. O at 13:4-13:13, 19:14-20:7, 34:4-35:2; Ex. N. at 37:17-38:8; Ex. Supp. N at 59:15-59:18.  Chief Rivera stated that his belief that the bottle probably contained water was based on the results from the breathalyzer.  *See* Ex. Supp. O at 19:14-20:7.  Finally, Defendants object to Plaintiff's characterization of the bottle as a "re-purposed water bottle."  There is no evidence in the record that Plaintiff altered the T.G.I. Friday's Mudslide bottle by removing the original labeling.  *See* Ex. P; Ex. B at 83:21-84:2, 85:18-86:8; Ex. H at 12:22-13:9.

21.   Gary Anderson is the only person who claims to have detected the odor of an alcoholic beverage about plaintiff. (Defendants' Exhibit M, Document 35-6 at 4, Price Dep. 10:19-24.)

**Response**:   Paragraph number 21 should be stricken as it is improper under Local Rule 56.1(b)(3)(C) because it does not raise a genuine issue of material fact requiring denial of Defendants' Motion for Summary Judgment.  Notwithstanding and without waiving this objection, Defendants admit.

Respectfully Submitted,

Stephen Patton
Corporation Counsel of the City of Chicago

By:     /s/ Lindsey Vanorny
        Assistant Corporation Counsel
        City of Chicago Department of Law
        30 North LaSalle Street, Suite 900
        Chicago, Illinois 60602
        (312) 742-0234
        Attorney No. 6303642

By:     /s/ Scott Jebson
        Chief Assistant Corporation Counsel
        City of Chicago Department of Law
        30 North LaSalle Street, Suite 900
        Chicago, Illinois 60602
        (312) 744-6959
        Attorney No. 6225243

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

Michael Seiser,                )
                               )     12 C 2353
          Plaintiff,           )
                               )     Judge Holderman
     v.                        )
                               )
City of Chicago and Debra Kirby, )
                               )
          Defendants.          )

### SUPPLEMENTAL EXHIBITS IN SUPPORT OF
### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT[1]

| Exhibit | Description |
|---------|-------------|
| Supp. C | Excerpt of the Deposition of Defendant Deputy Superintendant Debra Kirby |
| Supp. K | Excerpt of the Deposition of Officer Brian Madsen |
| Supp. N | Excerpt of the Deposition of Sergeant Terrance Cochran |
| Supp. O | Excerpt of the Deposition of Chief Juan Rivera |

---

[1]Defendants have supplemented additional pages to their exhibits.

# SUPPLEMENTAL
# EXHIBIT C

Page 73

1  time you received the information from the chief, in
2  addition to what the chief told you, you're told that
3  the sergeants on the scene did not believe that
4  Officer Seiser was intoxicated.
5       MR. JEBSON:  Objection, vague as to which
6  sergeant you are talking about.
7  BY THE WITNESS:
8       A.  It could have an influence, definitely.  I
9  mean, would there be probable cause to arrest?  I
10  think that independent of the sergeant's evaluation,
11  there's still probable cause to arrest.
12  BY MR. FLAXMAN:
13       Q.  Shouldn't the decision of whether or not
14  there's probable cause to arrest be made by the
15  police officer on the scene?
16       MR. JEBSON:  Objection, argumentative.
17  BY THE WITNESS:
18       A.  In some circumstances, yes.
19  BY MR. FLAXMAN:
20       Q.  And can you tell us the circumstances under
21  which an officer on the fifth floor of police
22  headquarters should make a decision whether there's
23  probable cause to arrest?
24       MR. JEBSON:  Objection, calls for

Page 74

1  speculation.
2  BY THE WITNESS:
3       A.  In some regards.  What you had was a
4  uniformed officer working part-time employment.  My
5  understanding is that officer was already in the 9th
6  District.  The officer was in front of a school
7  drinking out of what was being told to me was an
8  alcoholic beverage bottle.  In regards to whether or
9  not there should be a decision to arrest, my
10  understanding, at least as I understand it, he was
11  already in the 9th District, so there was already a
12  variation of arrest.  This matter, it really didn't
13  affect it.  The officer was arrested, and the
14  probable cause that I had to order that arrest stood.
15  BY MR. FLAXMAN:
16       Q.  Was it necessary for the investigation that
17  you give an order that Mr. Seiser be arrested?
18       MR. JEBSON:  Objection to the form of the
19  question.
20       THE WITNESS:  Necessary in what regard?
21  BY MR. FLAXMAN:
22       Q.  Was there any reason why an order was
23  required from the deputy superintendent of the Bureau
24  of Professional Standards that an arrest be made?

Page 75

1       A.  Any time you're dealing with an allegation
2  of an officer in uniform drinking while on duty,
3  particularly in front of a school and with civilian
4  witnesses, it is the responsibility, I believe, of
5  the Internal Affairs Division, my role as deputy
6  superintendent, to ensure that's handled
7  appropriately.
8       Q.  So as you sit here now, it's your belief
9  that the decision about whether or not there's
10  probable cause to arrest in the situation we had on
11  March 29, 2011, was appropriately made by you?
12       A.  I made an appropriate decision, but any
13  officer present could have as well.
14       Q.  Do you agree that in making a decision of
15  the nature you described it's important that you have
16  all of the facts that were known or knowable before
17  you?
18       A.  It's important to have as many facts.  I
19  don't know that all facts could be known at any time.
20       Q.  Did you do anything to acquire any
21  additional facts other than what the chief told you?
22       A.  No, I did not.
23       Q.  Did you care whether or not the sergeant on
24  the scene concluded that Officer Seiser was not

Page 76

1  intoxicated?
2       MR. JEBSON:  Objection, misstates the
3  evidence and the form of the question.
4  BY THE WITNESS:
5       A.  Whether or not that sergeant's decision was
6  known at the time that I spoke with Chief Rivera is
7  unknown to me.
8  BY MR. FLAXMAN:
9       Q.  That wasn't my question.  My question was in
10  making your decision, did you care whether or not the
11  sergeant on the scene thought Officer Seiser was not
12  intoxicated?
13       A.  Again, you're asking me a question I cannot
14  answer.  I always care about the facts of the case.
15  Whether or not I had that knowledge to care about,
16  I'm not certain.
17       Q.  You could have acquired that knowledge,
18  couldn't you have, ma'am?
19       MR. JEBSON:  Objection, assumes that
20  knowledge is actually -- assumes a fact not in
21  evidence and it misstates the evidence.
22  BY THE WITNESS:
23       A.  Again, I had no knowledge of what the -- I'm
24  not clear as to what or any determination the

# SUPPLEMENTAL
# EXHIBIT K

Page 17

```
1      Q.   Did you ever have any discussions other than
2  what you've told us with Captain Johnson about this
3  incident?
4      A.   I don't believe so.
5      Q.   Did you ever hear the name Debra Kirby back
6  on the day of -- when you gave the Breathalyzer to
7  Mr. Seiser?
8      A.   Yes.
9      Q.   When did you hear that name?
10     A.   That was the day.
11     Q.   Do you remember who said it?
12     A.   I'm not sure.
13     Q.   Do you know Debra Kirby?
14     A.   No.
15     Q.   Did you ever speak with her on the phone?
16     A.   No.
17         MR. FLAXMAN:  I have nothing further.
18         MS. VANORNY:  I have a few questions.
19               EXAMINATION
20  BY MS. VANORNY:
21     Q.   Earlier you said you didn't have an
22  independent basis to believe that Michael Seiser was
23  under the influence, is that correct?
24     A.   Correct.
```

Page 18

```
1      Q.   Did you rely upon the information that you
2  received from other officers in order for your basis
3  for administering the DUI?
4      A.   Yes.
5      Q.   And also for issuing the ticket?
6      A.   Yes.
7         MS. VANORNY:  Nothing further.
8               FURTHER EXAMINATION
9  BY MR. FLAXMAN:
10     Q.   You said you relied on information from
11  other officers.  Could you tell us the names of those
12  other officers?
13     A.   I believe Sergeant Verta, two sergeants from
14  IAD.  I'm not sure about Captain Johnson.  I'm really
15  not sure, sir.
16     Q.   Okay.  Do you remember what Sergeant Verta
17  -- what information Sergeant Verta relayed to you
18  that was -- that indicated that Officer Seiser had --
19  was guilty of DUI?
20     A.   I'm not sure.
21     Q.   Can you tell us what information either of
22  the IAD officers related to you that Sergeant Verta
23  -- strike that -- that Officer Seiser had committed a
24  DUI?
```

Page 19

```
1      A.   I'm not sure.
2      Q.   Can you tell us what information, if any,
3  Captain Johnson related to you that indicated that
4  Officer Seiser had committed a DUI?
5      A.   I'm not sure, sir.
6      Q.   So am I correct that you can't specify what
7  information any of those officers gave you that
8  indicated that Officer Seiser committed a DUI?
9      A.   I'm not sure.
10     Q.   Okay.  And was there anything that you saw
11  on the day of the incident, March 29, 2011, that
12  indicated to you that Officer Seiser had committed a
13  DUI?
14     A.   No.  I'm not sure.
15     Q.   Well, was there anything about Officer
16  Seiser that indicated he had consumed an alcoholic
17  beverage?
18     A.   No, sir.
19     Q.   Anything about Officer Seiser that indicated
20  he was under the influence of an alcoholic beverage?
21     A.   No.
22     Q.   Did you ever see Officer Seiser's gun being
23  taken away from him?
24     A.   No.
```

Page 20

```
1      Q.   When you administered the Breathalyzer, did
2  Officer Seiser have his firearm?
3      A.   No, sir.
4      Q.   Did you fill out a warning to motorist form
5  for Officer Seiser on March 29, 2011?
6      A.   I'm not sure.
7      Q.   What is a warning to motorist form?
8      A.   It's just a form that states that if you
9  don't consent to the Breathalyzer, then your driver's
10  license would be suspended for a certain amount of
11  time.
12     Q.   Is that a form -- have you ever filled that
13  form out?
14     A.   Yes.
15     Q.   Do you always fill that form out before you
16  administer a Breathalyzer?
17     A.   I believe so.
18     Q.   Do you remember filling out that form in
19  connection with the Breathalyzer you administered to
20  Officer Seiser?
21     A.   No.
22     Q.   Have you ever seen a form that you filled
23  out or anybody filled out about warning to motorist
24  for Officer Seiser?
```

# SUPPLEMENTAL
# EXHIBIT N

Page 37

```
 1   you know who wrote the ticket?
 2        A.    The arresting officers.
 3        Q.    Do you know who it who told the
 4   arresting officers to write the ticket?
 5        A.    I may have or Sergeant Verta or
 6   Sergeant Price.
 7        Q.    When you were discussing whether
 8   Officer Seiser should be charged with transporting
 9   open alcohol, was there any discussion about who the
10   complaining witness would be?
11        A.    I don't think so.  I don't recall.
12        Q.    Am I correct that at the time the
13   decision was made to issue that traffic citation
14   nobody except Officer Seiser knew what was in that
15   bottle?
16        A.    That is correct.
17        Q.    And it wouldn't be a violation of that
18   statute to -- if there was water in the bottle,
19   would there?  Would it?
20        MR. PLATT:  Object to the form of the
21   question.  Calls for a legal conclusion.  You can
22   answer it to your knowledge.
23   BY THE WITNESS:
24        A.    The only way an officer would have
```

