APPEAL,MARTIN,PROTO,TERMED

# United States District Court
# Northern District of Illinois – CM/ECF LIVE, Ver 5.1.1 (Chicago)
# CIVIL DOCKET FOR CASE #: 1:12–cv–02353
# *Internal Use Only*

Seiser v. City of Chicago et al

Assigned to: Honorable James F. Holderman

Demand: $300,000

 Case in other court:  13–01985

Cause: 42:1983 Civil Rights Act

Date Filed: 03/29/2012

Date Terminated: 04/29/2013

Jury Demand: Both

Nature of Suit: 440 Civil Rights: Other

Jurisdiction: Federal Question

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 02/15/2013 | 35 | 2 | RULE 56.1(a)(3) Statement by City of Chicago, Debra Kirby regarding motion for summary judgment 33 (Attachments: # 1 Appendix Exhibit List, # 2 Exhibit A–B, # 3 Exhibit C–D, # 4 Exhibit E–H, # 5 Exhibit I–L, # 6 Exhibit M–P, # 7 Exhibit Q–T, # 8 Exhibit U–Y)(Vanorny, Lindsey) (Entered: 02/15/2013) |

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Michael Seiser, | ) | |
| | ) | 12 C 2353 |
| Plaintiff, | ) | |
| | ) | Judge Holderman |
| v. | ) | |
| | ) | |
| City of Chicago and Debra Kirby, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' RULE 56.1(a)(3) STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Defendants City of Chicago (the "City"), by its attorney, Stephen R. Patton, and

Debra Kirby (collectively, "Defendants"), by her attorneys, Lindsey Vanorny, Assistant

Corporation Counsel, and Scott Jebson, Chief Assistant Corporation Counsel, for their

Local Rule 56.1(a)(3) Statement of Undisputed Material Facts in support of their Motion for

Summary Judgment, state as follows[1]:

**JURISDICTION AND VENUE**

1.      Plaintiff Officer Michael Seiser ("Plaintiff") brought this action pursuant to 42

U.S.C. § 1983 and Illinois common law.  Jurisdiction is proper under 28 U.S.C. §§ 1331, 1343

and 1367.  Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391 (b).  Ex.

A.  (Compl. at ¶¶ 1-3.)

**PARTIES AND WITNESSES**

2.      Plaintiff currently is and at all times relevant to his Complaint, was a resident of

the Northern District of Illinois and employed by the City as a police officer.  Ex. A at ¶ 2; Ex. B

(Plaintiff Officer Michael Seiser Deposition) at 13:10-21, 17:3-22.

---

[1] Defendants assert these facts as undisputed only for the purpose of their motion for summary judgment.

1

3.      At all times relevant to Plaintiff's Complaint, Defendant Debra Kirby ("Deputy Kirby") was acting as the Deputy Superintendent of the Bureau of Professional Standards of the Chicago Police Department, with her office located at the Chicago Police Department Headquarters.  Ex. A at ¶ 4; Ex. C (Kirby Deposition) at 5:15-5:22.

4.      Kathleen Glassford (deceased) witnessed the incident that is the subject of this lawsuit when she was standing on the porch of her house at 4849 South Union Avenue, in Chicago, Illinois.  Ex. D (Chicago Police Department Event Queries, FCRL 000139, 000141, 000143); Ex. E (Glassford Deposition) at 5:23-6:4; Ex. F (Roseann Anderson Deposition) at 16:5-17:19.

5.      Gail Glassford, witnessed this incident when she was standing in front of her house at 4849 South Union Avenue, in Chicago, Illinois.  Ex. E at 12:10-12:16.

6.      Roseann Anderson, witnessed the incident that is the subject of this lawsuit when she was standing on the sidewalk in front of 4849 South Union Avenue, in Chicago, Illinois.  Ex. F at 5:3-5:7.

7.      Gary Anderson, witnessed the incident that is the subject of this lawsuit while he was working as a school security guard with the company Blackstar Project at Tilden High School.  Ex. G (Gary Anderson Deposition) at 8:1-8:15.

8.      Sergeant John Verta ("Sergeant Verta") was a sergeant with the 9th District at the time of the incident.  Sergeant Verta reported to Watch Commander Johnson.  Ex. H (Verta Deposition) at 16:8-16:14.

9.      Watch Commander Robert Johnson ("Commander Johnson") was the watch commander for the 9th District Police Station at the time of the incident.  Ex. I (Johnson Deposition) at 7:23-8:2.

2

10.      Officer Andrew Kral ("Officer Kral") was a police officer in the 9th District Police Station at the time of the incident.  He was supervised by Captain Johnson.  Ex. J (Kral Deposition) at 4:5-4:17.

11.      Officer Brian Madsen ("Officer Madsen") was a police officer in the 9th District Police Station at the time of the incident.  He was supervised by Captain Johnson.  Ex. K (Madsen Deposition) at 4:13-5:22.

12.      Lieutenant David Naleway ("Lieutenant Naleway") was a lieutenant with the Internal Affairs Division, with his office located at the Chicago Police Department Headquarters, at the time of the incident.  He supervised Sergeants Cochran and Price.  Ex. L (Naleway Deposition) at 5:7-7:5.

13.      Sergeant Matthew Price ("Sergeant Price") was a sergeant with the Internal Affairs Division at the time of the incident.  Lieutenant Naleway supervised Sergeant Price.  Ex. M at (Price Deposition) at 5:9-5:22.

14.      Sergeant Terrance Cochran ("Sergeant Cochran") was assigned to the Internal Affairs Division at the time of the incident.  Lieutenant Naleway supervised Sergeant Cochran.  Ex. N (Cochran Deposition) at 4:4-8, 11:2-9.

15.      Chief Juan Rivera ("Chief Rivera") was the Chief of the Internal Affairs Division, with his office located at the Chicago Police Department Headquarters, at the time of the incident.  Chief Rivera reported to Deputy Kirby.  Ex. O (Rivera Deposition) at 4:15-5:1.

## UNDISPUTED MATERIAL FACTS

16.       On the date of the incident, March 29, 2011, Plaintiff was an on-duty police officer, in uniform, assigned to the Operation Safe Schools Program at Tilden Career

Community Academy High School, which is located at 4747 South Union Avenue.  Ex. B at 20:17-21:3.

17.     Plaintiff was stationed at the southwest corner of 50th Street and Union Avenue. Ex. B at 33:7-11, 55:8-10.  Plaintiff's shift was from 1:00 p.m. through 4:00 p.m. that on that date.  Ex. B at 21:4-9.

18.     Plaintiff drove southbound on Union Avenue to reach his post while at the same time, drinking from a 1.75 liter T.G.I. Friday's Mudslide bottle.  Ex. B at 81:7-84:2, 85:20-86:8, 92:23-93:24, 99:4-17, 100:6-9, 102:13-103:9; Ex. P.  Plaintiff drove by two women on Union Avenue as he was drinking from the bottle.  Ex. B at 99:4-17, 100:6-9, 102:13-103:9.

19.     The bottle that Plaintiff was drinking from contained alcohol at the time it was purchased.  Ex. B at 83:21-84:2.  The bottle contained a label which stated, "The liquor is in it." Ex. B at 85:20-86:8; Ex. P.

20.     At 2:18 p.m. on March 29, 2011, the Chicago Police Department received a phone call from an unknown individual who reported that a Caucasian male in a silver Grand Am was observed chugging from a bottle of vodka while driving near the intersection of 50th Street and Union Avenue in Chicago, Illinois.  Ex. D (Chicago Police Department Event Query, FCRL 000141); Ex. A at ¶ 5.  The caller stated that the driver had an Illinois license plate and provided six digits of the driver's license plate number.  Ex. D (Chicago Police Department Event Query, FCRL 000141).  Also, the caller indicated that the driver had just pulled over near the intersection of 50th Street and Union Avenue and was sitting in his car.  Ex. D (Chicago Police Department Event Query, FCRL 000141).

21.     After the driver's license plate number was checked, it was determined that the owner of the car was Plaintiff.  Ex. D (Chicago Police Department Event Query, FCRL 000141).

22.   At 2:29 p.m. on March 29, 2011, the same civilian, Kathleen Glassford, called the

Chicago Police Department again and stated that the "DUI driver" was a police officer and

requested a police supervisor.  Ex. D (Chicago Police Department Event Query, FCRL 000143);

Ex. F at 15:3-9; 38:3-6; 16:23-17:2.

23.   Sergeant Verta responded to the request for a supervisor from the Office of

Emergency Management and Communications' (OEMC) dispatch personnel.  Ex. D (Chicago

Police Department Event Query, FCRL 000143); Ex. H at 6:21-7:12.

24.   Sergeant Verta met outside with the complainant, Gail Glassford, and another

witness, Roseann Anderson, at approximately 2:50 p.m. at the same address from which the call

was made.  Ex. E at 21:9-23:23; Ex. F at 25:15-28:14; Ex. H at 6:21-7:24, 38:13-39:3; Ex. Z

(Initiation Report from Sergeant John Verta to Commander David Jarmusz, FCRL 000044).

25.   The complainant, Gail Glassford, informed Sergeant Verta that she observed a

police officer driving a gray vehicle while he was chugging a gallon-sized bottle of vodka.  Ex.

H at 9:6-11; Ex. E at 12:10-19:4, 21:9-23:23; Ex. Z.

26.   The other witness, Roseann Anderson, substantiated the claim of the complainant

and also stated that she observed the individual driving over the speed limit.  Ex. H at 9:12-18,

22:15-22:18.  One of the two women identified the driver, Plaintiff, by pointing to him.  Ex. H at

9:22-24; Ex. F at 6:3-7:4, 25:15-28:14; Ex. Z.

27.   Before Sergeant Verta approached Plaintiff, he looked into Plaintiff's vehicle

from the passenger side and observed what appeared to be an alcoholic beverage bottle.  Ex. B at

81:7-82:22, 85:20-86:10, 97:19-99:3; Ex. H at 11:14-13:9; Ex. P (Photographs taken on March

29, 2011 of the alcoholic beverage container observed in Plaintiff's vehicle, FCRL 000103-

000104).  The bottle was gallon-sized with a red and white label with the seal broken.  Ex. H at

11:14-19, 12:22-13:4.  The bottle contained a clear liquid.  Ex. H at 11:14-19; 98:17-99:3.

28.      Sergeant Verta said, "What's in the bottle?"  Plaintiff said, "What bottle?"

Sergeant Verta responded, "The bottle on your front seat."  Plaintiff claims that he told Sergeant

Verta that alcohol was not in the bottle.  Sergeant Verta asked Plaintiff to open his door and to

give him the bottle.  Plaintiff refused to open the door, stating, "No. Get a warrant.  I know my

rights."  Sergeant Verta reiterated his request again to Plaintiff again and Plaintiff refused.  Ex. B

at 171:18-172:13; Ex. H at 13:21-15:8.

29.      Sergeant Verta then called the Watch Commander at the 9th District Police

Station, Captain Johnson, to advise him of the situation.  Ex. H at 15:11-16:17; Ex. I at 9:6-11.

Captain Johnson asked Sergeant Verta to bring Plaintiff into the 9th District Police Station and

stated that the Chicago Police Department's Internal Affairs Division would be contacted.  Ex. H

at 16:19-21; Ex. I at 10:23-11:3.

30.      After speaking to Sergeant Verta, Captain Johnson called Lieutenant Naleway of

the Internal Affairs Division and stated that there was an allegation that a police officer had been

drinking while on duty.  Ex. I at 10:21-11:13; Ex. L at 5:24-6:17.

31.      In response, Lieutenant Naleway stated that he would send a sergeant from the

Internal Affairs Division to the 9th District Police Station.  Ex. I at 11:16-17; Ex. L at 6:18-23.

Lieutenant Naleway assigned Sergeant Price of the Internal Affairs Division, who was on his

way to work, to respond to the incident and told him to report directly to the 9th District Police

Station.  Ex. L at 6:18-23; Ex. M at 7:12-8:12.

32.      After assigning Sergeant Price to investigate the allegations made against

Plaintiff, Lieutenant Naleway called Sergeant Cochran while he was on his way to the Chicago

6

Police Headquarters and told him to report directly to the 9th District Police Station in order to assist Sergeant Price with the administrative investigation of Plaintiff's conduct.  Ex. L at 7:2-8, 12:9-12:16; Ex. N at 11:2-12:10.

33.     Sergeant Verta drove Plaintiff to the 9th District Police Station.  Ex. B. at 202:24-203:2; Ex. H at 17:7-10.

34.     When Sergeant Verta and Plaintiff arrived at the 9th District Police Station, Seiser was placed in a viewing room.  Ex. B at 205:5-8; Ex. H at 18:3-5.

35.     Once Sergeant Price of the Internal Affairs Division arrived at the 9th District Police Station, either Captain Johnson or Sergeant Verta informed him that several witnesses had observed an on-duty uniformed police officer, who was assigned to the Operation Safe Schools Program at Tilden High School, drinking an alcoholic beverage while in his personal vehicle. Ex. M at 29:13-30:1.

36.     Sergeant Price was also informed that Sergeant Verta of the 9th District had observed the bottle on the passenger's side of Plaintiff's vehicle.  Ex. M at 36:3-7.  Sergeant Price also learned that when the officer in question was asked to open the door and to retrieve the bottle he refused because Sergeant Verta did not have a search warrant.  Ex. M at 36:3-18.

37.     After learning about the allegations made against Plaintiff, Sergeant Price met with Roseann Anderson, Gail Glassford, and Gary Anderson at the scene of the incident to discuss their observations.  Ex. M at 34:7-11; Ex. E at 21:9-23:23; Ex. F at 25:15-28:14; Ex. G at 26:5-29:2.

38.     In addition, as a part of the investigation, Evidence Technician Kamal Judeh ("Evidence Technician Judeh") took photographs of what appeared to be an alcoholic beverage container lying on the front passenger seat of Plaintiff's car while it was located at the scene of

the incident.  Ex. P; Ex. Q (Chicago Police Department Crime Scene Processing Report, FCRL

000078-000088); Ex. B at 81:7-84:2, 91:23-92:6, 97:19-99:3.  The bottle lying on Plaintiff's

front passenger seat was clearly visible through Plaintiff's car window.  Ex. B at 97:19-99:3.

39.   When Sergeant Price met with Roseann Anderson, she told him that she observed

a police officer, in uniform, driving a Pontiac southbound, while drinking from what appeared to

be an alcoholic beverage bottle with a red and white label.  Ex. F at 10:23-12:13, 25:14-28:14;

Ex. M at 31:3-32:1; Ex. B at 99:9-100:9, 121:14-19

40.   On the same day as the incident, March 29, 2011, Roseann Anderson signed a

sworn affidavit, which documented the information that she provided to Sergeant Price.  Ex. F.

6:3-7:4; Ex. R (Sworn Affidavit for Complaint Log Investigation, FCRL 000043).  The sworn

affidavit provided:

> It is alleged by the Complainant, Roseann Anderson, that on the above date and
> time at said location the Complainant observed an unknown male white police
> officer in full uniform driving S/B in a gray Pontiac with Illinois license plate
> [redacted] while drinking from a large clear bottle with a red and white label that
> appeared to be an alcoholic beverage.

Ex. R.

41.   Gail Glassford told Sergeant Price that she observed the police officer driving and

taking several large gulps from what appeared to be an alcoholic beverage bottle with a red and

white label and a red lid.  Ex. E at 12:22-15:10, 18:18-20, 22:11-23:14; Ex. M at 33:2-16; Ex. B

at 99:9-100:9, 121:14-19.

42.   Gary Anderson told Sergeant Price that he had observed an on-duty officer

driving and drinking from what appeared to be an alcoholic beverage container.  Ex. G at 13:20-

16:19, 26:5-29:5; Ex. M at 33:19-23.

43.     Gary Anderson also told Sergeant Price that he had a confrontation with the Plaintiff after attempting to obtain the Plaintiff's license plate number.  Ex. G at 11:1-12:2, 16:20-18:16, 22:8-23; Ex. M at 33:19-34:6; Ex. B at 119:13-125:2.

44.     Finally, Gary Anderson informed Sergeant Price that he smelled an odor of alcohol on Plaintiff's breath.  Ex. G at 19:10-21:5; Ex. M at 33:19-34:6.

45.     While Sergeant Price was at scene of the incident, he drove to the location where Plaintiff's vehicle was parked.  Ex. M at 34:12-16.  Sergeant Price observed what appeared to be an alcoholic beverage bottle lying on the passenger's seat of Plaintiff's vehicle.  Ex. M at 34:12-35:13; Ex. B at 97:19-99:3.  Sergeant Price also observed that the bottle was partially filled with a clear liquid.  Ex. M at 35:3-6; Ex. B at 97:19-99:3.

46.     After talking to the three witnesses, Sergeant Price called Lieutenant Naleway, who was at his office at the Chicago Police Department Headquarters, to inform him about the content of each of the witnesses' statements and that he had observed inside the officer's vehicle what appeared to be an alcoholic beverage bottle with a broken seal, containing a clear liquid. Ex. M at 37:3-39:9, Ex. L at 7:23-8:9; 12:17-13:23.

47.     After receiving this information from Sergeant Price, Lieutenant Naleway walked to Chief Rivera's office and told Chief Rivera all of the information that Sergeant Price had provided to him.  Ex. L at 8:10-8:13, 13:24-14:12; Ex. O at 6:23-7:19; 28:4-28:21.

48.     Chief Rivera told Lieutenant Naleway that he would inform Deputy Kirby about the incident and get back to him. Ex. L at 8:14-17; 28:22-29:1.

49.     After receiving this information, Chief Rivera walked to Debra Kirby's office and conveyed all of the information that he had learned from Lieutenant Naleway to Deputy Kirby. Ex. C at 8:4-9:10, 40:16-42:3; Ex. O at 6:21-9:10, 28:22-29:5, 30:24-31:24.

50.     Specifically, Chief Rivera informed Deputy Kirby that there was an incident in the 9th District in which an on-duty uniformed officer was observed by at least two civilian witnesses driving his personal vehicle up and down a street near a school while drinking from what appeared to be an alcoholic beverage container.  Ex. C at 8:4-9:10, 40:16-42:3; Ex. O at 6:21-9:10, 30:24-31:24.

51.     Chief Rivera also informed Deputy Kirby that the officer had a confrontation with one of the witnesses and that the same witness stated that he smelled alcohol on the officer.  Ex C at 8:4-9:10, 40:16-42:3; Ex O at Ex. 6:21-9:10, 30:24-31:24.

52.     Furthermore, Chief Rivera told Deputy Kirby that the 9th District had sent a supervisor to the scene of the incident and that the supervisor had observed a partially full bottle of what appeared to be vodka inside the car.  Chief Rivera also informed Deputy Kirby that the officer had refused to allow the supervisor to retrieve the bottle.  Ex C at 8:4-9:10, 40:16-42:3; Ex O at 6:21-9:10, 30:24-31:24.

53.     Deputy Kirby, Chief Rivera, Lieutenant Naleway, and Sergeant Price each testified that they did not possess any information that would lead them to believe that the aforementioned witnesses' accounts were unreliable.  Ex. C at 52:12-17; Ex. O at 29:6-9; Ex. L at 15:24-16:4; Ex. M at 44:8-13.

54.     In response to learning this information, Deputy Kirby told Chief Rivera that the officer was to be processed criminally for the offense of driving under the influence of alcohol.  Ex. C at 9:11-19, 19:18-24.  In addition, Deputy Kirby informed Chief Rivera that the 9th District Police Station was to handle the criminal portion of the investigation and that Internal Affairs Division was to handle the administrative portion of the investigation once the criminal investigation had concluded.  Ex. C at 9:11-19; Ex. O at 9:11-10:7, 29:10-18.

55.     Deputy Kirby also told Chief Rivera that the bottle should be retrieved from the officer's car.  Ex. C at 9:11-19; Ex. O at 9:11-17.

56.     Next, Chief Rivera went to Lieutenant Naleway's office and told him that at the direction of Deputy Kirby, the 9th District Police Station was to handle the criminal portion of the investigation and the Internal Affairs Division was to handle the administrative portion of the investigation once the criminal investigation had concluded.  Ex. L at 8:14-9:1, 14:21-15:5; Ex. O at 9:11-10:7, 29:10-29:22.

57.     After speaking to Chief Rivera, Lieutenant Naleway called Sergeant Cochran and Sergeant Price, who were at the 9th District Police Station, and informed them that Deputy Kirby had instructed that the 9th District Police Station was to handle the criminal portion of the investigation and the Internal Affairs Division was to handle the administrative portion of the investigation once the criminal investigation had concluded.  Ex. L at 8:20-9:23; Ex. N at 21:7-22:4; Ex. M at 16:2-20.

58.     Sergeant Cochran then told Captain Johnson and Sergeant Verta that Deputy Kirby had instructed that the 9th District was to handle the criminal part of the investigation and that the Internal Affairs Division was to handle the administration part of the investigation.  Ex. N at 21:7-14; Ex. I at 14:21-15:6; Ex. H at 43:23-44:14.

59.     In response, Captain Johnson stated that he would find officers that could handle the criminal phase of the investigation.  Ex. I at 14:21-15:6; Ex. N at 22:18-24:13.  Captain Johnson ordered Officers Kral and Madsen to conduct the criminal investigation.  Ex. I at 18:2-19:6.

60.     Officers Kral and Madsen arrived at the 9th District Police Station to conduct the criminal investigation.  Ex. J at 3:17-6:3; Ex K at 6:7-10.

61.     Plaintiff was administered field sobriety tests and then a breathalyzer test by Officer Madsen.  Ex. J at 7:15-20, 12:21-14:7; Ex. K at 8:15-9:11; Ex. B at 238:20-239:6, 247:14-247:17.  Plaintiff passed all of the field sobriety tests and the breathalyzer test showed that Plaintiff had a Blood Alcohol Content ("BAC") of 0.000.  Ex. B at 242:9-11, 247:14-17.

62.     Plaintiff was issued a citation for transporting alcoholic liquor in a container with the seal broken pursuant to 625 ILCS 5/11-502.  Ex. B at 261:12-24; Ex. H at 27:2-28:3; Ex. R (Citation issued to Plaintiff on March 29, 2011 for a violation of 625 ILCS 5/11-502, FCRL 000055); Ex. N at 35:23-36:2; Ex. K at 10:13-14; Ex. J at 14:23-15:9.

63.     Sergeants Cochran and Verta participated in the decision to issue Plaintiff the citation.  Ex. N at 35:23-36:6; Ex. H at 27:2-14.

64.     At the time the citation was issued, it was unknown whether the bottle observed in Plaintiff's vehicle contained alcohol.  Ex. H at 27:2-28:6; Ex. N at 35:23-36:21-23.

65.     Plaintiff was released without being charged for driving under the influence of alcohol.  Ex. H at 30:23-31:4; Ex. S (Arrest Report for Plaintiff, FCRL 000047-000051); Ex. B at 254:16-19, 260:5-24; Ex. I at 20:9-16: Ex. N at 35:5-16.

66.     Plaintiff was not handcuffed at any point on March 29, 2011.  Ex. B at 245:4-6.

67.     After the criminal phase of the investigation was complete, the administrative investigation began.  Ex. N at 39:8-13.

68.     Plaintiff was presented with an administrative consent to search form for his personal vehicle by either Sergeant Price or Sergeant Cochran.  Ex. B at 267:7-268:20; Ex. N at 39:14-24; Ex. M at 19:5-20:7.  Plaintiff refused to sign the consent to search form.  Ex. B at

267:7-268:20; Ex. N at 39:14-24; Ex. M at 21:11-16; Ex. V (Administrative Consent to Search Form, FCRL 000080).

69.     Next, Plaintiff was given a written direct order by Sergeant Price to provide access to the passenger's side of his vehicle to allow the bottle to be recovered.  Plaintiff agreed to comply with the direct order and signed a copy of the written direct order form.  Ex. B at 269:2-16; Ex. N at 39:14-24, 43:3-5; Ex. M at 21:20-22:24; Ex. W (Administrative Written Copy of Direct Order, FCRL 000081).

70.     Next, Plaintiff went to the location where his car was parked and retrieved the bottle.  Sergeant Verta took possession of the bottle and placed it in his trunk in order to transport it to the 9th District Police Station.  Ex B at 276:18-277:12; Ex. H at 28:7-28:24; Ex. M at 42:21-43:16; Ex. N at 45:13-46:12.

71.     After arriving back at the 9th District Police Station, Sergeant Cochran poured the contents of the bottle into a vial, which were later sent to the Illinois State Police for testing, and inventoried the bottle.  Ex. B at 278:4-279:15; Ex. H at 29:1-6; Ex. N at 50:9-51:9; Ex. M at 23:21-24:8; Ex. U (Illinois State Police Laboratory Report, FCRL 000118); Ex. X (Chicago Police Department Property Inventory, FCRL 000082).

72.     On March 29, 2011, Deputy Kirby never went to the 9th District Police Station or to the scene of the incident.  Ex. C at 50:11-12; Ex. B at 314:21-24; Ex. I at 24:6-11.

73.     Deputy Kirby was not informed that a citation had been issued to Plaintiff until after it had already been issued and the criminal investigation had concluded.  Ex. C at 54:21-55:2; Ex. N at 35:23-36:6.

74.     On May 27, 2011, the Internal Affairs Division received a facsimile from the

Illinois State Police which indicated that the contents of the vial tested negative for the presence

of alcohol.  Ex. U.

75.     Officer Madsen attended court for the citation that was issued to Plaintiff and

informed the prosecutor that the contents of the bottle tested negative for the presence of alcohol.

The court dismissed the ticket.  Ex. K at 12:4-13:11; Ex. B at 284:3-284:17.


                                        Respectfully Submitted,

                                        Stephen Patton
                                        Corporation Counsel of the City of Chicago

                        By:     /s/ Lindsey Vanorny
                                        Assistant Corporation Counsel
                                        City of Chicago Department of Law
                                        30 North LaSalle Street, Suite 900
                                        Chicago, Illinois 60602
                                        (312) 742-0234
                                        Attorney No. 6303642

                        By:     /s/ Scott Jebson
                                        Chief Assistant Corporation Counsel
                                        City of Chicago Department of Law
                                        30 North LaSalle Street, Suite 900
                                        Chicago, Illinois 60602
                                        (312) 744-6959
                                        Attorney No. 6225243

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| Michael Seiser, | ) | |
| | ) | 12 C 2353 |
| Plaintiff, | ) | |
| | ) | Judge Holderman |
| v. | ) | |
| | ) | |
| City of Chicago and Debra Kirby, | ) | |
| | ) | |
| Defendants. | ) | |

## EXHIBITS TO  DEFENDANTS' RULE 56.1(a)(3) STATEMENT
## OF UNDISPUTED MATERIAL FACTS
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

| Exhibit | Description |
|---|---|
| A | Plaintiff Officer Michael Seiser's Complaint |
| B | Excerpt of the Deposition of Plaintiff Officer Michael Seiser |
| C | Excerpt of the Deposition of Defendant Deputy Superintendant Debra Kirby |
| D | Chicago Police Department Event Queries (FCRL 000139, 000141, 000143) |
| E | Excerpt of the Deposition of Witness Gail Glassford |
| F | Excerpt of the Deposition of Witness Roseann Anderson |
| G | Excerpt of the Deposition of Witness Gary Anderson |
| H | Excerpt of the Deposition of Sergeant John Verta |

| I | Excerpt of the Deposition of Watch Commander Robert Johnson |
|---|---|
| J | Excerpt of the Deposition of Officer Andrew Kral |
| K | Excerpt of the Deposition of Officer Brian Madsen |
| L | Excerpt of the Deposition of Lieutenant David Naleway |
| M | Excerpt of the Deposition of Sergeant Matthew Price |
| N | Excerpt of the Deposition of Sergeant Terrance Cochran |
| O | Excerpt of the Deposition of Chief Juan Rivera |
| P | Photographs taken on March 29, 2011 of the alcoholic beverage container lying on the passenger seat of Plaintiff Officer Michael Seiser's personal vehicle (FCRL 000103-000104) |
| Q | Chicago Police Department Crime Scene Processing Report (FCRL 000078-000079) |
| R | Sworn Affidavit for Complaint Log Investigation (FCRL 000043) |
| S | Arrest Report for Plaintiff (FCRL 000047-000051) |
| T | Citation issued to Plaintiff Officer Michael Seiser on March 29, 2011 for a violation of 625 ILCS 5/11-502 (FCRL 000055) |

| U | Illinois State Police Laboratory Report (FCRL 000118) |
|---|---|
| V | Administrative Consent to Search Form (FCRL 000080) |
| W | Administrative Written Copy of Direct Order (FCRL 000081) |
| X | Chicago Police Department Property Inventory (FCRL 000082) |
| Y | Initiation Report from Sergeant John Verta to Commander David Jarmusz (FCRL 000044) |

# EXHIBIT A

Case: 1:12-cv-02353   Document 35-2   Filed 02/15/13   Page 2 of 35   PageID 151
Case: 13-1985      Document: 5-3         Filed: 05/23/2013      Pages: 115
Case: 1:12-cv-02353 Document #: 1 Filed: 03/29/12 Page 1 of 4 PageID #:1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Michael Seiser, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| -vs- | ) | No. 12 CV _____ |
| | ) | |
| City of Chicago and Debra Kirby, | ) | *(jury demand)* |
| | ) | |
| *Defendants.* | ) | |

## COMPLAINT

Plaintiff, by counsel, alleges as follows:

1.      This is a civil action arising under 42 U.S.C. §1983. The jurisdiction of this Court is conferred by 28 U.S.C. §1343 and 28 U.S.C. §1367.

2.      Plaintiff Michael Seiser is a resident of the Northern District of Illinois who is employed by defendant City of Chicago as a police officer.

3.      Defendant City of Chicago is an Illinois municipality.

4.      Defendant Debra Kirby was at all times relevant a Deputy Superintendent of the Chicago Police Department. Plaintiff sues Kirby in her individual capacity.

5.      On March 29, 2011, the Chicago police department received a civilian complaint that plaintiff had been driving his personal vehicle in police uniform while drinking what appeared to be an alcoholic beverage.

Case 1:12-cv-02353   Document 35-2   Filed 02/15/13   Page 3 of 35   PageID 152
Case: 13-1985      Document: 5-3        Filed: 05/23/2013      Pages: 115
Case: 1:12-cv-02353 Document #: 1 Filed: 03/29/12 Page 2 of 4 PageID #:2

6.    Chicago police officers investigated the above referred complaint.

7.    The officers who conducted this investigation were unable to corroborate the civilian's complaint that there was open alcohol in plaintiff's vehicle.

8.    After the officers were unable to obtain credible evidence to believe that plaintiff had violated any law or ordinance, the officers requested plaintiff to consent to a warrantless search of his vehicle.

9.    Plaintiff refused to consent to the warrantless search of his vehicle.

10.    After being informed that plaintiff had refused to consent to the warrantless earch of his vehicle, defendant Kirby directed a Chicago police sergeant to order plaintiff to allow the search of his vehicle.

11.    Plaintiff complied with this order.

12.    The search of plaintiff's vehicle revealed a large clear bottle containing water.

13.    After being informed that the search of plaintiff's vehicle had revealed a water bottle, defendant Kirby ordered that plaintiff be held in custody and processed criminally as a person who been driving under the influence of alcohol.

-2-

Case 1:12-cv-02353   Document 35-2   Filed 02/15/13   Page 4 of 35   PageID 153
Case: 13-1985      Document: 5-3        Filed: 05/23/2013      Pages: 115
Case: 1:12-cv-02353 Document #: 1 Filed: 03/29/12 Page 3 of 4 PageID #:3

14.    At the time she ordered that plaintiff be held in custody and processed criminally as a person who been driving under the influence of alcohol, defendant Kirby could not have reasonably believed that plaintiff had committed an offense.

15.    As required by Kirby's order, plaintiff was required to submit to field sobriety tests. Plaintiff passed each and every field sobriety test.

16.    After passing the field sobriety tests, and as required by Kirby's order, plaintiff was required to submit to a breathalyzer test. The breathalyzer showed that plaintiff's blood alcohol level was zero.

17.    As required by Kirby's order, plaintiff was charged with the possession of liquor with a broken seal in his motor vehicle.

18.    At the time she caused plaintiff to be charged with possession of liquor with a broken seal in his motor vehicle, defendant Kirby knew that there was no basis for this charge, which was dismissed at plaintiff's first court appearance on May 18, 2011.

19.    As a result of the foregoing, plaintiff was deprived of rights secured by the Fourth and Fourteenth Amendments to the Constitution of the United States, and was subjected to false arrest, false imprisonment, and malicious prosecution in violation of Illinois law.

20.    Plaintiff demands trial by jury.

-3-

Case 1:12-cv-02353   Document 35-2   Filed 02/15/13   Page 5 of 35   PageID 154
Case: 13-1985      Document: 5-3       Filed: 05/23/2013      Pages: 115
Case: 1:12-cv-02353 Document #: 1 Filed: 03/29/12 Page 4 of 4 PageID #:4

WHEREFORE plaintiff requests that judgment be entered against defendants City of Chicago and Kirby in an amount in excess of one hundred dollars as compensatory damages and against defendant Kirby in the amount of two hundred thousand dollars as punitive damages

/s/   Kenneth N. Flaxman
KENNETH N. FLAXMAN
ARDC No. 830399
200 S Michigan Ave Ste 1240
Chicago, IL 60604-2430
(312) 427-3200

*Attorney for Plaintiff*

# EXHIBIT B

# In The Matter of

# MICHAEL SEISER

# vs.

# CITY OF CHICAGO and DEBRA KIRBY

## Deposition of
## MICHAEL SEISER
## August 14, 2012

**Urlaub Bowen & Associates, Inc.**
Certified Shorthand Reporters
Video Conference Center
312-781-9586
Fax 312-781--9228
info@urlaubbowen.com
www.urlaubbowen.com

Case 1:12-cv-02353   Document 35-2   Filed 02/15/13   Page 8 of 35   PageID 157
Case: 13-1985      Document: 5-3        Filed: 05/23/2013      Pages: 115

1

```
           IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
                     EASTERN DIVISION

MICHAEL SEISER,                    )
                                   )
               Plaintiff,          )
                                   )
          vs.                      ) No. 12 C 2353
                                   )
CITY OF CHICAGO and DEBRA          )
KIRBY,                             )
                                   )
               Defendants.         )
```

        The videotaped deposition of MICHAEL

SEISER, taken pursuant to notice of taking

deposition, before Suzanne Thalji, CSR No.

084-002337, Certified Shorthand Reporter and a

notary public within and for the County of Cook,

State of Illinois at 30 North LaSalle Street,

Suite 900, Chicago, Illinois, on August 14, 2012,

commencing at 11:17 o'clock a.m.

        APPEARANCES:

                LAW OFFICES OF KENNETH N FLAXMAN, PC, by
                MR. KENNETH N. FLAXMAN
                (200 South Michigan Avenue, Suite 1240
                 Chicago, Illinois  60604
                 knf@kenlaw.com)
                    appeared on behalf of the plaintiff;

```
 1    APPEARANCES: (Cont'd)
 2      STEPHEN R. PATTON, CORPORATION COUNSEL, by
        MR. SCOTT J. JEBSON,
 3        Chief Assistant Corporation Counsel
            and
 4      MS. LINDSEY VANORNY,
          Assistant Corporation Counsel
 5        (30 North LaSalle Street, Suite 900
          Chicago, Illinois  60602)
 6        scott.jebson@cityofchicago.org
          lindsey.vanorny@cityofchicago.org
 7        appeared on behalf of the defendants.
 8    ALSO PRESENT:
 9      MR. SLAWOMIR KOJRO, Videographer
10          * * * * * * * *
11        I N D E X
12   Witness:                          Page
13   MICHAEL SEISER
14      Examination by:
15      Mr. Jebson................  4
        Mr. Flaxman...............  322
16      Mr. Jebson................  329
17        E X H I B I T S
        Marked For Identification
18
     No. Description               Page
19    1  Google map................. 32
      2  Photos..................... 77
20    3  Alcohol/Drug Influence Report.........252
      4  Arrest Report.........................253
21    5  Traffic Citation..................261
      6  Consent to Search..................267
22    7  Written Copy of Verbal Order............268
      8  First Request to Produce...............285
23    9  Seiser IAD statement..................288
24        (Exhibits Scanned/Attached)
                                          2
```

```
 1       THE VIDEOGRAPHER:  My name is Slawomir Kojro.
 2   I am a video technician for Depovision, located at
 3   77 West Washington Street, Chicago, Illinois, in
 4   association with Urlaub Bowen & Associates.
 5          The date is August 14, 2012.  The
 6   time is 11:17 a.m.
 7          We are present here today at
 8   30 North LaSalle Street, Chicago, Illinois, with
 9   reference to the case entitled Michael Seiser
10   versus City of Chicago, et al., pending in the
11   United States District Court, Northern District of
12   Illinois, Eastern Division, Case No. 12 C 2353.
13          The witness is Michael Seiser.  An
14   audiovisual recording of this deposition is at the
15   request of defendant.
16          Will counsel please identify
17   themselves for the record.
18       MR. FLAXMAN:  I am Kenneth Flaxman,
19   F-l-a-x-m-a-n, for Mr. Seiser.
20       MS. VANORNY:  I'm Lindsey Vanorny for the
21   defendants.
22       MR. JEBSON:  Scott Jebson, J-e-b-s-o-n, for
23   the defendants.
24       THE VIDEOGRAPHER:  Will the court reporter
                                          3
```

```
 1   identify herself and swear in the witness.
 2       THE REPORTER:  My name is Suzanne Thalji.
 3          (Witness sworn.)
 4          MICHAEL SEISER
 5   having been first duly sworn, was examined and
 6   testified as follows:
 7          EXAMINATION
 8   BY MR. JEBSON:
 9       Q.  Good morning.
10       A.  Good morning.
11       Q.  Could you please state your name and
12   spell your first and last name for the record?
13       A.  Sure.  My name is Michael Seiser,
14   M-i-c-h-a-e-l.  Last name is spelled S, like in
15   "Sam", -e-i-s, like in "Sam," -e-r.
16       Q.  You are a Chicago police officer?
17       A.  Yes.
18       Q.  What is your star number?
19       A.  4615.
20       Q.  I am not going to ask your date of
21   birth, but I will ask you how old you are.
22       A.  49 years old.
23       Q.  Did you review any documents prior to
24   this deposition relating to this case?
                                          4
```

```
 1       A.  Yes.
 2       Q.  Can I have a list of those documents,
 3   please?
 4       A.  I reviewed one document.
 5       Q.  What document --
 6       A.  Or documents.  That was the statement I
 7   gave to internal affairs regarding this matter.
 8       Q.  Other than your statement, did you
 9   review any other documents at any time regarding
10   this case?
11       A.  I met with Mr. Flaxman yesterday, and
12   there was a stack of documents, and I perused some
13   of them.
14       Q.  You are aware that there is a CR that
15   has been opened regarding this incident that's the
16   subject to this lawsuit?
17       A.  There is and I -- I believe that that
18   CR has been concluded with a suspension of five
19   days.
20       Q.  Did you review -- other than your
21   statement, did you review any other contents within
22   that CR at any time?
23       A.  There was documents that were given to
24   me a few days ago regarding my options with respect
                                          5
```

```
 1      A.   All right.
 2      Q.   Okay.  Can you please give me your
 3 educational background?
 4      A.   I have completed four years of college
 5 at Loyola University.
 6      Q.   What was your major?
 7      A.   Finance.
 8      Q.   Any other education after that?
 9      A.   No.
10      Q.   Okay.  And you obviously went to the
11 Police Academy?
12      A.   Yes.
13      Q.   When did you become a police officer,
14 what year?
15      A.   1995.
16      Q.   The academy was, what, six months long?
17      A.   My continuous service date was July 10,
18 and I think I hit the street around middle of
19 December 1995.
20      Q.   Okay.  And then you were first a PPO?
21      A.   Yes.
22      Q.   What was your first assignment?
23      A.   As a patrolman in the 25th District.
24      Q.   How long were you in the 25th District?
                                                    10
```

```
 1      A.   Yes.
 2      Q.   After the -- so that brings us up to
 3 about 2005?
 4      A.   Roughly.
 5      Q.   All right.  What was your next
 6 assignment?
 7      A.   I transferred to the 24th District.
 8      Q.   Any particular reason?
 9      A.   Just time for a change.
10      Q.   Okay.  How long did you work in the
11 24th District?
12      A.   Three to three and a half years.
13      Q.   All as a patrol officer?
14      A.   Yes.
15      Q.   So, no, you weren't on a gang team or
16 anything, a tact team, nothing like that?
17      A.   No.
18      Q.   Always in uniform?
19      A.   Yes.
20      Q.   And where did you go after that?
21      A.   18th District, where I'm currently
22 assigned.
23      Q.   Okay.  What was your first assignment
24 when you came to 18?
                                                    12
```

```
 1      A.   Oh --
 2      Q.   See, he should have told you I was
 3 going to be asking you all these background
 4 questions.
 5      A.   Somewhere around 10 years.
 6      MR. JEBSON:  As you can see, we have good
 7 news.  We have your cups.
 8      THE WITNESS:  Very good.
 9      MR. JEBSON:  Thank you.
10      THE WITNESS:  I'll let you pour.
11      MR. JEBSON:  Okay.  I will do it.  I'll even
12 pour you a glass, Ken.
13      THE WITNESS:  About maybe half.
14      MR. JEBSON:  Half, okay.  This is what I
15 ordered the video for --
16      THE WITNESS:  Thank you.
17      MR. JEBSON:  -- so we can get on camera I'm
18 serving you a glass of water, Ken.
19 BY MR. JEBSON:
20      Q.   I think you said 10 years --
21      A.   Somewhere around 10 years.
22      Q.   And that was always as a patrol officer?
23      A.   Yes.
24      Q.   Always in uniform?
                                                    11
```

```
 1      A.   Patrolman.
 2      Q.   Are you still a patrolman?
 3      A.   Yes.
 4      Q.   So you have always been a patrolman?
 5      A.   Yes, sir.
 6      Q.   You've had different assignments within
 7 the 18th District.  Is that fair to say?
 8      A.   I don't understand what you mean by
 9 that.
10      Q.   My understanding, when this happened,
11 the incident subject to this lawsuit, you were on
12 special employment working -- or assigned to
13 Operation Safe Student?
14      A.   Well, I was always assigned as a
15 patrolman.  However, the department does offer
16 extra employment opportunities where you can work
17 for certain agencies like maybe the CTA or Chicago
18 Public Schools, which was this particular
19 assignment on the day this incident happened.
20      It was my day off, but you can work
21 in full uniform for extra money.
22      Q.   Okay.  I am going to just quickly go
23 back to when you were working in 25th District,
24 when you were a patrol officer.
                                                    13
```

```
 1        Was your main duties in a patrol --
 2   a marked squad car doing routine patrol and
 3   responding to in-progress calls?
 4        A.   Yes.
 5        Q.   And was that generally your main
 6   responsibilities through the 10 years at 25?
 7        A.   Yes.
 8        Q.   And then when you went to 24th
 9   District, same thing?  Your main duties were patrol
10   officer in a marked squad, responding to
11   in-progress calls?
12        A.   Yes, sir.
13        Q.   And in 18, when you first came to 18,
14   same thing?  Uniformed officer working in a marked
15   squad car, routine patrol and responding to
16   in-progress calls?
17        A.   Yes, sir.
18        Q.   And what is your current -- is that
19   your current job description right now?
20        A.   Yes, sir.
21        Q.   Has that -- so during your entire
22   tenure at the Chicago Police Department, has it
23   always been as a patrol officer working in a marked
24   patrol car doing routine patrol, responding to
                                                      14
```

```
 1   in-progress calls?
 2        A.   Yes.
 3        Q.   Have you ever worked on a tact team?
 4        A.   No.
 5        Q.   How about a gang team?
 6        A.   No.
 7        Q.   How about in plainclothes?
 8        A.   Not in the district.  I have worked
 9   plainclothes recently for the CTA on my day off.
10        Q.   So when you were talking earlier about
11   working on your day offs, are you talking about
12   secondary employment?
13        A.   Yes.
14        Q.   So not working -- not being paid by the
15   City of Chicago Police Department, but on your days
16   off you would have a secondary employment?
17        A.   You may refer to it as secondary
18   employment.  However, the paychecks are facilitated
19   from the City of Chicago's Police Department, you
20   know.  Like, for instance, working for the CTA, the
21   checks come from the City of Chicago Police
22   Department.  They don't come from the CTA.
23        Q.   Okay.  So this is then different.  Like
24   I know some police officers work security like at
                                                      15
```

```
 1   the Cubs game or the Sox game.  That's different --
 2   that's something different than you are talking
 3   about.  Is that true?
 4        A.   Yes.
 5        Q.   Okay.  So can you explain the
 6   difference between a secondary employment where you
 7   would work security like at a Sox game compared to
 8   the secondary employment you are talking about now?
 9        A.   I'll try to do my best, but I have
10   never worked secondary employment at a Sox game.  I
11   mean --
12        Q.   I am just using that as an example.
13             What I mean is secondary employment
14   where you are not paid by the City of Chicago.
15             Do you understand what I mean?
16        A.   That would most likely be with a
17   private entity, but for some reason, you know, the
18   CTA is a private entity, but the checks are
19   facilitated from the Chicago Police Department.
20             I mean I -- you are working in full
21   uniform.  You represent the police department.  The
22   courts have ruled that if you get injured, the
23   City -- you know, you are working in the capacity
24   as a police officer.
                                                      16
```

```
 1             Why the checks come from the City of
 2   Chicago, I don't know.
 3        Q.   Okay.  So the secondary employment that
 4   you are talking about, like you said, you are
 5   working in full uniform.  You have full police
 6   powers?
 7        A.   Yes.
 8        Q.   You are representing the Chicago Police
 9   Department?
10        A.   Yes.
11        Q.   So is there any difference other than
12   you're working on your day off than working as a --
13   in terms of the police powers that you have when
14   you are working a patrol as a patrol officer in a
15   squad car than when you are on secondary employment
16   working, for instance, special employment when you
17   are assigned to Tilden High School, any difference?
18        A.   No.  You have your full police powers.
19             The only difference in my mind is
20   your rate of pay, which may be at time and a half,
21   or unfortunately with the CTA it's straight time
22   so --
23        Q.   Okay.  So let's talk about the date of
24   this incident, which is subject to the lawsuit, and
                                                      17
```

1 the records that I looked at, the date was
2 March 29, 2011. Does that seem right?
3    A.   Yes.
4    Q.   Okay.
5    A.   May I ask you one question?
6    Q.   Absolutely.
7    A.   Could you tell me the exact address of
8 Tilden High School?
9    Q.   The exact address?
10   A.   Yes.
11   Q.   I probably cannot give -- I can't do
12 that right now off the top of my head. I know the
13 general area, just because I looked at it on Google
14 yesterday.
15   A.   Okay.
16   Q.   Do you need that information?
17   A.   It would -- it might be helpful, but
18 I -- kind of think I know the general area too.
19   Q.   Okay. It would not take me long to go
20 and Google and get you the exact address if that
21 would help.
22   MS. VANORNY:  I can do that if you --
23   MR. JEBSON:  Okay, if you can do that.
24   MS. VANORNY:  Sure.

                                              18

1 MR. JEBSON:  We will get the exact address
2 for you.
3    THE WITNESS:  Okay.
4 BY MR. JEBSON:
5    Q.   So let's start with the date of the
6 incident. March 29, 2011, does that seem right?
7    A.   It seems right.
8    Q.   Okay. And were you working on
9 March 29, 2011?
10   A.   Yes.
11   MR. FLAXMAN:  It's 4747 South Union Avenue.
12   MR. JEBSON:  Okay.
13   MR. FLAXMAN:  Tilden Career Community Academy
14 High School. Does that sound right?
15 BY MR. JEBSON:
16   Q.   Does that sound right?
17   A.   Yes.
18   MR. JEBSON:  4747 South Union?
19   MR. FLAXMAN:  That's what Wikipedia says.
20   MR. JEBSON:  All right. Let's go with that.
21 BY MR. JEBSON:
22   Q.   You were working on March 29, 2011?
23   A.   Yes.
24   Q.   And in what capacity were you working?

                                              19

1    A.   I was working Operation Safe Schools
2 on -- in full uniform, and this particular program,
3 I consider it to be a secondary employment program.
4 However, you're allowed to work on a day of your
5 regular duty hours.
6         So in this instance it may have not
7 been my regular day off. It may have been. I
8 believe it was, but for this program you are
9 allowed to work -- in other words, the hours were
10 1300 to 1600, which is 1:00 to 4:00 p.m.
11        So on certain occasions I might have
12 worked a late car where you can start 5:00, 6:00
13 p.m. and work your regular shift.
14        So it's allowed where, you know, you
15 can go right from this employment opportunity to
16 your regular patrol duties in your district.
17   Q.   Okay. So on March 29, 2011, we know
18 that you were working Operation Safe Schools?
19   A.   Yes.
20   Q.   In police uniform?
21   A.   Yes.
22   Q.   And you were assigned to the -- is it
23 the Tilden --
24   A.   Tilden High School, I believe.

                                              20

1    Q.   Right. And we now know that's
2 4747 South Union?
3    A.   Yes.
4    Q.   And do you believe that -- and you were
5 working I think you just said 1:00 p.m. -- well,
6 13 -- was it 13 --
7    A.   1300 to 1600 hours.
8    Q.   So that's 1:00 p.m. to 4:00 p.m.?
9    A.   Yes.
10   Q.   And do you believe on March 29, 2011,
11 that that was your day off or not your day off.
12   A.   I believe it was my day off.
13   Q.   But even though it was your day off and
14 even though you would consider it your secondary
15 employment, you would agree that all the general
16 orders and the rules and regulations of the Chicago
17 Police Department would be -- would apply to you?
18   A.   I believe so.
19   Q.   Okay. So I think what we talked about
20 before, other than the fact that you were assigned
21 to Tilden High School on the day of this incident,
22 other than that, compared to when you're on the
23 street as a patrol officer, there's no difference
24 in terms of your police powers or the -- or your

                                              21

1       So just if you can look at each of
2   those pictures, take as much time as you need and
3   let me know when you've had a chance to look at
4   those pictures.
5       A.   Okay.
6       Q.   All right.  So let's look at Exhibit 2,
7   and it would be the third picture.  It's Bates
8   stamp 000096 at the bottom right-hand corner.
9       Do you see that picture?
10      A.   Yes, I do.
11      Q.   Does that picture show your car?
12      A.   Yes, it does.
13      Q.   Is that the car that you were driving
14  on the day of the incident?
15      A.   Yes, sir.
16      Q.   Is that the car that you drove to
17  Tilden High School?
18      A.   Yes.
19      Q.   Is that the car that you -- after you
20  got your radio on the day of the incident and got
21  your assignments, that you got into the car and
22  then drove southbound to your post --
23      A.   Yes.
24      Q.   -- near 50th Street?

78

1   BY MR. JEBSON:
2       Q.   Looking at Exhibit 2, picture 96, does
3   that picture show where you parked your car after
4   you left Tilden High School on the date of the
5   incident and you parked it -- when you parked it
6   to go to your post?
7       A.   Yes.
8       MR. FLAXMAN:  Thank you.
9       MR. JEBSON:  You're welcome.
10  BY MR. JEBSON:
11      Q.   If you can go to Bates stamp 97, is
12  that just another picture of your car?
13      A.   Yes, sir.
14      Q.   And Bates stamp 98, just another
15  picture of your car?
16      A.   Yes, sir.
17      Q.   Picture 98 -- or Bates stamp 98, is
18  that -- is the car parked in the same location as
19  shown in picture 96?
20      A.   I believe it is.
21      Q.   If we can then go to picture 99 of
22  Exhibit 2, that's just another picture of your car?
23      A.   Yes, sir.
24      Q.   And then picture 100, another picture

80

1       A.   Yes, sir.
2       MR. FLAXMAN:  What if he had said no?
3       MR. JEBSON:  That would be interesting.
4       MR. FLAXMAN:  Okay.
5   BY MR. JEBSON:
6       Q.   Do you know looking at this picture,
7   Bates stamp 96, where that car is parked?  Can you
8   tell?
9       A.   Yes.
10      Q.   Where is it parked?
11      A.   It is on Union Street, south of the
12  firehouse, and I would estimate that to be maybe
13  six car lengths south of the firehouse's driveway.
14      Q.   Does that picture show where you parked
15  your car after driving from the school to your post
16  on the day of the incident?
17      A.   Yes.
18      Q.   Turn to the next page, 97.
19      MR. FLAXMAN:  You should ask, is this car
20  parked where you parked it, because it might -- it
21  shows a lot of things but --
22      MR. JEBSON:  Okay.  I thought that's what I
23  asked but --
24      MR. FLAXMAN:  No, you didn't.

79

1   of your car?
2       A.   Yes, sir.
3       Q.   Same thing with picture 101?
4       A.   Yes, sir.
5       Q.   And picture 102?
6       A.   Yes, sir.
7       Q.   Okay.  Looking at Exhibit 2, picture
8   103, do you recognize what's shown in that picture?
9       A.   Yes, sir.
10      Q.   And what is shown in that picture?
11      A.   This is the bottle I used to drink
12  water from on the day in question.
13      Q.   The day of the incident?
14      A.   Yes, sir.
15      Q.   And then if you look at picture 104 of
16  Exhibit No. 2, is that just another picture of the
17  bottle that you drank water out of?
18      A.   Yes, and it's -- it is in the -- lying
19  on the front seat of my car.
20      Q.   That's in picture 104 of Exhibit 2?
21      A.   Yes, sir.
22      Q.   And on picture 103 of Exhibit 2, do you
23  know where the bottle is?
24      A.   It appears to be laying on the front

81

1  seat of my car.  However, the picture appears that
2  it's at least to me sort of like upright.
3      Q.   Okay.  Am I correct that the bottle
4  that's shown in Exhibit 2, picture 103 and 104, on
5  the bottle, on the label it says TGI Friday's
6  Mudslide?
7      A.   Would you repeat your question?
8      Q.   Sure.  Am I correct that on the bottle,
9  on the label on the bottle that's shown in Exhibit 2,
10  picture 103 and 104, it says TGI Friday's Mudslide?
11      A.   In 103 and 104?
12      Q.   Right.
13      A.   The bottle is positioned in such a way
14  that you cannot read the label.
15      Q.   My question was probably not a good one.
16      So let me -- the bottle that is
17  shown in Exhibit 2, picture 103 and 104, that is
18  your bottle, right?
19      A.   Yes.
20      Q.   And I think you said you used that
21  bottle to drink water the day of the incident?
22      A.   To drink water from, yes.
23      Q.   Right.  Where did you get that bottle
24  from?

82

1      A.   My girlfriend purchased this item from
2  a store six months prior to this incident, and it
3  was a nice thick bottle with a nice secure cap.
4      So I washed it out and have been
5  using it to drink water from.
6      A lot of guys would freeze water on
7  hot days, and days they want to drink water, they'd
8  bring their own water and have cold water to drink.
9      Q.   Okay.  So is the bottle that's shown in
10  picture 103 and 104 of Exhibit 2, was that the
11  bottle that you would generally drink water from?
12      A.   Yes.
13      Q.   And I think you said your girlfriend
14  got that bottle about six months prior to the date
15  of the incident?
16      A.   Yes.
17      Q.   And during that six months, would that
18  be the bottle that you would drink water from?
19      A.   We, you know, took a while to consume
20  it, but, you know, I've been using it, yeah.
21      Q.   What was in the bottle prior --
22  originally in the bottle?
23      A.   There is a drink called Mudslide, which
24  looks like a chocolate shake and has, I believe,

83

1  rum in it.  This particular bottle did have the
2  alcohol added to it.
3      Q.   Okay.  Did you drink the original
4  contents from the bottle that is shown in picture
5  103 on Exhibit 2?
6      A.   Yes.
7      Q.   Okay.  So that was six months prior to
8  this incident?
9      A.   We probably went through it -- maybe
10  took three weeks to go through it.
11      Q.   Okay.  And you say it's a chocolate
12  drink with rum?
13      A.   It looks like a chocolate shake, and I
14  believe the alcohol that is used for this drink is
15  rum, but I'm not sure.
16      Q.   Were you with your girlfriend when she
17  purchased it?
18      A.   No.
19      Q.   Did she purchase that from TGI
20  Friday's?
21      A.   No.  I think she bought it from CVS,
22  but I'm not sure.
23      Q.   Okay.  Had you -- prior to your
24  girlfriend getting this six months before the

84

1  incident, had you ever seen that bottle before,
2  that type of bottle?
3      A.   Can you rephrase that?
4      Q.   Sure.  You mentioned that it's a drink
5  called Mudslide that was originally in the bottle.
6      A.   Yes.
7      Q.   So what I'm saying is:  Prior to your
8  girlfriend getting that drink six months prior to
9  the incident, had you ever had a Mudslide from the
10  same or similar bottle prior to that -- prior to
11  that?
12      A.   I don't think so.
13      Q.   So after you and your girlfriend had
14  consumed the original Mudslide drink in that bottle
15  that's shown in picture 103, you started using that
16  as a bottle that you would drink water out of?
17      A.   On occasion, yes.
18      Q.   All right.  So I am not asking what you
19  can see in the picture of Exhibit 2, 103 or 104.
20      I'm asking:  Based on your
21  knowledge, as you sit here right now, would you
22  agree that on one of the labels of the bottle
23  that's shown in picture 103 and 104 of Exhibit 2,
24  even though you may not see it on the label, but it

85

1  does say on it TGI Friday's Mudslide?
2      A.   Yes.
3      Q.   And would you agree that also it says
4  on the bottle, even though you may not see it in
5  the pictures, but it says on the bottle, "The
6  liquor is in it"?
7      A.   That printing is on the label, but it's
8  very small.
9      Q.   But it is on the label?
10     A.   Yes.
11     Q.   How big is that bottle in terms of like
12 is -- how many -- what amount of liquid?
13     A.   I believe it's a 1.75-liter bottle.
14     Q.   Prior to you going to work on May 29,
15 2011, the day of the incident, did you fill -- let
16 me strike that.
17         To make things easy, when I refer to
18 the bottle, I'm going to say the Mudslide bottle.
19         If I say that, will you know that
20 I'm referring to the bottle that's shown in picture
21 103 and 104 of Exhibit 2?
22     MR. FLAXMAN:  Let me object to that use of
23 the term Mudslide bottle to refer to a bottle that
24 no longer contains Mudslide.  That's a --

86

1      A.   Yes.
2      Q.   Okay.  So on the day of the incident,
3  did you then take the bottle out of the freezer to
4  go to work?
5      A.   Yes.
6      Q.   So when you -- I think you said that
7  you believe you went directly from home to Tilden
8  School the day of the incident?
9      A.   Yes.
10     Q.   When you -- do you remember when you
11 took the bottle out of the refrigerator that day?
12     A.   It was sometime in the morning, and I
13 took it out of the freezer and put it in the
14 refrigerator.
15     MR. FLAXMAN:  Going back, he said he may have
16 been in court that day.  So you were --
17     MR. JEBSON:  Okay.
18     MR. FLAXMAN:  -- creating ambiguity with
19 that.
20     MR. JEBSON:  Okay.  Well, it's not
21 intentional.
22 BY MR. JEBSON:
23     Q.   Well, it sounds like -- would it be
24 fair to say that on the morning of the day of the

88

1      MR. JEBSON:  All right.  I am just trying to
2  make things easier.
3      MR. FLAXMAN:  If you ever use this again, it
4  will be unfairly prejudicial.
5      MR. JEBSON:  All right.  I will just keep
6  referring it to the bottle shown in Exhibit 2, 103.
7  BY MR. JEBSON:
8      Q.   On the date of the incident, March 29,
9  2011, prior to you going to Tilden School, did you
10 fill the bottle that's shown in picture 103 of
11 Exhibit 2 with water?
12     A.   Yes.
13     Q.   Do you remember how much water you put
14 in that bottle prior to going to school that day?
15         Like did you fill it to the top?
16     A.   That particular bottle may have been
17 frozen, and then as the day progressed, there was
18 water in it.
19     Q.   When do you remember putting water in
20 the bottle that's shown in Exhibit 2, picture 103?
21 Was it the day of the incident, or was it earlier?
22     A.   I think it was earlier.
23     Q.   So then earlier, when you put water in
24 it, did you put it in the freezer so it froze?

87

1  incident, that you took the bottle that's shown in
2  picture 103 of Exhibit 2 out of the freezer?
3      A.   Yes.
4      Q.   And put it in the refrigerator?
5      A.   Yes.
6      Q.   Did you do that when you first woke up?
7      A.   I don't think so.
8      Q.   About what time -- when you say the
9  morning, about what time do you think you would
10 have taken that bottle out of the freezer and put
11 it in the refrigerator?
12     A.   Within an hour of waking up.
13     Q.   So about what time would that be?
14     A.   8:00, 8:30 in the morning.
15     Q.   Do you remember -- I know you don't
16 know whether or not you went to court before going
17 to the school.  You may have, but you may not have.
18         Other than going to court -- may
19 have -- other than maybe going to court, is there
20 anything else that you remember that you may have
21 done other than going -- that you did before going
22 to the school?
23     A.   Just the, you know, daily routines of,
24 you know, showering and preparing for work --

89

**Page 90**

1    Q.  All right.
2    A.  -- or court.
3    Q.  At some point it sounds like you took
4 the bottle that's shown in Exhibit 2, picture 103,
5 out of the refrigerator, and you took it with you?
6    A.  Yes.
7    Q.  If you went to court, would you have
8 taken it with you to go to court?
9    A.  Yes.
10    Q.  And when you -- if you went to court,
11 would you have left it in your car when you went to
12 court?
13    A.  Yes, sir.
14    Q.  Okay.  So -- and then if you went to
15 court, you would have gone from court into your
16 car, then to the school, if you did go to court?
17    A.  Yes.
18    Q.  If you didn't go to court, then you
19 would have simply taken the bottle out of the
20 refrigerator, brought it with you in the car, then
21 gone straight to school?
22    A.  Yes.
23    Q.  When you took the bottle out of the
24 fridge the day of the incident to either go to

**Page 91**

1 court or to go to the school, was the liquid in the
2 bottle -- was it still frozen or was it a liquid?
3    A.  May have been partially still frozen.
4    Q.  Do you know what percentage of the
5 bottle would have been partially still frozen, if
6 it was?
7    A.  No.
8    Q.  So at some point you get to Tilden
9 School on the day of the incident shortly before
10 1:00 o'clock, correct?
11    A.  Yes.
12    Q.  Do you leave the bottle that's shown
13 in Exhibit 2, picture 103, in your car when you go
14 into the school?
15    A.  Yes.
16    Q.  So then you go into the school shortly
17 before 1:00, and then you're hanging out.
18    The sergeant doesn't come.  You get
19 radios.  You are going to be assigned to the post
20 at 50th Street.  You leave the school.
21    Then you go back into the car?
22    A.  Right.
23    Q.  When you go back into the car, is the
24 bottle that's shown in Exhibit 2, picture 103, is

**Page 92**

1 that -- where is that in the car?
2    A.  It's on my front seat, passenger --
3 front passenger seat.
4    Q.  The same place generally where it's
5 shown in picture 104 of Exhibit 2?
6    A.  Yes.
7    Q.  And is that where you left it when you
8 went into the school shortly before 2:00 o'clock?
9    A.  Yes.
10    Q.  So after -- you're in the school.  The
11 sergeant doesn't come.  You get the radios.  You
12 know your post.
13    You go back into your car, and now
14 the next thing you're going to do is drive to your
15 post, right?
16    A.  Yes.
17    Q.  From the time that you get into the car
18 after getting your radio to the time you drive and
19 park your car to the post -- at the post, do you
20 ever pick up the bottle off the front passenger
21 seat?
22    A.  Yes.
23    Q.  Okay.  So tell me what you do in terms
24 of the bottle, everything you do in terms of the

**Page 93**

1 bottle from the time that you get into your car
2 after getting your radio and you're going to drive
3 to your post until you drive to your post.
4    A.  I'm driving towards my post, and I
5 remember picking up the bottle, holding it and
6 driving with my left hand and drinking from the
7 bottle.
8    Q.  Do you remember when you saw the two
9 women on the east side of Union, the one on the
10 porch and the one standing in the sidewalk -- when
11 you saw them, do you remember if you had the bottle
12 that's shown in Exhibit 103, Exhibit -- I'm sorry,
13 let me start over.
14    When you get into your car and
15 you're driving to your post and then when you see
16 the two women on the east side of Union, the one
17 on the porch and the one on the sidewalk with the
18 yellow CPS vest --
19    A.  Jacket.
20    Q.  Jacket.  When you see them, do you
21 have the bottle in your hand that's depicted in
22 Exhibit 2, picture 103?
23    A.  I may have been drinking from the
24 bottle at that point.

1     Q.   And looking at the bottle on picture
2  104 of Exhibit 2, it looks like it's got a red cap?
3     A.   104?
4     Q.   104, yes, or 103. I am just drawing
5  your attention to the cap.
6     A.   It does have a red cap.
7     Q.   And I assume you just twist it off to
8  open it up?
9     A.   That's correct, numerous -- you know, I
10 think it got twisted five or six times.
11    Q.   And would you agree that when you first
12 open the bottle for the first time, you break a
13 seal?
14    A.   Right.
15    Q.   And would you agree that looking at the
16 bottle shown in Exhibit 2, picture 104, that you
17 can see that the seal is broken on the bottle?
18    A.   104?
19    Q.   Correct. You see the label is kind of
20 folded over? I am talking about the red and white
21 label near the cap.
22    A.   I don't know if that's the particular
23 seal.
24    Q.   Can you tell from that picture that the

94

1     MR. FLAXMAN:  If you let him explain --
2     MR. JEBSON:  I will.
3     THE WITNESS:  I think 104 is better.
4  BY MR. JEBSON:
5     Q.   Okay. Let's look at 104 of Exhibit 2.
6  There's a red cap.
7     A.   There's a red cap. Most products that
8  have caps -- whether it's a juice container, a milk
9  carton -- has a ring that is attached to the cap
10 with maybe three or four or five prongs, so when
11 the cap is twisted, the ring or seal is broken. I
12 imagine it's for tampering.
13        It will, you know -- if you see that
14 the seal is broken, you know that the product has
15 been tampered with. You shouldn't buy it or drink
16 from it.
17        This red and silver candy-striped
18 paper below on the neck appears to be some sort of
19 product label -- labeling. I wouldn't consider
20 that a seal.
21    Q.   Okay. Would you agree, looking at
22 picture 104 of Exhibit 2, that it looks like the
23 seal to this bottle is not there, that they -- it
24 looks like the bottle has been opened?

96

1  seal is broken?
2     A.   Well, there is a seal under the plastic
3  cap that, when you twist the cap, separates. That's what
4  I would consider to be the seal.
5     Q.   Okay. So let's look at -- maybe this
6  will be easier -- Exhibit 2, picture 103.
7        You see that there's a red cap, and
8  then underneath the red cap there is a space in
9  between where there's -- the seal -- when I say
10 seal, I mean the seal which is red and white
11 stripes.
12        Do you see that?
13    A.   Yeah.
14    MR. FLAXMAN:  Let me object. That's not a
15 seal. That's tape.
16    MR. JEBSON:  I thought he referred to it as a
17 seal. That's why I was using the word seal. I'll
18 use whatever word you want.
19    THE WITNESS:  Well, would you -- do you want
20 me to clarify this or --
21    MR. FLAXMAN:  Yes, yes, yes, yes.
22 BY MR. JEBSON:
23    Q.   Well, let's look at Exhibit 103,
24 picture --

95

1     A.   Would you rephrase that?
2     Q.   Sure.
3     A.   Rephrase it or repeat it.
4     Q.   Absolutely. Looking at Exhibit 2,
5  picture 104, would you agree that looking at the
6  bottle in that picture, it appears that that bottle
7  has been opened because the seal is not -- is
8  missing?
9     A.   I would have to disagree with you with
10 respect to the phrasing of seal missing. I don't
11 think the seal is missing in this instance.
12    Q.   Let me rephrase the question then.
13        Would you agree that looking at
14 Exhibit 2, picture 104, that it appears that the
15 bottle has been opened?
16    A.   From me looking at this photo, I would
17 say it's questionable.
18    Q.   Well, let's take the photo out of it.
19        At some point you were able to look
20 through your car window and see the bottle that's
21 shown in picture 104 of Exhibit 2 on the front seat
22 of your passenger -- front seat passenger seat,
23 right?
24    A.   Yes.

97

1    Q.   And that was -- well, you can see that
2  simply walking up to the car and looking -- just
3  looking through the window, you can see the bottle
4  on the front passenger seat?
5    A.   Yes.
6    Q.   So you would agree that standing and
7  looking into the car and seeing the bottle on the
8  front passenger seat, that it could appear that the
9  bottle has been opened?
10    MR. FLAXMAN:  I object to the form of the
11  question.
12    MR. JEBSON:  You can answer.
13    THE WITNESS:  Are you asking me the question
14  as -- from my viewpoint or from what someone else
15  may perceive about that bottle?
16  BY MR. JEBSON:
17    Q.   Well, let's talk about your viewpoint.
18       If you're looking into your car at
19  the bottle, the way the bottle was situated after
20  you got to your post and you got out of your car,
21  if you just looked in your car and you saw that
22  bottle, would you agree that it would look like the
23  bottle was opened?
24    A.   I -- I believe that if someone looked

98

1  at that bottle, they could tell it was opened
2  because there was not much liquid left in that
3  bottle.
4    Q.   Okay.  So I am going to go -- I'm going
5  back now to when you get into your car, after
6  getting your radio and you're going to drive to
7  your post on the day of the incident.  Okay?
8    A.   All right.
9    Q.   I believe you mentioned that -- I was
10  asking you -- when you saw the two women on the
11  east side of Union Street, I asked whether or
12  not -- if you were drinking out of that bottle
13  that's shown in Exhibit 2, picture 103 and 104.
14    A.   Yes.
15    Q.   And you said that you believe that you
16  were drinking from that bottle?
17    A.   Yes.
18    Q.   Do you know how many -- is it one
19  constant drink from the bottle, and what I mean by
20  that is you bring the bottle and you're drinking
21  from it; or was it you would drink from it, remove
22  the bottle from your lips, and put it back, when
23  you're doing -- when you see these women?
24    A.   I -- you know, I really don't recall.

99

1    Q.   Okay.  Could it be either of those
2  situations?
3    A.   Are you asking me if either of those --
4  either of those two possibilities may have occurred?
5    Q.   Let me ask a different question.
6       You mentioned that you believe that
7  you were drinking the bottle when you saw these two
8  women?
9    A.   Yes.
10    Q.   So then my question was:  Do you
11  believe that when you saw these two individuals,
12  when you were drinking the bottle, was it just the
13  drinking motion, drinking from the bottle where
14  your lips stayed on the bottle the whole time that
15  you saw them; or was it you took the bottle from
16  your lips and put it back?
17    A.   I -- I don't recall.
18    Q.   Okay.
19    MR. FLAXMAN:  And I would ask that next time
20  you ask a question like that, you say drinking from
21  the bottle, not drinking the bottle.
22    MR. JEBSON:  Okay.  Just so I know, what's
23  the difference?
24    MR. FLAXMAN:  We drink from the bottle.  We

100

1  sometimes eat a bottle if it's edible, but we don't
2  drink a bottle.  We drink the liquid.
3    MR. JEBSON:  Did I say drink the bottle?
4    MR. FLAXMAN:  Yes.
5    MR. JEBSON:  Oh, I'm sorry.
6  BY MR. JEBSON:
7    Q.   Let me repeat the question so it's
8  obvious what I'm asking, because I don't think you
9  had an edible bottle in your car.
10    A.   No.
11    Q.   But just in case, when you were --
12  after getting your radio and you were going to go
13  to your assignment at 50th Street and Union, you
14  got into your car.  You're driving southbound, and
15  you see the two women on the east side of the
16  street.
17       You mentioned that you were drinking
18  from the bottle that is shown in Exhibit 2, picture
19  103 and 104?
20    A.   Yes.
21    Q.   And from what you just told me, you
22  don't know whether or not, when you were drinking
23  from the bottle when you saw these women, whether
24  or not it was one constant drink where the bottle

101

1  would not leave your lips or if you would drink and
2  then release a bottle from your lips and drink
3  again?  You don't know which one of those scenarios
4  it was?
5       MR. FLAXMAN:  Let me object.  This is a third
6  scenario, that he took a sip and put it down.
7       MR. JEBSON:  Okay.
8       MR. FLAXMAN:  And he's going to say he
9  doesn't remember what he did, which is what he said
10  before, but go ahead.
11       MR. JEBSON:  Okay.  Let me ask again.
12  BY MR. JEBSON:
13       Q.   When you got your radio and you knew
14  what your post was, you left the school.  You got
15  into your car to drive to your post southbound on
16  Union Street.
17            You mentioned that you saw the two
18  women on the east side of the Union Street, correct?
19       A.   Yes.
20       Q.   And you mentioned that, when you saw
21  these women, that you were drinking from the bottle
22  that is shown in Exhibit 2, picture 103 and 104?
23       A.   Yes.
24       Q.   In terms of how you were drinking from

102

1  the bottle, in terms of whether -- when you were
2  looking at them, if you were -- had the bottle up
3  to your lips the entire time or if you drank from
4  the bottle and put it down or if you drank from the
5  bottle, released the bottle from your lips and took
6  another sip, you don't know which of the three
7  scenarios happened?
8       A.   I do not -- yeah.  I do not recall how
9  I drank from that bottle.
10       Q.   Okay.  But it would have been one of
11  those three scenarios?
12       A.   Yes.
13       MR. JEBSON:  Okay.  Let's -- the tape is
14  almost out, so we have to take a break.
15       THE WITNESS:  Okay.  I'll take a restroom
16  break, please.
17       MR. JEBSON:  Okay.
18       THE VIDEOGRAPHER:  End of tape 1, deposition
19  of Michael Seiser.  The time is 1:14.  Off the
20  record.
21            (Recess taken.)
22       THE VIDEOGRAPHER:  Tape 2, deposition of
23  Michael Seiser.  Time is 1:24.  On the record.
24

103

1  BY MR. JEBSON:
2       Q.   Okay.  We left off talking about --
3  some questions about the bottle.  So I want to
4  direct your attention again back to picture 103
5  and 104 of Exhibit No. 2.
6            Would you agree that it is a clear
7  bottle with labels on it?
8       A.   Yes.
9       Q.   In terms of the label right underneath
10  the red cap, you actually had a good description.
11            Candy type color -- what did you
12  say?
13       A.   A red and silver candy cane striped
14  product label.
15       Q.   Okay.  The label that says Mudslide,
16  looking at picture 104 of Exhibit 2, it appears --
17  am I right that there is a label on the front and
18  the back of the bottle?
19       A.   You are correct.
20       Q.   So looking at Exhibit 2, 104, are we
21  looking at the rear label or the front label?
22       A.   The rear.
23       Q.   Is the rear label where it says the
24  Mudslide?

104

1       A.   It may.
2       Q.   Do you know?
3       A.   I do not.
4       Q.   Okay.  In terms of the language, "The
5  liquor is in it," is that on the front label or the
6  rear label?
7       A.   I don't know.
8       Q.   Do you know what's on the front label,
9  what it says?
10       A.   In general.
11       Q.   Yeah.
12       A.   It has a picture of a glass with, for
13  better lack of description, a brown Slurpee type
14  material in this glass, and then I think it has the
15  wording TGIF Mudslide somewhere on that label, and,
16  you know, there's other markings on the bottle with
17  weight and a colorful design.
18       Q.   Is the glass that's on the front label,
19  is that a cocktail glass?
20       A.   All I remember is it's a glass.
21       Q.   Do you know what I mean by cocktail
22  glass?
23       A.   Not really.
24       Q.   If you order -- well, a regular glass

105

1   one standing on the sidewalk?
2      A.   Rephrase it.
3      Q.   Sure.  At any time up to today's date,
4   have you ever personally spoken to the two women
5   who you believed -- the one to be sitting on the
6   porch and the one standing on the sidewalk with the
7   yellow jacket with CPS on it?
8      A.   I don't think so.
9      Q.   Have you ever read any reports that set
10  out what they claim they saw regarding your actions
11  on the day of the incident?
12     A.   I may have.
13     Q.   Do you know -- if you did do that, when
14  would that have been?
15     A.   Yesterday with Mr. Flaxman and I
16  believe -- and I'm assuming that one of these
17  ladies did file a complaint on me.
18          So during the -- this CR process,
19  there may have been some sort of summary,
20  summarizing what the complaint is; and there may
21  have been a sworn affidavit signed by her that was
22  presented to me at some point during this whole
23  rigmarole.
24     Q.   You know, as you sit here right now,

118

1   that there was a signed complaint by a citizen
2   regarding allegations that you were drinking
3   alcohol while driving?
4      A.   Yes.
5      Q.   Okay.  And you believe that you may
6   have reviewed that signed affidavit?
7      A.   At some point, yes.
8      Q.   Okay.  So at some point you park your
9   car a little bit south of the fire station after
10  getting your radio and going to your post; is that
11  correct?
12     A.   Yes.
13     Q.   What did you do after that?
14     A.   I stayed in my car for a short period
15  of time; and after a short period of time, there
16  was a man who came in the middle of Union Street,
17  and he was staring at the front end of my car, and
18  I could tell that he was speaking my license plate
19  number into a cell phone.
20     Q.   How long were you sitting in your car
21  when it came to a stop just south of the fire
22  station before you saw this individual, this man?
23     MR. FLAXMAN:  Let me object to the form of
24  the question.

119

1       You said how long were you sitting
2   in the car when it came to a stop.
3           Did you mean after it came to a
4   stop?
5      MR. JEBSON:  I did.  So let me ask the
6   question again.  Thank you.
7   BY MR. JEBSON:
8      Q.   After your car came to a stop just
9   south of the firehouse, how long were you sitting
10  in your car until you saw this individual who you
11  thought was taking down your license plate?
12     MR. FLAXMAN:  Object.  He didn't say taking
13  down.  He said speaking into a telephone.
14  BY MR. JEBSON:
15     Q.   After your car came to a stop just past
16  the fire station, how long were you sitting in the
17  car before you saw this individual who you believe
18  was talking into something regarding your license
19  plate?
20     A.   Well, I don't know how much time
21  elapsed, but I do know he was speaking my license
22  plate into that cell phone.
23     Q.   Would you say that -- I know you don't
24  know the exact time, but was it more than five

120

1   minutes or less than five minutes?
2      A.   Probably more, but I'm not sure.
3      Q.   Are you able to give me a range, like
4   between five and 10 minutes?
5      A.   I would say anywhere from five minutes
6   to fifteen minutes.
7      Q.   And during that time, whatever it was,
8   did you drink out of the bottle that's shown in
9   Exhibit 2, picture 103?
10     A.   Yes.
11     Q.   About how many times would you say?
12     A.   I'm not sure, but I would say it was
13  two to three times.
14     Q.   By the way, when you did drink in that
15  bottle, when you were heading towards your post
16  when you passed the two women, was the liquid
17  completely all liquid and none of it frozen at that
18  point?
19     A.   Yes, sir.
20     Q.   So obviously when your car came to a
21  stop, it was still a liquid?
22     A.   Yes, sir.
23     Q.   So when you saw this individual
24  speaking into -- was it his phone?

121

1    A.   Yes, I assume it was his phone.

2    Q.   Okay. And you said you heard him

3  speaking your license plate number into his phone?

4    A.   I may have heard him, but I saw him

5  speaking, and it was obvious to me that he was

6  reading my license plate number into the cell

7  phone.

8    Q.   Do you know where he came from?

9    A.   I do not.

10    Q.   When you first saw him, was he in

11  the -- in Union Street in the middle of the street?

12    A.   Yeah.

13    Q.   And when you first saw him, how far

14  away from the front of your car was he?

15    A.   Two to three car lengths.

16    Q.   Did you recognize that individual when

17  you first saw him?

18    A.   I don't -- no, I don't think so.

19    Q.   And obviously at that time you were

20  still wearing your police uniform?

21    A.   Yes.

22    Q.   And when you saw this individual

23  talking into his phone your license plate number,

24  you were just still sitting in your vehicle?

122

---

1    A.   Yes.

2    Q.   What did you do after that?

3    A.   I got out of my car after traffic had

4  gone by.  There was one car, and he kind of had to

5  move out of the way, and he came closer to my car,

6  and then he walked off to the sidewalk, and I

7  approached him for a short conversation.

8    Q.   When you approached him, was he still

9  in the street?

10    A.   He was walking off the street towards

11  the east side of Union across from the firehouse,

12  south of the firehouse.

13    Q.   Which direction was he walking other

14  than going east?  Like was he heading northbound,

15  like northeast?

16    A.   At what point?

17    Q.   When you got out of the car to approach

18  him.

19    A.   He was walking eastbound towards the

20  sidewalk on the east side of Union.

21    Q.   Okay. And did you have a conversation

22  with this person?

23    A.   Yes, I did.

24    Q.   Tell me what you said and what he said.

123

---

1    A.   I don't remember the whole conversation

2  because it's been quite some time, but I asked him

3  why he was speaking my license plate into the cell

4  phone, and I became concerned, and, you know, I

5  don't remember what he said, if he said anything,

6  but I did ask him for identification because the

7  police department wants you to document via a

8  contact card when you stop people and explain why

9  you're talking to them.

10         And this person said, I'm not doing

11  anything wrong, and I don't have to give you my

12  identification.

13         And I told him, Well, I think you

14  do, and I'm going to call a sergeant; and if you

15  are breaking any laws, I'm going to have you

16  arrested because -- and then I said -- and I said,

17  You are not the police, and you are a civilian, and

18  I don't think you should be speaking my license

19  plate, which can be traced back to my home and, you

20  know -- I have no reason -- or you have no reason

21  why to do that.

22         And, you know, I may have said

23  something to the effect that, you know, you could

24  be giving my license plate and gang-bangers could

124

---

1  run it and find out where I live, you know, and

2  that wouldn't be good.

3    Q.   When you had this conversation with

4  this gentleman, were you both standing?

5         In other words, was he walking away

6  or was he stopped?

7    A.   No.  He walked over to the east side of

8  Union -- on the east side of Union, and there may

9  have been two other people present.

10         I think one was an African-American

11  young man, and the other may have been a woman, but

12  I'm not sure.

13    Q.   Do you know their names?

14    A.   No, I don't.

15    Q.   Had you ever seen them before?

16    A.   I don't think so.

17    Q.   Have you seen them since?

18    A.   No.

19    Q.   So when you were asking this person,

20  Why are you speaking my license into your phone,

21  his response was, I don't have to tell you?

22    A.   I don't remember if he told me at all;

23  but when I asked for identification to document why

24  I was stopping him, he says, I'm not doing anything

125

| | |
|---|---|
| 1   A.   Yes, as a supervisor handing out | 1   like, What's up, Sarge? |
| 2   radios, posts, you know, et cetera. | 2          And he said, Mike, what's in the |
| 3   Q.   **Did you have any problems, complaints,** | 3   bottle? |
| 4   **or any animosity at all or any negative feelings** | 4          And I may have said, What bottle? |
| 5   **with Sergeant Verta prior to the date of this** | 5   Or something to that effect.  I don't really |
| 6   **incident?** | 6   remember. |
| 7   A.   No. | 7          And he may have indicated, The |
| 8   Q.   **Do you have any negative feelings,** | 8   bottle on your front seat. |
| 9   **animosity at all regarding Sergeant Verta as you** | 9          And he may have said then, What's in |
| 10  **sit here right now?** | 10  it? |
| 11  A.   Not -- not really, not really. | 11          And I told him it wasn't alcohol, |
| 12  Q.   **So Sergeant -- I'm sorry, Officer --** | 12  and he told me, Open your car.  Give me the bottle. |
| 13  MR. FLAXMAN:  Gneizko. | 13          And I told him, No.  Get a warrant. |
| 14  BY MR. JEBSON: | 14          I know my rights and he -- I saw |
| 15  Q.   **Gneizko?** | 15  that he was getting visibly angry. |
| 16  A.   Gneizko, yeah. | 16          And I said, you know, What's going |
| 17  Q.   **Officer Gneizko, he had indicated to** | 17  on?  You have a complaint or something? |
| 18  **you that Sergeant Verta wanted to see you?** | 18          And he says, Oh, yeah. |
| 19  A.   Yes. | 19          He goes, I've got a woman that says |
| 20  Q.   **Did he then point to the general** | 20  you're driving 10 to 15 miles per hour down the |
| 21  **direction where Sergeant Verta was?** | 21  middle of Union Street chugging from a vodka |
| 22  A.   No.  I turned around. | 22  bottle. |
| 23  Q.   **Okay.  Were you at your post when your** | 23          And then I said something like, |
| 24  **partner told you this?** | 24  That's ludicrous, you know.  This woman's got to be |
| 170 | 172 |
| 1   A.   Yes. | 1   nuts. |
| 2   Q.   **What did you do after your partner said** | 2          And I said, Is she going to file a |
| 3   **Sergeant Verta wanted to see you?** | 3   complaint?  Is she signing an affidavit? |
| 4   A.   I walked over there. | 4          And he didn't say anything. |
| 5   Q.   **Walked over to where his squad car was?** | 5          And then I suggested, Well, you |
| 6   A.   No. | 6   know, why don't we do this.  Why don't we go into |
| 7   Q.   **To where?** | 7   the 9th District, and I'll blow in the machine, and |
| 8   A.   He was standing on the passenger side | 8   this way you'll have the evidence to kill the CR |
| 9   in close proximity to my vehicle, so I walked over | 9   number and, because I think this woman is kind of |
| 10  there. | 10  crazy, you'll have evidence to cover yourself |
| 11  Q.   **And was he in police uniform?** | 11  because if you just give this a code, like a 19 |
| 12  A.   Yes. | 12  Paul, she might get a CR number on you. |
| 13  Q.   **So white shirt?** | 13          And he didn't say anything for a few |
| 14  A.   Yes. | 14  seconds; and then he looks at me, and he goes, |
| 15  Q.   **And you walked up to him.** | 15  Okay, Mike. |
| 16        **Was there a conversation?** | 16          And then there was another SUV that |
| 17  A.   Yes. | 17  came on scene with another officer, and he leads me |
| 18  Q.   **Can you please tell me what you said to** | 18  over to that SUV, which is a marked squadrol -- |
| 19  **him and what he said to you?** | 19  marked squad SUV, excuse me, and he puts me in the |
| 20  A.   I'll try.  It may not be verbatim, but | 20  back where the prisoners go, and he closes the |
| 21  I remember most of the conversation. | 21  door. |
| 22  Q.   **Okay.** | 22          And I think another squad car came, |
| 23  A.   He, you know, was standing by my | 23  and Sergeant Verta had a conversation with these |
| 24  vehicle and, you know, said something to the effect | 24  three, four officers, including Officer Gneizko, |
| 171 | 173 |

1  that you were in the back of the SUV, Sergeant
2  Verta --
3      A.   I estimate it at that time, yes.
4      Q.   So then Sergeant Verta opened the back
5  door of the SUV and you got out?
6      A.   Yep.
7      Q.   And then did you get into another
8  police car?
9      A.   Yes.
10     Q.   Did you have any conversation with
11  anyone from the time you got out of the SUV until
12  the time you got into the police car?
13     A.   Sergeant Verta might have said
14  something like, Okay, let's go or, you know, get in
15  my -- get in my SUV.
16          I got in the front seat.
17     Q.   Okay.
18     A.   I don't -- I really don't remember.  It
19  was something very short.
20     Q.   So Sergeant Verta also had an SUV?
21     A.   I believe he did.
22     Q.   And you got in the front seat?
23     A.   Yes.
24     Q.   So then did you and Sergeant Verta then

202

1  drive to the 9th District?
2      A.   Yes.
3      Q.   Did you go -- did you stop on the way
4  anywhere else, or did you go right to the 9th
5  District?
6      A.   No, right to the 9th District.
7      Q.   And you obviously weren't handcuffed,
8  correct?
9      A.   That's correct.
10     Q.   And in your mind you were not under
11  arrest at that point?
12     A.   Well, you know, that's a good question.
13          I don't believe so.
14     Q.   You don't believe that you were under
15  arrest at that point?
16     A.   That's correct.
17     Q.   And when you went to the 9th District,
18  you still wanted to go to the 9th District, right?
19     A.   Yes.
20     Q.   Did you have any conversation with
21  Sergeant Verta on the way to the 9th District?
22     A.   He may have talked to me.  I don't
23  remember what was said.  And if it was, it was
24  something very short.

203

1      Q.   Do you remember saying anything to him?
2      A.   I may have.  I don't -- well, you know,
3  there were -- there was a camera in that vehicle,
4  and I'm sure it has audio.
5      Q.   Okay.  If you did say something, you
6  don't remember what it was?
7      A.   No.
8      Q.   When you get to the 9th District --
9  were you familiar with that 9th District?
10     A.   No, not really.
11     Q.   Had you ever been to that 9th District
12  before?
13     A.   I may have.
14     Q.   For obviously work purposes, right?
15     A.   Yes.
16     Q.   Did you know anyone that worked in the
17  9th District?
18     A.   What was your question, know?
19     Q.   Did you know anyone that worked in the
20  9th District at that time?
21     A.   Meaning know in what terms?
22     Q.   Like if I said do you know anyone that
23  works in the 9th District, their names.
24     A.   Quite possibly.  Recognize, yes.

204

1  Know --
2      Q.   No one that you would talk to on a
3  regular basis?
4      A.   Not that -- not that I can recall, no.
5      Q.   When you get to the 9th District,
6  what's the first thing that happens?
7      A.   Sergeant Verta leads me to what I would
8  call as an interview room with one-way glass.
9      Q.   I assume you've been in similar type
10  rooms in the past as a police officer?
11     A.   Infrequently.
12     Q.   How many times would you say in your
13  career you've been in similar type rooms?
14     A.   Not many.
15     Q.   Over 10?
16     A.   Possibly.  Not much more than that.
17     Q.   All right.  And you wanted to go to the
18  9th District so you can take a sobriety test?
19     A.   To blow into the machine to prove my
20  innocence and --
21     Q.   Okay.  And you have obviously conducted
22  the sobriety tests, blowing into a machine, as a
23  police officer to people you've arrested for DUIs?
24     A.   Say that again.

205

1  radio that you had on your shoulder?
2     A.   Yes.
3     Q.   And you heard that while you were
4  sitting in the interview room?
5     A.   Yes.
6     Q.   How long had you been in the interview
7  room before you had heard this?
8     A.   I think it was quite some time.
9     Q.   And what do you mean by quite some
10 time, over a half hour?
11    A.   I believe it was.
12    Q.   Over an hour?
13    A.   Possibly.
14    Q.   Over an hour and a half?
15    A.   It may have been.
16    Q.   Over two hours?
17    A.   Possible.
18    Q.   Over two and a half hours?
19    A.   I don't think so.
20    Q.   And did you hear anything else over the
21 radio at any time when you were in the police
22 station?
23    A.   Police calls.
24    Q.   Anything referring to you?

218

1     Q.   Okay.  And then what's the next thing
2  that happened?
3     A.   Kind of sat there and --
4     Q.   Okay.
5     A.   At some point during the process, you
6  know, Sergeant Verta might have been coming and
7  going, and then I think Sergeant Price from
8  internal affairs arrives.
9     Q.   When you first saw Sergeant Price, was
10 that in the interview room?
11    A.   He may have stopped by the watch
12 secretary's desk, but I think he -- when he
13 arrived, he kind of walked right into the interview
14 room.  I'm not sure.
15    Q.   I am only asking when you first saw
16 him, were you in the interview room?
17    A.   Yes.
18    Q.   And when Sergeant Verta was again
19 coming back and forth in the interview room, do
20 you remember any conversation you had with him?
21    A.   Well, other than the ones I've already
22 mentioned?
23    Q.   Right.
24    A.   I -- no.  My memory is exhausted at

220

1  this point.
2     Q.   Okay.  So at this point right before
3  Sergeant Price comes to walk into the interview
4  room when you see him the first time, you had
5  wanted to come to the 9th District, and you wanted
6  to give a sobriety test, correct?
7     A.   Yes.  I wanted to prove my innocence.
8     Q.   And you would agree at least up to this
9  point where Sergeant Price -- right before he walks
10 in the door, you were still not under arrest?
11    A.   You know, I don't think so but, you
12 know, could be questionable.
13    Q.   I'm asking what you think.
14    A.   I don't think so, but it angered me
15 that they were going to impound my vehicle.  I
16 mean --
17    Q.   I understand that.  I am just talking
18 about whether or not you felt that you were under
19 arrest.
20    A.   At that point I don't think so.
21    Q.   So Sergeant Price comes into the
22 interview room.
23         Do you have a conversation with him?
24    A.   Yes.

221

1     A.   I don't think so.
2     Q.   Did you hear Sergeant Verta come on the
3  air and make that reference to your car being
4  impounded before or after you had requested to go
5  to the bathroom?
6     A.   I'm really not sure.
7     Q.   When you requested to go to the
8  bathroom, how did you do it?  Did you open the door
9  and make the request?  What happened?
10    A.   I was led -- I was led to a bathroom
11 down the hallway, and it was the desk officer that
12 led me there who may be this watch secretary, and
13 he stood guard outside my bathroom door.
14    Q.   It was a he?
15    A.   Yes.
16    Q.   Okay.  You don't know his name?
17    A.   No.
18    Q.   Do you know what race he is?
19    A.   I think he was Caucasian.
20    Q.   And then you went to the bathroom?
21    A.   Yes.
22    Q.   And then what happened?
23    A.   He escorted me back to this room that I
24 referred to as the interview room.

219

**Page 238**

1  if you want to?
2  A.  No.
3  Q.  That's what I'm getting at.
4      Do you have to give the four tests,
5  the horizontal gaze nystagmus test, the walk and
6  turn, the one-legged stand, the finger to nose,
7  before you give the Breathalyzer?
8  A.  Oh, you should.
9  Q.  Okay.  That's what I'm getting at.
10     Is that typically what you would do?
11  A.  Yes.  And I can't give the HGN test
12  because I'm not certified in it.
13  Q.  What is the HGN test?
14  A.  That's where the person looks at a --
15  either a pen or a straight pointer, for lack of a
16  better word, and they go from left to right and
17  see if there is any -- what they refer to as a
18  nystagmus in the person's movement which is called
19  by alcohol impairment.
20  Q.  So when you went to the processing
21  area, who went with you?
22  A.  Officer Kral and Officer Madsen.
23  Q.  Anybody else?
24  A.  No.

**Page 240**

1  administratively.  I mean, this is -- those are
2  procedures that are pursued for criminal charges.
3  Q.  So would it be fair to say that you do
4  not know what the procedures are administratively
5  in terms of allegations of drinking and driving?
6  A.  That would be fair to say, yes.
7  Q.  Okay.
8  A.  I am aware that they can order you to
9  blow into the machine administratively.
10  Q.  And they may be able to do -- order you
11  to do more things.  You just don't know?
12  A.  That's correct.
13  Q.  So going back to the -- did they
14  perform the HGN test on you?
15  A.  Yes.
16  Q.  Did they perform the walk and turn test
17  on you?
18  A.  Yes.
19  Q.  Did they perform the one-legged stand
20  test?
21  A.  Yes.
22  Q.  And the finger to nose?
23  A.  Yes.
24  Q.  And you told me before that Sergeant

**Page 239**

1  Q.  And what happened when you got to the
2  processing area?
3  A.  I was offered by Officer Madsen if I
4  wanted to take the standard field sobriety tests.
5  Q.  And I assume you said yes?
6  A.  Yes.
7  Q.  Because you actually -- that's why you
8  wanted to go to the 9th District in the first
9  place, right?
10  A.  No.  I wanted to blow immediately into
11  the machine as the administrative part of the
12  investigation to clear my name and prove my
13  innocence and, you know, kill the CR number and
14  make sure the sergeant didn't get in trouble.
15  Q.  Well, you would agree that, in terms of
16  the administrative part of the test, that if the
17  person conducting the administrative part of the
18  test wanted to do the HGN test, the walk and turn
19  test, the one-legged stand test, and the finger and
20  nose test, they can certainly ask the officer to do
21  that, right?
22  A.  Administratively?
23  Q.  Yes.
24  A.  I don't know what they do

**Page 241**

1  Verta had asked you if you wanted to do the field
2  sobriety tests, right?
3  A.  Yes.
4  Q.  That's back when you are in the
5  processing room?
6  A.  No.
7  Q.  I'm sorry.  In the interview room --
8  A.  Interview room.
9  Q.  -- right?
10  A.  Yes.
11  Q.  And you said yes, but you want to take
12  your --
13  A.  No, I didn't say yes.
14  Q.  I thought you said you want to take
15  your gear off.
16  A.  I said something to the effect that not
17  with all this gear on.  It wouldn't be fair.
18  Q.  Okay.  I took that answer to imply that
19  you wanted to, but you wanted to get your gear off?
20  A.  Well, I -- I would have taken them,
21  but, yeah, I mean, not with -- for some reason I
22  thought he wanted me to do it with all the gear on
23  and with my gun on, and it wouldn't have been fair.
24  Q.  All right.  So just let me ask the

1  simple question.
2       You wanted to do the field sobriety
3  test?
4       A.  If -- if -- yes.
5       Q.  Okay.  And obviously to do that, you
6  wanted to make sure that you didn't do it with your
7  gun or any of your other equipment on you?
8       A.  Correct.
9       Q.  Okay.  And you passed all those four
10  field sobriety tests?
11       A.  After I was arrested, yes.
12       Q.  And when you did the field sobriety
13  tests, you did not have your gun or your gear on?
14       A.  That's correct.
15       Q.  Who is -- which officer conducted the
16  four field sobriety tests?
17       A.  Officer Madsen.
18       Q.  Okay.  And what happened after -- at
19  the conclusion of the sobriety tests?
20       A.  I was instructed back to the bench,
21  which was on the other side of a steel grate, and I
22  had to wait, and Officer Kral and Madsen started to
23  do their paperwork, and I was waiting for the
24  20-minute waiting period, and then they offered me

242

1  the Breathalyzer test.
2       Q.  The bench that you were sitting on,
3  where was that?
4       A.  It was on the other side of -- where
5  the prisoners sit, where you would put prisoners.
6       Q.  Was it still in what you would call the
7  processing room?
8       A.  Yes.
9       Q.  Okay.  Were there any prisoners next to
10  you when you were sitting on that bench?
11       A.  Not next to me.  In close proximity.
12       Q.  When you say close proximity, what do
13  you mean?
14       A.  Two -- two stations or booths away and
15  then there was one or two guys in a -- they weren't
16  booths.  It was like a holding cell.
17       Q.  I guess I'm having a hard time
18  visualizing the booths you're talking about.
19       What do you mean by booths?  Here,
20  do you want a piece of paper?
21       A.  Yeah.  Oh, this would work.
22       Q.  I'll just make it easy so we know what
23  we're talking about.
24       A.  This is a steel mesh grate that goes up

243

1  so high, maybe four or five feet, and then there's
2  glass at some point, and it's a partition.
3       And on one side is where the
4  officers have seats and a computer to process
5  prisoners, and then there's this partition, and
6  then you're on -- the prisoner is -- the arrestee
7  is on the other side.  And there's handcuff rings,
8  and there's a stool, and typically an arrestee
9  would be handcuffed to the steel ring, and you're
10  there (indicating).
11       Q.  So were there any arrestees sitting on
12  the same bench as you at any time?
13       A.  They're not benches.  They're seats or
14  stools and, you know, there's -- this is one
15  station, and then there's like a partition, and
16  then there's another section and then another --
17  there's like seven of them in a room, eight, and
18  there were -- there was a Hispanic prisoner two
19  stations away from me, and then around the corner
20  there was a giant holding cell with long benches on
21  both sides, and there's an open cement floor, and
22  then there's a giant steel door.
23       Q.  Did -- so if I'm understanding what
24  you're saying, there were no prisoners on the same

244

1  stool as you?
2       A.  That's correct.  There was a prisoner
3  two booths away from me.
4       Q.  Okay.  And were you ever handcuffed at
5  any time that day?
6       A.  No.
7       Q.  Did any of the prisoners say anything
8  to you at any time when you were in the police
9  station?
10       A.  They were kind of laughing and
11  chuckling.  I don't think they verbalized anything,
12  but Officer Madsen kind of took me away from those
13  prisoners to do the standard field sobriety tests
14  because maybe they were laughing and it was
15  embarrassing and degrading.
16       Q.  You would agree that when you're in the
17  police station in the 9th District, none of the
18  prisoners actually said anything to you?
19       A.  Not that I heard.
20       Q.  Okay.  And you said that Officer Madsen
21  and Officer Kral at some point moved you away from
22  some of the prisoners when they -- when the field
23  sobriety tests were done?
24       A.  I think Officer Kral kind of like, you

245

1  know -- kind of moved his head, and I think Officer
2  Madsen kind of understood that to take me away from
3  the prisoners a short distance so they can, you
4  know, see, you know, me.
5      Q.  Do the field sobriety tests?
6      A.  Or just see me in general, I think.
7      Q.  Okay.  Would you agree that you don't
8  know the location that you would have been placed
9  if the field sobriety test was done for
10 administrative purposes only?
11     A.  Please restate that.
12     Q.  Yes.  If the field sobriety test was
13 done for administrative purposes only, you don't
14 know where that would have taken place?
15     A.  It would be a fair assessment, fair
16 thing to say.
17     Q.  Same question for the Breathalyzer:  If
18 that was done for administrative purposes only, you
19 don't know where that would have taken place?
20     A.  That would be fair.
21     Q.  After Officer Madsen and Kral did their
22 paperwork, what's the next thing that happened?
23     A.  Well, they were working on their
24 paperwork after I took the standard field sobriety

246

1      Q.  And when you gave the Breathalyzer, do
2  you believe that you were in an area where other
3  prisoners could not see?
4      A.  No.  There was prisoners there.
5      Q.  I know there were other prisoners
6  there, but were you able to see the other prisoners
7  when you --
8      A.  Yes.
9      Q.  You have to let me get the question
10 out.
11     A.  Okay.
12     Q.  Were you able to see the other
13 prisoners when you gave your Breathalyzer test?
14     A.  Yes.
15     Q.  Do you know if they were looking at you
16 when you were giving the Breathalyzer test?
17     A.  I do not.
18     Q.  Did any of the prisoners say anything
19 to you at any time when you were giving the
20 Breathalyzer test?
21     A.  No.
22     Q.  Did you hear any laughing during the
23 time that you were giving the Breathalyzer test?
24     A.  Not that I recall.

248

1  tests, and a waiting period elapsed, and I was
2  offered to take the Breathalyzer.
3      Q.  And when you were offered to take that,
4  what was your response?
5      A.  I said yes.
6      Q.  That's something you wanted to do even
7  when you were back at the scene, right?
8      A.  Yes.
9      Q.  Who administered --
10     A.  However, I would like to say that I
11 believed it would be under the administrative
12 aspects as opposed to being arrested as an
13 arrestee.
14     Q.  Who conducted the Breathalyzer?
15     A.  Officer Madsen.
16     Q.  And the results were zero?
17     A.  .000.
18     Q.  Who was present -- oh, by the way,
19 where was the Breathalyzer test conducted?
20     A.  In the processing area at the 9th
21 District.
22     Q.  Same area where the field sobriety
23 tests were conducted?
24     A.  In close proximity.

247

1      Q.  After the Breathalyzing -- Breathalyzer
2  test, what's the next thing that happened?
3      A.  Officer Madsen indicated the results
4  and brought me back to the other side -- the other
5  side of -- or where I was sitting before, and they
6  continued to do the paperwork, and there was a
7  short conversation.
8      Q.  Short conversation between who?
9      A.  I remember Officer Kral typing away,
10 and I imagine it was my arrest report, and at some
11 point he asked me, Can I ask you a question?
12         And I said, You can ask, but I might
13 not answer it.
14         He said, Why didn't you just give
15 the sergeant the bottle?
16         And I said, Because I believe in the
17 Constitution.
18         And he laughed at me.
19     Q.  Anything else during that conversation?
20     A.  No.
21     Q.  Did you have any other conversation at
22 that time with anyone else?
23     A.  Prior -- prior to this and it may have
24 been after the standard field sobriety tests, I may

249

Case 1:12-cv-02353   Document 35-2   Filed 02/15/13   Page 28 of 35   PageID 177
Case: 13-1985      Document: 5-3      Filed: 05/23/2013      Pages: 115

65 (Pages 254 to 257)

1    A.   I believe so.
2    Q.   Okay.  So if someone is arrested and
3  then you have to get charges approved, right?
4    A.   No, not all the time.
5    Q.   Okay.  Well, in this case you agree
6  that you were not charged with driving under the
7  influence?
8    A.   This document indicates that there are
9  two charges on here.
10    Q.   I am not talking about the traffic
11  citation.  That's why I said the DUI.
12    A.   Well, I see right here that Charge
13  No. 1 is IVC, driving under the influence of
14  alcohol.
15    Q.   Right.  That's my question.
16        You agree that you were not charged
17  with driving under the influence of alcohol?
18    A.   I did not have to go to a court for
19  that specific charge.
20    Q.   I understand that, but that's not my
21  question, though.
22        You mentioned to me that you know --
23  as a police officer, you know what -- when someone
24  is charged with an offense and when someone is not

254

1  charged, I assume?
2    A.   Well, if I do an arrest report and I
3  put some charges on that arrest report, I deem that
4  as being charged.
5    Q.   Is that what you believe -- when
6  someone is charged with an offense, you think
7  simply by putting that --
8    A.   Yeah.  They're under arrest.
9    Q.   You have to let me -- but I am not
10  talking about arrest.  That wasn't my question.
11        My question -- I didn't ask if you
12  were arrested.
13        My question is:  Do you believe that
14  you were charged with the offense of driving under
15  the influence of alcohol?
16    A.   Not only do I believe I was charged
17  with that offense, no matter how briefly it may
18  have been, I was also arrested and in my mind
19  falsely for that charge.
20    Q.   But I am not talking about arrest.  I
21  am talking about charged.
22        So you believe that you were charged
23  with driving under the influence?
24    A.   No matter how briefly, yes.

255

1    Q.   What is the basis of your belief that
2  you were charged with the offense of driving under
3  the influence?
4        And I am not talking about arrested.
5  I'm talking about charged.
6    A.   Because it appears on my arrest report
7  and I was arrested and informed of my arrest before
8  any probable cause or in my mind reasonable
9  suspicion took place to either formulate a proper
10  arrest or charging.
11    Q.   We are talking about two different
12  things.
13    A.   I guess we are.
14    Q.   So I am -- so I am not talking about
15  arrest.  So that's not my question.
16    A.   Okay.
17    Q.   My question is only to the charge, so
18  not the arrest.
19    A.   Okay.
20    Q.   Do you believe that you were charged
21  with driving under the influence of alcohol?
22    A.   Officer Kral, who I believe did my
23  arrest report, had to physically place charges on
24  my arrest report, and because that occurred, I

256

1  believe I was charged with the offense of DUI.
2    Q.   Have you ever arrested someone for a
3  DUI but that person was not later charged with a
4  DUI?
5    A.   I believe that may have occurred.
6    Q.   When that did occur, did you fill out
7  an arrest report?
8    A.   That may have occurred.
9    Q.   And when you filled out the arrest
10  report, did you put the charge of driving under the
11  influence on the arrest report?
12    A.   Yeah, that may have occurred.
13    Q.   And how many times has that occurred?
14    A.   It's very rare.
15    Q.   So in that case where you arrested
16  someone for a DUI, you generated an arrest report
17  and you put the charge of a DUI on the arrest
18  report, that person was not actually charged with a
19  DUI?
20    A.   That may have occurred.
21    Q.   So why is it in your case that you
22  believe because there was an arrest report and that
23  the charges of a DUI are on the arrest report, why
24  do you believe that that means that you were

257

Case 1:12-cv-02353   Document 35-2   Filed 02/15/13   Page 29 of 35   PageID 178
Case: 13-1985      Document: 5-3      Filed: 05/23/2013      Pages: 115

66 (Pages 258 to 261)

1 charged with a DUI?
2     A.   Because in this instance it was done
3 improperly.
4     Q.   Any other reason?
5     A.   At this time I can't think of any.
6     Q.   The time where you arrest someone for
7 a DUI and then filled out the arrest report and put
8 on the arrest report the charge of -- or the
9 offense of DUI, when did that happen?
10    A.   The specific incident that I believe
11 that may have happened occurred -- I think it was
12 in the 5th District, maybe three, four years ago.
13 I'm not certain of the time period, but I remember
14 the person failed miserably the standard field
15 sobriety tests and did take a Breathalyzer, which
16 registered, I think, .04 or .05, and the person had
17 indicated to me after the field sobriety tests were
18 given that he was sick, physically sick, and after
19 conducting a proper investigation, he was released
20 without charging.
21    Q.   When you released him without
22 charging --
23    A.   I didn't release him without charging.
24 The watch commander does that.

258

1     Q.   When he was released without charging,
2 did it state on top of the arrest report like it
3 states on yours, status completed, release without
4 charging?
5     A.   I -- I don't know because that -- I
6 think that process occurs if the arrest report is
7 printed out after that fact occurs, and I don't
8 think I would print out that person's arrest report.
9     Q.   You think the fact that it says status
10 completed, release without charging, that's put on
11 there when this arrest report is already printed
12 out?
13    A.   No, when -- after that occurs.  If you
14 were to print that person's arrest report, based on
15 his CB number, then I think that that may print at
16 the top of that person's arrest report.
17    Q.   Oh, so, in other words, in your
18 situation had you printed out -- I know you didn't,
19 but had you printed out his arrest report, you
20 believe it would have said status completed,
21 release without charging?
22    A.   If -- these arrest reports continually
23 evolve as they add things to the program.
24        So I'm assuming that that portion of

259

1 the program was in effect.  I don't know.
2     Q.   That was in effect at least the time
3 that -- on the date of your incident?
4     A.   I believe so.
5     Q.   And you would agree that if you
6 arrested someone for a DUI and then went to
7 the police station and then they passed the
8 Breathalyzer, there would still be an arrest report
9 that's generated because the person was arrested,
10 right?
11    A.   Can you repeat that?
12    Q.   Sure.  If you arrest someone for a DUI,
13 you bring them into the station and then they do a
14 Breathalyzer or whatever test where it's determined
15 that that person is not going to be charged with a
16 DUI, there is still an arrest report that's
17 generated with the charge -- with the offense of a
18 DUI on the arrest report?
19    A.   There should be.
20    Q.   All right.  So you wouldn't let someone
21 leave the station without an arrest report?
22    A.   There should be an arrest report.  I
23 mean, is it done in every instance?  I can't speak
24 for other people but --

260

1     Q.   But it should be done?
2     A.   It should be done.
3     MR. JEBSON:  This will be 5, please.
4         (Deposition Exhibit No. 5,
5          Witness Seiser, was marked for
6          identification 08/14/2012.)
7 BY MR. JEBSON:
8     Q.   You have been handed Deposition
9 Exhibit 5.
10        You have seen that before?
11    A.   I believe so.
12    Q.   This is a copy of your traffic citation
13 for having an open container of alcohol with a
14 broken seal?
15    A.   Yes.
16    Q.   That is -- you were issued that
17 citation; is that right?
18    A.   I was.
19    Q.   And that's the only traffic citation
20 you were issued?
21    A.   Yes.
22    Q.   And that's the only thing that you
23 had -- you were required to go to court for?
24    A.   Yes.

261

1 was kind of upset because in my mind I -- at that
2 point things were going from bad to worse, and I
3 think I was being railroaded.
4     Q.   All right.  So now we're back to -- you
5 said the first time you found out that the arrest
6 for the DUI -- that that was not going forward is
7 when you were given the traffic citation?
8     A.   The criminal aspect?
9     Q.   Right.
10    A.   Yes.
11    Q.   What happened first?  Were you given
12 the citation for the -- the traffic citation for
13 having an open alcohol container with a broken
14 seal, or were you first asked to sign a consent to
15 search your vehicle by Cochran and Price?
16    A.   To the best of my recollection, I think
17 I was taken back to the interview room and
18 presented with this consent to search form of my
19 vehicle.
20    MR. JEBSON:  Mark this -- is it 5 or 6?
21    THE REPORTER:  6.
22    MR. FLAXMAN:  6.
23    MR. JEBSON:  6.  There you go.
24
                                              266

1     (Deposition Exhibit No. 6,
2         Witness Seiser, was marked for
3         identification 08/14/2012.)
4 BY MR. JEBSON:
5     Q.   You have been handed Deposition Exhibit
6 No. 6.
7         Is that the consent to search that
8 was -- minus the confidential stamp that we have on
9 here, was that the form that was given to you by
10 Sergeant Price and Sergeant Cochran?
11    A.   It appears to be.
12    Q.   And when -- that was given to you when
13 you were in the interview room?
14    A.   Yes.
15    Q.   And when it was given to you, was it
16 just Sergeant Cochran and Price that were present?
17    A.   I believe so.
18    Q.   And did it have the words
19 administrative written on top like it --
20    A.   I don't -- I don't remember that.
21    Q.   Okay.
22    A.   It may have.  It may not.  I don't
23 remember.
24    Q.   All right.  Was it your understanding
                                              267

1 when Sergeant Price and Sergeant Cochran had given
2 you the consent to search that that related to the
3 administrative parts of the investigation?
4     A.   No, I don't think so.
5     Q.   Did you know one way or the other?
6     A.   I'm not sure.  I remembered them -- I
7 remembered asking them if I had to sign this, and
8 they said, No, you don't have to sign it.
9         And then I think I asked them if --
10 the next question was could I be fired from my job
11 for not signing this.
12    Q.   And what did they say?
13    A.   I think they said they don't think so.
14    Q.   Do you remember any other -- anything
15 else in that conversation?
16    A.   Well, after -- after I read it and I
17 made a decision not to sign it, that's when they
18 presented me with another document, and this was a
19 written order to -- a written order to open up my
20 car and hand over the bottle and its contents.
21    (Deposition Exhibit No. 7,
22         Witness Seiser, was marked for
23         identification 08/14/2012.)
24
                                              268

1 BY MR. JEBSON:
2     Q.   You have been handed Deposition Exhibit
3 No. 7.
4         Is that the order that was handed to
5 you by Sergeant Cochran and Sergeant Price when you
6 were in the interview room after you refused to
7 sign the consent to search?
8     A.   It appears to be.
9     Q.   Did you sign this document?
10    A.   Yes, I did.
11    Q.   When Sergeant Cochran and Sergeant
12 Price gave you this document, was there a
13 conversation between you and the two sergeants?
14    A.   I don't recall.  It was pretty
15 clear-cut to me that if I didn't sign this, I would
16 probably be fired.
17    Q.   Why did you say it was clear-cut?  Was
18 that based on something that they said to you, or
19 was it based on what you read?
20    A.   I don't remember.  They may have.  I
21 don't remember.
22    Q.   Well, when you were given Deposition
23 Exhibit No. 7 when you were in the interview room,
24 did you read it?
                                              269

1   from my vehicle.
2        Q.   And we'll get to that in a second, but
3   my only question now is:  Do you remember -- what
4   do you remember happening first, you signing
5   Exhibit No. 7 or you getting the traffic ticket?
6        A.   My best recollection is that I believe
7   I signed this Exhibit No. 7 and then was given this
8   traffic citation.
9        Q.   Do you remember how much time passed
10  between the two?
11       A.   I do not.
12       Q.   After you signed the direct order,
13  Exhibit 7, what's the next thing that happened?
14       A.   I think I stayed in that interview room
15  while all the sergeants talked for a while.
16            And then I think I went with
17  Sergeant Verta and Sergeant Price and Sergeant
18  Cochran, and we went back to where my car was
19  parked on Union.  And I opened up the car and
20  retrieved the bottle from my front seat because
21  of this direct order, and I handed the bottle to
22  somebody who then handed that bottle to Sergeant
23  Cochran.
24            And he opened it and kind of swirled

274

1   it around and smelled it, and I think he looked at
2   it a little bit, and then he made the statement
3   that it appears to be water.
4        Q.   That happened at the -- near 50th and
5   Union where your car was?
6        A.   Where my car was, yeah.
7        Q.   Did you ever go back to the 9th
8   District after that?
9        A.   Yes.
10       Q.   Okay.  Were you issued the traffic
11  ticket before you went to where your car was to get
12  the bottle inventoried?
13       A.   It may have.  I think I got it when I
14  got all the paperwork, the I-bond, and I think I
15  was presented with the ticket, and I think I was
16  presented with the -- my copy of the inventory of
17  my bottle.
18       Q.   When you said that the sergeants were
19  talking while you were in --
20       A.   I think -- I think they were, you know,
21  talking to make plans to go back to my car.
22       Q.   I still have to get the question out.
23       A.   Okay.  I'm sorry.
24       Q.   That's okay.  When you said you were in

275

1   the interview room, you said you heard the
2   sergeants talking.
3            Were you able to hear what they were
4   talking about?
5        A.   No.
6        Q.   So then after they were talking, that's
7   when you went with -- you went back to where your
8   car was?
9        A.   Yes.
10       Q.   And who did you go with to get to that
11  area?
12       A.   I think it was Sergeant Verta.
13       Q.   Just you and Verta?
14       A.   No.
15       Q.   I mean in the car.
16       A.   If I went with Sergeant Verta, it was
17  just me and him.  I believe it was him.
18       Q.   So when you get to the scene, that's
19  when your car door is opened, the bottle is taken
20  out, and the contents are inventoried.  Is that
21  true?
22       A.   No.
23       Q.   What did I get wrong?
24       A.   The contents were inventoried in the

276

1   9th District station by Sergeant Cochran.
2        Q.   Oh, so when --
3        A.   The bottle was retrieved by me out of
4   my car.  I handed the bottle to somebody.  It may
5   have been Sergeant Price, and then I think Sergeant
6   Price handed it to Sergeant Cochran, and it was,
7   you know -- swirled it around or opened it and then
8   swirled it around and then kind of like smelled it
9   and made that statement.
10            And then the bottle was secured in
11  Sergeant Verta's vehicle, and we all went back to
12  the 9th District station.
13       Q.   When the bottle was taken out of your
14  car, do you have any reason to believe that --
15  well, strike that.
16            Do you have any reason to believe
17  that anyone tampered with your bottle from the time
18  that you left your car with Verta to go to the 9th
19  District until you got back to where your car was
20  with Sergeant Verta?
21       A.   I don't believe so.
22       Q.   You don't believe anyone tampered with
23  it?
24       A.   No, I don't think so.

277

1      Q.   Do you believe that that bottle was
2  tampered with by anyone at any time?
3      A.   I don't think so.
4      Q.   So when the bottle is taken back to
5  the 9th District, is that when the liquid was
6  inventoried?
7      A.   Yes.
8      Q.   And you saw the liquid being poured
9  into whatever it was to be inventoried?
10     A.   A little vial, yes.
11     Q.   And the liquid that was poured from the
12  bottle, that -- the liquid that was in the bottle
13  was in that bottle when you put it in the car for
14  the last time?
15     A.   Say that again.
16     Q.   Sure.  I just want to make sure that
17  you're not saying that the liquid that was taken
18  out of the bottle was not the liquid that was in
19  the bottle when you put it in your car at the last
20  time.
21          Do you follow what I'm saying?
22     A.   No.
23     MR. FLAXMAN:  We will stipulate that --
24     MR. JEBSON:  Okay.

                                    278

1  Price.
2      Q.   Did anyone say anything in response to
3  that?
4      A.   No, not that I recall.
5      Q.   You didn't say anything?
6      A.   No, I don't think so.
7      Q.   All right.  So now we're back at the
8  9th District.  The water is put into the vial.
9      A.   I have to initial the tamper-resistant
10  tape and the evidence bags and all that.
11     Q.   Okay.  What happens after that?
12     A.   I think I'm given my traffic ticket,
13  the inventory copy of the bottle, and an I-bond or
14  my portion of the I-bond that I had to sign.
15          And then I think Sergeant Verta --
16  at some point I am given back my weapon, I think,
17  by Sergeant Cochran in a police envelope, and it's
18  unloaded.
19          And, you know, I asked them I'd like
20  to load it, and I think at that point -- or at some
21  point Sergeant Verta leads me down the hallway up
22  to the second floor where they have -- I'll call it
23  a gun box which has Kevlar, which is bullet
24  resistant, and you can put your weapon in there and

                                    280

1      MR. FLAXMAN:  -- the water that was in the
2  bottle was the water that was tested at the crime
3  lab.
4      MR. JEBSON:  Okay.
5  BY MR. JEBSON:
6      Q.   So you get back to the 9th District.
7           After the water is put in the vial,
8  what's the next thing that happens?
9      A.   Sergeant Cochran inventories it and
10  goes onto the computer and does that part of the
11  inventory.
12          I see him put tamper-resistant tape
13  on it, and inventory bags are filled out, and then
14  it's -- the computer work is approved by the desk
15  sergeant, and the property is secured.
16     Q.   When you -- going back to when you went
17  back to get the bottle out of your car, you said
18  that at one point Sergeant Cochran said something
19  about water?
20     A.   Yeah.
21     Q.   What did he say?
22     A.   It appears to be water.
23     Q.   And who is present when he said that?
24     A.   Myself, Sergeant Verta, and Sergeant

                                    279

1  load it properly.  In case there's an accidental
2  discharge, nobody would be hurt.
3      Q.   Were you given back your gun before you
4  went to your car to retrieve the bottle?
5      A.   No.
6      Q.   So it was after you came back?
7      A.   Yes.
8      Q.   Did anyone ever take your badge?
9      A.   My badge was on my vest.  So when
10  Officer Kral and Madsen were there and they said
11  take off all your gear, we're going in back, that's
12  probably when my star was taken.
13     Q.   Did anyone ever say to you I want you
14  to give me your star?
15     A.   Captain Johnson may have requested
16  that.
17     Q.   I don't want you to guess, though.
18          So my question is:  Do you remember
19  anyone ever requesting your star?
20     A.   I think it was Captain Johnson
21  initially.
22     Q.   He asked you for your star?
23     A.   Gun and -- I think he said gun and
24  star.

                                    281

Case 1:12-cv-02353 Document 35-2 Filed 02/15/13 Page 33 of 35 PageID 182
Case: 13-1985 Document: 5-3 Filed: 05/23/2013 Pages: 115

72 (Pages 282 to 285)

1    Q.    And what did you -- did you respond to
2 anything in terms of the star?
3    A.    You know, if he said that, you know --
4 I remember the gun because I asked if it was to be
5 turned over loaded or unloaded, and I think he may
6 have said star.  I --
7    Q.    But you're not sure?
8    A.    I'm not sure.
9    Q.    Okay.  You would agree that you were
10 never stripped of your police powers?
11    A.    Well, I mean, what does that actually
12 mean?
13    Q.    What does it mean to you?
14    A.    Losing your gun and your star and, you
15 know -- was I stripped?  Yes.  And I would argue
16 that I was because I was arrested.
17    Q.    Did anyone tell you you are being
18 stripped of your police powers?
19    A.    No, but to me it was quite obvious.  So
20 it didn't have to be spoken.
21    Q.    But no one ever said you're being
22 stripped of your police powers?
23    A.    It wasn't spoken, but through their
24 actions it was quite obvious to me.
                                                    282

1 ticket?
2    A.    Yes, sir.  This was Exhibit 5.
3    Q.    What happened at court?
4    A.    I met Mr. Flaxman, and my case was
5 called.  And Mr. Flaxman explained to the judge
6 that there wasn't any alcohol in this container.
7 Therefore, it's not an alcohol container, and the
8 ticket was tossed out.
9    Q.    Was there -- was Officer Kral or
10 Madsen -- did you see them at the court call?
11    A.    I saw Officer Madsen.
12    Q.    Did he say anything to -- did you hear
13 him say anything to anyone regarding this case?
14    A.    At that -- in court?
15    Q.    Or after court or before court.
16    A.    No, I don't -- in fact, I don't even
17 think he stood up when the case was called.
18    Q.    Okay.  Is that the last involvement
19 you've had with this case other than speaking --
20 meeting with your attorney and coming to this
21 deposition?
22    A.    Would you repeat that?
23    Q.    Sure.  Actually, you gave a statement
24 to IAD, right?
                                                    284

1    Q.    I understand that, but that's a
2 different question.
3        So I just want to -- if you would
4 just answer my question:  Did anyone ever say to
5 you you're being stripped of your police powers?
6    A.    No.
7    Q.    After you were -- when were you given
8 your vest back?
9    A.    Towards the end of the night before I
10 retrieved my weapon or before I loaded my weapon.
11    Q.    Okay.  After the bottle was retrieved
12 from your car and you went back to the 9th District,
13 have you told me about all the conversations that
14 you had -- you would have had with any police
15 personnel?
16    A.    Would you say that again?
17    Q.    Yes.  I want to make sure you have told
18 me about all the conversations you had with any
19 police personnel after the bottle was retrieved
20 from your car and you went back to the 9th District.
21    A.    I believe I have.
22    Q.    Did you go to court?
23    A.    Yes, I did.
24    Q.    And it was whatever date was on the
                                                    283

1    A.    Yes.
2    Q.    Okay.  I'll get to that in a second.
3        Other than giving your statement to
4 IAD, after the court call for your ticket, have you
5 had any other procedures that you had to go to
6 regarding this case?
7    A.    Any other procedures?
8    Q.    That's not the best question, so let me
9 ask a different one.
10        After court for your ticket, were
11 you required to go anywhere to give any statement
12 or do anything regarding this incident?
13    A.    Well, I had yesterday's meeting with
14 Mr. Flaxman.
15    Q.    Other than talking to your attorney.
16    A.    I don't believe so.
17    MR. JEBSON:  Can you mark this as -- where
18 are we at, 8?
19        (Deposition Exhibit No. 8,
20        Witness Seiser, was marked for
21        identification 08/14/2012.)
22    MR. JEBSON:  Might as well do it now, right?
23 I am not going to -- just the ones I need to know,
24 I'm going to ask, and you will get me these
                                                    285

80 (Pages 314 to 317)

1    Q.   Do you have any information that Debra
2  Kirby --
3    A.   But --
4    Q.   Did you finish your answer?  Go ahead
5  if you didn't finish your answer.
6    A.   But if you were asking me did I
7  identify myself as Officer Seiser, I did not.
8    Q.   Do you have any information that Debra
9  Kirby --
10   A.   And I'll say this.
11   Q.   Sure.
12   A.   She was a passenger in that SUV --
13   Q.   Okay.
14   A.   -- not the driver.
15   Q.   Do you have any information that Debra
16  Kirby knows who you are personally?
17   A.   I don't think so.
18   Q.   Have you ever identified yourself to
19  Debra Kirby?
20   A.   Not that I -- no, I don't think so.
21   Q.   Why did you -- why are you suing Debra
22  Kirby in this lawsuit?
23   A.   I believe she ordered my arrest over a
24  telephone.

314

1  name.
2         And my question is:  Do you have a
3  memory of any specific instance where there was a
4  specific discussion about Debra Kirby and this
5  incident?
6    A.   It's quite possible.
7    Q.   But I'm not asking if it's possible.
8         I'm asking if you have a specific
9  memory of one.
10   A.   I believe there is.
11   Q.   Okay.  Tell me about that, please.
12   A.   People have asked me about this
13  incident, and, you know, I would, you know, kind of
14  speak in generalities, and I think her name would
15  come up in the course of the conversations.
16        It's quite possible that a person or
17  persons might have sent me emails, unsolicited
18  emails, regarding this incident, stuff like that.
19   Q.   Do you have those emails?
20   A.   I'm not sure.
21   Q.   I am going to make a request that if
22  you can look for those emails and if you can print
23  them out and give them to your attorney.
24   A.   Okay.

316

1    Q.   Any other reason?
2         You can't look at your attorney when
3  you answer the question.
4    A.   I -- I'm not an attorney, but I don't
5  think so.  I mean --
6    Q.   Do you have -- do you know what
7  information -- assuming that Debra Kirby did order
8  your arrest, do you have any information of what
9  information was provided to Debra Kirby?
10   A.   No.
11   Q.   Have you -- other than speaking to your
12  attorney, have you ever spoken to anyone else
13  regarding Debra Kirby as it relates to this
14  incident?
15   A.   It's possible that people who have
16  asked me about this particular incident may have
17  brought up her name.
18   Q.   Do you remember any specific instances?
19   A.   Would you say that again?
20   Q.   Yep.  I'm trying to figure out:  Are
21  there any times that you spoke about Debra Kirby
22  regarding this incident, her involvement, to anyone
23  other than your attorney?  And I think you said
24  it's possible that someone may have brought up her

315

1    Q.   Do you know the names of any of these
2  individuals that have either emailed or spoken
3  about Debra Kirby as it relates to this incident?
4    A.   I may be able to retrieve or get the
5  email.
6    Q.   As you sit here right now --
7    A.   Or emails.
8    Q.   -- do you know their names?
9    A.   I'm not sure.  I would have to check.
10   Q.   As you sit here right now, do you
11  remember the specific or general conversations
12  about Deb Kirby and this incident, any of those
13  individuals?
14   A.   I think this email may -- may have --
15  may have informed me that this lawsuit was filed,
16  and that email might have had a link to the actual
17  filing of the lawsuit in federal court with a
18  summary.  Is it a summary?
19   MR. FLAXMAN:  You can't ask me.
20   THE WITNESS:  A summary of what was listed
21  with the Court.
22  BY MR. JEBSON:
23   Q.   Anything else you can remember about
24  that?

317

Deposition of MICHAEL SEISER, 8/14/2012

Page 333

1      A.    Correct.

2      MR. JEBSON:  Okay.  That's all the questions

3  I have.

4      MR. FLAXMAN:  We will waive signature.

5      THE VIDEOGRAPHER:  This concludes the

6  deposition of Michael Seiser, end of tape 4.  The

7  time is 6:48 p.m.  Off the record.

8          FURTHER DEPONENT SAITH NOT ...

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Urlaub Bowen & Associates, Inc.  312-781-9586

---

Deposition of MICHAEL SEISER, 8/14/2012

Page 334

1  STATE OF ILLINOIS )
               ) SS:

2  COUNTY OF C O O K )

3

4      I, Suzanne Thalji, a notary public in and
  for the County of Cook and State of Illinois, do

5  hereby certify that MICHAEL SEISER was duly sworn
  by me to testify the whole truth, and that the

6  foregoing deposition was recorded stenographically
  by me and was reduced to computerized transcript

7  under my direction, and that the said deposition
  constitutes a true record of the testimony given by
  said witness.

8

9      I further certify that the reading
  and signing of the deposition was waived by the

10  deponent's counsel.

11      I further certify that I am not a
  relative or employee or attorney or counsel of any

12  of the parties, or a relative or employee of such
  attorney or counsel, or financially interested

13  directly or indirectly in this action.

14      IN WITNESS WHEREOF, I have hereunto set
  my hand and affixed my seal of office at Chicago,

15  Illinois, this 23rd day of August, A.D. 2012.

16

17

18      Notary Public, Cook County, Illinois
      My commission expires May 6, 2016

19      Illinois CSR License 084-002337

20

21

22

23

24

Urlaub Bowen & Associates, Inc.  312-781-9586

# EXHIBIT C

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                   EASTERN DIVISION
 3
 4   MICHAEL SEISER,            )
                     Plaintiff; )
 5                              )
                                )
 6                              )
                                )
 7      -v-                     )No. 12 CV 02353
                                )
 8                              )
                                )
 9   CITY OF CHICAGO and DEBRA  )
     KIRBY,                     )
10                Defendants.   )
11
12
13       The Discovery Deposition of DEBRA KIRBY,
14   taken before Beth C. Radtke, C.S.R. within and for
15   the State of Illinois, pursuant to the provisions of
16   the Federal Rules of Civil Procedure of the United
17   States District Court, pertaining to the taking of
18   depositions, taken at 200 South Michigan Avenue,
19   Suite 200, Chicago, Illinois, commencing at the hour
20   of approximately 11:00 a.m. on the 11th day of
21   December, 2012.
22
23
24
```

Page 2

```
 1                   APPEARANCES
 2
 3   LAW OFFICE OF KENNETH N. FLAXMAN
     By Mr. Kenneth N. Flaxman
 4      200 South LaSalle Street
        Suite 1240
 5      Chicago, Illinois  60604
        312.427.3200
 6      knf@kenlaw.com
        Appeared on behalf of the Plaintiff;
 7
 8   CORPORATION COUNSEL
     By Mr. Scott Jebson
 9      Ms. Lindsey Vanorny
        30 North LaSalle Street
10      Suite 1400
        Chicago, Illinois  60602
11      312.744.4833
        scott.jebson@cityofchicago.org
12      lindsey.vanorny@cityofchicago.org
        Appeared on behalf of the Defendants.
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1                    INDEX
 2
 3   WITNESS:                        PAGE:
 4   DEBRA KIRBY
        Examination by Mr. Flaxman        4
 5      Examination by Mr. Jebson         50
        Further Examination by Mr. Flaxman 64
 6
 7
        EXHIBITS:
 8
        Exhibit No. 1                      6
 9
10                    *****
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1       (Witness sworn.)
 2            DEBRA KIRBY,
 3   having been first duly sworn, was examined and
 4   testified as follows:
 5            EXAMINATION
 6   BY MR. FLAXMAN:
 7      Q.   Could you state your name and spell your
 8   last name, please?
 9      A.   Debra Kirby, K-i-r-b-y.
10      Q.   What's your business or occupation?
11      A.   Police officer.
12      Q.   For how long have you been a police officer?
13      A.   26 years.
14      Q.   Did you start in 1986?
15      A.   Yes, I did.
16      Q.   What's your present position?
17      A.   I am chief of the Bureau of Organizational
18   Development.
19      Q.   What does that mean?
20      A.   That I am the chief in charge of the
21   research and development division, the training
22   academy, and the violence reduction strategy.
23      Q.   How did you get that position?
24           MR. JEBSON:  I'll just object to vague.  If
```

Page 5

1  you understand it, you can answer.
2  BY THE WITNESS:
3      A.   I was appointed to my position by
4  superintendent Gary McCarthy.
5  BY MR. PLAXMAN:
6      Q.   Did you take a test to get that position?
7      A.   For chief, no.
8      Q.   When did you become chief?
9      A.   I was appointed chief sometime in, I
10 believe, May of 2011.
11     Q.   Before becoming chief, what was your
12 position?
13     A.   I was general counsel to superintendent Jody
14 Wies.
15     Q.   Were you ever deputy superintendent of the
16 Bureau of Professional Standards?
17     A.   Yes, I was.
18     Q.   When was that?
19     A.   You're correct.  That was previous to being
20 appointed to chief, so I was appointed to deputy
21 superintendent Bureau of Professional Standards, I
22 believe, in February of 2011.
23     Q.   And what were your job duties as deputy
24 superintendent of the Bureau of Professional

Veritext Chicago Reporting Company
312-442-9087          800-248-3290          847-406-3200

Page 6

1  Standards?
2      A.   At that time I oversaw the Internal Affairs
3  Division, the Education Division, the Office of
4  Management and Accountability, and the inspectors and
5  Auditing Control Division.
6      Q.   Do you know the man sitting to my left,
7  Michael Seiser?
8      A.   I do not know him personally.
9      Q.   Have you ever heard his name other than in
10 connection with this lawsuit?
11     A.   I have no specific recollection of his name
12 other than this.
13     Q.   On March 29, 2011, did you give any orders
14 relating to Officer Seiser?
15     A.   I am not clear about your question, sir.
16     Q.   Well, let me show you what I've marked as
17 Kirby Deposition Exhibit No. 1.  Could you look at
18 it, and is this a form memo that you've seen before?
19     A.   I'm sorry, I don't understand what you mean
20 by form memo.
21     Q.   Is this a to-from subject report that -- of
22 the style used in the Chicago Police Department in
23 March of 2011?
24     A.   Generally it is, yes.

Veritext Chicago Reporting Company
312-442-9087          800-248-3290          847-406-3200

Page 7

1      Q.   Are you familiar with a police sergeant
2  named Matthew Price?
3      A.   Yes, I am.
4      Q.   Have you ever seen Mr. Price's signature?
5      A.   I cannot say that I did.
6      Q.   Okay.  Well, why don't you take a minute to
7  read this exhibit.  Have you had a chance to read the
8  exhibit?
9      A.   Yes, I have.
10     Q.   Do you recall giving any direction on
11 March 29, 2011, relating to Officer Seiser?
12     A.   You're asking a very broad based question
13 and you're asking in reference to this memo.  I did
14 not speak directly with Sergeant Price, but I did
15 have contact with Chief Rivera relative to the
16 incident involving Officer Seiser.
17     Q.   How many contacts with Chief Rivera did you
18 have on March 29, 2011, relating to Officer Seiser?
19     A.   As I sit here today, I believe it was three.
20 It may have been more, it may have been only two.
21     Q.   Do you recall the date -- strike that.  Do
22 you recall the time of the first contact?
23     A.   It was on the afternoon of March 29th.
24     Q.   And was that contact in person or --

Veritext Chicago Reporting Company
312-442-9087          800-248-3290          847-406-3200

Page 8

1      A.   I believe it was, yes.
2      Q.   And where did it take place?
3      A.   As I recall, it was in my office.
4      Q.   Did Chief Rivera come into your office?
5      A.   As I recall today, yes, I believe he came to
6  my office.
7      Q.   Was anybody else there?
8      A.   I don't have a recollection of anybody else
9  being there.
10     Q.   Could you tell us as best you can what he
11 said to you and what you said to him?
12     A.   At the time that Chief Rivera came into my
13 office, and it's not verbatim, but it's to the best
14 of my recollection at this time, was that he
15 identified that we had an incident in the 9th
16 District in which a uniformed officer was observed
17 driving in his personal vehicle drinking from what
18 was believed to be a bottle of alcohol, maybe vodka,
19 that the officer had been observed by at least two
20 civilian witnesses, that there was some sort of a
21 confrontation with one of the witnesses in which the
22 civilian witness is alleging that the officer had
23 alcoholic beverage on his breath or at least the
24 smell of alcohol, that the 9th District had sent a

Veritext Chicago Reporting Company
312-442-9087          800-248-3290          847-406-3200

Page 9

1  supervisor to the scene, and that that supervisor had
2  seen what looked to be a bottle of vodka, I believe
3  is what the chief was saying, inside the officer's
4  car, and that the officer was not allowing the
5  sergeant to retrieve the bottle.  As I sit here
6  today, that's not everything that the chief told me,
7  but to the best of my recollection, that's what it
8  was, inclusive of the fact that at least one of the
9  other civilian witnesses had seen the officer
10  drinking from the bottle.
11      Q.   What did you say to the chief?
12      A.   At that time I told Chief Rivera that, well,
13  the 9th District is to process this criminally, we've
14  got a DUI here, and that the IAD was to handle it
15  administratively once the criminal processing was
16  done.  I believe that there was some discussion over
17  the bottle being locked in the vehicle, and I said
18  that the bottle could be retrieved search instant to
19  arrest.
20      Q.   And did you say anything else?
21      A.   As I sit here today, I may or may not have
22  said anything else, but as I said, I remember Chief
23  Rivera giving me a rundown of what happened and
24  identifying that the 9th District would handle it as

Page 10

1  would IAD from the administrative.
2      Q.   Did you ever tell Chief Rivera in that
3  conversation that the officer was to be charged
4  criminally for driving under the influence?
5      A.   I don't know if I said that specifically in
6  that regard, but it really wasn't an issue at that
7  time.  Based on what Chief Rivera told me, there was
8  a mutual understanding that the officer was to be
9  charged as a DUI based on the totality that he
10  explained to me.
11      Q.   Okay.  You used the initials DUI.  What does
12  that mean?
13      A.   Driving under the influence.
14      Q.   And that's a violation of Illinois law, is
15  that right?
16      A.   Correct.
17      Q.   Does that require -- what do you have to do
18  to commit a DUI?
19           MR. JEBSON:  Objection, incomplete       .
20  hypothetical.
21           THE WITNESS:  I'm sorry, I didn't
22  understand --
23  BY MR. FLAXMAN:
24      Q.   What was it in the facts that Chief Rivera

Page 11

1  related to you that caused you to believe that the
2  officer had committed a DUI?
3      A.   Well, as the information was related to me,
4  I had an officer in uniform driving in his personal
5  vehicle observed drinking from a bottle of alcohol,
6  or what was believed to be alcohol, that there was a
7  confrontation with a civilian witness who stated that
8  they smelled alcohol on the officer's breath and we
9  also had the sergeant who observed the bottle inside
10  the officer's vehicle.  There may have been more
11  information that was relayed to me, but that
12  basically puts in summary, that and the fact that the
13  officer was observed drinking from that bottle while
14  driving.
15      Q.   Did Chief Rivera tell you that the sergeant
16  had not been able to detect the odor of an alcoholic
17  beverage?
18      A.   I don't recall that in the conversation I
19  had with the chief initially.
20      Q.   Did Chief Rivera tell you that the sergeant
21  had not heard any slurred speech from the officer?
22      A.   That was not relayed to me, no.
23      Q.   Did Chief Rivera tell you that the sergeant
24  had not observed any indicia of intoxication in his

Page 12

1  contacts with the officer?
2      A.   That was not relayed to me.
3      Q.   When you said that the vehicle could be
4  searched instant to an arrest, could you explain what
5  you meant by that?
6      A.   That means it could be searched incident to
7  an arrest, but basically there was some question
8  about whether or not the bottle of alcohol could be
9  retrieved, and at that time, I said if there is a
10  criminal charge, then upon inventorying the vehicle
11  or impounding the vehicle, there would be an
12  inventory of the contents of the vehicle, which would
13  include the bottle.
14      Q.   Now did you do or say anything to Chief
15  Rivera that indicated that it was your decision that
16  the officer should be charged criminally for driving
17  under the influence?
18      A.   I didn't use any specific terminology, but
19  in telling my chief that the officer was to be
20  charged with -- or the 9th District was to be
21  handling the criminal incident and IAD was to handle
22  the administrative, implicit in that direction was
23  that the officer would be charged.
24      Q.   Did you ever learn -- well, do you know of

Page 17

1   with specific directives in that regard.  I do know
2   there's certain limitations on taking of photographs,
3   that type of issue, but again, there's -- there's
4   practice and then there's what some directives
5   address.
6        Q.   Do you recall what information was
7   communicated to you in that e-mail you just
8   described?
9        A.   I don't have the e-mail in front of me, but
10  basically it was identified that the officer was not
11  relieved of powers.  I believe it was relayed that
12  the officer was not charged with a DUI, and that
13  they're not certain, but the bottle may have
14  contained water.
15       Q.   Did you ever learn that the officer had been
16  charged with transporting open alcohol?
17       A.   Yes, I did.
18       Q.   When did you -- do you recall when you
19  learned that?
20       A.   You know, I don't fully recall whether it
21  was in the e-mail that the chief sent to me later
22  that evening or if I found out through the -- what
23  they call the synoptic report, a to-from issued by
24  the sergeant that responded to the scene.

Page 18

1        Q.   And which sergeant was that?
2        A.   I'm unclear as I'm sitting here today.  It
3   could have been either Sergeant Cochran or Sergeant
4   Price.  As I read this, Sergeant Price had the
5   investigation, but because Sergeant Cochran was
6   there, they might have both written the report.
7        Q.   Did you have anything to do with two IAD
8   sergeants being at 9th District on that day?
9        A.   I'm unclear by what you mean with "have
10  anything to do."
11       Q.   Did you order that two sergeants go out
12  there that day?
13       A.   No, I did not.
14       Q.   Did you ever direct that Officer Seiser be
15  given an order to consent to a search of his vehicle?
16       A.   I'm not certain what you're asking.  Did I
17  direct that Officer Seiser consent?
18       Q.   Well, when an officer is being investigated
19  for rule violations of the Chicago Police Department,
20  he or she can be ordered to consent to a search, is
21  that right?
22       A.   I'm not trying to be difficult, but consent
23  is, I think, a different term.  Officers can be
24  ordered to do certain things.  Whether or not they

Page 19

1   consent is their decision.
2        Q.   Well, let's go back to Exhibit 1.  Did you
3   direct Sergeant Price to order Officer Seiser to
4   provide Sergeant Matthew Price with access to officer
5   Seiser's personal vehicle?
6        A.   As I stated earlier, I did not have a direct
7   conversation with sergeant price, but given the fact
8   that I had had a conversation with Chief Rivera
9   regarding this incident, whether or not it was
10  attributed to me I'm not certain, but in that I had
11  the conversation with the chief that identified that
12  IAD was to process this administratively, that may be
13  where Sergeant Price got the direction.
14       Q.   Well, you told us that -- about the car
15  being searched incident to an arrest.  Do you know
16  whether or not Officer Seiser was arrested that day?
17       A.   Yes, Officer Seiser was arrested.
18       Q.   Was -- did you direct that he be arrested?
19       A.   Again, I didn't say, "Go arrest Officer
20  Seiser," but I identified to Chief Rivera that what
21  we had here was a criminal case to be processed by
22  the 9th District and implicit in identifying that
23  would be the arrest of the officer.  So I identified
24  the IAD was to handle the case administratively.

Page 20

1        Q.   Did you do any investigation on your own to
2   learn what the facts were about the criminal case of
3   Officer Seiser?
4        A.   Was I on the scene?  No, I was not.
5        Q.   Did you ask any questions of the chief about
6   what the officer had seen on the scene?
7        A.   Again, I don't know if it was a back and
8   forth or if the chief added additional information in
9   response to my questions, but I identified basically
10  what I learned out of the conversation with the
11  chief.
12       Q.   If the chief had told you that the three
13  civilian eyewitnesses hated police, would that have
14  affected your judgment?
15       MR. JEBSON:  Objection, calls for
16  speculation.
17  BY THE WITNESS:
18       A.   Depending upon circumstances, anything would
19  play in, but under that circumstance, what I was told
20  was that there was at least two civilian witnesses
21  identifying officer actions or any -- any action that
22  would contribute to a DUI identification.
23  BY MR. FLAXMAN:
24       Q.   Well, did the chief tell you that one of the

Page 37

1    A.  As with any practice of law, there's an area

2 of expertise. My statement is directly referencing

3 that I'm not 100 percent informed and up to date on

4 the status of Miranda and Garrity.

5    Q.  Do you know why -- well, do you know of name

6 of the officer who conducted the CR investigation?

7    A.  I don't have an independent recollection

8 sitting here today.

9    Q.  Officer Mahalik (phonetic), does that ring a

10 bell? Strelick.

11    A.  There is a Sergeant Strelick, if that's who

12 you're referencing.

13    Q.  Did you ever talk to him about Officer

14 Seiser?

15    A.  I don't recall speaking about Officer Seiser

16 with Sergeant Strelick, no. I may have, but I don't

17 recall it.

18    Q.  Did you ever -- well, did you ever have any

19 dealings with him when you were the head of IAD?

20    A.  The head of IAD or while I was there as

21 deputy superintendent?

22    Q.  Either.

23    A.  Yes.

24    Q.  Would you agree that he has a good

Page 38

1 reputation for truth and veracity?

2    MR. JEBSON: Objection, foundation.

3    MR. FLAXMAN: Let me rephrase that.

4 BY MR. FLAXMAN:

5    Q.  Would you agree that his reputation for

6 truthfulness and veracity is good?

7    MR. JEBSON: Objection, foundation, calls

8 for speculation.

9 BY THE WITNESS:

10    A.  I don't know of Sergeant Strelick's

11 reputation. What I can say is that he's -- he seems

12 to be a consistent investigator, at least during the

13 time I was at IAD, yes.

14 BY MR. FLAXMAN:

15    Q.  Did you know back on -- let's go back. On

16 March 29, 2011, when a motorist was suspected of DUI,

17 would the officer who would require the motorist to

18 do performance tests have to be able to articulate a

19 basis for -- strike that.

20    MR. FLAXMAN: Let's take a break.

21    MR. JEBSON: Okay.

22    (A short break was taken.)

23 BY MR. FLAXMAN:

24    Q.  When were you the head of Internal Affairs?

Page 39

1    A.  I was the head of Internal Affairs probably

2 from May of 2004 until sometime, I believe, in March

3 of 2008.

4    Q.  Okay. Did you ever hear of an officer named

5 Guisebusch? Guisebusch? G-u-i-s-e-b-u-s-c-h.

6    A.  I may have. I don't have independent

7 recollection at this time.

8    Q.  Do you recall an incident when a man was

9 arrested by two police officers and taken to a police

10 station and then the man claimed that the lockup

11 keeper planted a gun on the man?

12    A.  I don't have an independent recollection of

13 that, no.

14    Q.  How many times have you been deposed?

15    A.  I'm not really sure. Probably about -- I

16 would say a dozen, maybe.

17    Q.  Did you know -- well, on March 29, 2011, did

18 you do anything to cause Officer Seiser to be charged

19 with possession of open alcohol?

20    MR. JEBSON: Objection to the form of the

21 question; vague.

22 BY THE WITNESS:

23    A.  Did I do anything? Well, whether that was

24 an outcome of the initial direction that there was

Page 40

1 probable cause to arrest the officer, to that level

2 of setting the ball in motion, I had a role, but did

3 I write the ticket or order the ticket be written, I

4 did not do that.

5 BY MR. FLAXMAN:

6    Q.  Did you know the ticket was being written?

7    A.  Prior to it being written, no.

8    Q.  Other than what you've told us, is there any

9 other information of which you were aware on March

10 29, 2011, that caused you to believe that there was

11 probable cause to arrest Officer Seiser?

12    A.  There may have been, there may not have

13 been. That's a very broad based question, so I

14 probably would have to read everything that I've

15 discussed with you here today.

16    Q.  Can you tell us as best you can what it was

17 that caused you to believe that there was probable

18 cause to arrest Officer Seiser?

19    MR. JEBSON: Objection, asked and answered.

20 You can answer it again.

21 BY THE WITNESS:

22    A.  Well, as I stated, my conversation with

23 Chief Rivera and my recollection is not verbatim, the

24 conversation was quite sometime ago, but I was told

Page 41

1  that an officer in uniform was working the overtime
2  school initiative, was observed driving, my
3  recollection is, up and down the street near the
4  school while drinking from a bottle of alcohol.  He
5  was observed by at least two civilian witnesses, one
6  of those civilian witnesses stated that the officer
7  was drinking while driving, that the other witness
8  had an altercation with the officer, some sort of
9  confrontation after the officer exited his vehicle,
10  and it was the officer's personal vehicle, or at
11  least not a squad car, that the other civilian
12  witness identified that the officer had the smell of
13  alcohol, that the civilians had contacted 911, that
14  they had related that the officer was in uniform,
15  that the -- the 9th District sent a supervisor to the
16  scene, that the supervisor had had a discussion with
17  the officer, that the officer had a bottle of vodka
18  or something in the car that was partially emptied,
19  it wasn't full of liquid, that the supervisor had a
20  conversation with the officer, the officer was not
21  turning over the bottle of vodka at that time or
22  alcohol that was in the car, and as I recall, they
23  had stated IAD was out there and had spoken with
24  witnesses and I believe the officer was already in

Page 42

1  the 9th District when I spoke with Chief Rivera.  I
2  may have known more, but at this point that's what I
3  recall of my conversation with the chief.
4      Q.  Well, you didn't talk to anybody else other
5  than the chief it, is that right?
6      A.  No, as I stated, I didn't talk to the two
7  sergeants on the scene.  I may or may not have talked
8  to Lieutenant Nalway, but I don't recall specifically
9  talking to Lieutenant Nalway.
10      Q.  Did you ask the chief to get more
11  information?
12      A.  No, I did not.
13      Q.  Did you ask the chief any questions about
14  what the officer's side of the story was?
15      A.  I don't recall that.  Like I said, I talked
16  to the chief for a while, but I don't recall
17  specifically what I asked the chief.
18      Q.  Did the chief tell you why he was presenting
19  you with this problem?
20      A.  No, he didn't, it was just a routine
21  notification.
22      Q.  Well, was it routine for you to order that
23  Officer Seiser be arrested?
24      A.  From the context of routine, it's not

Page 43

1  routine to have an officer arrested, but within the
2  context of the notification to me on the DUI, my
3  position was and remains that the 9th District was to
4  process the case criminally and the IAD was to
5  process it administratively.  In the conversation
6  with chief, it was identified that there was
7  minimally probable cause to arrest for the DUI.
8      Q.  Why was it that you didn't want to leave
9  that decision to the officers on the scene?
10      A.  I'm sorry, leave what decision?
11      Q.  Whether there was probable cause to arrest
12  and to charge?
13      A.  It wasn't an issue of leaving that to the
14  officers on the scene, but my understanding is that
15  Officer Seiser, I didn't know his name at the time,
16  but the officer was already in the 9th District and
17  so the idea there is, okay, how is this processed at
18  this point.  It became very clear from the facts that
19  I was told that there was probable cause to arrest
20  for the DUI and that's how it was to proceed.
21      Q.  Did you do anything to cause Sergeant
22  Cochran to go out to the scene?
23      A.  No.
24      Q.  Do you have any knowledge about the

Page 44

1  reputation of Lieutenant Nalway for truthfulness?
2      A.  I know Dave Nalway, I believe him to be a
3  truthful individual.  As to his reputation, I have no
4  knowledge.
5      Q.  Is there something called Behavioral
6  Intervention or is there or was there some program
7  called Behavioral Intervention for police officers?
8      A.  There was a program Behavioral Intervention
9  System, I believe it was called.
10      Q.  Were you involved with that program?
11      MR. JEBSON:  Objection, will not lead to the
12  discovery of relevant information.
13  BY MR. FLAXMAN:
14      Q.  Were you involved with that program?
15      A.  I don't understand what you mean by
16  involved.
17      Q.  Did you create it or manage it or work in
18  it?
19      MR. JEBSON:  Same objection.
20  BY THE WITNESS:
21      A.  Behavioral Intervention, or as it was known
22  was BIS, was the responsibility of the Personnel
23  Division.  During the time that I was the head of
24  IAD, certain CRs were reviewed for placement into

Page 49

1     Q.  Did you rely on more information than what

2  civilians had told you about a particular driver?

3         MR. JEBSON:  Objection, assumes facts not in

4  evidence.

5  BY THE WITNESS:

6     A.  I don't know if I ever made an arrest based

7  on what a civilian told me about a driver.

8  BY MR. FLAXMAN:

9     Q.  You are a defendant in this lawsuit.  Do you

10  know that?

11    A.  Yes, I do.

12    Q.  Did you review the answer to the complaint

13  that was filed on your behalf?

14    A.  Yes, I did.

15    Q.  Did you review it before it was filed?

16    A.  Yes, I did.

17    Q.  Did you see anything incorrect when you

18  reviewed it?

19         MR. JEBSON:  Objection.

20  BY THE WITNESS:

21    A.  I would have to review the answer again to

22  be able to answer that question for you.

23         MR. FLAXMAN:  I have nothing further.

24         MR. JEBSON:  Okay.  I just have a few

Page 50

1  questions.

2              EXAMINATION

3  BY MR. JEBSON:

4     Q.  Mr. Flaxman asked you what probable cause

5  you had to convey to Chief Rivera that Officer Seiser

6  was to be processed criminally for the DUI.  Do you

7  remember that question and your answer?

8     A.  Yes, I do.

9     Q.  Did that information come from Chief Rivera?

10    A.  Yes.

11    Q.  Did you ever go out to the scene?

12    A.  No, I did not.

13    Q.  Where were you when you first learned any

14  information regarding any allegation of Officer

15  Seiser drinking and driving?

16    A.  I was in my office in the Bureau of

17  Professional Standards.

18    Q.  And where is that located?

19    A.  It's on the fifth floor of CPD headquarters.

20    Q.  And the first time you learned of anything

21  to do with allegations of Officer Seiser drinking and

22  driving, that came from Chief Rivera?

23    A.  Yes.

24    Q.  And he -- you told us what he had told you?

Page 51

1     A.  As I recall today, yes.  It wasn't verbatim,

2  but basically what he told me, yes.

3     Q.  Now approximately, I'm not going to ask you

4  for the exact time, but approximately what time did

5  you obtain that information from Chief Rivera?

6     A.  It was later in the afternoon.  As I recall,

7  there was already an IAD investigator in the 9th

8  District, so it had to be sometime between -- I don't

9  know, 3:30 and 5:30, somewhere in there.

10    Q.  Were you given information when you obtained

11  the information regarding the allegations against

12  Officer Seiser drinking and driving where Officer

13  Seiser was?

14    A.  It was my understanding that the officer was

15  in the 9th District.

16    Q.  When is the next time that you received any

17  information regarding -- that you can remember today

18  regarding Officer Seiser being processed either

19  criminally or administratively?

20    A.  Like I said, I -- as I sit here today, I

21  believe the next conversation I had was when -- it

22  wasn't a conversation, Chief Rivera sent me an e-mail

23  basically summarizing what happened as a result of

24  the processing of the officer in the 9th District.

Page 52

1     Q.  And approximately what time was that?

2     A.  It was after 10:00, so somewhere between

3  10:00 and 11:00 at night.

4     Q.  And was the information that was given to

5  you that Officer Seiser was released without charging

6  as it relates to the DUI?

7     A.  Yes.

8     Q.  Now I want to go back to originally when you

9  get the information from Chief Rivera when you were

10  sitting in your office, okay?

11    A.  Okay.

12    Q.  Did you ever tell -- or strike that.

13        Did you get any information from Chief

14  Rivera that would lead you to believe that any of the

15  information that you received was unreliable as it

16  relates to establishing probable cause to have

17  Officer Seiser criminally processed for DUI?

18    A.  No.

19    Q.  Did you ever tell Chief Rivera or anyone

20  that Officer Seiser was to be criminally processed for

21  a DUI and no matter what happens during that

22  investigation, if he -- that he is to continue to be

23  processed criminally no matter what happens?  Did you

24  ever give that direction?

Page 53

1    A.    No.

2    Q.    At some point did you find out that Officer
3  Seiser passed a field sobriety test?

4    A.    Yes, I did.

5    Q.    At some point did you find out that Officer
6  Seiser had blown zeros in the Breathalyzer test?

7    A.    Yes, I did.

8    Q.    When did you find those two things out?

9    A.    To the best of my recollection it was that
10  night when Chief Rivera e-mailed me.

11    Q.    So you obtained that information after you
12  were told that Officer Seiser was released without
13  charging for the DUI?

14    A.    Correct.

15    Q.    Hypothetically speaking, if you were told
16  that Officer Seiser had passed a field sobriety test
17  and had blown zeros on the Breathalyzer test and you
18  were asked, Deputy Superintendent Kirby, what should
19  we do now in terms of whether or not to proceed
20  criminally on the DUI?  If you were asked that, what
21  would have been your response?

22    A.    At that time I would say that the evidence
23  would warrant basically what the 9th District did.
24  They released him without charging.

Page 54

1    Q.    You told us that at some point you found out
2  that Officer Seiser was issued a citation for having
3  an open container of alcohol in his vehicle?

4    A.    Correct.

5    Q.    When did you find that information out?

6    A.    Again, I believe I found it out that night
7  in the e-mail that Chief Rivera sent me.  Or you know
8  what?  It might have been in the synoptic report
9  following.  I am not sure, but it was either later
10  that evening or the following day.

11    Q.    And when you say either later that evening
12  or the following day, when you say later that
13  evening, would that be the e-mail from Chief Rivera
14  to you?

15    A.    Yes.

16    Q.    So it would have been either at that point
17  or the following day?

18    A.    As I recall, yes.

19    Q.    When you read the synoptic report?

20    A.    Correct.

21    Q.    So would it be a fair statement that you did
22  not even know about the citation that was issued to
23  Officer Seiser until after the -- after the ticket
24  was issued and after the criminal part of the

Page 55

1  investigation was complete?

2    A.    That's my understanding, yes.

3    Q.    Hypothetically speaking, if someone from the
4  9th District had called you and said that Officer
5  Seiser had passed the field sobriety test and blew
6  zeros so we're going to release him on the DUI
7  without charging him for the DUI and they asked you
8  we have a question, should we give him a -- issue a
9  citation for having an open container of alcohol, the
10  question was is there probable cause to issue that
11  ticket, what would your response have been based on
12  the information that you had at that time?

13    A.    I guess what you're asking me is that, you
14  know, as I sit here today, based on the information I
15  had at that time, I don't see fault with the issuance
16  of that ticket.  The allegations were such that the
17  officer was drinking from the bottle, that there was
18  a belief that -- at least one complaint that he
19  smelled of alcohol, that it was an alcoholic beverage
20  bottle, so you know, within the construct of probable
21  cause, there was valid basis for the citation.

22    Q.    And when you had the initial conversation
23  with Chief Rivera in your office, you mentioned that
24  Chief Rivera told you that the supervisor from the

Page 56

1  9th District saw that bottle in the officer's car?

2    A.    Correct.  Chief Rivera relayed that the
3  sergeant on the scene not only spoke with the officer
4  but observed what he believed to be an alcoholic
5  beverage bottle in the vehicle and that it had a
6  small amount or it was -- you know, it wasn't a full
7  bottle, that there was alcohol missing from it,
8  whether or not the seal was observed, but that it was
9  partially empty I recall.

10    Q.    And you -- just so we're clear, you did not
11  give any direction or convey any information on
12  whether or not to issue that ticket, true?

13    A.    Correct, yes.

14    Q.    Now you are familiar with the administrative
15  process that an officer is to go through if there are
16  allegations that a police officer is drinking while
17  driving?

18    A.    Yes.

19    Q.    Now I want you to assume for purposes of
20  these questions that the police department was going
21  to only proceed administratively against Officer
22  Seiser and was just going to ignore the probable
23  cause to arrest him for the DUI, okay?

24    A.    Okay.

Page 85

1   that.

2       MR. FLAXMAN:  I have nothing further.

3       MR. JEBSON:  I don't have any questions.

4       MR. FLAXMAN:  And you'll reserve I bet.

5       MR. JEBSON:  Yes, please.

6       (Deposition concluded at 1:04 p.m.)

---

Page 86

1           IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

4   MICHAEL SEISER,                )
                       Plaintiff;  )
5                                  )
                                   )
6       -v-                        )No. 12 CV 02353
                                   )
7                                  )
   CITY OF CHICAGO and DEBRA       )
8   KIRBY,                         )
                       Defendants. )
9
10      I, DEBRA KIRBY, state that I have read the
11  foregoing transcript of the testimony given by me at
12  my deposition on the 11th day of December, 2012, and
13  that said transcript consisting of pages 4 through 85
14  is a true and accurate record of the testimony given
15  by me at said deposition except as I have so
16  indicated on the errata sheets provided herein.
17      Please check one:
18      _____ I made no corrections
19      _____ Number of errata sheets submitted

21  SUBSCRIBED AND SWORN
    Before me this __ day
22  Of _____, 20 __

23  Notary Public
24

---

Page 87

1               CERTIFICATE OF
2         CERTIFIED SHORTHAND REPORTER
3       I, Beth C. Radtke, a Certified Shorthand
4   Reporter of the State of Illinois, CSR License No.
5   084-004567, do hereby certify:
6       That previous to the commencement of the
7   examination of the aforesaid witness, the witness
8   was duly sworn by me to testify the whole truth
9   concerning the matters herein;
10      That the foregoing deposition transcript was
11  stenographically reported by me and was thereafter
12  reduced to typewriting under my personal direction
13  and constitutes a true and accurate record of the
14  testimony given and the proceedings had at the
15  aforesaid deposition;
16      That I am not a relative or employee or attorney
17  or counsel for any of the parties herein, nor am I
18  interested directly or indirectly in the outcome of
19  this action.
20      IN WITNESS WHEREOF, I do hereunto set my hand at
21  Chicago, Illinois, this 19th day of December, 2012

23              _____
                Beth Radtke, C.S.R
24              License No. 084-004567

---

[02353 - anybody]                                    Page 1

| 0 | 312.744.4833 2:11 | acquired 76:17 | 75:14 |
|---|---|---|---|
| 02353 1:7 86:6 | acted 81:16,16 | agreed 69:7 |
| 084-004567 87:5,24 | 4 | action 20:21 26:17 | ahead 24:24 83:12 |
| | 4 3:4 86:13 | 87:19 | alcohol 8:18,24 11:5 |
| 1 | | actions 20:21 63:2 | 23:7,22 26:24 27:16 |
| 1 3:8 6:17 19:2 26:5 | 5 | active 84:15 | 32:13,22 37:16 |
| 47:8 48:5 61:16 | 5 57:6 | activities 32:16,20 | 39:19 41:4,13,22 |
| 100 37:3 70:12,18 | 50 3:5 | activity 33:3 | 54:3 55:9,19 56:7 |
| 83:18 | 5:30 51:9 | actual 47:11,15 | 59:7 65:17,22 67:4 |
| 10:00 52:2,3 | | add 72:1 | 67:5,13,19,22 68:5 |
| 11:00 12:02:3 | 6 | added 20:8 58:11 | 70:15 71:8 78:17 |
| 11th 1:20 86:12 | 6 3:8 | addition 73:2 | 79:6,19 80:3 |
| 12 1:6 86:6 | 60602 2:10 | additional 20:8 | alcoholic 8:23 11:16 |
| 1240 2:4 | 60604 2:5 | 75:21 77:10,17,21 | 55:19 56:4 74:8 |
| 1400 2:10 | 64 3:5 | additionally 23:24 | 80:11 |
| 15 2:11 | | address 16:2 17:5 | allegation 23:24 |
| 19th 87:21 | 8 | 18:19 | allegations 50:14 |
| 1:04 85:6 | 85 86:13 | admirable 16:2 17:5 | 59:1 60:23 61:6 |
| | | 12:22 23:1,10,16 | 62:4,8 69:5 75:1 |
| 2 | 9 | 25:6,8,21 26:13 | allegations 23:22 |
| 20 86:21 | 911 41:13 | 29:6 34:2,9,21 | 24:16 50:21 51:1 |
| 200 1:18,19 2:4 | 93.3 57:6 | 35:20,23 36:4 56:14 | 24:36 50:21 51:1 |
| 2004 39:2 | 9th 8:15,24 9:13,24 | 57:2 60:9 61:3,23 | 55:16 56:16 57:18 |
| 2008 39:3 | 12:20 13:10,15,18 | 62:18 68:8,11,16,21 | 59:11 |
| 2011 16:23:22 6:13 | 15:5 18:8 19:22 | 68:23 69:1,3,4,17 | alleged 24:5,10,13 |
| 6:23 7:11,18 13:6 | 21:16 23:4 25:4 | 69:18,23 70:3 82:20 | 27:22 60:17,19 |
| 13:15 15:13 22:10 | 29:3 30:17 33:17 | 82:23 | alleging 8:22 |
| 23:4 28:1,8 30:13 | 41:15 42:1 43:3,16 | administratively | allow 47:18 62:15 |
| 38:16 39:17 40:10 | 51:7,15,24 53:23 | 9:15 19:12,24 43:5 | allowed 23:21 70:2 |
| 75:11 77:12 83:22 | 55:4 56:1 57:15 | 51:19 56:21 57:13 | allowing 9:4 |
| 84:18 | 59:14 62:10,12 | 57:17 58:2,5,17 | alteration 41:8 |
| 2021 1:21 86:12 | 74:11 77:4,8 82:17 | 60:22 61:9,13,20 | amendment 35:21 |
| 87:21 | | 62:11 | 36:1 |
| 26 4:13 | a | admissible 81:23 | amount 56:6 |
| 29 6:13 7:11,18 | a.m. 1:20 | 82:2 | amounts 24:24 |
| 13:15 15:13 22:10 | able 11:16 27:11 | admission 36:18 | 35:22 56:7 40:20 |
| 23:3 28:1,8 30:13 | 38:18 49:22 | affairs 6:2 22:15,17 | 49:12,21,22 50:7 |
| 38:16 39:17 40:10 | academy 4:22 | 24:6 38:24 39:1 | 63:6 66:18,19 67:10 |
| 75:11 77:12 83:22 | accepting 66:19,24 | 75:5 82:19 | 76:14 79:11,13 82:5 |
| 84:18 | access 19:4 26:4 | affect 74:13 | answered 29:10,19 |
| 29th 7:23 13:10 | 47:18 79:1 | aforesaid 87:7,15 | 40:19 79:12 |
| | accountability 6:4 | afternoon 7:23 | answering 36:8 |
| 3 | accurate 14:3 27:23 | 15:16 51:6 | answers 66:23 |
| 30 2:9 | 86:14 87:13 | ago 40:24 | anybody 8:7,8 42:4 |
| 312.427.3200 2:5 | acquire 75:20 77:21 | agree 27:21 37:24 | 67:9 |
| | | 38:5 67:3,12 69:6 | |

# EXHIBIT D

To: 913127446566
06/22/12 01:40 AM      Page  3 of 5          From:  (3127456931)

---

**CHICAGO POLICE DEPARTMENT**                          22-JUN-2012    **PAGE    1**
**EVENT QUERY**

---

Event #  1108808888

| Type | Location | | Date | Pri | DG | Svc Beat | Disp |
|---|---|---|---|---|---|---|---|
| DUI | 5000 S UNION AV (AMB1) | | 29-MAR-2011 14:18:47 | 1C | 009 | 0935 | 19P |
| Source | Response Level | Caller | | | | Phone | |
| E | 1 | SPRINT NEXTEL - IDEN | | | | ▇▇▇▇▇ | |
| Address of Occurrence | | | | | | Occ Beat | |
| 5000 S UNION AV (AMB1) | | | | | | 0935 | |

Event Chronology

| Date | Activity | Wkstn | Person | Text |
|---|---|---|---|---|
| 29-MAR-2011 14:16:33 | REC | | | |
| 29-MAR-2011 14:18:47 | ENTRY | PCT27 | C606053 | EventLocation, CallerLocation have been changed. |
| 29-MAR-2011 14:20:20 | DSP | PDS28 | D308575 | 902 |
| 29-MAR-2011 14:20:23 | ASST | PDS28 | D308575 | 934 |
| 29-MAR-2011 14:20:25 | CLEAR | PDS28 | D308575 | 902 |
| 29-MAR-2011 14:20:30 | AUTPRE | PDS28 | D308575 | 934 |
| 29-MAR-2011 14:55:59 | DSP | PDS28 | D308575 | 902 |
| 29-MAR-2011 14:56:03 | ASST | PDS28 | D308575 | 920 |
| 29-MAR-2011 14:56:07 | CLEAR | PDS28 | D308575 | 902 |
| 29-MAR-2011 15:13:19 | CLOC | PDS28 | D308575 | 920 [009] |
| 29-MAR-2011 16:00:28 | XREF | PD29 | D550926 | #CPD1108809082 by PD29, Unit 920 |
| 29-MAR-2011 16:00:38 | CLEAR | PD29 | D550926 | 920 Papercar changed from to 920 D/19P |
| 29-MAR-2011 16:00:38 | CLOSE | PD29 | D550926 | D/19P |
| 29-MAR-2011 16:16:51 | ROPEN | PDS28 | D306724 | open |
| 29-MAR-2011 16:17:19 | DSP | PDS28 | D306724 | X920 |
| 29-MAR-2011 16:17:32 | DSP | PDS28 | D306724 | 954 |
| 29-MAR-2011 16:17:44 | CLOC | PDS28 | D306724 | X920 [ 009 CR INV] |
| 29-MAR-2011 16:17:55 | CLOC | PDS28 | D306724 | 954 [ 009 PAPER] |
| 29-MAR-2011 16:17:58 | DSP | PDS28 | D306724 | 944 |
| 29-MAR-2011 16:18:16 | ACK | PMDT5035 | PC0Q935 | 944 |
| 29-MAR-2011 16:18:18 | ENR | PMDT5035 | PC0Q935 | 944 |
| 29-MAR-2011 16:18:20 | ONS | PMDT5035 | PC0Q935 | 944 |
| 29-MAR-2011 16:18:43 | CLOC | PDS28 | D306724 | 944 [ 5000 S UNION SITTING ON CAR] |
| 29-MAR-2011 16:27:27 | SCHOFF | PMDT5027 | PC0P599 | Unit #954 scheduled for Logoff |
| 29-MAR-2011 16:36:51 | ASST | PD29 | D550926 | 947 |
| 29-MAR-2011 16:37:10 | CLOC | PD29 | D550926 | 947 [ 5000 S UNION  ON VEH] |
| 29-MAR-2011 16:37:25 | ACK | PMDT5013 | PC0W068 | 947 |
| 29-MAR-2011 16:45:28 | CLOC | PD29 | D550926 | 944 [ 009] |
| 29-MAR-2011 16:54:54 | SCHOFF | PMDT5035 | PC0Q935 | Unit #944 scheduled for Logoff |
| 29-MAR-2011 17:23:06 | CLEAR | PD29 | D306724 | 944 |
| 29-MAR-2011 17:34:06 | CLEAR | PDS28 | D308575 | 954 |
| 29-MAR-2011 17:39:23 | XREF | PDS28 | D308575 | #CPD1108811176 by PDS28, Unit 947 |
| 29-MAR-2011 17:39:46 | CHNG | PDS28 | D308575 | Remarks Entered; |
| 29-MAR-2011 18:54:11 | ASST | PD29 | D550926 | 905 |
| 29-MAR-2011 18:54:33 | CLOCOS | PD29 | D550926 | 905 [ 009  W/REPORT] |

Seiser 12 C 2353
FCRL 000139

TO: 913127446566                         From: (3127456931)
06/22/12 01:40 AM        Page  4 of 5

---

CHICAGO POLICE DEPARTMENT                    22-JUN-2012    PAGE    2
EVENT QUERY

---

Event # 1108808888

Event Chronology

| Date | Activity | Wkstn | Person | Text |
|------|----------|-------|--------|------|
| 29-MAR-2011 18:54:42 | MISC | PDS28 | D308575 | 905 was  called into 009 at    1721 hrs |
| 29-MAR-2011 18:54:52 | XREF | PD29 | D550926 | #CPD1108812146 by PD29, Unit 905, Unit 905 |
| 29-MAR-2011 19:23:22 | CLOC | PDS28 | D308575 | 947 [50/ UNION] |
| 29-MAR-2011 19:23:34 | CLOC | PDS28 | D308575 | 947 [50/ UNION W/ THE CAR] |
| 29-MAR-2011 20:33:59 | ONS | PDS28 | X920 | |
| 29-MAR-2011 20:46:09 | CLEAR | PD29 | D99391 | 947 |
| 29-MAR-2011 21:02:44 | CLEAR | PDS28 | D308575 | X920 |
| 29-MAR-2011 22:22:12 | CLEAR | PD29 | D106919 | 905 |
| 29-MAR-2011 22:22:12 | CLOSE | PD29 | D106919 | |
| | RMKS | | | *** WIRELESS CALL *** |
| | RMKS | | | M/W  CHUGGING FROM A BOTTLE OF |
| | | | | VODKA FROM A SILVER GRAND AM IL |
| | | | | LIC |
| | | | | JUST PULLED OVER @ LOCATION (AND IS |
| | | | | STILL IN THE CAR)---BUT CALLER SAW |
| | | | | THIS WHEN HE DROVE PAST-NFI |
| | RMKS | | | SOS |
| | | | | STA/VALID  VA |
| | | | | TTL/ |
| | | | | ORIG PLT  LIC |
| | | | | SEISER MICHAEL J |
| | | | | |
| | | | | PONTIAC COUPE |
| | | | | STATUS UNAVAILABLE  REF PLT |
| | | | | EXP/102010 |

Unit Summary

| Unit | Dispatch | Enroute | Onscene | T | TA | TC | Clear |
|------|----------|---------|---------|---|----|----|-------|
| 902 | 14:20:20 | | | | | | 14:20:25 |
| 934 | 14:20:23 | | | | | | 14:20:30 |
| 934 | 14:20:30 | | | | | | 14:56:07 |
| 902 | 14:55:59 | | | | | | 16:00:38 |
| 920 | 14:56:03 | 15:13:19 | | | | | 21:02:44 |
| X920 | 16:17:19 | 16:17:44 | 20:33:59 | | | | 17:34:06 |
| 954 | 16:17:32 | 16:17:55 | | | | | 17:23:06 |
| 944 | 16:17:58 | 16:18:18 | 16:18:20 | | | | 20:46:09 |
| 947 | 16:36:51 | 16:37:10 | | | | | 22:22:12 |
| 905 | 18:54:11 | | 18:54:33 | | | | |

Seiser 12 C 2353
FCRL 000141

TO: 913127446566
06/22/12 01:40 AM      Page 5 of 5          From:  (3127456931)

## CHICAGO POLICE DEPARTMENT
## EVENT QUERY                                    22-JUN-2012    PAGE  1

Event #  1108809082

| Type | Location | | Date | Pri | DG | Svc Beat | Disp |
|---|---|---|---|---|---|---|---|
| REQSUP | 4849 S UNION AV -1 | | 29-MAR-2011 14:29:41 | 1A | 009 | 0935 | 19P |
| Source | Response Level | Caller | | | | Phone | |
| E | 1. | SPRINT NEXTEL - IDEN - CATHY GLASSFORD | | | | | |

Address of Occurrence
4849 S UNION AV

Occ Beat
0935

Event Chronology

| Date | Activity | Wkstn | Person | Text |
|---|---|---|---|---|
| 29-MAR-2011 14:23:24 | REC | | | |
| 29-MAR-2011 14:29:41 | ENTRY | PCT46 | C543470 | EventLocation, Floor, CallerLocation, CallerName have been changed. Priority; 3D->1A |
| 29-MAR-2011 14:31:02 | DSP | PDS28 | D308575 | 920 |
| 29-MAR-2011 14:31:14 | ACK | PMDT5043 | PC0R816 | 920 |
| 29-MAR-2011 14:56:03 | AUTPRE | PDS28 | D308575 | 920 |
| 29-MAR-2011 16:00:28 | XREF | PD29 | D550926 | #CPD1108808888 by PD29, Unit 920 |
| 29-MAR-2011 16:00:47 | CLEAR | PD29 | D550926 | 920 D/19P |
| 29-MAR-2011 16:00:47 | CLOSE | PD29 | D550926 | D/19P |
| | RMKS | | | *** WIRELESS CALL *** |
| | RMKS | | | REQUEST POLICE SUPERVISOR REGARDING DUI DRIVER SHE CALLED IN FOR THE LOCATION OF 50TH & UNION DRIVER IS AN OFF DUTO PO SUP MEDINA NOTIF  NFI |

Unit Summary

| Unit | Dispatch | Enroute | Onscene | T | TA | TC | Clear |
|---|---|---|---|---|---|---|---|
| 920 | 14:31:02 | | | | | | 14:56:03 |
| 920 | 14:56:03 | | | | | | 16:00:47 |

Seiser 12 C 2353
FCRL 000143

# EXHIBIT E

In The Matter of

**MICHAEL SEISER**

vs.

**CITY OF CHICAGO, et al**

Deposition of
GAIL GLASSFORD
August 15, 2012

**Urlaub Bowen & Associates, Inc.**
Certified Shorthand Reporters
Video Conference Center
312-781-9586
Fax 312-781-9228
info@urlaubbowen.com
www.urlaubbowen.com

---

Deposition of GAIL GLASSFORD, 8/15/2012

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHAEL SEISER,                  )
                                 )
            Plaintiff,           )
                                 )
        vs.                      )  No. 12 C 2353
                                 )
CITY OF CHICAGO and DEBRA        )
KIRBY,                           )
                                 )
            Defendants.          )

     The deposition of GAIL GLASSFORD, taken
pursuant to notice, before Karen M. Kane, CSR
No. 084-004706, Certified Shorthand Reporter within
and for the County of Cook, State of Illinois, at
30 North LaSalle Street, Suite 900, Chicago,
Illinois, on August 15, 2012, commencing at
2:54 o'clock p.m.

APPEARANCES:

LAW OFFICES OF KENNETH N. FLAXMAN, PC, by
MR. KENNETH N. FLAXMAN
200 South Michigan Avenue, Suite 1240
Chicago, Illinois  60604
knf@kenlaw.com
     on behalf of the plaintiff;

Urlaub Bowen & Associates, Inc.  312-781-9586

---

Deposition of GAIL GLASSFORD, 8/15/2012

Page 2

1   APPEARANCES: (Continued)
2
3   HONORABLE STEPHEN R. PATTON
    CORPORATION COUNSEL, by
4   MR. SCOTT J. JEBSON,
    Chief Assistant Corporation Counsel
5   MS. LINDSEY VANORNY,
    Assistant Corporation Counsel
6   30 North LaSalle Street, Suite 900
    Chicago, Illinois  60602
7   sjebson@cityofchicago.org
    lindsey.vanorny@cityofchicago.org
8      on behalf of the Defendants.
9             I N D E X
10  Witness:                            Page
11  GAIL GLASSFORD
12  Examination by:
13      Mr. Jebson ................... 3
        Mr. Flaxman .................. 24
14
15          * * * * * * *
16          E X H I B I T S
17  Number              Marked for ID/Referenced
18  1 ..................................... 3
    2 ..................................... 16
19
20          (Exhibits scanned/attached.)
21
22
23
24

Urlaub Bowen & Associates, Inc.  312-781-9586

---

Deposition of GAIL GLASSFORD, 8/15/2012

Page 3

1           (Deposition Exhibit No. 1,
2            Witness Glassford, was marked
3            for identification
4            08/15/2012.)
5       (Witness sworn.)
6             GAIL GLASSFORD
7   called as a witness herein, having been first duly
8   sworn, was examined and testified as follows:
9             EXAMINATION
10  BY MR. JEBSON:
11      Q.   Could you please state your name for
12  us?
13      A.   Gail Glassford.
14      Q.   And if you could, please spell your
15  last name.
16      A.   G-l-a-s-s-f-o-r-d.
17      Q.   Have you ever given a deposition
18  before?
19      A.   No, I have not.
20      Q.   By the way, how do you spell your first
21  name?
22      A.   G-a-i-l.
23      Q.   Oh, you said that.  Okay.
24      A.   Yeah.

Urlaub Bowen & Associates, Inc.  312-781-9586

Deposition of GAIL GLASSFORD, 8/15/2012

Page 4

1    Q.    Some people spell it --
2    A.    G-a-l-e or G-a-l.
3    Q.    Okay.  So this is a deposition.  And
4  I'll just kind of go through what's going to happen
5  so you understand what's going to take place.
6         I'm just going to ask you some
7  questions, and all your answers need to be out loud
8  so the court reporter can take that down.
9    A.    Okay.
10   Q.    And if my question calls for a yes or
11 no, if you can say "yes" or "no" instead of saying
12 "uh-huh" or "huh-uh" just so the court reporter can
13 accurately take down your answer.
14   A.    Yes.
15   Q.    Great.  And then if you can -- before
16 you answer if you can wait until I completely get
17 the question out, that way we don't talk over each
18 other.  Okay?
19   A.    Uh-huh, yes.
20   Q.    Great.  If you don't understand my
21 question, please let me know, and then I'll just
22 rephrase it.  Okay?
23   A.    Yes.
24   Q.    Great.  Any questions before we begin?

Urlaub Bowen & Associates, Inc.  312-781-9586

---

Deposition of GAIL GLASSFORD, 8/15/2012

Page 5

1    A.    No.
2    Q.    Okay.  If you have any -- if you want
3  to take a break, just let me know.
4    A.    Okay.  I will.
5    Q.    So I'm just going to ask you some
6  preliminary questions.
7         Where are you currently living?
8    A.    I'm currently living at 2923 South
9  Bonfield.
10   Q.    What is your relationship with Roseann
11 Anderson?
12   A.    She's my niece's mother.
13   A.    I'm never going to be able to figure
14 that out.
15   A.    My brother -- I had -- my mom had me
16 and two brothers.  My older brother dated Roseann
17 Anderson and had birth to my niece, Gerri Lynn.
18 And my brother moved out and she lives down the
19 block, so we get to see her a constant flow.
20   Q.    Got you.  And so you obviously know
21 Gary Anderson?
22   A.    Yes.
23   Q.    And do you know Kathleen?
24   A.    Yes.  That was my mother.

Urlaub Bowen & Associates, Inc.  312-781-9586

---

Deposition of GAIL GLASSFORD, 8/15/2012

Page 6

1    Q.    Oh, that's your mother?
2    A.    Yes.
3    Q.    Did she pass away?
4    A.    Yes, she did, August 20th.
5    Q.    I'm sorry about that.
6    A.    That's okay.
7    Q.    Okay.  Is this the (indicating) --
8    A.    That's the one with the sticker on it.
9    Q.    Are you currently working?
10   A.    No, I am not.
11   Q.    Were you working back on March 29th,
12 2011?
13   A.    Yes, I was.
14   Q.    And where were you working?
15   A.    With the school board as the CPS safety
16 facilitator with Blackstar.
17   Q.    That's the same company that Gary
18 Anderson used to work for?
19   A.    Yes.
20   Q.    So I've handed you Deposition Exhibit
21 No. 1, which I believe is a -- did you have a
22 chance to read this?
23   A.    Yes, I did.
24   Q.    And you just read it?

Urlaub Bowen & Associates, Inc.  312-781-9586

---

Deposition of GAIL GLASSFORD, 8/15/2012

Page 7

1    A.    Yes.
2    Q.    And am I correct that this is a
3  statement that you gave at the police station on
4  May 10th, 2011?
5    A.    Yes.
6    Q.    And it was regarding certain events
7  that you saw on March 29th, 2011?
8    A.    Yes.
9    Q.    And after the statement -- after you
10 gave that statement, was it typed up?
11   A.    Yes, and they gave us a sheet just like
12 this (indicating).
13   Q.    Okay.  So looking at Deposition Exhibit
14 No. 1, did you have a chance to review all the
15 questions and answers and make sure they were
16 accurate?
17   A.    Yes.
18   Q.    And then after -- and did you, in fact,
19 review it?
20   A.    Yes.
21   Q.    And looking at Exhibit No. 1, are all
22 of the questions and answers accurate?
23   A.    Yes, because I even had to sign here
24 because he wrote "drive" the wrong way and I

Urlaub Bowen & Associates, Inc.  312-781-9586

Page 8

1   corrected his spelling (indicating).

2        Q.   So you're talking about the second page

3   of Deposition Exhibit No. 1?

4        A.   Yes.

5        Q.   So when you reviewed it, you noticed

6   that there was a mistake and you corrected it?

7        A.   Yes, and I signed my initials and he

8   put his.

9        Q.   Okay.  Is there any other changes?

10       A.   No.  It was just that there.

11       Q.   Okay.  So after you made the change and

12  after you reviewed your statement, did you sign it?

13       A.   Yes, I did.

14       Q.   So I'm going to ask you some questions

15  about March 29th, 2011.  Okay?

16       A.   Yes.

17       Q.   I'm going to start with, what were your

18  general duties that day working for -- was it

19  Black --

20       A.   Blackstar.

21       Q.   -- Blackstar?  Okay.  What were your

22  general duties?

23       A.   My general duties were to follow the --

24  watch the children and make sure they pretty much

Page 9

1   didn't get into a fight and there was no breaking

2   into houses, no drug dealing, and just pretty much

3   making sure the kids had a safe way to get home

4   without anything going wrong.

5        Q.   And was that the children that attended

6   Tilden school?

7        A.   Yes.

8        Q.   How long -- as of March 29th, 2011, how

9   long had you worked at Blackstar at Tilden High

10  School -- Tilden school?

11       A.   How long did I actually work for the

12  whole entire thing?  I worked a whole two -- two

13  school seasons.

14       Q.   Okay.  What were your hours that you

15  worked on March 29th, 2011?

16       A.   It was 6:00 in the morning until 10:00,

17  and then 1:00 in the afternoon until about 5:00.

18       Q.   And do you remember what you were

19  wearing on March 29th, 2011?

20       A.   Yes.  I had a pair of black pants with

21  a long sleeve kind of heavy shirt and a yellow vest

22  that said CPS on the back.

23       Q.   By the way, is the only statement that

24  you signed the statement that you signed on May

Page 10

1   10th, 2011, that's Deposition Exhibit No. 1?

2        A.   Uh-huh.

3        Q.   Is that yes?

4        A.   Yes.

5        Q.   You said "uh-huh."

6        A.   I'm sorry.  Yes.

7        Q.   That's okay.  Do you remember ever

8   signing any affidavit regarding this incident?

9        A.   No.

10       Q.   So it's just -- the only thing you

11  signed was Deposition Exhibit No. 1?

12       A.   Yes.

13       Q.   Okay.  So going back to the day of the

14  incident, which is March 29th, 2011, you were

15  telling me what you were wearing.

16       A.   Yes.

17       Q.   During the time that you were working,

18  is there anything that drew your attention to any

19  cars driving on Union Street?

20       A.   Well, we actually have to pay attention

21  to the cars because they do -- every so often we do

22  have a suspicious vehicle driving in the

23  neighborhood and approaching the children.  So I

24  keep my eyes out 24, just constantly moving them to

Page 11

1   make sure there's no cars in the area.

2            And the only reason why I turned

3   into this is because I saw him driving real slow at

4   10 miles per hour down the street as he was lifting

5   a bottle to his mouth.

6        Q.   And when you say "him," who are you

7   referring to?

8        A.   The officer in the vehicle.

9        Q.   What color vehicle was it?

10       A.   It was a silver Pontiac, two-door.

11       Q.   Do you know what model it was?  If you

12  don't, you can tell me you don't know, but if you

13  do --

14       A.   No, I don't.

15       Q.   Okay.  But it was a Pontiac two-door?

16       A.   Uh-huh, yes.

17       Q.   When you first saw the Pontiac --

18  strike that.

19            You mentioned the officer that was

20  in the car.

21       A.   Yes.

22       Q.   How do you know it was an officer?

23       A.   Well, at the time I did not know it was

24  an officer until he drove back again and I saw the

Deposition of GAIL GLASSFORD, 8/15/2012

Page 12

1   blue -- that he had a blue-collared shirt on with

2   the emblem of the Chicago Police Department --

3        Q.    Okay.

4        A.    -- as he drove back towards Tilden High

5   School.

6        Q.    So I'm going to go back to the first

7   time that you saw the person driving the silver

8   Pontiac.  Okay?

9        A.    Okay.

10       Q.    Where were you located when you first

11  saw the car?

12       A.    I was standing in front of my house at

13  4849 South Union Avenue.

14       Q.    Did you say your house?

15       A.    At the time it was my house.  It was

16  mine, my mother's and my father's.

17       Q.    And do you remember about what time it

18  was?

19       A.    It was probably around 2:00 and 3:00

20  because it was around the time the kids were

21  starting to get out of school.

22       Q.    Where was the silver Pontiac when you

23  first saw it?

24       A.    When I first saw the silver Pontiac it

Urlaub Bowen & Associates, Inc.  312-781-9586

---

Deposition of GAIL GLASSFORD, 8/15/2012

Page 13

1   was driving down Union towards the firehouse on

2   49th and Union.

3        Q.    So would that be south?

4        A.    Southbound, yes.

5        Q.    And using Tilden school, the front door

6   as a reference point, where was the silver car when

7   you first saw it?

8        A.    When -- actually, when I first saw it I

9   was monitoring my route, which is 49th to 50th,

10  which is like a two-block radius, I had to monitor

11  that.  And I saw him driving him down towards the

12  firehouse, and then he drove again back towards the

13  school and parked right out in front of the school.

14       Q.    So when you first saw the silver

15  Pontiac, it was heading southbound from the school?

16       A.    Yeah, from the school towards the

17  firehouse.

18       Q.    And when you first saw it, had it

19  reached 49th Street yet?

20       A.    He was, actually, literally -- I was

21  watching him as he was driving down Union from 49th

22  to 50th.

23             Okay.

24       A.    My eyes never left the car.

Urlaub Bowen & Associates, Inc.  312-781-9586

---

Deposition of GAIL GLASSFORD, 8/15/2012

Page 14

1        Q.    And when you first saw the silver

2   Pontiac, how fast was he going?

3        A.    Anywhere between 5 and 10 miles per

4   hour.

5        Q.    Did you get a good look at him?

6        A.    Yes, I did.

7        Q.    And did you notice what he was doing

8   when he was driving past you?

9        A.    He had his arm out on the steering

10  wheel and he was grabbing something in between his

11  legs, and as he kept driving by he picked it up and

12  swug a drink and then dropped it back down between

13  his legs and continued driving.

14       Q.    What hand did he have on the steering

15  wheel?

16       A.    I believe it was his left hand.

17       Q.    And what hand did he have on the

18  bottle?

19       A.    His right one.

20       Q.    And you said that he had the bottle

21  between his legs originally?

22       A.    Yes, it was originally set between his

23  legs.

24       Q.    And did you see him raise that bottle

Urlaub Bowen & Associates, Inc.  312-781-9586

---

Deposition of GAIL GLASSFORD, 8/15/2012

Page 15

1   up?

2        A.    Yes, a couple of times.

3        Q.    And what did the bottle look like?

4        A.    It was a -- it almost kind of looked

5   either -- it was clear but kind of like either a

6   glass or a plastic and it had writing on the

7   bottle.  It was -- the label was probably about --

8   I don't know -- about maybe a foot high all the way

9   around the bottle and it had writing and little

10  emblems on it with red and white lettering.

11       Q.    What was -- what was -- you said the

12  bottle was a foot high?

13       A.    No.  The label was about a foot high

14  around (indicating).

15       Q.    Oh, around?

16       A.    Yeah.

17       Q.    Okay.

18       A.    The bottle was about maybe this tall

19  and the label was about, yay, about that tall

20  (indicating).

21       Q.    Okay.  So we can't -- we don't know

22  what this is --

23       A.    Well, about 3 feet was as tall as the

24  bottle, and the label was probably about a foot.

Urlaub Bowen & Associates, Inc.  312-781-9586

---

Deposition of GAIL GLASSFORD, 8/15/2012

Page 16

1    Q.    Okay.  Well, let's use a piece of
2  paper, a regular normal piece of paper.  Was it
3  taller (indicating) --
4    A.    It was a little -- just a little taller
5  than this (indicating).
6    Q.    That's okay.  Let me start over.
7  MR. JEBSON:  Can you just get me a regular
8  sheet of paper?
9  MR. FLAXMAN:  Here, here.
10  MS. VANORNY:  Sure.
11  MR. JEBSON:  Can we mark this as Exhibit 2?
12                (Deposition Exhibit No. 2,
13                Witness Glassford, was marked
14                for identification
15                08/15/2012.)
16  BY MR. JEBSON:
17    Q.    It's a blank piece of paper, Deposition
18  Exhibit No. 2.  I'm just holding it straight up
19  (indicating).
20                Using this as a reference, how tall
21  was the bottle?
22    A.    It was about -- maybe about 2 inches
23  taller than the piece of paper.
24    Q.    Okay.  And when you said that the label

Urlaub Bowen & Associates, Inc.  312-781-9586

---

Deposition of GAIL GLASSFORD, 8/15/2012

Page 17

1  went around, how far did it go around?
2    A.    It went all the way around and touched
3  end to end.
4    Q.    Okay.  And about how tall was the
5  label?
6    A.    About a little less than half the sheet
7  of paper.
8    Q.    Okay.
9  MR. FLAXMAN:  If we could stipulate that's
10  it's an 8 1/2 by 11 piece of paper.
11  MR. JEBSON:  Yes, we can do that.
12  BY MR. JEBSON:
13    Q.    You said -- and maybe I misheard you or
14  you misspoke -- you said 3 feet.  Did you mean --
15    A.    Like I don't exactly know the exact
16  size, but to me it was a giant bottle, almost like
17  a gallon.
18    Q.    Okay.  The size of piece of paper --
19  the 2 inches --
20    A.    Yeah.
21    Q.    -- about 2 inches bigger than a size of
22  a piece of paper (indicating)?
23    A.    Yes.
24    Q.    And you believe it was about a gallon?

Urlaub Bowen & Associates, Inc.  312-781-9586

---

Deposition of GAIL GLASSFORD, 8/15/2012

Page 18

1    A.    Yeah.
2    Q.    Okay.  And did it appear to you that he
3  was drinking alcohol?
4    A.    Yes, because the bottle was clearly
5  marked "vodka" in red letters.
6    Q.    And was there anything else about it
7  that led you to believe that he was drinking
8  alcohol?
9    A.    All I saw was the giant bottle that had
10  the vodka label on it.  And I assume vodka is
11  clear, and it was clear liquid he was drinking.
12    Q.    The label -- the red label, did he have
13  his hand on over the label?
14    A.    No, he didn't.  He had it around the
15  neck.
16    Q.    Okay.
17    A.    He had his hand around the neck.
18    Q.    And how many times did you see him
19  drink out of it?
20    A.    Anywhere between four and six times.
21    Q.    And did it appear to you that he was
22  looking at you when he was doing that?
23    A.    The first time he didn't, but the
24  second and third time after we had noticed that he

Urlaub Bowen & Associates, Inc.  312-781-9586

---

Deposition of GAIL GLASSFORD, 8/15/2012

Page 19

1  was doing it tended to -- like it's as if he was
2  trying to get caught.  He would look at us and then
3  take a swig of the bottle and then look at us again
4  and drive off.
5    Q.    And what did you understand that
6  behavior to be?
7    A.    He was drinking alcohol, so I would
8  figure that the alcohol had some kind of play on
9  it, like he grew beer muscles.
10    Q.    And did you see the silver car continue
11  to go south?
12    A.    Yes, until it hit in front of the
13  firehouse.  And then he got out and chatted with
14  some of the other officers standing on the corner
15  there.
16    Q.    Okay.  And then what happened?
17    A.    And then he got back in the car and he
18  drove towards Tilden way and he went inside, I
19  guess.
20                Because my mother had called Gary to
21  ask him if he actually was drinking a bottle of
22  vodka in his car, and Gary was literally right
23  across -- because he does 50 to 51st and he was
24  right across, and he said yes.

Urlaub Bowen & Associates, Inc.  312-781-9586

Deposition of GAIL GLASSFORD, 8/15/2012

Page 20

1 And he said -- well, my mother asked
2 him can you give me the license plate number.  And
3 Gary walked across the street and gave the license
4 plate number to my mother, then walked back, and
5 that's when him and the cop had started talking.
6 Q.    When you first saw the silver car, was
7 there anyone outside with you?
8 A.    It was Roseann Anderson, and my mother
9 was sitting on the porch.
10 Q.    Okay.  And what happened after the
11 officer -- so you see him drive past, you're
12 heading southbound, and you see him stop near the
13 fire station  And then I think at some point you
14 see him get back in the car and drive back towards
15 you?
16 A.    Yes, towards -- back towards Tilden.
17 Q.    Okay.  And then did you see where he
18 parked his car?
19 A.    He parked it right in front of the
20 school.
21 Q.    And did you see what happened after
22 that?
23 A.    No, I didn't, until we went in and we
24 were told that the officer had come in and

Urlaub Bowen & Associates, Inc.  312-781-9586

Deposition of GAIL GLASSFORD, 8/15/2012

Page 21

1 complained about Gary Anderson, about him taking --
2 supposedly taking the number for a gang banger.
3 Q.    When you say that you heard that the
4 officer had complained about Gary Anderson, which
5 officer are you referring to?
6 A.    The officer that was in the car.
7 Q.    The silver car?
8 A.    Yes.
9 Q.    Okay.  And then what's the next thing
10 that happened after that?
11 A.    The next thing that happened after that
12 is we had all went in and we had come back out, and
13 then there was a -- my mother was talking to the
14 officer that had came to -- about her calling for
15 the drunk driver.  And then we walked over to my
16 mother's house, and that's when we told them
17 everything.
18 So then they picked me and Roseann
19 up and drove us down -- back to the fire station
20 where he was posted back again and asked, "Well, is
21 this the guy that was in the car?"
22 We said, "Yes."  Although, he
23 supposedly -- we didn't find no bottle.
24 So we're like, "Well, we saw it for

Urlaub Bowen & Associates, Inc.  312-781-9586

Deposition of GAIL GLASSFORD, 8/15/2012

Page 22

1 sure."
2 And they're like, "Okay.  Well,
3 we'll have somebody come out and you can write up a
4 piece of paper stating what you saw."
5 Q.    When the officer first came to talk to
6 you, was that officer wearing a white shirt?
7 A.    Yes, he was.
8 Q.    Okay.  And did you tell the officer
9 what you had seen and heard?
10 A.    Yes.
11 Q.    Did you tell him that you saw who you
12 now know to be a guy wearing a police uniform
13 driving a silver car and drinking what you believe
14 to be an alcoholic drink?
15 A.    Yes.
16 Q.    Did you hear Roseann Anderson tell the
17 officer the same thing?
18 A.    Yes.  We were in the car together.
19 Q.    Okay.  And what happened -- so after
20 you're at the -- well, where were you?
21 When the officer in the white shirt
22 first came to talk to you, where were you?
23 A.    I was out in front of 4849 South Union.
24 Q.    And was Roseann Anderson there, too?

Urlaub Bowen & Associates, Inc.  312-781-9586

Deposition of GAIL GLASSFORD, 8/15/2012

Page 23

1 A.    Yes, she was.
2 Q.    And Gary was there, too?
3 A.    I believe so, but I cannot remember if
4 he was actually out there; but I do know for a fact
5 my mom was sitting on the porch.
6 Q.    Okay.  And when the officer in the
7 white shirt first came to where you were before you
8 relocated to the firehouse, did you tell the
9 officer originally what you had seen?
10 A.    Yes, I had.
11 Q.    And did you tell him that you saw the
12 person in the silver car drinking what you believe
13 to be an alcoholic drink?
14 A.    Yes.
15 Q.    So after you go to the firehouse -- and
16 what happens after that?  After you tell what you
17 saw again, what happens after that?
18 A.    They took our names and our phone
19 numbers, and I believe they looked us up to make
20 sure we were telling the truth on our dates and our
21 ages.  And then they let us walk back to the house.
22 And then they said, well, if there's any more
23 further actions they would let us know.
24 Q.    Okay.  And you didn't sign anything

Urlaub Bowen & Associates, Inc.  312-781-9586

Deposition of GAIL GLASSFORD, 8/15/2012

Page 36

1   driving down the street?

2          A.    No.

3          MR. FLAXMAN:  Okay.  I have nothing further.

4          MR. JEBSON:  Okay.  I don't have any

5   questions.

6               You have a right to review this

7   transcript to make sure that the court reporter

8   accurately took down your answers.  You don't have

9   to do that.  If you want to do that, my

10  understanding is you have to come down to the court

11  reporter's office.  But, again, it's up to you if

12  you want to do that.

13         THE WITNESS:  No, I think she got it pretty

14  well.

15         MR. JEBSON:  Okay.  Then signature will be

16  waived.  That's it.  Thank you.

17              FURTHER DEPONENT SAITH NOT ...

18

19

20

21

22

23

24

Urlaub Bowen & Associates, Inc.  312-781-9586

---

Deposition of GAIL GLASSFORD, 8/15/2012

Page 37

1   STATE OF ILLINOIS )
                      )  SS:
2   COUNTY OF COOK    )

3

4          I, Karen M. Kane, a Certified
    Shorthand Reporter in and for the County of Cook
5   and State of Illinois, do hereby certify that GAIL
    GLASSFORD was duly sworn by me to testify the whole
6   truth, and that the foregoing deposition was
    recorded stenographically by me and was reduced to
7   computerized transcript under my direction, and
    that the said deposition constitutes a true record
8   of the testimony given by said witness.

9          I further certify that the reading
    and signing of the deposition was waived by the
10  deponent.

11         I further certify that I am not a
    relative or employee or attorney or counsel of any
12  of the parties, or a relative or employee of such
    attorney or counsel, or financially interested
13  directly or indirectly in this action.

14         IN WITNESS WHEREOF, I have hereunto set
    my hand and affixed my seal of office at Chicago,
15  Illinois, this 10th day of September, A.D. 2012.

16

17

18         Illinois CSR License 084-004706

19

20

21

22

23

24

Urlaub Bowen & Associates, Inc.  312-781-9586

# EXHIBIT F

In The Matter of

**MICHAEL SEISER**

vs.

**CITY OF CHICAGO, et al**

**Deposition of
ROSEANN ANDERSON
August 15, 2012**

**Urlaub Bowen & Associates, Inc.**
Certified Shorthand Reporters
Video Conference Center
312-781-9586
Fax 312-781-9228
info@urlaubbowen.com
www.urlaubbowen.com

---

Deposition of ROSEANN ANDERSON, 8/15/2012

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHAEL SEISER,          )
          Plaintiff,     )
     vs.                 )   No. 12 C 2353
CITY OF CHICAGO and DEBRA )
KIRBY,                   )
          Defendants.    )

     The deposition of ROSEANN ANDERSON, taken
pursuant to notice, before Karen M. Kane, CSR
No. 084-004706, Certified Shorthand Reporter within
and for the County of Cook, State of Illinois, at
30 North LaSalle Street, Suite 900, Chicago,
Illinois, on August 15, 2012, commencing at
1:07 o'clock p.m.

     APPEARANCES:

          LAW OFFICES OF KENNETH N. FLAXMAN, PC, by
          MR. KENNETH N. FLAXMAN
          200 South Michigan Avenue, Suite 1240
          Chicago, Illinois  60604
          knf@kenlaw.com
               on behalf of the plaintiff;

Urlaub Bowen & Associates, Inc.  312-781-9586

---

Deposition of ROSEANN ANDERSON, 8/15/2012

Page 2

1   APPEARANCES: (Continued)
2       HONORABLE STEPHEN R. PATTON
        CORPORATION COUNSEL, by
3       MR. SCOTT J. JEBSON,
        Chief Assistant Corporation Counsel
4       MS. LINDSEY VANORNY,
        Assistant Corporation Counsel
5       30 North LaSalle Street, Suite 900
        Chicago, Illinois  60602
6       sjebson@cityofchicago.org
        lindsey.vanorny@cityofchicago.org
7          on behalf of the Defendants.
8
9                 I N D E X
    Witness:                        Page
10
    ROSEANN ANDERSON
11
    Examination by:
12
        Mr. Jebson ................. 3
13      Mr. Flaxman ................ 31
14
15         * * * * * * * *
         E X H I B I T S
16
    Number          Marked for ID/Referenced
17
18  1 ........................... 3
    2 ........................... 3
19  3 ........................... 3
20
        (Exhibits scanned/attached.)
21
22
23
24

Urlaub Bowen & Associates, Inc.  312-781-9586

---

Deposition of ROSEANN ANDERSON, 8/15/2012

Page 3

1       (Deposition Exhibit Nos. 1, 2,
2        and 3, Witness Anderson, were
3        marked for identification
4        08/15/2012.)
5       (Witness sworn.)
6   MR. JEBSON:  This is the deposition of
7   Roseann Anderson, taken pursuant to the Federal
8   Rules of Civil Procedure.
9           ROSEANN ANDERSON
10  called as a witness herein, having been first duly
11  sworn, was examined and testified as follows:
12          EXAMINATION
13  BY MR. JEBSON:
14      Q.   Could you please state your name for
15  the record, your first and last name.
16      A.   Roseann Anderson.
17      Q.   And, Ms. Anderson, have you ever given
18  a deposition before?
19      A.   No.
20      Q.   So it's pretty simple.  I'm just going
21  to ask you some questions.  The court reporter is
22  going to take down your answers.
23           The important thing is all your
24  answers need to be out loud instead of like

Urlaub Bowen & Associates, Inc.  312-781-9586

Deposition of ROSEANN ANDERSON, 8/15/2012

Page 4

1   shrugging your head so the court reporter can take
2   down your answer.
3           A.    I understand.
4           Q.    And if you don't understand my
5   question, just let me know and I'll just repeat it.
6           A.    Okay.
7           Q.    And if you can wait until I get the
8   question out before you answer, that way we don't
9   talk over each other.
10          A.    Okay.
11          Q.    Any questions?
12          A.    No.
13          Q.    Okay.  So I have marked as exhibits --
14  Deposition Exhibits 1, 2, and 3.
15               1 is, I believe, a statement that
16  you gave on May 10th, 2011; Exhibit 2 is an
17  affidavit that is dated March 29th, 2011; and the
18  third one is just a Google map I did.  As a
19  reference point, I did 4849 South Union.
20               Prior to the deposition did you have
21  a chance to review your affidavit, Exhibit 2, and
22  your statement, Exhibit 1?
23          A.    Yes.
24          Q.    Okay.  So I'm just going to ask you

Urlaub Bowen & Associates, Inc.  312-781-9586

Deposition of ROSEANN ANDERSON, 8/15/2012

Page 5

1   some questions about the affidavit and your
2   statement and then the events of that day.
3               So, first, can I please get your
4   address?
5           A.    4825 South Union Avenue.
6           Q.    And you were living there on March
7   29th, 2011?
8           A.    Yes.
9           Q.    Directing your attention to Exhibit
10  No. 2.  Sometime March 29th, 2011, did someone
11  from the police department come to either your
12  residence or somewhere around your residence to
13  talk to you about an incident that happened that
14  day?
15          A.    Yes.
16          Q.    And did you talk -- was it a police
17  officer?
18          A.    Yes.
19          Q.    Okay.  And did he have a white shirt
20  on?
21          A.    Yes.
22          Q.    And did he ask you about what you saw
23  regarding someone driving on your street?
24          A.    Yes.

Urlaub Bowen & Associates, Inc.  312-781-9586

Deposition of ROSEANN ANDERSON, 8/15/2012

Page 6

1           Q.    Did you talk to him about that?
2           A.    Yes.
3           Q.    And after you talked to him, did you
4   then sign an affidavit?
5           A.    Yes.
6           Q.    So I'm going to read the affidavit into
7   the record.  Let me get my copy.  So I'm reading
8   from Exhibit No. 2.
9               Location of Incident, it says 4849
10  South Union.  The date is 29 March, 2011.  The time
11  is 2:15 p.m., slash, 1415 hours, which is military
12  time.
13               And in the summary of statement of
14  the affidavit it says, "It is alleged by the
15  complainant, Roseann Anderson, that on the above
16  date and time at said location the complainant
17  observed an unknown male white police officer in
18  full uniform driving southbound in a gray Pontiac
19  with Illinois license plate" -- I then scratched
20  out the license plate number -- "while drinking
21  from a large clear bottle with a red and white
22  label that appeared to be an alcoholic beverage."
23               Did I correctly read that statement?
24          A.    Yes.

Urlaub Bowen & Associates, Inc.  312-781-9586

Deposition of ROSEANN ANDERSON, 8/15/2012

Page 7

1           Q.    Is that what you told the police
2   officer when he talked to you about what you had
3   observed on March 29th, 2011?
4           A.    Yes.
5           Q.    Did you then sign the affidavit after
6   reading what I just read?
7           A.    Yes.
8           Q.    And is everything in the affidavit that
9   I just read true and accurate, to the best of your
10  memory?
11          A.    Yes.
12          Q.    And sometime later on May 10th, 2011, I
13  believe that you then went to a police station to
14  give your statement regarding this incident?
15          A.    Yes.
16          Q.    And did you, in fact, do that?
17          A.    Yes.
18          Q.    I'll turn your attention to Exhibit 1,
19  Bates stamped page 107, which is the last page.  Is
20  that your signature?
21          A.    Yes.
22          Q.    And did you read your statement prior
23  to signing it?
24          A.    Yes.

Urlaub Bowen & Associates, Inc.  312-781-9586

Deposition of ROSEANN ANDERSON, 8/15/2012

Page 8

1    Q.    And is your statement that you gave,
2    which is Deposition Exhibit 1, a true and accurate
3    statement of what you remember seeing on March 29,
4    2011?
5    A.    Yes.
6    Q.    So I'm going to just briefly go over
7    what you remember seeing --
8    A.    Okay.
9    Q.    -- because I know it's been a while.
10   So you can -- I'm going to keep your statement and
11   affidavit in front of you.  If you need to refer to
12   that, feel free.
13   A.    Okay.
14   Q.    How long have you lived at 4825 South
15   Union?
16   A.    About 14 years.
17   Q.    Do you know -- I'm just going to say a
18   name and let me know if you know this person --
19   Officer Michael Seiser?
20   A.    No.
21   Q.    On May 29th, 2011 -- I'm sorry -- March
22   29th, 2011, were you working on that day?
23   A.    No.
24   Q.    Were you at home that day?

Urlaub Bowen & Associates, Inc.  312-781-9586

---

Deposition of ROSEANN ANDERSON, 8/15/2012

Page 9

1    A.    Yes.
2    Q.    At sometime during the day did you
3    observe a gray car driving southbound on Union that
4    drew your attention?
5    A.    Yes.
6    Q.    Tell me where you were when that
7    happened.
8    A.    I was in front of 4849 South Union.
9    Q.    And do you know who lives at that
10   address?
11   A.    My daughter's grandmother.
12   Q.    What's her name?
13   A.    Kathleen Glassford, who is now
14   deceased.
15   Q.    I'm sorry to hear that.  Why were you
16   over there that day?
17   A.    I took my daughter down there to see
18   her grandma.
19   Q.    All right.  Do you remember what time
20   you got to that house?
21   A.    I would say about 2:00 o'clock because
22   it was right after school.
23   Q.    Oh.  The school is Tilden school?
24   A.    No.  She goes to Alexander Graham.

Urlaub Bowen & Associates, Inc.  312-781-9586

---

Deposition of ROSEANN ANDERSON, 8/15/2012

Page 10

1    Q.    My question wasn't a good one.
2          The school on Union is Tilden
3    school?
4    A.    Yes.
5    Q.    Okay.  So around 2:00 o'clock you were
6    at 4849 South Union?
7    A.    Yes, sir.
8    Q.    And when you saw the gray car driving
9    southbound on Union, where were you?
10   A.    I was standing right on the sidewalk in
11   front of 4849.
12   Q.    Do you remember what you were wearing
13   that day?  And if you don't, you don't.
14   A.    Probably jeans and a sweatshirt.
15   Q.    Are you just guessing?
16   A.    That's my normal wear.
17   Q.    Okay.  Do you remember how your hair
18   was, if it was up or down?  And by the way, if you
19   don't remember, you can just tell me you don't
20   remember.
21   A.    I can tell you a ponytail.  That's how
22   I wear my hair all the time.
23   Q.    All right.  So what was it that drew
24   your attention that day to the gray Pontiac?

Urlaub Bowen & Associates, Inc.  312-781-9586

---

Deposition of ROSEANN ANDERSON, 8/15/2012

Page 11

1    A.    It was driving very slowly down the
2    middle of the street.
3    Q.    And that is southbound on Union?
4    A.    Yes, sir.
5    Q.    And what color was that car?
6    A.    Probably like a grayish color.
7    Q.    And the model?
8    A.    It was either a Grand Am or -- Grand
9    Am, Grand Prix.
10   Q.    It was a Pontiac?
11   A.    Yes.
12   Q.    And what else -- other than the fact
13   that it was driving slow in the middle of the
14   street, what else did you notice?
15   A.    The person inside the car was drinking
16   from a clear large bottle with a red and white
17   label that appeared to be alcohol.
18   Q.    And what was it about the bottle that
19   appeared to be alcohol?
20   A.    I've had the same kind of alcohol, so I
21   knew what the bottle looked like, so that's what
22   drew my attention.
23          And we have a lot of children that
24   play outside, so any kind of drunk driver we try to

Urlaub Bowen & Associates, Inc.  312-781-9586

Deposition of ROSEANN ANDERSON, 8/15/2012

Page 12

```
 1   call right away on them.
 2       Q.    Okay.  And what bottle -- you said that
 3   you've seen the bottle in the past.
 4       A.    Yes.
 5       Q.    What type of alcohol was in that
 6   bottle?
 7       A.    Vodka.
 8       Q.    And the person that was driving the
 9   gray car, was it a male or a female?
10       A.    Male.
11       Q.    And so it appeared to you that he was
12   drinking out of a clear vodka bottle?
13       A.    Yes.
14       Q.    And can you describe -- you said you
15   were on the sidewalk when that happened?
16       A.    Yes.
17       Q.    And when did you first notice the gray
18   car heading southbound on Union?  Like how far
19   north was he when you first noticed him?
20       A.    It wasn't that far.  There's a stop
21   sign on -- let me make sure I've got this right.
22             There's a stop sign right here on
23   48th Place, and I'm only a little down from here
24   (indicating).  So I noticed the car at the stop
```

Urlaub Bowen & Associates, Inc.  312-781-9586

Deposition of ROSEANN ANDERSON, 8/15/2012

Page 13

```
 1   sign, and as he drove past is when I seen him lift
 2   the bottle and drink from it.  And he was in the
 3   middle of the street driving very slowly
 4   southbound.
 5       Q.    When you saw him drink from what you
 6   believe to be the vodka bottle, did it appear to
 7   you that the driver was looking at you when he was
 8   doing that?
 9       A.    No.
10       Q.    Did it appear -- where did it appear
11   that he was looking, based on your observations?
12       A.    Straight ahead.
13       Q.    How many times did you see the
14   individual driving the gray car drink from you what
15   you thought to be a vodka bottle?
16       A.    Twice.
17       Q.    So the first time that you saw him
18   drink from the vodka bottle, was that after he
19   stopped at the stop sign or before?
20       A.    After.
21       Q.    And then where was he in relationship
22   to where you were standing when you saw him drink
23   the first time of what you thought was a vodka
24   bottle?  How far away from you?
```

Urlaub Bowen & Associates, Inc.  312-781-9586

Deposition of ROSEANN ANDERSON, 8/15/2012

Page 14

```
 1       A.    Directly in front of me.
 2       Q.    Okay.  So how many feet -- and I'm not
 3   asking for an exact amount.  What's your best guess
 4   of how many feet away the car was from you when you
 5   saw the person drinking out of what you thought to
 6   be a vodka bottle?
 7       A.    Maybe not even 10 feet.
 8       Q.    All right.  The second time that -- how
 9   much time passed from the time you saw him drink
10   out of what you thought to be a vodka bottle the
11   first time until you saw him drink out of it a
12   second time?
13       A.    Maybe 30 seconds.
14       Q.    And was he drinking it in the same way
15   that he was drinking it the first time you saw him?
16       A.    Yes.
17       Q.    How far away was -- well, let me ask a
18   different question.
19             Did you have a clear view of the
20   person drinking out of what you thought to be a
21   vodka bottle the first time you saw him?
22       A.    Yes.
23       Q.    Did you have a clear view of the person
24   drinking out of what you thought to be the vodka
```

Urlaub Bowen & Associates, Inc.  312-781-9586

Deposition of ROSEANN ANDERSON, 8/15/2012

Page 15

```
 1   bottle the second time?
 2       A.    Yes.
 3       Q.    What did you -- what happened after you
 4   saw him drink out of the bottle a second time?
 5       A.    My daughter's grandmother called the
 6   police.
 7       Q.    And that would have been Kathleen
 8   Glassford?
 9       A.    Yes.
10       Q.    When you were outside and you saw the
11   driver of the gray van taking those two drinks out
12   of the bottle, was there anyone else outside in the
13   area with you?
14       A.    Gail Glassford.
15       Q.    And who is she in relationship to you?
16       A.    She's my daughter's aunt.
17       Q.    And when you saw the driver of the gray
18   Pontiac drink out of the bottle the first time, do
19   you know where Gail Glassford was?
20       A.    Standing next to me.
21       Q.    About how far away from you was she?
22       A.    Less than a foot.
23       Q.    Okay.  And how about the second time
24   that you saw the person driving the gray car drink
```

Urlaub Bowen & Associates, Inc.  312-781-9586

Deposition of ROSEANN ANDERSON, 8/15/2012

Page 16

1   out of the bottle, where was Gail at that time?
2       A.   Still standing next to me.
3       Q.   Same place?
4       A.   Yes.
5       Q.   So you mentioned that -- oh.  Was
6   Kathleen Glassford also outside during that time?
7       A.   Yes, she was.
8       Q.   Where was she?
9       A.   The porch.
10      Q.   The porch to the house at 4849 South
11  Union?
12      A.   Yes, sir.
13      Q.   To your knowledge, was Kathleen
14  Glassford out on the porch during the both times
15  that you observed the driver of the vehicle
16  drinking out of the bottle?
17      A.   Yes.
18      Q.   And did you say anything to anyone in
19  response to when you saw the driver of the gray
20  vehicle drink out of what appeared to you to be a
21  vodka bottle?
22      A.   I don't -- I honestly don't remember.
23      Q.   Okay.  Do you know why it is that
24  Kathleen Glassford called the police?

Urlaub Bowen & Associates, Inc.  312-781-9586

Deposition of ROSEANN ANDERSON, 8/15/2012

Page 17

1       A.   Because she also seen what he was
2   doing.
3       Q.   Is that something that she told you,
4   like "I saw it, too," or did you notice someone
5   saying something to her?
6       A.   She -- I'm trying to remember because I
7   don't want to -- I think she said something like,
8   "Did you see that?"
9       Q.   Did she say that to you?
10      A.   Yes.
11      Q.   And what was your response to that?
12      A.   I said "yes."
13      Q.   And then what do you remember about the
14  next thing that was said?
15      A.   She said she was going to call the
16  police.
17      Q.   And did she say why she was going to
18  call the police, or was it obvious to you?
19      A.   It was obvious.
20      Q.   And why was it obvious to you?
21      A.   Because we seen the same thing.
22      Q.   Okay.  And then what's the next thing
23  that happened after that?
24      A.   I'm sorry.  It's just been awhile.

Urlaub Bowen & Associates, Inc.  312-781-9586

Deposition of ROSEANN ANDERSON, 8/15/2012

Page 18

1       Q.   It's okay.  Let me ask you this:  Did
2   you stay outside after you saw the person in the
3   gray car drinking twice, or did you --
4       A.   Yes.
5       Q.   And how long did you stay outside until
6   you did something else, like go inside or go
7   somewhere else?
8       A.   I was probably outside for like an
9   hour.
10      Q.   After you saw the person drinking the
11  second time out of the bottle who was driving that
12  gray car, did you see him proceed southbound down
13  Union?
14      A.   Yes.
15      Q.   And did you see -- what did you see
16  where he went?
17      A.   He parked in front of the fire station
18  on 50th and Union.
19      Q.   Did you see him get out of the car?
20      A.   Yes.
21      Q.   Were you able to determine what he was
22  wearing when he got out of the car?
23      A.   Not at that time.
24      Q.   At sometime later?

Urlaub Bowen & Associates, Inc.  312-781-9586

Deposition of ROSEANN ANDERSON, 8/15/2012

Page 19

1       A.   Yes.
2       Q.   And what was he wearing?
3       A.   A full Chicago police uniform.
4       Q.   And where was he later when you were
5   able to see that he was wearing a Chicago police
6   officer's uniform?
7       A.   He was getting out of his car in front
8   of the fire station.
9       Q.   Okay.  So that's when -- after he had
10  passed you, after he parked near the fire station,
11  he then got out of the car?
12      A.   Uh-huh.
13      Q.   And at that point when he was in that
14  area, you noticed that he was wearing a Chicago
15  police officer's uniform?
16      A.   Yes, sir.
17      Q.   Did you notice the driver -- what did
18  you notice about the driver of the gray Pontiac
19  after he got out of his car near the fire station?
20      A.   I seen him walk up to my brother.
21      Q.   And your brother is?
22      A.   Gary Anderson.
23      Q.   And where was Gary Anderson and where
24  was the person who got out of the gray car standing

Urlaub Bowen & Associates, Inc.  312-781-9586

Deposition of ROSEANN ANDERSON, 8/15/2012

Page 24

1   my brother was just, "Let me let you go."

2            Because at that time my brother was

3   actually on the job, so he had to call and report

4   what was going on to his superior.

5      Q.   You said that you can hear voices

6   getting louder when you were talking to your

7   brother?

8      A.   Yes.

9      Q.   Did you -- in terms of the voices

10  getting louder, which voices did you hear?

11     A.   The other man.

12     Q.   Okay.  So when he -- so then you and

13  your brother hang up?

14     A.   Yes.

15     Q.   And then what did you do next?

16     A.   I just stood out there.  I didn't know

17  what else to do.

18     Q.   Okay.  And then did you continue to

19  observe the person who got out of that gray car who

20  you then saw he was wearing a police uniform?

21     A.   Yes.

22     Q.   And what did you observe him doing?

23     A.   After he was done with his conversation

24  with my brother, he got back into his car.

Urlaub Bowen & Associates, Inc.  312-781-9586

---

Deposition of ROSEANN ANDERSON, 8/15/2012

Page 25

1     Q.   Oh, the police officer got back into

2  his gray car?

3     A.   Yes.

4     Q.   And then did you continue to observe

5  him sitting in the gray car?

6     A.   Yes.

7     Q.   What did you observe?

8     A.   He was just sitting there.  From the

9  angle he was parked I couldn't see into the car, so

10  I don't know what else he was doing in there.

11     Q.   Sure.  At some point did you see him

12  get back out of that car?

13     A.   No.

14     Q.   What did you do next?

15     A.   I was just standing in front of 4849

16  South Union, and a different -- a police

17  officer pulled up in front of the house in a police

18  vehicle and he, you know, asked us what was going

19  on.  We explained to him.  He was in a white shirt.

20         And after we explained to him what

21  we saw, he went down by the gray Pontiac, and I

22  don't know what was done down there.

23         And then a few minutes later he sent

24  another police officer in a vehicle for me and Gail

Urlaub Bowen & Associates, Inc.  312-781-9586

---

Deposition of ROSEANN ANDERSON, 8/15/2012

Page 26

1   and brought us down by the police station.  And

2   basically they just took our names and our phone

3   numbers, our information, and we sat there for a

4   few minutes and then they brought us back, back in

5   front of 4849.

6      Q.   Okay.  So I want to back up a little

7   bit.

8         So we're at the point where you see

9   the guy in the gray car get back into his car.

10     A.   Yes.

11     Q.   And then at some point a police

12  officer, then, with a white shirt pulls up to where

13  you are?

14     A.   Yes.

15     Q.   And then you said that you told him

16  what was going on.  Did you tell him that you saw

17  someone with a police uniform driving southbound on

18  Union drinking out of what appeared to be a vodka

19  bottle, or something to that effect, that he was

20  drinking alcohol while driving?

21     A.   We told him that we seen someone that

22  was drinking and driving who is now parked in front

23  of the fire station and has got out of his vehicle

24  and was wearing what appeared to be a Chicago

Urlaub Bowen & Associates, Inc.  312-781-9586

---

Deposition of ROSEANN ANDERSON, 8/15/2012

Page 27

1   policeman's uniform.

2     Q.   Okay.  Anything else you remember

3   telling him at that point?

4     A.   I know he said something, "Are you

5   sure," or something like that.  And I said, "yes,"

6   and then that's when he left to go down by the

7   Pontiac.

8      Q.   Okay.  And then do you know that

9   officer's name that was wearing the white shirt

10  that you originally talked to?

11     A.   No.

12     Q.   So then I think you said at some point

13  either that officer or another officer came back to

14  where you were?

15     A.   Yes.

16     Q.   Was that a different officer?

17     A.   Yes.

18     Q.   But he also had a white shirt?

19     A.   No.  He had a blue shirt.

20     Q.   Oh, blue shirt.  Okay.  Do you know his

21  name?

22     A.   No.

23     Q.   And did you tell him what you saw?

24     A.   Basically he just asked me and Gail to

Urlaub Bowen & Associates, Inc.  312-781-9586

Deposition of ROSEANN ANDERSON, 8/15/2012

Page 36

1  Q.   And how big a -- how big a bottle is
2  that?  I mean, is it a gallon bottle, a liter
3  bottle?
4  A.   The bottle that the person had?
5  Q.   No.  The one that you had had that you
6  saw -- was the same as the bottle you saw.
7  A.   I think it's a fifth.
8  Q.   And does the Dimitri bottle, does that
9  come in plastic bottles?
10  A.   Yes.
11  Q.   And are there labels on that?
12  A.   Yes.
13  Q.   Do you know what the labels say?
14  A.   Dimitri vodka.
15  Q.   Were you able to see a Dimitri vodka
16  label on the bottle as the car drove past you?
17  A.   I seen a red and white label.
18  Q.   And when you say red and white, is it a
19  red background and white printing?
20  A.   It's a white background and I believe
21  with red printing.
22  Q.   Could you be able to make out any of
23  the printing?
24  A.   No.

Urlaub Bowen & Associates, Inc.  312-781-9586

---

Deposition of ROSEANN ANDERSON, 8/15/2012

Page 37

1  Q.   Anything else about that bottle that
2  made you believe it was a Dimitri vodka bottle?
3  A.   The way the grooves are in the -- the
4  bottle has grooves in it.
5  Q.   Have you ever seen any other bottles
6  besides Dimitri vodka bottles that looked like the
7  bottle you saw that day?
8  A.   No.
9  Q.   Did you ever tell any police officer
10  that you thought it was a Dimitri vodka bottle?
11  A.   No.  I said a bottle with a red and
12  white label on it.
13  Q.   You said that your daughter's
14  grandmother called the police.
15  A.   Yes.
16  Q.   Did she call the police before you
17  called your brother?
18  A.   Yes.  She was on the phone with the
19  police.
20  Q.   And did you hear her give the license
21  plate number over the phone to the police?
22  A.   Yes.
23  Q.   And was that before you spoke with your
24  brother?

Urlaub Bowen & Associates, Inc.  312-781-9586

---

Deposition of ROSEANN ANDERSON, 8/15/2012

Page 38

1  A.   It was while I was on the phone with my
2  brother.
3  Q.   So Kathleen Glassford called the
4  police -- am I right that she called the police
5  before she had the license plate number?
6  A.   Yes.
7  Q.   Have you ever been with her before when
8  she called the police about cars traveling down
9  Union?
10  A.   Yes.
11  Q.   How many times has she done that?
12  A.   I have no idea.
13  Q.   Has she done that --
14  A.   She's done it before.
15  Q.   Have you ever called the police about
16  cars -- suspicious cars driving down Union?
17  A.   Yes, I have.
18  Q.   How many times have you done it?
19  A.   A few.
20  Q.   More than 10?
21  A.   No, probably not more than 10, no.
22  Q.   When is the last time you did it?
23  A.   It's been awhile.
24  Q.   When is the last time you know that

Urlaub Bowen & Associates, Inc.  312-781-9586

---

Deposition of ROSEANN ANDERSON, 8/15/2012

Page 39

1  Kathleen Glassford did it?
2  A.   Kathleen has been deceased for a year
3  now.
4  Q.   I'm sorry.  Before she passed do you
5  remember when it was that she -- the last time she
6  called the police?
7  MR. FLAXMAN:  We'll take a break.  I'm sorry.
8  (Recess taken.)
9  BY MR. FLAXMAN:
10  Q.   Is there a neighborhood watch on your
11  block?
12  A.   No.
13  Q.   Okay.  This is a question that I
14  routinely ask, and I'm not trying to insult you or
15  embarrass you.  Are you on any kind of medication,
16  ma'am?
17  A.   No, sir.
18  Q.   Okay.  Did you ever -- after your phone
19  call to your brother, did you ever talk with him
20  about the events of March 29th, 2011?
21  A.   Not until the officer came to make
22  this -- to do this (indicating).
23  Q.   By "this," you mean Exhibit 2?
24  A.   Yes.

Urlaub Bowen & Associates, Inc.  312-781-9586

Deposition of ROSEANN ANDERSON, 8/15/2012

Page 52

1    Q.    Anybody ever tell you that there was
2  water in the bottle that the officer was drinking?
3    A.    Nope.
4    Q.    Anybody ever ask you to come to court
5  on a case against the officer?
6    A.    No.
7    Q.    Anybody ever tell you that you were
8  listed as the complaining witness on a ticket
9  issued to the officer for carrying open alcohol in
10 his car?
11   A.    No.
12   Q.    Okay.  And other than what you saw as
13 the man drove by, drinking from the bottle, do you
14 have any other information that supports a belief
15 that the man was drinking alcohol?
16   A.    No.
17   MR. FLAXMAN:  Thank you.  I have nothing
18 further.
19   MR. JEBSON:  Okay.  I don't, either.  This is
20 going to be typed up and you have the right, if you
21 want to, to review it to make sure the court
22 reporter accurately took down your answers.  You
23 can waive that right and then you don't have to
24 review it, but it's completely up to you.

Urlaub Bowen & Associates, Inc.  312-781-9586

Deposition of ROSEANN ANDERSON, 8/15/2012

Page 53

1    THE WITNESS:  It doesn't matter.
2    MR. JEBSON:  I can't make that decision for
3  you, so it's up to you.
4    THE WITNESS:  I don't need to sign it; I
5  don't need to read it.
6    MR. JEBSON:  Okay.  So signature waived.
7    FURTHER DEPONENT SAITH NOT ...

Urlaub Bowen & Associates, Inc.  312-781-9586

Deposition of ROSEANN ANDERSON, 8/15/2012

Page 54

1  STATE OF ILLINOIS )
                     )  SS:
2  COUNTY OF COOK    )

3         I, Karen M. Kane, a Certified
4  Shorthand Reporter in and for the County of Cook
   and State of Illinois, do hereby certify that
5  ROSEANN ANDERSON was duly sworn by me to testify
   the whole truth, and that the foregoing deposition
6  was recorded stenographically by me and was reduced
   to computerized transcript under my direction, and
7  that the said deposition constitutes a true record
   of the testimony given by said witness.

8         I further certify that the reading
9  and signing of the deposition was waived by the
   deponent.

10        I further certify that I am not a
11 relative or employee or attorney or counsel of any
   of the parties, or a relative or employee of such
12 attorney or counsel, or financially interested
   directly or indirectly in this action.

13        IN WITNESS WHEREOF, I have hereunto set
14 my hand and affixed my seal of office at Chicago,
   Illinois, this 10th day of September, A.D. 2012.
15

16

17

18        Illinois CSR License 084-004706
19

20

21

22

23

24

Urlaub Bowen & Associates, Inc.  312-781-9586

# EXHIBIT G

**ORIGINAL TRANSCRIPT**

---

2

```
 1          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                  EASTERN DIVISION

 3    MICHAEL SEISER,                )
                                     )
 4                 Plaintiff,        )
                                     )
 5        vs.                        )  No. 12 C 2353
                                     )
 6    CITY OF CHICAGO and DEBRA      )
      KIRBY,                         )
 7                                   )
                   Defendants.       )
 8
 9        The deposition of GARY ANDERSON, taken
10    pursuant to notice, before Karen M. Kane, CSR
11    No. 084-004706, Certified Shorthand Reporter within
12    and for the County of Cook, State of Illinois, at
13    30 North LaSalle Street, Suite 900, Chicago,
14    Illinois, on August 15, 2012, commencing at
15    2:04 o'clock p.m.
16
17        APPEARANCES:
18        LAW OFFICES OF KENNETH N. FLAXMAN, PC, by
          MR. KENNETH N. FLAXMAN
19        200 South Michigan Avenue, Suite 1240
          Chicago, Illinois  60604
20           knf@kenlaw.com
             on behalf of the plaintiff;
21
22
23
24
```

---

2

```
 1    APPEARANCES: (Continued)

 2        HONORABLE STEPHEN R. PATTON
          CORPORATION COUNSEL, by
 3        MR. SCOTT J. JEBSON,
          Chief Assistant Corporation Counsel
 4        MS. LINDSEY VANORNY,
          Assistant Corporation Counsel
 5        30 North LaSalle Street, Suite 900
          Chicago, Illinois  60602
 6        sjebson@cityofchicago.org
          lindsey.vanorny@cityofchicago.org
 7             on behalf of the Defendants.

 8    ALSO PRESENT:

 9        Ms. Roseann Anderson

10
11                  I N D E X
12    Witness:                          Page

      GARY ANDERSON
13
          Examination by:
14
              Mr. Jebson ................. 3
15            Mr. Flaxman ................ 30

16            * * * * * * *

17                E X H I B I T S
18    Number                Marked for ID/Referenced

19    1 ......................................... 5
20
21            (Exhibits scanned/attached.)
22
23
24
```

---

3

```
 1                  (Witness sworn.)
 2                 GARY ANDERSON
 3    called as a witness herein, having been first duly
 4    sworn, was examined and testified as follows:
 5                  EXAMINATION
 6    BY MR. JEBSON:
 7        Q.   Good afternoon.
 8        A.   Good afternoon.
 9        Q.   Could you please state your name for
10    the record?
11        A.   Gary Anderson.
12        MR. JEBSON:  This is the deposition of Gary
13    Anderson, taken pursuant to the Federal Rules of
14    Civil Procedure.
15    BY MR. JEBSON:
16        Q.   Mr. Anderson, have you ever given a
17    deposition before?
18        A.   No, sir.
19        Q.   All right.  I'll just go through --
20    it's pretty simple, but just basically explain
21    what's going to happen.
22             I'm just going to ask you some
23    questions, and if you can make your answers out
24    loud so the court reporter can take down your
```

---

4

```
 1    answer.
 2        A.   Yes, sir.
 3        Q.   And if my question calls for a yes or a
 4    no, if you can say "yes" or "no" instead of saying
 5    "uh-huh" or "huh-uh."  That way the court reporter
 6    can take it down.
 7        A.   Yes, sir.  Yes.
 8        Q.   Great.  And then it is common when
 9    we're not in a deposition when people talk that
10    you're going to anticipate where I'm going with a
11    question.  It's natural to interrupt me --
12        A.   Okay.
13        Q.   -- but it's difficult in a deposition.
14    Because if you do that, then we're talking over
15    each other and it makes the court reporter's job
16    really, really hard.
17             So if you can wait until I get the
18    question out before you answer it, even if you know
19    where I'm going with it --
20        A.   Okay.
21        Q.   -- that way we won't talk over each
22    other.
23        A.   Okay.  Yes, sir.
24        Q.   Great.  Thank you.
```

5

1      A.     Yes, sir.

2      Q.     I'll do the same thing for you.  If you

3   don't understand my question, please let me know,

4   and I'll just rephrase it.

5      A.     Yes, sir.

6      Q.     Sound good?

7      A.     Yes, sir.

8      Q.     Any questions before we get started?

9      A.     No, sir.

10      Q.     Great.  You don't have to call me, sir,

11   either.  It makes me seem old.

12      A.     I'm sorry.

13      Q.     I have the same habit, so --

14      A.     Okay.

15      Q.     Can I please get your date of birth?

16      A.     6/9/81.

17      Q.     And what's your current address?

18      A.     727 West 47th Place.

19      Q.     And where are you currently working?

20      A.     Whitney Foods.

21                  (Deposition Exhibit No. 1,

22                  Witness G. Anderson, was

23                  marked for identification

24                  08/15/2012.)

URLAUB BOWEN & ASSOCIATES, INC.
(312) 781-9586

6

1   BY MR. JEBSON:

2      Q.     I'm going to hand you what I've marked

3   as G. Anderson -- meaning Gary Anderson --

4   Deposition Exhibit 1.

5      A.     Okay.

6      Q.     And that is a statement that I believe

7   you gave on May 10th, 2011.

8      A.     Okay.

9      Q.     And if you turn to the last page of

10   that exhibit, which is Bates stamped 110, do you

11   see your signature on that page?

12      A.     Yes, sir.

13      Q.     Okay.  So is this a statement that you

14   gave regarding certain events that you observed on

15   March 29th, 2011?

16      A.     Yes, sir.

17      Q.     And did you give that statement on May

18   10th, 2011?

19      A.     Yes, sir.

20      Q.     After giving that statement, did you

21   have an opportunity to review the questions and

22   answers?

23      A.     Yes, sir.

24      Q.     And did you do that?

URLAUB BOWEN & ASSOCIATES, INC.
(312) 781-9586

7

1      A.     Yes, sir.

2      Q.     And after reviewing the questions and

3   answers, did you do that to make sure it was

4   accurate?

5      A.     Yes, sir.

6      Q.     And was it accurate?

7      A.     Yes, sir.

8      Q.     Did you sign your statement, which is

9   Exhibit 1, after you reviewed it for accuracy?

10      A.     Yes, sir.

11      Q.     Are all the answers that you gave in

12   Exhibit No. 1 true and correct, to the best of your

13   knowledge?

14      A.     Yes, sir.

15      Q.     Great.  So I'm going to ask you some

16   questions about March 29th, 2011.  Were you working

17   at that time?

18      A.     Yes, sir.

19      Q.     And where were you working?

20      A.     My post is at 50th and Union.

21      Q.     You mentioned your post.  What do you

22   mean by that?

23      A.     At the time I worked for Blackstar

24   Project, which was a -- we were safety facilitators

URLAUB BOWEN & ASSOCIATES, INC.
(312) 781-9586

8

1   for Tilden High School.

2      Q.     Blackstar Project?

3      A.     Yes, sir.

4      Q.     Can you explain what type of company

5   that is?

6      A.     It's actually -- we -- for the schools.

7   Instead of inside a school, we're outside the

8   school security guards.  But we're like parents

9   and -- parents and just citizens of the community

10   so that we were protecting the students because

11   that is one of our dangerous routes where they have

12   to walk through to get home.  We make sure the

13   students get home safely.

14      Q.     And the students, that's for the Tilden

15   school?

16      A.     Yes.

17      Q.     So you were assigned to the Tilden

18   school --

19      A.     Yes, sir.

20      Q.     -- on March 29th, 2011?

21      A.     Yes.

22      Q.     How long had you been assigned to that

23   school as of that date?

24      A.     As of -- I was there a year, a year and

URLAUB BOWEN & ASSOCIATES, INC.
(312) 781-9586

9

1    three months as of that day.

2        Q.    And what were your general duties?

3        A.    General duties is you watch any

4    suspicious activity in cars, any suspicious people

5    walking up, make sure they're not grabbing anything

6    on their side or bringing anything towards the

7    school; anybody on bikes; you know, any other rival

8    gangs trying to come towards the school, you know,

9    because we're supposed to know our area pretty well

10   and we interact with the community and everything

11   like that, so we watch out for the community as

12   long as there's students.

13       Q.    Did you have a job title?

14       A.    Safety facilitator.

15       Q.    And how many other safety facilitators

16   were working at Tilden on that day?

17       A.    There was approximately 22 others.

18       Q.    Were you one of the supervisors?

19       A.    I was actually assistant coordinator at

20   the time.

21       Q.    Is that a supervisory role?

22       A.    At the time, yes.

23       Q.    Okay.

24       A.    Yes, sir.

10

1        Q.    Did you have to wear a uniform?

2        A.    All we had was our -- it was actually a

3    green vest, it was a green vest that said CPS on

4    the back.

5        Q.    Did that stand for Chicago Public

6    Schools?

7        A.    Yes, sir.

8        Q.    Do you remember what time you would

9    have started working on March 29th, 2011?

10       A.    March 29th?

11       Q.    And when I say March 29th, 2011, I'm

12   talking about the day of the incident that is

13   subject to the statement that you gave which is

14   Deposition Exhibit 1.

15       A.    I started working at actually 1:00

16   o'clock that day.  In the afternoon I started at

17   1:00.

18       Q.    I want to make sure I have the date

19   right.  Is it March 29th, 2011, the date of the

20   incident?

21       A.    March 29th.  It's on the paper.

22       Q.    Okay.  You're looking at your

23   statement?

24       A.    Yes.

11

1        Q.    Okay.  Thanks.  At some point did

2    anything unusual attract your attention on March

3    29th, 2011?

4        A.    This is how it happened:  I was on my

5    post.  It's actually across from the firehouse on

6    50th and Union.  I got a call from my sister.

7    She's like, "Gary, can you get the license plate of

8    the car that's speeding that way?"

9              I'm like, "What car are you talking

10   about," because no car came by.

11             I'm like, "A car just parked out in

12   front of the firehouse."

13             She goes, "Gary, that's the car."

14             So I walk over.  I'm like, "Nana,

15   that's the Chicago police."

16             She goes, "Okay."  She's like,

17   "What's he doing?"

18             I'm like, "He just took a drink out

19   of a clear container."

20             She goes, "Yeah, he just did the

21   same thing driving fast past us," you know.

22             So I went to get his license plate

23   and I tried to do it like so he wouldn't know, but

24   he actually noticed me.  And I started walking back

12

1    towards my post across the street, and that's when

2    he got out of the car and confronted me.

3        Q.    And your sister is Roseann Anderson?

4        A.    Yes.  Yes, sir.

5        Q.    And where specifically was your post

6    that day?

7        A.    I was actually on 50th and Union right

8    across -- the firehouse is across from my post.

9    I'm on 50th and Union.  It's right across the

10   street.

11             And the firehouse is on the southwest

12   side?

13       A.    Yes, sir.

14       Q.    So would your post be on the east side?

15       A.    Yes, sir.

16       Q.    And when you say your post, would you

17   just be standing in that area?

18       A.    No.  I go back and forth.  Like if I'm

19   on -- if I'm on 50th, I go from 49th all the way to

20   51st.  I just -- we like rotate and we just keep

21   going so we can -- because we have like a little

22   gap between us, so that's where they like to come

23   and gather and do all their stuff, so we kind of

24   walk in between there.

---

13

1  Q.   When you say "they," is that the
2  troublemakers?
3  A.   Yes, sir.
4  Q.   And when you would go, would you be on
5  foot or would you drive?
6  A.   I would be on foot.
7  Q.   So from the start when you start
8  working in particular on that day, you're always on
9  foot?
10  A.   Yes, sir.
11  Q.   So when you were -- so you're
12  essentially across the street from the firehouse?
13  A.   Yes, sir.
14  Q.   And so where were you standing when you
15  got the phone call from your sister?
16  A.   I was directly across the street from
17  the firehouse.
18  Q.   Were you with anyone?
19  A.   No.  I was by myself.
20  Q.   Prior -- okay.  So you talked to your
21  sister and she mentions that she saw someone
22  drinking and driving?
23  A.   Yes, sir.
24  Q.   Do you remember exact word for word or

---

14

1  just generally what she said?
2  A.   She called me, she goes, "Gary, there's
3  a car speeding towards you and it looks like he's
4  drinking and driving."
5  I'm like, "Okay.  What color is the
6  car?"
7  She's like, "It's a gray or silver
8  Bonneville or Stratus."
9  I'm like, "Okay.  I see one," you
10  know, because he just came out of the viaduct.  I'm
11  like, "He's coming this way," you know.
12  I'm like, "He just parked, Nana."
13  She was like, "Get the license plate
14  for me," and I'm like, "Okay."
15  And I walk over and I look and I see
16  a shield.  I'm like, "Nana, he's a cop."
17  She goes, "I don't care," you know,
18  "give me his license plate."
19  So I grab it and I just walk around
20  his car like I'm looking at the students and
21  everything like that, but I'm actually getting it.
22  And I go walk across the street and I'm like,
23  "Nana, this is his license plate number."
24  And he gets out of the car and

---

15

1  that's when he, you know, starts ...
2  Q.   Okay.  So you actually see the car that
3  your sister was describing as it pulled up and
4  parked?
5  A.   Yes, sir.
6  Q.   And prior to it parking, did you see
7  the driver of the vehicle drink out of a bottle?
8  A.   Before -- before I started to walk
9  across the street and get the license plate, he
10  actually took a swig and put it between his legs.
11  Q.   And can you -- what did it appear to
12  you that he was doing when you saw that?
13  A.   See, from a drink -- it looked like he
14  was taking a drink of vodka because the details on
15  the front of the bottle and that, you know, it
16  was -- it looked like a bottle of Smirnoff vodka to
17  me.
18  Q.   So the bottle that he was drinking out
19  of looked like a vodka bottle?
20  A.   Yes, sir.
21  Q.   And can you describe generally what the
22  bottle looked like?
23  A.   It was like a fifth.  It was a big
24  gallon, and it had like a clear but red label on

---

16

1  the front.
2  Q.   And you saw the driver of the gray car
3  take a drink of that prior to him pulling over?
4  A.   No.  When he pulled -- when he pulled
5  over --
6  Q.   Okay.
7  A.   -- he took a drink.  Then that's when I
8  started walking towards him and he set it down.
9  And when I started to take his license plate and I
10  came around the back of his car to make it look
11  like I was just like walking around because maybe
12  he would think that, but when I started walking
13  across the street, that's when he got out of the
14  car and came towards me.
15  Q.   Okay.  And when you saw him take a
16  drink from that bottle that appeared to you to look
17  like a vodka bottle, did it appear to you that he
18  was drinking alcohol?
19  A.   Yes, sir.
20  Q.   And did you convey the drivers -- the
21  license plate to your sister?
22  A.   Yes, I did, and she called -- she
23  called the police.
24  Q.   And how did you convey the license

17

plate number to your sister?

    A.    I had my phone on speaker and I had it
like low like I wasn't on it.  And I guess he saw
me mouthing the numbers because I walked and looked
down at his license plate and I started mouthing
the numbers to my sister and I walked around his
car.  And when I got directly like behind his car,
that's when he came out when I was going across the
street.

    Q.    And then at some pint did he get out of
the --

    A.    Yes, sir.

    Q.    -- out of the gray car?

    A.    Yes, sir.

    Q.    And where were you when he got out of
the gray car?

    A.    I actually made it back to my post
across the street when he -- when he advanced
towards me.

    Q.    And did you have a conversation with
him?

    A.    Yes, sir, I did.

    Q.    And tell me about that conversation.

    A.    When I -- he's like, "What are you

18

doing?  What are you doing?"

        I'm like -- I'm like, "Officer, I'm
not doing nothing, I'm not doing anything," because
I didn't want him, you know -- so he goes, "What
are you doing?  Giving my license plate to the gang
members so they can shoot me?"

        I'm like, "Officer, no, that's not
what I'm doing."  I'm like, "For you to say that,"
you know ...

    Q.    Was he wearing a police uniform?

    A.    Yes, he was.  He was in his dress
blues.

    Q.    Can you describe his tone of voice when
he was talking to you?

    A.    It was a really high-pitched tone of
voice, like very aggressive.

    Q.    And what happened after you had that
conversation with him?

    A.    I had to call in my supervisor.

    Q.    Okay.  And how did you call that in?

    A.    We have walkie-talkies.

    Q.    Okay.

    A.    So I called in -- I called in the code.

    Q.    And what was the code?

19

    A.    For me -- for me I just -- you know,
for assistance it's a 10-1, so I called for
assistance.

    Q.    Just give me one second, please.  I was
looking at the wrong one, that's why.  No, you have
the right one.

    A.    Oh, okay.

    Q.    I have the wrong one, so just give me
one second.

        Can you turn to the last page of
your report, please?

    A.    Okay.

    Q.    And I'm going to read starting with the
second question.

    A.    Okay.

    Q.    It starts, "Were you attempting to
obtain."  Do you see that?

    A.    Yes, sir.

    Q.    Okay.  I'm just going to read it into
the record.

        "QUESTION:  Were you attempting to
obtain his license plate number for your sister who
had called you previously?

        "ANSWER:  Yes, sir.

20

        "QUESTION:  Did you notice anything
about the driver of the vehicle during your verbal
encounter with him?

        "ANSWER:  Just that he had alcohol
on his breath and it was really strong, and when he
got out of the vehicle he was staggering a little."

        Is that what you told the --

    A.    Yes, sir.

    Q.    -- the police officer who was
interviewing you?

    A.    Yes, sir.

    Q.    So when the police officer got out of
that gray car when he approached you, you noticed
him staggering?

    A.    When he went to take a step and he came
out of the car, he like went to the side a little
bit.  And when he came towards me, you just smelled
it on his breath.

    Q.    What did you smell?

    A.    Alcohol very strong on his breath.

    Q.    Did it appear to you given what you
saw, the fact that you saw him drink what you
believe to be alcohol from a bottle that looked
like to you to be a vodka bottle and the fact that

21

1  you smelled alcohol and that he staggered, did you
2  draw any conclusions?
3      A.    That he was drunk.
4      Q.    I'm sorry?
5      A.    That he was drunk, sir, yes, sir.
6      Q.    And so after -- have you told me all
7  about the initial conversation you had with the
8  person who got out of the gray car?
9      A.    Yes, sir.
10     Q.    What did you do after you had that
11 conversation?
12     A.    After I had the conversation, I called
13 my supervisor and I let him know of the situation
14 with the officer.
15          After I had -- after -- my boss came
16 this way, he actually got back in his car and went
17 to my school.
18     Q.    He meaning the --
19     A.    The officer.
20     Q.    So the officer in the gray car got back
21 into his car and drove away?
22     A.    Yeah.  He went -- actually, it's 47th
23 Place where the school was located.  There's other
24 cops posted inside there for the school.  And he

URLAUB BOWEN & ASSOCIATES, INC.
(312) 781-9586

22

1  also tried to get ahold of the principal to try to
2  get me in trouble.
3      Q.    Okay.
4      A.    Because he said, you know, "I'm going
5  to try to get you in trouble," you know, "watch
6  your back."
7          I'm like, you know ...
8      Q.    So let me go back to that.  So during
9  your initial conversation with the person who was
10 wearing a police uniform who got out of the gray
11 car, what did he say to you?
12     A.    What he told me was, "You know what I
13 can do to you," you know?
14          And I'm like, you know -- that's
15 when I -- I had my hand on -- you know, so my boss
16 can hear what's going on, too.
17     Q.    You had your hand on the phone?
18     A.    On the walkie-talkie so, you know, in
19 case it escalated, you know, from there.
20     Q.    Did he threaten you?
21     A.    He said to me, he said, "Watch your
22 back," you know, "You know what I can do to you,"
23 you know.
24     Q.    What did you understand that to be?

URLAUB BOWEN & ASSOCIATES, INC.
(312) 781-9586

23

1      A.    Anything because, you know, in the
2  reports they do give my name and where I live and
3  my phone number, anything could, you know --
4      Q.    Did he say anything that you took as a
5  threat?
6      A.    No, just that, just, you know ...
7      Q.    But you took that as a threat?
8      A.    Yes, sir, I did.
9      Q.    So what did you -- so going back to you
10 call your boss on the walkie-talkie.  What's the
11 next thing that you do?
12     A.    The next thing I do is my boss -- my
13 coordinator -- and also there's another -- which is
14 like a counselor -- comes and grabs me.  We walk
15 back towards the school and we go up and talk to
16 the principal.
17          Because he's actually there, that
18 officer was actually there to stand on our post
19 across from us and help us guide the students to
20 get them away from the school as quickly as we can.
21          So I went up and talked to the
22 principal and she alerted, you know, everybody else
23 what happened.  So I had to talk with her and
24 actually tell her what happened.  After that I

URLAUB BOWEN & ASSOCIATES, INC.
(312) 781-9586

24

1  never saw the officer again.
2      Q.    Okay.  What did you do after you
3  spoke -- you said the principal?
4      A.    Yes, it was the principal, sir.
5      Q.    Okay.  And what did you do after
6  speaking to the principal?
7      A.    She told me, you know, if there's any
8  problem with that officer during the day, let her
9  know.  Also, my coordinator and counselor also told
10 me that, too.
11     Q.    Okay.  By the way, did you recognize
12 the officer who got out of the gray car as someone
13 that you had seen in the past?
14     A.    No.
15     Q.    Did you know his name?
16     A.    No.
17     Q.    Have you ever seen him since that day?
18     A.    No, sir.
19     Q.    So after you talked to the principal,
20 tell me what you did.
21     A.    After that I had to go back downstairs
22 to our office and then I had to talk to -- which is
23 Blackstar -- and we had to let them know what
24 happened.

URLAUB BOWEN & ASSOCIATES, INC.
(312) 781-9586

25

```
 1        Q.    With your Blackstar --
 2        A.    Yeah.  Where we are there's my
 3   coordinator, but also that's our office, but our
 4   main office is Blackstar.  So we had to let them
 5   know of the situation.
 6        Q.    Okay.  And then what did you do?
 7        A.    They let me go back -- they didn't let
 8   me go back to my post on 50th because of what he
 9   said, so they posted me in front of the school for
10   my safety.
11        Q.    When you said "because of what he
12   said," you're referring to what the officer in the
13   gray car said?
14        A.    Yes, sir.
15        Q.    And what are you referring to, what
16   statement?
17        A.    Like watch my back and everything like
18   that, you know.
19        Q.    For you to watch your back?
20        A.    Yes, sir.
21        Q.    So your boss told you we're not going
22   to send you back there because of what you reported
23   what the officer said to you?
24        A.    Yes, sir.
```

26

```
 1        Q.    So where did you go?
 2        A.    They posted me right back in front of
 3   the school.  I was right in front of the school on
 4   47th Place and Union.
 5        Q.    Okay.  At then at some point later that
 6   day did you speak to a police officer with your
 7   sister?
 8        A.    I believe his name was Detective Price.
 9        Q.    Okay.  If I told you his name was
10   Sergeant Price and not Detective Price, would you
11   have any reason to disagree with me?
12        A.    No, sir.
13        Q.    Okay.  When you talked to Sergeant
14   Price, where did that take place?
15        A.    It was on 48th and Union, right by my
16   sister's house, 4825 South Union.
17        Q.    Do you remember what time you spoke to
18   him?
19        A.    The incident happened at 2:15.  About
20   3:45, maybe 4:00 o'clock.
21        Q.    Is that your best guess?
22        A.    Yes.
23        Q.    Could you be off a little bit?
24        A.    I could be, yeah.
```

27

```
 1        Q.    Okay.  But would it be fair to say it
 2   was shortly after you had the incident with the
 3   officer?
 4        A.    2:15 -- it could have been closer to
 5   3:00.
 6        Q.    Okay.
 7        A.    Yeah.
 8        Q.    And when you spoke to Sergeant Price,
 9   did you tell Sergeant Price what --
10        MR. FLAXMAN:  Object to leading at this
11   point.
12        MR. JEBSON:  I don't think that's a proper
13   objection.
14        MR. FLAXMAN:  I think it is.
15        MR. JEBSON:  I don't think so.
16   BY MR. JEBSON:
17        Q.    When you talked to Sergeant Price, what
18   did you say to him?
19        A.    I let him know that my sister gave me
20   the phone call about the gray or silver car coming
21   towards me, and then I let her know that it was an
22   officer.
23              She's like, you know, it doesn't
24   matter, you know.  So I gave her -- I gave her the
```

28

```
 1   license plate, and then I told him about the
 2   altercation with the officer.
 3        Q.    Did you tell Sergeant Price any of your
 4   observations regarding the officer while he was in
 5   the car?
 6        A.    Yes, I did.
 7        Q.    And what did you say?
 8        A.    I told him that I did see him take a
 9   drink out of a clear bottle, and then when he went
10   got out of the car he was staggering, and when he
11   came up to talk to me there was a strong smell of
12   alcohol on his breath.
13        Q.    When you told him about the clear
14   bottle, did you give -- did you tell the sergeant
15   what you believed that bottle to be?
16        A.    I told him I believe it was a bottle of
17   alcohol -- I did -- either vodka or gin, I believe
18   that's what I said.
19        Q.    Okay.  And after talking to the
20   sergeant --
21        A.    Yes, sir.
22        Q.    -- what did you do next?
23        A.    After everything was done with the
24   detective, sergeant, he gave us his number and he
```

47

1     Q.    And you didn't sign an affidavit.  Did

2 you see your sister sign an affidavit?

3     A.    Yeah, she actually -- she signed it.

4     Q.    Did you see anybody else sign an

5 affidavit?

6     A.    I believe it was the other girl, Gail.

7     Q.    Okay.  Are you related to Gail?

8     A.    No.

9     Q.    And how is -- all right.

10     A.    Gail is actually my sister's daughter's

11 aunt.

12     Q.    Okay.  Did anybody ever tell you

13 about the only thing in that clear plastic bottle

14 was water?

15     A.    No.

16     Q.    Okay.  Did anybody ever tell you that

17 the officer took a breathalyzer and blew zero,

18 zero, zero?

19     A.    Huh-uh.

20     Q.    All right.  Did anybody ever tell you

21 that he's facing a five-day suspension because of

22 that incident?

23     A.    No.

24     MR. FLAXMAN:  Okay.  I have nothing further.

URLAUB BOWEN & ASSOCIATES, INC.
(312) 781-9586

---

48

1     MR. JEBSON:  Okay.  I don't have any

2 questions.

3     So you have a right to review this

4 to make sure the court reporter accurately took

5 down your answers.  You don't have to review it.

6 You can say you don't want to review it and waive

7 that right.  It's completely up to you.

8     THE WITNESS:  Okay.

9     MR. JEBSON:  It's up to you.  So if you want

10 to review it, my understanding is you come down to

11 the court reporter's office and review it.

12     THE WITNESS:  Okay.

13     MR. JEBSON:  It's completely up to you.

14     THE WITNESS:  Okay.

15     MR. JEBSON:  So do you want to review it, or

16 do you trust that the court reporter did her job?

17     THE WITNESS:  I trust that she did her job

18 and I spoke -- we all spoke clearly.

19     MR. JEBSON:  Okay.  Then signature will be

20 waived.  And that's it.  You're done.

21     (Discussion off the record.)

22     THE WITNESS:  (773) 712-5239.

23     MR. JEBSON:  So that will be on the

24 transcript.

URLAUB BOWEN & ASSOCIATES, INC.
(312) 781-9586

---

49

1 STATE OF ILLINOIS )
             ) SS:
2 COUNTY OF COOK   )

3     I, Karen M. Kane, a Certified
4 Shorthand Reporter in and for the County of Cook
and State of Illinois, do hereby certify that **GARY**
5 **ANDERSON** was duly sworn by me to testify the whole
truth, and that the foregoing deposition was
6 recorded stenographically by me and was reduced to
computerized transcript under my direction, and
7 that the said deposition constitutes a true record
of the testimony given by said witness.

8     I further certify that the reading
9 and signing of the deposition was waived by the
deponent.

10     I further certify that I am not a
11 relative or employee or attorney or counsel of any
of the parties, or a relative or employee of such
12 attorney or counsel, or financially interested
directly or indirectly in this action.

13

14     IN WITNESS WHEREOF, I have hereunto set
my hand and affixed my seal of office at Chicago,
15 Illinois, this 10th day of September, A.D. 2012.

16

17

18 Illinois CSR License 084-004706

19

20

21

22

23

24

URLAUB BOWEN & ASSOCIATES, INC.
(312) 781-9586

WORD INDEX

# EXHIBIT H



Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION
 3
 4   MICHAEL SEISER,              )
                                  )
 5              Plaintiff,        )
                                  )
 6       -vs-                     )   NO. 12 C 2353
                                  )
 7   CITY OF CHICAGO and DEBRA    )
                                  )
 8   KIRBY,                       )
                                  )
                Defendants.       )
 9
10
11         Deposition of SERGEANT JOHN VERTA taken
12   before TRUDY G. GORDON, a Certified Shorthand
13   Reporter, pursuant to the Federal Rules of Civil
14   Procedure for the United States District Courts,
15   pertaining to the taking of depositions, at Suite
16   1240, 200 South Michigan Avenue, Chicago, Illinois at
17   11:00 o'clock a.m. on the 26th day of October, A.D.,
     2012.
18
19
20
21
22
23
24
```

Veritext Chicago Reporting Company
312-442-9087          800-248-3290          847-406-3200



Page 2

```
 1   PRESENT:
 2       KENNETH N. FLAXMAN, P.C.
         200 South Michigan Avenue
 3       Suite 1240
         Chicago, Illinois  60604
 4       312-602-2233
         BY:  MR. KENNETH FLAXMAN
 5            knf@kenlaw.com
 6            appeared on behalf of the Plaintiff;
 7
         CITY OF CHICAGO
 8       30 North LaSalle Street
         Room 900
 9       Chicago, Illinois  60602
         312-744-4833
10       BY:  MR. THOMAS PLATT
              tplatt@cityofchicago.org
11
              appeared on behalf of the Defendants.
12
13
14
15
16
17   ALSO PRESENT:  MR. MICHAEL SEISER
18
19
20
21
22
23   REPORTED BY:  TRUDY G. GORDON, C.S.R.
24            CERTIFICATE NO.  084-004077
```

Veritext Chicago Reporting Company
312-442-9087          800-248-3290          847-406-3200

Page 3

```
 1                    I N D E X
 2   WITNESS                                  PAGE
 3   SERGEANT JOHN VERTA
 4   EXAMINATION BY MR. FLAXMAN....................   4
 5   EXAMINATION BY MR. PLATT.....................  57
 6   FURTHER EXAMINATION BY MR. FLAXMAN...........  61
 7
                    E X H I B I T S
 8
 9   DEPOSITION EXHIBITS       DESCRIPTION       PAGE
10
     EXHIBIT NO. 1            REPORT               4
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Veritext Chicago Reporting Company
312-442-9087          800-248-3290          847-406-3200

Page 4

```
 1              (Witness sworn and Exhibit No. 1
 2               was marked.)
 3             SERGEANT JOHN VERTA,
 4   called as a witness herein, having been first duly
 5   sworn, was examined and testified as follows:
 6                  EXAMINATION
 7   BY MR. FLAXMAN:
 8       Q.   Would you state your name and spell your
 9   last name, please.
10       A.   John Verta.  V, as in Victor, E-R-T-A.
11       Q.   And what's your business or occupation?
12       A.   Sergeant with the Chicago Police
13   Department.
14       Q.   How long have you been a sergeant?
15       A.   Six years.
16       Q.   And before being a sergeant, what was your
17   position with the Chicago Police Department?
18       A.   I was a patrolman in the 14th District.
19       Q.   When did you start working for the Chicago
20   Police Department?
21       A.   August 1997.
22       Q.   And what's your present assignment?
23       A.   Ninth District.
24       Q.   Are you a field sergeant?
```

Veritext Chicago Reporting Company
312-442-9087          800-248-3290          847-406-3200

Page 5

1     A.    I'm the school sergeant.
2     Q.    Excuse me?
3     A.    School sergeant.
4     Q.    Are you the subject of any pending
5   disciplinary matters of which you're aware?
6     A.    No.
7     Q.    One time I didn't ask that and it turned
8   out that the witness was in the process of being
9   fired for being drunk, and I always ask that
10  question, so I'm glad you could say no.
11         Do you know the man sitting to my left,
12  Michael Seiser?
13    A.    Yes.
14    Q.    How long have you known Mr. Seiser?
15    A.    Since our incident.
16    Q.    Did you know him before that?
17    A.    Only by face.
18    Q.    By this incident, do you mean the
19  occurrence of March 29, 2011?
20    A.    Correct.
21    Q.    Before coming here today, did you look at
22  any documents?
23    A.    Yes.
24    Q.    What did you look at?

Page 6

1     A.    Arrest report, and my to-from report that
2   I completed.
3     Q.    Did you -- Were you involved in the
4   preparation of the arrest report?
5     A.    What do you mean by involved in the
6   preparation?
7     Q.    Did you type it in?  Did you tell somebody
8   what to write?
9     A.    No.
10    Q.    Did you review it before it became an
11  official Chicago police report?
12    A.    I'm not sure if I reviewed it or not.
13    Q.    When you looked at the arrest report in
14  preparation for the deposition, did you see anything
15  in there that you believe was incorrect?
16    A.    No.
17    Q.    When you reviewed your to-from report, did
18  you see anything in there that you believe was
19  incorrect?
20    A.    No.
21    Q.    How did you come to be involved in the
22  what we'll call -- what I'll call the Seiser incident
23  in March of 2011?
24    A.    I responded to a request for a supervisor.

Page 7

1     Q.    And how did you get that request?
2     A.    By OEMC dispatch.
3     Q.    Was that over your radio?
4     A.    Yes.
5     Q.    Do you remember what the OEMC dispatch
6   was?
7     A.    I believe it was a DUI driver, and a
8   subsequent call was request for a supervisor, that
9   the DUI driver was an on duty Chicago police officer.
10    Q.    What did you do in response to that OEMC
11  request?
12    A.    Responded to the complainant's address.
13    Q.    Do you remember who the complainant was?
14    A.    No.
15    Q.    Were you in uniform when you responded to
16  the complainant's address?
17    A.    Yes.
18    Q.    Was the complainant a male or female?
19    A.    I would be able to tell you if I was to
20  review my document.
21    Q.    Before you review your document, just your
22  recollection --
23    A.    Female.
24    Q.    -- I'd like to exhaust that.

Page 8

1          How many complainants?  Was there more than
2   one complainant?
3     A.    It was a complainant and a witness.
4     Q.    Was one of the -- one of those two
5   people -- Were they both female?
6     A.    Both female.
7     Q.    Was one older than the other, do you
8   recall?
9     A.    I don't know.
10    Q.    All right.  Who -- Did you speak with
11  either the complainant or the witness?
12    A.    Both of them.
13    Q.    Where were you when you first spoke with
14  them?
15    A.    At the address that they made the call
16  from.
17    Q.    Were you inside or outside?
18    A.    Outside.
19    Q.    Do you remember what the temperature was
20  that day?
21    A.    No.
22    Q.    Do you remember what -- about what time of
23  day it was?
24    A.    About 14:50 hours.

Page 9

1    Q.    That's 2:00 or 3:00 p.m.?

2    A.    I'm sorry.  Yes.  14:50 as in 2:50, not

3    3:00 o'clock.

4    Q.    Okay.  So sometime after 2:00 p.m.?

5    A.    Yes.

6    Q.    And -- Well, as best you can, could you

7    tell us what the complainant told you?

8    A.    She said that there was an officer driving

9    his personal car erratically five to ten miles over

10   the limit and that he was chugging on a gallon-size

11   bottle of vodka.

12   Q.    And did you also receive information from

13   the witness?

14   A.    She substantiated the claim of the

15   complainant.

16   Q.    And they both said that the male was

17   driving over the speed limit?

18   A.    Yes.

19   Q.    Well, how long did you spend talking with

20   them?

21   A.    Couple minutes.

22   Q.    What did you do next?

23   A.    Went down to where she pointed out Officer

24   Seiser.

Page 10

1    Q.    When you went to where Officer Seiser was,

2    was there any other police officer there?

3    A.    I believe so.

4    Q.    Was there one or more than one?

5    A.    At that time it was Officer Seiser and his

6    partner.

7    Q.    Do you remember the name of his partner?

8    A.    No.

9    Q.    Did you -- When you went to interview the

10   complainant and the witness, did you drive a marked

11   police car?

12   A.    Yes.

13   Q.    Was it a cage car or was it a van or if

14   you recall?

15   A.    I don't think it was a cage car.  I didn't

16   have a cage car.

17   Q.    Was it an SUV?

18   A.    No, I think it was a squad.

19   Q.    So did you then drive to where Officer

20   Seiser was?

21   A.    Yes.

22   Q.    And did you get out of the car?

23   A.    Absolutely.

24   Q.    Did you talk with Officer Seiser?

Page 11

1    A.    Yes, I did.

2    Q.    As best you recall -- Was anybody else

3    there when you spoke with Officer Seiser?

4    A.    I don't recall.

5    Q.    What did you say to Officer Seiser and

6    what did he say to you at that time?

7    A.    I asked him if he had been involved in a

8    confrontation with anybody.

9    Q.    And what did he say?

10   A.    No.

11   Q.    And did you speak again?

12   A.    I asked him what was in the bottle on his

13   front seat.

14   Q.    Were you able -- Had you been able to see

15   a bottle on the front seat?

16   A.    Before I approached him, I looked in his

17   vehicle from the passenger side and saw a bottle

18   gallon-size with a liquid, clear liquid in it, seal

19   broken.

20   Q.    Were you able to see any of the -- any of

21   the writing or any of the label?

22   A.    The label was down towards the seat.

23   Q.    So you couldn't -- Am I correct that you

24   couldn't see any writing indicating that the bottle

Page 12

1    did or did not contain alcohol?

2    A.    I don't recall.

3    Q.    Was there anything about that bottle which

4    caused you to believe it contained alcohol?

5    A.    The complainant indicated that it was a

6    vodka bottle and there was a clear substance in it

7    and it's a gallon-size glass bottle commonly used to

8    contain alcohol.

9    Q.    Was there anything that you saw when you

10   looked at the bottle through the passenger side

11   window that indicated to you that it was a vodka

12   bottle?

13   A.    No.

14   Q.    You -- Have you ever seen a vodka bottle?

15   A.    Yes.

16   Q.    Have you ever seen a Smirnoff vodka

17   bottle?

18   A.    Yes.

19   Q.    Have you ever seen a Dimitrov vodka

20   bottle?

21   A.    I have no clue on that.

22   Q.    Okay.  Was there anything about the bottle

23   you saw on the front seat that caused you to believe

24   it was a Smirnoff vodka bottle?

Page 13

1    A.    I didn't know what was inside the bottle.
2  It had a red and white label.
3    Q.    Where was the red and white label?
4    A.    Around the sealing.
5    Q.    Was there -- Is there any -- Did the fact
6  that there was a red and white label cause you to
7  believe that it did or did not contain alcohol?
8    A.    It was a bottle commonly used to contain
9  alcohol.
10   Q.    Did you -- What did you say to -- Well,
11 when you spoke with Officer Seiser and asked him had
12 you been in a confrontation, how far away from him
13 were you?
14   A.    Couple feet.
15   Q.    Were you able to smell the odor of an
16 alcoholic beverage from him?
17   A.    No.
18   Q.    Did you hear his speech slurred in any
19 way?
20   A.    No.
21   Q.    What did you -- Well, what further
22 conversation did you have with Officer Seiser at that
23 time?
24   A.    I asked him to open up the door and get me

Page 14

1  the bottle.
2    Q.    And why did you do that?
3    A.    Because there was an allegation of
4  misconduct.
5    Q.    Did you order him to open up the door and
6  give you the bottle?
7  MR. PLATT:  Answer the question.
8  BY THE WITNESS:
9    A.    No.
10 BY MR. FLAXMAN:
11   Q.    What did -- Did Mr. Seiser open up the
12 door and give you the bottle?
13   A.    No.
14   Q.    And did he say or do anything after you
15 asked him to open up the door and give you the
16 bottle?
17   A.    He asked me if I had a signed affidavit or
18 a search warrant.
19   Q.    And did you have a signed affidavit?
20   A.    Not at that time.
21   Q.    Did you have a search warrant?
22   A.    No.
23   Q.    What did you tell Mr. Seiser?
24   A.    I reiterated my request, open the door.

Page 15

1    Q.    Now, at the time you reiterated your
2  request, did you believe that Mr. Seiser had the
3  right not to open his door of the car?
4    A.    Yes.
5    Q.    And after he exercised that right, what if
6  anything did you say or do?
7    A.    I reiterated my request again to tell me
8  what was inside the bottle and he refused.
9    Q.    Did he ever tell you it's not alcohol?
10   A.    No.
11   Q.    Then what happened?
12   A.    He was placed into the backseat of a squad
13 car.
14   Q.    When you say he was placed, how did that
15 come to be?
16   A.    I asked him to go over to the rear seat of
17 the squad car.
18   Q.    And did he do that?
19   A.    Yes.
20   Q.    From the time you arrived on the scene to
21 the time you asked him to step into the rear of the
22 squad car, had you observed anything about
23 Mr. Seiser's speech, appearance, or moving around
24 that caused you to believe that he was under the

Page 16

1  influence of alcohol?
2    A.    No.
3    Q.    Did he go -- Was it your squad car you
4  asked him to go to?
5    A.    Not at that time.
6    Q.    Why did you ask him to go and sit in the
7  squad car?
8    A.    I was going to call the watch commander
9  and advise him of the situation.
10   Q.    Were you going to ask the watch commander
11 what should I do next?
12   A.    Pretty much.
13   Q.    Who was the watch commander?
14   A.    Captain Johnson.
15   Q.    And did you speak with the watch
16 commander?
17   A.    Yes.
18   Q.    You told him what happened.
19        What did he tell you to do?
20   A.    Bring Officer Seiser in and then Internal
21 Affairs would be called.
22   Q.    Is that what you did?
23   A.    Yes.
24   Q.    Was Mr. Seiser under arrest when you

Page 17

1  brought him to the police station?

2     A.    He wasn't free to leave.

3     Q.    Was he handcuffed?

4     A.    No.

5     Q.    Had he been -- Had you taken away his gun?

6     A.    No, not at that time.

7     Q.    All right.  Did he freely and voluntarily

8  accompany you to the police station?

9     A.    He drove in the front seat with me in my

10 squad car.

11    Q.    Okay.  While you were driving with him in

12 your squad car to the police station, did you -- did

13 anything happen that caused you to believe that

14 Mr. Seiser was under the influence of an alcoholic

15 beverage?

16    A.    No.

17    Q.    Did you have any discussion with

18 Mr. Seiser while you were driving to the police

19 station?

20    A.    I don't know.

21    Q.    Do you remember him offering to take a

22 breathalyzer?

23    A.    I don't recall.

24    Q.    How far was the police station from where

Page 18

1  you picked up Mr. Seiser?

2     A.    Two-and-a-half miles.

3     Q.    And where did you go when you got there?

4     A.    Officer Seiser was placed into like a

5  viewing room.

6     Q.    And what did you do?

7     A.    I spoke to the watch commander.

8     Q.    And that was Commander Johnson?

9     A.    Captain Johnson.

10    Q.    And was anybody else there when you spoke

11 with him?

12    A.    I don't believe so.

13    Q.    What did you say to him?  What did he say

14 to you?

15    A.    He advised me that he had contacted

16 Internal Affairs already and that they were going to

17 come out and administer a breathalyzer test.

18    Q.    And what did you say, if anything?

19    A.    He's my superior.  I have nothing to say.

20    Q.    What did you do next?

21    A.    He told me to sit with Officer Seiser

22 until Internal Affairs arrived.

23    Q.    And did you go back to work or --

24    A.    I was at work.

Page 19

1     Q.    I mean, did you leave the police station?

2     A.    We were in the station.

3     Q.    Did you stay in the station and wait for

4  Internal Affairs?

5     A.    Yes, I went by Officer Seiser.

6     Q.    And did you talk with him?

7     A.    Possibly.  I think I offered him you

8  needed to go to the bathroom or make a telephone call

9  or anything to that effect.

10    Q.    How long were you with him waiting for

11 Internal Affairs?

12    A.    I can't say definitively.

13    Q.    Well, it's the same day?

14    A.    Yes.

15    Q.    How many people came from -- arrived from

16 Internal Affairs?

17    A.    At that time, one.

18    Q.    And do you remember who that was?

19    A.    Sergeant Price.

20    Q.    Had you known Sergeant Price before that

21 day?

22    A.    No.

23    Q.    Have you had any dealings with Sergeant

24 Price other than in connection with the Seiser

Page 20

1  incident?

2     A.    No.

3     MR. SEISER:  Can we take a break for a second?

4     MR. FLAXMAN:  Sure.

5               (WHEREUPON, we were off the

6               record.)

7  BY MR. FLAXMAN:

8     Q.    Before you went to the police station when

9  you went out to see Mr. Seiser at his personal

10 vehicle after speaking with the complaining witness

11 and the witness, was there another civilian at the

12 scene where Mr. Seiser was with whom you spoke?

13    A.    Another civilian at this --

14    Q.    Where Mr. Seiser was on the street.

15    A.    Not that I recall.

16    Q.    Did you ever -- Do you recall somebody

17 named Gary Anderson?

18    A.    No.

19    Q.    Do you remember anybody at the scene where

20 Mr. Seiser was telling you that Mr. -- that he had

21 perceived a strong smell of alcohol about Mr. Seiser?

22    MR. PLATT:  Objection to the form of the

23 question.  I'm not clear at what point.

24    You can answer.

Page 21

1    MR. FLAXMAN:  What was your objection?

2    MR. PLATT:  I'm not clear at what point or

3  what --

4    MR. FLAXMAN:  Okay.

5  BY MR. FLAXMAN:

6    Q.   At the time when you were with Mr. Seiser

7  at where his personal vehicle was before you put him

8  in the car, did a civilian come up to you, a male

9  civilian come up and speak with you and say that he

10  had detected a strong smell of alcohol about

11  Mr. Seiser?

12    A.   No.  I don't have any recollection of it.

13    Q.   And do you have recollection of a civilian

14  who came up to you and said that he had observed

15  Mr. Seiser staggering a little at the same time and

16  place?

17    A.   No.

18    MR. PLATT:  He was putting him into the car.

19  When?

20  BY MR. FLAXMAN:

21    Q.   At any time before you were putting him

22  into the car.

23    A.   No.

24    Q.   Did you ever talk to a male who said that

Page 22

1  he was a witness to Mr. Seiser's activities that day?

2    A.   No.

3    Q.   Did the complainant or the witness when

4  you spoke to them before you spoke with Mr. Seiser

5  tell you that Mr. Seiser had been placing the bottle

6  from which he was drinking between his legs, took a

7  swig, and put it back between his legs?

8    A.   I don't recall that, no.

9    Q.   Did you do anything to cause the witness

10  and the complainant to come to the police station?

11    A.   No.

12    Q.   Did you ever see them at the police

13  station?

14    A.   Not that I recall.

15    Q.   Did anybody, either the complainant or the

16  witness, tell you that Mr. Seiser's car had been

17  driving very slowly down the street?

18    A.   No, she told me it was speeding.

19    Q.   And when you approached Mr. Seiser for the

20  first time on the street, was he sitting in his car

21  or was he standing on the street?

22    A.   Standing on the street.

23    Q.   Did you ever -- On the day of the

24  incident, did you ever hear anyone ask about

Page 23

1  impounding Mr. Seiser's vehicle?

2    A.   In the station?

3    Q.   At any time that day.

4    A.   Yes.

5    Q.   Were you involved in -- Well, did you say

6  that?

7    A.   Did I say that?

8    Q.   Right.

9    A.   I -- Could you --

10    Q.   Okay.  Who -- When is the first time you

11  heard someone talk about impounding Mr. Seiser's

12  vehicle?

13    A.   When the second sergeant from Internal

14  Affairs came in.

15    Q.   Do you remember the second sergeant's

16  name?

17    A.   Cochran.

18    Q.   Who was it that spoke about impounding

19  Officer Seiser's vehicle?

20    A.   Sergeant Cochran.

21    Q.   Was Officer Seiser's vehicle impounded?

22    A.   No.

23    Q.   You told us, I think, that Officer Seiser

24  was not free to leave when you took him to the police

Page 24

1  station.

2    Why was he not free to leave?

3    A.   We were going to proceed administratively

4  with the breathalyzer test.

5    Q.   And what does it mean to proceed

6  administratively with the breathalyzer?

7    A.   He has to comply with the rules of the

8  Chicago Police Department.  He's an on-duty member.

9    Q.   Was that your decision that he -- that --

10  you were going to proceed administratively with the

11  breathalyzer?

12    A.   It was a decision me and the watch

13  commander had made at the time.

14    Q.   And was that when you -- Was that decision

15  made when you spoke with the watch commander before

16  you took Mr. Seiser back to the police station?

17    A.   When we arrived back at the station.

18    Q.   Before you went to the station, why did

19  you bring Mr. Seiser to the station?

20    A.   The watch commander told me to bring him

21  in and that Internal Affairs would be called.

22    Q.   And why was Mr. Seiser not free to leave

23  when you were taking him to the station?

24    A.   Because he was the subject of an

Page 25

1  allegation of wrongdoing.
2        Q.    Was he a suspect of a crime?
3        A.    Yes.
4        Q.    And what was the crime?
5        A.    Transporting open alcohol and DUI.
6        Q.    Now, other than what the complainant and
7  the witness told you, did you have any other reason
8  to believe that Officer Seiser had been driving a
9  vehicle while under the influence of alcohol?
10       A.    For the driving under the influence of
11 alcohol?
12       Q.    Right.
13       A.    No.
14       Q.    Did you have any other reason to believe
15 that Mr. Seiser had been transporting open alcohol?
16       A.    Yes.
17       Q.    What was that?
18       A.    The bottle laying on his seat.
19       Q.    And what reason, if any, did you believe
20 that that bottle contained alcohol?
21       A.    The seal was broken on the bottle.  It's a
22 glass gallon-size bottle which is commonly used to
23 contain alcohol.  What type of alcohol was in it, I
24 don't know.

Page 26

1        Q.    That bottle was in plain view through the
2  window of the vehicle; is that right?
3        A.    Absolutely.
4        Q.    And are you -- Do you know whether or not
5  you could seize open alcohol in a vehicle when the
6  open alcohol is in plain view?
7        A.    What do you mean by seize?  Would I have
8  the right to go get it?
9        Q.    Yes.
10       A.    I would have to get a search warrant.
11       Q.    And did you do anything to get a search
12 warrant?
13       A.    No.
14       Q.    Why not?
15       A.    It wasn't the route that we went.
16       Q.    What was the route that you went?
17       A.    Internal Affairs made the decision to
18 charge him criminally.  Afterwards he was given an
19 order administratively to open up his car.
20       Q.    And you knew, didn't you, that when
21 evidence is seized administratively, like you just
22 described, it can't be used in a criminal case?
23       A.    Correct.
24       Q.    Were you involved in the -- Well, let me

Page 27

1  get the foundation.
2        You know that Mr. Seiser received a ticket
3  for transporting open alcohol?
4        A.    Yes.
5        Q.    Were you involved in the decision that
6  that ticket should be written?
7        A.    Yes.
8        Q.    Who -- Did you make that decision?
9        A.    It was a culmination of --
10       Q.    Who was involved in making that decision?
11       A.    Captain Johnson, as well as the sergeants
12 from Internal Affairs.
13       Q.    Which sergeant?
14       A.    Price and Cochran.
15       Q.    And at the time that ticket was written --
16 Do you know -- Who wrote the ticket, do you know?
17       A.    I don't.  I don't know.
18       Q.    At the time that ticket was written, did
19 you know whether or not there was alcohol in that
20 bottle?
21       A.    It was a bottle commonly used to contain
22 alcohol.
23       Q.    Had that bottle been seized at the time
24 the ticket was written?

Page 28

1        A.    No.
2        Q.    Excuse me?
3        A.    No, it was not.
4        Q.    Well, were you -- Did you ever learn that
5  the bottle had been taken from Mr. Seiser's car?
6        A.    After the criminal proceeding was done.
7        Q.    Well, did you go with Mr. Seiser when the
8  bottle was taken out of his car?
9        A.    Yes.
10       Q.    Who else was with you?
11       A.    I actually drove Officer Seiser out there,
12 and Sergeants Cochran and Price followed us in their
13 car.
14       Q.    And did Officer Seiser open his vehicle?
15       A.    Yes.
16       Q.    And who removed the bottle from the
17 vehicle?
18       A.    It was one of those two sergeants.  I
19 don't recall which one.
20       Q.    Do you know what happened to the bottle?
21       A.    In fact, I believe Officer Seiser handed
22 it to them.
23       Q.    Do you know what happened to it after?
24       A.    It was placed in the trunk of my vehicle.

Page 29

1  Q.   And then what happened to it?
2  A.   Officer Seiser followed me and the
3  sergeants from Internal Affairs back to the Ninth
4  District.  The bottle was then recovered from the
5  trunk, brought into the station, and a vial was taken
6  and sent for testing.
7  Q.   Do you know who sent it for testing?
8  A.   I have no idea.
9  Q.   Did you send it for testing?
10 A.   No, I did not.
11 Q.   Have you looked at any papers that
12 indicate that the bottle wasn't sent for testing
13 until months later when another Internal Affairs
14 sergeant asked that it be tested?
15 A.   I have no knowledge of that.
16 Q.   How would that bottle be tested or that
17 vial be tested?
18 A.   I'm not a scien -- I have no idea.
19 Q.   Would it be sent to a crime lab?
20 A.   Yeah.
21 Q.   Did anybody smell the liquid that was
22 placed in the vial?
23 A.   I didn't.
24 Q.   Did anybody taste it?

Page 30

1  A.   Not that I saw.
2  Q.   Was there anything about that liquid that
3  indicated to you that it contained alcohol?
4  A.   I'm not a chemist.  I don't know.
5  Q.   So as far as you knew at that time the
6  liquid was water?
7  A.   I didn't say that.
8  Q.   Okay.  Well, do you have any reason to
9  believe it was alcohol?
10 A.   The fact that it was inside a bottle
11 commonly used to contain alcohol.
12 Q.   Any other reason?
13 A.   At that -- At which time are we talking?
14 Q.   At the time that Mr. Seiser was charged
15 with possession of -- transporting of alcohol?
16 A.   No.  We didn't have the bottle at that
17 time.  We were able to go off of what we saw.
18 Q.   Did you -- Were you -- Was the ticket for
19 transporting open alcohol written at the same time
20 that the decision was made that Mr. Seiser would be
21 charged with transporting open alcohol?
22 A.   No.
23 Q.   When was the ticket written?
24 A.   The criminal process took place.  The

Page 31

1  ticket was written.  He was released without charging
2  on the DUI.  At that time Internal Affairs proceeded
3  administratively and gave him an order to open up the
4  car.
5  Q.   Do you know who the complaining witness
6  was on the transporting open alcohol?
7  A.   No.
8  Q.   Have you ever been involved in the
9  prosecution of a motorist for transporting open
10 alcohol?
11 A.   I'm sure at one point in my 16 years, I
12 think, I've written one before.
13 Q.   In order to prove that Mr. Seiser had
14 transported open alcohol, would you need a witness to
15 say that he or she had observed Mr. Seiser
16 transporting a vehicle -- driving a vehicle?
17 A.   Would you need a witness?
18 Q.   Right.
19 A.   No, you don't necessarily need a witness.
20 Q.   Would you need evidence that Mr. Seiser
21 had driven a vehicle?
22 A.   Sure.  Yes.
23 Q.   And what evidence did you have when
24 Mr. Seiser was charged with transporting open alcohol

Page 32

1  that he had been driving a vehicle?
2  A.   When we had the complainant and the
3  witness who indicated that they saw him driving a
4  vehicle.
5  Q.   Were you involved in notifying the
6  complainant and the witness to come to court to
7  testify that they had seen Mr. Seiser driving a
8  vehicle?
9  A.   No, sir.
10 Q.   Do you know if anyone was?
11 A.   If the witnesses were in court?
12 Q.   No.  No.
13 Do you know if anyone was responsible for
14 notifying the witness or the complainant?
15 A.   That would be the State's Attorney.  I
16 don't have any part of that.
17 Q.   Did you believe that Mr. Seiser would be
18 found guilty of transporting open alcohol when you
19 were involved in approving him being charged with
20 that?
21 A.   I'm not a judge.  It's not my job to
22 determine whether he's guilty or innocent.
23 Q.   That wasn't my question.
24 Did you believe that he would be found

Page 41

1    A.   No.

2    Q.   You wrote that he asked you do you have a

3 signed affidavit?

4      Do you remember him asking that?

5    A.   Yes.

6    Q.   Did you know what he meant by a signed

7 affidavit?

8    A.   I would have to assume what he meant.  But

9 I would assume he was meaning did I have enough to

10 proceed with the investigation.

11    Q.   Well, is there any requirement to have a

12 signed affidavit for a civilian complaint against a

13 police officer?

14    A.   Once you have knowledge of wrongdoing from

15 a Department member you have to investigate it

16 whether you have a signed affidavit or not.

17    Q.   And did you have knowledge of wrongdoing

18 by a Department member?

19    A.   Yes.

20    Q.   And what was that knowledge?

21    A.   Transporting open alcohol.

22    Q.   Now, this third paragraph you wrote that

23 Sergeant Price arrived at 16:00 hours.

24      That's 4:00 p.m.; is that right?

Page 42

1    A.   Yes.

2    Q.   So does that mean from 2:18 p.m. until

3 4:00 p.m. you were with Mr. -- Well, no, strike that.

4      What time -- If you interviewed the

5 witness and the complainant at 2:18 p.m. --

6    A.   Correct.

7    Q.   -- what time was it that you first spoke

8 with Mr. Seiser -- Officer Seiser?

9    A.   I can't say definitively, but I'm going to

10 approximate.  Probably about 10, 15 minutes after the

11 initial call came in.

12    Q.   So were you -- Was Mr. Seiser -- Officer

13 Seiser waiting in an interview room for an hour, hour

14 and a half for Internal Affairs to arrive?

15    A.   I don't think it was an hour, hour and a

16 half.  By the time I spoke to them, spoke to him, we

17 engaged in a conversation, called the watch

18 commander, transported him into the station, I don't

19 think it was very long at all before Sergeant Price

20 arrived.  In fact, I think it was pretty quick for

21 their normal response time.

22    Q.   Well, Sergeant -- Were you present when

23 Sergeant Price first spoke to Officer Seiser at the

24 Ninth District?

Page 43

1    A.   I don't recall.

2    Q.   When you spoke with the watch commander

3 before going into the station with Officer Seiser,

4 was that over the radio?

5    A.   No, I called him.

6    Q.   On a cell phone?

7    A.   Yes, sir.

8    Q.   Was that a Chicago --

9    A.   No, it was my personal cell phone.

10    Q.   Let me finish the question.

11      Was that a City of Chicago Police

12 Department cell phone?

13    A.   No.

14    Q.   That's your personal cell phone?

15    A.   Yes.

16    Q.   You have to say yes or no.

17    A.   I said yes.

18    Q.   Why did you use your personal cell phone

19 rather than a radio?

20    A.   You wouldn't engage in a conversation like

21 that over the radio.  The radio is for emergency

22 transmission, not for consultation.

23    Q.   Did you ever hear anyone refer to Deputy

24 Superintendent Kirby on the day of the Seiser

Page 44

1 incident?

2    A.   Expand by what do you mean by refer.

3    Q.   Well, did anybody mention her name?

4    A.   Yes.

5    Q.   Who is the first person that you heard

6 mention her name?

7    A.   Sergeant Cochran.

8    Q.   And what did he say in reference to Deputy

9 Superintendent Kirby?

10    A.   He indicated that, per my order, that

11 Seiser was to be charged criminally for driving under

12 the influence of alcohol based upon the witnesses'

13 statements.  In addition, that Seiser's vehicle was

14 to be impounded and the contents inventoried.

15    Q.   Now, had you spoken with Deputy

16 Superintendent Kirby that day?

17    A.   Never spoken with her.

18    Q.   Have you ever met her?

19    A.   No.

20    Q.   Do you know who, if anyone, did speak to

21 her about Mr. Seiser -- Officer Seiser?

22    A.   No.

23    Q.   At the time Sergeant Cochran said that

24 Deputy Superintendent Kirby had ordered that Officer

Page 61

```
 1      A.    Yes.
 2      Q.    Earlier in the deposition you were asked
 3  about -- You saw Mr. Seiser at the scene of the
 4  incident.  You were asked did you believe he had a
 5  right not to open the door of the car.
 6            Do you remember that question?
 7      A.    Yes.
 8      Q.    And you answered yes?
 9      A.    Correct.
10      Q.    What was the basis of your belief?
11      A.    He has the -- It is his personal vehicle.
12  The door was looked.  If he didn't open it, it's his
13  vehicle.  He wants -- if we were to proceed
14  criminally, we could get a search warrant to open
15  that car door.
16            MR. PLATT:  That's all I've got.
17            FURTHER EXAMINATION
18  BY MR. FLAXMAN:
19      Q.    Did you get the bottle out of Mr. Seiser's
20  car before or after he took the breathalyzer test?
21      A.    It was after.
22      Q.    And when you had the bottle, did you ever
23  read what the label said?
24      A.    I was advised by the Internal Affairs
```

Page 62

```
 1  sergeants.
 2      Q.    You told us, when Mr. Platt asked you
 3  questions, about the fact that the bottle had a clear
 4  liquid substance in it was one of the things you
 5  considered.
 6      A.    Um-hum.
 7      Q.    Are all alcoholic beverages clear liquid
 8  substances?
 9      A.    No, not all of them.
10      Q.    Are there anything besides vodka a clear
11  liquid substance?
12      A.    I would assume there's all kinds of
13  different types of alcohol.
14      Q.    Okay.  Well --
15      A.    I'm not a big drinker.  I wouldn't -- I
16  would assume there's other clear alcohol out there.
17      Q.    Was there -- The label that was on that
18  bottle, did that have a list of ingredients, if you
19  recall?
20      A.    I believe it was an alcohol -- It had
21  alcohol in it.
22      Q.    And do you remember if it said that it was
23  a Mudslide?
24      A.    I believe it was a Mudslide.  I'm not 100
```

Page 63

```
 1  percent.
 2      Q.    And did the label say that it also had
 3  chocolate flavor in it?
 4      A.    I don't recall.
 5      Q.    Had you ever seen a Mudslide bottle
 6  that -- where the Mudslide was clear liquid?
 7      A.    I don't -- I don't drink.
 8      Q.    Okay.  Do you know who went -- who, if
 9  anyone, went to court on that traffic citation for
10  open alcohol?
11      A.    I have no clue.
12      Q.    You didn't go to court?
13      A.    No.
14            MR. FLAXMAN:  Nothing further.
15            MR. PLATT:  Okay.
16            MR. FLAXMAN:  Signature?
17            MR. PLATT:  We'll reserve it.
18                 (WHEREUPON, the deposition was
19                  concluded at 12:33 p.m.)
20              *    *    *    *    *    *
21
22
23
24
```

Page 64

```
 1            IN THE UNITED STATES DISTRICT COURT
 2           FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION
 3  MICHAEL SEISER,              )
 4            Plaintiff,         )
 5       -vs-                    )  NO. 12 C 2353
 6  CITY OF CHICAGO and DEBRA    )
 7  KIRBY,                       )
 8            Defendants.        )
 9
10            I, SERGEANT JOHN VERA, state that I have
11  read the foregoing transcript of the testimony given
12  by me at my deposition on the 26th day of October,
13  2012, and that said transcript constitutes a true and
14  correct record of the testimony given by me at the
15  said deposition except as I have so indicated on the
16  errata sheets provided herein.
17            _____
18                  SERGEANT JOHN VERTA
19  No corrections (Please initial) _____
    Number of errata sheets submitted _____ (pgs.)
20
21  SUBSCRIBED AND SWORN to
    before me this _____ day
22  of _____, 2012.
23  _____
24       Notary Public
```

# EXHIBIT I



```
                                              Page 1
 1
 2         IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
 3                   EASTERN DIVISION
 4
   MICHAEL SEISER,
 5                   Plaintiff;      )
                                     )
 6                                   )
                                     )
 7                                   )
            -v-                      )No. 12 CV 02353
 8                                   )
                                     )
 9                                   )
   CITY OF CHICAGO and DEBRA         )
10 KIRBY,                            )
                   Defendants.       )
11
12
13
14        The Discovery Deposition of ROBERT JOHNSON,
15 taken before Beth C. Radtke, C.S.R. within and for
16 the State of Illinois, pursuant to the provisions of
17 the Federal Rules of Civil Procedure of the United
18 States District Court, pertaining to the taking of
19 depositions, taken at 200 South Michigan Avenue,
20 Suite 1240, Chicago, Illinois, commencing at the hour
21 of approximately 11:15 a.m. on the 6th day of
22 November, 2012.
23
24
               Veritext Chicago Reporting Company
 312-442-9087        800-248-3290        847-406-3200
```



```
                                              Page 2
 1                     APPEARANCES
 2
 3 LAW OFFICE OF KENNETH N. FLAXMAN
   By Mr. Kenneth N. Flaxman
 4    200 South LaSalle Street
      Suite 1240
 5    Chicago, Illinois  60604
      312.427.3200
 6    knf@kenlaw.com
      Appeared on behalf of the Plaintiff;
 7
 8 CORPORATION COUNSEL
   By Mr. Thomas Platt
 9    Ms. Lindsey Vanorny
      30 North LaSalle Street
10    Suite 1400
      Chicago, Illinois  60602
11    312.744.4833
      thomas.platt@cityofchicago.org
12    lindsey.vanorny@cityofchicago.org
      Appeared on behalf of the Defendants.
13
14                     *****
15
16
17
18
19
20
21
22
23
24
               Veritext Chicago Reporting Company
 312-442-9087        800-248-3290        847-406-3200
```

```
                                              Page 3
 1
 2                       INDEX
 3 WITNESS:                            PAGE:
 4 ROBERT JOHNSON
      Examination by Mr. Flaxman         4
 5
 6
 7 EXHIBITS:
 8    No Exhibits Identified
 9
                         *****
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
               Veritext Chicago Reporting Company
 312-442-9087        800-248-3290        847-406-3200
```

```
                                              Page 4
 1        (Witness sworn.)
 2              ROBERT JOHNSON,
 3 having been first duly sworn, was examined and
 4 testified as follows:
 5                   EXAMINATION
 6 BY MR. FLAXMAN:
 7      Q.    Could you state your name and spell your
 8 last name for us, please?
 9      A.    Captain Robert R. Johnson, J-o-h-n-s-o-n,
10 star number 106.
11      Q.    And are you a captain with the Chicago
12 Police Department?
13      A.    Yes.
14      Q.    How long have you been a captain?
15      A.    Approximately eleven years.
16      Q.    When did you start with the Chicago Police
17 Department?
18      A.    1971.
19      Q.    So you'd be 41 years?
20      A.    42 years.
21      Q.    Are you planning on retiring?
22      A.    Next week.
23      Q.    And are you planning on leaving the Chicago
24 area?
               Veritext Chicago Reporting Company
 312-442-9087        800-248-3290        847-406-3200
```

Page 5

```
 1     A.   No.
 2     Q.   Could you briefly go through your progress
 3 up the ranks in the Chicago Police Department?
 4     A.   Patrol officer, 1971 to '74; detective,
 5 primarily assigned to the Gang Crimes Investigation
 6 Unit from 1974 to 1985; sergeant, assigned to various
 7 things during the ten years I was a sergeant; 1995
 8 promoted to lieutenant; and in 2001, promoted to
 9 captain.
10     Q.   You became a lieutenant in 1995?
11     A.   Right, captain in 2001.
12     Q.   Were you a field lieutenant?
13     A.   Some of the time.
14     Q.   Aside from the times you were a field
15 lieutenant, what did you do?
16     A.   In 1996, the commander asked me to be the
17 acting watch commander, so primarily I was a watch
18 commander from that point on.
19     Q.   What are you going to do when you retire?
20     A.   I teach and I write and I've got a lot of
21 things I never got around to doing that I'd like to
22 do now.
23     Q.   What do you teach?
24     A.   I teach leadership, supervision, ethics,
```

Page 6

```
 1 resource allocation.  Anything to do with law
 2 enforcement.
 3     Q.   Where do you teach?
 4     A.   Calumet College.
 5     Q.   What's the extent of your formal education?
 6     A.   I have a master's degree from St. Xavier
 7 University.
 8     Q.   And what kind of stuff do you write?
 9     A.   About law enforcement.
10     Q.   You don't write crime novels?
11     A.   No.  I do write humor.  I've published in
12 magazines nobody's ever heard of.
13     Q.   Tell us the name of it.
14     A.   One is called On The Scene in Albuquerque,
15 New Mexico.  Mostly I write law enforcement.
16     Q.   What's the other magazine that nobody's ever
17 heard of?
18     A.   Pardon me?
19          MR. PLATT:  Objection, irrelevant.  You can
20 answer.
21          THE WITNESS:  I don't even understand the
22 question.
23 BY MR. FLAXMAN:
24     Q.   You said you write for magazines that
```

Page 7

```
 1 nobody's ever heard of.  You gave us the name of one.
 2 Is there another one?
 3     A.   There's been several magazines.
 4     Q.   What are their names?
 5          MR. PLATT:  Objection, irrelevant.  I am not
 6 going to instruct you not to answer.  You can answer
 7 if you want.
 8          THE WITNESS:  I'd rather not.  I'd rather
 9 get going.
10          MR. PLATT:  Why is it relevant?
11          MR. FLAXMAN:  There might be something
12 relevant.  It's going to take a second to answer the
13 question unless there's something embarrassing to the
14 answer.
15 BY THE WITNESS:
16     A.   I don't remember the names of the magazines.
17 I stopped writing humor quite some time ago.  I
18 mostly write supervision and leadership.
19 BY MR. FLAXMAN:
20     Q.   Do you write under your name of Robert R.
21 Johnson?
22     A.   Yes, Robert Roy Johnson.
23     Q.   Back in March of 2011, what was your
24 assignment?
```

Page 8

```
 1     A.   The 9th District, watch commander in the 9th
 2 District.
 3     Q.   Did you work a particular shift?
 4     A.   Afternoon shift, third watch.
 5     Q.   Do you know the man -- have you ever met the
 6 man to my right?
 7     A.   No.  I may have seen him in the station that
 8 day, but that would be the extent of it.
 9     Q.   Do you know an officer named Madsen and an
10 officer named Kral?
11     A.   Yes.
12     Q.   How long have you known Madsen?
13     A.   Oh, as long as -- for a few years.  I'm not
14 sure exactly how long.
15     Q.   And how long have you known Kral?
16     A.   It would be the same.
17     Q.   Do you know if either of those two officers
18 Madsen or Kral have specialized training in
19 processing DUI suspects?
20     A.   I don't know.
21     Q.   Do you know if they work patrol?
22     A.   Yes.
23     Q.   And do you know if they were working patrol
24 back in March of 2011?
```

Page 9

1    A.  Yes.
2    Q.  Do you remember an incident where the man to
3  my right, Mr. Seiser, was suspected of DUI back in
4  March of 2011?
5    A.  Yes.
6    Q.  How did you first become aware of that
7  incident?
8    A.  Sergeant Verta called me in the office, said
9  that he was with a police officer and that he had
10  received a complaint that the police officer had been
11  drinking on duty.
12    Q.  Now how long have you known Sergeant Verta?
13    A.  Several years.
14    Q.  And how did that call come in to you from
15  Sergeant Verta?  Police radio, land line telephone?
16    A.  Land line telephone.
17    Q.  Was any of it -- do you remember the time of
18  day this call came in?
19    A.  It would have to be sometime after
20  approximately 1:30 in the afternoon is when I get to
21  work.
22    Q.  Okay.  And what did you say to Sergeant
23  Verta when he told you that he received a complaint
24  of a police officer drinking?

Page 10

1    A.  That he had to bring the officer in to the
2  station.
3    Q.  And why did you say that?
4    A.  Any time there's an allegation of a police
5  officer drinking on duty, he has to be processed
6  administratively and he has to blow a Breathalyzer.
7    Q.  Did you ask Sergeant Verta if the complaint
8  seemed to be -- seemed to have any factual basis?
9    A.  No.
10    Q.  Did he tell you that the complaint seemed
11  credible?
12    A.  I don't recall him saying one way or the
13  other.
14    Q.  Did he tell you that he had spoken with the
15  police officer?
16    A.  Yes.
17    Q.  Did he tell you that the police officer did
18  not appear to be under the influence of alcohol?
19    A.  I don't recall, but it's not relevant
20  administratively.
21    Q.  All right.  After you received this call
22  from Sergeant Verta, what did you do?
23    A.  I told him to bring the officer in to the
24  9th District and then I notified the Internal Affairs

Page 11

1  Division that we had an allegation against a police
2  officer that he had been drinking on duty, because
3  they are the ones that administer the Breathalyzer.
4    Q.  And how did you make that notification?
5    A.  Phone call from the office.
6    Q.  Did you make it or did you have somebody
7  make it?
8    A.  I made that call.
9    Q.  Do you know who you spoke with?
10    A.  I know now that it was a lieutenant whose
11  name --
12    Q.  Does Nalway, N-a-l-w-a-y, sound --
13    A.  Right.
14    Q.  Had you known Lieutenant Nalway before that?
15    A.  No.
16    Q.  What did Lieutenant Nalway say to you?
17    A.  He said he would send a sergeant in.
18    Q.  Was this the first time that you had been
19  involved in an incident where a complaint had been
20  made that a police officer had been drinking on duty?
21    A.  No.
22    Q.  How many times did this happen in your
23  career?
24    A.  Several times.

Page 12

1    Q.  Okay.  And is it -- in each of those several
2  times, did you notify Internal Affairs of the
3  complaint?
4    A.  No.  As a sergeant -- the procedure has
5  changed somewhat.  As a sergeant, it would have been
6  my responsibility at that time, I would have had an
7  evidence technician come in and administer the
8  Breathalyzer.  This is back in the mid '80s or early
9  '90s.  I don't know when it changed, but at some
10  point the procedure changed that IAD administers the
11  Breathalyzer.
12    Q.  Do you know if IAD administered a
13  Breathalyzer to Mr. Seiser or to Officer Seiser?
14    A.  I know he was administered a Breathalyzer.
15  I'm not sure who did it.
16    Q.  After you notified Lieutenant Nalway, what
17  was your next involvement with the allegation against
18  Officer Seiser?
19    A.  A sergeant from Internal Affairs came on
20  scene.
21    Q.  Do you remember his or her name?
22    A.  Price.
23    Q.  Had you ever met Sergeant Price before?
24    A.  Not that I recall.

Page 13

1    Q.    And did he come into your office and talk
2    with you?
3    A.    He just advised me that he was here and I
4    told him -- I think he came in with Sergeant Verta
5    and Sergeant Verta apprised him of what we had and I
6    was part of that conversation.
7    Q.    So you spoke -- after your phone
8    conversation with Sergeant Verta, did you speak with
9    him again at the police station?
10    A.    Yes.
11    Q.    About how much time passed between the phone
12    conversation and the face-to-face conversation?
13    A.    I don't recall exactly.
14    Q.    Was it less than an hour?
15    A.    I would say it would have been in the
16    neighborhood of an hour, either side.
17    Q.    Was Officer Seiser present during the
18    conversation?
19    A.    No.
20    Q.    Do you know if he was in the police station
21    during the conversation?
22    A.    I assume that he was.
23    Q.    When's the first time you saw Officer Seiser
24    or did you ever see Officer Seiser?

Page 14

1    A.    I don't recall now.  I may have seen him
2    because I would go in and out of the office.  I may
3    have seen him, but I don't recall.
4    Q.    Do you recall any conversations you had with
5    Officer Seiser that day?
6    A.    I don't.
7    Q.    What did Officer Verta tell you when you
8    spoke with him for the first time face to face on
9    March 29, 2011?
10    A.    In essence, basically the same thing, that
11    there were -- it turns out now, I thought at the time
12    only one, but he said several people had alleged that
13    Officer Seiser had been drinking on duty.
14    Q.    And did you have a -- what's your next
15    involvement with Officer Seiser that day?
16    A.    I don't recall any.
17    Q.    Well, did you ever -- were you involved in
18    Officers Kral and Madsen coming to the police
19    station?
20    A.    Yes.
21    Q.    How were you involved in that?
22    A.    At another point, a second sergeant from IAD
23    came on the scene and then came into my office.  I
24    think Sergeant Verta and the other sergeant from IAD

Page 15

1    were present, and he informed me that he had been
2    advised that Debra Kirby had directed them, IAD, to
3    process this as a criminal DU.
4    Q.    Did you say anything in response to that?
5    A.    I told them I would find them officers who
6    could do the criminal phase of the investigation.
7    Q.    How would the incident -- well, would the
8    incident have been processed differently if it was
9    not a criminal -- if it was not processed as a
10    criminal matter?
11    A.    Administrative and criminal are different,
12    yes.
13    Q.    Well, would -- who would have administered
14    the Breathalyzer if it was a civil -- if it was an
15    administrative?
16    A.    Administrative?  I'm not sure who exactly
17    does it.  I know it's supervised by IAD.  Whether
18    they do it or they call in an evidence technician, I
19    don't know.
20    Q.    Had you spoken with Debra Kirby that day?
21    A.    No.
22    Q.    Have you ever spoken with Debra Kirby?
23    A.    Yes.
24    Q.    Okay.

Page 16

1    A.    Recently for the first time.
2    Q.    Did you understand the statement by the
3    second IAD sergeant as an order from Debra Kirby that
4    Officer Seiser should be processed criminally?
5    A.    As his direction, yes.  As far as I was
6    concerned, IAD was in charge of the entire thing, and
7    that was his orders from his boss.
8    Q.    Did you have discretion to say, no, he can't
9    be processed criminally?
10    A.    I would say not.  That was a superior
11    officer telling me -- or telling them how it should
12    be done.
13    Q.    At the time you heard of the superior
14    officer's order that Officer Seiser should be
15    processed criminally, were you aware of any facts
16    that indicated that Officer Seiser had committed the
17    offense of DUI?
18    A.    No, I wasn't.
19    Q.    Anybody tell you that he had the odor of an
20    alcoholic beverage about him?
21    A.    No.
22    Q.    Anybody tell you that he did not have the
23    odor of an alcoholic beverage about him at that time?
24    A.    Not that I recall.

Page 17

1    Q.   Anybody tell you that Officer Seiser had
2  slurred speech?
3    A.   No.
4    Q.   Do you know whether the DUI performance test
5  had been administered to Officer Seiser before the
6  order came from Kirby that he should be processed
7  criminally?
8    A.   No.
9    Q.   Do you know why Officer Seiser was being
10  processed criminally, other than the fact that an
11  order had come from Ms. Kirby?
12    A.   No.
13    Q.   What did it mean that Officer Seiser would
14  be processed criminally?
15    A.   Well, I'm not sure I understand the
16  question.  Exactly that.  He would be charged with
17  driving under the influence of alcohol.
18    Q.   What would happen?  Well, okay, let me go
19  back.  This second IAD sergeant, do you remember his
20  name?
21    A.   That would have been Cochran.
22    Q.   After sergeant Cochran said Kirby has
23  ordered that Seiser should be processed criminally,
24  what happened to Seiser?

Page 18

1    A.   He was.  I --
2    Q.   Is that the point at which you asked for
3  Kral and Madsen?
4    A.   Kral and Madsen, correct.
5    Q.   Any reason why you picked out Kral and
6  Madsen?
7    A.   I asked my desk people or my secretary, I
8  don't recall exactly who I asked, maybe even the
9  sergeants, who do we have out there that would be
10  best able to conduct a DUI investigation.
11    Q.   And somebody told you Kral and Madsen?
12    A.   Yes.
13    Q.   And did you -- did you speak to Kral and
14  Madsen?
15    A.   Yes.
16    Q.   What did you tell them?
17    A.   I told them that there was an allegation
18  that a police officer had been drinking while on duty
19  and that IAD had been directed to process it as a
20  driving under the influence criminal investigation.
21  I told them they were the officers that were going to
22  do it.
23    Q.   So were you giving them an order that they
24  were to process Officer Seiser as a criminal DUI?

Page 19

1    A.   I directed them to assist IAD, yes.
2    Q.   Well, was that a request that they do it
3  or --
4    A.   No, I directed them to do it.
5    Q.   And by directed, that means you ordered?
6    A.   Right.
7    Q.   And when you had this conversation with
8  them, were they -- was that face to face?
9    A.   Yes.
10    Q.   Where did the conversation take place?
11    A.   I'm -- I'm not sure.  I don't think in this
12  particular instance it was in the office.  I think I
13  may have been out of the office and encountered them
14  when they came in the hallway.
15    Q.   Was anybody else there?
16    A.   Not that I recall.
17    Q.   And did they say anything to you after you
18  gave them that direction?
19    A.   Not that I recall.
20    Q.   Okay.  When's the next -- what's the next
21  thing you heard about the processing of Officer
22  Seiser?
23    A.   There may have been incidental things that I
24  heard, but nothing I recall, except when it was

Page 20

1  brought to my attention that the arrest report was on
2  the computer and that he had blown zeros on the
3  Breathalyzer.
4    Q.   What, if anything -- by blowing zeros, does
5  that mean that the Breathalyzer did not detect any
6  alcohol --
7    A.   Correct.
8    Q.   -- in Mr. Seiser?
9         What, if anything, did you do after learning
10  that he had blown zeros in the Breathalyzer?
11    A.   I pulled the arrest report up on the
12  computer, reviewed the narrative of the arrest
13  report, which stated that fact, that he had passed
14  all the field sobriety tests and had blown zero on
15  the Breathalyzer, and at that point, I released him
16  without charging.
17    Q.   Well, I -- did you ever learn that at some
18  point Officer Seiser received a traffic citation for
19  transporting open alcohol?
20    A.   Yes.
21    Q.   Were you involved in the issuance of that
22  citation?
23    A.   No.
24    Q.   Do you know who was?

Page 21

1    A.   No, I'm not sure who did.
2    Q.   Did IAD say that he should be charged with
3  transporting open alcohol?
4    A.   I don't know.
5    Q.   Did you type into the arrest report in the
6  computer that -- that Officer Seiser should be
7  released without charging?
8    A.   I did.
9    Q.   Do you know if he was released without
10 charging?
11   I believe so, yes.
12   Q.   Well, okay.  Did you -- in preparing for
13 this deposition, did you look over the reports that
14 showed that a ticket had been -- a citation had been
15 issued?
16   A.   I knew he had been issued a citation, yes.
17   Q.   Did you know that when you wrote that he
18 should be released without charging?
19   A.   I don't recall.
20   Q.   Did you -- was part of your job as watch
21 commander to review those citations?
22   A.   No.
23   Q.   Did you ever learn that Mr. Seiser was --
24 Officer Seiser was asked to consent to a search of

Page 22

1  his car?
2    A.   No.
3    Q.   Did you ever learn that he was ordered --
4  Officer Seiser was ordered to submit to a search of
5  his car?
6    A.   Did you ask me did I ever learn that?
7    Q.   Right.
8    A.   I am aware of it now.
9    Q.   Were you aware of it back on the date of the
10 incident?
11   A.   I don't recall.  I had no part of that, so I
12 don't recall if anybody mentioned it to me or not.
13   Q.   When you prepared for this deposition, did
14 you become aware of it?
15   A.   Yes.
16   Q.   Of that fact?  When you prepared for this
17 deposition, did you understand why it was that
18 Officer Seiser had been charged with transporting
19 open alcohol?
20   A.   Yes.
21   Q.   And why was that?
22   A.   Because a bottle of what appeared to be an
23 alcoholic beverage, which was open, was recovered
24 from his vehicle.

Page 23

1    Q.   Do you know whether or not the ticket was
2  written before the bottle was recovered?
3    A.   I don't.
4    Q.   And as you sit here now, am I correct that
5  you know that that bottle was seized after an
6  administrative order to Officer Seiser to consent to
7  a search of his car?
8    A.   I don't recall reviewing that, but you
9  telling me that now, yes.
10   Q.   Okay.  And did you know back in March of
11 2011 that if evidence is seized by IAD pursuant to an
12 administrative order to consent to a search that
13 can't be used in a criminal proceeding?
14   A.   No.
15   Q.   Did you ever learn that Officer Seiser's
16 gun, weapon had been taken from him on the day of the
17 incident?
18   A.   I don't recall.
19   Q.   Is there a -- a box to fill in for facts
20 constituting probable cause in the paperwork that's
21 associated with processing somebody for a DUI?
22   A.   In the DUI paperwork itself?
23   Q.   Right.
24   A.   I don't know.

Page 24

1    Q.   Well, all right.  Back in March of 2011,
2  March 29th of 2011, were you aware of any facts that
3  would provide probable cause to process Officer
4  Seiser for DUI?
5    A.   I was not, no.
6    Q.   Did you see Ms. Kirby at the police station
7  that day?
8    A.   No.
9    Q.   Do you know if she ever came out and made
10 personal observations of Officer Seiser?
11   A.   To my knowledge, no.
12   Q.   Did you ever see the bottle that was
13 recovered from Officer Seiser's vehicle?
14   A.   No.
15   Q.   Do you know or have you ever heard of a
16 civilian named Roseanne Anderson?
17   A.   I don't think so, no.
18   Q.   How about Gary Anderson?
19   A.   No.
20   Q.   How about Gail Glassford?
21   A.   No.
22   Q.   Do you know an Officer Gneizko,
23 G-n-e-i-z-k-o?
24   A.   I don't think so, no.  Sometimes I know

Page 25

1    officers to see them, but don't know their names.
2    That name doesn't sound familiar.
3        Q.   And I might have spelled his name wrong.  Is
4    there a particular place in the police station where
5    the Breathalyzer is administered?
6        A.   There may be, but I don't know where that's
7    at.
8        Q.   Have you ever seen the Breathalyzer?
9        A.   No.
10       Q.   Okay.  Do you know what position Ms. Kirby
11   held back in March of 2011?
12       A.   I'm not certain, but I believe it was
13   assistant deputy superintendent in charge of Internal
14   Affairs.  I do know that she was the top boss in
15   Internal Affairs.  I believe it was assistant deputy
16   superintendent.
17       Q.   Did she outrank you back then?
18       A.   Yes.
19            MR. FLAXMAN:  Let's take a break.
20            (A short break was taken.)
21   BY MR. FLAXMAN:
22       Q.   Did you ever have -- back on the day of the
23   incident, March 29, 2011, do you recall any
24   conversations with Sergeant Verta, other than those

Page 26

1    you've told us about?
2        A.   I don't recall any, no.
3        Q.   Well, specifically do you recall any
4    conversation with Sergeant Verta about whether or not
5    Officer Seiser should be charged with transporting
6    open alcohol?
7        A.   I don't recall.
8        Q.   Okay.  Is there anything that you could look
9    at or anyone you could talk to that would help
10   refresh your recollection about whether you had any
11   such conversation with Sergeant Verta?
12       A.   Only Sergeant Verta himself.  It's not
13   something I normally would be involved with.
14       Q.   Would a sergeant normally be involved with
15   writing a --
16       A.   He may have had knowledge of it.  You asked
17   me if there was anybody I could talk to that would...
18       Q.   All right.  That would what?  We got to
19   finish sentences for the court reporter.
20       A.   I forget what the question was.  What was
21   the question?
22       Q.   Have you ever been deposed before?
23       A.   Yes.
24       Q.   Have you ever been a defendant in any

Page 27

1    lawsuits?
2        A.   Yes.
3        Q.   Any pending lawsuits?
4        A.   No.
5        Q.   Okay.  Have you ever sued the Chicago Police
6    Department?
7        A.   Have I personally?  No.
8        Q.   Have you ever been part of a case against
9    the Chicago Police Department?
10       A.   Not that I recall.
11            MR. FLAXMAN:  I have nothing further.
12            MR. PLATT:  No questions.  Signature is
13   reserved.
14            (Deposition concluded at 11:56 a.m.)
15
16
17
18
19
20
21
22
23
24

Page 28

1         IN THE UNITED STATES DISTRICT COURT
2        FOR THE NORTHERN DISTRICT OF ILLINOIS
              EASTERN DIVISION
3
4    MICHAEL SEISER,                  )
                      Plaintiff,      )
5                                     )
                                      )
6        -v-                          )No. 12 CV 02353
                                      )
7                                     )
     CITY OF CHICAGO and DEBRA        )
8    KIRBY,                           )
                      Defendants.     )
9
10
11       I, ROBERT JOHNSON, state that I have read the
12   foregoing transcript of the testimony given by me at
13   my deposition on the 6th day of November, 2012, and
14   that said transcript consisting of pages 4 through 26
15   is a true and accurate record of the testimony given
16   by me at said deposition except as I have so
17   indicated on the errata sheets provided herein.
18       Please check one:
19       _____ I made no corrections
20       _____ Number of errata sheets submitted
21   _____
     SUBSCRIBED AND SWORN
22   Before me this ___ day
     Of _____, 20___
23   _____
24   Notary Public

# EXHIBIT J

Case 1:12-cv-02353  Document 35-5  Filed 02/15/13  Page 10 of 27  PageID 245
Case: 13-1985    Document: 5-3      Filed: 05/23/2013    Pages: 115

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


MICHAEL SEISER,                    )
                 Plaintiff;        )
                                   )
                                   )
                                   )
                                   )
     -v-                           )No. 12 CV 02353
                                   )
                                   )
                                   )
CITY OF CHICAGO and DEBRA          )
KIRBY,                             )
                 Defendants.       )


     The Discovery Deposition of ANDREW KRAL,

taken before Beth C. Radtke, C.S.R. within and for

the State of Illinois, pursuant to the provisions of

the Federal Rules of Civil Procedure of the United

States District Court, pertaining to the taking of

depositions, taken at 200 South Michigan Avenue,

Suite 1240, Chicago, Illinois, commencing at the hour

of approximately 12:00 p.m. on the 6th day of

November, 2012.

```
 1              APPEARANCES
 2
 3   LAW OFFICE OF KENNETH N. FLAXMAN
     By Mr. Kenneth N. Flaxman
 4     200 South LaSalle Street
       Suite 1240
 5     Chicago, Illinois  60604
       312.427.3200
 6     knf@kenlaw.com
       Appeared on behalf of the Plaintiff;
 7
 8   CORPORATION COUNSEL
     By Mr. Thomas Platt
 9     Ms. Lindsey Vanorny
       30 North LaSalle Street
10     Suite 1400
       Chicago, Illinois  60602
11     312.744.4833
       thomas.platt@cityofchicago.org
12     lindsey.vanorny@cityofchicago.org
       Appeared on behalf of the Defendants.
13
14
15
16
17
18
19
20
21
22
23
24
                                              2
```

```
 1   A.  Officer Madsen.
 2   Q.  And did you both -- were you both ordered to
 3   come in?
 4   A.  Yes.
 5   Q.  When you came in, does that mean you went to
 6   the 9th District police station?
 7   A.  Yes.
 8   Q.  And what did you do when you got there?
 9   A.  Spoke with somebody at the front desk.
10   Q.  Do you remember who that was?
11   A.  Sergeant Hitney.
12   Q.  Can you spell that for us?
13   A.  I cannot.
14   Q.  What did Sergeant Hitney tell you to do?
15   A.  Go in back and see the captain.
16   Q.  And who was the captain?
17   A.  Captain Johnson.
18   Q.  And did you follow that order?
19   A.  Yes.
20   Q.  And did you see the captain?
21   A.  Yes.
22   Q.  And what did the captain say?
23   A.  I don't remember.
24   Q.  Okay.  Was anybody else present besides you
                                              4
```

```
 1        (Witness sworn.)
 2             ANDREW KRAL,
 3   having been first duly sworn, was examined and
 4   testified as follows:
 5             EXAMINATION
 6   BY MR. FLAXMAN:
 7   Q.  Could you state your name and spell your
 8   last name for us, please?
 9   A.  Andrew Kral, K-r-a-l.
10   Q.  And you're a Chicago police officer.  For
11   how long have you been a Chicago police officer?
12   A.  Seven years.
13   Q.  Have you ever met the man to my right?
14   A.  Not before this.
15   Q.  Well, did you meet him on March 29, 2011?
16   A.  Yes.
17   Q.  How did you have occasion to meet him?
18   A.  I was ordered to come in to the station.
19   Q.  What -- were you ordered to do something at
20   the station?
21   A.  At first I was ordered just to come in.
22   Q.  Were you working with a partner?
23   A.  Yes, I was.
24   Q.  And who was that?
                                              3
```

```
 1   when you spoke with the captain?
 2   A.  Sergeant Verta and two other officers,
 3   plainclothes.
 4   Q.  Did you ever learn that they were IAD
 5   sergeants?
 6   A.  Yes.
 7   Q.  Was Officer Madsen with you also?
 8   A.  I don't recall.
 9   Q.  Okay.  What did do you after that
10   conversation?
11   A.  I don't understand.
12   Q.  Well, let me go back.  You don't remember
13   what the captain said.  Do you remember what anybody
14   said during that -- when you went back to see the
15   captain?
16   A.  When I went back there, I met with the
17   captain and the two plainclothes officers.  They
18   informed me that they were from IAD.
19   Q.  And did anybody else say anything?
20   A.  In terms of?
21   Q.  In terms of what you should do, why you were
22   there?
23   A.  We were then informed by the two officers
24   from IAD, which I learned were sergeants, there
                                              5
```