**Page 6**

1  had been allegations of a DUI and that we were
2  ordered to process the subject for a DUI. It had
3  been an off-duty police officer.
4  **Q. Now had you ever processed anyone for DUI**
5  **before?**
6  A. Yes.
7  **Q. How often have you -- do you do a lot of**
8  **DUIs?**
9  A. I wouldn't say a lot, no.
10  **Q. Do you do more than one a year?**
11  A. Yes.
12  **Q. Are you a certified Breathalyzer person?**
13  A. No.
14  **Q. Is your partner certified?**
15  A. I believe so, yes.
16  **Q. Did you -- when you were told there was an**
17  **allegation of DUI, were you given any other**
18  **information about what the allegation -- about the**
19  **nature of the allegation?**
20  A. Yes.
21  **Q. What were you told?**
22  A. I was informed that there had been witnesses
23  on scene and -- who had seen an open container of
24  alcohol in the car, seen the subject driving, and one

**Page 7**

1  of the sergeants, I don't recall his name, informed
2  me that there was -- one of the witnesses smelled
3  alcohol on his breath.
4  **Q. Anything else that you can recall about this**
5  **conversation?**
6  A. No.
7  **Q. What did you do after -- after you left that**
8  **conversation? Where did you go?**
9  A. We went to the processing room.
10  **Q. And you say "we," who is the "we?"**
11  A. My partner, officer Madsen.
12  **Q. What did you do in the processing room?**
13  A. Conducted our investigation per orders for a
14  DUI.
15  **Q. And what did that -- what did you actually**
16  **do as part of that investigation?**
17  A. Some field sobriety tests.
18  **Q. And did you administer those or did your**
19  **partner?**
20  A. My partner did.
21  **Q. Did you observe?**
22  A. Yes.
23  **Q. Did you observe Officer Seiser pass all the**
24  **field sobriety tests?**

**Page 8**

1  A. Yes.
2  **Q. Were you -- did you speak with Officer**
3  **Seiser?**
4  A. Not that I remember.
5  **Q. Did you get close enough to Officer Seiser**
6  **to smell the odor of alcoholic beverages about him?**
7  A. Yes.
8  **Q. Did you smell the odor of alcoholic**
9  **beverages?**
10  A. No.
11  **Q. Was there anything about Officer Seiser that**
12  **indicated that he had recently consumed alcohol?**
13  A. No.
14  **Q. Did he tell you he had recently consumed**
15  **alcohol?**
16  A. I don't recall that.
17  **Q. Do you recall anything that Officer Seiser**
18  **said to you at that time?**
19  A. At that time, no.
20  **Q. Did you fill out a field sobriety test**
21  **report?**
22  A. My partner did.
23  **Q. Is there anything in that report that**
24  **requires a statement of probable cause for**

**Page 9**

1  administering the field sobriety test?
2  A. I'm not familiar with the form enough to
3  know.
4  **Q. Okay. What happened after Officer Seiser**
5  **passed all the field sobriety tests?**
6  A. We read him his warning to motorist.
7  **Q. When you say "we read him," who is the "we?"**
8  A. My partner.
9  **Q. And those -- who are those warnings to**
10  **motorists?**
11  A. It's a warning that if you submit to
12  chemical testing and you're found guilty of a DUI,
13  there will be a suspension of your driver's license
14  for three months; if you don't submit to chemical
15  testing and found guilty, there will be a suspension,
16  I believe, for six months of your driver's license.
17  **Q. Are you aware of any rule or regulation in**
18  **the Chicago Police Department that requires that**
19  **there be probable cause before a police officer**
20  **administers those warnings to a motorist?**
21  A. Sure.
22  **Q. And was there probable cause -- well, did**
23  **you believe that there was probable cause that**
24  **Officer Seiser had committed a DUI?**

1   A.  Yes.
2   Q.  And what was the -- why did you believe
3 that?
4   A.  Based on what people from IAD, the two
5 sergeants were telling me and the witness statements
6 that they had.
7   Q.  Had you spoken to any of those witnesses?
8   A.  No.
9   Q.  Had you seen any written witness statements?
10   A.  No.
11   Q.  Was there anything about Officer Seiser that
12 indicated to you that he was under the influence of
13 alcoholic beverage?
14   A.  No.
15   Q.  Do you remember which IAD sergeant told you
16 these things?
17   A.  Yes, but I don't recall his name.
18   Q.  Well, does Sergeant Price refresh your
19 recollection?
20   A.  If he's the male white, bald.
21   Q.  I think they're both male whites.  No?
22 Okay, was one IAD sergeant white and one was black?
23   A.  Yes.
24   Q.  And was it the white IAD sergeant who told

10

1 you that -- the facts that -- that there was -- well,
2 was it the white sergeant who spoke during the
3 meeting?
4   A.  At first, yes.
5   Q.  And what did the African American sergeant
6 say?
7   A.  He informed us that we were to take the
8 officer in back and process him as a DUI.
9   Q.  And as a police officer in the Chicago
10 Police Department, it's your duty to follow orders
11 from a sergeant, is that right?
12   A.  Yes.
13   Q.  Have you ever seen the alcohol drug
14 influence report that was prepared that day?
15   A.  Yes.
16   Q.  When's the -- did you see it back on the day
17 it was prepared?
18   A.  I'm sorry?
19   Q.  Did you see -- it was prepared on March 29,
20 2011.  Did you see it then?
21   A.  Yes.
22   Q.  Did you -- does your handwriting appear on
23 it anywhere?
24   A.  I don't believe so.

11

1   Q.  How did you have occasion to see it?
2   A.  My partner was preparing it.
3   Q.  Did you look at it?
4   A.  Yes.
5   Q.  Okay.  Well, after Officer Seiser passed the
6 performance test, then what did you do?
7   MR. PLATT:  You mean the field sobriety?
8   MR. FLAXMAN:  That's what I meant.  Let me
9 rephrase the question.
10 BY MR. FLAXMAN:
11   Q.  After Officer Seiser passed the field
12 sobriety test, what, if anything, did you do?
13   A.  Read the warning to motorist.
14   Q.  And did you read it or did your partner?
15   A.  My partner.
16   Q.  And did Officer Seiser respond to the
17 warning?
18   A.  How so?
19   Q.  Did he say yes, I will submit to the test?
20   A.  I believe so.
21   Q.  What happened next?
22   A.  He was sat next to the machine and my
23 partner performed the test.
24   Q.  And where was Officer Seiser when he took

12

1 the test?  Where in the station?
2   A.  The 9th District processing room.
3   Q.  Were there other people present besides you,
4 Officer Madsen and Officer Seiser?
5   A.  Not that I recall.
6   Q.  Are there prisoners in the processing room?
7   A.  I don't recall any at the time.
8   Q.  Are there detention cells adjacent to the
9 processing room?
10   A.  That would be in another room.
11   Q.  Do you recall if Officer Seiser had his
12 firearm when he was taking the Breathalyzer test?
13   A.  He did not.
14   Q.  Had you seen someone take the firearm from
15 Officer Seiser?
16   A.  No.
17   Q.  I used the word detention cells.  Are
18 detention cells different than holding cells, or do
19 you understand them to be different?  Let me ask you
20 the right question.
21   A.  Okay.
22   Q.  Were there holding cells adjacent to the
23 processing area where the Breathalyzer was
24 administered?

13

**Page 14**

1  A.  No.
2  Q.  How long did it take to administer the
3  Breathalyzer?
4  A.  I don't know.
5  Q.  Do you remember what the results were of the
6  Breathalyzer?
7  A.  0.000.
8  Q.  What, if anything, did you do after that?
9  A.  I informed my sergeant, sergeant Verta what
10 I had.
11 Q.  And what did Sergeant Verta tell you?
12 A.  I don't recall.
13 Q.  What did you do after you informed sergeant
14 Verta what you had?
15 A.  I believe I talked to the captain and we did
16 a release without charging.
17 Q.  Did you have to fill out paperwork for the
18 release without charging?
19 A.  I completed the arrest report.
20 Q.  Were you involved in issuing a traffic
21 citation to Officer Seiser?
22 A.  No.
23 Q.  Do you know who -- did you know -- well, as
24 you sit here now, do you know that a traffic citation

**Page 15**

1  was issued?
2  A.  Yes.
3  Q.  Do you know who issued it?
4  A.  My partner.
5  Q.  Were you present when he issued it?
6  A.  Yes.
7  Q.  Do you know why he issued it?
8  A.  I believe it was for open container,
9  transportation of open container.
10 Q.  Did someone tell him to write a traffic
11 citation?
12 A.  I don't remember.
13 Q.  Did you see him write the citation?
14 A.  Yes.
15 Q.  Did he write the citation after the
16 Breathalyzer or before the Breathalyzer?
17 A.  I don't recall when that was written.
18 Q.  Did he write the -- well, was Officer Seiser
19 -- did you ever see Officer Seiser get his firearm
20 back that day?
21 A.  No.
22 Q.  What did do you with Officer Seiser -- well,
23 after the Breathalyzer, I think you said you left to
24 speak with -- do you know where Officer Seiser went

**Page 16**

1  after the Breathalyzer?
2  A.  No.
3  Q.  Was Officer Seiser ever handcuffed?
4  A.  No.
5  Q.  Was he ever restrained?
6  A.  No.
7  Q.  Was he ever told he's under arrest when you
8  were present?
9  A.  When I was present, no.
10 Q.  Did anybody ever tell him in your presence
11 that you're not free to leave, sir?
12 A.  Not in my presence.
13 Q.  Did you go to court on the traffic citation?
14 A.  I did not.
15 Q.  Do you know if your partner did?
16 A.  I believe he did.
17 Q.  Do you know who the complaining witness was
18 in the traffic citation?
19 A.  Not offhand, no.
20 Q.  Did either of the IAD -- did anybody ever
21 give you the names of the persons who had complained
22 about Officer Seiser?
23 A.  Yes.
24 Q.  Who gave you those names?

**Page 17**

1  A.  The white -- I can't remember his name.  The
2  white IAD sergeant.
3  Q.  Okay.
4  A.  That was Sergeant Cochran.
5  Q.  Was there -- were you present when there was
6  any kind of a lineup or a showup involving Officer
7  Seiser?
8  A.  No.
9  Q.  Did you see any civilian witnesses at the
10 police station?
11 A.  No.
12 Q.  Did you go out to the scene where Officer
13 Seiser's car was that day?
14 A.  No.
15 Q.  Did you ever see the -- bottle or the
16 object that was recovered from Officer Seiser's car?
17 A.  No.
18 Q.  Were you ever told that Officer Seiser would
19 be processed administratively?
20 A.  Yes.
21 Q.  Who told you that?
22 A.  Sergeant Cochran.
23 Q.  Was that before the Breathalyzer or after
24 the Breathalyzer?

**Page 26**

1   A. No.

2   Q. Do you remember asking him, "Why don't you

3   just give the bottle to the sergeant?"

4   A. Say that again, please.

5   Q. Do you remember asking Officer Seiser

6   anything in substance about why don't you just give

7   the sergeant the bottle?

8   A. No.

9   Q. Did you know that Officer Seiser was being

10   processed because there was a bottle observed in his

11   car?

12   A. Yes.

13   Q. You never saw that bottle, did you?

14   A. No.

15   Q. Did Officer Seiser ever tell you that there

16   was water in the bottle?

17   A. I don't recall.

18   Q. Anybody ever tell you that there was water

19   in the bottle?

20   A. No.

21   Q. Did you ever tell Officer Seiser that you're

22   under arrest for DUI?

23   A. Not that I remember.

24   Q. In the processing room, are there any rooms

**Page 28**

1   MR. PLATT:  Reserved.

2   MR. FLAXMAN:  All right.

3   (Deposition concluded at 12:43 p.m.)

**Page 27**

1   that look onto it where detainees can be held?

2   A. Yes.

3   Q. What do you call those rooms?

4   A. There's three or I believe four rooms that

5   they're labeled interview rooms.

6   Q. Do you remember any non-police officer being

7   present in any of those interview rooms while Officer

8   Seiser was back there with you?

9   A. No.

10   MR. FLAXMAN:  All right.  Nothing further.

11   EXAMINATION

12   BY MR. PLATT:

13   Q. Let me ask you, earlier you were asked

14   questions about whether or not someone could be

15   guilty of having an open alcohol container or in

16   violation of the open alcohol container statute if

17   the container does not contain alcohol.  Do you

18   remember being asked those questions?

19   A. Yes.

20   Q. Do you know whether or not someone can be

21   guilty of that one way or the other?

22   A. No, I don't.

23   MR. PLATT:  That's all I have.

24   MR. FLAXMAN:  Signature?

**Page 29**

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION

3

4   MICHAEL SEISER,            )
            Plaintiff;  )
5                          )
                           )
6   -v-            )No. 12 CV 02353
                           )
7                          )
    CITY OF CHICAGO and DEBRA      )
8   KIRBY,            )
            Defendants.  )
9

10

11   I, ANDREW KRAL, state that I have read the

12   foregoing transcript of the testimony given by me at

13   my deposition on the 6th day of November, 2012, and

14   that said transcript consisting of pages 4 through 26

15   is a true and accurate record of the testimony given

16   by me at said deposition except as I have so

17   indicated on the errata sheets provided herein.

18   Please check one:

19   _____ I made no corrections

20   _____ Number of errata sheets submitted

21   _____

     SUBSCRIBED AND SWORN

22   Before me this ___ day

     Of _____, 20___

23

     _____

24   Notary Public

# EXHIBIT K

Page 1

1      IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF ILLINOIS
2            EASTERN DIVISION
3
4  MICHAEL SEISER,
          Plaintiff;  )
5
6
7   -v-         )No. 12 CV 02353
8
9  CITY OF CHICAGO and DEBRA
   KIRBY,
10       Defendants.  )
11
12
13     The Discovery Deposition of BRIAN MADSEN,
14  taken before Beth C. Radtke, C.S.R. within and for
15  the State of Illinois, pursuant to the provisions of
16  the Federal Rules of Civil Procedure of the United
17  States District Court, pertaining to the taking of
18  depositions, taken at 200 South Michigan Avenue,
19  Suite 1240, Chicago, Illinois, commencing at the hour
20  of approximately 12:45 p.m. on the 6th day of
21  November, 2012.
22
23
24

Page 2

1           APPEARANCES
2
3  LAW OFFICE OF KENNETH N. FLAXMAN
  By Mr. Kenneth N. Flaxman
4     200 South LaSalle Street
     Suite 1240
5     Chicago, Illinois  60604
     312.427.3200
6     knf@kenlaw.com
     Appeared on behalf of the Plaintiff;
7
8  CORPORATION COUNSEL
  By Mr. Thomas Platt
9     Ms. Lindsey Vanorny
     30 North LaSalle Street
10    Suite 1400
     Chicago, Illinois  60602
11    312.744.4833
     thomas.platt@cityofchicago.org
12    lindsey.vanorny@cityofchicago.org
     Appeared on behalf of the Defendants.
13
14
15
16
17
18
19
20
21
22
23
24



Page 3

1           INDEX
2
3  WITNESS:              PAGE:
4  BRIAN MADSEN
    Examination by Mr. Flaxman     4
5    Examination by Ms. Vanorny    17
    Further Examination by Mr. Flaxman  18
6
7
8  EXHIBITS:
9    Deposition Exhibit No. 1     15
     Citation
10
11     EXHIBIT RETAINED BY COUNSEL
12
13           *****
14
15
16
17
18
19
20
21
22
23
24



Page 4

1    (Witness sworn.)
2         BRIAN MADSEN,
3  having been first duly sworn, was examined and
4  testified as follows:
5         EXAMINATION
6  BY MR. FLAXMAN:
7    Q.   Could you state your name and spell your
8  last name?
9    A.   Madsen, Brian.  B-r-i-a-n M-a-d-s-e-n.
10    Q.   And you're a Chicago police officer.  For
11  how long have you been a Chicago police officer?
12    A.   This year is nine years.
13    Q.   Back in March of 2011, do you remember what
14  your assignment was?
15    A.   I am not sure.
16    Q.   Do you remember -- were you working assigned
17  to the 9th District?
18    A.   Correct.
19    Q.   Do you recall being ordered to come into the
20  9th District on March 29, 2011?
21    A.   Yes.
22    Q.   How did you get that order?
23    A.   Over the radio.
24    Q.   And do you remember what the order was?

## Page 5

1    A.   I am not sure.  See the desk.

2    Q.   Did you -- and were you working with a

3  partner that day?

4    A.   Yes, correct.

5    Q.   Who were you working with?

6    A.   Andy Kral.

7    Q.   Is that the same officer who left as you

8  came in?

9    A.   Yes.

10   Q.   What did you do after getting that order?

11   A.   Spoke to the desk or --

12   Q.   Did you go to the police station?

13   A.   Yes.

14   Q.   And you went with your partner?

15   A.   Correct.

16   Q.   When you got to the police station, you

17  spoke with the desk.  What did you do after speaking

18  with the desk?

19   A.   I think we went in the back and the

20  supervisors were in the back and we spoke with them.

21   Q.   Do you remember with whom you spoke?

22   A.   Captain Johnson.  There was a couple people

23  from IAD there, sergeants.

24   Q.   And one was black and one was white?

## Page 6

1    A.   Correct.

2    Q.   Was there a Sergeant Verta there?

3    A.   Yes.

4    Q.   Do you remember who spoke during that

5  gathering?

6    A.   I think a little bit of everyone.

7    Q.   Well, did you get any orders during that

8  meeting?

9    A.   Yeah, I mean, we were supposed to process

10  Officer Seiser as a DUI.

11   Q.   Had you ever met Officer Seiser before?

12   A.   No.

13   Q.   Did anyone tell you -- well, do you remember

14  who it was who gave that you instruction to process

15  Officer Seiser as a DUI?

16   A.   I'm not really sure.

17   Q.   Did whoever gave you that instruction tell

18  you why you should be processing Officer Seiser as a

19  DUI?

20   A.   I'm not sure.  Can you ask the question

21  again?

22   Q.   Did anybody tell you why Officer Seiser was

23  there to be processed for a DUI?

24   A.   I think it was, like, he was working off

## Page 7

1  duty and he was doing the school crossing guard.  I'm

2  not sure.

3    Q.   Well, what did you do after getting the

4  instruction to process Officer Seiser as a DUI?

5    A.   I think we did the fields and, you know, did

6  that kind of stuff.

7    Q.   Where were you -- well, did you perform the

8  field sobriety test?

9    A.   Yes.

10   Q.   Did you do it in the police station?

11   A.   Correct.

12   Q.   Where did you do it in the police station?

13   A.   I think it was the processing room.

14   Q.   And was anybody present when you

15  administered the field sobriety test to Officer

16  Seiser?

17   A.   I believe my partner was.  I'm not sure if

18  anybody else was.

19   Q.   Was Sergeant Verta there?

20   A.   I don't recall.

21   Q.   Either of the IAD sergeants there?

22   A.   I don't recall.

23   Q.   Were there any detainees who were able to

24  observe what you were doing?

## Page 8

1    A.   I don't believe so, but...

2    Q.   Before you administered the field sobriety

3  test, did you have any conversation with Officer

4  Seiser?

5    A.   I am not sure.

6    Q.   Did you say anything to him?

7    A.   I don't recall.

8    Q.   Did you tell him what to do during the field

9  sobriety test?

10   A.   Oh, yeah.

11   Q.   What's the first thing you remember telling

12  him?

13   A.   I'm not sure which one we performed first,

14  but...

15   Q.   Okay.  After you -- did you go through all

16  -- all of the standard field sobriety tests?

17   A.   Yes.

18   Q.   And how did Officer Seiser do?

19        MS. VANORNY:  Would it help if you had your

20  report?

