No. 15-3225

————

IN THE UNITED STATES COURT OF APPEALS

FOR THE SEVENTH CIRCUIT

MICHAEL J. BELLEAU,

     Plaintiff-Appellee,

  v.

EDWARD F. WALL, ET AL.,

     Defendants-Appellants.

APPEAL FROM THE DISTRICT COURT FOR THE EASTERN DISTRICT
OF WISCONSIN, CASE NO. 12-CV-1198,
THE HONORABLE WILLIAM C. GRIESBACH, PRESIDING

BRIEF AND APPENDIX OF DEFENDANTS-APPELLANTS

BRAD D. SCHIMEL
Attorney General

ANTHONY D. RUSSOMANNO*
Assistant Attorney General
State Bar #1076050

ABIGAIL C. S. POTTS
Assistant Attorney General
State Bar #1060762

Attorneys for Defendants-Appellants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 267-2238 (*AAG Russomanno*)
(608) 267-7292 (*AAG Potts*)
(608) 267-2223 (fax)
*russomannoad@doj.state.wi.us*\*Counsel of Record
*pottsac@doj.state.wi.us*

# TABLE OF CONTENTS

Page

JURISDICTIONAL STATEMENT ................................................................ 1

ISSUES PRESENTED FOR REVIEW .......................................................... 2

STATEMENT OF THE CASE .................................................................... 3

SUMMARY OF THE ARGUMENT ............................................................. 8

ARGUMENT ............................................................................................ 10

    I.     Belleau's monitoring does not violate the Fourth
          Amendment. .................................................................. 11

          A.    *Grady* provides the applicable legal framework................. 12

          B.    Belleau's monitoring is proper under the general
               reasonableness test. ............................................................ 13

          C.    Belleau's monitoring is a reasonable special needs
               search. ................................................................................ 20

    II.    GPS monitoring of Belleau does not violate the Ex Post
          Facto Clause. ................................................................... 27

          A.    Belleau's GPS monitoring is not retroactive
               punishment for past criminal conduct. ............................... 28

          B.    Belleau's ex post facto claim fails because GPS
               monitoring is not a punishment. ......................................... 29

               1.    The legislature did not intend to impose a
                    punishment................................................................ 30

               2.    Under the five-factor test, Belleau cannot meet
                    his burden to overturn legislative intent by the
                   "clearest proof."....................................................... 32

                    a.    GPS monitoring is not a traditional
                         punishment. ...................................................... 33

                    b.    GPS monitoring does not impose a legally
                         sufficient disability or restraint. ..................... 37

                    c.    GPS monitoring does not promote
                         traditional aims of punishment........................ 39

Page

        d.    The GPS law has a rational connection to
             a nonpunitive purpose. ..................................... 40

        e.    It is not excessive to apply the GPS law
             to Belleau. ....................................................... 41

III.    Belleau's equal protection claim fails. ......................................... 43

CONCLUSION .................................................................................... 46

## TABLE OF AUTHORITIES

**<u>Cases</u>**

*Cacoperdo v. Demosthenes,*
   37 F.3d 504 (9th Cir. 1994) ............................................................ 17

*Cent. States, Se. & Sw. Areas Pension Fund v. Midwest Motor Exp.,*
   181 F.3d 799 (7th Cir. 1999) ........................................................ 10

*City of Indianapolis v. Edmond,*
   531 U.S. 32 (2000)..................................................... 20, 21, 22, 23

*Doe v. Bredesen,*
   507 F.3d 998 (6th Cir. 2007) ........................................... 28, passim

*Grady v. North Carolina,*
   135 S. Ct. 1368 (2015) ................................................. 8, 11, 12, 13

*Green v. Berge,*
   354 F.3d 675 (7th Cir. 2004) ......................................... 15, 25, 26

*Hudson v. U.S,*
   522 U.S. 93 (1997)........................................................................ 37

*Jacobson v. Massachusetts,*
   197 U.S. 11 (1905)........................................................................ 11

*Johnson v. Quander,*
   370 F. Supp. 2d 79 (D.D.C. 2005) ........................................... 15, 16

*Kansas v. Hendricks,*
   521 U.S. 346 (1997)................................................................ 11, 42

*McKune v. Lile,*
   536 U.S. 24 (2002)................................................................... 10, 18

*Michigan Department of State Police v. Sitz,*
   496 U.S. 444 (1990)..................................................................... 22

*Mueller v. Raemisch,*
   740 F.3d 1128 (7th Cir. 2014) ................................................. 31, 36

*Riley v. N.J. State Parole Bd.,*
   98 A.3d 544 (N.J. 2014) ........................................................ 33, 34

*Romer v. Evans,*
   517 U.S. 620 (1996)...................................................................... 44

*Samson v. California,*
   547 U.S. 843 (2006)........................................................ 12, passim

Page

*Skinner v. Railway Labor Executives' Ass'n,*
   489 U.S. 602 (1989)........................................................15, 20, 24, 25
*Smith v. Doe,*
   538 U.S. 84 (2003)...........................................................17, passim
*Srail v. Vill. of Lisle, Ill.,*
   588 F.3d 940 (7th Cir. 2009) ........................................................ 44
*State v. Bowditch,*
   700 S.E.2d 1 (N.C. 2010) ........................................................ 15, 33
*State v. Trosclair,*
   89 So. 3d 340 (La. 2012) ........................................................ 33
*Turner v. Glickman,*
   207 F.3d 419 (7th Cir. 2000) ........................................................ 45
*United States v. Jones,*
   132 S. Ct. 945 (2012) ........................................................ 12
*U.S. v. Leach,*
   639 F.3d 769 (7th Cir. 2011) ........................................................ 28, 31
*United States v. Schaffner,*
   258 F.3d 675 (7th Cir. 2001) ........................................................ 10
*Vernonia School District 47J v. Acton,*
   515 U.S. 646 (1995)........................................................ 12
**Statutes**
28 U.S.C. § 1291 ........................................................ 1
28 U.S.C. § 1331 ........................................................ 1
Wis. Stat. § 301.45........................................................ 31
Wis. Stat. § 301.45(7) ........................................................ 5
Wis. Stat. § 301.48........................................................ 1, 3, 10
Wis. Stat. § 301.48(2)(a) ........................................................ 29
Wis. Stat. § 301.48(2)(b)........................................................ 5, 42, 43
Wis. Stat. § 301.48(2)(b)2........................................................ 5, 28
Wis. Stat. § 301.48(6) ........................................................ 42
Wis. Stat. § 301.48(6)(b)3........................................................ 42
Wis. Stat. § 301.48(7)(d) & (e) ........................................................ 30
Wis. Stat. § 301.48(7m)........................................................ 7, 30
Wis. Stat. § 980.01(2) ........................................................ 4

Page

Wis. Stat. § 980.01(6) ................................................................... 4, 43, 44

Wis. Stat. § 980.01(7) ................................................................... 4, 43, 44

Wis. Stat. § 980.06................................................................... 4, 43

Wis. Stat. § 980.07................................................................... 5

Wis. Stat. § 980.09(1) .................................................................... 5

Wis. Stat. § 980.09(4) .................................................................... 43

**<u>Other Authorities</u>**

*Using Undiagnosed Post-Traumatic Stress Disorder to Prove Your Case: A*
  *Child's Story,*
    31 Child. L. Prac. 97 (2012)............................................................ 17

## JURISDICTIONAL STATEMENT

The plaintiff-appellee, Michael Belleau, filed a complaint for declaratory and injunctive relief in the U.S. District Court for the Eastern District of Wisconsin on November 27, 2012, and an amended complaint on October 9, 2013, alleging that Wis. Stat. § 301.48 violates the Ex Post Facto Clause, the Fourth Amendment, and the Equal Protection Clause of the U.S. Constitution. (Dkt. 1 & 34.)[1] The district court had jurisdiction under 28 U.S.C. § 1331. The district court issued a final decision and order on September 21, 2015, and entered final judgment on September 28, 2015, granting Belleau's motion for summary judgment, declaring Wis. Stat. § 301.48 unconstitutional under both the Ex Post Facto Clause and Fourth Amendment as applied to Belleau, and enjoining enforcement of the law as applied to Belleau. (Dkts. 104, 106; D-A APP 001-046.)

On October 6, 2015, the defendants-appellants filed a timely notice of appeal. (Dkt. 109.) This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291, as the appeal is from the final order of a district court.

---

[1] "Dkt" refers to the docket before the district court unless otherwise noted.