Page 38

```
 1   known whether or not there was water in the bottle
 2   is either Officer Seiser would have had to have
 3   surrendered it prior to a ticket being issued, or
 4   the ticket being issued which would have authorized
 5   us to seize the bottle and then the bottle could be
 6   tested for analysis to determine what was in the
 7   bottle.  Your client had refused.  Your client had
 8   refused previous requests to turn over the bottle.
 9   BY MR. FLAXMAN:
10        Q.    So was he being charged with
11   transporting open alcohol because he had refused to
12   surrender the bottle?
13        A.    It was one of the basis of the fact
14   that we knew that the bottle appeared to be a bottle
15   that contained exclusively used for alcoholic
16   beverages or beverages that are mixed with alcohol
17   or a mix.  Under normal circumstances, we wouldn't
18   have had to ask him, if he were treated as a regular
19   citizen.
20        Q.    And what would have happened under
21   those normal circumstances?
22        A.    The car would have been impounded, and
23   we would have been able to take the bottle,
24   especially in light of it being in plain view.
```

Page 39

```
 1        Q.    Was there any discussion in which you
 2   were involved that day about impounding Officer
 3   Seiser's car?
 4        A.    No.  Not that I recall.
 5        Q.    When -- did Chief Rivera mention
 6   Deborah Kirby's name?
 7        A.    No.
 8        Q.    After your conversation with Chief
 9   Rivera, what did you do?
10        A.    I think at that point we came in and
11   informed Officer Seiser that the criminal aspect was
12   over and done with and now we were proceeding with
13   administrative.
14        Q.    And did you read him any
15   administrative rights?
16        A.    I don't know if we would have read him
17   his administrative rights for that.  I think what
18   I -- I think we might have given him two things.
19        I think we asked him if he would
20   let us search his vehicle and get the bottle.  I
21   think he told us no.  I think we presented him with
22   a consent to search form, which he refused.  And
23   ultimately he was given a direct order, which he
24   complied with.
```

Page 40

```
 1        Q.    Let me show you what has been marked
 2   as Exhibit 1.
 3        (Whereupon, Cochran Deposition
 4         Exhibit No. 1 was marked for
 5         identification.)
 6   BY MR. FLAXMAN:
 7        Q.    Have you ever seen this before?
 8        A.    Yes.
 9        Q.    Can you tell us what it is?
10        A.    It's a consent to search form.
11        Q.    Is this the consent to search form you
12   were just talking about?
13        A.    Yes.
14        Q.    Whose handwriting is it, if you know,
15   where the word administrative appears at the top?
16        A.    That was mine.
17        Q.    Is there a particular form for
18   administrative consent to search?
19        A.    We would use these -- we would use the
20   standardized form.  The department doesn't delineate
21   between -- back then the department didn't delineate
22   between forms to be used by internal affairs versus
23   forms to be used by regular folks in the department.
24        Q.    Is there a different form now for
```

Page 41

1  internal affairs consent to search?

2       A.      I think there may be a different form

3  out there now.

4       Q.      When you wrote administrative, what

5  did you mean by that?

6       A.      That this is strictly for

7  administrative, not for criminal.

8       Q.      Does that say that anywhere in the

9  form, other than the word administrative?

10      A.      Other than administrative, no, that's

11 it.

12      Q.      Next to time it says 2010, does that

13 mean 8:10 p.m.?

14      A.      Yes.

15      Q.      Is that your handwriting?

16      A.      No.

17      Q.      Do you know whose handwriting it is?

18      A.      I believe it's Sergeant Price.

19      Q.      Is it -- is 8:10 p.m. the time that

20 the consent to search was given to Officer Seiser?

21      A.      Yes.

22      Q.      Now, did Officer Seiser have the right

23 to refuse to consent on March 29th, 2011 at

24 8:10 p.m.?

---

Page 42

1       A.      Yes.

2       Q.      And he exercised that right; is that

3  correct?

4       A.      Yes.

5       Q.      And then after Officer Seiser

6  exercised that right, did you give him a direct

7  order to -- or was he given a direct order to allow

8  a search of his car?

9       A.      Yes.

10      Q.      Do you remember what time of the day

11 or night that direct order was given?

12      A.      It would have been shortly after the

13 administrative consent to search.

14      Q.      Let me show you what's been marked as

15 Exhibit 2.

16              (Whereupon, Cochran Deposition

17               Exhibit No. 2 was marked for

18               identification.)

19 BY MR. FLAXMAN:

20      Q.      Is that -- well, this is called

21 written copy verbal order; is that right?

22      A.      Yes.

23      Q.      Were you present when a verbal order

24 was given to Officer Seiser that's consistent with

---

Page 43

1  what's set out in Exhibit 2?

2       A.      Yes.

3       Q.      Did you give the verbal order, or did

4  Sergeant Price give it or did somebody else give it?

5       A.      Sergeant Price gave it.

6       Q.      Do you know if Sergeant Price spoke

7  with Deborah Kirby before giving the order?

8       A.      I don't believe that he did.

9       Q.      Do you know why he wrote, "per the

10 direction of Deputy Superintendent Deborah Kirby"?

11      A.      Because in our conversation with each

12 other we both had discussed what had been told to us

13 by Lieutenant Naleway.

14      Q.      And what had Lieutenant Naleway told

15 you about Deborah Kirby?

16      A.      That this was under her instructions

17 that -- for the case to be split administratively

18 and criminally and that he was to be given a written

19 copy of the verbal order.  He was given a verbal

20 order prior to this.

21      Q.      But Lieutenant Naleway told you that,

22 that he was to be given a written copy of a verbal

23 order?

24      A.      Yes.

---

Page 44

1       Q.      And when did Lieutenant Naleway tell

2  you that?

3       A.      This was in one of our conversations

4  that we had.  But Matt specifically said, I've

5  already got it typed out, I've got it for him.

6       Q.      Did you have a conversation with

7  Lieutenant Naleway after Officer Seiser had refused

8  to consent to the search of his vehicle?

9       A.      I believe we called and told the

10 lieutenant that he had refused to sign the consent

11 to search form, but he was complying with the direct

12 order.

13      Q.      Did you have the power as an internal

14 affairs sergeant to give that order to Officer

15 Seiser to permit the search of his vehicle?

16      A.      Yes.

17      Q.      Did that order have to be per the

18 direction of Deputy Superintendent Deborah Kirby?

19      A.      Did it have to be?

20      Q.      Yeah.

21      A.      No, it didn't have to be.

22      Q.      Do you know why Sergeant Price wrote

23 in that sentence "per the direction of Deputy

24 Superintendent Deborah Kirby"?

Page 57

BY MR. FLAXMAN:

Q.    Did you ever work with Sergeant Price before?

A.    Yes.

Q.    Did you ever know him to be untrustworthy?

A.    No.

Q.    Did you ever know him to be untruthful in the reports he prepares?

A.    No.

Q.    If you look at the Exhibit 2, where Sergeant Price wrote, "per the direction of Deputy Superintendent Deborah Kirby of the Bureau of Professional Standards," it would be your belief that Sergeant Price wrote that because that's the direction he received from Deputy Superintendent Deborah Kirby?

A.    Or that's what was related to him, yes.

Q.    All right.  And it would have been related to him from another supervisor?

A.    Yes.

Q.    In the course of your work in internal affairs have your supervisors ever given you

Page 58

misinformation about instructions they had received from the deputy superintendent?

A.    I don't understand your characterization.  I don't understand what you mean.

Q.    Well, in your work in internal affairs had any supervisor ever told you that the deputy superintendent ordered that we do this when the deputy superintendent had not ordered that we do this?

MR. PLATT:  Object to the form of the question.  Calls for speculation.  If you know.

BY THE WITNESS:

A.    I would have no way of knowing.

MR. PLATT:  Let's take a break.

(Whereupon, a short break was taken and the proceedings resumed as follows:)

MR. FLAXMAN:  Back on the record.

BY MR. FLAXMAN:

Q.    Did you ever smell the liquid that was in the mudslide bottle?

A.    I don't think I did.

Q.    Do you recall on the scene when the bottle was recovered from Officer Seiser's car

Page 59

opening the cap of the mudslide bottle?

A.    Not on the scene.

Q.    Did you see anybody on the scene open the cap of the mudslide bottle?

A.    No.

Q.    Did you ever see anybody swish around the liquid that was in the mudslide bottle?

A.    That I did.

Q.    Was that on the street or in the police station?

A.    Probably.  I think I might have done both, I might have swished it around out on the street and then particularly inside the station with the light.

Q.    Do you remember anybody saying after the bottles had been recovered from Officer Seiser's car, It appears to be water?

A.    No, I don't think so.

Q.    Is there anything that would refresh your recollection about whether you heard somebody say, It appears to be water?

A.    I don't know.

Q.    Okay.  Did you review anything about any documents about the earlier CR, earlier

Page 60

investigation involving Officer Seiser?

A.    At what point?

Q.    In preparing for this deposition.

A.    No.

Q.    Have you had any other investigations involving Officer Geisbush other than that one with Officer Seiser?

A.    I may have had one.

Q.    Have you had any contact with Officer Geisbush?

A.    I may have seen him out and about.

Q.    Do you remember the name of the civilian who was involved in that investigation, the man who alleged that a gun had been planted on him?

A.    I don't remember his name.

Q.    Have you ever spoken with Deborah Kirby at all?

A.    Yes.

Q.    How many times?

A.    In what context?

Q.    In any context where you're speaking words and she is speaking words?

MR. PLATT:  About anything?

# SUPPLEMENTAL
# EXHIBIT O

Page 9

1    Q.   And did you talk to Ms. Kirby?
2    A.   Yes, I did.
3    Q.   Was anybody else present when you spoke with
4  her?
5    A.   No.  She was in her office by herself.
6    Q.   What did you say to her, and what did she
7  say to you?
8    A.   Again, in essence, I just -- not verbatim
9  but the same information that the lieutenant gave me,
10 I, in essence, repeated to her.
11   Q.   What, if anything, did she say to you?
12   A.   She basically told me, she says, the
13 District is going to -- should proceed criminally and
14 once the criminal investigation is concluded, Internal
15 Affairs would conduct the administrative.
16        And she stated she wanted them to
17 recover the liquor bottle.
18   Q.   What, if anything, did you do next?
19   A.   I then walked back over to Lieutenant
20 Naleway's Office and relayed that information to him.
21   Q.   And what did he say to you?
22   A.   He stated he would just keep me up to date
23 as to, you know, what was going on or how it unfolded
24 or he would have someone keep me up to date, keep me

Page 10

1  apprised of the incident.
2    Q.   Did Deputy Superintendent Kirby tell you
3  that the officer was to be charged criminally for
4  driving under the influence?
5    A.   No.  She just stated again it's the
6  9th District's responsibility to conduct and proceed
7  with the criminal investigation.
8    Q.   What was your next involvement in this
9  incident?
10   A.   It was later in the evening.  I was at home
11 when I received a phone call.
12   Q.   And who was that from?
13   A.   That was Sergeant Cochran.
14   Q.   And is Sergeant Cochran a Chicago Police
15 officer?
16   A.   Yes.  He's a sergeant assigned to Internal
17 Affairs in the General Investigative section.
18   Q.   Had you done anything to cause Sergeant
19 Cochran to be assigned to that investigation?
20   A.   No.
21   Q.   Did you know before receiving the phone call
22 that Sergeant Cochran was working on that
23 investigation?
24   A.   I'm not sure if Naleway -- he may have

Page 11

1  mentioned who was on the scene after I relayed the
2  information from Kirby, but I don't recall.
3    Q.   Had you asked that Sergeant Cochran call
4  you?
5    A.   No.
6    Q.   Well, when he called you, what did he say?
7    A.   He told me that the criminal investigation
8  had concluded, that the officer -- the results of the
9  Breathalyzer were triple zeros.  And he asked me if we
10 were to relieve -- or if he was to relieve the officer
11 of police powers.
12   Q.   And what did you say?
13   A.   I stated, no, we were not going to relieve
14 the police officer of police powers.  And I told him
15 to proceed administratively with the investigation.
16   Q.   When you say "proceed administratively,"
17 what did you mean?
18   A.   Basically, "administratively" means the --
19 again, the initiation of the CR, the recovery of
20 whatever evidence, for our administrative
21 investigation.
22   Q.   Do you remember what time this phone call
23 was?
24   A.   Again, approximately in the area of 7:30, I

Page 12

1  believe.
2    Q.   What was your next involvement?
3    A.   I believe I had a second conversation with
4  him.  I'm not quite sure, I don't recall, whether he
5  called me or I called him; but later in that evening,
6  I did have a conversation with him.
7         And at that point, he relayed an update
8  to me where he stated that they had given the officer
9  a direct order and that he had complied; he had
10 retrieved the liquor bottle from his vehicle and that
11 they had recovered it and that they were inventorying
12 it.
13        And I think he mentioned that it was --
14 he described it; he stated it's probably water but,
15 you know, it's subject to the test.  I said fine.
16        And he said he was -- the officer is
17 going to be released without charging.  And I think at
18 that point -- I'm not sure, but I believe he mentioned
19 who it was, the officer's -- I think he gave me his
20 last name.
21   Q.   And is that the last name Seiser?
22   A.   Yes.
23   Q.   And had you ever heard that name before?
24   A.   No.