21        MR. FLAXMAN:  I'll do that if I want to.

22  BY MR. FLAXMAN:

23   Q.   Do you remember how he did?

24   A.   He did well.

Page 9

```
 1      Q.   He passed all the field sobriety tests?
 2      A.   He did not appear intoxicated.
 3      Q.   Were you able to smell the odor of any
 4  alcoholic beverage about Officer Seiser?
 5      A.   At no time.
 6      Q.   Did you detect any slurred speech?
 7      A.   No.
 8      Q.   After Officer Seiser passed the field
 9  sobriety test, did you administer a Breathalyzer
10  test?
11      A.   Yes.
12      Q.   Why?
13      A.   I'm not sure.
14      Q.   Were you ordered to administer the
15  Breathalyzer?
16      A.   I'm not sure.
17      Q.   Is there a form that the officers fill out
18  before administering a Breathalyzer, a warning to
19  motorist form?
20      A.   Yes.
21      Q.   Is there a box on that form or a line in
22  that form where the officer fills out what the
23  probable cause was to administer the field sobriety
24  test?
```

Page 10

```
 1      A.   I'm not sure.
 2      Q.   Did you administer a Breathalyzer test to
 3  Officer Seiser?
 4      A.   Yes.
 5      Q.   At the time you administered the
 6  Breathalyzer test, did you have any basis to believe
 7  that Officer Seiser was under the influence of
 8  alcohol?
 9      A.   No.
10      Q.   And do you remember how Officer Seiser did
11  on the Breathalyzer test?
12      A.   It was triple zeros.
13      Q.   Did you write a traffic citation that day?
14      A.   Yes, sir.
15      Q.   Why did you write the traffic citation?
16      A.   I'm unsure.
17      Q.   Did somebody order you to do it?
18      A.   Possibly.
19      Q.   Well, do you remember what the traffic
20  citation was that you wrote?
21      A.   I think it was open alcohol.
22      Q.   Had you observed open alcohol in Officer
23  Seiser's vehicle?
24      A.   No, sir.
```

Page 11

```
 1      Q.   Had anyone told you that they had observed
 2  open alcohol?
 3      A.   I think Sergeant Verta related that there
 4  was an open bottle or an open container and there was
 5  a witness that saw him drinking from it.  I'm not
 6  sure.
 7      Q.   Did somebody -- did you ever speak to that
 8  witness?
 9      A.   No, sir.
10      Q.   Did somebody ever tell you that there was
11  alcohol in that bottle?
12      A.   No, sir.
13      Q.   Was it your understanding back in March of
14  2011 that the offense of transporting open alcohol
15  required that there be alcohol in the container that
16  was being transported?
17      A.   I'm not sure.
18      Q.   Well, if you had a container that formerly
19  contained alcohol but now contained water which was
20  open in a vehicle, would that be a violation of any
21  ordinance or statute of which you are aware?
22      A.   No, I'm not sure.
23      Q.   Okay.  Do you remember who it was who told
24  you the name of the complainant to write in that
```

Page 12

```
 1  ticket you wrote?
 2      A.   It was a lot of people there.  I'm really
 3  not sure, sir.
 4      Q.   Did you go to court on the ticket?
 5      A.   Yes, sir.
 6      Q.   And did you testify?
 7      A.   I spoke with a state's attorney ahead of
 8  time and I learned that it was just water in there,
 9  so...
10      Q.   Well, how did you learn that it was just
11  water in there?
12      A.   I'm not sure if it went to the chemical lab
13  and came back negative or -- I'm not sure.
14      Q.   Do you remember telling the state's attorney
15  at the -- at Mr. Seiser's court appearance that the
16  container had water in it?
17      A.   Correct.
18      Q.   Had you done anything to notify the
19  complaining witness to -- whose name was on the
20  ticket to come to the court hearing for Mr. Seiser?
21      A.   I'm not sure.
22      Q.   Did you stand up and tell the judge that it
23  was water in the --
24      A.   It never got to that point, sir.
```

Page 13

1  Q. Well, were you present -- were you present
2  in court when the case was called?
3  A. Yes, sir.
4  Q. And did you stand up?
5  A. I'm not sure.
6  Q. Do you remember what happened?
7  A. I believe they dismissed the ticket, sir.
8  Q. Okay. Do you remember if the prosecutor was
9  a state's attorney or a corporation counsel or
10 somebody else?
11 A. I'm really not sure.
12 Q. Do you remember -- do you recall any
13 conversations you had with Mr. Seiser back on
14 March 29, 2011?
15 A. No.
16 Q. Did you ever ask him, "Why don't you just
17 give the sergeant the bottle?"
18 A. I don't know.
19 Q. Did Mr. Seiser ever tell you that day that
20 the bottle had water in it?
21 A. I don't think so.
22 Q. Did he ever tell you that day that it had
23 alcohol in it?
24 A. I don't think so.

Veritext Chicago Reporting Company
312-442-9087          800-248-3290          847-406-3200

Page 14

1  Q. Anything that you recall that he told you?
2  A. No.
3  Q. Did you write the ticket before you had the
4  results of the Breathalyzer?
5  A. I'm unsure.
6  Q. Did you ever tell the captain that you were
7  writing a ticket?
8  A. Unknown.
9  Q. What do you mean unknown?
10 A. I'm not sure.
11 Q. Would you -- well, do you remember if you
12 wrote in the arrest report anything about issuing the
13 ticket?
14     MS. VANORNY: Do you want to look at your
15 report?
16     THE WITNESS: Sure.
17 BY MR. FLAXMAN:
18 Q. If you don't remember, you don't remember.
19 If you don't remember, say you don't remember and I
20 may or may not ask you to look at the report, but if
21 you don't remember, you don't remember. Please don't
22 look at the Corporation Counsel for an answer.
23     MS. VANORNY: You can just answer based on
24 what you remember.

Veritext Chicago Reporting Company
312-442-9087          800-248-3290          847-406-3200

Page 15

1      THE WITNESS: I'm not sure.
2  BY MR. FLAXMAN:
3  Q. Did you ever hear anybody tell Officer
4  Seiser that he was under arrest back in March of
5  2011?
6  A. I don't think so. I'm not sure.
7  Q. Did you hear Officer Seiser say anything
8  back that day?
9  A. I don't recall.
10 Q. Okay. Do you know someone named Roseanne
11 Anderson?
12 A. No, sir.
13 Q. Did you ever hear that name before?
14 A. I don't recall, sir.
15 Q. Do you know someone named Gary Anderson?
16 A. No, sir.
17 Q. Do you know someone named Gail Glassford?
18 A. I believe that was the name on the ticket,
19 sir.
20 Q. Did you ever meet them?
21 A. No, sir.
22     MR. FLAXMAN: Can we mark this as Exhibit 1?
23     (Exhibit No. 1 was marked as requested.)
24

Veritext Chicago Reporting Company
312-442-9087          800-248-3290          847-406-3200

Page 16

1  BY MR. FLAXMAN:
2  Q. Can you tell us what Exhibit 1 is?
3  A. It's a ticket that was issued to Michael
4  Seiser.
5  Q. Does your handwriting appear on it?
6  A. Yes, sir.
7  Q. On the left is the name Gail Glassford?
8  A. Yes, sir.
9  Q. Did you write that?
10 A. Yes.
11 Q. Why did you write that?
12 A. I believe I was told to by a supervisor.
13 Q. Do you know which supervisor told you to
14 write that?
15 A. No, sir.
16 Q. Okay. Did you ever see the bottle that was
17 seized -- recovered from Mr. Seiser's car?
18 A. I don't believe so.
19 Q. Do you remember who it was who told you that
20 the bottle contained water?
21 A. I'm not sure.
22 Q. Did you ever see a crime lab report about
23 the bottle containing water?
24 A. I don't recall.

Veritext Chicago Reporting Company
312-442-9087          800-248-3290          847-406-3200

Page 21

1    A.   I'm not sure.

2    Q.   Well, what do you mean you're not sure?

3    A.   I mean, I could look.  If you've got

4  paperwork in front of you, I could --

5    Q.   Well, I'll tell you that none of the

6  paperwork in front of me contains a warning to

7  motorist form.  Before you came here today, did you

8  have a chance to look over documents with the

9  corporation counsel?

10   A.   Yes, sir.

11   Q.   And did any of those documents include a

12  warning to motorist form?

13   A.   I'm unsure.

14   Q.   Okay.  Well, is there any -- do you have

15  those documents in front of you that you looked at to

16  prepare for the deposition?

17   A.   I believe so.

18   Q.   Well, could you take a look through them and

19  see if you could find the warning to motorist form?

20  Do you have them?

21   A.   No, sir, I'm sorry, I don't.

22   Q.   Okay.  Is that a one-page form or a two-page

23  form or something else if you recall?

24   A.   I think it's a bunch of pages and then you

Page 22

1  kind of tear it apart.

2    Q.   And is that the form that requires that you

3  fill out what the probable cause was for the test?

4    A.   I'm not sure.

5         MR. FLAXMAN:  All right.  I have nothing

6  further.

7         MS. VANORNY:  Nothing further.

8         MR. FLAXMAN:  We're done.  Signature?

9         MS. VANORNY:  We'll reserve.

10        MR. FLAXMAN:  Thank you.

11        (Deposition concluded at 1:04 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 23

1         IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

3

4  MICHAEL SEISER,            )
               Plaintiff;     )
5                             )
                              )
6    -v-                      )No. 12 CV 02353
                              )
7                             )
   CITY OF CHICAGO and DEBRA  )
8  KIRBY,                     )
               Defendants.    )
9

10

11        I, BRIAN MADSEN, state that I have read the

12  foregoing transcript of the testimony given by me at

13  my deposition on the 6th day of November, 2012, and

14  that said transcript consisting of pages 4 through 26

15  is a true and accurate record of the testimony given

16  by me at said deposition except as I have so

17  indicated on the errata sheets provided herein.

18        Please check one:

19        _____ I made no corrections

20        _____ Number of errata sheets submitted

21  _____

   SUBSCRIBED AND SWORN
22  Before me this __ day

   Of _____, 20__

23  _____

24  Notary Public

Page 24

1              CERTIFICATE OF

2         CERTIFIED SHORTHAND REPORTER

3    I, Beth C. Radtke, a Certified Shorthand

4  Reporter of the State of Illinois, CSR License No.

5  084-004567, do hereby certify:

6    That previous to the commencement of the

7  examination of the aforesaid witness, the witness

8  was duly sworn by me to testify the whole truth

9  concerning the matters herein;

10   That the foregoing deposition transcript was

11  stenographically reported by me and was thereafter

12  reduced to typewriting under my personal direction

13  and constitutes a true and accurate record of the

14  testimony given and the proceedings had at the

15  aforesaid deposition;

16   That I am not a relative or employee or attorney

17  or counsel for any of the parties herein, nor am I

18  interested directly or indirectly in the outcome of

19  this action.

20   IN WITNESS WHEREOF, I do hereunto set my hand at

21  Chicago, Illinois, this 18th day of November, 2012.

22

23  _____

                    Beth Radtke, C.S.R

24                  License No. 084-004567

# EXHIBIT L

Page 1

1          UNITED STATES DISTRICT COURT FOR THE
2              NORTHERN DISTRICT OF ILLINOIS
3                     EASTERN DIVISION
4
5   MICHAEL SEISER,            )
                              )
6        Plaintiff,           )
                              )
7   vs.                       )   Case No. 12 C 2353
                              )   Judge Holderman
8   CITY OF CHICAGO and       )
    DEBRA KIRBY,              )
9                             )
         Defendants.          )
10  _____)
11
12        The deposition of LIEUTENANT DAVID NALEWAY,
13  called for examination by Plaintiff, taken pursuant to
14  notice and pursuant to the Federal Rules of Civil
15  Procedure for the United States District Courts,
16  pertaining to the taking of depositions, taken before
17  Bonnie Lindsey, a Certified Shorthand Reporter within
18  and for the State of Illinois, at 200 South Michigan
19  Avenue, Suite 1240, Chicago, Illinois, commencing at
20  3:00 p.m. on Friday, January 18, 2013.
21
22
23
24

Page 2

1   A P P E A R A N C E S:
2
3       Kenneth N. Flaxman, Esq.
4       KENNETH N. FLAXMAN, PC
5       200 North LaSalle Street, Suite 1240
6       Chicago, Illinois 60604-2430
7       (312) 427-3200
8       knf@kenlaw.com
9            On behalf of Plaintiff;
10
11      Scott Jebson, Esq.
12      Chief Assistant Corporation Counsel
13      Federal Civil Rights Litigation
14      30 North LaSalle Street, Suite 900
15      Chicago, Illinois 60602
16      (312) 742-6408
17      sjebson@cityofchicago.org
18           On behalf of Defendants.
19
20
21
22
23
24

Page 3

1                  I N D E X
2
3   WITNESS                              PAGE
4   LIEUTENANT DAVID NALEWAY
5
6       Examination by Mr. Flaxman         4
7       Examination by Mr. Jebson         11
8
9                E X H I B I T S
10             (None marked.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1           (Proceedings commenced at
2            3:00 p.m.)
3           (Witness sworn.)
4   WHEREUPON:
5           LIEUTENANT DAVID NALEWAY,
6   called as a witness herein by the plaintiff, having
7   been first duly sworn, was examined and testified as
8   follows:
9               EXAMINATION
10  BY MR. FLAXMAN:
11      Q.   State your name and spell your last name for
12  us.
13      A.   Lieutenant David Naleway; that's spelled N,
14  as in "Nancy," -A-L-E-W-A-Y.
15      Q.   And what's your business or occupation,
16  Lieutenant?
17      A.   Chicago police officer.
18      Q.   How long have you been a Chicago police
19  officer?
20      A.   21 years.
21      Q.   What is your present assignment?
22      A.   Lieutenant, assigned to the 10th District.
23      Q.   Are you a field lieutenant?
24      A.   Both, field on two days and two days the

Page 5

1   district station supervisor.

2        Q.   And before being assigned to the

3   10th District, what was your assignment?

4        A.   I was assigned to the 13th District.

5        Q.   How long were you there?

6        A.   14, 15 months.

7        Q.   And before that?

8        A.   Internal Affairs Division.

9        Q.   How long did you work in Internal Affairs?

10       A.   Just over 8 years.

11       Q.   And why did you leave Internal Affairs?

12       A.   I took a bid.

13       Q.   You took the bid to the 13th District?

14       A.   Yes.

15       Q.   Is that a better job than IAD?

16       A.   It's a secure job.  There is only 75 bids

17   for lieutenants in the city.

18       Q.   Before coming here, did you review any

19   documents about Officer Seiser and this lawsuit?

20       A.   Yes, I did.

21       Q.   What did you look at?

22       A.   Reports that were presented to me from

23   Sergeant Price and from Sergeant Cochran.

24       Q.   Do you recall receiving information about an

Page 6

1   officer in the 9th District back on March 29th of

2   2011?

3        A.   I don't remember the exact date, but yes, I

4   do.

5        Q.   What information did you receive?

6        A.   I received a phone call from a Captain

7   Johnson.

8        Q.   What did he say?

9        A.   He told me that one of his sergeants had

10  received a call for a supervisor and citizen complaint

11  and upon his arrival, he spoke to several citizens and

12  their allegation was that they had seen a uniformed

13  Chicago police officer driving a vehicle and he was

14  drinking from, what they believe to be, a bottle of

15  alcohol, and upon stopping, when he got out of his

16  vehicle -- it was a civilian vehicle -- that he took a

17  couple more swigs out of that bottle.

18       Q.   And what did you do after you received that

19  information?

20       A.   I called up -- I told the captain that I

21  would be sending out sergeant to him.  And I contacted

22  Sergeant Price and told him to report directly to the

23  9th District.

24       Q.   Did you do anything else?

Page 7

1        A.   At that time, no.

2        Q.   What was your next involvement with this

3   incident?

4        A.   A short time later -- Well, I contacted

5   Sergeant Cochran, and he was scheduled to be starting,

6   so he would have been en route to headquarters.  I

7   told him to also report to the 9th District to help

8   Sergeant Price.

9        Q.   Why did you believe that Sergeant Price

10  needed help?

11       A.   We usually have two sergeants respond to

12  call-outs.

13       Q.   What else did you do, if anything?

14       A.   That was it for that time.

15       Q.   Well, did you have any conversation with any

16  of your superiors about this incident?

17       A.   Subsequently, yes, I did.

18       Q.   When is the first such conversation you had?

19       A.   After I received a phone call from Sergeant

20  Price.

21       Q.   And what did Sergeant Price tell you in that

22  phone call?

23       A.   He was en route back to the 9th District; he

24  had gone out and interviewed the complaining

Page 8

1   witnesses, three of them, I believe it was three.

2        And he related to me what they had told

3   him and that he had a signed sworn affidavit from one

4   of the complainants and he had gone and he had looked

5   into the vehicle that the officer had gotten out of

6   and that he could clearly see what appeared to be a

7   liquor bottle on the front seat, with a clear liquid

8   in it, and it had some red markings and a red cap on

9   it.

10       Q.   After receiving that information, what, if

11  anything, did you do?

12       A.   I went to Chief Rivera's office.  I related

13  to him what had been told to me.

14       Q.   And what did Chief Rivera, tell you, if

15  anything?

16       A.   He told me he would contact Deputy Kirby and

17  he would get back to me.

18       Q.   And did he get back to you?

19       A.   Yes, he came to my office.

20       Q.   And what did he tell you?

21       A.   He told me that at the direction of Deputy

22  Kirby, that the 9th District would be processing any

23  criminal aspect of the investigation and that Internal

24  Affairs would be doing the administrative portion of

Page 9

```
 1   the investigation.
 2       Q.   And what, if anything, did you do after
 3   receiving that information?
 4       A.   I relayed that information to both Sergeant
 5   Price and Sergeant Cochran.
 6       Q.   Did you ever tell Sergeant Cochran that
 7   Deputy Superintendent Kirby had ordered that Officer
 8   Seiser was to be charged criminally?
 9       A.   No.
10       Q.   Did you ever tell Sergeant Price that Kirby
11   had ordered that Seiser was to be charged criminally?
12       A.   There was never any mention of the name
13   Seiser.
14       Q.   Okay.  Well, did you ever tell Cochran that
15   Kirby had ordered that the officer was to be charged
16   criminally?
17       A.   No.
18       Q.   Did you tell Price that Kirby had ordered
19   that the officer was to be charged criminally?
20       A.   No.
21       Q.   To your knowledge, had Kirby ordered that
22   the officer was to be charged criminally?
23       A.   No.
24       Q.   What is your next involvement?
```

Veritext Chicago Reporting Company
312-442-9087          800-248-3290          847-406-3200

Page 10

```
 1       A.   There was a phone call I received from, I
 2   don't know what order it came in, but I received phone
 3   calls from both Sergeant Cochran and Sergeant Price.
 4            Sergeant Price had related to me that
 5   there were some officers that were being brought into
 6   the 9th District to process the criminal portion.
 7            And then subsequently, I received a
 8   phone call from Sergeant Cochran that they were
 9   getting ready to perform some testing on the officer.
10       Q.   And did you have any further involvement?
11       A.   I received another phone call, yes.
12       Q.   And who was that from?
13       A.   It was from Sergeant Price, I believe.
14       Q.   What did he tell you in that phone call?
15       A.   He told me that the officer had submitted to
16   it a Breathalyzer and blew triple zeros.
17       Q.   What happened next?
18       A.   Sergeant Cochran contacted me.  I was
19   already at home; Sergeant Cochran contacted me,
20   reiterated the same information, that there was
21   triple zeros.
22            At that time, he asked me if the
23   officer should be relieved of his duties, and I
24   instructed Sergeant Cochran to call the Chief for
```

Veritext Chicago Reporting Company
312-442-9087          800-248-3290          847-406-3200

Page 11

```
 1   further guidance.
 2       Q.   After telling Cochran to call the Chief for
 3   further guidance -- and by the "Chief," you mean Chief
 4   Rivera --
 5       A.   Chief Rivera, yes.
 6       Q.   -- did you have any further involvement?
 7       A.   None at all.
 8            MR. FLAXMAN:  I have nothing further.
 9                    EXAMINATION
10   BY MR. JEBSON:
11       Q.   I'm going to sit over here so the court
12   reporter can hear me.
13            Lieutenant, I just want to go in
14   chronological order of your involvement.  And it
15   sounds like the first time you heard anything about an
16   allegation of an officer drinking on duty was from
17   Captain Johnson.
18       A.   That's correct.
19       Q.   And you were at your office when you got
20   that call?
21       A.   That's correct.
22       Q.   And after getting that call, what is
23   the -- Strike that.
24            Captain Johnson had relayed
```

Veritext Chicago Reporting Company
312-442-9087          800-248-3290          847-406-3200

Page 12

```
 1   information, generally speaking, that there was an
 2   on-duty officer and the allegation was drinking while
 3   driving in his personal vehicle?
 4       A.   We didn't know that the officer was on duty.
 5   All of the information I had was that we had a
 6   uniformed officer, it was in front of a school, and we
 7   did subsequently find out that he was there to work
 8   special employment.
 9       Q.   And after having this initial telephone
10   conversation with Captain Johnson, what is the next
11   thing you did?
12       A.   I contacted Sergeant Price and directed him
13   to go to the 9th District.
14       Q.   And then what did you do?
15       A.   I contacted Sergeant Cochran and directed
16   him to go to the 9th District.
17       Q.   Is the next thing that happened in terms of
18   your involvement, you received a phone call from
19   Sergeant Price?
20       A.   Correct.
21       Q.   And I think you told Mr. Flaxman that
22   Sergeant Price had conveyed to you the information
23   that he had gathered after talking to three witnesses
24   at the scene.
```

Veritext Chicago Reporting Company
312-442-9087          800-248-3290          847-406-3200

---

Page 13

1      A.    Yes.
2      Q.    And am I correct that Sergeant Price had
3  told you, generally speaking, that these three
4  witnesses had observed a uniformed officer in his
5  personal vehicle, drinking out of what appeared to be
6  a bottle that contained alcohol?
7      A.    Yes.
8      Q.    And did you also get information from
9  Sergeant Price that a 9th District officer had earlier
10 responded to the scene, had spoken to some witnesses
11 and had looked into the officer's car and saw what
12 appeared to look like an alcoholic bottle with clear
13 liquid in there?
14     A.    That was Sergeant Verta.
15     Q.    And that was told to you by Sergeant Price?
16     A.    Yes.
17     Q.    And were you also told that according
18 to Sergeant Verta -- Strike that.
19           Were you also told by Sergeant Price
20 that the 9th District officer, who we know is Sergeant
21 Verta, when he looked and saw that bottle, that there
22 was a broken seal?
23     A.    Yes.
24     Q.    Now, all the information that Sergeant Price