## ISSUES PRESENTED FOR REVIEW

1. The Fourth Amendment forbids warrantless searches if unreasonable under the circumstances, including the nature and purpose of the search and the extent it intrudes on reasonable privacy expectations. Here, Wisconsin uses GPS technology to track the general location of a formerly civilly committed repeat child sex offender, with the primary aim of reducing recidivism. Under these circumstances, is it unreasonable to track the location of Belleau?

    The district court answered: yes.

    This Court should answer: no.

2. The Ex Post Facto Clause forbids retroactive punishment. A retroactive law violates the clause if the legislature intended to punish, or if there is the clearest proof of a punitive effect. Here, the legislature did not intend to punish, but rather intended to regulate. The GPS monitoring at issue does not dictate where Belleau may go, and he is not treated like a probationer. Does Belleau show by the clearest proof that he is being retroactively punished?

    The district court answered: yes.

    This Court should answer: no.

3. Under equal protection principles, similarly situated persons may not be treated differently if there is no rational reason.

Here, formerly civilly committed persons (those with mental disorders making them likely to reoffend sexually) are not eligible to petition a court to terminate monitoring, while those who were not civilly committed may petition after twenty years. Does it violate equal protection principles to treat these two groups differently?

The district court did not reach this question.

This Court should answer: no.

## STATEMENT OF THE CASE

Plaintiff Michael Belleau challenges the constitutionality of applying Wis. Stat. § 301.48's lifetime GPS monitoring to him. The Wisconsin Department of Corrections (DOC) administers the law, and Belleau names two DOC administrators in their official capacities. (Dkt. 104:1.)[2] In his complaint, he raised ex post facto, Fourth Amendment, equal protection, and due process challenges. (Dkt. 34.)

Belleau was convicted in 1992 of second-degree sexual assault of a child. (Dkt. 104:2.) The charge was based on allegations that Belleau had sexually assaulted a boy over the course of five years, beginning when the boy was eight years old. (Dkt. 104:2.) While on probation for those offenses, Belleau was convicted of having sexually assaulted a nine-year-old girl in 1998.

---

[2] The material facts are not in dispute, and so this statement of the case often refers to the district court's recitation of facts, Dkt. 104, D-A APP 004-011, with other record citations added for some details.

(Dkt. 104:2.) After serving part of a ten-year sentence, Belleau was again paroled in December 2000, but his parole was revoked in 2001 for having contact with two girls, ages four and five, and admitting that he had sexual fantasies about them and would have molested them if given the opportunity. (Dkt. 104:2.)

After Belleau completed his sentence in 2005, he was civilly committed as a "sexually violent person" under Wis. Stat. ch. 980, which required a finding after a trial that, due to his mental disorder, Belleau was more likely than not to commit another serious sexual offense. (Dkt. 104:3-6.) By statute, "sexually violent person" means "a person who has been convicted of a sexually violent offense . . . and who is dangerous because he or she suffers from a mental disorder that makes it likely that the person will engage in one or more acts of sexual violence." Wis. Stat. § 980.01(7). A sexually violent offense includes first, second, and third degree sexual assault, first and second degree sexual assault of a child, and child enticement. Wis. Stat. § 980.01(6). A "mental disorder" is "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." Wis. Stat. § 980.01(2).

Belleau was committed to the custody of Wisconsin's Department of Health Services for control, care, and treatment until no longer a "sexually violent person." Wis. Stat. § 980.06. Committed persons are reexamined to

- 4 -

determine progress at least every twelve months and may petition for discharge at any time. Wis. Stat. § 980.07; Wis. Stat. § 980.09(1). (Dkt. 104:3-4.)

In 2010, Belleau was released from civil commitment because an evaluator, Dr. Richard Elwood, determined that Belleau no longer met the more-likely-than-not threshold. (R. 104:5-6.) At the same time, Dr. Elwood determined that Belleau's adjusted risk of committing a new sex offense in the next ten years was still about 16%. (Dkt. 98, ¶ 20.) Dr. Elwood also determined that Belleau had a diagnosis of pedophilia that predisposes him to commit sexually violent acts, and observed that he had not completed treatment for that condition. (Dkt. 104:4; *see also* Dkt. 98, ¶¶ 15-18, 25-26.)

On Belleau's release from civil commitment, he became subject to lifetime GPS monitoring pursuant to a law enacted after the dates of Belleau's offenses. *See* Wis. Stat. § 301.48(2)(b) (applicability to ch. 980 patients). (Dkt. 104:6.) Under the law, Belleau qualified for lifetime monitoring on discharge because of his status as a discharged ch. 980 patient. Wis. Stat. § 301.48(2)(b)2. His monitoring could be terminated only based on physical incapacitation. Wis. Stat. § 301.45(7).

The GPS monitoring device is small and cylindrical, is worn on the ankle and under clothing, and is waterproof up to fifteen feet. (Dkt. 104:7; *see also* Dkt. 68, ¶ 35 (stipulated facts); Dkt. 98, ¶¶ 45-47, 53.) The device transmits

Belleau's location to the DOC Monitoring Center. (Dkt. 104:7-8; *see also* Dkt. 68, ¶¶ 2-5; Dkt. 98, ¶ 44.) The GPS device vender states it is accurate to a deviation of +/- thirty meters. (Dkt. 98, ¶ 44.) About once per day, the device must be charged for approximately one hour using an electrical cable, which can be plugged into any outlet. (Dkt. 104:7; *see also* Dkt. 68, ¶ 36.)

GPS registrants like Belleau are termed "maximum discharge" registrants, which means a sex offender subject to GPS monitoring who is no longer subject to probation, parole, or other supervised release. (Dkt. 104:8; *see also* Dkt. 68, ¶ 1; Dkt. 98, ¶ 30.) For maximum discharge registrants, DOC typically reviews the location points retroactively on a nightly basis. (Dkt. 104:8; *see also* Dkt. 68, ¶¶ 3-4.) The points are viewed on a Bing map that allows for zooming, and typically all points for a twenty-four-hour period are viewed at once on a map. (Dkt. 104:8; *see also* Dkt. 68, ¶¶ 3-4.) During these retroactive viewings, the Monitoring Center employees at times make notes. (Dkt. 68, ¶ 15.)

GPS monitoring does not restrict the movements of a maximum discharge registrant. (Dkt. 68, ¶ 12; Dkt. 98, ¶¶ 31-41.) The GPS law does not require Belleau to avoid certain areas or to be in certain locations. (Dkt. 104:9; *see also* Dkt. 68, ¶ 21; Dkt. 98, ¶¶ 33-38, 41.)

Rarely, maximum discharge registrants are given something called an "exclusion zone," but Belleau has no "exclusion zones" of any sort. (Dkt. 104:9;

*see also* Dkt. 98, ¶ 41.) Even for maximum discharge registrants who are given an exclusion zone, they do not in fact prevent the registrant from going anywhere. (Dkt. 104:9; *see also* Dkt. 68, ¶¶ 11-12; Dkt. 98, ¶¶ 31-32.) Instead, the zones are in place for informational purposes only, and only if a victim requests it or, even more rarely, when DOC creates one absent such a request. (Dkt. 68, ¶¶ 7-10.) The registrant is not forbidden from entering an "exclusion zone," DOC has no authority to remove the registrant from such a zone, and there are no GPS-related sanctions for entering a zone. (Dkt. 104:8; *see also* Dkt. 68, ¶ 12; Dkt. 98, ¶ 32.) Rather, if a maximum discharge registrant has an "exclusion zone" and enters and stays in the zone, it merely creates an alert at the Monitoring Center, which may lead to a welfare check of the victim or registrant. (Dkt. 68, ¶ 11; Dkt. 98, ¶ 31-32.)

Maximum discharge registrants like Belleau are not required by the GPS monitoring program to be in or at a particular place at a particular time. (Dkt. 68, ¶ 21; Dkt. 98, ¶¶ 33-38.) Belleau is free to move out of Wisconsin and, if he does, GPS monitoring is terminated. (Dkt. 98, ¶ 39.) *See* Wis. Stat. § 301.48(7m). Belleau is billed a GPS monitoring fee of $50 per month but has never paid the fee. (Dkt. 104:9; *see also* Dkt. 98, ¶ 62.) The current rental fee for Belleau's individual GPS device is approximately $135 per month. (Dkt. 98, ¶¶ 57-60.)

Belleau filed suit in 2012, challenging the constitutionality of his monitoring. The district court decided the case on cross-motions for summary judgment, finding that the GPS monitoring law violated both the Ex Post Facto Clause and the Fourth Amendment as applied to Belleau. The court did not reach Belleau's equal protection claim (Dkt. 104:42 n.6), and Belleau had abandoned his due process claim by agreeing it should be dismissed. (Dkt. 90:2 n.2.)