Page 13

1    Q.   This was Officer -- this is Sergeant Cochran
2    you had the conversation with?
3    A.   Yes.
4    Q.   Did Sergeant Cochran tell you that Officer
5    Seiser was going to be charged with transporting open
6    alcohol?
7    A.   No.  All he mentioned was that they
8    recovered the bottle and that they were processing it,
9    they were inventorying it.
10   Q.   Did he tell you that the bottle contained
11   water?
12   A.   What he stated was that it's probably,
13   "probably water" is the way he put it.
14   Q.   Did he tell you whether or not he had asked
15   Officer Seiser whether the bottle contained alcohol?
16   A.   No and never asked him or he never mentioned
17   it.
18   Q.   Would that have been within Sergeant
19   Cochran's powers as the Internal Affairs officer on
20   the scene?
21   A.   I'm sure he could have, yes.
22   Q.   And if Officer Seiser had given a false
23   answer to that question from the Internal Affairs
24   officer, would that have been a violation of the

Page 14

1    Chicago Police rules?
2    A.   Sure.
3    Q.   What's your next involvement after that
4    second phone call that you just described?
5    A.   I then updated, or apprised, Deputy
6    Superintendent Kirby of the outcome of the incident.
7    Q.   How did you update her?
8    A.   I sent her a quick message on my BlackBerry.
9    Q.   Let me show you what I've marked as
10   Deposition Exhibit No. 1.
11                (Document tendered.)
12   BY MR. FLAXMAN:
13   Q.   Do you remember receiving a message of
14   this -- Well, can you tell us what this is, if you
15   know?
16   A.   This is Sergeant Matthew Price, and he is
17   relaying to me that he has attached a copy of the
18   Synoptic Reports, for my information.
19   Q.   And what is a Synoptic Report?
20   A.   It's a summary of the incident, the event.
21   Q.   And are Exhibit 2 and Exhibit 3 the Synoptic
22   Reports?
23                (Documents tendered.)
24   MR. JEBSON:   Is 2 Price and 3 Cochran?

Page 15

1    MR. FLAXMAN:  3 is Cochran, and 2 will be
2    Price, yeah.
3    MR. JEBSON:  Okay, thank you.  I just want
4    to make sure on the record which one we're talking
5    about.
6    BY MR. FLAXMAN:
7    Q.   Are those the Synoptic Reports that came
8    with Exhibit 1?
9                (Witness reviewing documents.)
10   BY MR. FLAXMAN:
11   Q.   Do you remember the question?
12   A.   Sir?
13   Q.   Do you remember the question?
14   A.   No, I'm sorry.
15   Q.   The question was, are those two exhibits, 2
16   and 3, the copies of the Synoptic Reports that were
17   attached to Exhibit 1?
18   A.   Yes.
19   Q.   And after receiving the Synoptic Reports,
20   did you also receive a Timeline for the investigation?
21   A.   Yes.
22   Q.   And is that what Exhibit 4 relates to?
23                (Document tendered.)
24   BY THE WITNESS:

Page 16

1    A.   Right.
2    Q.   And Exhibit 4 is a copy of an e-mail that
3    you received that was sent to you on March 30, 2011 at
4    about 6:01 a.m.?  Is that right?
5    A.   That's correct.
6    Q.   And is Exhibit 5 a copy of that Timeline
7    that was attached to Exhibit 4 in the e-mail?
8                (Document tendered.)
9    BY THE WITNESS:
10   A.   Yes.
11   Q.   Did you read those Synoptic Reports when
12   they were in electronic format?
13   A.   Probably not.  I think there is a separate
14   e-mail where I had -- I think, because it was early in
15   the morning, I had my sergeant print them out for the
16   morning meeting.
17   Q.   Let me show you what's been marked as
18   Exhibit 7.  Is that what you were just talking about?
19                (Document tendered.)
20   BY MR. FLAXMAN:
21   Q.   Well, what is Exhibit 7?
22   A.   It's an e-mail where I communicated to my
23   administrative sergeant and I forwarded her the
24   attachments and asked her to print the attachments for

Page 17

1   the EMM, which is the Executive Management Meeting,
2   morning Management Meeting.
3      Q.  Say that again slowly.
4      A.  Executive Management Meeting, and it's a
5   morning meeting where we brief the higher-ups.
6      Q.  And did she print out the documents for the
7   Executive Management Meeting?
8      A.  Yes.
9      Q.  And did you attend that Executive Management
10   Meeting?
11      A.  Yes, I did.
12      Q.  How many other people were there?
13      A.  It's usually the executive -- what they call
14   the Executive Package, which are all the Deputy
15   Superintendents in charge of the bureaus, and the
16   Chiefs.
17      Q.  Was the Superintendent there?
18      A.  You know, I don't recall.  I'm going to
19   guess he probably was, but I don't know for sure if he
20   was.  There are times where the First Deputy would
21   handle it, but that's awhile back.
22      Q.  Do you recall any discussion at the
23   Executive Management Meeting about Officer Seiser?
24      A.  There may have been.  The discussion would

Page 18

1   have been between Deputy Superintendent Kirby.  She
2   would actually be the person who would be asked
3   whether they had any information to relate to the
4   Superintendent.
5      Q.  Do you remember if she said anything about
6   Officer Seiser at that meeting?
7      A.  I really don't recall.  She may have.
8      Q.  Let me show you what's been marked as
9   Exhibit 6.  Tell us what that is, please.
10           (Document tendered.)
11      MR. JEBSON:  Exhibit 8?  Is that right?
12      MR. FLAXMAN:  No, 6.  I skipped 6, remember?
13      MR. JEBSON:  Oh, you did.  Okay.
14   BY MR. FLAXMAN:
15      Q.  Exhibit 6 contains some e-mails exchanged
16   with you and Debra Kirby; is that right?
17      A.  Yes, that's correct.
18      Q.  And am I correct that you forwarded copies
19   of these Synoptic Reports and the Timeline to
20   Ms. Kirby at about 7:17 a.m. on March 30, 2011?
21      A.  I forwarded the Synoptic Reports, yes.
22      Q.  But not the Timeline?
23      A.  I'm not sure if I forwarded the Timeline.
24      Q.  Okay.

Page 19

1      A.  It doesn't appear on this one.
2      Q.  And Exhibit 8, is that a request you made to
3   your sergeant, to print out the Timeline?  Or, what is
4   it?
5           (Document tendered.)
6   BY THE WITNESS:
7      A.  Yes.  I forwarded the Synoptic Reports, the
8   attachments, and I requested my administrative
9   sergeant to print the Timeline, yes.
10      Q.  Let me show you what's been marked
11   Exhibit 9.
12           (Document tendered.)
13   BY MR. FLAXMAN:
14      Q.  Do you remember sending a message of some
15   sort to Debra Kirby on March 29th, 2011, at about
16   10:38 p.m.?
17      A.  Yes.
18      Q.  And is this the information that you
19   conveyed to her in that message?
20      A.  That's correct.
21      Q.  The second sentence you wrote, "The liquor
22   bottle contained water."
23      A.  Right.
24      Q.  How did you know that the liquor

Page 20

1   bottle -- Strike that.
2          From where had you received that
3   information?
4      A.  Again, I was told by the sergeant, Sergeant
5   Cochran, that it probably contained water, so I made
6   the assumption based on the results from the
7   Breathalyzer.
8      Q.  Did you ever learn that Officer Seiser had
9   been charged with transporting open alcohol?
10      A.  I found out later, yes.
11      Q.  Well, did you know that Officer Seiser had
12   been charged with transporting open alcohol on
13   March 29th, 2011, at 10:28 p.m.?
14      A.  I can't recall if he ever mentioned it.  I
15   think I would have probably put it in the e-mail, but
16   I can't say for certain or for sure.
17      Q.  And who is the "he" who would have mentioned
18   it?
19      A.  Oh, Cochran.
20      Q.  As you sit here now, when do you first
21   recall learning that Officer Seiser had been charged
22   with transporting open alcohol?
23      A.  When I read the Synoptic Reports the
24   following -- that morning.

Page 33

1  communication, you know, he informed me that they were
2  going to release him without charging, I asked for the
3  information in terms of his name and assignment; and
4  that's, I believe, where I received that information.
5            I think that's how I ended up titling
6  the e-mail PO Seiser or Officer Seiser; that's when I
7  placed that information on the Subject line.
8       Q.  And you're talking about the e-mail that you
9  sent to Debra Kirby at 10:28 p.m. on March 29th, 2011?
10      A.  That's correct.
11      Q.  So you learned the information that it was
12 Officer Seiser, I think you said, during the second
13 phone conversation that you had with Sergeant Cochran?
14      A.  Yes.
15      Q.  And would that have been near the time that
16 you sent the e-mail at 10:28 p.m.?
17      A.  Yes, that's right.
18      Q.  Okay.  So the first conversation you had
19 with Sergeant Cochran was earlier that night?
20      A.  Yes, that's correct.
21      Q.  And that is when Sergeant Cochran had
22 informed you that Officer Seiser had blown triple
23 zeros on the Breathalyzer test?
24      A.  He didn't name him.  He stated that the

Page 34

1  officer in question had taken a Breathalyzer and the
2  results were triple zeros, or something to that
3  effect.
4       Q.  Now, during the second phone call that you
5  had with Sergeant Cochran, I believe you just said
6  that's when you learned that, you obtained information
7  that, the contents of that bottle after it was
8  retrieved, was possible water; is that right?
9       A.  "Possible" or, I believe, "probable"; either
10 one of the two words I recall him mentioning, yes.
11      Q.  Now, based on your experience as a police
12 officer, do police officers when they suspect that a
13 bottle may contain alcohol, is it practice of police
14 officers to drink the contents to see if it's alcohol?
15      A.  No.
16      Q.  What is the procedure?
17      A.  They process the evidence by inventorying
18 the contents of the bottle, placing it in a small
19 vial, which is sent into the inventorying system; the
20 bottle itself is emptied of the remaining liquid, and
21 that is also inventoried.
22      Q.  And is that contents then tested somewhere?
23      A.  Yes.
24      Q.  And where is it tested?