---

Page 14

1  had conveyed to you, did you then convey all that
2  information to Chief Rivera?
3      A.    Yes, I did.
4      Q.    And is that when you hung up with Sergeant
5  Price, and did you then walk over to the Chief's
6  office?
7      A.    I walked to his office, yes.
8      Q.    And conveyed all the information that you
9  received from Sergeant Price?
10     A.    Yes.
11     Q.    And then what did you do?
12     A.    I went back to my office.
13     Q.    And then at some point later -- Well, strike
14 that.
15           Before going back to your office, is
16 that when Chief Rivera said that he was going to go
17 talk to Debra Kirby?
18     A.    Yes.
19     Q.    Then you went back to your office?
20     A.    I went back to my office, yes.
21     Q.    Sometime later Chief Rivera came to your
22 office?
23     A.    Yes, he did.
24     Q.    And is that when he conveyed to you that

---

Page 15

1  according to Debra Kirby that the 9th District is to
2  process the officer during the criminal investigation
3  and that after that, IAD would do the administrative
4  portion of the investigation?
5      A.    That's correct.
6      Q.    And when you talked to Sergeant Price, when
7  he conveyed to you the information he received from
8  the witnesses, did Sergeant Price ever mention the
9  name Seiser?
10     A.    Never.
11     Q.    When did you first hear who that accused
12 officer was, that his name was Seiser?
13     A.    The next day.
14     Q.    Now, at any time, did you receive any
15 information that Debra Kirby had ordered or directed
16 anyone to issue Officer Seiser a citation?
17     A.    No, I did not hear that.
18     Q.    Did you ever tell anyone to issue Officer
19 Seiser a citation?
20     A.    No, I did not.
21     Q.    When is the first time you ever heard that
22 Officer Seiser was issued a citation?
23     A.    The day after.
24     Q.    Now, at any time, Lieutenant, when Sergeant

---

Page 16

1  Price was giving you the information that he received
2  from the witnesses, did it ever appear to you that
3  that information was unreliable information?
4      A.    No.
5           MR. JEBSON:  That's all the questions I
6  have.
7           MR. FLAXMAN:  Signature?
8           MR. JEBSON:  We'll reserve.
9           MR. FLAXMAN:  Thank you.
10               (Which concluded the deposition at
11               3:14 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 17

```
 1          UNITED STATES DISTRICT COURT FOR THE
 2             NORTHERN DISTRICT OF ILLINOIS
 3                   EASTERN DIVISION
 4   MICHAEL SEISER,            )
                                )
 5            Plaintiff,        )
                                )
 6      vs.                     )   Case No. 12 C 2353
                                )   Judge Holderman
 7   CITY OF CHICAGO and        )
     DEBRA KIRBY,               )
 8                              )
             Defendants.        )
 9   _____)
10
11        I, LIEUTENANT DAVID NALEWAY, state that I
     have read the foregoing transcript of the testimony
12   given by me at my deposition on January 18, 2013,
     which consists of pages 1 through 16, and that said
13   transcript constitutes a true and correct record of
     the testimony given by me at the said deposition
14   except as I have so indicated on the errata sheets
     provided herein.
15                       --------------------------
                         LIEUTENANT DAVID NALEWAY
16
17   No corrections (Please initial)_____
     Number of errata sheets submitted_____(pgs.)
18
19   SUBSCRIBED AND SWORN to
     before me this _____day
20   of_____, 2013
21
22   --------------------------
     NOTARY PUBLIC
23
24
```

Veritext Chicago Reporting Company
312-442-9087    800-248-3290    847-406-3200

Page 18

```
 1               CERTIFICATE
 2                    OF
 3          CERTIFIED SHORTHAND REPORTER
 4
 5        I, BONNIE LINDSEY, a Certified Shorthand
 6   Reporter of the State of Illinois, CSR License
 7   No. 084-003946, do hereby certify:
 8        That previous to the commencement of the
 9   examination of the aforesaid witness, the witness was
10   duly sworn by me or duly affirmed to testify the whole
11   truth concerning the matters herein;
12        That the foregoing deposition transcript was
13   stenographically reported by me and was thereafter
14   reduced to typewriting under my personal direction and
15   constitutes a true and accurate record of the
16   testimony given and the proceedings had at the
17   aforesaid deposition;
18        That the said deposition was taken before me
19   at the time and place specified;
20        That I am not a relative or employee or
21   attorney or counsel for any of the parties herein, nor
22   a relative or employee of such attorney or counsel for
23   any of the parties hereto, nor am I interested
24   directly or indirectly in the outcome of this action.
```

Veritext Chicago Reporting Company
312-442-9087    800-248-3290    847-406-3200

Page 19

```
 1        IN WITNESS WHEREOF, I do hereunto set my
 2   hand at Chicago, Illinois, this 24th day of January,
 3   2013.
 4
 5
 6
 7
 8        BONNIE LINDSEY, CSR, RPR
 9        CSR License No. 084-003946
```

Veritext Chicago Reporting Company
312-442-9087    800-248-3290    847-406-3200

[Index page - Page 1]

Veritext Chicago Reporting Company
312-442-9087    800-248-3290    847-406-3200

# EXHIBIT M

Page 1

```
 1              UNITED STATES DISTRICT COURT FOR THE
 2                   NORTHERN DISTRICT OF ILLINOIS
 3                         EASTERN DIVISION
 4
 5    MICHAEL SEISER,            )
                                 )
 6            Plaintiff,         )
                                 )
 7       vs.                     )   Case No. 12 C 2353
                                 )   Judge Holderman
 8    CITY OF CHICAGO and        )
      DEBRA KIRBY,               )
 9                               )
              Defendants.        )
10    _____)
11
12            The deposition of SERGEANT MATTHEW PRICE,
13    called for examination by Plaintiff, taken pursuant to
14    notice and pursuant to the Federal Rules of Civil
15    Procedure for the United States District Courts,
16    pertaining to the taking of depositions, taken before
17    Bonnie Lindsey, a Certified Shorthand Reporter within
18    and for the State of Illinois, at 200 South Michigan
19    Avenue, Suite 1240, Chicago, Illinois, commencing at
20    2:02 p.m. on Friday, January 18, 2013.
21
22
23
24
```

Page 2

```
 1    A P P E A R A N C E S :
 2
 3        Kenneth N. Flaxman, Esq.
 4        KENNETH N. FLAXMAN, PC
 5        200 North LaSalle Street, Suite 1240
 6        Chicago, Illinois 60604-2430
 7        (312) 427-3200
 8        knf@kenlaw.com
 9            On behalf of Plaintiff;
10
11        Scott Jebson, Esq.
12        Chief Assistant Corporation Counsel
13        Federal Civil Rights Litigation
14        30 North LaSalle Street, Suite 900
15        Chicago, Illinois 60602
16        (312) 742-6408
17        sjebson@cityofchicago.org
18            On behalf of Defendants.
19
20
21
22
23
24
```

Page 3

```
 1                    I N D E X
 2    WITNESS                              PAGES
 3    SERGEANT MATTHEW PRICE
 4        Examination by Mr. Flaxman         4, 46
 5        Examination by Mr. Jebson         28, 52
 6
 7                    EXHIBITS
 8
      PLAINTIFF'S                          FIRST
 9    MARKED 1/18/13                       REFERRED
10
      No. 2  (IAD document, Synoptic Report, 6 pages)   13
11
      No. 5  (IAD document, Timeline, 2 pages)          25
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1              (Proceedings commenced at
 2               2:02 p.m.)
 3              (Witness sworn.)
 4    WHEREUPON:
 5              SERGEANT MATTHEW PRICE,
 6    called as a witness herein by the plaintiff, having
 7    been first duly sworn, was examined and testified as
 8    follows:
 9                   EXAMINATION
10    BY MR. FLAXMAN:
11        Q.   Could you state your name and spell your
12    last name.
13        A.   Sure.  Matthew Price, P-R-I-C-E.
14        Q.   And what's your business or occupation?
15        A.   Sergeant with the Chicago Police Department.
16        Q.   How long have you been a sergeant?
17        A.   A little over five years.
18        Q.   How long have you been a police officer for
19    the City of Chicago?
20        A.   A little over 12 years.
21        Q.   What's your present assignment?
22        A.   Assigned to Unit 608.
23        Q.   And what's the responsibility of Unit 608?
24        A.   It's the Major Accident Investigation Unit.
```

Page 5

1    Q.  How long have you been in that unit?
2    A.  Since about March of last year.
3    Q.  What was your assignment before that?
4    A.  I was assigned to the 25th District.
5    Q.  How long did you work in the 25th District?
6    A.  Just under a year.
7    Q.  Were you a Field Sergeant?
8    A.  Yes.
9    Q.  What did you do before that?
10   A.  I was assigned to the Internal Affairs
11   Division.
12   Q.  And when did you work in Internal Affairs?
13   A.  For, roughly, about three years, just under.
14   Q.  Why did you leave Internal Affairs?
15   A.  To just give me an opportunity to do
16   something different.
17   Q.  Was it your idea to leave Internal Affairs?
18   A.  Yes.
19   Q.  Who was your supervisor at the time you left
20   Internal Affairs?
21   A.  My immediate supervisor was Lieutenant Dave
22   Naleway.
23   Q.  Is he still at Internal Affairs?
24   A.  Not that I'm aware of.

Page 6

1    Q.  Did he leave before you or after you?
2    A.  After.
3    Q.  Do you know when he left?
4    A.  No, actually, I don't.
5    Q.  All right.  Back in March of 2011, you were
6    still in Internal Affairs?
7    A.  Yes.
8    Q.  Do you recall being assigned to an incident
9    involving Officer Seiser, S-E-I-S-E-R?
10   A.  Yes.
11   Q.  Had you ever heard of Officer Seiser before?
12   A.  Yes.
13   Q.  How had you heard of Officer Seiser?
14   A.  We were assigned to the same district as
15   patrol officers.
16   Q.  So did you ever work with him?
17   A.  We were on the same watch, never worked the
18   same car together.
19   Q.  Well, at the time you were assigned to the
20   March 2011 incident, did you have any opinion about
21   Officer Seiser?
22   A.  No.
23   Q.  Did you think he was a jerk?
24   A.  I never really talked to him.

Page 7

1    Q.  Other than what you describe, what you told
2    us about, had you had any other knowledge about
3    Officer Seiser?
4    A.  None that I could think of, other than he
5    was on the third watch.
6    Q.  Had you ever become aware that his name is
7    mentioned on blogs dealings with Chicago police
8    officers?
9    A.  I think I've heard about it after the fact.
10   I've never seen it when I was in 25 as a patrol
11   officer.  I don't even know if the blog was created at
12   that time.
13   Q.  How did you get involved in the incident
14   that this lawsuit is about?
15        MR. PLAXMAN:  If you'll allow that question.
16        MR. JEBSON:  I will.
17   BY THE WITNESS:
18   A.  I was contacted by my lieutenant on my way
19   in to work and was advised to respond to the
20   9th District.
21   Q.  And about what time was that?
22   A.  I think it was a little after 3:00 o'clock.
23   Q.  And was your supervisor Lieutenant Naleway?
24   A.  Yes.

Page 8

1    Q.  How did he contact you?
2    A.  By phone.
3    Q.  By your personal cell phone?
4    A.  Yes.
5    Q.  And do you recall as best you can what he
6    told you?
7    A.  He said there was an incident with an
8    on-duty member who was alleged to be drinking alcohol
9    while on duty.
10   Q.  Did he tell you anything else?
11   A.  No, just to go directly to the 9th District,
12   as opposed to the headquarter building.
13   Q.  And did you do that?
14   A.  I did.
15   Q.  Well, when you got to the 9th District, what
16   did you do?
17   A.  I went and met with Sergeant Verta and
18   Captain Johnson.
19   Q.  Did Sergeant Verta relay any information to
20   you?
21   A.  That they had an allegation of an on-duty
22   officer drinking an alcoholic beverage.
23   Q.  Did he tell you anything else?
24   A.  He gave me some information about the

Page 9

1   complainant.
2        Q.   Did Captain Johnson say anything?
3        A.   Not that I recall.
4        Q.   What happened next?
5        A.   I contacted the complainant.
6        Q.   How many complainants did you contact?
7        A.   I just used one as the complainant, and
8   there was additional witnesses.
9        Q.   Well, how many people did you talk to; how
10  many civilians did you talk to?
11       A.   Over the course of that day, roughly four.
12       Q.   Did they all tell you the same story?
13            MR. JEBSON:  Objection.  Overbroad.
14  BY MR. FLAXMAN:
15       Q.   I'll rephrase that.
16            Did they all relate to you the same
17  alleged wrongdoing on the part of the officer?
18       A.   To what extent?
19       Q.   Well, did one of them tell you that the
20  officer had been driving too fast?
21       A.   Not that I'm aware of, not that I recall.
22       Q.   Do you remember any of the civilians telling
23  you that the officer had been driving too slowly --
24  too slow?

Page 10

1        A.   I don't necessarily recall the speeds
2   involved.  I just recall about an individual -- they
3   were saying that the on-duty -- not necessarily
4   on-duty, but uniformed individual was observed
5   drinking from what appeared to be an alcoholic
6   beverage.
7            They all had similar --
8        Q.   Did they tell you --
9            MR. JEBSON:  Did you finish your answer?
10  BY THE WITNESS:
11       A.   I'd have to hear the question in its
12  entirety again in order to finish the answer.
13            It would be more along the lines of,
14  one said they saw him drinking from an alcoholic
15  beverage; I believe another saw him with an alcoholic
16  beverage in his lap; another smelled an alcoholic
17  beverage after seeing him drink an alcoholic beverage
18  and so on and so forth.
19       Q.   Did one of them tell you that he or she
20  could read the name of a brand of vodka on the bottle?
21       A.   I don't recall anybody saying they could
22  read the name of a bottle or the brand, I'm sorry, but
23  I believe one of them mentioned they looked
24  distinctive like a brand of vodka.

Page 11

1        Q.   Were any of the people you spoke to males?
2        A.   One was a male.
3        Q.   And did that male tell you that he had been
4   able to detect the smell of an alcoholic beverage from
5   the officer?
6        A.   He did say he smelled an alcoholic beverage
7   on his breath.
8        Q.   And did you speak with that officer later?
9            MR. JEBSON:  That officer?
10  BY MR. FLAXMAN:
11       Q.   Did you speak with the officer who was the
12  subject of these complaints later that day?
13       A.   The accused officer I spoke with briefly
14  later across from a desk several hours later.
15       Q.   And did you detect the odor of an alcoholic
16  beverage about that officer?
17       A.   I don't know if I was necessarily close
18  enough.
19       Q.   Did anybody else, other than that male
20  civilian tell you that they had detected the odor of
21  an alcoholic beverage about that officer?
22       A.   During my time, nobody else mentioned the
23  detection of an alcoholic beverage other than the male
24  witness.

Page 12

1        Q.   Do you know an Internal Affairs sergeant
2   named Cochran?
3        A.   Yes, I do.
4        Q.   Did you see Sergeant Cochran out at the
5   9th District that day?
6        A.   I did.
7        Q.   Did you know he was coming before he
8   arrived?
9        A.   Before he arrived?
10       Q.   Right.
11       A.   I think I heard about him going to be in the
12  9th District when I was on my way back to the
13  9th District.  I returned there after speaking with
14  the complainant, the witnesses, and going to check out
15  the accused officer's vehicle.
16       Q.   Had you asked for another sergeant to come
17  assist you?
18       A.   I didn't ask for it, no.
19       Q.   Did you need another sergeant to assist you?
20       A.   It was helpful.
21       Q.   Did you speak with Sergeant Cochran when he
22  arrived?
23       A.   He had actually arrived to the 9th District
24  before I did, but I spoke to him when I had arrived

Page 13

1  back at the 9th District.

2      Q.   Did you ever hear him say that Officer

3  Seiser was to be charged criminally for driving under

4  the influence, based upon the witness's statements?

5      A.   I never heard him say the word

6  "charged/criminally."

7      Q.   Did you ever hear him say that Deputy

8  Superintendent Kirby had ordered that Officer Seiser

9  was to be charged criminally?

10     A.   I never heard him use the words "charged

11  criminally."

12     Q.   Before coming here today, did you review the

13  CR file about the incident?

14     A.   No, I did not.

15     Q.   Did you review anything?

16     A.   I reviewed the Synoptic Report that I

17  submitted, and I submitted the timeline.

18     Q.   Do you have Exhibit 2 in front of you?

19     A.   Yes.

20     Q.   Is that your Synoptic Report?

21     A.   That appears to be, yes.

22     Q.   And where were you when you prepared this

23  report?

24     A.   I would have prepared the report back at the

Page 14

1  Internal Affairs Division.

2      Q.   At the time you prepared this report,

3  Deposition Exhibit 2, had the bottle been seized from

4  Officer Seiser's vehicle?

5      A.   At the time I prepared this, it had.

6      Q.   And did you have any reason to believe that

7  there was alcohol inside that bottle after it had been

8  seized?

9      A.   There was an allegation that he had consumed

10  alcohol from it and it appeared to be a clear liquid,

11  which is consistent with possibly vodka.

12     Q.   After the bottle had been seized, did you

13  have a chance to closely examine the contents of the

14  bottle?

15     A.   I didn't pour it, but it was poured by

16  Sergeant Cochran to a smaller bottle where the bottle

17  was inventoried.

18     Q.   Were you present when it was poured?

19     A.   Yes.

20     Q.   Did you hear Officer Cochran say, "Looks

21  like water?"

22     A.   Not at that point.

23     Q.   Did he ever say that?

24     A.   He may have said something along those lines

Page 15

1  later on that night.

2      Q.   Where were you when you heard Officer

3  Cochran say words along those lines?

4          MR. JEBSON:  I'm just going to object.  He

5  said he may have said it.

6  BY THE WITNESS:

7      A.   He may have said it back at the Internal

8  Affairs Division later on.

9      Q.   Did you hear anybody, as you sit here now,

10  do you recall anybody saying that there's "probably

11  water" in that bottle?

12     A.   I mean, it could have been Sergeant Cochran

13  later on.  I don't necessarily recall.

14     Q.   Did you have any -- Well, you talked to

15  Sergeant Cochran after you left the 9th District on

16  March 29th, 2011; is that right?

17     A.   Correct.

18     Q.   Did you talk with anybody else?

19     A.   After I left the 9th District?

20     Q.   Right.

21     A.   Not that I recall.  I mean, I talked to

22  people -- I had to go on a shooting later that night

23  to collect urine, as a result of firearms discharge

24  incidents, so I talked to people regarding the

Page 16

1  shooting later on.

2      Q.   Did you talk to Lieutenant Naleway about the

3  Seiser incident on March 29th or 30th of 2011?

4      A.   I talked to him early on when he notified me

5  to go out to the 9th District.

6          I talked to him later after I had

7  spoken with the complainant and the witnesses and had

8  an opportunity to go look at the bottle.

9      Q.   What did you tell him?

10     A.   Just the information that's contained in the

11  Synoptic Report.

12     Q.   Did he tell you anything about -- Well, did

13  he mention Deputy Superintendent Kirby to you in any

14  of your conversations with him on March 29th, 2011?

15     A.   Yes.

16     Q.   What did he say?

17     A.   It was per the deputy, we were to be -- I'm

18  sorry -- that the accused was to be processed by the

19  9th District and we would handle the administrative

20  portion of the allegations.

21     Q.   When did he tell you that?

22     A.   When I was en route back to the 9th

23  District; that's when he also informed me that

24  Sergeant Cochran would be meeting me at the 9th

Page 17

1   District.

2       Q.   When you say he told you that per Deputy

3   Superintendent Kirby, Seiser was to be processed, what

4   does it mean to be processed?

5       A.   Just to be fair, they're investigated for it

6   prior to being charged; you have to go through the

7   process to make sure the individual meets the

8   criteria.

9       Q.   Were you involved in that processing?

10      A.   I was the one that handled the

11  administrative portions.

12      Q.   Were you present when that processing went

13  forward?

14      A.   I was in a separate room.

15      Q.   Were you at the 9th District when the

16  processing --

17      A.   I was at the 9th District, yes.

18      Q.   Do you know what the processing consisted

19  of?

20      A.   I believe it's a standard field sobriety

21  test.

22      Q.   Did you ever learn the results of those

23  standard field sobriety tests?

24      A.   I learned the accused passed the standard

Page 18

1   field sobriety tests, and then I later learned that he

2   actually submitted to a Breathalyzer.

3       Q.   And you learned that he had passed the

4   Breathalyzer; is that right?

5       A.   I learned that the results were point 000.

6       Q.   And then you learned that somebody decided

7   or the Watch Commander decided that Seiser would not

8   be charged with a DUI; is that right?

9       A.   I believe there wasn't enough to

10  substantiate a DUI charge.  I don't know if it was the

11  Watch Commander that said that or -- I believe it was

12  the patrol officers didn't have enough to

13  substantiate.

14      Q.   Is that when the administrative part of the

15  investigation went forward?

16      A.   I think there was a little bit more after

17  that.  I think possibly he was issued a citation and

18  an I-Bond, after which --

19      Q.   Do you know why the citation was issued?

20      A.   I believe it was because he had an open

21  alcoholic beverage bottle in his car with a liquid

22  still inside it.

23      Q.   Do you know who it was that made the

24  decision to issue that citation?