On October 6, 2015, the defendants filed a notice of appeal. (Dkt. 109.) The defendants moved for a stay pending appeal, and this Court granted the stay on October 16, 2015. (7th Cir. Dkt. 6.)

## SUMMARY OF THE ARGUMENT

Belleau seeks to invalidate GPS monitoring as it applies to him. The Constitution, however, does not forbid reasonable efforts to promote public safety and to mitigate the risks Belleau presents.

In terms of the Fourth Amendment, monitoring is a warrantless search, but this does not end the inquiry. In *Grady v. North Carolina*, 135 S. Ct. 1368 (2015), the Supreme Court explained that GPS monitoring of sex offenders who have completed their sentences is subject to a reasonableness inquiry. Here, monitoring is permissible under two approaches used to evaluate reasonableness. First, monitoring is reasonable under the totality of the circumstances test because it is sensibly designed to deter and is reasonably

- 8 -

limited because it does not dictate where the Belleau may go, reveal what he is doing in particular, or include real-time monitoring. Second, it fits the mold of "special needs" searches because it is not an ordinary crime detection tool, but rather is directed at mitigating risks from an especially worrisome subset of sex offenders.

Regarding ex post facto, the GPS law does not retroactively punish and is punitive in neither intent nor effect. The law applies to Belleau because of his civil commitment, which was ongoing when the law took effect. The legislative history reveals nonpunitive goals of reducing recidivism and providing information in the event of future crimes. Neither goal is punishment for a past crime. And there is no clear proof that would justify disregarding that intent. The law does not resemble traditional punishment, is not akin to probation, and does not restrain Belleau in a legally significant way. Rather, apart from having to wear the bracelet, Belleau may do as he pleases. It is a rational and measured effort to mitigate risk and does not violate the Ex Post Facto Clause.

Regarding equal protection, Belleau complains that registrants who were not civilly committed may petition to remove the device after twenty years, but those who were committed may not. This argument is subject to rational basis review, and the distinction easily passes muster. As a person formerly committed as having a mental disorder based on a showing that it was likely

he would commit another serious sex offense, Belleau is not similarly situated to registrants who have not been subject to such a finding. Likewise, it is rational to treat a class of people differently who were found to meet the commitment threshold because it is logical to think they pose greater risks for longer time periods.

## ARGUMENT

Belleau challenges the constitutionality of Wis. Stat. § 301.48, Wisconsin's GPS monitoring law, which requires lifetime GPS monitoring of certain serious sex offenders like Belleau. The district court found the law unconstitutional as applied to Belleau under both the Ex Post Facto Clause and the Fourth Amendment. The defendants believe that the constitution requires neither result and request that this Court reverse the district court's summary judgment rulings.

The standard of review on Belleau's claims is de novo. *U.S. v. Schaffner*, 258 F.3d 675, 678 (7th Cir. 2001) ("We review rulings regarding the constitutionality of a . . . statute de novo."). Belleau must carry a "heavy burden" of showing the law is unconstitutional. *Cent. States, Se. & Sw. Areas Pension Fund v. Midwest Motor Exp.*, 181 F.3d 799, 809 (7th Cir. 1999) (citation omitted).

As the Supreme Court has recognized, "[s]ex offenders are a serious threat in this Nation." *McKune v. Lile*, 536 U.S. 24, 32 (2002) (citing U.S. DOJ

statistics). Notably, where the question was how to cope with a repeat offender who had a mental disorder making re-offense likely, the Court upheld the much more burdensome step of civil commitment. *See Kansas v. Hendricks*, 521 U.S. 346 (1997). In doing, the Court reiterated the rule that, in the civil context, constitutional concerns may sometimes bow to public safety. *Id.* at 356-57 (citing *Jacobson v. Massachusetts*, 197 U.S. 11, 26 (1905)).

The Wisconsin Legislature—like legislatures throughout the United States—has seen fit to impose monitoring on a subset of the most dangerous sexual predators. The burden of GPS monitoring is dramatically less than that of involuntary commitment, and so it follows that it poses lesser constitutional concerns. Under these circumstances, Belleau cannot meet his burden to show that his monitoring is unconstitutional.

## I.    Belleau's monitoring does not violate the Fourth Amendment.

The district court concluded that the monitoring was an unreasonable search. The court erred because Wisconsin's decision about how to deal with offenders like Belleau is reasonable under the circumstances.

Under *Grady*, monitoring Belleau is a Fourth Amendment search. *Grady*, 135 S. Ct. at 1371. The question remains whether it is a reasonable one. Although monitoring places burdens on Belleau, his constitutional expectations must be balanced against society's interest in protecting itself

from repeat sex offenders, especially those that target children, and GPS monitoring is reasonably designed to promote that aim.

### A.  *Grady* provides the applicable legal framework.

The Supreme Court's *Grady* decision recently clarified how the Fourth Amendment applies to GPS monitoring of sex offenders who have completed their sentences. *See Grady*, 135 S. Ct. 1368. The decision contained three notable rulings:

- GPS monitoring of sex offenders is a Fourth Amendment "search" under the trespass analysis in *United States v. Jones*, 132 S. Ct. 945 (2012).

- Whether the monitoring passes constitutional muster depends on whether it is reasonable.

- The reasonableness of the search depends on the totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations.

*Id.* at 1371.

In so holding, *Grady* cited two prior Supreme Court cases as relevant: *Samson v. California*, 547 U.S. 843 (2006), which applied a general reasonableness test; and *Vernonia School District 47J v. Acton*, 515 U.S. 646 (1995), which applied the special needs doctrine. *Grady*, 135 S. Ct. at 1371. The Court remanded *Grady* to the lower courts for a determination of reasonableness. Its citation of *Samson* and *Vernonia*, however, suggest that

the general reasonableness test and special needs are both pertinent in evaluating the reasonableness of a search.

Belleau's GPS monitoring should be upheld under either the general reasonableness or special needs rubric. The purpose of the GPS monitoring is unique and important—to discourage re-offense by a serious sex offender. Monitoring is reasonable in light of that important goal and Belleau's circumstances.

### B. Belleau's monitoring is proper under the general reasonableness test.

Belleau's monitoring is constitutional under the general reasonableness test. As suggested in *Grady*, the Supreme Court's *Samson* decision provides guidance when analyzing the totality of the circumstances here. *See Grady*, 135 S. Ct. at 1371. *Samson* applied a reasonableness framework to warrantless and suspicionless searches of a probationer. *Id.* at 846. Belleau's monitoring is even more justified than the search upheld as reasonable in *Samson*.

Like *Grady*, *Samson* states a totality test, where the intrusion is weighed against society's need for the search:

> "[U]nder our general Fourth Amendment approach" we "examin[e] the totality of the circumstances" to determine whether a search is reasonable within the meaning of the Fourth Amendment. Whether a search is reasonable "is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests."

- 13 -

*Samson*, 547 U.S. at 848 (citations omitted).

*Samson* applied that framework to intrusive and suspicionless in-person searches of probationers "at any time of the day or night." *Samson*, 547 U.S. at 846 (quotation marks omitted). The Court upheld those searches and seizures as reasonable under the Fourth Amendment. Its analysis focused on the reduced expectations of someone on probation and the state's important interest in "reducing recidivism." *Id.* at 852-53. The Court held: "the Fourth Amendment does not render the States powerless to address these concerns *effectively*." *Id.* at 854 (emphasis in original).

The same kind of reasoning applies here. First, Belleau has reduced expectations given the nature of his acts. Second, society's interests are especially compelling—the topic is not probationers, who might have been convicted of any crime, but rather a serious and repeat child sex offender. Third, monitoring is a measured response to that public safety risk.

*First*, Belleau should not enjoy the same Fourth Amendment expectations as everyone else. *Samson* illustrates that probationers, based on their status, have diminished expectations. *Samson*, 547 U.S. at 852. And reduced expectations have been recognized in other contexts, as well, especially when certain classes of people pose compelling safety concerns.

- 14 -

In *Skinner v. Railway Labor Executives' Ass'n*, the Court addressed compulsory blood and urine tests of railroad employees involved in certain train accidents or safety violations. 489 U.S. 602, 606, 634 (1989). *Skinner* supports that diminished expectations are not limited to just inmates or probationers: the Supreme Court explained that non-incarcerated individuals—railroad employees engaged in "safety-sensitive" work—have "diminished" expectations of privacy, at least when it came to a search that was tied to that safety concern. *Id.* at 620, 627.