Page 35

1       A.  That's tested at our forensic -- or state
2  lab will test the sample of the liquid.
3       Q.  You mentioned, in terms of, this Executive
4  Meeting -- I think I have the title wrong.  What is it
5  called?
6       A.  Executive Manager Meeting.
7       Q.  (Continuing.) -- that took place the day
8  after the incident?
9       A.  Yes, that morning -- (Indiscernible.)
10                 (Interruption by the court
11                 reporter.)
12 BY MR. JEBSON:
13      Q.  So when you say "Yes, that morning," that
14 took place the next day, March 30th, 2011?
15      A.  That's correct.
16      Q.  In terms of what Mr. Flaxman had asked you
17 regarding when certain events took place and you gave
18 certain times, are those just your best approximation?
19      A.  That's correct, yes.
20      Q.  So you're not saying with absolute certainty
21 that it happened at those exact times?
22      A.  No, I can't say for sure, as far as the
23 times.
24      Q.  Now, you're aware by reviewing the Complaint

Page 36

1  Register, that Officer Seiser was taken from the scene
2  to the 9th District?
3       A.  Yes.
4       Q.  And that he was asked to undergo a field
5  sobriety test?
6       A.  That's correct.
7       Q.  Which included a Breathalyzer test?
8       A.  Yes.
9       Q.  And that he was then asked to -- Well,
10 strike that.
11            And at some point, the bottle was
12 retrieved out of his vehicle?
13      A.  Yes, that's correct.
14      Q.  And would it be correct that other than the
15 citation that was issued to Officer Seiser, everything
16 that Officer Seiser had to do, from going into the
17 station, up until he left that night, he would have
18 been required to do under the administrative phase of
19 the investigation?
20      A.  Yes.
21            MR. JEBSON:  That's all the questions I
22 have.
23
24

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Michael Seiser, | ) | |
| | ) | Case No. 12 CV 02353 |
| Plaintiff, | ) | |
| | ) | JUDGE HOLDERMAN |
| v. | ) | |
| | ) | |
| City of Chicago and Debra Kirby, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' REPLY MEMORANDUM IN FURTHER SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

Defendants City of Chicago (the "City"), by its attorney, Stephen R. Patton, and Deputy Superintendent Kirby ("Deputy Kirby") (collectively, "Defendants"), by her attorneys, Lindsey Vanorny, Assistant Corporation Counsel, and Scott Jebson, Chief Assistant Corporation Counsel, submit the following reply memorandum in further support of their motion for summary judgment:

**INTRODUCTION**

In this case, Defendants have established that there are no genuine issues of material fact and that Defendants are entitled to judgment as a matter of law on all of Plaintiff's claims. First, Plaintiff has forfeited his false arrest claim by admitting that there was probable cause to arrest him. Likewise, Plaintiff's claim that he was subjected to a warrantless search fails as a matter of law because probable cause existed to arrest him for driving under the influence of alcohol, which also provides a valid basis for administering a breathalyzer test. Moreover, Plaintiff now claims for the first time, in opposition to Defendants' summary judgment motion, that he was detained for an unreasonable period of time at the police station. The undisputed material facts establish that Deputy Kirby was not personally involved in Plaintiff's detention and therefore,

she cannot be subjected to liability under Section 1983.  Even if this Court were to assume for

sake of argument that Deputy Kirby had been personally involved in Plaintiff's detention,

Plaintiff has failed to meet his burden in establishing that his detention was delayed

unreasonably.  In the alternative, even if Deputy Kirby did not have probable cause to detain

Plaintiff and to subject him to a breathalyzer test, she is entitled to qualified immunity as a matter

of law.  Finally, the City should be granted summary judgment as a matter of law on Plaintiff's

malicious prosecution claim because probable cause existed for each of his charges, there is no

evidence of malice in the record, and Plaintiff has not established that any Chicago Police

Officer had any further involvement in prosecuting his criminal case after arresting and detaining

him.

## ARGUMENT

### I. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S FEDERAL CLAIMS.

#### A. Plaintiff forfeited his false arrest claim against Deputy Kirby.

In his memorandum, Plaintiff claims that he never asserted a claim for false arrest.[1]  *See*

Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment ("Pl.'s

Mem.") at 6 (noting that "Defendants devote a bulk of their summary judgment motion to an

unasserted false arrest claim...").  Furthermore, Plaintiff concedes that there was probable cause

to arrest him.  *See* Pl.'s Mem. at 6. (noting that Defendants mistakenly "focus on the non-issue of

whether there had been probable cause to arrest.")  Accordingly, Plaintiff has forfeited any false

arrest claim that he may have arising out of this incident and summary judgment should be

entered in Defendants' favor on this claim.  *See Garcia v. City of Chicago*, 2012 WL 601844, at

*9 (N.D. Ill. 2012) (noting that the failure to raise arguments in opposition to a motion for

---

[1] To the contrary, Plaintiff alleges in his Complaint that he "was subjected to false arrest" and that "Deputy Kirby could not have reasonably believed that plaintiff had committed an offense."  (Dkt. No. 1; Compl. at ¶ 8, 19.)

summary judgment related to a specific claim acts as forfeiture of that claim).

**B.     Probable cause existed to subject Plaintiff to a breathalyzer test.**

In this case, Plaintiff is now conceding that Deputy Kirby had probable cause to arrest him for driving under the influence of alcohol, but is contending that there is no probable cause to require him to submit to a breathalyzer test.  *See* Def.'s Mem. at 6, 7-11.  In particular, Plaintiff claims that Deputy Kirby ordered that Plaintiff be held in custody "to attempt to secure evidence" of his intoxication and to subject him to a warrantless breathalyzer test.  *See* Pl.'s Mem. at 7.

Plaintiff's argument is unavailing for several reasons.  First, Plaintiff has presented no evidence (because there is none) that Deputy Kirby ordered Plaintiff to submit to a breathalyzer test.  But more importantly, even if Defendant Kirby had specifically ordered Plaintiff to submit to a breathalyzer, that order would have been perfectly legal because the existence of probable cause to arrest Plaintiff for driving under the influence of alcohol would also provide a basis for administering a breathalyzer test.  *See Karberg v. Weber*, 2004 WL 2967015, at *3 (N.D. Ill. 2004).

A warrantless search to obtain breath or blood samples is permitted in the DUI context so long as there is probable cause to arrest the individual for driving under the influence of alcohol.  *See Karberg*, 2004 WL 2967015, at *3 (citing *Schmerber v. State of Calif.*, 384 U.S. 757 (1966)) (noting that a "police officer may obtain a compulsory blood test to determine blood alcohol content where probable cause exists to effect an arrest, circumstances do not permit time to obtain a warrant, and the test is a reasonable test."); *see also People v. Jones*, 214 Ill. 2d 187 (2005) (noting that Illinois law permits non-consensual warrantless breath and blood testing in DUI cases that do not involve death and personal injury.)

Despite the fact that in the very beginning of Plaintiff's memorandum, he concedes that there was probable cause to arrest him for driving under the influence of alcohol, he spends a good portion of his response arguing that there actually was not probable cause to arrest him for a DUI.  *See* Pl.'s Mem. at 6, 8-10.  Specifically, Plaintiff argues that the three civilian witnesses were not credible because there were several inconsistencies across their statements.  *See* Pl.'s Mem. at 8-10.  For example, one of the witnesses told the police that Plaintiff was speeding while another witness said that Plaintiff was driving very slowly.  *See* Pl.'s Mem. at 10.  In addition, one of the witnesses stated that she observed Plaintiff driving his car while drinking from a bottle that "was clearly marked 'vodka' in red letters" as opposed to T.G.I.  Friday's Mudslide.  *See* Pl.'s Mem. at 8; Defendants' Reply to Plaintiff's Response to Defendants' Local Rule 56.1(a)(3) Statement of Undisputed Material Facts ("Def.'s Reply") at ¶¶ 18-19.  Lastly, Plaintiff argued that only one of the civilian witnesses smelled an odor of alcohol on Plaintiff's breath while the police officers that interacted with Plaintiff did not notice an odor or any other visible signs of intoxication.  *See* Pl.'s Mem. at 8-9.

Plaintiff's attempt to rely upon these inconsistencies to create a genuine issue of material fact is misplaced.  The only relevant inquiry is whether Deputy Kirby had probable cause to believe that Plaintiff was driving under the influence at the moment that she ordered that Plaintiff be processed criminally for that offense, something which Plaintiff conceded early in his response brief.  *See* Pl.'s Mem. at 6; *Anderer v. Jones*, 385 F. 3d 1043, 1049 (7th Cir. 2004) (In evaluating probable cause, the court must consider the "information known to the officer at the moment the arrest was made, not on subsequently-received information."); *see also Davis v. Tavares*, 2011 WL 53440, at *3 (N.D. Ill., 2011) (noting that "a court evaluates probable cause not with the benefit of hindsight, and not on the facts as perceived by an omniscient observer, but

4

on the facts as they appeared to a reasonable person in the officer's position, even if that reasonable belief turned out to be incorrect.")  Likewise, once probable cause is established, Deputy Kirby has no duty to conduct further investigation in hopes of uncovering exculpatory evidence.  *See Anderer*, 385 F. 3d at 1049; *see also Spiegel*, 196 F. 3d at 725 ("the law does not require that a police officer conduct an incredibly detailed investigation at the probable cause stage.")

Plaintiff has failed to point to any evidence in the records which establishes that Deputy Kirby actually knew about any of these inconsistencies at the time she ordered that Plaintiff was to be processed criminally for driving under the influence of alcohol.  Likewise, Plaintiff argues that his partner, Chicago Police Officer Krzysztof Gniedziejko, did not observe any indicators that Plaintiff was intoxicated, including an odor of alcohol, slurred speech, or difficulty walking. *See* Pl.'s Mem. at 9.  However, there is no evidence in the record that any of the police officers investigating this incident spoke to Officer Gniedziejko, let alone passed this information onto Deputy Kirby.  Accordingly, all of the facts which Plaintiff relies upon in his memorandum to attempt to undermine the existence of probable cause to arrest Plaintiff for a DUI are immaterial.

Moreover, even if the Court were to ignore the fact that Plaintiff has conceded that there was probable cause to arrest him for a DUI and were to assume for the sake of argument that Deputy Kirby had known of this information, the minor discrepancies cited by Plaintiff do not rise to the level that would cause a reasonable police officer to question the witnesses' credibility.  The key facts that provided a basis to arrest Plaintiff for driving under the influence of alcohol were consistent across all three of the witnesses.  Specifically, each witness reported that they had observed a police officer in full uniform driving and drinking from what appeared to be an alcoholic beverage container.  *See* Def.'s Reply at ¶ 25-26, 39-42.  In addition, both

Sergeants Verta and Price observed what appeared to be an alcoholic beverage bottle, partially filled with a clear liquid, lying on the passenger's seat of Plaintiff's vehicle. *See* Def.'s Reply at ¶ 27, 45.

Moreover, police officers are not required to resolve inconsistencies in witness reports in order to have probable cause. *See Wells v. City of Chicago*, 2012 WL 4092691, *7 (N.D.Ill., 2012) (citing *Spiegel v. Cortese*, 196 F. 3d 717, 724 (7th Cir. 1999)). In *Spiegel v. Cortese*, the Seventh Circuit noted that there is no requirement that "a victim's reported must be unfailingly consistent to provide probable cause" and that "the credibility of a putative victim or witness is a question, not for police officers in discharge of their considerable duties, but for the jury in a criminal trial." *See Spiegel*, 196 F. 3d at 725; *see also Bonds v. Fizer*, 713 F. Supp. 2d 752, 763-764 (N.D. Ill. 2010) (concluding that "[a]lthough less than ideal, questionable citizen complaints are sufficient to establish probable cause") (collecting cases).