Page 19

1       A.   I don't, no.

2       Q.   Did you hear anybody order anybody else to

3   write a citation?

4       A.   I did not.

5       Q.   After the citation was issued and I-Bond

6   processed, was that when the administrative

7   proceedings continued?

8       A.   That's when they would have began.

9       Q.   What did the administrative proceeding

10  consist of?

11      A.   At that time Officer Seiser was presented

12  with the opportunity to submit to a Consent to Search

13  of his vehicle that was parked still, from the initial

14  allegation, on Union.

15      Q.   Now, was that consent to search part of the

16  administrative procedure?

17      A.   Yes.

18      Q.   Was he initially asked to waive any rights

19  he may have had?

20      A.   He was provided with a Consent to Search.

21  Across the top it was written "administrative" on the

22  Consent to Search.

23      Q.   Was he presented with a Consent to Search

24  before somebody wrote "administrative" out?

Page 20

1       A.   No.  It would have contained the word

2   "administrative" on it.

3       Q.   Did you hand Mr. Seiser the Consent to

4   Search?

5       A.   I may have.  I don't recall necessarily.  It

6   would have been either me or Sergeant Cochran.  We

7   were both present.

8       Q.   Did you write "administrative" on the

9   Consent to Search?

10      A.   I did not.

11      Q.   Did Sergeant Cochran write "administrative"

12  on the Consent to Search?

13      A.   I believe he did.

14      Q.   Do you know of anybody who gave Officer

15  Seiser a Consent to Search that did not have the word

16  "administrative" written on it?

17      A.   Not that I'm aware of.

18      Q.   Is there a separate form for administrative

19  consent to search, as opposed to not administrative

20  consent to search?

21          MR. JEBSON:  Objection.  Foundation.  Time

22  frame.

23  BY MR. FLAXMAN:

24      Q.   Back in March of 2011, was there a specific

Page 21

1  form for administrative consent to search, as opposed
2  to not administrative consent to search?
3      A.   Not that I'm necessarily aware of.  That
4  might have been why it was written "administrative
5  process," just to let him know it was part of the
6  administrative process.
7      Q.   And as you sit here now, are you absolutely
8  sure that "administrative" was written on the Consent
9  to Search form before it was given to Officer Seiser?
10     A.   I believe it was.
11     Q.   And did Officer Seiser sign the Consent to
12 Search form?
13     A.   No, he did not.
14     Q.   And then what happened during the
15 administrative process?
16     A.   It was marked "refused."
17     Q.   And was that the end of the administrative
18 investigation?
19     A.   No.
20     Q.   What happened next?
21     A.   He was given a direct order to allow access
22 to the passenger's side of the vehicle so that the
23 bottle, the alcoholic beverage, could be recovered.
24     Q.   Who gave him that order?

Veritext Chicago Reporting Company
312-442-9087        800-248-3290        847-406-3200

---

Page 22

1      A.   I read him that order.
2      Q.   And did you have the authority to give that
3  order?
4      A.   I think it was something that was discussed
5  between Sergeant Cochran when he was on the phone with
6  some other supervisor and relayed to me from Sergeant
7  Cochran.
8      Q.   Did you ever write that the order had been
9  given at the direction of Debra Kirby?
10     A.   Yes.
11     Q.   And did you speak with Debra Kirby that day?
12     A.   I did not, no.
13     Q.   Why did you write the order was given at the
14 direction of Debra Kirby?
15     A.   That was how it was related to me.
16     Q.   From and by whom?
17     A.   Sergeant Cochran.
18     Q.   And did you ever learn that Sergeant Cochran
19 had been in contact with Debra Kirby on March 29th,
20 2011?
21     A.   Not that I'm aware of.
22     Q.   Did Officer Seiser obey the order to allow
23 access to his vehicle?
24     A.   He did.

Veritext Chicago Reporting Company
312-442-9087        800-248-3290        847-406-3200

---

Page 23

1      Q.   What happened next?
2      A.   He signed the written order, and we
3  proceeded out to the 9th District.  He was escorted
4  there by Sergeant Verta, and I followed with
5  Sergeant Cochran.
6      Q.   And where did you go?
7      A.   To where his vehicle was parked.
8      Q.   And did you get access to his vehicle?
9      A.   Yes.
10     Q.   How did you get access to Officer Seiser's
11 vehicle?
12     A.   He opened the passenger's side door.
13     Q.   And who reached -- Did somebody reach in to
14 take the bottle?
15     A.   I don't recall if he did or if I did.
16     Q.   Who took possession of the bottle after it
17 left the car?
18     A.   I took possession of it, and then I handed
19 it to Sergeant Verta, and it was placed in Sergeant
20 Verta's trunk.
21     Q.   And when is the next time you saw that
22 bottle?
23     A.   It was when we returned to the 9th District.
24 Sergeant Verta drove, with Seiser following in his

Veritext Chicago Reporting Company
312-442-9087        800-248-3290        847-406-3200

---

Page 24

1  personal vehicle, and myself and Sergeant Cochran
2  following Seiser.
3      Q.   And what happened with the bottle?
4      A.   It was brought into the 9th District and
5  inventoried with its contents being poured into a
6  smaller vial, placed with a tamper-resistant seal and
7  then actually placed in a larger vial and then taped
8  to the bottle itself.
9      Q.   Did you do anything to cause that smaller
10 bottle to be submitted for scientific evaluation?
11     A.   I sat there when it was inventoried.
12     Q.   Excuse me?
13     A.   I sat there when it was being inventoried; I
14 was present for the inventorying.
15     Q.   Well, when something is inventoried, does it
16 go to the crime lab?
17     A.   Not necessarily.
18     Q.   Well, does additional paperwork have to be
19 completed to send an object to the crime lab?
20     A.   It just depends on the nature or the
21 circumstances, for things to go to the crime lab.
22     Q.   Well, if you wanted that vial containing the
23 liquid to be analyzed by the crime lab, what would you
24 have to do back in March 29th of 2011?

Veritext Chicago Reporting Company
312-442-9087        800-248-3290        847-406-3200

Page 29

1    Q.   The initial information.
2    A.   The initial information I learned from
3  Lieutenant Naleway about responding to the 9th
4  District for an on-duty department member that was
5  observed to be drinking what was believed to be an
6  alcoholic beverage.
7    Q.   And where were you when you received that
8  information, and how did you receive that information?
9    A.   They called me on my phone when I was on my
10  way in to work.
11    Q.   And what did you do after receiving that
12  information?
13    A.   I responded to the 9th District, met with
14  Sergeant Verta and Captain Johnson.
15    Q.   Okay.  And what did they tell you?
16    A.   They told me, similarly; that they had an
17  allegation of an on-duty department member who was
18  working, I believe it was called, Operation Safe
19  School and he was assigned to Tilden High School and
20  that there was an allegation that he was observed
21  drinking an alcoholic beverage and he was in full
22  uniform but he was in his personal car.
23    Q.   Were you given information that witnesses
24  had observed this?

Page 30

1    A.   Yes.
2    Q.   And what did you do after receiving
3  information about this incident from either Sergeant
4  Verta or Captain Johnson?
5    A.   I contacted one of the individuals via phone
6  to see if she would be willing to sign a sworn
7  affidavit and went out and met with her on the
8  4800 block of South Union.
9    Q.   Now, when you went out to meet with her,
10  what was that person's name?
11    A.   Her name was Rosanne Anderson.
12    Q.   And did you speak with her?
13    A.   I did.
14    Q.   And did she tell you what she had observed?
15    A.   She did.
16    Q.   What did she tell you?
17    A.   It would have been listed on that allegation
18  section.
19    Q.   When you say it would be listed in the
20  allegation section, are you referring to your Synoptic
21  Report?
22    A.   Yes.
23    Q.   And you can refer to that if you want.
24    A.   Okay.

Page 31

1    Q.   And that's what, Exhibit 2?
2    A.   Yes.  It says "Deposition Exhibit 2" at the
3  bottom.
4    Q.   So feel free to refer to that.  And you
5  don't have to give me a verbatim, but generally
6  speaking, what did Ms. Anderson tell you?
7    A.   That she observed him driving a Pontiac,
8  southbound, while drinking from an alcoholic beverage
9  bottle.
10    Q.   And what location -- what's in this general
11  area?
12    A.   A school, Tilden High School.
13    Q.   Did Ms. Anderson indicate to you what the
14  bottle looked like?
15    A.   In it, she described it as having a red and
16  white label.
17    Q.   Did she describe it as looking like it was
18  an alcoholic bottle?
19    A.   Yes.  She described it as a clear bottle
20  with red and white label, appearing to be an alcoholic
21  beverage.
22    Q.   Did she indicate to you that based on her
23  observation that she believed that the uniformed
24  officer was drinking alcohol while driving?

Page 32

1    A.   Yes.
2    Q.   Did you speak to anyone else at that scene?
3    A.   I did.
4    Q.   Who did you speak to?
5    A.   I spoke with Gary Anderson, and I also spoke
6  with a woman named Gail Glassford at the scene.
7    Q.   Go ahead and take a look at your Synoptic
8  Report and your Timeline; and you can just tell me,
9  just try to get an idea generally, about what time it
10  was that you spoke to these witnesses when you went to
11  the scene.
12    A.   Right around 4:15, it looks like.
13    Q.   Now, these times that you have in your
14  Synoptic Report and in your timeline, are those your
15  best times?
16    A.   Approximately.
17    Q.   So those aren't exact times, where you
18  looked at your watch and you document it as it's
19  happening?
20    A.   Not necessarily, just an approximate of, in
21  and around, the time frame of when I did it.
22    Q.   So the other woman that you spoke to, you
23  said, was Gail Glassford?
24    A.   Yeah.  There was a woman, Gail Glassford, I

Page 33

1  spoke to at the scene, and a man, Gary Anderson.
2       Q.   Generally speaking, what did Gail Glassford
3  tell you?
4       A.   She had a similar allegation; in that, he
5  was driving, when she observed him actually exiting
6  the vehicle and taking two large gulps from the bottle
7  and then placing it back in his car.
8       Q.   Did she also give you the same general
9  description, in terms of, that the bottle looked like
10  it was an alcoholic bottle?
11       A.   I believe so.  I'd have to refer to --
12       Q.   Go ahead.  You can do that.
13       A.   I mean, she said drinking from an alcoholic
14  beverage and that it had a red and white label; and
15  she also mentioned a red lid, which I don't think
16  Rosanne Anderson mentioned a red lid.
17       Q.   You said you spoke to Gary Anderson as well?
18       A.   I did.
19       Q.   And what did Gary Anderson tell you?
20       A.   Generally, he said something similar, about
21  him observing somebody drinking while driving
22  southbound, the on-duty individual drinking from what
23  appeared to be an alcoholic beverage bottle.
24            He had a little different information

Page 34

1  then.  He mentioned trying to write down the license
2  plate, after which he had somewhat of a verbal
3  confrontation with the on-duty individual, and I think
4  it was during that time he said he could detect what
5  he thought was an odor of alcoholic beverage from the
6  on-duty officer's breath.
7       Q.   And you spoke to these three individuals --
8  the two women, Gail Glassford, Rosanne Anderson, and
9  Gary Anderson -- all at the scene?
10       A.   Yes, individually.  Individually, at the
11  scene.
12       Q.   Okay.  Did you, while at the scene, see the
13  on-duty officer's vehicle?
14       A.   Not when I talked to them initially.  I had
15  to actually drive over to where the vehicle was
16  parked.
17       Q.   Did you do that?
18       A.   I did.
19       Q.   And what observations did you make when you
20  looked in the vehicle?
21       A.   I saw in the passenger's side of the
22  vehicle, there was a large, clear bottle, looked like
23  a gallon-size bottle, with a small handle on the back
24  and that it was upside down, so you couldn't read the

Page 35

1  front of the bottle; it had a red lid and like red and
2  white labeling.
3       Q.   And what did the bottle look like?
4       A.   Like I said, it was like a gallon-size
5  bottle; it had a clear liquid inside of the bottle,
6  but it wasn't full.  There was still -- I don't
7  remember the quantity that was inside the bottle, but
8  it was no longer a full bottle.  I don't know if it
9  was a third, a half, things like that.
10       Q.   Did the bottle appear to you to look like it
11  was an alcoholic bottle?
12       A.   It did appear to look like it was an
13  alcoholic beverage bottle.
14       Q.   And was the bottle that you saw consistent
15  with what the witnesses told you that they saw the
16  uniformed officer drink out of?
17       A.   Yes.
18       Q.   Now, going back briefly to when you first
19  got to the 9th District, were you given information
20  that a 9th District sergeant had gone to the scene
21  earlier?
22       A.   Yes.
23       Q.   And were you given information whether or
24  not that 9th District officer had looked into the

Page 36

1  on-duty officer's vehicle and observed the bottle?
2       A.   Yes.
3       Q.   What information did you receive?
4       A.   That Sergeant Verta had met with the on-duty
5  officer, following his request for the supervisor to
6  go out and check, and that he observed the bottle on
7  the passenger's side of the car;
8            Questioned the officer about it; the
9  officer acted as though -- from what Verta said, as
10  though he didn't know what bottle, and then when
11  Sergeant Verta asked for the officer to open the car
12  to see the bottle, the officer wanted to see a search
13  warrant for him to open it;
14            And when Sergeant Verta was unable to
15  provide a search warrant, he told him that he had
16  rights and wasn't going to open up the bottle -- oh,
17  I'm sorry -- open up the car for him to see the
18  bottle.
19       Q.   Now, when Sergeant Verta told you this, this
20  is originally back at the 9th District, right?
21       A.   Yes.
22       Q.   Was his description of the bottle that he
23  saw consistent with the bottle that you saw when you
24  were at the scene, looking into the car and seeing the

Page 37

```
1   bottle?
2         A.    Yes.
3         Q.    So now we're back at the scene, just to
4   bring us back to where we are; you've talked to the
5   three witnesses, which were Gail Glassford, Rosanne
6   Anderson, and Gary Anderson; and then you had gone to
7   the location and you looked into the on-duty officer's
8   car and you saw the bottle.
9         A.    Yes, I did.
10        Q.    Okay.  What did you do after that?
11        A.    I would have contacted my lieutenant just to
12  let him know of what I learned thus far, as a result
13  of the investigation, as far as what the three
14  witnesses -- I'm sorry -- the complainant and two
15  witnesses said at that time; I was provided, by one of
16  the witnesses, with an additional witness phone number
17  that I was going to call when I returned back to the
18  9th District;
19              And, also, that I saw a clear bottle
20  inside the car, containing a clear liquid and the red
21  and white labeling that they described and the red
22  lid.
23        Q.    By the way, this is Lieutenant Naleway,
24  right?
```

Page 38

```
1         A.    Yeah.  I would have contacted my direct
2   supervisor, which was Lieutenant Naleway.
3         Q.    And then did you also tell Lieutenant
4   Naleway that earlier a 9th District sergeant had gone
5   out and had looked into the vehicle of the on-duty
6   officer and had seen that same clear bottle with their
7   broken seal?
8         A.    I may have.  I don't recall whether or not
9   we discussed it at that time or not.  I believe I
10  would have told him about it at that time.
11        Q.    Okay.  And approximately what time did you
12  talk to Lieutenant Naleway after you had spoken to the
13  witness and looked into the vehicle and saw the
14  bottle?
15        A.    On the Timeline, it says at about,
16  approximately, 16:45.
17        Q.    Which is what time in --
18        A.    4:45.
19        Q.    Okay.  And when you spoke to Lieutenant
20  Naleway, this is over the telephone?
21        A.    Yes.
22        Q.    And then, obviously, there was an end to the
23  conversation; and did you hear back from Lieutenant
24  Naleway?
```

Page 39

```
1         A.    I did.
2         Q.    And was that through a telephone call?
3         A.    Yes.
4         Q.    By the way, when you spoke to Lieutenant
5   Naleway after speaking to the witnesses and looking
6   into their car, did you convey to Lieutenant Naleway
7   all the information you received from the witnesses
8   and all the observations that you made?
9         A.    Yes.
10        Q.    So after you spoke to Lieutenant Naleway on
11  the phone and you gave that information and you hung
12  up, you received a call back from -- you received a
13  call from Lieutenant Naleway?
14        A.    Yes.
15        Q.    And where were you when you received that
16  call?
17        A.    I was driving back to the 9th District.
18        Q.    And did you have a conversation with
19  Lieutenant Naleway?
20        A.    Yes.
21        Q.    And what did he say to you?
22        A.    That the 9th District would be processing
23  the accused individual for the criminal portion of the
24  investigation and that I would handle the
```

Page 40

```
1   administrative investigation and that Sergeant Cochran
2   would join in to assist me in the 9th District.
3         Q.    And was that the end of the conversation?
4         A.    I believe so.  I don't recall if there was
5   anything -- There may have been others, but I don't
6   recall anything.
7         Q.    So there may have been other things said,
8   but at some point the conversation came to a
9   conclusion.
10        A.    Yes.
11        Q.    And when it came to a conclusion, you went
12  to the 9th District?
13        A.    Yes.
14        Q.    And when you went to the 9th District, I
15  believe you told Mr. Flaxman that Sergeant Cochran was
16  already there.
17        A.    Yes.
18        Q.    And when you got to the 9th District, at
19  some point after that, did 9th District police
20  officers begin the criminal processing of
21  Officer Seiser?
22        A.    Yes.  They were called in to process Officer
23  Seiser for the criminal portion.
24        Q.    So when the 9th District officers got to the
```

Page 41

1   police station, were you already there?
2       A.  Yes.
3       Q.  And did you conduct the field sobriety test?
4       A.  I didn't, no.  The people who did the
5   criminal portion conducted the field sobriety tests.
6       Q.  And how about the Breathalyzer?
7       A.  They conducted that as well.
8       Q.  The 9th District police officer?
9       A.  Yes.  I was just to handle the
10  administrative portion of the investigation.
11      Q.  And at some point, you received information
12  that Officer Seiser had passed the field sobriety test
13  and had blown zeros on the Breathalyzer test?
14      A.  Yes.
15      Q.  And at some point, that information was, to
16  your understanding, conveyed to Lieutenant Naleway?
17      A.  Yes.
18      Q.  And, to your knowledge, who conveyed that
19  information?
20      A.  Sergeant Cochran.
21      Q.  And then after that information was conveyed
22  to Lieutenant Naleway, was that information then
23  conveyed to Chief Rivera?
24      A.  Yes.

Page 42

1       Q.  And was that also by Sergeant Cochran?
2       A.  Yes.
3       Q.  And were you present when Sergeant Cochran
4   made the phone call first to Lieutenant Naleway and
5   then to Chief Rivera?
6       A.  Yes.  We were seated at the 9th District
7   desk.
8       Q.  And am I correct that after Sergeant Cochran
9   hung up with Chief Rivera, at some point after that,
10  the administrative part of the investigation began?
11      A.  Yes.
12      Q.  Now, going back to the criminal part of the
13  investigation, at some point during the criminal part
14  of the investigation, Officer Seiser was issued a
15  citation; is that correct?
16      A.  Yes.
17      Q.  Do you have any knowledge at all that Debra
18  Kirby was the one that played any role in the decision
19  to issue that ticket?
20      A.  No.
21      Q.  During the administrative phase of the
22  investigation, at some point -- Well, what's the first
23  process of the administrative phase?
24      A.  For that portion of it, it was when we

Page 43

1   presented him with the administrative Consent to
2   Search of his vehicle.
3       Q.  Which he refused, right?
4       A.  Yes.
5       Q.  And then he was ordered to open his car
6   door -- allow you guys to open his car door?
7       A.  Yes.  He was given a written direct order,
8   as well as I read it verbally.
9       Q.  And at that point, he complied with that
10  order?
11      A.  He complied with the order, and then we had
12  to drive out to his vehicle for him to actually comply
13  by opening the car.
14      Q.  And at some point, the car door was opened
15  and the bottle was retrieved?
16      A.  Yes.
17      Q.  Prior to the bottle being retrieved, did you
18  hear anyone indicate that they thought that the bottle
19  contained water?
20      A.  No.
21      Q.  If there was any mention of the bottle
22  possibly containing water, was that after the bottle
23  was retrieved and the contents poured into the vial?
24      A.  It would have been after, quite possibly.