Other cases have recognized that someone's status or actions can lead to diminished expectations. That holds true when the actions are past criminal acts. In this Court's *Green v. Berge*, addressing DNR collection from inmates, the concurrence observed that constitutional repercussions may continue after a sentence is complete because "[e]stablished criminality may be the basis of legal obligations that differ from those of the general population," including under the Fourth Amendment. 354 F.3d 675, 680 (7th Cir. 2004).

In *State v. Bowditch*, 700 S.E.2d 1, 11 (N.C. 2010), the North Carolina Supreme Court addressed monitoring of sex offenders and likewise observed that "convicted felons do not enjoy the same measure of constitutional protections, including the expectation of privacy under the Fourth Amendment." In the DNA context, the court in *Johnson v. Quander* explained that some information can become an ongoing matter of state interest once

- 15 -

someone commits certain acts: "[o]nce a person is convicted of one of the felonies included as a predicate offense under [the DNA Act], his identity has become a matter of state interest and he has lost any legitimate expectation of privacy in the identifying information derived from blood sampling." 370 F. Supp. 2d 79, 88 (D.D.C. 2005), *aff'd*, 440 F.3d 489 (D.C. Cir. 2006).

Belleau, too, should have a reduced expectation of privacy given his own conduct and propensities. He poses unique and ongoing safety risks to society, and the monitoring is addressed at just that. Belleau was convicted of sexually assaulting multiple children on separate occasions over many years, and records reveal that he continued to harbor thoughts of molestation years later. (Dkt. 104:2.) Belleau's records also show that he failed to successfully complete sex offender treatment while incarcerated, even though that treatment was offered. (Dkt. 98, ¶¶ 6-7.) In light of the nature of his convictions, his civil commitment, and failure to complete sex offender treatment, Belleau should not have the same expectations of privacy as the general public. Even more so than the *Skinner* railroad employees, it should be the case that Belleau's expectations of privacy are subject to diminution.

*Second*, society has a compelling interest in reducing the likelihood that Belleau will sexually assault another child. Child sexual assault is devastating and comes with ongoing effects, as courts have noted: "The impact of these crimes on the lives of the victims is extraordinarily

severe." *Cacoperdo v. Demosthenes*, 37 F.3d 504, 508 (9th Cir. 1994). It has been reported that, "[a]ccording to the National Center for PTSD, 90% of children who are sexually assaulted develop PTSD, which is a severe and disabling neurological response to trauma." Christina Rainville, *Using Undiagnosed Post-Traumatic Stress Disorder to Prove Your Case: A Child's Story*, 31 Child. L. Prac. 97 (2012).

Empirical data shows there is good reason to worry that an offender like Belleau may reoffend. That includes the assessment that put Belleau's risk of sexual re-offense at 16% upon release and at 8% now. (Dkt. 98, ¶ 20; Dkt. 101, ¶ 89.) The Supreme Court has acknowledged the significant risks and "grave concerns" posed by sex offenders, and has held that a legislature rationally takes that into consideration when regulating them. *Smith v. Doe* 538 U.S. 84, 103 (citing US DOJ statistics and prior cases).

Federal statistics reveal that, as a general matter, sex offenders, and particularly multiple-offense child molesters, have a significant propensity to reoffend sexually. For example, a federal study of recidivism found that, "[c]ompared to non-sex offenders released from State prisons, released sex offenders were 4 times more likely to be rearrested for a sex crime." U.S. Department of Justice, Bureau of Justice Statistics, *Recidivism of Sex Offenders Released from Prison in 1994*, Nov. 2003, at 1, *available at* http://www.bjs.gov/content/pub/pdf/rsorp94.pdf (last visited 11/16/15).

- 17 -

Notably, the study also found that "[r]eleased child molesters with more than 1 prior arrest for child molesting" had a "7.3%" likelihood of being rearrested for child molesting. *Id.* at 2. These kinds of alarming sexual recidivism rates have been cited and relied on by the Supreme Court. *See McKune*, 536 U.S. at 32-33; *Smith*, 538 U.S. at 103-04. And those significant rates are just with regard to child molesters in general, and not the subset who have previously met the high bar for civil commitment.[3]

*Third*, given these circumstances, the GPS monitoring is a measured response and is not unduly intrusive. It is true that Belleau must always wear a device on his ankle. The device transmits a point on an Internet-style map showing, in a general way, where Belleau is. (Dkt. 68, ¶¶ 12, 23, Ex. A-D.) But Belleau's location is not monitored in real time, it does not show what he is doing in particular (for example, what room he is in when at home), and it does not include stopping Belleau and physically searching him. (Dkt. 68, ¶ 12; Dkt. 98, ¶ 41.) Thus, in several ways, it is less intrusive than the searches and seizures upheld in *Samson*, where intrusive, in-person searches of probationers could occur at any time. *See Samson*, 547 U.S. at 846.

---

[3] As discussed elsewhere in the brief, the monitoring also has a secondary use and social benefit: if the deterrence fails in a given case, then at least GPS provides a tool for getting someone off the street so the assaults do not continue. (*See* Dkt. 61-1, Ex. 1010:34.)

The GPS monitoring also makes sense. Some recent studies support the impact of GPS monitoring on deterring potential re-offence. For example, a recent meta-analysis of electronic monitoring found that, as a general matter, "[o]n average, EM [electronic monitoring] reduces arrests by 24 percent for program participants."[4] And, notably, a 2012 federally-funded California study of high risk sex offender parolees on GPS found a dramatic reduction in recidivism. The authors found "a clear pattern of divergence in outcomes," and that recidivism ratios for those on traditional parole were "more than twice as high" than those who received the GPS monitoring.[5]

All said, these circumstances justify the monitoring. Belleau is not just someone with a criminal history; he is someone with an especially concerning criminal history that comes with continued risks to other people's children.

---

[4] John K. Roman, Ph.D., et al., District of Columbia Crime Policy Institute, *The Costs and Benefits of Electronic Monitoring for Washington, D.C.*, Sept. 2012, at 3, *available at* http://www.urban.org/UploadedPDF/412678-The-Costs-and-Benefits-of-Electronic-Monitoring-for-Washington-DC.pdf (last visited 11/16/15). Other studies support the proposition that electronic monitoring reduces re-offence. For example, a recent Florida senate report discussed a study of electronic monitoring for those on community supervision and found "electronic monitoring reduces the likelihood that an offender will not successfully complete community supervision by approximately 31% relative to the supervision failure rate of offenders who are not subject to it." The report states that the reduction in failure rates is even greater for those who committed sex crimes. *See* The Florida Senate, Committee on Criminal Justice, *Interim Report 2012-117*, Sept. 2011, at 7, *available at* http://www.flsenate.gov/PublishedContent/Session/2012/InterimReports/CJ1172012-117cj1.pdf (last visited 11/16/15).

[5] Stephen V. Gies, et al., *Monitoring High-Risk Sex Offenders with GPS Technology: An Evaluation of the California Supervision Program, Final Report,* Mar. 2012, at vii, *available at* https://www.ncjrs.gov/pdffiles1/nij/grants/238481.pdf (last visited 11/16/15).

Acts have consequences, and there must be a point where society can take reasonable measures to mitigate risks that someone's own choices have created. Like in *Samson*, "the Fourth Amendment does not render the States powerless to address these concerns *effectively*." *See id.* at 854. The GPS monitoring reasonably balances Belleau's risks and society's interests and should be upheld.

### C.    Belleau's monitoring is a reasonable special needs search.

The foregoing explains why, under the totality of the circumstances, the monitoring should be upheld. *Grady* also suggests a second analysis, based on a "special needs" warrant exception. Special needs provides a separate basis for upholding the monitoring here.

Special needs searches are exceptions to the warrant requirement. When faced with a special need, courts "balance the governmental and privacy interests to assess the practicality of the warrant and probable-cause requirements in the particular context." *Skinner*, 489 U.S. at 619. The Supreme Court's special needs jurisprudence shows that the GPS monitoring here is permissible. It targets a unique and difficult problem that does not, and cannot, rely on probable cause. It is not crime fighting as usual.

The Supreme Court has explained: "we have upheld certain regimes of suspicionless searches where the program was designed to serve 'special needs, beyond the normal need for law enforcement.'" *City of Indianapolis v.*

- 20 -

*Edmond*, 531 U.S. 32, 40 (2000) (citations omitted). The special needs doctrine does not apply where "the primary purpose of the . . . program is to uncover evidence of ordinary criminal wrongdoing" but rather may apply to situations where that is not the primary purpose. *See id.* at 42.