In sum, the undisputed material facts in this case establish that Deputy Kirby had probable cause to arrest Plaintiff for driving under the influence of alcohol and to require him to submit to a breathalyzer test.[2] Therefore, summary judgment should be granted in Defendants' favor on Plaintiff's claim for illegal search under the Fourth Amendment.

> **C.** **Plaintiff has improperly attempted to add a new claim at the summary judgment stage that he was detained for an unreasonable period of time for the purpose of gathering additional evidence that he was intoxicated.**

For the first time during the course of this litigation, Plaintiff claims that his detention at the police station was unnecessarily delayed as a result of "Deputy Kirby's order to attempt to

---

[2] In Plaintiff's memorandum, he claims that "Defendants are mistaken in relying on *Devenpeck v. Alford*, 543 U.S. 146 (2004) and its progeny." *See* Pl.'s Mem. at 10. Further, Plaintiff states that "the existence of probable cause to arrest Plaintiff for transporting open alcohol would not authorize the police to hold plaintiff in custody for DUI testing without probable cause to believe that the test would yield evidence of crime." *Id.* Plaintiff has misstated Defendants' argument. Defendants merely argued that "even if probable cause existed for only one of the offenses, Plaintiff would still be barred from asserting a false arrest claim." Def.'s Mem. at 12. Defendants do not contend that probable cause to arrest Plaintiff for transporting alcoholic liquor in a container with a broken seal would provide a valid basis to administer a breathalyzer test or would bar Plaintiff's illegal search claim.

secure evidence that…[he] was intoxicated." *See* Pl.'s Mem. at 7.  As previously noted, there is

no evidence in the record to support that Deputy Kirby made such an order.  Furthermore,

Plaintiff is improperly attempting to add a new claim at the summary judgment stage of which

Defendants had no notice.

In his memorandum, Plaintiff states that he does not complain of false arrest, but rather of

false imprisonment.  *See* Pl.'s Mem. at 6.  Plaintiff cites *Wallace v. Kato*, which explains that

false imprisonment is detention without legal process and that the tort of false imprisonment ends

once a person is bound over by a magistrate or arraigned on charges.  *See Wallace v. Kato*, 549

U.S. 384, 389-390 (2007).  In addition, Plaintiff cited several cases that stand for the proposition

that arrestees are entitled to a prompt judicial determinations of probable cause under the Fourth

Amendment and that "delays for the purpose of gathering additional evidence are *per se*

unreasonable."  *Lopez v. City of Chicago*, 464 F. 3d 711 (7th Cir. 2006); *see also Gerstein v.*

*Pugh*, 420 U.S. 103, 125 (1975) (holding that when an individual is arrested without a warrant,

the Fourth Amendment requires a prompt probable cause hearing); *County of Riverside v.*

*McLaughlin,* 500 U.S. 44, 56-57 (1991) (holding that "a jurisdiction that provides judicial

determinations of probable cause within 48 hours of arrest will, as a general matter, comply with

the promptness requirement of Gerstein").

In this case, Plaintiff's Complaint makes no mention of a claim that he was detained for

an unreasonable time period for the purpose of gathering additional evidence or that he was

prevented from receiving a prompt probable cause hearing.  (Dkt. No. 1.)  Under the federal

notice pleading standards, Plaintiff is required to give Defendants fair notice of his claims.  *See*

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007).  Here, Plaintiff's claim that he was

detained for an unreasonable period of time is sufficiently distinct from the allegations contained

in his complaint that he was arrested and detained without probable cause such that Defendants should have been apprised of this new claim. *See Hunt v. Roth*, 2013 WL 708116, *6 (N.D. Ill., 2012) (noting that a plaintiff could not add a claim at the summary judgment stage that he was detained at a police station for unreasonable period of time where his complaint only stated that he was arrested and detained without probable cause). Furthermore, Plaintiff's failure to provide Defendants with notice of this claim denied them of the opportunity to conduct discovery related to it. Consequently, Plaintiff should not be permitted to transform his false arrest claim into an unreasonable detention claim in his response brief in opposition to Defendants' summary judgment motion. *See Johnson v. Cypress Hill*, 641 F. 3d 867, 873 (7th Cir. 2011) (noting that "[t]here must be a point at which a plaintiff makes a commitment to the theory of [his] case"); *Grayson v. O'Neill*, 308 F. 3d 808, 817 (7th Cir. 2002) ("[A] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.") In fact, the Seventh Circuit has held that such attempts to change claims on the eve of summary judgment are "exactly the sort of switcheroo [it] has counseled against." *Johnson*, 641 F. 3d at 873.

> **i.    In the alternative, Deputy Kirby did not have any personal involvement in determining the length of Plaintiff's detention.**

Even if Plaintiff were permitted to add a *Gerstein* claim, Deputy Kirby had no personal involvement in determining the duration of Plaintiff's detention at the police station or the time at which he would receive a probable cause hearing. In fact, Deputy Kirby had no further involvement in this incident after she ordered that Plaintiff be processed criminally for driving under the influence of alcohol. *See* Def.'s Reply at ¶¶ 54, 72-73. In fact, Deputy Kirby never went to the 9th District Police Station. *See* Def.'s Reply at ¶ 72.

An individual can only be held liable under Section 1983 if she caused or participated in

the constitutional deprivation. *See Dishman v. Cleary*, 2011 WL 1261098, at *5 (N.D. Ill. 2011)

(citing *Vance v. Peters*, 97 F. 3d 987, 991 (7th Cir. 1996)); *see also, e.g., Swanigan v. Trotter*,

645 F. Supp. 2d 656, 677-678 (N.D. Ill. 2009) (noting that an arresting officer is not responsible

for a plaintiff's detention once he turns the plaintiff over to the jailers at the police station.)

Accordingly, Deputy Kirby cannot be held liable under Section 1983 for any unreasonable

detention of Plaintiff that occurred after she ordered that he was to be processed criminally.

> ii.     **Moreover, Plaintiff has failed to meet his burden of establishing
>         that the delay in this case was unreasonable.**

Plaintiff has also failed to establish that he was detained for an unreasonable time period.

Plaintiff claims that his detention was unreasonably prolonged for the purpose of gathering

additional evidence in violation of *County of Riverside v. McLaughlin*. *See County of Riverside,*

500 U.S. 44, 56-57 (1991).

Under *McLaughlin*, delays of less than 48 hours are presumed to be reasonable and the

arrestee has the burden of establishing that the length of his custody is nonetheless unreasonable.

*See Portis v. City of Chicago, Ill*., 613 F. 3d 702, 704 (7th Cir. 2010).  Plaintiff is mistaken that

*McLaughlin* prohibits the police from detaining an arrestee while conducting further

investigation.  Rather, under *McLaughlin*, the police may hold an arrestee in custody in order to

further investigate a crime to "bolster" a case against the arrestee so long as there was probable

cause to justify Plaintiff's arrest in the first place.  *See U.S. v. Sholola*, 124 F. 3d 803, 805 (7th

Cir. 1997); *see also U.S. v. Daniels*, 64 F. 3d 311 (7th Cir. 1995) (noting that "*Gerstein* and its

progeny simply prohibit law enforcement from detaining a defendant *to gather evidence to

justify his arrest*."); *Wells v. City of Chicago*, 2012 WL 4092691, *7 (N.D.Ill., 2012) (noting that

the Seventh Circuit has not applied the same *per se* prohibition against delays for the purpose of

gathering additional evidence cited in *McLaughlin* to delays of less than forty-eight hours.)

In this case, Deputy Kirby had probable cause to justify Plaintiff's arrest in the first place, which Plaintiff concedes in his response brief. Therefore, the police officers who processed Plaintiff for driving under the influence of alcohol were not prohibited from conducting further investigation related to Plaintiff's criminal case.

> **D.    Even if Deputy Kirby did not have probable cause for Plaintiff's arrest on March 29, 2011, she is entitled to qualified immunity.**

Plaintiff claims that Deputy Kirby is not entitled to assert the affirmative defense of qualified immunity because her official duties did not include "instructing police officers to require arrestees to submit to breathalyzers." *See* Pl.'s Mem. at 12. Plaintiff further claims that Deputy Kirby "usurped the traditional function of the street police officer when she ordered that plaintiff be processed criminally for DUI." *See* Pl.'s Mem. at 12.

First, Plaintiff cites no factual support for his claim that Deputy Kirby instructed that Plaintiff must submit to a breathalyzer test. Secondly, Plaintiff does not cite to any caselaw to support his argument that Deputy Kirby was acting outside the scope of her official duties on the date in question. Conversely, Deputy Kirby testified in her deposition that it was within the scope of her duties as Deputy Superintendent to assist in making probable cause determinations when a Chicago Police Officer is accused of committing a crime while on duty. See Defendants' Response to Plaintiff's Local Rule 5.61(b)(3)(C) Statement of Additional Material Facts ("Def.'s Response") at ¶ 8. Accordingly, Deputy Kirby was acting within the scope of her official duties at the time of this incident and is entitled to assert a qualified immunity defense.

Here, it is well established that individuals have the right to be free from being detained without probable cause and from being required to submit to a breathalyzer without probable cause. *See Mustafa v. City of Chicago,* 442 F. 3d 544, 548 (7th Cir. 2006); *Skinner v. Railway Labor Executives' Association*, 489 U.S. 602, 616-617 (1989). Accordingly, the only issue

remaining is whether a reasonable officer in Deputy Kirby's position could have believed that it

was lawful to order that Plaintiff be processed criminally for driving under the influence of

alcohol.  *See Mustafa*, 442 F. 3d at 548.

In her initial brief, Deputy Kirby argued that in light of the facts that she knew at the time

she ordered that Plaintiff be arrested, she is entitled to qualified immunity.  *See Spiegel*, 196 F.

3d at 723 ("as long as a reasonably credible witness or victim informs the police that someone

has committed, or is committing, a crime, the officers have probable cause to place the alleged

culprit under arrest, and their actions will be cloaked with qualified immunity if the arrestee is

later found innocent"); *see also Messerschmidt v. Millender*, 132 S. Ct. 1235, 1245 (2012)

("Qualified immunity gives government officials breathing room to make reasonable but

mistaken judgments and protects all but the plainly incompetent or those who knowingly violate

the law.") (internal quotations omitted).  Plaintiff's only response to Deputy Kirby's qualified

immunity argument is that whether her actions were reasonable "turn on disputed facts."[3]  *See*

Pl.'s Mem. at 6.  However, as previously mentioned, the inconsistencies in the witnesses'

statements identified by Plaintiff are immaterial because Plaintiff has not cited to any evidence

that Deputy Kirby was actually aware of these facts.  Furthermore, Plaintiff has not disputed that

Deputy Kirby acted reasonably based on the information that was communicated to her.

Accordingly, she is entitled to qualified immunity as a matter of law.

---

[3] Plaintiff argues that Deputy Kirby ordered that Plaintiff be held in custody for DUI testing. *See* Pl.'s Mem. at 13.
Again, there is no evidence in the record to support that Deputy Kirby made this order.  Rather, she ordered that
Plaintiff be processed criminally for driving under the influence of alcohol.  SOF ¶ 54.

## II.   THE CITY IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S MALICIOUS PROESCUTION CLAIM.[4]

Plaintiff's malicious prosecution claim fails as a matter of law because Plaintiff cannot establish the absence of probable cause.  Plaintiff claims that the probable cause standard under Illinois law is stricter than the one under the Fourth Amendment.  *See* Pl.'s Mem. at 14-15.  Although the two standards may differ in language, Plaintiff has not cited a single case which explicitly supports this conclusion.  Plaintiff appears to have adopted this position because he has already conceded that there was probable cause to arrest Plaintiff for transporting open alcohol.  *See* Pl.'s Mem. at 2 (stating "nothing in this case turns on whether there was probable cause to arrest plaintiff for transporting open alcohol.")