Page 44

1       Q.  And the citation that was given to Officer
2   Seiser, that was issued prior to the administrative
3   parts beginning; is that correct?
4       A.  Best of my knowledge, I believe it was, yes.
5       Q.  So that was certainly prior to the bottle
6   being retrieved?
7       A.  Yes.
8       Q.  When you were speaking to the three
9   witnesses, specifically Gail Glassford, Gary Anderson,
10  and Rosanne Anderson, after speaking to them, is there
11  anything that they said to you that you believe that
12  they were giving you unreliable information?
13      A.  No.
14      Q.  And you say you spoke to four witnesses.
15  Who was the fourth witness?
16      A.  The fourth would have been Kathleen
17  Glassford who is Gail Glassford's mother.  I spoke to
18  her by telephone.
19      Q.  And when did you speak to her on the
20  telephone?
21      A.  At the 9th District, probably when
22  Officer Seiser was performing his standard field
23  sobriety tests, in and around that time frame.
24      Q.  And do you know, based on the information

## Page 53

```
 1   have a search warrant or a signed affidavit?
 2       A.   Yes.
 3       Q.   So when Mr. Flaxman was asking you, Did you
 4   ask Officer Seiser if there was ever -- if it was
 5   water in the bottle, if you asked that to Officer
 6   Seiser or if Officer Seiser just blurted it out, do
 7   you have to take Officer Seiser's word that water is
 8   in that bottle; or would you, during the
 9   administrative phase, still order Officer Seiser to
10   open that door so the contents could be tested?
11       MR. FLAXMAN:  Object to the form of the
12   question.
13   BY THE WITNESS:
14       A.   No.  I still would have gone along with --
15   you know, I wouldn't have taken his word for it, just
16   because I can't tell -- I'm not a lab; I can't tell
17   what it is.  I'm not going to taste it.
18            So I still would have had him open the
19   car door and still would have gone along with the
20   administrative portion processes of --
21       Q.   Your voice is very low.  I just want to make
22   sure I heard your answer.
23            So am I correct that even if Officer
24   Seiser said there is water in that bottle, am I
```

## Page 54

```
 1   correct that Officer Seiser would have still been
 2   ordered to open that door so the contents could be
 3   tested?
 4       A.   Yes.  And then also the bottle would have
 5   been recovered at that time; it would have just been
 6   earlier in the process that the bottle was recovered.
 7       Q.   And am I correct that when you initially
 8   talked to Officer -- I'm sorry -- Sergeant Verta in
 9   the 9th District, that you got information that
10   Sergeant -- I'm sorry, let me start over.
11            Am I correct that when you originally
12   spoke to Sergeant Verta and Captain Johnson in the
13   9th District, you obtained information that Officer
14   Seiser was not being cooperative regarding the
15   contents of what was in that bottle?
16       A.   Yes.
17       Q.   And am I correct that you conveyed that
18   information to Lieutenant Naleway when you spoke to
19   him during one of the conversations?
20       A.   Yes.  I believe it was when we spoke
21   after -- in conjunction with talking about what the
22   witnesses had provided and upon seeing the bottle that
23   was consistent with what the witnesses said and what
24   Sergeant Verta had said.
```

## Page 55

```
 1       MR. JEBSON:  Thank you.  That's all the
 2   questions I have.
 3       MR. FLAXMAN:  Signature?
 4       MR. JEBSON:  We'll reserve signature,
 5   please.
 6            (Which concluded the deposition at
 7             2:55 p.m.)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

## Page 56

```
 1        UNITED STATES DISTRICT COURT FOR THE
 2           NORTHERN DISTRICT OF ILLINOIS
 3                 EASTERN DIVISION
 4   MICHAEL SEISER,            )
                               )
 5           Plaintiff,        )
                               )
 6       vs.                   )   Case No. 12 C 2353
                               )   Judge Holderman
 7   CITY OF CHICAGO and       )
     DEBRA KIRBY,              )
 8                             )
           Defendants.         )
 9   _____).
10
11       I, SERGEANT MATTHEW PRICE, state that I have
12   read the foregoing transcript of the testimony given
     by me at my deposition on January 16, 2013, which
     consists of pages 1 through 55, and that said
13   transcript constitutes a true and correct record of
     the testimony given by me at the said deposition
14   except as I have so indicated on the errata sheets
     provided herein.
15
16   ---------------------------
          SERGEANT MATTHEW PRICE
17
18   No corrections (Please initial)_____
     Number of errata sheets submitted_____(pgs.)
19
20   SUBSCRIBED AND SWORN to
     before me this _____day
21   of_____, 2013
22
23   ---------------------------
     NOTARY PUBLIC
24
```

# EXHIBIT N

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3
   MICHAEL SEISER,              )
 4                             )
             Plaintiff,         )
 5                             )
        vs.                     )  No. 12-cv-2353
 6                             )
   CITY OF CHICAGO, et al.,     )
 7                             )
             Defendants.        )
 8
 9
10
11           The deposition of TERRANCE COCHRAN,
   called for examination pursuant to the Rules of
12 Civil Procedure for the United States District
13 Courts pertaining to the taking of depositions,
14 taken before Kathy Hendrix, Certified Shorthand
15 Reporter, within and for the County of Cook and
16 State of Illinois, at 200 South Michigan, Suite
17 1240, Chicago, Illinois, on November 19, 2012, at
18 the hour of 12:00 o'clock p.m.
19
20
21
22
23
24
```

Page 2

```
 1  A P P E A R A N C E S:

 2
 3
 4
 5     KENNETH N. FLAXMAN, P.C.
       200 South Michigan Avenue
 6     Suite 1240
       Chicago, Illinois  60604
 7     BY:  KENNETH N. FLAXMAN, ESQ.
       (312) 427-3200
 8
 9          Appeared on behalf of the Plaintiff;

10     CITY OF CHICAGO
       30 North LaSalle Street
11     Suite 900
       Chicago, Illinois 60602
12     BY:  MR. THOMAS J. PLATT
       (312) 744-4833
13          Appeared on behalf of the Defendants.
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1              (Witness duly sworn.)
 2                 TERRANCE COCHRAN
 3 called as a witness herein, having been first duly
 4 sworn on oath, was examined and testified as
 5 follows:
 6              EXAMINATION
 7 BY MR. FLAXMAN:
 8      Q.     State your name for us, please.
 9      A.     Certainly.  Terrance, T-e-r-r-a-n-c-e,
10 Cochran, C-o-c-h-r-a-n.
11      Q.     And what is your business or
12 occupation?
13      A.     I am a sergeant of police.
14      Q.     Is that city of Chicago?
15      A.     Yes.
16      Q.     For how long have you been a police
17 officer employed by the city of Chicago?
18      A.     Going on 27 years.
19      Q.     What's your starting date?
20      A.     August '86 I believe.
21      Q.     When did you first become a sergeant?
22      A.     2004 I think.
23      Q.     What was your position immediately
24 before becoming a sergeant?
```

Page 4

```
 1      A.     I was a detective with the special
 2 victims unit in area 4.
 3      Q.     What is your present assignment?
 4      A.     I'm with the internal affairs
 5 division.
 6      Q.     And how long have you been with the
 7 internal affairs division?
 8      A.     Going on 9 years, 10 years.
 9      Q.     Do you have plans to retire in the
10 near future, in the next year or two?
11      A.     Who knows.
12      Q.     Excuse me?
13      A.     Who knows.
14      Q.     Okay.  Before coming here today, did
15 you look at any documents in connection with this
16 deposition?
17      A.     Yes.
18      Q.     Tell us what you looked at.
19      A.     My report, the synoptic that I
20 generated and perused the closing summary packet of
21 Sergeant Stehlik.
22      Q.     When you reviewed your report, did you
23 see anything in there as you sit here today you
24 believe to be incorrect?
```

Page 5

1    A.    No, I don't believe so.

2    Q.    When you reviewed the closing summary

3  packet, did you see anything in there as you sit

4  here today that you believe to be incorrect?

5    A.    I didn't prepare it but I don't

6  believe so.

7    Q.    Do you know the man to my right?

8    A.    Yes, I have seen him.

9    Q.    Do you remember when you first came

10 into contact with the plaintiff Michael Seiser?

11   A.    On an earlier CR investigation.

12   Q.    Was Officer Seiser the subject of that

13 CR investigation?

14   A.    Yes.

15   Q.    Do you recall what the allegation of

16 wrongdoing was that was the subject of that

17 investigation?

18   A.    I believe it was failure to conduct a

19 complete search of a prisoner.  And I think an

20 additional allegation of wearing his firearm in the

21 processing room.  I think that was it.

22   Q.    Do you remember the outcome of your

23 investigation?

24   A.    It was sustained.

Page 6

1    Q.    Did you recommend any particular

2  discipline?

3    A.    Yes.

4    Q.    What did you recommend?

5    A.    I think it was 45 days, I think.  That

6  was the initial recommendation.

7    Q.    In that earlier CR investigation, did

8  you interview Officer Seiser?

9    A.    Yes.

10   Q.    And did he admit to having failed to

11 conduct a complete search of the prisoner?

12   A.    No, he did not.

13   Q.    And you concluded that he had been

14 untruthful in that denial; is that right?

15   A.    I would say he was not as thorough as

16 he stated that he was.

17   Q.    Was anybody else investigated --

18 strike that.

19         Did you investigate anyone else

20 who also was accused of failure to conduct a

21 complete search of that particular prisoner?

22   A.    Yes, that was his partner for the day,

23 Officer Geisbush, I think.

24   Q.    Was that investigation also a

Page 7

1  sustained investigation?

2    A.    Yes.

3    Q.    Did you recommend the same discipline

4  for the other officer?

5    A.    No, I think his discipline --

6  recommendation, I think, I am not positive, I think

7  it may have been 30 days.

8    Q.    After that investigation -- do you

9  remember when that investigation was?

10   A.    Not really.  Maybe 2005, 2006,

11 somewhere around there.  I don't know.

12   Q.    After that investigation did you ever

13 have any contact with Officer Seiser before

14 March 29th of 2011?

15   A.    I may have seen him either down at my

16 office or at some assignment or something.

17   Q.    Have you ever heard his name mentioned

18 by anyone at IAD before March 29th of 2011?

19   A.    Mentioned by anyone else?

20   Q.    Right.

21   A.    Not really.

22   Q.    What do you mean by "not really"?

23   A.    Well, I mean we may talk about anybody

24 in passing.  It's not something that I just, you

Page 8

1  know, let's remember any conversation I have about

2  this particular person or what I may have heard said

3  about that particular person.

4    Q.    Are you familiar with any of the blogs

5  that relate to Chicago police officers?

6    A.    Yes.

7    Q.    Do you read any of those blogs?

8    A.    Every now and then.

9    Q.    And in reading any of those blogs

10 every now and then, have you ever come across the

11 name Michael Seiser?

12   A.    Constantly.  Well, it used to be

13 constantly, I haven't read it in a while.

14   Q.    And what blogs was it that you would

15 see these references to Seiser?

16   A.    Second City Copper.

17   Q.    Did you ever believe that Officer

18 Seiser was involved with that particular blog?

19   A.    No.  I didn't know, didn't care.

20   Q.    Well, did you ever hear anybody at IAD

21 mention that they believed that Officer Seiser was

22 involved with Second City Copper?

23   A.    Not really.  Nothing that I recall.

24   Q.    Well, were these references to Officer

Page 9

1  Seiser and Second City Cop complimentary to him as a
2  police officer?
3      A.      I took them as a joke.
4      Q.      What do you mean?
5      A.      They would say things like Seiser for
6  Mayor, Seiser Rules, that kind of stuff.  That's
7  what I remember seeing.
8      Q.      Are you involved with any blogs about
9  the Chicago Police Department?
10     A.      No, I am not.
11     Q.      Do you know someone named Deborah
12 Kirby?
13     A.      Yes.
14     Q.      How do you know Deborah Kirby?
15     A.      She was, at one time, was my big boss
16 at the internal affairs division.
17     Q.      Have you ever heard her refer to
18 Officer Seiser?
19     A.      Other than this particular incident,
20 no.
21     Q.      Have you ever heard Ms. Kirby refer to
22 her awareness of Second City Cop blog?
23     A.      We never really talked about it.
24     Q.      Have you ever heard her say anything

Page 10

1  about that blog?
2      A.      She may or may not have.  We are not
3  in the same -- her office is completely different.
4  We don't associate.  When she was there.
5      Q.      Did you ever have any conversations
6  with her about Officer Seiser in March of 2011?
7      A.      That I talked to her personally?
8      Q.      Right.
9      A.      No, I did not.
10     Q.      Did anyone ever tell you that they had
11 spoken to Ms. Kirby about Officer Seiser?
12     A.      Yes.
13     Q.      Who is that?
14     A.      That is my lieutenant, my former
15 lieutenant, Lieutenant David Naleway, N-a-l-e-w-a-y.
16     Q.      How did Lieutenant Naleway happen to
17 stop being your lieutenant?
18     A.      He left the unit to go back to be a
19 watch commander in, I think, he's in 10.
20     Q.      Let's go to March 29th of 2011.  Do
21 you remember what shift you were working that day?
22     A.      Afternoons.
23     Q.      And what are the hours of the
24 afternoon shift you were working?

Page 11

1      A.      4:00 p.m. to midnight.
2      Q.      And were you assigned to an incident
3  involving Officer Seiser?
4      A.      Yes.
5      Q.      Who gave you that assignment?
6      A.      Lieutenant Naleway.
7      Q.      That's when he was the IAD lieutenant
8  for you?
9      A.      Yes.
10     Q.      How did he go about giving that you
11 assignment?
12     A.      He told me to go to the 9th District
13 and assist Sergeant Matthew Price.
14     Q.      Did you know Sergeant Matthew Price?
15     A.      Yes, I worked with him.
16     Q.      Did Lieutenant Naleway tell you what
17 it was you were going to assist Sergeant Price in
18 doing?
19     A.      That we had allegations from multiple
20 citizens that an on-duty, uniformed police officer
21 driving his personal vehicle was seen drinking from
22 a booze bottle and driving.
23     Q.      Did Lieutenant Naleway say anything
24 else to you at that time?

Page 12

1      A.      He initially -- that I was to go and
2  assist.  And I believe in that conversation he
3  stated that -- he stated that -- the case was -- the
4  criminal case and the administrative case were to be
5  separate.
6      Q.      Were you signed to the criminal case
7  or the administrative case?
8      A.      I was assigned to the administrative
9  case but to assist with the criminal case if they
10 had questions.
11     Q.      Did you ask Lieutenant Naleway why
12 Sergeant Price needed help?
13     A.      No.
14     Q.      Is this the kind of matter that has in
15 the past resulted in two sergeants from IAD being
16 assigned?
17     A.      It could.
18     Q.      Can you recall any other instance
19 where you have been assigned to assist another
20 sergeant in an IAD investigation?
21     A.      Numerous.
22     Q.      Can you recall any other incidents
23 involving an allegation of drinking on duty where
24 you have been assigned to assist another IAD

Page 21

1     A.   No, he did not say that.

2     Q.   Did he tell you that he thought there

3  was probable cause to charge Officer Seiser with

4  driving under the influence of alcohol?

5     A.   We didn't discuss that.  Initially we

6  did not discuss that.

7     Q.   Was anything else said that you can

8  recall during the first meeting?

9     A.   Yes.  I relayed to Sergeant Verta and

10  relayed to the captain the instructions I had been

11  given by my lieutenant, that per Deborah Kirby, the

12  District was to handle the criminal part of the

13  investigation, and we were to do the administrative

14  investigation and it was to be kept separate.

15     Q.   Now had you spoken with Deborah Kirby

16  when you used her name that way?

17     A.   No.

18     Q.   Had somebody told you that this was

19  Deborah Kirby's order?

20     A.   Yes, the lieutenant.

21     Q.   Lieutenant Naleway?

22     A.   Yes.

23     Q.   And what exactly had Lieutenant

24  Naleway told you about Deborah Kirby?

Page 22

1     A.   What I had just repeated; that the

2  district was to handle the criminal aspect, and we

3  were to do the administrative aspect and it was to

4  be kept separate.

5     Q.   Now, what is the difference between

6  the administrative aspect and the criminal aspect?

7     A.   Under criminal, the officer has the

8  same rights as a normal citizen and can refuse.

9  Under administrative, he can be ordered to do

10  certain things that he may have refused to do under

11  criminal.

12     Q.   When administratively you order a

13  police officer to do something, can any evidence

14  that is obtained as a result of that order be used

15  in criminal proceedings against the officer?

16     A.   That is a difficult question to

17  answer.

18     Q.   Okay.  Now, what happened after that

19  first meeting?

20     A.   Like I said, toward the end I

21  specifically conveyed to the captain that, per the

22  boss, per my lieutenant that they were to have

23  their, quote, their best DUI guys come in and do the

24  investigation.

Page 23

1     Q.   You say "per the boss," was that the

2  lieutenant?

3     A.   Yes, per the lieutenant.  They were to

4  have their best DUI guys come in and do the

5  investigation.

6     Q.   Had the lieutenant told you that this

7  is what Deborah Kirby had told them to do?

8     A.   No, not the best DUI guys, but the

9  District to handle the criminal investigation, yes.

10     Q.   And what did you do after that

11  meeting?

12     A.   I believe I called and spoke with

13  Sergeant Price to see what was going on with him

14  because he was not there.

15     Q.   And when you called him, did you use

16  your personal BlackBerry?

17     A.   I think I did.

18     Q.   And did you find out where Sergeant

19  Price was?

20     A.   Yes.

21     Q.   And where was he?

22     A.   He was out talking with additional

23  witnesses.  They started kind of sort of coming out

24  of the woodwork.

Page 24

1     Q.   Did he tell you how many witness he

2  had spoken with?

3     A.   Two or three.

4     Q.   Did he tell you who he had spoken

5  with?

6     A.   He may have.  I don't remember the

7  names he gave me.

8     Q.   What did you do after this

9  conversation with Sergeant Price?

10     A.   Asked the captain to ensure that

11  someone was coming in.  I think he did call and have

12  the officers come in on their way in, and I believe

13  I went in and spoke with Officer Seiser.

14     Q.   Where did that conversation take

15  place?

16     A.   In the interview room.

17     Q.   And can you describe the interview

18  room for us?

19     A.   It's a room with a table that has a

20  bunch of chairs.  And it's -- one of the walls is

21  two-way glass that you can look into the other room

22  and see people.

23     Q.   Was Officer Seiser handcuffed in that

24  interview room?

Page 33

1    A.    They didn't, the sergeant did.

2    Q.    Now, when a civilian is asked to
3  submit to a breathalyzer the police officer has to
4  have some probable cause to ask the person to submit
5  to the breathalyzer; is that right?

6    A.    Yes.

7    Q.    Did you tell the 9th District officers
8  that there was probable cause to require Officer
9  Seiser to submit to a breathalyzer?

10    A.    Yes.

11    Q.    And did you tell them what facts gave
12  rise to that probable cause?

13    A.    I don't understand the question.

14    Q.    Well, did you tell them why there was
15  probable cause?  Did you tell them what facts caused
16  you to believe that there was probable cause to
17  require Officer Seiser to submit to a breathalyzer?

18    A.    Yes, I told them what I had been told.

19    Q.    Can you tell us as best you can what
20  you told them?

21    A.    Yes.  That citizens reported Officer
22  Seiser in uniform driving his personal vehicle in an
23  erratic manner.  It was described to us also via
24  OEMC too, because Sergeant Verta pulled the OEMC

Page 34

1  record of what was typed in, one was that he was
2  driving over the speed limit, one was that he was
3  driving considerably left than the speed limit,
4  swerving and repeatedly drink from the bottle.

5    Q.    After you informed Lieutenant Naleway
6  of the zero, zero, zero on the breathalyzer what, if
7  anything, did Lieutenant Naleway tell you?

8    A.    The lieutenant stated that I should
9  get in contact with Chief Rivera to notify him of
10  what the current status of the situation was and to
11  find out whether or not the officer was going to be
12  relieved of his police powers.

13    Q.    Where was Chief Rivera in the chain of
14  command?

15    A.    I think he was right under Deborah
16  Kirby.

17    Q.    Did you tell Lieutenant Naleway that
18  you didn't want to go out of the chain of command,
19  that he should talk to the chief?

20    A.    I'm not in the habit of telling my
21  boss that, no.

22    Q.    Had you ever contact Chief Rivera
23  about particular cases before?

24    A.    Yes.

Page 35

1    Q.    All right.  How did you contact Chief
2  Rivera?

3    A.    Usually through his BlackBerry or
4  whatever other numbers.

5    Q.    Well, the day of the incident,
6  March 29th, 2011, how did you contact Chief Rivera?

7    A.    I believe it was his BlackBerry.

8    Q.    And what did he say to you and what
9  did you say to him?

10    A.    Essentially that the officer had
11  passed all of the field sobriety testing, that it
12  came back triple zeros, that we still didn't have
13  the bottle to verify what was going on with that,
14  that he was going to be released without charging.
15  He stated we were to proceed administratively and
16  that the officer was not going to be relieved.

17    Q.    How many conversations did you have
18  with Chief Rivera that day?

19    A.    Just one.

20    Q.    Did Chief Rivera talk to you about the
21  citation for transporting open alcohol?

22    A.    I don't think so.

23    Q.    Well were you involved in any decision
24  for a citation to be issued to Officer Seiser for

Page 36

1  transporting open alcohol?

2    A.    Yes.

3    Q.    Who else was involved in that
4  decision?

5    A.    I think it might have been the captain
6  and Sergeant Verta.

7    Q.    Was there a conversation?

8    A.    We may have had one.  There was a lot
9  going on at that time with the captain.

10    Q.    Was it your idea that Officer Seiser
11  be charged with transporting open alcohol?

12         MR. PLATT:    Object to the form of the
13  question.  You can answer.

14  BY THE WITNESS:

15    A.    It may have been or it may not have
16  been or we may have said, as a group discussion, we
17  may have said we still have got to address the issue
18  of the alcohol bottle with the seal broken in his
19  car.

20  BY MR. FLAXMAN:

21    Q.    Was that decision made before the
22  bottle was retrieved from Officer Seiser's car?

23    A.    Yes.

24    Q.    Do you know who it was who -- well, do

Page 37

1  you know who wrote the ticket?