In *Edmond*, the Court found that a highway checkpoint program was a "normal need"—as opposed to a "special" one—because it "unquestionably has the primary purpose of interdicting illegal narcotics." 531 U.S. at 40. The police "stopped 1,161 vehicles" and arrested "104 motorists. Fifty-five arrests were for drug-related crimes, while 49 were for offenses unrelated to drugs." *Id.* at 35. The stops included that "[t]he officer . . . looks for signs of impairment and conducts an open-view examination of the vehicle from the outside. A narcotics-detection dog walks around the outside of each stopped vehicle." *Id.* That program was not a special needs search. The Court explained that it "cannot sanction stops justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime." *Id.* at 44.

By way of contrast, the Court listed nine cases that addressed or discussed special needs that justified warrantless searches:

- random drug testing of student athletes

- drug tests for U.S. Customs Service employees seeking transfer or promotion to certain positions

- drug and alcohol tests for railway employees involved in train accidents or found to be in violation of particular safety regulations

- warrantless administrative inspection of premises of 'closely regulated' business

- administrative inspection of fire-damaged premises to determine cause of blaze

- administrative inspection to ensure compliance with city housing code

- brief, suspicionless seizures of motorists at a fixed Border Patrol checkpoint designed to intercept illegal aliens and at a sobriety checkpoint aimed at removing drunk drivers from the road

- a similar type of roadblock with the purpose of verifying drivers' licenses and vehicle registrations.

*Edmond*, 531 U.S. at 37-38.

Running through the special needs cases are themes of promoting public safety apart from normal crime fighting, dealing with difficult circumstances that do not lend themselves to probable cause determinations, at times addressing situations where it is reasonable to view expectations of privacy as reduced, and focusing on deterrence through regulation. All of these concerns are also present in this case.

For example, the Court has approved of searches to address substantial potential hazards to the community with the goal of promoting safety. In discussing why a highway sobriety checkpoint program was constitutional in *Michigan Department of State Police v. Sitz*, 496 U.S. 444 (1990), the Court

explained that the searches were brief and for the purpose of removing impaired drivers from the road, not crime fighting. The Court noted the safety concerns as supporting its legality:

> This checkpoint program was clearly aimed at reducing the immediate hazard posed by the presence of drunk drivers on the highways, and there was an obvious connection between the imperative of highway safety and the law enforcement practice at issue. The gravity of the drunk driving problem and the magnitude of the State's interest in getting drunk drivers off the road weighed heavily in our determination that the program was constitutional.

*Edmond*, 531 U.S. at 39 (discussing *Sitz*).

The *Edmond* drug-stop scenario was different than this example because the drug-stop program did not address an intractable or unique safety problem, but rather was, at bottom, a program "whose primary purpose was to detect evidence of ordinary criminal wrongdoing." *Edmond*, 531 U.S. at 38, 41-42. Belleau's GPS monitoring is more like *Sitz*: it is not primarily a crime-detection tool; it is in place to deal with the safety risks that Belleau poses to others.

The Supreme Court has also approved of searches that have the twin goals of deterring violations of laws that impact public safety and gathering information that may shed light on violations if they do occur. *Skinner*, which addressed blood and urine tests of railroad workers involved in accidents or safety violations, highlighted that special needs may come into play in several contexts: "The Government's interest in regulating the conduct of

railroad employees to ensure safety, like its supervision of probationers or regulated industries, or its operation of a government office, school, or prison, 'likewise presents "special needs" beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements.'" 489 U.S. at 620 (citations omitted).

*Skinner* contains two points that are relevant here. First, *Skinner* recognized that a proper special needs goal is deterring future violations. *Skinner*, 489 U.S. at 620-21 (explaining that the program was designed to "prevent accidents and casualties"). The key was that "know[ing] they will be tested" "increas[ed] the likelihood that employees will forgo" the banned activity in the first place. *Id.* at 630. Second, *Skinner* recognized that another valid use of the searches was providing useful information that might confirm or eliminate suspicions in the event of a future accident or violation. *Id.*

These are the same goals driving Belleau's monitoring. It is designed to: (1) deter re-offense by a serious sex offender based on that offender knowing that his location is being tracked and (2) secondarily, create a repository of

information that may aid in detecting or ruling out involvement in future sex offenses.[6] (Dkt. 61-1, Ex. 1010:34.)

Notably, in discussing DNA collection in *Green*, this Court distinguished between a law enforcement "goal" (which may be a special need) and ordinary "investigation of a specific crime" (which is not). *Green*, 354 F.3d at 678. This Court adopted the reasoning that, "[a]lthough the state's DNA testing of inmates is ultimately for a law enforcement goal," it fits the definition of a special needs search "since it is not undertaken for the investigation of a specific crime." *Id.* Belleau's monitoring is likewise removed from a law enforcement investigation. The monitoring's primary purpose—dissuading an offense in the first place—leaves out law enforcement altogether.

Given that the monitoring addresses a special need, the remaining task is to "balance the governmental and privacy interests to assess the practicality of the warrant and probable-cause requirements in the particular context." *Skinner*, 489 U.S. at 619. Here, there is no dispute that probable cause is not in play, or even possible. The primary goal is to *prevent* re-offense, not to catch someone engaged in a particular act. By its very nature, the program is

---

[6] The legislative history states a primary purpose of reducing "overall recidivism rates" and promoting public safety "by letting offenders know they are being watched." (Dkt. 61-1, Ex. 1010:34.) It also states secondary uses, including "[e]liminating tracked offenders from the list of potential perpetrators" of a crime and, if not eliminated, including them. (Dkt. 61-1, Ex. 1010:34.) Indeed, knowledge that monitoring data could be used in the future by law enforcement is what makes monitoring a deterrent.

not "investigation of a specific crime" that might be amenable to a warrant. *Green*, 354 F.3d at 678.

Especially given that the monitoring does not fit the probable cause mold, the program strikes the proper balance between societal interests and privacy. This is not a police program. Police do not administer the GPS monitoring and only have access to GPS data if specifically requested. (Dkt. 101, ¶¶ 63-68.) Police do not make such requests frequently. (Dkt. 101, ¶ 65.) In fact, police have never requested Belleau's GPS data for a criminal investigation of him.[7] (Dkt. 101, ¶¶ 67-68.)

And the monitoring comes with limits. Belleau is tracked at all times, but what he does in particular is not known because he simply appears as a dot on a map. (Dkt. 68, ¶¶ 12, 23, Ex. A-D; Dkt. 98, ¶¶ 31-41.) That dot is not viewed in real time but rather retrospectively. (Dkt. 68, ¶ 3.) He is not physically searched by police or anyone else. Belleau may still go where he pleases, and the device is relatively small and can be worn under clothing.

---

[7] The submissions reflect three instances of potential police involvement, none of which relates to ordinary crime detection. One had to do with Belleau allegedly intimidating a privately employed GPS technician, who then asked for the option to have a police escort; but an installer later said no assistance was needed. (Dkt. 101, ¶ 76.) Another instance came one day after Belleau's release from civil commitment, when local police and DOC employees were unable to locate Belleau (Dkt. 101, ¶ 69.) The GPS data helped locate him, and that was the end of it (Dkt. 101, ¶ 69.) Finally, Belleau was contacted twice about tampering with the device; one of those times he actually had cut off the device. (Dkt. 70-10:2, 5.) There is no evidence that Belleau was punished for tampering.

It is true that Belleau's location is always recorded, but that makes sense in light of the purpose of the program; otherwise, a registrant would know he could reoffend at certain times or places. This intrusion must be weighed against the unique problem Belleau poses, the especially vulnerable class of victims that are at risk, and the fact that his expectations of privacy should be diminished given his own conduct. The monitoring should be upheld as a proper special needs search.

## II.    GPS monitoring of Belleau does not violate the Ex Post Facto Clause.

The district court concluded that Belleau's monitoring violates the Ex Post Facto Clause even though the Wisconsin Legislature did not intend to punish. (Dkt. 104:11-32; D-A APP013-034.) Rather, applying five factors from *Smith v. Doe*, 538 U.S. 84 (2003), the court set aside that intent and deemed the law punitive. The State respectfully submits that those factors compel the opposite result.

Under *Smith,* there are three steps to the ex post facto inquiry. First, the question is whether the imposition is retroactive. If so, the second question is whether the legislature intended to punish. If not (as the district court found), then the final question is whether to disregard that intent because of a law's clearly punitive effect. To make that showing, a plaintiff must come

forward with the "clearest proof" to overcome nonpunitive legislative intent. *Smith*, 538 U.S. at 92.