In *Guidry v. Boyd*, the Court held that the presence of even an empty beer or liquor bottle in the passenger side of a car is a sufficient basis for probable cause under the statute.  *Guidry v. Boyd*, 2007 WL 2317174, at *9 (N.D. Ill. 2007).  Additionally, the Court held that the existence of probable cause to arrest under the statute proved fatal to a plaintiff's malicious prosecution claim.  *Id*. at 13.  In this case, Sergeants Verta and Price each independently observed what appeared to be an alcoholic beverage bottle lying on the passenger seat of Plaintiff's vehicle.  *See* Def.'s Reply at ¶¶ 27, 45.  They also each observed that the seal on the bottle was broken and that the bottle was partially filled with a clear liquid.  *Id*.  Therefore, the police officers that arrested and detained Plaintiff had probable cause to do so.

Plaintiff also claims that the police officers involved in this incident lacked probable cause because they "knew that the repurposed bottle contained only water."  *See* Pl.'s Mem. at

---

[4] In his memorandum, Plaintiff claims that he is only pursing his malicious prosecution claim against the City for the actions of its police officers.  *See* Pl.'s Mem. at 2.  Further, Plaintiff states "Defendants mistakenly read the complaint as asserting a malicious prosecution claim against Kirby in her individual capacity."  *See* Pl.'s Mem. at 7, n. 7.  However, in Plaintiff's Complaint, he states that Deputy Kirby caused him to be charged with possession of liquor with a broken seal in his motor vehicle despite the fact that "she knew there was no basis for this charge, which was later dismissed at plaintiff's first court appearance."  (Dkt. No. 1, Compl. at ¶ 18.)

15. Plaintiff does not cite the record to support this assertion. *Id.* Furthermore, although Plaintiff characterizes the bottle that Sergeants Verta and Price observed as a "repurposed water bottle," there is no evidence that Plaintiff altered the T.G.I. Friday's Mudslide bottle or its original labeling. Def.'s Response at ¶ 20. In addition, the record establishes that the police officers involved in this incident did not know that the bottle contained water at the time the citation was issued. *See* Def.'s Reply at ¶ 64; Def.'s Response at ¶ 20.

Plaintiff's malicious prosecution claim also fails as a matter of law because Plaintiff has not established that any Chicago Police Officer had any further involvement in prosecuting his criminal case after arresting and detaining him. *See Lipscomb v. Knapp*, 2009 WL 3150745, at *12 (N.D. Ill. 2009) (stating that "[a] plaintiff who demonstrates only that he was arrested and detained without probable cause has not made out a claim for malicious prosecution.") Plaintiff failed to respond to this argument. *See Rebolar ex. rel. Rebolar v. City of Chicago, Ill*., 2012 WL 4361248, at *18 (N.D. Ill. 2012) (noting that a plaintiff's failure to respond to a defendant's argument constitutes waiver). To prevail on a malicious prosecution claim, a plaintiff "must do more than state conclusively that the defendants maliciously prosecuted him." *Sneed v. Rybicki*, 146 F. 3d 478 (7th Cir. 1998). Rather, a Plaintiff must be able to point to facts which support the conclusion that malicious prosecution actually occurred, including evidence that the police officers gave perjured testimony, falsified information or evidence, or withheld exculpatory evidence. *Id.* Here, Officer Madsen attended Plaintiff's court hearing related to the citation in order to inform the prosecutor that the contents of the bottle tested negative for the presence of alcohol and that the ticket should be dismissed. *See* Def.'s Reply at ¶ 75. Therefore, Plaintiff has failed to make a showing as to this element of a malicious prosecution claim.

Finally, Plaintiff has failed to establish that any of the police officers involved in this

incident acted with malice.  He has set forth two arguments related to this element.  First,

Plaintiff claims that "malice is obvious from the City's decision to require plaintiff to answer to

the charge of transporting open alcohol after the City knew that plaintiff's repurposed bottle only

contained water."  *See* Pl.'s Mem. at 13-14.  Contrary to Plaintiff's claims, there is no evidence

in the record that any Chicago Police Officer knew that the bottle contained water.  *See* Def.'s

Response at ¶ 20.  The citation was issued prior to the time that the bottle was retrieved as a part

of the administrative investigation.  *See*  Def.'s Reply at ¶¶ 62-71.  Once the bottle was retrieved,

its contents were poured into a vial and sent to the Illinois State Police for testing.  *See* Def.'s

Reply at ¶ 71.  Moreover, Plaintiff admitted that at the time the citation was issued, it was

unknown whether the bottle observed in his car contained alcohol.  *See* Def.'s Reply at ¶ 64.

Consequently, Plaintiff's claim that Chicago Police Officers charged him with transporting open

alcohol in a container with a broken seal knowing that his bottle only contained water is

unfounded.

Secondly, Plaintiff claims that there is evidence that the police officers involved in this

incident acted with malice because they "knew that *Garrity v. New Jersey*, 385 U.S. 493 (1967)

barred use of the contents of the bottle against plaintiff at a criminal proceeding."  *See* Pl.'s

Mem. at 14.  Plaintiff's claim is not supported by a citation to the record in this case.  Also,

Plaintiff is incorrect that *Garrity* would prevent police officers from using the contents of the

bottle against Plaintiff at a criminal proceeding.  In *People v. Carey*, the court noted that *Garrity*

held that "the protections of the fifth and fourteenth amendments against coerced statements

prohibit use in subsequent criminal proceedings of statements obtained from police officers

under threat of removal from office."  *People v. Carrey*, 386 Ill. App. 3d 254, 266 (2008).

Further, the court explained that these protections do not extend non-testimonial or physical

evidence such as the contents of the bottle.  *Id*. at 266-267.

Here, summary judgment is appropriate if Plaintiff fails to establish any one of these

elements.  *See Freeman v. Brown*, 2012 WL 3777074, at *5 (N.D. Ill. 2012) (internal citation

omitted.)  Accordingly, summary judgment should be granted in favor of Defendants on

Plaintiff's malicious prosecution claim.

**WHEREFORE**, for the reasons set forth above and in their initial memorandum in

support of their motion for summary judgment, there are no genuine issues of material fact and

Defendants are entitled to judgment as a matter of law on all counts of Plaintiff's Complaint.

Therefore, Defendants respectfully requests this Court to grant summary judgment in their favor

on all claims contained in Plaintiff's Complaint.

Respectfully Submitted,

Stephen Patton
Corporation Counsel of the City of Chicago

By:     /s/ Lindsey Vanorny
        Assistant Corporation Counsel
        City of Chicago Department of Law
        30 North LaSalle Street, Suite 900
        Chicago, Illinois 60602
        (312) 742-0234
        Attorney No. 6303642

By:     /s/ Scott Jebson
        Chief Assistant Corporation Counsel
        City of Chicago Department of Law
        30 North LaSalle Street, Suite 900
        Chicago, Illinois 60602
        (312) 744-6959
        Attorney No. 6225243

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL SEISER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 12 C 2353 |
| | ) | |
| CITY OF CHICAGO and DEBRA KIRBY, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

On March 29, 2011, Chicago Police Department Officer Michael Seiser ("Officer
Seiser") was patrolling in a vehicle while drinking clear liquid from a 1.75-liter liquor bottle.
Multiple witnesses alleged that they had seen him driving while drinking from a large bottle that
appeared to contain alcohol. Officer Seiser was subsequently arrested for driving under the
influence of alcohol and transporting an open container of alcohol in a vehicle. After his arrest,
he passed field sobriety tests and a breathalyzer, and a subsequent analysis at a crime laboratory
found that the liquid did not contain alcohol. Officer Seiser's complaint alleges claims under 42
U.S.C. § 1983 against Deputy Superintendent Debra Kirby ("Deputy Kirby") in her individual
capacity for unlawful detention and for an unreasonable search in the form of the breathalyzer
test. (Dkt. No. 1.) The complaint also alleges one claim under state law against the City of
Chicago ("the City") for malicious prosecution. (*Id.*) On February 15, 2013, Deputy Kirby and
the City moved for summary judgment on all of Officer Seiser's claims. (Dkt. No. 33.) For the
reasons explained below, their motion is granted in its entirety, and summary judgment is entered
against Officer Seiser on all claims.

<u>BACKGROUND</u>

The following facts are undisputed. On March 29, 2011, Officer Seiser was assigned to patrol an area on the South Side of Chicago as part of the Operation Safe Schools Program, from 1 p.m. to 4 p.m. (Dkt. No. 35 ("Defs.' 56.1(a)(3) SMF") ¶¶ 16, 17.) During his shift that day, Officer Seiser was in uniform, but driving his personal vehicle, a Pontiac Grand Am. (*Id.* ¶¶ 20, 21, 25.) While driving southbound on Union Avenue, Officer Seiser was drinking from a 1.75-liter T.G.I. Friday's Mudslide bottle. (*Id.* ¶ 18.) T.G.I. Friday's Mudslide is an alcoholic beverage. (*Id.* ¶ 19.) A label on the bottle stated, "[t]he liquor is in it." (*Id.*)

At 2:18 p.m., the Chicago Police Department received a phone call from a woman later identified as Kathleen Glassford. (*Id.* ¶ 20-23.) Glassford called to report an unknown individual driving a silver Grand Am and drinking from what appeared to be a bottle of liquor. (*Id.*) She reported the license plate number, and then called back 10 minutes later to say that the individual was a police officer. (*Id.*) Sergeant John Verta ("Sergeant Verta") responded to the scene, and met with Glassford's daughter, Gail Glassford, and another witness, Roseann Anderson. (*Id.* ¶¶ 8, 23-25.) Both witnesses stated that they observed a police officer driving a gray vehicle while drinking from a gallon-sized bottle of liquor. (*Id.* ¶¶ 25-26.)

Sergeant Verta then approached Officer Seiser, on the passenger side of Officer Seiser's vehicle. (*Id.* ¶ 27.) He observed in the front passenger seat what appeared to be a bottle of liquor with a red and white label, a broken seal, and clear liquid inside. (*Id.* ¶ 27; *see also id.* ¶ 38.) Sergeant Verta asked Officer Seiser, "What's in the bottle?" (*Id.* ¶ 28.) Seiser responded: "What bottle?" (*Id.*) Officer Seiser claims that he told Sergeant Verta that there was no alcohol in the bottle. (*Id.*) Officer Seiser refused two requests by Sergeant Verta to open the door so he could inspect the bottle, and said that Sergeant Verta would need to "[g]et a warrant" in order to access

2

the vehicle. (*Id.*) Sergeant Verta testified that he did not smell alcohol on Officer Seiser's breath or hear slurred speech. (Dkt. No. 42 ("Pl.'s 56.1(a)(3) SMF") ¶ 5.)