2       A.     The arresting officers.

3       Q.     Do you know who it who told the

4  arresting officers to write the ticket?

5       A.     I may have or Sergeant Verta or

6  Sergeant Price.

7       Q.     When you were discussing whether

8  Officer Seiser should be charged with transporting

9  open alcohol, was there any discussion about who the

10  complaining witness would be?

11       A.     I don't think so.  I don't recall.

12       Q.     Am I correct that at the time the

13  decision was made to issue that traffic citation

14  nobody except Officer Seiser knew what was in that

15  bottle?

16       A.     That is correct.

17       Q.     And it wouldn't be a violation of that

18  statute to -- if there was water in the bottle,

19  would there?  Would it?

20            MR. PLATT:  Object to the form of the

21  question.  Calls for a legal conclusion.  You can

22  answer it to your knowledge.

23  BY THE WITNESS:

24       A.     The only way an officer would have

Page 38

1  known whether or not there was water in the bottle

2  is either Officer Seiser would have had to have

3  surrendered it prior to a ticket being issued, or

4  the ticket being issued would have authorized

5  us to seize the bottle and then the bottle could be

6  tested for analysis to determine what was in the

7  bottle.  Your client had refused.  Your client

8  refused previous requests to turn over the bottle.

9  BY MR. FLAXMAN:

10       Q.     So was he being charged with

11  transporting open alcohol because he had refused to

12  surrender the bottle?

13       A.     It was one of the basis of the fact

14  that we knew that the bottle appeared to be a bottle

15  that contained exclusively used for alcoholic

16  beverages or beverages that are mixed with alcohol

17  or a mix.  Under normal circumstances, we wouldn't

18  have had to ask him, if he were treated as a regular

19  citizen.

20       Q.     And what would have happened under

21  those normal circumstances?

22       A.     The car would have been impounded, and

23  we would have been able to take the bottle,

24  especially in light of it being in plain view.

Page 39

1       Q.     Was there any discussion in which you

2  were involved that day about impounding Officer

3  Seiser's car?

4       A.     No.  Not that I recall.

5       Q.     When -- did Chief Rivera mention

6  Deborah Kirby's name?

7       A.     No.

8       Q.     After your conversation with Chief

9  Rivera, what did you do?

10       A.     I think at that point we came in and

11  informed Officer Seiser that the criminal aspect was

12  over and done with and now we were proceeding with

13  administrative.

14       Q.     And did you read him any

15  administrative rights?

16       A.     I don't know if we would have read him

17  his administrative rights for that.  I think what

18  I -- I think we might have given him two things.

19            I think we asked him if he would

20  let us search his vehicle and get the bottle.  I

21  think he told us no.  I think we presented him with

22  a consent to search form, which he refused.  And

23  ultimately he was given a direct order, which he

24  complied with.

Page 40

1       Q.     Let me show you what has been marked

2  as Exhibit 1.

3            (Whereupon, Cochran Deposition

4            Exhibit No. 1 was marked for

5            identification.)

6  BY MR. FLAXMAN:

7       Q.     Have you ever seen this before?

8       A.     Yes.

9       Q.     Can you tell us what it is?

10       A.     It's a consent to search form.

11       Q.     Is this the consent to search form you

12  were just talking about?

13       A.     Yes.

14       Q.     Whose handwriting is it, if you know,

15  where the word administrative appears at the top?

16       A.     That was mine.

17       Q.     Is there a particular form for

18  administrative consent to search?

19       A.     We would use these -- we would use the

20  standardized form.  The department doesn't delineate

21  between -- back then the department didn't delineate

22  between forms to be used by internal affairs versus

23  forms to be used by regular folks in the department.

24       Q.     Is there a different form now for

Page 45

1    A.    Because it was my understanding that
2  is where it came from.
3    Q.    And Officer Seiser signed this copy of
4  this direct order; is that right?
5    A.    Yes.
6    Q.    And then there's the time of 29
7  March 2011 at 2015 hours; do you see that?
8    A.    Yes.
9    Q.    Does that mean that this written copy
10  verbal order was signed by Officer Seiser at about
11  8:15 p.m.?
12    A.    Yes.
13    Q.    After Officer Seiser signed this order
14  what, if anything, did you do?
15    A.    I explained to Officer Seiser that we
16  were going to go to his vehicle, that we wanted --
17  that we were not going to search his vehicle, that
18  all we wanted out of the vehicle was the bottle that
19  was sitting plain view on the passenger seat.
20    Q.    And did you go up to Officer Seiser's
21  vehicle?
22    A.    Yes, I went in my car, and I believe
23  Sergeant Price went with me.  Officer Seiser, I
24  believe, went with Sergeant Verta.

Page 46

1    Q.    So was there anybody other than the
2  four of you at Officer Seiser's car?
3    A.    The two officers that were sitting on
4  the car, that the sergeant had put on the car.
5    Q.    When you got to the car, what
6  happened?
7    A.    Officer Seiser -- we walked to the
8  car.  Officer Seiser took the bottle out of the car.
9  I don't recall if he either gave it to me or if he
10  placed it in Sergeant Verta's trunk, or if I placed
11  it in Sergeant Verta's trunk.  But essentially
12  that's how it was taken back into the 9th District.
13    Q.    Did you look at the plastic bottle?
14    A.    Not real good right then, no.
15    Q.    Did you notice whether or not it had a
16  cap on it?
17    A.    Yes.
18    Q.    Did it have a cap?
19    A.    Yes.
20    Q.    Did you ever ask Officer Seiser what
21  was in the bottle?
22    A.    I don't think I did.
23    Q.    Did you have the right to order
24  Officer Seiser to consent to a search of his

Page 47

1  vehicle?  Did you have the right to order Officer
2  Seiser tell you what was in the bottle?
3    A.    At what point?
4    Q.    At 8:15 p.m. on March 29th, 2011.
5    A.    Yes.
6    Q.    Did you ever do that?
7    A.    No.
8    Q.    Why not?
9    A.    Because Officer Seiser could have told
10  me anything.
11    Q.    It had been a violation of police
12  board Rule 2, wouldn't it, for Officer Seiser to lie
13  to you and tell you that it was water?
14    A.    No, I would have not said it was a
15  violation.  I don't know what it was.
16    Q.    No, if Officer Seiser had lied to you
17  about what was in the bottle, that would be a
18  violation of rules and regulations of the Chicago
19  Police Department?
20          MR. PLATT:  Objection.  Calls for
21  speculation.  No foundation.  You can answer, to
22  your knowledge.
23  BY THE WITNESS:
24    A.    I can't call Officer Seiser a liar.  I

Page 48

1  don't know what's in the bottle.
2  BY MR. FLAXMAN:
3    Q.    Well, that wasn't my question, sir.
4  You have done internal affairs investigation,
5  haven't you?
6    A.    Yes.
7    Q.    And you have taken statements from
8  officers accused of wrongdoing?
9    A.    Correct.
10    Q.    And have you ever had an occasion
11  where an officer denied wrongdoing, and then the
12  officer was charged with the wrongdoing and with
13  having made a false statement in the IAD
14  investigation?
15    A.    Correct.
16    Q.    And if you had asked Officer Seiser
17  what was in the bottle and he told you it was water
18  and it turned out it was alcohol, he could have been
19  disciplined -- would have been disciplined for that
20  false statement.
21          MR. PLATT:  Objection.  Foundation.
22  Calls for speculation.  You can answer.
23  BY THE WITNESS:
24    A.    In that specific way that you said,

Page 49

1   yes, and it turned out to be alcohol, yes.
2   BY MR. FLAXMAN:
3       Q.   Why did you not ask Officer Seiser
4   what was in the bottle?
5       A.   I had to reason to ask him what was in
6   the bottle.
7       Q.   You didn't think that would be useful
8   in your IAD investigation?
9       A.   I thought it would have been useful if
10  Officer Seiser turned it over a long time ago.
11      Q.   Okay.  Let me ask the question again.
12  Did you think it would not have been useful for you
13  to ask Officer Seiser what was in the bottle on
14  March 29th of 2011?
15      A.   At that point, no.
16      Q.   Why not?
17      A.   Because Officer Seiser had refused all
18  other earlier requests from Sergeant Verta and from
19  me to surrender the bottle.  At that point it's
20  sheer speculation as to what is in it, who knows.
21      Q.   Did you ever on March 29th of 2011 ask
22  Officer Seiser what was in the bottle?
23      A.   No, I did not.
24      Q.   Do you know if Sergeant Price asked

Veritext Chicago Reporting Company
312-442-9087                            800-248-3290                            847-406-3200

Page 50

1   Officer Seiser what was in the bottle?
2       A.   I don't believe he did.
3       Q.   Do you know if Sergeant Verta asked
4   Officer Seiser on March 29th of 2011 what was in the
5   bottle?
6       A.   I don't think he did.  I don't
7   remember that aspect of whether he may or may not
8   have.  I don't know.
9       Q.   Did you see the bottle back at the 9th
10  District Police Station?
11      A.   Yes.
12      Q.   What happened to it there?
13      A.   We went into the same interview room.
14  I advised Officer Seiser that the contents were
15  going to be analyzed and that he was welcome to sit
16  with me while some of the contents was poured into a
17  little container so that it could be sent out for
18  analysis.
19      Q.   Who actually poured the liquid into
20  the container?
21      A.   I did.
22      Q.   Did you smell the odor of an alcoholic
23  beverage as you poured the liquid into the
24  container?

Veritext Chicago Reporting Company
312-442-9087                            800-248-3290                            847-406-3200

Page 51

1       A.   No.
2       Q.   Can you describe what the liquid
3   looked like as you poured it into the container?
4       A.   It was clear.
5       Q.   What happened to the vial after you
6   poured the liquid into it?
7       A.   It was sealed with tape that Officer
8   Seiser put his initials on, and I believe it was put
9   into packaging to be sent to the crime lab.
10      Q.   Did you do anything to cause that
11  liquid to be sent to the crime lab?
12      A.   I did not, no.
13      Q.   Do you know if Sergeant Price did
14  anything to cause that liquid to be sent to the
15  crime lab?
16      A.   I don't think he did.  He was not the
17  investigator.
18      Q.   Who was the investigator?
19      A.   Sergeant Stehlik, that was for the
20  administrative investigation.
21      Q.   Did you ever talk with Sergeant
22  Stehlik about this incident?
23      A.   Not really other than to ensure that
24  he had all of his copies of the paperwork.

Veritext Chicago Reporting Company
312-442-9087                            800-248-3290                            847-406-3200

Page 52

1       Q.   Do you know how much time passed
2   before Sergeant Stehlik sent that vial out to be
3   investigated by the crime lab?
4       A.   I have no knowledge of what he may
5   have done.  I don't know.
6       Q.   Aside from the criminal charge of
7   transporting open alcohol, did Officer Seiser, from
8   what you saw or heard on March 29, 2011, violate any
9   police department rules?
10      A.   Yes.
11      Q.   Which ones?
12      A.   Conduct unbecoming.
13      Q.   And what conduct was that?
14      A.   In the conduct that was reported by
15  the citizens that he appeared to be in full uniform,
16  driving in an erratic manner, drinking from a bottle
17  that appeared to contain alcohol or a booze bottle.
18      Q.   And what's unbecoming about that?
19      A.   It gives the citizens the perception
20  that you are drinking alcohol while you are in
21  uniform.
22      Q.   And what is it about the scenario you
23  described that conveys that perception?
24      A.   Well, he's in uniform, he's driving in

Veritext Chicago Reporting Company
312-442-9087                            800-248-3290                            847-406-3200

Page 73

```
 1              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3
    MICHAEL SEISER,              )
 4                              )
                 Plaintiff,      )
 5                              )
         vs.                    )   No. 12-cv-2353
 6                              )
    CITY OF CHICAGO, et al.,     )
 7                              )
                 Defendants.     )
 8

 9

10          I hereby certify that I have read the
11  foregoing transcript of my deposition given on
12  November 19, 2012, at the time and place aforesaid,
13  and I do again subscribe and make oath that the same
14  is true, correct, and a complete transcript of my
15  deposition so given as aforesaid, as it now appears.

16

17

18          _____
            TERRANCE COCHRAN - WITNESS
19          CORRECTION SHEET(S) ATTACHED

20

21

22

23

24
```

Page 74

```
 1  STATE OF ILLINOIS )
                      ) SS:
 2  COUNTY OF C O O K )

 3          I, KATHLEEN J. HENDRIX, a
 4  Certified Shorthand Reporter within and for the
 5  County of Cook, State of Illinois, do hereby
 6  certify:

 7          That previous to the
 8  commencement of the examination of the
 9  witness, the witness was duly sworn to testify
10  the whole truth concerning the matters herein;
11          That the foregoing
12  deposition transcript was reported
13  stenographically by me, was thereafter reduced
14  to typewriting under my personal direction and
15  constitutes a true record of the testimony
16  given and the proceedings had;
17          That the said deposition was
18  taken before me at the time and place
19  specified;
20          That I am not a relative or
21  employee or attorney or counsel, nor a
22  relative or employee of such attorney or
23  counsel for any of the parties hereto, nor
24  interested directly or indirectly in the
```

Page 75

```
 1  outcome of this action.
 2          IN WITNESS WHEREOF, I do
 3  hereunto set my hand, this 29th day of
 4  November, 2012.

 5

 6          _____
 7              Kathleen J. Hendrix
                Certified Shorthand Reporter
 8
 9  C.S.R. Certificate No. 84-004180.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 76

```
 1                  I N D E X
 2
 3  WITNESS                            EXAMINATION
    TERRANCE COCHRAN
 4
 5  BY MR. FLAXMAN                          3
 6  BY MR. PLATT                           63
 7  FX BY MR. FLAXMAN                      66
 8  FX BY MR. PLATT                        67
 9  FX BY MR. FLAXMAN                      69
10
11
12
13
14              E X H I B I T S
15  NUMBER                                PAGE
16  No. 1   Consent to Search Form         40
17  No. 2   Written Copy Verbal Order      42
18
19
20
21
22
23
24
```

# EXHIBIT O

Page 1

```
 1        UNITED STATES DISTRICT COURT FOR THE
 2            NORTHERN DISTRICT OF ILLINOIS
 3                  EASTERN DIVISION
 4
 5   MICHAEL SEISER,            )
                                )
 6            Plaintiff,         )
                                )
 7        vs.                    )   Case No. 12 C 2353
                                )   Judge Holderman
 8   CITY OF CHICAGO and         )
     DEBRA KIRBY,                )
 9                               )
              Defendants.        )
10   _____)
11
12        The deposition of JUAN RIVERA, called for
13   examination by Plaintiff, taken pursuant to notice and
14   pursuant to the Federal Rules of Civil Procedure for
15   the United States District Courts, pertaining to the
16   taking of depositions, taken before Bonnie Lindsey, a
17   Certified Shorthand Reporter within and for the State
18   of Illinois, at 200 South Michigan Avenue, Suite 1240,
19   Chicago, Illinois, commencing at 1:03 p.m. on Friday,
20   January 18, 2013.
21
22
23
24
```

Page 2

```
 1   A P P E A R A N C E S:
 2
 3        Kenneth N. Flaxman, Esq.
 4        KENNETH N. FLAXMAN, PC
 5        200 North LaSalle Street, Suite 1240
 6        Chicago, Illinois 60604-2430
 7        (312) 427-3200
 8        knf@kenlaw.com
 9             On behalf of Plaintiff;
10
11        Scott Jebson, Esq.
12        Chief Assistant Corporation Counsel
13        Federal Civil Rights Litigation
14        30 North LaSalle Street, Suite 900
15        Chicago, Illinois 60602
16        (312) 742-6408
17        sjebson@cityofchicago.org
18             On behalf of Defendants.
19
20
21
22
23
24
```

Page 3

```
 1                      I N D E X
 2   WITNESS                                      PAGES
     JUAN RIVERA
 3        Examination by Mr. Flaxman              4, 37
 4        Examination by Mr. Jebson              27, 41
 5
 6                      EXHIBITS
 7
     PLAINTIFF'S                               FIRST
 8   MARKED 1/18/13                            REFERRED
 9
     No. 1   (E-mail 3/30/11, sent 5:24 a.m.,      14
10           concerning Synoptic Report and
             Supplemental, 1 page)
11
     No. 2   (IAD document, Synoptic Report, 6 pages) 14
12
     No. 3   (IAD document, Supplemental Synoptic    14
13           Report with Timeline, 5 pages)
     No. 4   (E-mail 3/30/11, sent at 6:01 a.m.,    16
14           concerning Timeline, 1 page)
15
     No. 5   (IAD document, Timeline, 2 pages)      16
16
     No. 6   (E-mails 3/30/11, sent 5:24 a.m.,      18
17           7:17 a.m., and 7:19 a.m., concerning
             Synoptic Report and Supplemental, 1 page)
18
     No. 7   (E-mails 3/30/11, sent 5:24 a.m. and   16
19           7:18 a.m., concerning Synoptic Report
             and Supplemental, 1 page)
20
     No. 8   (E-mails 3/30/11, sent 6:00 a.m. and   19
21           7:19 a.m., concerning Timeline, 1 page)
22   No. 9   (E-mails 3/29/11, sent 10:28 p.m. and  19
             10:40 p.m., 1 page)
23
     No. 10  (E-mail 3/29/11, sent 10:57 p.m.,      23
24           concerning Officer Seiser, 1 page)
```

Page 4

```
 1             (Proceedings commenced at
 2              p.m.)                             0
 3             (Witness sworn.)
 4   WHEREUPON:
 5                  JUAN RIVERA,
 6   called as a witness herein by the plaintiff, having
 7   been first duly sworn, was examined and testified as
 8   follows:
 9                   EXAMINATION
10   BY MR. FLAXMAN:
11        Q.   Could you state your name and spell your
12   last name, please.
13        A.   I'm Juan Rivera.  Last name is R-I-V-E-R-A.
14        Q.   And what's your business or occupation?
15        A.   Currently the Chief of Chicago Police
16   Department in the capacity of Internal Affairs.
17        Q.   And to whom do you report as Chief?
18        A.   I report directly to my superiors, which
19   would be the First Deputy and the Superintendent of
20   the Chicago Police Department.
21        Q.   How long have you worked for the Chicago
22   Police Department?
23        A.   26 years.
24        Q.   How long have you been the Chief?
```

Page 5

1      A.   I've been the Chief over three years.

2      Q.   What was your assignment immediately before

3 becoming Chief?

4      A.   Before I was promoted to Chief, I was a

5 Deputy Chief of a patrol area, Area Five.

6      Q.   And for three years you've been a chief, has

7 that been in Internal Affairs?

8      A.   Yes.

9      Q.   And what's your civil service rank?

10     A.   Lieutenant.

11     Q.   When did you become a lieutenant?

12     A.   2003.

13     Q.   Before coming here to this deposition, did

14 you look at any documents?

15     A.   Today, no.

16     Q.   At any time in connection with --

17     A.   Yes.  Yes.

18     Q.   What did you look at?

19     A.   I reviewed the CR file.  I reviewed Synoptic

20 Reports regarding the incident.

21     Q.   Did you talk to anybody in regards to this

22 deposition other than counsel?

23     A.   No, just prep sessions.

24     Q.   Do you know a police officer named Michael

Page 6

1 Seiser?

2      A.   I don't know him personally.  I know who he

3 is, based on this incident, yes.

4      Q.   Had you ever heard of Michael Seiser before

5 March of 2011?

6      A.   No.

7      Q.   How did you become aware of this incident?

8      A.   I was in my office and Lieutenant Naleway,

9 who is Commanding Officer of General Investigations

10 and Internal Affairs, came to my office, and he was

11 apprizing me of a situation that had taken place in

12 the 9th District.

13     Q.   About what time of the day or night was

14 this?

15     A.   It was evening, I'm guessing here and I'll

16 give you an approximation, of maybe 5:00 p.m. or

17 after, somewhere in that range of time.

18     Q.   Was anybody else with you and Lieutenant

19 Naleway when he related that information to you?

20     A.   No.  I was in my office by myself.

21     Q.   Could you tell us as best you can what

22 Lieutenant Naleway told you.

23     A.   Yes.  He related that there was an incident

24 in the 9th District where there was an on-duty officer

Page 7

1 who was in uniform driving his personal vehicle and he

2 was observed drinking out of a liquor bottle while

3 driving up and down in the area of, I believe it's,

4 Tilden High School; and the liquor bottle had red,

5 with red and white label.

6          And he went further on to state that

7 there was an encounter, a confrontation, between the

8 officer and a civilian witness and that the civilian

9 witness had made the allegation that the officer had

10 alcohol on his breath or he smelled alcohol on the

11 officer's breath.

12          And he continued and stated that there

13 were 911 calls; 9th District responded, I believe the

14 sergeant responded, to the scene and he began to

15 conduct his investigation into the incident; at which

16 time, the on-duty officer, I believe he refused or did

17 not cooperate with the sergeant and he did not allow

18 the sergeant to retrieve the liquor bottle in the

19 vehicle.

20     Q.   Now, did that information that you just

21 related cause you to believe that that on-duty

22 uniformed officer had violated any rules or

23 regulations of the Chicago Police Department?

24     A.   Based on the allegations, yes.

Page 8

1      Q.   And what are those violations?

2      A.   In essence, he was drinking while on duty,

3 obviously a discredit upon the Department, due to the

4 conduct.

5      Q.   Did Lieutenant Naleway in that first

6 conversation tell you that he had assigned an Internal

7 Affairs officer to the incident?

8      A.   I believe he stated, "I have investigators

9 responding," or something to that effect.  I'm not

10 sure if he actually named the sergeant or I'm just

11 stated investigator or investigators.

12     Q.   And what, if anything, did you say to

13 Lieutenant Naleway in response to that report?

14     A.   I basically told him I was going to go

15 across the hall on the fifth floor there and also

16 apprize the Deputy Superintendent who at the time was

17 Kirby.

18     Q.   And did you do that?

19     A.   Yes.

20     Q.   How much time elapsed from when Lieutenant

21 Naleway came into your office until when you went to

22 speak with Ms. Kirby?

23     A.   It must have been five minutes before I, you

24 know -- I just went over and knocked on her door.

Page 9