Wisconsin's law should be upheld under this inquiry. Belleau's monitoring is not a retroactive punishment, and, in enacting the GPS law, the legislature did not intend to punish. Belleau has not come forward with the "clearest proof" showing otherwise. This Court should follow the Sixth Circuit's lead, which found that a more burdensome GPS monitoring program in Tennessee was not a punishment and did not violate the Ex Post Facto Clause. *See Doe v. Bredesen*, 507 F.3d 998 (6th Cir. 2007), *cert. denied*, 555 U.S. 921 (2008).[8]

## A.    Belleau's GPS monitoring is not retroactive punishment for past criminal conduct.

To violate the Ex Post Facto Clause, a law must be both retroactive and a punishment. *U.S. v. Leach*, 639 F.3d 769, 772 (7th Cir. 2011). As to retroactivity, Belleau contended before the district court that the Ex Post Facto Clause forbids "a different and greater punishment upon a person for a criminal act than was associated with the act at the time the person committed it." (Dkt. 67:11.) But Belleau's GPS monitoring was

---

[8] The district court rejected the *Bredesen* court's analysis as unpersuasive. (Dkt. 104:31.) The district court also noted that the plaintiff in *Bredesen* happened to be on probation, unlike Belleau. But that fact was not part of the Sixth Circuit's analysis. *See Bredesen*, 507 F.3d at 1003-07. Rather, consistent with Wisconsin's law, the Sixth Circuit explained that Tennessee's GPS law could apply "for the rest of [a registrant's] life," *id.* at 1001, yet remained "a civil, nonpunitive regime" with non-punitive effects. *Id.* at 1004-07.

triggered by his then-current status as a civilly committed person, and not by his past criminal acts.

The applicable triggering provision, Wis. Stat. § 301.48(2)(b)2., provides that Belleau is subject to the monitoring based on his discharge from 980 status: *i.e.*, civil commitment of a sexually violent person who was found more likely than not to reoffend because of a mental disorder. *See* Wis. Stat. ch. 980. Belleau is not subject to monitoring based on his convictions or criminal sentence. The GPS law became effective on July 1, 2007. *See* 2005 Wis. Act 431. The law applies only to persons convicted or on probation or parole after January 1, 2008. Wis. Stat. § 301.48(2)(a). Belleau was off of probation and parole as of January 2005. (Dkt. 69:1-2 ¶ 2.)

The reason that Belleau is subject to lifetime GPS monitoring is that, at the time the law became effective, he was civilly committed. That commitment was based on continuing evaluations. (Dkt. 69:4-5; Dkt. 98, ¶¶ 28-29.) Thus, the monitoring is not retroactive as applied to Belleau.

## B.    Belleau's ex post facto claim fails because GPS monitoring is not a punishment.

Even assuming retroactive effect, the monitoring does not violate the Ex Post Facto Clause because it is not punishment.

To show that a law is penal, a plaintiff has two avenues available. One is to show that the legislature intended to impose a punishment. *Smith*, 538 U.S. at 92. Otherwise, a plaintiff must come forward with "the clearest proof" to "transform what has been denominated a civil remedy into a criminal penalty." *Id.* at 92 (citations omitted). That second inquiry involves five main factors. None clearly favor Belleau.

### 1. The legislature did not intend to impose a punishment.

The first question is whether Wisconsin's Legislature intended to punish when imposing GPS monitoring. The district court agreed with the defendants that no evidence showed punitive intent. (Dkt. 104:16-18; D-A APP 018-020.)

The GPS statute has the non-punitive goal of reducing ongoing risks to Wisconsin citizens. That purpose is reflected in the legislative history. For example, in correspondence sent to Wisconsin legislative staff during the drafting process, the potential to reduce recidivism was the number one reason provided:

> The most important benefits of GPS monitoring of sex offenders are as follows:
>
> 1. Reducing overall recidivism rates by letting offenders know they are being watched (public safety).

(Dkt. 61-1, Ex. 1010:34.)

Secondary uses included evaluating whether a registrant is present at a crime scene. (Dkt. 61-1, Ex. 1010:34.) That is not an ex post facto issue because it only applies to future conduct. When a "law targets only the conduct undertaken by convicted sex offenders after its enactment, it does not violate the Ex Post Facto Clause." *Leach*, 639 F.3d at 773 (discussing a sex offender registry).

The law's operation supports these stated rationales. Unlike criminal punishments, the GPS tracking terminates if the registrant simply chooses to move out of state. Wis. Stat. § 301.48(7m). Also, unlike a criminal sentence, the monitoring may cease based on physical incapacitation. *See* Wis. Stat. § 301.48(7)(d) & (e) (providing for termination of monitoring in the event of physical incapacitation where the registrant "is not a danger to the public"). The monitoring statute is in Wisconsin's code chapter setting out the duties of the Wisconsin Department of Corrections. *See* Wis. Stat. ch. 301 ("Corrections"). The chapter also includes Wisconsin's sex offender registry law, Wis. Stat. § 301.45, which this Court previously found was not a punishment. *See Mueller v. Raemisch*, 740 F.3d 1128, 1133 (7th Cir. 2014).

As the Supreme Court concluded with respect to sex offender registries, "an imposition of restrictive measures on sex offenders adjudged to be dangerous is 'a legitimate nonpunitive governmental objective and has been historically so regarded.'" *Smith*, 538 U.S. at 93 (citation omitted); *see also*

- 31 -

*Bredesen*, 507 F.3d at 1004 (coming to the same conclusion as to Tennessee's GPS law). Likewise, here, the district court correctly concluded that the monitoring was not intended as punishment for past crimes.

> ## 2. Under the five-factor test, Belleau cannot meet his burden to overturn legislative intent by the "clearest proof."

The second inquiry is whether there are compelling reasons to disregard legislative intent and deem the law a punishment. This showing requires the "clearest proof" that the law is not what it purports to be, which involves five main factors:

> [The law] has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with regard to this purpose.

*Smith,* 538 U.S. at 97. The district court concluded that Belleau met his burden, weighing the first two factors most heavily.[9] (Dkt. 104:20.) That was erroneous. Although the monitoring may impose burdens, they are not clearly akin to criminal punishment.

---

[9] The district court at first questioned whether the "clearest proof" standard applied because the legislature did not explicitly label the GPS law "civil." However, the court then applied the "clearest proof" standard anyway. (Dkt. 104:19.) That was correct under *Smith v. Doe.* As Justice Souter explained in his concurrence, the law in *Smith* also "[did] not expressly designate the requirements imposed as 'civil.'" *Smith,* 538 U.S. at 107 (2003) (Souter, J., concurring in the judgment). Justice Souter was concerned with that lack of explicitness, but the five-justice majority was not. *See id.* at 93-96, 105.

### a. GPS monitoring is not a traditional punishment.

The district court concluded that the monitoring is like a traditional punishment. The court compared it to probation, asserted that it is a system of public shaming, and suggested it is akin to branding because the bracelet may irritate an older person's skin. (Dkt. 104:20-25.) But the monitoring is not like any of these things. Traditional punishments are incarceration or, in the past, a person being "held . . . up before his fellow citizens for face-to-face shaming or [being] expelled . . . from the community." *Smith*, 538 U.S. at 98. That is not the case here.

The apparent majority view is that GPS monitoring of sex offenders is not punishment. *See State v. Trosclair*, 89 So. 3d 340, 355 & n.7 (La. 2012) (noting the majority view). Among these cases is *Bowditch*, which upheld a North Carolina law similar to Wisconsin's, except for the fact that North Carolina's law came with greater burdens. *See* 700 S.E.2d at 4-5 (automatic ninety-day maintenance visits; six hours of recharging every day; restrictions on submerging the ankle bracelet in water of three feet or more).

Likewise, the Sixth Circuit concluded that Tennessee's more burdensome monitoring technology did not resemble a punishment. *See Bredesen*, 507 F.3d at 1001, 1004-07. The court came to that conclusion even though it addressed a GPS device that was significantly larger (6 x 3.75 x 1.75 inches)

than Wisconsin's technology (2.5 x 3.5 x 1.5 inches), and that came with greater inconveniences and potential embarrassments—including needing to step outside occasionally, wearing the device outside outer garments, and not getting it wet—that are not required with Wisconsin's technology. *Id.* at 1002, 1005. (Dkt. 68, ¶ 35; Dkt. 98, ¶¶ 45-46, 53.)