At this point, Sergeant Verta contacted a watch commander, who told him to bring Officer Seiser to the station and then notified the Internal Affairs Division. (Defs.' 56.1(a)(3) SMF ¶¶ 29-31.) Sergeant Verta drove Officer Seiser to the police station, while Internal Affairs Sergeant Matthew Price ("Sergeant Price") headed to the scene to inspect the vehicle and interview witnesses. (*Id.* ¶¶ 13, 29-31.) Sergeant Price—after being briefed about Sergeant Verta's encounter with Officer Seiser and given some background about the witnesses—met with Roseann Anderson, Gail Glassford, and another witness, Gary Anderson. (*Id.* ¶ 37.) Each of these witnesses told him that they had observed a police officer drinking what appeared to be an alcoholic beverage while driving. (*Id.* ¶¶ 40-42.) Roseann Anderson signed a sworn affidavit alleging the same. (*Id.* ¶ 40.) Gary Anderson told Sergeant Price that, after attempting to obtain Officer Seiser's license plate number, he had a "confrontation" with Officer Seiser during which he smelled alcohol on Officer Seiser's breath. (*Id.* ¶¶ 42-44.) Sergeant Price also observed the vehicle, and saw the bottle, which appeared to him to be a partially filled alcoholic beverage bottle. (*Id.* ¶ 45.)

Sergeant Price then contacted a lieutenant at the Internal Affairs Division, who relayed the information to Internal Affairs Division Chief Juan Rivera ("Chief Rivera"). (*Id.* ¶¶ 15, 46-47.) Chief Rivera then met with Deputy Kirby, and informed her of all the information that had been relayed up the chain of command from Sergeant Price. (*Id.* ¶ 46-51.) Deputy Kirby then told Chief Rivera to process Officer Seiser criminally for the offense of driving under the influence of alcohol, and requested that the bottle be retrieved from Officer Seiser's car. (*Id.* ¶ 54-55.) She also ordered an administrative investigation. (*Id.* ¶ 56.)

The record is unclear about exactly what time Officer Seiser was taken to the police station, but at 5:52 p.m., he was officially arrested. (Dkt. No. 35, Ex. S, at 1.) The arrest record lists charges of both driving under the influence and transporting an open container of alcohol in a vehicle. (*Id.*) After Seiser's arrest, Officer Brian Madsen ("Officer Madsen") administered sobriety tests and a breathalyzer at the station. (*Id.* at 3; Defs.' 56.1(a)(3) SMF ¶ 61.) Officer Seiser passed all of the sobriety tests as well as the breathalyzer test, which showed that he had a blood alcohol content of 0.000. (Defs.' 56.1(a)(3) SMF ¶ 61.) Neither Officer Madsen nor Officer Andrew Kral, who also participated in the investigation after the arrest, perceived anything about Officer Seiser's behavior that indicated he was intoxicated. (Pl.'s 56.1(a)(3) SMF ¶¶ 11-12.)

Officer Seiser was issued a citation for transporting an open container of alcohol in a vehicle. (Defs.' 56.1(a)(3) SMF ¶¶ 62, 65.) He initially refused to allow a search of his personal vehicle as part of the administrative investigation, apparently believing that the search was part of the criminal investigation. (*Id.* ¶ 68; Dkt. No. 42 ("Pl.'s Resp. to Defs.' 56.1(a)(3) SMF") ¶ 68.) Sergeant Price then issued Officer Seiser a direct order to allow the bottle to be recovered, which Officer Seiser obeyed. (Defs.' 56.1(a)(3) SMF ¶ 69.) At 8:17 p.m., March 29, 2011, Seiser was released on his own recognizance. (Pl.'s 56.1(a)(3) SMF ¶ 19.)

The bottle was recovered and sent to the Illinois State Police laboratory for testing. (*Id.* ¶¶ 70-71.) On April 29, 2011, a laboratory report was issued by the Illinois State Police indicating that the contents of the bottle had tested negative for alcohol. (Dkt. No. 35, Ex. U.) Officer Madsen attended court on May 18, 2011, for the open container citation and informed the prosecutor that the bottle had tested negative for alcohol. (Defs.' 56.1(a)(3) SMF ¶ 75; Dkt. No. 35, Ex. T.) The court dismissed the charge against Officer Seiser. (Defs.' 56.1(a)(3) SMF ¶ 75.)

LEGAL STANDARD

A grant of summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the burden of "informing the court of the basis for its motion and identifying the evidence it believes demonstrates the absence of a genuine issue of material fact." *Kurowski v. Shinseki*, No. 12 C 1967, 2013 WL 1397708, at *2 (N.D. Ill. April 5, 2013) (Holderman, C.J.) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "There is no genuine issue of material fact when no reasonable jury could find in favor of the nonmoving party." *Brewer v. Bd. of Trs. of the Univ. of Ill.*, 479 F.3d 908, 915 (7th Cir. 2007). The record must be viewed in the light most favorable to the non-movant. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

DISCUSSION

Officer Seiser's Complaint alleges a Fourth Amendment violation—the predicate for Officer Seiser's federal claims under 42 U.S.C. § 1983—as well as allegations under Illinois state law of false arrest, false imprisonment, and malicious prosecution. (Dkt. No. 1 ("Compl.") ¶ 19.) In his response to the Defendants' motion for summary judgment, however, Officer Seiser abandons his false arrest claim and clarifies that his only § 1983 claim is directed at Deputy Kirby, in her individual capacity, for unlawful detention. (*See* Dkt. No. 41 ("Pl.'s Resp.") at 5-6 ("Plaintiff . . . does not complain of a false arrest.").)[1] However, he also appears to allege a

---

[1] In fact, Officer Seiser refers to his § 1983 claim as one "in the nature of false imprisonment." (Pl.'s Resp. at 6.) The court will construe Officer Seiser's claim as one for unlawful post-arrest detention under the Fourth Amendment. *See Ray v. City of Chicago*, 629 F.3d 660, 663 (7th Cir. 2011) (describing a "post-arrest detention claim" under the Fourth Amendment); *Warfield v. City of Chicago*, 565 F. Supp. 2d 948, 967 (N.D. Ill. 2008) (Castillo, J.).

distinct § 1983 claim against Deputy Kirby, also in her individual capacity, for conducting an unreasonable search in the form of the breathalyzer test. (*See id.* at 6.)[2] Officer Seiser's response also states that his only state law claim is for malicious prosecution against the City. (*Id.* at 5-6.) To the extent that Officer Seiser's Complaint includes any other causes of action, they are forfeited in light of his response to the summary judgment motion. *See Palmer v. Marion Cnty.*, 327 F.3d 588, 597-98 (7th Cir. 2003) (claims and arguments not presented to a district court in response to a summary judgment motion are deemed abandoned and waived).

I.      Section 1983 Claim For Unreasonable Search Against Deputy Kirby

Officer Seiser argues that Deputy Kirby should be liable under § 1983 for an unreasonable search of his person, in the form of a breathalyzer test, while he was held at the police station. According to Officer Seiser, this search was unreasonable because there was no probable cause to arrest him for driving under the influence and the detention and search were improperly used "'for the purpose of gathering additional evidence to justify the arrest.'" (Pl.'s Resp. at 10-11 (quoting *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991)).)

Breathalyzer tests constitute searches within the meaning of the Fourth Amendment, and are therefore subject to the strictures of the amendment's prohibition of unreasonable searches and seizures. *See Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 616-17 (1989); *see also Schmerber v. California*, 384 U.S. 757, 767 (1966). Although searches conducted without warrants are per se unreasonable, *see Katz v. United States*, 389 U.S. 347, 357 (1967), there are a few specific common exceptions, including a search incident to a lawful arrest. *Chimel v. California*, 395 U.S. 752, 762-63 (1969); *Schmerber*, 384 U.S. at 770-71. Under those

---

[2] Officer Seiser's Complaint was unclear about the nature of his § 1983 claim, and the court notes that his response to Defendants' motion for summary judgment hardly untangles the knot.

precedents, for example, a "police officer may obtain a compulsory blood test to determine blood alcohol content where probable cause exists to effect an arrest, circumstances [d]o not permit time to obtain a warrant, and the test is a reasonable test." *Karberg v. Weber*, No. 03 C 50071, 2004 WL 2967015, at *3 (N.D. Ill. Nov. 19, 2004) (Reinhard, J.) (citing *Schmerber*, 384 U.S. at 770-71). Similarly, the application of a breathalyzer test is appropriate where the police have probable cause to believe that the defendant committed the crime of driving under the influence. *See Ebert v. Vill. of Kildeer*, No. 07 CV 1355, 2009 WL 901483, at *6 (N.D. Ill. Mar. 31, 2009); *see also Skinner*, 489 U.S. at 617.

Thus, a threshold inquiry is whether there was probable cause to arrest Officer Seiser for driving under the influence. "A police officer has probable cause to arrest when, at the moment the decision is made, the facts and circumstances within her knowledge and of which she has reasonably trustworthy information would warrant a prudent person in believing that the suspect had committed or was committing an offense." *Fleming v. Livingston Cnty., Ill.*, 674 F.3d 874, 878-79 (7th Cir. 2012) (citation omitted). This "flexible, commonsense approach does not require that the officer's belief be correct or even more likely true than false, so long as it is reasonable." *Qian v. Kautz*, 168 F.3d 949, 953 (7th Cir. 1999). Further, there is no requirement that officers resolve every inconsistency in witness reports in forming probable cause, *Spiegel v. Cortese*, 196 F.3d 717, 725 (7th Cir. 1999), or that they conduct further investigation after establishing probable cause, *Anderer v. Jones*, 385 F.3d 1043, 1049 (7th Cir. 2004), *amended on denial of reh'g*, 412 F.3d 794 (7th Cir. 2005). The Seventh Circuit has also "consistently held that an identification or a report from a single, credible victim or eyewitness can provide the basis for probable cause." *Woods v. City of Chicago*, 234 F.3d 979, 996 (7th Cir. 2000) (collecting cases).

In this case, there was probable cause to arrest Officer Seiser not only for transporting a container of open alcohol in a vehicle in violation of 625 ILCS § 5/11-502, but also for driving under the influence of alcohol in violation of 625 ILCS § 5/11-501. Three separate complainants—Roseann Anderson, Gail Glassford, and Gary Anderson—told Sergeant Price, an investigating Internal Affairs officer, that they had observed a police officer drinking what appeared to be an alcoholic beverage. (Defs.' 56.1(a)(3) SMF ¶¶ 40-42.) Roseann Anderson signed a sworn affidavit stating that the individual appeared to be "drinking from a large clear bottle with a red and white label that appeared to be an alcoholic beverage." (*Id.* ¶ 40.) Gary Anderson told Sergeant Price that he "had a confrontation with [Officer Seiser] after attempting to obtain [Officer Seiser's] license plate number," and that he smelled alcohol on Officer Seiser's breath. (*Id.* ¶¶ 43-44.)

Additionally, Officer Seiser was uncooperative when Sergeant Verta approached him. The bottle—which held 1.75 liters and had a red and white label, contained a clear liquid, and had a broken seal—was visible in the vehicle from the passenger side door, where Sergeant Verta was standing. (*Id.* ¶ 27.) After Sergeant Verta asked "What's in the bottle?," Officer Seiser responded, "What bottle?" (*Id.* ¶ 28.) When Sergeant Verta pressed on, asking Officer Seiser to open the door and give him the bottle, Officer Seiser twice refused to do so, telling Sergeant Verta to get a warrant. (*Id.*) Sergeant Price relayed this information to supervisors, who ultimately contacted Deputy Kirby. (*Id.* ¶¶ 46-49.)