```
 1      Q.   And did you talk to Ms. Kirby?
 2      A.   Yes, I did.
 3      Q.   Was anybody else present when you spoke with
 4   her?
 5      A.   No.  She was in her office by herself.
 6      Q.   What did you say to her, and what did she
 7   say to you?
 8      A.   Again, in essence, I just -- not verbatim
 9   but the same information that the lieutenant gave me,
10   I, in essence, repeated to her.
11      Q.   What, if anything, did she say to you?
12      A.   She basically told me, she says, the
13   District is going to -- should proceed criminally and
14   once the criminal investigation is concluded, Internal
15   Affairs would conduct the administrative.
16              And she stated she wanted them to
17   recover the liquor bottle.
18      Q.   What, if anything, did you do next?
19      A.   I then walked back over to Lieutenant
20   Naleway's Office and relayed that information to him.
21      Q.   And what did he say to you?
22      A.   He stated he would just keep me up to date
23   as to, you know, what was going on or how it unfolded
24   or he would have someone keep me up to date, keep me
```

Veritext Chicago Reporting Company
312-442-9087          800-248-3290          847-406-3200

Page 10

```
 1   apprised of the incident.
 2      Q.   Did Deputy Superintendent Kirby tell you
 3   that the officer was to be charged criminally for
 4   driving under the influence?
 5      A.   No.  She just stated again it's the
 6   9th District's responsibility to conduct and proceed
 7   with the criminal investigation.
 8      Q.   What was your next involvement in this
 9   incident?
10      A.   It was later in the evening.  I was at home
11   when I received a phone call.
12      Q.   And who was that from?
13      A.   That was Sergeant Cochran.
14      Q.   And is Sergeant Cochran a Chicago Police
15   officer?
16      A.   Yes.  He's a sergeant assigned to Internal
17   Affairs in the General Investigative section.
18      Q.   Had you done anything to cause Sergeant
19   Cochran to be assigned to that investigation?
20      A.   No.
21      Q.   Did you know before receiving the phone call
22   that Sergeant Cochran was working on that
23   investigation?
24      A.   I'm not sure if Naleway -- he may have
```

Veritext Chicago Reporting Company
312-442-9087          800-248-3290          847-406-3200

Page 11

```
 1   mentioned who was on the scene after I relayed the
 2   information from Kirby, but I don't recall.
 3      Q.   Had you asked that Sergeant Cochran call
 4   you?
 5      A.   No.
 6      Q.   Well, when he called you, what did he say?
 7      A.   He told me that the criminal investigation
 8   had concluded, that the officer -- the results of the
 9   Breathalyzer were triple zeros.  And he asked me if we
10   were to relieve -- or if he was to relieve the officer
11   of police powers.
12      Q.   And what did you say?
13      A.   I stated, no, we were not going to relieve
14   the police officer of police powers.  And I told him
15   to proceed administratively with the investigation.
16      Q.   When you say "proceed administratively,"
17   what did you mean?
18      A.   Basically, "administratively" means the --
19   again, the initiation of the CR, the recovery of
20   whatever evidence, for our administrative
21   investigation.
22      Q.   Do you remember what time this phone call
23   was?
24      A.   Again, approximately in the area of 7:30, I
```

Veritext Chicago Reporting Company
312-442-9087          800-248-3290          847-406-3200

Page 12

```
 1   believe.
 2      Q.   What was your next involvement?
 3      A.   I believe I had a second conversation with
 4   him.  I'm not quite sure, I don't recall, whether he
 5   called me or I called him; but later in that evening,
 6   I did have a conversation with him.
 7              And at that point, he relayed an update
 8   to me where he stated that they had given the officer
 9   a direct order and that he had complied; he had
10   retrieved the liquor bottle from his vehicle and that
11   they had recovered it and that they were inventorying
12   it.
13              And I think he mentioned that it was --
14   he described it; he stated it's probably water but,
15   you know, it's subject to the test.  I said fine.
16              And he said he was -- the officer is
17   going to be released without charging.  And I think at
18   that point -- I'm not sure, but I believe he mentioned
19   who it was, the officer's -- I think he gave me his
20   last name.
21      Q.   And is that the last name Seiser?
22      A.   Yes.
23      Q.   And had you ever heard that name before?
24      A.   No.
```

Veritext Chicago Reporting Company
312-442-9087          800-248-3290          847-406-3200

Page 25

1  Q.  Do you know why Sergeant Cochran
2  communicated with you directly about the Seiser
3  incident on March 29th, 2011?
4     A.  At that time, I had the responsibility of
5  making the decision whether to relieve an officer or
6  not, so any investigator that responded to the scene
7  would have called me to ascertain whether that was the
8  next step in the process in the investigation.
9     Q.  Are there other responsibilities for which
10  the sergeants would go outside the chain of command to
11  communicate with you directly?
12     A.  Obviously, if they were told by their
13  superior to call me directly, based on the fact that
14  they had more information, they would.
15     Q.  Do you have any recollection of having
16  spoken with Sergeant Cochran about the citation for
17  open alcohol?
18        MR. JEBSON:  I'm sorry, can you please read
19  back that question.
20        (Record read as requested.)
21        MR. JEBSON:  Objection to time frame.
22  BY MR. FLAXMAN:
23     Q.  At any time.
24     A.  During this incident?

Page 26

1     Q.  Right.
2     A.  No, I don't recall him even mentioning it.
3     Q.  Did you talk with Sergeant Cochran after the
4  incident about the citation for open alcohol?
5     A.  I don't recall speaking to him with regards
6  to the citation.  I believe I spoke to Investigator
7  Sergeant Stehlik.
8     Q.  When did you talk with Investigator Sergeant
9  Dalik --
10     A.  Stehlik.
11        In my review of --
12     Q.  -- Stehlik?
13        Would you spell that for the reporter.
14     A.  S-T-E-H-I-K [sic], I believe.
15     Q.  Did you learn from Investigator Stehlik that
16  the contents of that bottle had not been tested while
17  the citation was pending?
18     A.  No.
19     Q.  Did you learn from Investigator Stehlik that
20  he had sent the contents of that bottle to be tested?
21     A.  No.
22     Q.  Well, did you ever learn that the test of
23  the bottle showed that it contained water?
24        MR. JEBSON:  Objection.  That misstates what

Page 27

1  the report says.
2        MR. FLAXMAN:  Excuse me?
3        MR. JEBSON:  That misstates the evidence.
4        MR. FLAXMAN:  Well, he can say he never
5  learned it.
6  BY MR. FLAXMAN:
7     Q.  Let me rephrase the question.
8        Did you ever learn anything about any
9  scientific tests that had been conducted on the
10  contents of that bottle?
11     A.  Yes.
12     Q.  And when was it that you learned that?
13     A.  In my review of the CR Investigative File.
14     Q.  And what did you learn?
15     A.  I learned that it was submitted, tested, and
16  the results were no presence of the alcohol in the
17  bottle.
18        MR. FLAXMAN:  I have nothing further.
19             EXAMINATION
20  BY MR. JEBSON:
21     Q.  I have just a few questions.
22        Am I correct that the first time that
23  you learned about witnesses talking about an on-duty
24  officer driving his personal vehicle while --

Page 28

1        (Interruption by the court
2        reporter.)
3  BY MR. JEBSON:
4     Q.  Is the first time that you heard anything
5  about this incident when Lieutenant Naleway came to
6  your office?
7     A.  Yes.
8     Q.  And you told Mr. Flaxman about the
9  information that Lieutenant Naleway conveyed to you?
10     A.  That's correct.
11     Q.  Can you spell Naleway for us, please.
12     A.  N-A-L-E-W-A-Y.
13     Q.  And am I correct that Lieutenant Naleway had
14  conveyed to you that he had learned that witnesses had
15  seen an on-duty officer driving his private vehicle
16  while drinking what appeared to be alcohol out of what
17  appeared to be a vodka bottle?
18     A.  That's correct.
19     Q.  And were you given information that this
20  occurred near a school?
21     A.  Yes.
22     Q.  After Lieutenant Naleway had conveyed the
23  information to you, is it at that point then you went
24  to Debra Kirby's office?

Page 29

```
1      A.    Yes.
2      Q.    And did you relay all the information to
3  Debra Kirby that was related to you from Lieutenant
4  Naleway?
5      A.    That's correct.
6      Q.    Was there anything about the information
7  that Lieutenant Naleway said to you that led you to
8  believe that the information was unreliable?
9      A.    No, not at all.
10     Q.    And after speaking -- after conveying to
11 Debra Kirby the information that you received from
12 Lieutenant Naleway, then Debra Kirby gave you
13 information about the 9th District; they were to
14 handle the criminal portion of the investigation and
15 IAD was to handle the administrative portion of the
16 investigation, and then the bottle was to be
17 retrieved?
18     A.    That's correct.
19     Q.    And after speaking with Debra Kirby did you
20 then convey what Debra Kirby told you, to Lieutenant
21 Naleway?
22     A.    Yes, I did.
23     Q.    Am I correct that the next time that you had
24 any communication with Debra Kirby that day would be
```

Page 30

```
1  later that night when you sent her an e-mail, which is
2  marked as your Deposition Exhibit 9?
3      A.    Yes.
4      Q.    And that would have been the e-mail that you
5  sent to Debra Kirby at 10:28 p.m.?
6      A.    That's correct.
7      Q.    And did you at any time on March 29th, 2011,
8  the day of the incident, have any knowledge regarding
9  that a citation was issued to Officer Seiser?
10     A.    I don't recall having any knowledge or
11 having a conversation with anybody that related that
12 information to me.
13     Q.    And did you ever tell Debra Kirby anything
14 about a citation that was issued to Officer Seiser on
15 the day of the incident, March 29th, 2011?
16     A.    No.
17     Q.    Do you have any information that Debra Kirby
18 was aware that a citation was issued to Officer
19 Seiser, that she was aware of it as of March 29th,
20 2011?
21     A.    On that day, no, she did not have any
22 knowledge of that.  I'm not aware of her having any
23 knowledge of it.
24     Q.    Going back to the initial conversation that
```

Page 31

```
1  you had with Lieutenant Naleway when he came to your
2  office, I think you told Mr. Flaxman that one of the
3  things that Lieutenant Naleway told you is that a
4  9th District sergeant went to the scene of the
5  incident.
6      A.    Yes, a 9th District sergeant was summoned to
7  the scene.  Yes.
8      Q.    And did Lieutenant Naleway tell you that
9  this 9th District sergeant had looked into the
10 officer's car and saw a bottle in that car?
11     A.    Yes, he did.
12     Q.    And did Lieutenant Naleway tell you that
13 according to the 9th District sergeant, it looked like
14 it was an alcoholic bottle?
15     A.    Yes.
16     Q.    And did Lieutenant Naleway tell you that the
17 sergeant from the 9th District, when he saw this
18 bottle, it appeared that the seal to the bottle was
19 broken?
20     A.    Yes.
21     Q.    And did you convey that information to Debra
22 Kirby when you went down to her office after talking
23 to Lieutenant Naleway?
24     A.    Yes, that's correct.
```

Page 32