The district court here relied on a New Jersey Supreme Court case, but that case is off point. (Dkt. 104:21.) It described a different GPS program that seemingly was modeled on probation. *See Riley v. N.J. State Parole Bd.*, 98 A.3d 544, 546-48 (N.J. 2014). Unlike Wisconsin's law, the New Jersey law came with "a monitoring parole officer," "restrictions on [the registrant's] freedom to travel," and had characteristics equivalent to "parole supervision for life by another name," such as being required to report to the monitoring officer and allow the officer into the home for various reasons. *Id.*

Belleau's monitoring is not like probation or parole. It does not forbid him from going where he pleases. (Dkt. 68, ¶ 12; Dkt. 98, ¶¶ 31-41.) It does not require Belleau to report to or avoid particular places or people; to refrain from certain activities (such as consuming alcohol); or to complete certain lifestyle-related activities (such as maintaining employment or providing urine samples). And it does not come with the powers of revocation.

Rather, the GPS device simply indicates where Belleau is on a map. (Dkt. 68, ¶¶ 12, 23, Ex. A-D.) Belleau must wear the device at all times, must

charge it, and very rarely must make arrangements to have a technician repair it. (Dkt. 104:21-22.) These things are burdens, but this does not equate to probation in a substantial way.

The district court also raised the traditional punishment of "public shaming" as a factor, but that discussion is inconsistent with *Smith v. Doe.* (Dkt. 104:22-24.) Embarrassment or shaming is not an ex post facto problem when it is merely a "collateral consequence" of a regulation designed for another purpose. *Smith*, 538 U.S. at 99. That is true even if leads to "social ostracism." *Id.*

Here, there is no evidence that the monitoring is meant to shame; it is meant to reduce recidivism and, potentially, help sort out future crimes. Any potential embarrassment is therefore collateral. Further, with GPS, a person would not automatically know that the wearer is a sex offender, as similar devices might be worn in a number of contexts or for other offenses. (Dkt. 98, ¶¶ 42-43.) As the court noted in *Bredesen*, an observer would not automatically understand that a wearer is a sex offender. *Bredesen*, 507 F.3d at 1005.

The district court also referenced Belleau's assertion that the GPS bracelet has caused him discomfort by rubbing his skin. The court related that to "branding," which appears to be a reference to *Smith*'s statement about "[p]unishments such as whipping, pillory, and branding [that] inflicted

physical pain and staged a direct confrontation between the offender and the public." *Smith*, 538 U.S. at 98. But Belleau does not allege he is in the kind of physical pain that *Smith* referenced, much less that the rubbing "stage[s] a direct confrontation." The record also reflects that DOC will adjust the band or move it to the other ankle by request, and that Belleau apparently has made no such request. (Dkt. 98, ¶ 47.)

Lastly, the district court referenced the monthly fee for GPS monitoring. The court stated that the fee "has the effect of a fine" and "support[s] the conclusion that the measure is punitive." (Dkt. 104:24-25.) Those statements are inconsistent with this Court's recent holding that Wisconsin's sex offender registry fee is not punitive because it offsets a cost created by the registrant. *See Mueller*, 740 F.3d at 1135 ("As they are responsible for the expense, there is nothing punitive about requiring them to defray it.").

Even putting aside other administrative costs, the $50-per-month fee is well below the $135 monthly rental cost for his GPS unit alone. (Dkt. 98, ¶ 57.) As this Court stated, plaintiffs "cannot get to first base without evidence that [an alleged fine] is grossly disproportionate to the annual cost of keeping track of a sex offender registrant." *See Raemisch*, 740 F.3d at 1134. The fee here is not close to being disproportionate.

In sum, the traditional punishment factor favors upholding the GPS monitoring as nonpunitive. (*See* Dkt. 104:20.)

- 36 -

**b.    GPS monitoring does not impose a legally sufficient disability or restraint.**

The second factor asks if the regulation imposes a legally sufficient disability or restraint. The district court concluded that there was "little question that GPS tracking does so," but that conclusion is in tension with the case law. (Dkt. 104:25.) Not every restraint or burden is a legally sufficient restraint for ex post facto purposes.

Under the ex post facto cases, the restraint need be more than "minor and indirect." *Smith*, 538 U.S. at 100. The paradigmatic instance of a legally significant physical restraint is imprisonment. *Id.* Indeed, prior to *Smith*, the Supreme Court has found occupational disbarment not to reach the level of a legally significant disability or restraint. *See id.* (citing *Hudson v. U.S.*, 522 U.S. 93, 104 (1997)). And in the context of upholding sex offender registry burdens, the Court explained that a registry is not an ex post facto restraint because, unlike prison, it merely requires reporting and updating where the person lives and works; it does not force someone to *be* in a certain location. *Id.* at 101-02. In applying *Smith* to the GPS context, the *Bredesen* court concluded that Tennessee's GPS law similarly did not impose punitive restraints in violation of the Ex Post Facto Clause. *Bredesen*, 507 F.3d at 1005.

Here, Belleau must wear an ankle bracelet, which comes with some burdens. But it does not physically prevent him from leaving his house or otherwise force him to be in a certain location. (Dkt. 67:20.) It weighs about eight ounces and must be charged about one hour per day. (Dkt. 68, ¶¶ 35-36; Dkt. 98, ¶¶ 45-47, 53.) Plugging in a cord is inconvenient, but Belleau is not required to charge his GPS bracelet in a particular location, and the charging cord is sufficiently long that, in a photo submitted by Belleau, the excess length is coiled on the floor as he lies on a bed. (Dkt. 101, ¶¶ 84-85; Dkt. 76-1.)

The district court also relied on the idea of "exclusion" and "inclusion" zones (*see* Dkt. 104:26), which may control where some offenders go *if* they are also on probation, parole, or other supervised release. (*See* Dkt. 98, ¶¶ 30-31.) But Belleau is not one of those people. (Dkt. 98, ¶¶ 30-31, 41.) The undisputed evidence was that Belleau had no zones whatsoever that controlled where he could go or where he had to be. (Dkt. 98, ¶¶ 30-31, 41.) It is true that someone who is off supervision *might* have a version of an "exclusion" zone, but the word "exclusion" is a misnomer in that instance. For those off supervision, "exclusion" zones only relay information—that the registrant is in a certain sensitive area, such as near a victim's residence— but they do not prevent the registrant from entering the zone, and there is no penalty. (Dkt. 98, ¶¶ 31, 41.) In any event, this is an as-applied challenge;

Belleau is not subject to even these non-binding zones and so lacks standing to challenge them.

Belleau's GPS monitoring neither forbids Belleau's movement from one place to another, including out of Wisconsin altogether, nor requires him to affirmatively enter certain places at designated times. (Dkt. 98, ¶¶ 31-41.) It is a burden, but not a legally significant restraint.

### c.    GPS monitoring does not promote traditional aims of punishment.

The next factor asks whether the law "promotes the traditional aims of punishment." *Smith*, 538 U.S at 97. The GPS law, which is designed to protect public safety, does not run afoul of this factor.

GPS monitoring is not retributive. The Supreme Court has concluded that categorically imposing requirements on sex offenders is not retributive where, as here, the goal is regulatory and related to the danger of recidivism. *Smith*, 538 U.S at 102. It is true that the GPS law aims to reduce recidivism, and deterrence is sometimes a purpose of punishment. *Id.* But, importantly, it is also an aim of regulation. *Id.* As the Supreme Court observed: "Any number of governmental programs might deter crime without imposing punishment." *Id.* Here, deterrence is a regulatory aim, not a punitive one, meaning this factor does not support Belleau's claim. *See id.*; *see also Bredesen*, 507 F.3d at 1005 (stating the same as to Tennessee's law).

> **d.    The GPS law has a rational connection to a nonpunitive purpose.**

The next factor is among the "[m]ost significant": whether the GPS law has a "rational connection to a nonpunitive purpose." *Smith*, 538 U.S. at 102 (citation omitted). The district court correctly recognized that "there is little doubt that the law is rationally related to the purpose of protecting the public from people who have committed sex offenses." (Dkt. 104:28.) Given the rational connection to a nonpunitive aim, there is no good reason to credit Belleau's assertions that this is a punishment in disguise.

Like sex offender registries, the GPS law has the nonpunitive purpose of public safety. *See Smith*, 538 U.S. at 102-03. As applied to Belleau, it has the goal of reducing recidivism in someone proven to be a repeat child sex offender, who has been adjudicated in the past as likely to reoffend, and who has an underlying (and untreated) mental condition. (Dkt. 98, ¶¶ 1-26.) It has the secondary aim of helping figure out future crimes, if any. That, too, is not aimed at punishing past crimes.