These facts are more than sufficient for a reasonable person to conclude both that Officer Seiser was transporting an open container of alcohol in a vehicle and that he had been driving under the influence. This is true notwithstanding the minor, immaterial inconsistencies in witness reports identified in Officer Seiser's response brief—for example, that Glassford claimed to have

seen Officer Seiser driving over the speed limit while Roseann Anderson said he had been driving very slowly. (Pl.'s Resp. at 8.) *See Spiegel*, 196 F.3d at 725 (unnecessary to resolve all witness inconsistencies in formation of probable cause). It is also true despite the fact that Sergeant Verta did not hear slurred speech from Officer Seiser or observe signs of drunkenness. Those observations may sometimes be sufficient to aid in a probable cause determination for driving under the influence, but they are not necessary.[3]

Further, the circumstances here did not enable the police officers to obtain a warrant. Because of the speed with which alcohol leaves the bloodstream, there was a legitimate concern about the the destruction of evidence. *See Schmerber*, 384 U.S. at 770. The test itself was also a reasonable and relatively nonintrusive one, particularly compared to the blood test authorized in *Schmerber. See id.* at 762; *see also Skinner*, 489 U.S. at 625 ("[B]reath tests do not require piercing the skin and may be conducted safely outside a hospital environment and with a minimum of inconvenience or embarrassment.") In light of these uncontested facts, no reasonable jury could find that the application of the breathalyzer test here was an unreasonable search under the Fourth Amendment.

II.    Section 1983 Claim For Unlawful Detention Against Deputy Kirby

Officer Seiser also makes a second claim under § 1983, arguing that he was unreasonably detained for the purposes of gathering additional evidence against him. This claim is related to his argument that the breathalyzer was an unreasonable search—Officer Seiser argues that the

---

[3] Officer Seiser also is not entitled to rely on the additional observations of Sergeants Madsen and Kral, who testified during their depositions that they did not see anything about Seiser to indicate that he was intoxicated. These officers did not observe Seiser until well after Deputy Kirby made the decision to process Officer Seiser criminally. The time frame for analyzing a probable cause determination is the moment the decision was made. *See Fleming*, 674 F.3d at 878-79. Facts learned afterward are not relevant. *Id.* Moreover, in this case, it is not clear that Sergeant Madsen or Sergeant Kral communicated their observations to Deputy Kiryby or anyone else until their depositions.

"unreasonable" detention was for the purpose of administering the "unreasonable" breathalyzer (*see* Pl.'s Resp. at 10-11)—but distinct in that it touches on the issue of unlawful detention. That is, Officer Seiser complains here of a seizure, whereas the breathalyzer was a search.

"A police officer who unlawfully restrains an individual's movement violates the Fourth Amendment and opens [him]self to liability for unlawful detention . . . ." *Rusinowski v. Vill. of Hillside*, 835 F. Supp. 2d 641, 649 (N.D. Ill. 2011) (Leinenweber, J.) (citations omitted). However, "the existence of probable cause is a complete defense." *Id.* (citation omitted); *see also Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006) ("Probable cause to arrest is an absolute defense to any claim under Section 1983 against police officers for . . . false imprisonment . . . ."). As explained above, there is no reasonable dispute here that the police had probable cause to arrest Officer Seiser.

In addition, "[a] person arrested without a warrant may be held prior to a judicial determination of probable cause for a brief period to carry out the administrative steps incident to arrest." *Ray v. City of Chicago*, 629 F.3d 660, 663 (7th Cir. 2011) (citation and quotation marks omitted). Here, there can be no reasonable dispute that Officer Seiser's detention was lawful. Officer Seiser was arrested at 5:52 pm, promptly subjected to a breathalyzer test, and released at 8:17 pm, less than two and a half hours later. The undisputed evidence shows that Officer Seiser was released as soon as practicable after the police determined that he had a blood alcohol content of 0.000. Accordingly, summary judgment for Deputy Kirby is appropriate on Officer Seiser's § 1983 claim of unlawful detention.

Moreover, even if Deputy Kirby did not have probable cause to detain Officer Seiser, she is entitled to qualified immunity. Under the qualified immunity doctrine, Deputy Kirby is shielded from civil liability if she can "demonstrate that [s]he was performing a discretionary

function and that a reasonable law enforcement officer would have believed that, at the time [s]he acted, [her] actions were within the bounds of the law." *Belcher v. Norton*, 497 F.3d 742, 749 (7th Cir. 2007) (citation omitted). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244 (2012) (internal quotation marks omitted).

Officer Seiser argues that Deputy Kirby lacked the discretionary authority to process Officer Seiser criminally because she "usurped the traditional function of the street police officers when she ordered that Officer Seiser be processed criminally for DUI." (Pl.'s Resp. at 12.) Deputy Kirby testified at her deposition that she was empowered to make probable cause determinations when a police officer is accused of committing a crime while on duty, and that she oversaw the Internal Affairs Division. (Dkt. No. 35, Ex. C., at 5:15-6:5; Dkt. No. 44, Ex. C, at 74:22-75:13.) Officer Seiser has responded only with conclusory statements about Deputy Kirby's authority, without any citation to authority or support from the record. Because there is no evidence that Deputy Kirby was acting beyond the scope of her authority and because her determination of probable cause based on information relayed up the chain of command from Sergeant Price was reasonable, Deputy Kirby is entitled to qualified immunity, and summary judgment is appropriate on that basis as well.

III.     State Law Malicious Prosecution Claim Against the City

Officer Seiser also brings a malicious prosecution claim against the City for continuing to prosecute him for the open container violation. To state a claim for malicious prosecution, Officer Seiser must show that "(1) the defendant commenced or continued an original criminal or civil judicial proceeding; (2) the proceeding terminated in favor of the plaintiff; (3) there was an

absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." *Hurlbert v. Charles*, 938 N.E.2d 507, 512 (Ill. 2010). As with the § 1983 unlawful detention claim, state law malicious prosecution claims are foreclosed by a finding of probable cause. Officer Seiser agrees (*see* Pl.'s Resp. at 14), but argues that the probable cause standard for the Illinois tort of malicious prosecution is stricter than the probable cause to arrest standard under the Fourth Amendment.[4]

Illinois courts have defined "probable cause" with respect to malicious prosecution involving criminal proceedings as "a state of facts that would lead a person of ordinary caution and prudence to believe, or entertain an honest and strong suspicion, that the person arrested committed the offense charged." *Johnson v. Target Stores, Inc.*, 791 N.E.2d 1206, 1219 (Ill. App. Ct. 2003) (internal quotation marks and citations omitted). "There is no need to verify the veracity of each item of information obtained; one need only act with reasonable prudence and caution in proceeding." *Ross v. Mauro Chevrolet*, 861 N.E.2d 313, 320 (Ill. App. Ct. 2006).

In this case, the police department obtained, from Officer Seiser's personal vehicle, a 1.75-liter bottle that, when originally purchased, contained alcohol. (Defs.' 56.1(a)(3) SMF ¶ 19.) A label on the bottle stated, "The liquor is in it." (*Id.*) Both parties agreed that, "[a]t the time the citation was issued, it was unknown whether the bottle observed in [Officer Seiser's] vehicle contained alcohol." (*See* Pl.'s Resp. to Defs.' 56.1(a)(3) SMF ¶ 64.) Police did not determine conclusively that the bottle did not contain alcohol until they received results from the crime lab about one month later. (Dkt. No. 35, Ex. U.) At the first court hearing thereafter, Officer Madsen appeared and told the prosecutor the contents of the bottle had tested negative

---

[4] Perhaps Officer Seiser pursues this line of argument because he already seems to have conceded that there was probable cause to arrest him for transporting open alcohol. (*See* Pl.'s Resp. at 2 ("[N]othing in this case turns on whether there was probable cause to arrest plaintiff for transporting open alcohol.").)

for alcohol, at which point the ticket was dismissed. (Pl.'s Resp. to Defs.' 56.1(a)(3) SMF ¶ 75;
*see also* Dkt. No. 35, Ex. T.)

Based on the appearance of the bottle, there was probable cause to proceed with the open
container charge. Until the City determined conclusively via testing that the bottle did not
contain alcohol, the City was justified in pursuing charges against Officer Seiser. And as soon as
the City made that determination, the ticket was dismissed. (*Id.* ¶ 74-75.) Thus, there is no
indication that the prosecution proceeded improperly at any point; there is every indication that
the police acted with "reasonable prudence and caution" in pursuing this charge against Officer
Seiser. *See Ross*, 861 N.E.2d at 320. No reasonable jury could find otherwise, so summary
judgment against Officer Seiser is appropriate.

<u>CONCLUSION</u>

For the reasons explained above, defendants' motion for summary judgment (Dkt. No.
33) is granted in its entirety. Judgment is entered in favor of defendants on all counts. Civil Case
Terminated.

ENTER:

*James F. Holderman*

JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date: April 29, 2013

13

AO 450(Rev. 5/85)Judgment in a Civil Case

# United States District Court
## Northern District of Illinois
### Eastern Division

Michael Seiser                         **JUDGMENT IN A CIVIL CASE**

        v.                              Case Number: 12 C 2353

City of Chicago, et al

☐     Jury Verdict.  This action came before the Court for a trial by jury.  The issues have been
       tried and the jury rendered its verdict.

☐     Decision by Court.  This action came to trial or hearing before the Court.  The issues
       have been tried or heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that Defendants' motion for summary
judgment  is gratned in its entirety. Judgment is entered in favor of defendants on all counts.

Thomas G. Bruton, Clerk of Court

Date: 4/29/2013            /s/ Gladys Lugo, Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Michael Seiser,                          )
                                         )
            *Plaintiff,*                  )
       *-vs-*                             )     No. 12 CV 2353
                                         )
City of Chicago and Debra Kirby,         )     *(Judge Holderman)*
                                         )
            *Defendants.*                 )

## NOTICE OF APPEAL

Notice is hereby given that Michael Seiser, plaintiff above named, hereby appeals to the United States Court of Appeals for the Seventh Circuit from the judgment entered on April 29, 2013.

                              /s/  Kenneth N. Flaxman
                              KENNETH N. FLAXMAN
                              ARDC No. 830399
                              200 S Michigan Ave Ste 1240
                              Chicago, IL 60604-2430
                              (312) 427-3200

                              *Attorney for Plaintiff*

# CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of May, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:  Lindsey Vanorny, ACC, Scott Jebson, ACC, 30 N LaSalle St., Ste 900, Chicago, IL 60602, and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants:  none.


/s/ Kenneth N. Flaxman
_____
Kenneth N. Flaxman
ARDC Number 08830399
200 S Michigan Ave, Ste 1240
Chicago, IL 60604-2430
(312) 427-3200 (phone)
(312) 427-3930 (fax)
knf@kenlaw.com (email)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Michael Seiser, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| *-vs-* | ) | No. 12 CV 2353 |
| | ) | |
| City of Chicago and Debra Kirby, | ) | *(Judge Holderman)* |
| | ) | |
| *Defendants.* | ) | |

## DOCKETING STATEMENT

1.    Plaintiff invoked the jurisdiction of the district court pursuant
to 28 U.S.C. §1343 to assert claims arising under 42 U.S.C. 1983 against the
City of Chicago and Chicago police officers Debra Kirby.

2.    Judgment was entered in favor of all defendants and against
plaintiff on April 29, 2013

3.    Plaintiff did not file any post-judgment motion and files his
notice of appeal on May 7, 2013.

> /s/   Kenneth N. Flaxman
> KENNETH N. FLAXMAN
> ARDC No. 830399
> 200 S Michigan Ave Ste 1240
> Chicago, IL 60604-2430
> (312) 427-3200
>
> *Attorney for Plaintiff*

# CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of May, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:  Lindsey Vanorny, ACC, Scott Jebson, ACC, 30 N LaSalle St., Ste 900, Chicago, IL 60602, and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants:  none.

/s/  Kenneth N. Flaxman

_____
Kenneth N. Flaxman
ARDC Number 08830399
200 S Michigan Ave, Ste 1240
Chicago, IL 60604-2430
(312) 427-3200 (phone)
(312) 427-3930 (fax)
knf@kenlaw.com (email)