```
1      Q.    Now, in terms of communications that you had
2  with Sergeant Cochran on the day of the incident, I
3  believe you said that the first time that you spoke to
4  him is when he had called you on the telephone.
5      A.    Yes.
6      Q.    And were you at home at that point?
7      A.    Yes, I was.
8      Q.    And at that point, one of the questions he
9  had asked you is whether or not Officer Seiser should
10 be relieved of -- I don't know if he said Officer
11 Seiser.  Let me re-ask the question.
12           At some point did you learn that the
13 officer relating to this incident, allegations of
14 driving his personal vehicle and drinking, did you
15 learn that his name was Officer Seiser?
16     A.    Yes.
17     Q.    Do you remember when you first learned that?
18     A.    It was probably the second communication we
19 had.  Again, I don't recall if I called Sergeant
20 Cochran or if he called me, but he updated me with
21 regards to the fact that they had given the officer a
22 direct order and recovered the alcoholic -- or the
23 alcohol beverage bottle.
24           And at that time, after that
```

Page 41

1   then required to take an administrative Breathalyzer.

2       Q.   In that scenario you describe, is a sworn

3   complaint required from the citizen?

4       A.   Not necessarily.

5       Q.   If the officer who responds to the complaint

6   does not himself or herself detect the smell of an

7   alcoholic beverage, is a sworn complaint required of

8   the citizen complainant?

9       A.   Again, there are different factors that are

10  considered, different scenarios.

11          MR. FLAXMAN:  I have nothing further.

12              FURTHER EXAMINATION

13  BY MR. JEBSON:

14      Q.   In terms of, if an officer is called in to

15  do a random Breathalyzer test, if that officer refuses

16  and says, "No, I'm not going to participate in this

17  test," what would happen to that officer?

18      A.   There would be, obviously, a complaint

19  initiated against the officer.

20      Q.   Could that officer be fired for refusing to

21  undergo the random Breathalyzer test?

22      A.   Yes.

23      Q.   If a citizen makes a complaint that an

24  officer is drinking while driving and that officer is

Page 42

1   called in and asked to do a Breathalyzer test and the

2   officer says, "I don't want to give a Breathalyzer

3   test," what would happen to that officer?

4       A.   Again, an investigation would have been

5   initiated and the officer can face up to separation.

6       Q.   And "separation" means being fired, right?

7       A.   That's correct.

8           MR. JEBSON:  That's all the questions I

9   have.

10          MR. FLAXMAN:  Signature?

11          MR. JEBSON:  We will reserve signature,

12  please.

13              (Which concluded the deposition at

14              2:00 p.m.)

15

16

17

18

19

20

21

22

23

24

Page 43

1           UNITED STATES DISTRICT COURT FOR THE

2              NORTHERN DISTRICT OF ILLINOIS

3                  EASTERN DIVISION

4   MICHAEL SEISER,            )
                               )
5               Plaintiff,     )
                               )
6       vs.                    )  Case No. 12 C 2353
                               )  Judge Holderman
7   CITY OF CHICAGO and        )
    DEBRA KIRBY,               )
8                              )
                Defendants.    )
9   _____)

10

11          I, JUAN RIVERA, state that I have read the

12  foregoing transcript of the testimony given by me at

    my deposition on January 18, 2013, which consists of

    pages 1 through 42, and that said transcript

13  constitutes a true and correct record of the testimony

    given by me at the said deposition except as I have so

14  indicated on the errata sheets provided herein.

15                          -----------------

16

17  No corrections (Please initial)_____

    Number of errata sheets submitted_____(pgs.)

18

19  SUBSCRIBED AND SWORN to

    before me this _____ day

20  of_____, 2013

21

22  ------------------------

    NOTARY PUBLIC

23

24

Page 44

1                   CERTIFICATE

2                       OF

3           CERTIFIED SHORTHAND REPORTER

4

5       I, BONNIE LINDSEY, a Certified Shorthand

6   Reporter of the State of Illinois, CSR License

    No. 084-003946, do hereby certify:

7

8           That previous to the commencement of the

9   examination of the aforesaid witness, the witness was

10  duly sworn by me or duly affirmed to testify the whole

11  truth concerning the matters herein;

12          That the foregoing deposition transcript was

13  stenographically reported by me and was thereafter

14  reduced to typewriting under my personal direction and

15  constitutes a true and accurate record of the

16  testimony given and the proceedings had at the

17  aforesaid deposition;

18          That the said deposition was taken before me

19  at the time and place specified;

20          That I am not a relative or employee or

21  attorney or counsel for any of the parties herein, nor

22  a relative or employee of such attorney or counsel for

23  any of the parties hereto, nor am I interested

24  directly or indirectly in the outcome of this action.

# EXHIBIT P



Seiser 12 C 2353
FCRL 000103



Seiser 12 C 2353
FCRL 000104

# EXHIBIT Q

Crime Scene Report 156068     Printed by PC0L389 on 30-MAR-2011 00:23

Report No.: **156068**
Incident: **CR 1044352**
Event No.: **1108811176**
Status: **APPROVED**

# CHICAGO POLICE DEPARTMENT
## CRIME SCENE PROCESSING REPORT
3510 South Michigan Avenue
Chicago, Illinois 60653
(for use by Chicago Police Department Personnel Only)

Report No.: **156068**   Incident: **CR 1044352**   Event No.: **1108811176**   Unit Assigned (Beat): **5814**   ME No.:

IUCR:

Assignment Type: **PHOTO REQUEST**   Requested By **BT. 950**

No Service: **NO**   ERT Assignment: **NO**   Secured: **YES**

Date / Time Received: **29-MAR-2011 16:56** Arrived: **29-MAR-2011 17:12** Completed: **29-MAR-2011 17:43**

Address of Service **5032 S UNION AVE   CHICAGO, IL   BEAT:0935**

Address of Incident

Associated Incidents

**Investigating Officers and Technicians**

Evidence Technician **JUDEH, KAMAL** Star No.: **8825** Unit: **477**

**Involved People**

| Name | Sex | Race | Age | D.o.B. | IR No. | CB No. |
|---|---|---|---|---|---|---|
| Victim **VERTA #892, MALE** | | | | | | |

**Inventories**
None

**Inventory Items**
None

**Firearms**
None

**Crime Scene Photos**

Crime Scene Video Exists **NO**

| Photo Type | Media Type | Scale Used | Photo Description |
|---|---|---|---|
| **BOTH (OVERALL/CLOSE UP)** | **DIGITAL** | | VIEW OF THE FRONT & REAR OF THE VEHICLE WITH LICENSE PLATES ATTACHED TO IT |
| **OVERALL** | **DIGITAL** | | VIEW OF THE DRIVER & PASSENGER SIDE OF THE ABOVE VEHICLE |
| **BOTH (OVERALL/CLOSE** | **DIGITAL** | | |



Page 1 of 2

Seiser 12 C F 2353
FCRL 000079

Crime Scene Report 156068    Printed by PCOL389 on 30-MAR-2011 00:23

Page 2 of 2

**UP)**

**DIGITAL**      **VIEW OF A BOTTLE ON THE PASSENGER FRONT SEAT**

**Involved Vehicles**

| Color | Description | License No. | State | Make | Model | Vin No. | Year |
|-------|-------------|-------------|-------|------|-------|---------|------|
| SILVER | | | | | PONTIAC GRAND AM SE | | |

**Narrative**

R/t was requested to take photographs of a vehicle at the above location. Upon arrival, Bt. 947 (Schejbal #2861) was guarding the vehicle and also directed the R/t to the area to capture, per Sgt. Venta. R/t took above indicated photographs.

Submitted by **JUDEH KAMAL H** Star No **8825** on **29-MAR-2011 17:43**

Approved by **PEVITZ BARBARA** Star No **2153** on **29-MAR-2011 21:14**

# EXHIBIT R

**SWORN AFFIDAVIT FOR COMPLAINT LOG INVESTIGATION**
CHICAGO POLICE DEPARTMENT

STATE OF ILLINOIS      )
                       )  CC
COUNTY OF COOK         )

| Location of Incident | Date | Time |
|---|---|---|
| 4849 S. UNION | 29 MAR 11 | 3:15 p.m / 1415 hours |

Summary of Statement(s):

IT IS ALLEGED BY THE COMPLAINANT, ROSEANN ANDERSON, THAT ON THE ABOVE DATE AND TIME AT SAID LOCATION THE COMPLAINANT OBSERVED AN UNKNOWN MALE WHITE POLICE OFFICER IN FULL UNIFORM DRIVING S/B IN A GRAY PONTIAC WITH ILLINOIS LICENSE PLATE                  WHILE DRINKING FROM A LARGE CLEAR BOTTLE WITH A RED AND WHITE LABEL THAT APPEARED TO BE AN ALCOHOLIC BEVERAGE.

I, Roseann Anderson  hereby state as follows:

1.   I have read the above summary and/or attached statement(s) in its entirety, reviewed it for accuracy and been given an opportunity to make corrections and additions to the statement(s).

2.   Under penalties as provided by law pursuant to 735 ILCS 5/1-109, I certify that the information set forth in the statement(s) above and/or attached summary are true and correct, except as to any matters therein stated to be on information and belief as to such matters, I certify as aforesaid that I verily believe the same to be true.

Roseann Anderson
Print Affiant's Name

Roseann Anderson
Affiant's Signature

3-29-11
Date

SGT M. PRECE #2147
Print Witness' Name

SGT M. P #2147
Witness' Signature

29 MAR 11
Date

CPD-44.126 (Rev. 7/09) English

Attachment No. _____

Complaint Log No. 1044352

Seiser 12 C 2353
FCRL 000043

# EXHIBIT S

**CHICAGO POLICE DEPARTMENT**
**ARREST REPORT**
3510 S. Michigan Avenue, Chicago, Illinois 60653
(For use by Chicago Police Department Personnel Only)
CPD-11. 420C(REV. 8/30)

**STATUS COMPLETED- RELEASE**
**W/O CHARGING**

CB #: 18107799
IR #:
YD #:

**ARREST REPORTING**

Name: **SEISER, Michael J**
Res:
  Unk
DOB:
AGE: 48 years
POB: Illinois
DLN:
ARMED WITH  Unarmed

Beat: 1611

Male
White
6' 03"
235 lbs
Brown Eyes
Sandy Hair
Short Hair Style
Light Complexion

NO PICTURE
AVAILABLE

Arrest Date: 29 March   2011 17:52     TRR Completed? No     Total No Arrested:1     Co-Arrests     Assoc Cases
Location: 3120 S Halsted St                              Beat: 924     DCFS Ward ? No
          Chicago, IL  60608
          280 -  Police Facility/Veh Parking Lot     Dependent Children?No
Holding Facility: District 009 Lockup
Resisted Arrest?  No

**Victim**

1     Offense As Cited  **625 ILCS 5.0/11-501-A-2**
                        IVC - DRIVING UNDER INFLUENCE OF ALCOHOL
                        Class A - Type  M
2     Offense As Cited  **625 ILCS 5.0/11-502-A**
                        IVC - TRANS/CARRY ALC LIQ/DRIVER
                        Class P -

**NO NARCOTICS RECOVERED**

**NO WARRANT IDENTIFIED**

Print Generated By: COCHRAN, Terrance ( PC0L389 )     Page 1 of 5     29 MAR 2011 10:01



Seiser 12 C 2353
FCRL 000047

**Chicago Police Department - ARREST Report**

CB #: 18107799

SEISER, Michael

ARREST REPORTING

**VICTIM**

| | | |
|---|---|---|
| Name: STATE OF ILLINOIS, Madsen #8848 | | |
| Res: 3120 S Halsted St | Beat: 924 | Injured? No    Deceased? No |
| Chicago, IL 60608 | | DOB: |
| 312-747-8227 | | Age:    Hospitalized? No |
| | | Treated and Released? No |
| | | Comments: |

**WITNESS**

| | | |
|---|---|---|
| Name: ANDERSON, Roseann | | Female |
| Res: 4825 S Union Ave | Beat: 935 | Unknown |
| Chicago, IL 60609 | | DOB:    Injured? No    Deceased? No |
| | | Hospitalized? No |
| | | Age: 31 years |
| | | Treated and Released? No |

Comments: Witness Observed Offender In Full Uniform Drive South In A Grey Pontiac With Il Plate        While Driving Drink From A Large Clear Bottle With A Red And White Lable That Appeared To Be An Alcohlic Beverage

**WITNESS**

| | | |
|---|---|---|
| Name: GLASSFORD, Gail A | | Female |
| Res: 4849 S Union Ave | Beat: 935 | Unknown |
| Chicago, IL 60609 | | DOB:    Injured? No    Deceased? No |
| | | Hospitalized? No |
| | | Age: 23 years |
| | | Treated and Released? No |
| | | Comments: |

**WITNESS**

| | | |
|---|---|---|
| Name: ANDRESON, Gary | | Male |
| | | Injured? No    Deceased? No |
| | | DOB:    Hospitalized? No |
| | | Age: 29 years |
| | | Treated and Released? No |
| | | Comments: |

**Vehicle:     VEHICLE IMPOUNDED:** No

2000  Automobile - Pontiac - Grand Am - Sedan, 2-Door    VIN#:        Lic#:        IL
Color: Aluminum Or Silver (Top) / Aluminum Or Silver (Bottom)    Inv#:
Pound#:
Disposition:

**Confiscated Properties :**

All confiscated properties are recorded in the e-Track System. This system can be queried by the inventory number to retrieve all official court documents related to evidence and/or recovered properties.

PROPERTIES INFORMATION FOR    SEISER, Michael,    NOT AVAILABLE IN THE AUTOMATED ARREST SYSTEM.

Print Generated By: COCHRAN, Terrance ( PC0L389 )    Page 2 of 5    29 MAR 2011 10:01



Seiser 12 C 2353
FCRL 000048

Chicago Police Department - ARREST Report

CB #: 18107799
SEISER, Michael

**ARREST REPORTING**

(The facts for probable cause to arrest AND to substantiate the charges include, but are not limited to, the following)

EVENT #08888 PER INTERNAL AFFAIRS SGT COCHRAN #894 R/OS WERE ORDERED TO PLACE SUBJECT IN CUSTODY FOR DUI. P.O. MADSEN #8848 CONDUCTED SFST ON SUBJECT WHO WAS ABLE TO PEFORM. SUBJECT WAS GIVEN THE BREATHALIZER 1907 HRS WITH A RESULT OF .000.

SEE WC COMMENTS SECTION FOR ADDITIONAL COMMENTS

| | |
|---|---|
| Desired Court Date:    18 May 2011 | |
| Branch:  TRFCT50 W WASHINGTON - Room | BOND INFORMATION NOT AVAILABLE |
| Court Sgt Handle?  No | |
| Initial Court Date: | |
| Branch:        - Room | |
| Docket #: | |

**ATTESTING OFFICER**

I hereby declare and affirm, under penalty of perjury, that the facts stated herein are accurate to the best of my knowledge, information and/or belief.

Attesting Officer:        #18467      KRAL, A J (PC0Y381)        29 MAR 2011 19:57

**ARRESTING OFFICER(S)**

| | | | Beat |
|---|---|---|---|
| 1st Arresting Officer: | #8848 | MADSEN, B A (PC0X169) | 0905 |
| 2nd Arresting Officer: | #18467 | KRAL, A J (PC0Y381) | 0905 |

**APPROVING SUPERVISOR**

Seiser 12 C 2353
FCRL 000049

**Chicago Police Department - ARREST Report**

CB #: 18107799

SEISER, Michael

ARREST PROCESSING REPORT

| | |
|---|---|
| **Holding Facility:** District 009 Lockup | **Time Last Fed:** |
| **Received in Lockup:** | **Time Called:**          **Phone#:** |
| **Prints Taken:** | **Cell #:** |
| **Palmprints Taken:** | |
| **Photograph Taken:** | **Transport Details :** 1PO      0905      29-MAR-2011 18:00 |
| **Released from Lockup:** 29 March    2011 20:45 | |

LOCKUP KEEPER PROCESSING

VISUAL CHECK OF ARRESTEE                    ARRESTEE QUESTIONNAIRE

RETURN TO HOLDING FACILITY COMMENTS

QUESTIONNAIRE REMARKS

LOCKUP KEEPER COMMENTS

INTERVIEW LOG

**NO INTERVIEWS LOGGED**

VISITOR LOG

**NO VISITORS LOGGED**

Seiser 12 C 2353
FCRL 000050

**Chicago Police Department - ARREST Report**

CB #: 18107799

SEISER, Michael

## ARREST PROCESSING REPORT

**MOVEMENT LOG INFORMATION NOT AVAILABLE**

| Watch Commander Comments: | See Watch Commander comments. |
|---|---|
| #106   Johnson, Robert R (PC0P947) | |
| 29 MAR 2011 20:03 | |
| Subject was being processed administratively in 009 by IAD Sgt. Brice #2147.  Sgt. Cochran #395 of IAD came into 009 and informed Sgt. Verta #892, Bt. 920 that per Dept. Supt. Kirby, the subject was to be processed criminally as a DUI.  Subject passed all field sobriety tests and registered 0.00 on the BAC. | |

## ARRESTEE PROCESSING PERSONNEL

## APPROVAL PERSONNEL

**Beat**

**Release w/o Charging Appvl :**   #106       JOHNSON, R R(PC0P947)       29 MAR 2011 20:05

Seiser 12 C 2353
FCRL 000051

# EXHIBIT T

DRIVER'S COPY - See reverse for instructions.

☐ POLICE DEPARTMENT COPY

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS FIRST MUNICIPAL DISTRICT**

☐ City of Chicago, a Municipal Corporation, Plaintiff, vs.
☐ People of the State of Illinois

UNIFIED TRAFFIC TICKET AND
COMPLAINT NO. TW-256-778

*TW256778*

Name  Last  SEISER  First  MICHAEL

Address  Street

Oper. License ☑  CDL ☐

On TUES 05/24/20 11  at  515 P

☐ operate a certain
motor vehicle, to wit: a

FORD
Make

4849 S. UNION AVE
CHICAGO IL
City

UNION (700 W)
(Street or Highway)

Situated within the corporate limits of the City of Chicago

Illinois Vehicle Code 625 ILCS 5/

☐ 3-701  NO VALID STATE REGISTRATION
☐ 3-707  OPERATING UNINSURED VEHICLE
☐ 6-101  NO VALID DRIVER'S LICENSE
☐ 5-303(a)  DRIVING WHILE LICENSE SUSPENDED/REVOKED
☐ 6-112  FAILURE TO PRODUCE DRIVER'S LICENSE
☐ 11-501(a)  DRIVING UNDER THE INFLUENCE
☐ 11-502  ILLEGAL TRANSPORTATION/ALCOHOL
☐ 12-603.1  FAILURE TO WEAR SEAT BELT
☐ 11-601  FAILURE TO REDUCE SPEED/ACCIDENT

☐ 11-601(b) SPEEDING:
☐ 11-606 (a) SPEEDING IN A SCHOOL ZONE
☐ 11-605.1 SPEEDING IN A CONSTRUCTION ZONE

☐ 9-400 (b)(1) DISOBEY SOLID RED SIGNAL
☐ 9-24-010 (b) FAILURE TO STOP AT STOP SI

CHICAGO
City

IL 13
State  Date of Birth

00
Year

GRY
Color

State
License Plate No.

STANDARDIZED FIELD SOBRIETY
TESTS RECORDED

OFFENSE NOT LISTED
(SEE OTHER OFFENSE BOX BELOW)

CH  5  SEC  502  OFFENSE  ALCOHOL
LIQUOR IN VEHICLE - SEAL BROKEN

Start ✎  18 18 18 09 09
COURT COPY OF  IMPD

Complainant certifies that the statements set forth in this instrument are true and correct.

X _____
Officer's Signature

CL  02
On  18  MAY  11
A.M. ☐ o'clock
TRAFFIC COURT IS LOCATED IN THE CHICAGO
DALEY CENTER, 50 WEST WASHINGTON, CHICAGO

COMPLETE AND ATTACH THE ADDITIONAL WITNESS
INFORMATION - PERSONAL SERVICE CITATION FORM

Without admitting guilt, I promise to comply
with the terms of this citation and release.

Signature _____

# EXHIBIT U

MAY-27-2011  08:02        IL. ST. POLICE                312 633 3977    P.02/02

# ILLINOIS STATE POLICE
### Division of Forensic Services
Forensic Science Center at Chicago
1941 West Roosevelt Road
Chicago, Illinois 60608-1229
(312) 433-8000 (Voice) * 1-(800) 255-3323 (TDD)

Pat Quinn
*Governor*

April 29, 2011
**LABORATORY REPORT**

Hiram Grau
*Director*

TERRANCE COCHRAN  #894
CHICAGO PD UNIT 121
INTERNAL AFFAIRS DIVISION
3510 SOUTH MICHIGAN AVENUE
CHICAGO, IL  60653

Laboratory Case #C11-017382
CR #1044352

OFFENSE    Liquor Violation
SUSPECT    Michael Seiser

The following evidence was received by the Forensic Science Center at Chicago on April 22, 2011:
**Inventory# 12278068**

| EXHIBIT | DESCRIPTION | FINDINGS |
|---------|-------------|----------|
| 1 | 1-ONE EMPTY BOTTLE LABELLED "MUDSLIDE" | Not analyzed. |
| 2 | 1-ONE VIAL OF UNKNOWN LIQUID | No volatiles detected. |

Volatile analysis includes, but is not limited to, the following: Ethanol, Methanol, Acetone, Isopropanol, and Toluene.

Respectfully submitted,

Laura LeDonne
Forensic Scientist III

Seiser 12 C 2353
FCRL 000118

# EXHIBIT V

*ADMINISTRATIVE*

| **CONSENT TO SEARCH** CHICAGO POLICE DEPARTMENT | UNIT 121 | DATE 29 MAR 2011 | TIME *2010* |
|---|---|---|---|

TO BE COMPLETED PRIOR TO SEARCH

I, _____ Michael J. SEISER _____ , have been advised of my constitutional
(Print Full Name)
right not to have a search made of the premises/vehicle described below without a search
warrant first being obtained. I have also been advised that I do not have to consent to this warrantless
search unless I wish to do so.

Having been advised that I do not have to consent to a warrantless search, I hereby authorize
and give my consent to ___ Sgt. Terrance COCHRAN ___ and ___ Sgt. Matthew PRICE ___ who have iden-
(Officer)                                      (Officer)
tified themselves as Chicago Police Officers assigned to the ___ Unit #121 - Internal Affairs Division ___
(Unit)
to conduct a complete search at this time of the premises/vehicle under my lawful control and
described as ___ 2000 PONTIAC Coupe VIN # _____ bearing ILLINOIS plates of _____

In addition, I hereby authorize and give my consent to the above named officers to obtain
and remove from the searched premises/vehicle any materials, documents, or other items that
may be used in connection with a legitimate law enforcement purpose.

By my signature on this document, I hereby state and certify that this consent to search is
being given by me to the above named officers knowingly, voluntarily, and without having
received any threats, promises, or duress of any kind.

*REFUSED*
_____
(SIGNATURE)

**WITNESS** (NON-DEPARTMENT MEMBER, IF AVAILABLE)

*Sgt M. PRICE #2147 / Sgt Terrance Cochran*
(PRINTED NAME)
*Sgt M/L #2147* 894
(SIGNATURE)

| REPORTING MEMBER(S) | | | |
|---|---|---|---|
| REPORTING MEMBER'S NAME Sergeant Terrance COCHRAN | STAR NO. #894 | EMPLOYEE NO. | SIGNATURE 894 |
| REPORTING MEMBER'S NAME Sergeant Matthew PRICE | STAR NO. #2147 | EMPLOYEE NO. | SIGNATURE *Sgt M/L* |
| SUPERVISORY APPROVAL | | | |
| SUPERVISOR'S NAME | STAR NO. | SIGNATURE | |
| INCIDENT INFORMATION | | | |
| RD NO. | I-UCR CODE | EVENT NO. | CONSENT TO SEARCH INVENTORY NO. |

CPD-11.483 (REV. 5/07)

*Log #1044352*
Seiser 12 C 2353
FCRL 000080

# EXHIBIT W

**INTERNAL AFFAIRS DIVISION**
**General Investigations Section**

**29 MAR 2011**
**CL #1044352**

TO:          Police Officer Michael SEISER #4615
                   018th District

FROM:      Sergeant Matthew PRICE #2147
                   Internal Affairs Division (121)

SUBJECT:   Written Copy of Verbal Order

Officer SEISER,

Per the direction of Deputy Superintendent Debra KIRBY of the Bureau of Professional of Standards
You are hereby expressly ORDERED by Sergeant Matthew PRICE #2147:

1.     To provide Sergeant Matthew PRICE #2147 Unit 121 keys to access your Pontiac Grand Am bearing Illinois Plate_____for the purpose of obtaining the large clear bottle with a red and white label and red lid, which is believed to contain an alcoholic beverage. This bottle is located on the passenger seat of said vehicle, which is currently located at approximately 5032 S. Union on the street.

I, _Michael J. Seiser_ have been given a copy of this direct order which

was read to me by Sergeant PRICE on DATE/ TIME: _29-MAR-2011 at 2215hrs._

_P.O. Michael S_____

Police Officer Michael SEISER #4615
018th District

WITNESSED BY:

_Sgt. M. Price #2147_
_Al Tisdale #894_

Seiser 12 C 2353
FCRL 000081

# EXHIBIT X

# PROPERTY INVENTORY - NO.
## CHICAGO POLICE DEPARTMENT
CPD-34.523 (REV. 10/09)

INV NO 12278068     PKG NO 2533879     CR 1044352     RE-INVENTORY OF:     UNIT 009

INVENTORY NO.
12278068

| DATE RECOVERED | ITEM ID | QUANTITY | DESCRIPTION OF PROPERTY |
|---|---|---|---|
| 29-MAR-2011 | 1 | 1 | OTHER : CLEAR PLASTIC 1.75 L SEALED EMPTY BOTTLE BEARING TGIFRIDAY'S "MUDSLIDE" LABEL |
| | 1 | 1 | OTHER : SEALED GLASS VIAL INSIDE PLASTIC VIAL WITH TR TAPE #031118 WITH CLEAR LIQUID SOLUTION FROM TGIF BOTTLE |

COMMENTS: Related to DUI Investigation / From front passenger seat at Officer's vehicle

CURRENCY:

Court Date _____ Court Branch _____

STATE CHARGES: _____

RECOVERED/SEIZED FROM - NAME     SEISER, MICHAEL     Star: 4615     ADDRESS

DECEASED _____     ARRESTED _____

OWNER'S NAME     COCHRAN, TERRANCE     Star: 894     ADDRESS     AT 5832 S UNION AVE CHICAGO, IL 60609     TELEPHONE NO.

$ INVENTORY AMT

CITY     STATE     ZIP

RECOVERED BY - NAME     COCHRAN, TERRANCE     STAR NO. 894     UNIT 121

CHECK IF: [X] C.P.D.

INVESTIGATING OFFICER - COCHRAN, TERRANCE     STAR NO. 894     UNIT 121     BEAT OF RECOVERY 935

CHARGE TYPE _____     IR/CB DATE: _____

## EVIDENCE & RECOVERED PROPERTY SECTION     USE ONLY

HOLD FOR INVESTIGATION AND/OR EVIDENCE
(IF NOT NEEDED FOR INVESTIGATION/EVIDENCE, LEAVE BLANK)

[ ] PROPERTY AVAILABLE FOR RETURN TO OWNER

SIGNATURE     Electronic Approval

1st OFFICER'S NAME     COCHRAN, TERRANCE     STAR NO. 894     UNIT 121     TIME 21:13

[ ] TO BE DISPOSED OF BY CUSTODIAN (NOT TO BE RETURNED)
(THIS APPLIES IF PROPERTY IS NOT EVIDENCE, NOT RETURNABLE AND/OR OWNER IS UNKNOWN)

SIGNATURE     Electronic Approval

2nd OFFICER'S NAME     PRICE, MATTHEW     STAR NO. 2147     UNIT 121

INITIAL DESTINATION OF PROPERTY: ERPS

APPROVING DESK SERGEANT     PTASZKOWSKI, TODD     STAR NO. 1348     DATE 29-MAR-2011     TIME 21:13

SEE COPY 4 (CHARGES TO RIDER)

VIA: [X] POLICE MAIL     [ ] RECOVERING UNIT PERSONNEL
[ ] E & RPS PICKUP     [ ] EVID/LAB TECHNICIAN

Created by: PO3L389

MY SIGNATURE HEREON ACKNOWLEDGES RECEIVING ALL PROPERTY DESCRIBED IN THIS INVENTORY
RECIPIENTS SIGNATURE X _____

OFFICER'S SIGNATURE - STAR - UNIT X _____
WATCH COMDR'S APPROVAL SIGNATURE (EXEMPT RANK REQUIRED FOR FIREARMS) X _____

DATE RECEIVED     ADDRESS - STREET     JUDGE     CT.BR.

COURT ORDER - DISPOSAL INSTRUCTIONS

OFFICER'S SIGNATURE - STAR     UNIT
X     E & R.P.S USE ONLY

## COPY 3 - COURT COPY - ATTACH TO COURT PAPERS

Printed by: PO3U615     29-MAR-2011 21:14

# EXHIBIT Y

Patrol Division                                          29 March 2011
009th District


**TO:**        David Jarmusz
               Commander
               009th District


**FROM:**      John D. Verta #892
               Sergeant
               009th District


**SUBJECT:**   Complaint Log # 1044352


**Log #:**1044352

**Event #:** 08888 for original call of DUI Driver   Event # 09082 For Request for Supervisor

**Allegation:** Drinking on Duty

**Accused:** Seiser, Michael # 4615,

**Date, Day and Time:** 29 March 2011, Tuesday, 1418 Hours

**Location:** 5000 South Union

**Date Complainant & Witness Interviewed:** 29 March 2011

**Complainant:** Glassford, Gail, F/W, _____ 23 Yoa, 4849 South Union, Chicago, Illinois, Home _____ Cell # _____

**Witness:** Anderson, Roseann, F/W, _____ 31 Yoa, 4825 South Union, Chicago, Illinois, Home _____

**Vehicle Involved:** Pontiac Grand Am, barring Illinois Plate _____ , registered to Accused.

**Notifications:** Captain Johnson (3rd Watch, Watch Commander), Lt. Naleway #367 (I.A.D.) at 1510hrs, Sgt. Matt Price #2147(I.A.D.)

**Seiser 12 C 2353**
**FCRL 000044**