It is rational to think that a person meeting Belleau's description would pose significant risks when allowed back into society. Indeed, the evidence was that Belleau will always pose a greater risk than a member of the general population (Dkt. 98, ¶¶ 20, 23-24), and the general statistics cited above also support that evidence.    *See supra* Part I.B. It is rational to think

that overt GPS monitoring has a potential to deter some crimes that would otherwise occur. The studies cited above include references to "24 percent" reductions in recidivism, and non-monitored groups with re-offense rates "more than twice as high" as a monitored group. *See supra* Part I.B. At a minimum, these kinds of studies show that the legislative choice to monitor is rational. This significant factor does not support Belleau's claim.

### e.    It is not excessive to apply the GPS law to Belleau.

The last factor asks if the law "is excessive with respect to [the] purpose." *Smith*, 538 U.S. at 97. The GPS law is not. For the monitoring to serve its purpose, it is necessary that the tracking occur continuously. Otherwise, the registrant would know he could reoffend at some times or places without detection, removing the potential to reduce recidivism.

The GPS monitoring program is constructed to serve that purpose, and nothing more. It does not restrict where Belleau may choose to travel or reveal what Belleau is doing in particular. (Dkt. 68, ¶¶ 12, 23, Ex. A-D; Dkt. 98, ¶¶ 31-41.)  Rather, it requires him to wear a bracelet so that an electronic map reveals where he is, in a general sense: the images, even at full zoom, merely show scattered dots and roofs of buildings. (Dkt. 68, ¶ 23, Ex. D.) No doubt the bracelet and mapping is undesirable from Belleau's

perspective, but it must be viewed in light of the circumstances and purpose of the law. GPS is not an excessive measure as applied to Belleau.

Of course, as the district court pointed out, no one can know for certain if a particular person will reoffend. (*See* Dkt. 104:29.) But that also holds true when it comes to civil commitment of sex offenders. Yet a significant likelihood (not certainty) of re-offense has been upheld as reason enough to civilly *commit* certain sex offenders without running afoul of the Ex Post Facto Clause. *See Kansas v. Hendricks*, 521 U.S. 346, 357 (1997) (multiple-offense pedophile civilly committed based on "a likelihood" of future offense). The State acknowledges that Belleau no longer met Wisconsin's standard for civil commitment, but it does not automatically follow that *all* state regulation of Belleau must then end.

Belleau bears a heavy burden to overturn a law as unconstitutional. It makes sense that there is a high bar. The question of how to handle people like Belleau is not an easy one. A legislature could properly conclude that someone with his history should never leave prison. Here, the legislature has struck a different balance that gives someone like Belleau another chance to be out. It is reasonable to impose regulatory safeguards to make that approach more workable for society, especially given the stakes.

## III. Belleau's equal protection claim fails.

Belleau also pled an equal protection claim, although the district court did not reach it in its summary judgment decision.[10] (Dkt. 34:13-14, ¶¶ 48-52.) The claim has no merit.

Belleau alleges that the GPS monitoring law draws an unconstitutional distinction between registrants who can eventually petition for removal of the device and offenders like Belleau who cannot. By statute, other covered sex offenders can petition for removal of GPS after twenty years, but previously civilly committed registrants are excluded from that petition option. *See* Wis. Stat. § 301.48(2)(b) and (6)(b)3.[11]

---

[10] In addition, Belleau pled a procedural due process claim that challenged inclusion and exclusion zones. (Dkt. 34:14-15 ¶¶ 53-58.) Belleau abandoned that procedural due process claim at summary judgment. Even if he had not abandoned it, it would have failed because, as discussed earlier in the brief, Belleau is not subject to inclusion and exclusion zones. He thus has no standing to raise the issue.

[11] Wisconsin Stat. § 301.48(6) states:

> **(6)** OFFENDER'S PETITION TO TERMINATE LIFETIME TRACKING.
> (a) Subject to par. (b), a person who is subject to lifetime tracking may file a petition requesting that lifetime tracking be terminated. A person shall file a petition requesting termination of lifetime tracking with the circuit court for the county in which the person was convicted or found not guilty or not responsible by reason of mental disease or defect.
> . . .
> 3. A person described in sub. (2) (b) may not file a petition requesting termination of lifetime tracking.

Wis. Stat. § 301.48(2)(b) includes formerly civilly committed persons like Belleau whom a "court discharges . . . under s. 980.09(4)."

Belleau acknowledged that the rational basis standard applies to this claim. (Dkt. 34:13-14, ¶52.) Under rational basis, "a law will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous." *Romer v. Evans*, 517 U.S. 620, 632 (1996). Further, Belleau must first show that he was treated less favorably than other similarly situated persons or groups. *See Srail v. Vill. of Lisle, Ill.*, 588 F.3d 940, 943 (7th Cir. 2009) (stating elements).

Belleau is not similarly situated to individuals who may petition for removal of the device: formerly civilly committed 980 patients are, by definition, those that were diagnosed with a mental disorder and a heightened risk of future sexual violence. *See* Wis. Stat. § 980.01(6)-(7); Wis. Stat. § 980.06. The same cannot be said for non-980 sex offenders who have the twenty-year petition option. A sexually violent individual under Wis. Stat. ch. 980 has been "convicted of a sexually violent offense . . . and is dangerous because he or she suffers from a mental disorder that makes it likely that the person will engage in one or more acts of sexual violence." Wis. Stat. § 980.01(7). The definition of "sexually violent offense" is a list of qualifying serious sex crimes. Wis. Stat. § 980.01(6). These crimes are all sexually motivated felonies that relate to physical contact or harm, or intent to engage in such contact or inflict such harm. *Id*. Thus, by definition,

980 patients committed one of a list of specific sexually violent offenses, and were found by a jury or court to have a heightened risk of future sexual violence. Other sex offenses, like possessing child pornography or statutory rape, are not included in this list, and cannot form a basis for a 980 commitment.

So, former 980 patients are distinct from non-980 patients because (1) they have committed one of a specific list of serious sex crimes, and (2) they have been found dangerous because they suffer from a mental disorder that makes it likely that the person will again engage in one or more acts of sexual violence. Wis. Stat. § 980.01(7). Thus, Belleau cannot establish that former 980 patients are similarly situated to other GPS offenders subject to the 20-year petition, and his equal protection claim fails.

Further, Belleau's claim fails because there is a rational basis supporting treating 980 patients differently. Rational basis review is "highly-deferential." *Turner v. Glickman*, 207 F.3d 419, 426 (7th Cir. 2000). It is reasonable for the State to believe that a person with a mental disorder of a sexual nature, who has committed a sexually violent offense, is more dangerous than other sex offenders for a longer period of time and, therefore, requires lifetime monitoring. Because this is rational, the equal protection claim fails.

## CONCLUSION

For the reasons stated, the defendants respectfully request that this Court reverse the district court's granting of summary judgment to Belleau and its denial of summary judgment for the defendants.

Dated this 16th day of November, 2015.

BRAD D. SCHIMEL
Attorney General

*s/Anthony D. Russomanno*
ANTHONY D. RUSSOMANNO
Assistant Attorney General
State Bar #1076050

ABIGAIL C. S. POTTS
Assistant Attorney General
State Bar #1060762

Attorneys for Defendants-Appellants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 267-2238 (*AAG Russomanno*)
(608) 267-7292 (*AAG Potts*)
(608) 267-2223 (fax)
*russomannoad@doj.state.wi.us*
*pottsac@doj.state.wi.us*

## CERTIFICATE OF SERVICE

I certify that on November 16, 2015, I electronically filed the foregoing Brief of Defendants-Appellants with the clerk of court using the CM/ECF system, which will accomplish electronic notice and service for the following participants in the case, who are registered CM/ECF users:

Attorney James A. Walrath
Attorney Laurence Jacques Dupuis

Dated this 16th day of November, 2015.

*s/Anthony D. Russomanno*
ANTHONY D. RUSSOMANNO
Assistant Attorney General

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

**X**     This brief contains 10,741 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

___     This brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

**X**     This brief has been prepared in a proportionally spaced typeface using **Microsoft Word 2007** in **13 point Century Schoolbook**, or

___     This brief has been prepared in a monospaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style].

Dated this 16th day of November, 2015.

_s/Anthony D. Russomanno_
ANTHONY D. RUSSOMANNO
Assistant Attorney General

## CERTIFICATE OF COMPLIANCE WITH APPENDIX REQUIREMENTS

I hereby certify that all materials required by Fed. R. App. P. 30(a) & (b) and 7th Cir. R. 30(a) & (b) are included in the required short appendix, including a copy of the judgment or order under review and any opinion, memorandum of decision, findings of fact and conclusions of law, oral statement of reasons delivered by the trial court or administrative agency upon the judgment, decree or order.

Dated this 16th day of November, 2015.


*s/Anthony D. Russomanno*
ANTHONY D. RUSSOMANNO
Assistant Attorney General