No. 15-3225
———————

## IN THE UNITED STATES COURT OF APPEALS

## FOR THE SEVENTH CIRCUIT

MICHAEL J. BELLEAU,

   Plaintiff-Appellee,

   v.

EDWARD F. WALL and
DENISE SYMDON,

   Defendants-Appellants.

## DEFENDANTS-APPELLANTS' SEPARATE APPENDIX

BRAD D. SCHIMEL
Attorney General

ANTHONY D. RUSSOMANNO*
Assistant Attorney General
State Bar #1076050

ABIGAIL C. S. POTTS
Assistant Attorney General
State Bar #1060762

Attorneys for Defendants-Appellants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 267-2238 (*AAG Russomanno*)
(608) 267-7292 (*AAG Potts*)
(608) 267-2223 (fax)
*russomannoad@doj.state.wi.us**Counsel of Record
*pottsac@doj.state.wi.us*

## CERTIFICATE OF COMPLIANCE WITH
## APPENDIX REQUIREMENTS

I certify that all materials required by Fed. R. App. P. 30 (a) & (b) and 7th Cir. R. 30(a) & (b) are included in this separate appendix.

Dated this 16th day of November, 2015.

*s/Anthony D. Russomanno*
ANTHONY D. RUSSOMANNO
Assistant Attorney General
State Bar #1076050

ABIGAIL C. S. POTTS
Assistant Attorney General
State Bar #1060762

Attorneys for Defendants-Appellants

# INDEX TO APPENDIX

Judgment in a Civil Case
*Michael J. Belleau v. Edward F. Wall, et al.*
U.S. District Court – Eastern District
Case No. 12-C-1198
dated September 28, 2015 (Docket 106) ............. D-A APP. 001-002

Decision and Order on Summary Judgment
*Michael J. Belleau v. Edward F. Wall, et al.*
U.S. District Court – Eastern District
Case No. 12-C-1198
dated September 21, 2015 (Docket 104) ............. D-A APP. 003-046

AO 450 (Rev. 5/85) Judgment in a Civil Case ●

# United States District Court

## EASTERN DISTRICT OF WISCONSIN

MICHAEL J. BELLEAU,
        Plaintiff,

**JUDGMENT IN A CIVIL CASE**

v.

Case No. 12-C-1198

EDWARD F. WALL and
DENISE SYMDON,
        Defendants.

---

☐   **Jury Verdict.** This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

☒   **Decision by Court.** This action came before the Court for consideration.

   **IT IS HEREBY DECLARED** that the Defendants' enforcement of the State's GPS Tracking law, Wis. Stat. § 301.48, against Plaintiff Michael J. Belleau violates his rights under the Ex Post Facto Clause and Fourth Amendment to the United States Constitution.

   **IT IS THEREFORE ORDERED** that the Defendants, or their agents, remove the GPS Tracking device from the person of Michael J. Belleau within 48 hours after the stay hereinafter entered is lifted.

   **IT IS FURTHER ORDERED** that the Defendants are enjoined from requiring Plaintiff to comply with Section 301.48 of the Wisconsin Statutes except as punishment for a future crime or upon issuance of a warrant based on a finding of probable cause.

**IT IS FURTHER ORDERED** that this judgment is stayed for an initial period of 10 days to allow the Defendants to file a notice or appeal and a motion for a stay with the United States Court of Appeals for the Seventh Circuit. In the event the Defendants file a motion for a stay with the Court of Appeals within such time, the stay will continue pending a decision by the Court of Appeals on the Defendants' motion.

Approved:     s/ William C. Griesbach
_____
William C. Griesbach, Chief Judge
United States District Court

Dated: September 25, 2015.

JON W. SANFILIPPO
Clerk of Court

s/A. Wachtendonck
_____
(By) Deputy Clerk

2

D-A App.  002

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MICHAEL J. BELLEAU,

                    Plaintiff,

        v.                                          Case No. 12-CV-1198

EDWARD F. WALL and
DENISE SYMDON,

                    Defendants.

## DECISION AND ORDER ON SUMMARY JUDGMENT

In 2006, Wisconsin enacted a law requiring certain persons who have been convicted of a serious child sex offense to wear a global positioning system (GPS) tracking device for the rest of their lives. Wis. Stat. § 301.48 (2013–2014). The law became effective on July 1, 2007. The question presented in this case is whether that law can be constitutionally applied to a person whose crimes occurred almost twenty years before the law was enacted and who is no longer under any form of court ordered supervision.

Plaintiff Michael Belleau originally filed this action pro se against the assistant district attorney who represented the State in a previous proceeding against him. Because of the importance of the issues raised by the case, counsel was recruited to assist him. In an amended complaint filed thereafter, Edward F. Wall, Secretary of the Wisconsin Department of Corrections (DOC), and Denise Symdon, Administrator of the Division of Community Corrections, were substituted as defendants, both in their official capacities. The amended complaint alleges that the defendants

(hereinafter "the State") violated Belleau's rights under the Ex Post Facto Clause, and the Fourth and Fourteenth Amendments to the United States Constitution by subjecting him to lifetime GPS tracking pursuant to Section 301.48. It seeks a declaration to that effect and an injunction enjoining the State from enforcing Section 301.48 against Belleau. Based upon the facts set forth below, most of which are taken from their stipulation, the parties have filed cross motions for summary judgment. For the reasons that follow, Plaintiff's motion will be granted and the State's motion denied.

## BACKGROUND

In 1992 Michael Belleau was convicted of second degree sexual assault of a child. The charge was based on allegations that Belleau had sexually assaulted a boy over the course of five years, beginning when the boy was eight years old. The judgment of conviction shows an offense date of between October 23, 1987 and January 23, 1988. Aff. of Abigail C. Potts, Ex. 1011, ECF No. 61-2. Despite the severity of the offense, sentence was withheld and Belleau was placed on probation for a term of five years with conditions that he spend one year in the county jail and undergo treatment. In 1994 Belleau was convicted of having committed the crime of first-degree sexual assault of a nine-year-old girl on June 1, 1988. *Id.* For this crime, Belleau was sentenced to ten years in prison. Belleau was paroled in December 2000, but his parole was revoked and he was returned to prison as of October 1, 2001, after he admitted that he had contact with two girls ages four and five; that he had sexual fantasies about them; and that he would have molested the girls if given the opportunity. The conduct did not result in any new criminal charges, and Belleau's sentence for his previous conviction expired on January 3, 2005.

2

Prior to the expiration of his sentence, the State filed a petition in Brown County Circuit Court seeking to have Belleau civilly committed under Chapter 980 of the Wisconsin Statutes as "a sexually violent person." "A sexually violent person" is defined in Chapter 980 as "a person who has been convicted of a sexually violent offense . . . and who is dangerous because he or she suffers from a mental disorder that makes it likely that the person will engage in one or more acts of sexual violence." Wis. Stat. § 980.01(7). A "sexually violent offense" is any felony sexual assault as well as other serious felonies that appear to have been sexually motivated. *Id.* § 980.01(6). The term "mental disorder" is defined as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." *Id.* § 980.01(2). Though it is not a criminal proceeding, a person who is the subject of a petition under Chapter 980 has the right to many of the same procedural protections as a person charged with a crime, including the right to counsel, pretrial discovery, and a trial with the right to present and cross-examine witnesses, and in which the petitioner carries the highest burden of proof (beyond a reasonable doubt) and needs a unanimous jury verdict to prevail. Wis. Stat. §§ 980.03(2), (3) & 980.05. Upon a determination that he is a sexually violent person, the person is committed to the custody of the Wisconsin Department of Health Services for control, care, and treatment until he is no longer a "sexually violent person." Wis. Stat. § 980.06.[1] On or about September 15, 2004, a jury determined that Belleau met the standard for commitment under

---

[1] State procedures for the indefinite civil commitment of persons previously convicted of sexual assault who have completed their sentences and are not suffering from mental illnesses absolving them of criminal responsibility for their crimes were upheld by the United States Supreme Court against due process, double jeopardy, and ex post facto challenges in *Kansas v. Hendricks*, 521 U.S. 346 (1997), and *Kansas v. Crane*, 534 U.S. 407 (2002).

3

Chapter 980, and he was committed to Sand Ridge Secure Treatment Center in Mauston, Wisconsin.

Every twelve months, a person committed under Chapter 980 is entitled to a reexamination to determine whether the offender has made sufficient progress to be released on supervision or discharged. Wis. Stat. § 980.07. On February 12, 2010, Dr. Richard Ellwood, a psychologist in the Sand Ridge Evaluation Unit, completed an annual examination of Belleau pursuant to Section 980.07. Dr. Ellwood diagnosed Belleau with pedophilia based on the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 4th Ed., Text Revision DSM-IV-Tr, American Psychiatric Association (2000), and Belleau's history of offenses. According to Dr. Ellwood, the general understanding within the psychiatric profession is that pedophilia in adults cannot be changed. In Dr. Ellwood's opinion, Belleau's pedophilia is a mental disorder that predisposes him to commit sexually violent acts. Notwithstanding his diagnosis of pedophilia, however, Dr. Ellwood concluded that Belleau did not meet the criteria for continuation of his commitment under Chapter 980.

Dr. Ellwood arrived at this conclusion based on Belleau's score on the Static-99R, an actuarial risk assessment tool. "Essentially, actuarial risk assessment tools are methods of scoring individuals on a continuum of risk using risk-related attributes, such as drug use, criminal offense history, employment status, and childhood exposure to physical or sexual abuse, among others." Eric Silver and Lisa L. Miller, *A Cautionary Note on the Use of Actuarial Risk Assessment Tools for Social Control*, 48 CRIME & DELINQUENCY 138, 139 (2002). Actuarial risk assessment tools are commonly used in an attempt to predict whether a given offender will recidivate, i.e., commit another offense. *See generally*, Tracy Bateman Farrell, J.D., Annotation, *Admissibility of Actuarial*

4

*Risk Assessment Testimony in Proceeding to Commit Sex Offender*, 20 A.L.R. 6th 607 (2006).[2] Dr. Ellwood scored Belleau on the Static-99R at 0, which is a low risk range that, according to the source of recidivism rates Dr. Ellwood used, corresponded to a 7% chance of Belleau being charged or convicted of a new sex offense within 5 years of release from custody and a 13% chance within 10 years.[3] Aff. of Dr. Richard W. Ellwood, Ex. 1005, ECF No. 73. Although Belleau scored higher on the MnSOST-R, another actuarial risk assessment tool, Dr. Ellwood gave less weight to that score because of the MnSOST's greater margin of error and the fact that it did not account for the effect of aging as did the Static-99R. Since Belleau was sixty-seven years old at the time, the latter fact would appear especially significant. And while he also factored into his evaluation a number of dynamic risk factors, such as Belleau's failure to complete treatment and his earlier expressed attitude toward his offenses, Dr. Ellwood concluded that they did not "substantially alter the low to moderate risk indicated by the static factors." ECF No. 73 at 6. Because his evaluation did not

---

[2] Actuarial risk assessment tools are generally considered more accurate than the clinical judgment of a psychologist, the alternative method of predicting future offenses. But as one court has noted, "[w]hile actuarial risk assessments are said to outperform clinical risk assessments, actuarial assessments do not, and cannot, purport to make a prediction of a particular offender's future conduct." *Ohio v. Ellison*, No. 78256, 2002 WL 1821927, *2 (Ohio Ct. App. Aug. 8, 2002) (unpublished). Indeed, as the same court noted, "[t]he STATIC-99 cannot purport to make an individualized assessment of future conduct any more than a life expectancy table can provide an accurate prediction of a particular individual's longevity." *Id.* The reason is obvious: the fact that a certain number of individuals that fit a given profile are likely to recidivate does not tell us which individuals will and which will not because for each it is a matter of his own choice.

[3] Assuming the Static-99R is accurate, a controversial assumption in itself, *see* Helmus, Hanson, Thornton, et al, *Absolute Recidivism Rates Predicted By Static-99R and Static-2002R Sex Offender Risk Assessment Tools Vary Across Samples: A Meta-Analysis*, 39 CRIMINAL JUSTICE AND BEHAVIOR 1148, 1164 (2012), the results obtained by Dr. Ellwood mean that over a period of five years, seven individuals out of a hundred meeting the same profile as Belleau would be expected to reoffend. Over ten years, the expected number would be thirteen out of one hundred. In other words, over the same five-year period, ninety-three persons fitting the same profile would not be expected to reoffend and over a ten-year period, eighty-seven would not.

show that Belleau was more likely than not to commit a sexually violent act if he were released, Dr. Ellwood concluded that he did not meet the requirements for continued commitment under Chapter 980.

Based on Dr. Ellwood's evaluation, the State stipulated that it could not prove that Belleau was a sexually dangerous person, and on July 2, 2010, the Circuit Court of Brown County entered an order discharging Belleau from his Chapter 980 commitment pursuant to Section 980.09(4). The discharge was made effective July 7, 2010, however, to allow the DOC time to install a GPS monitoring device on Belleau after the holiday weekend.

Section 301.48, which was enacted as 2005 Act 431 by the Wisconsin legislature in 2006 and became effective on July 1, 2007, established a continuing GPS tracking system operated by the DOC to electronically monitor the whereabouts of persons who have been convicted of serious child sex offenses. GPS tracking is defined as "tracking using a system that actively monitors and identifies a person's location and timely reports or records the person's presence near or at a crime scene or in an exclusion zone or the person's departure from an inclusion zone." Wis. Stat. § 301.48(1)(b). The GPS tracking and monitoring law provides that persons, like Belleau, who are discharged from Chapter 980 civil commitment by a court order under Section 980.09(4) are subject to lifetime GPS monitoring. Wis. Stat. § 301.84(2)(b)2.

Belleau was released from the Brown County Jail on the morning of July 7, 2010, before the DOC agents arrived. He was located at a nearby bus stop, and without any warrant or other court order, the DOC agents quickly escorted him back to the jail where they proceeded to attach a 2.5 x 3.5 x 1.5 inch GPS tracking device to him with a black neoprene rubber strap that is wrapped around his right ankle. In doing so, the agents were acting under the authority of the

6

statute alone. Under that same authority, Belleau is now required to wear the device 24 hours per day, seven days a week, for the rest of his life. If he "intentionally tampers with, or blocks, diffuses, or prevents the clear reception of, a signal transmitted by" the device, he is guilty of a Class I felony, punishable by three-and-a-half years in prison and a $10,000 fine. Wis. Stat. §§ 946.465, 939.50.

The GPS tracking device Belleau is required to wear is an ExacuTrack One, which was provided by BI Incorporated, the vendor with which the DOC contracts for the tracking hardware and software it uses to comply with Section 301.48. The device is powered by rechargeable batteries that are designed to last about three years, but must be charged for approximately one hour in each 24-hour period. To charge the batteries, Belleau must connect one end of a charging cord to the device and plug the other end into an electrical outlet. Since he is not allowed to remove the device from his ankle, he must remain close by while the batteries are being charged. The device is waterproof and can be submerged to a depth of fifteen feet, allowing showering and bathing without removal, but it can rub against and cause discomfort and occasional blistering to the skin of his ankle. It also makes dressing more difficult. On occasion, GPS technicians go to Belleau's house to change the batteries or service the unit. Repairs have taken as long as an hour.

Though relatively small, the device creates a noticeable bulge under the wearer's pants leg and can become visible if his pants leg raises up, such as when the wearer sits or bends down. Several people have indicated to Belleau that they noticed the device and inferred that he is a sex offender. At least one has brandished a gun and warned him to stay away, while others have simply stopped talking to him. Because it is plainly visible if he wears shorts, he does not wear shorts in public. The device does not allow DOC monitors to listen in on Belleau's conversations, but they

7

can transmit messages to him. DOC monitors can send messages such as "call your officer now"; low battery, recharge unit"; "report to the office immediately"; and "remember your appointment" to the person wearing the device. The only message Belleau has received, however, is a non-verbal low battery alert. In any event, if received in public, these messages can also convey the fact that Belleau is wearing a monitoring device and invite closer scrutiny.

Belleau is considered by the DOC a "maximum discharge" registrant subject to GPS monitoring. Maximum discharge registrants are those who have completed and been discharged from their sentences and/or commitments, and thus DOC has no direct authority over them by virtue of any court judgment or order. Maximum discharge registrants have their locations tracked and recorded in real time, but their current locations are not monitored in real time, other than when real time alerts are received for tampering, a low battery, when the registrant leaves the State, or in those limited instances where a maximum discharge registrant has an exclusion zone and enters and remains in that zone. Typically, the DOC's GPS Monitoring Center monitors maximum discharge registrants retroactively every 24 hours. This is done at night, where a DOC employee ("Operator") assigned a set of maximum discharge registrants views a Bing computer map using Total Access software, which displays points showing the locations and movements of a particular person over the last 24 hours.

Although the law requires the DOC to create "for each person who is subject to global positioning system tracking" individualized inclusion zones, which the person is prohibited from leaving, and exclusion zones, which he is prohibited from entering except to pass through, "if necessary to protect public safety," Wis. Stat. § 301.48(3)(c), maximum discharge registrants like Belleau are generally not given exclusion zones and are not required to remain in inclusion zones.

8

It is undisputed that Belleau does not currently have any exclusion zones. However, DOC Administrative Directive #13-08 states: "Exclusion zones may also be imposed if deemed appropriate by the GPS Specialist and approved by the Sex Offender Programs Director, i.e. school zones, parks, daycares, etc." This Directive applies to maximum discharge registrants. If an exclusion zone is created for a maximum discharge registrant like Belleau, an alert will be generated at the DOC's GPS Monitoring Center and an Operator will notify a GPS Specialist if he remains in the exclusion zone beyond the time needed to pass through. But because DOC has no direct authority over maximum discharge registrants, its agents could not take Belleau into custody or order that he be taken into custody solely because of entry into an exclusion zone. The Specialist may instead contact the registrant by telephone, proceed to the location to investigate, or ask law enforcement to do so.

Section 301.48 also requires the DOC to determine the cost of the GPS tracking system for each person subject to the law and to assess a fee based on the ability of the person to pay that cost, considering his financial resources, present and future earning capacity, the needs and earning capacity of his dependents, and any other obligations or relevant factors. The DOC is then tasked with collecting from the person the entire cost or such portion of it that it determines he can pay. Wis. Stat. § 301.48(4). Despite the fact that Belleau's income was limited to a Social Security check, he was notified in September 2011 that he would have to pay a $240 per month GPS tracking fee. Based on Mr. Belleau's income, his tracking fee has subsequently been determined to be $50 per month.

9

## ANALYSIS

It is important to note at the outset what this case is not about. It is not about whether the State can subject an individual who is convicted of sexually assaulting a child to lifetime GPS monitoring as punishment for a crime. Given the fact that one can be sentenced to life in prison for such a crime, *see, e.g.*, Wis. Stat. § 948.02(1)(am); 18 U.S.C. § 2241(c), it necessarily follows that lifetime GPS tracking, as a component of a sentence imposed for such an offense, would be lawful. The case is also not about whether a person who is currently under the lawful supervision of the State in the form of parole, probation or extended supervision in connection with a criminal conviction, or supervised release under Section 980.08, can be required to submit to such tracking while on supervision. Persons under these forms of State supervision have only a conditional liberty and are subject to the conditions, rules and regulations of the State agency with authority over them. *See State v. Tarrell*, 74 Wis.2d 647, 653–54, 247 N.W.2d 696, 700–01 (1976) ("All conditions, rules and regulations must be imposed with the dual goal of rehabilitation of the probationer and protection of the public interest. The imposition of these conditions, rules and regulations demonstrates that while a probationer has a conditional liberty, this liberty is neither as broad nor as free from limitations as that of persons who have not committed a crime.").

Nor is the question whether we would prefer that Belleau be subject to such a law. Given his prior convictions, Dr. Ellwood's diagnosis of pedophilia, and the impact of sexually assaultive crimes on children, few would not want to take any step that could reduce the risk of another offense. But pedophilia does not cause a person to sexually assault a child. If it did, Belleau and those like him would be able to avoid their convictions by pleading not guilty by reason of mental

10

disease or defect.[4] Moreover, the State has stipulated that it could not prove that Belleau had a mental disorder that made it more likely than not that he would commit an act of sexual violence in the future. It was for that reason that his Chapter 980 civil commitment was terminated. Having served his sentences for his crimes and been discharged from his civil commitment, Belleau's liberty has thus been restored, subject to the limited disqualifications, such as the right to possess a firearm, that the law expressly allows. He is, moreover, legally presumed to be free, like the rest of us, to chose whether or not to engage in criminal conduct. The question presented in this case is whether such a person who has already served his sentence for his crimes and is no longer under any form of court ordered supervision can be forced by the State to wear such a device and to pay the State for the cost of monitoring him for the rest of his life.

## I.    Ex Post Facto Clause Violation

Belleau first claims that the application of Wisconsin's GPS tracking law to him constitutes a violation of his rights under the Ex Post Facto Clause of the United States Constitution. The Constitution provides that "No state shall . . . pass any . . . ex post facto Law." U.S. CONST. art. I, § 10, cl. 1. "The ex post facto prohibition forbids the Congress and the States to enact any law 'which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed.'" *Weaver v. Graham*, 450 U.S. 24, 28–29 (1981) (quoting *Cummings v. Missouri*, 4 Wall. 277, 325–326, 18 L.Ed. 356 (1867)). That the

---

[4] Section 971.15(1) of the Wisconsin Statutes states:

A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect the person lacked substantial capacity either to appreciate the wrongfulness of his or her conduct or conform his or her conduct to the requirements of law.

11

Framers of the Constitution were particularly concerned about the dangers of ex post facto laws is clear from the prominence they gave the prohibition of such enactments, placing it in Article I, and by its emphatic prohibition: 'No state shall … pass any … ex post facto law.'" Wayne A. Logan, *The Ex Post Facto Clause And The Jurisprudence Of Punishment*, 35 AM. CRIM. L. REV. 1261, 1275 (1998). The principal reason for the Framer's concern was a matter of fairness: "Through this prohibition, the Framers sought to assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed." *Weaver*, 450 U.S. at 28–29. The Framers were also concerned about "arbitrary and potentially vindictive legislation." *Id.* at 29; *Calder v. Bull*, 3 U.S. 386, 389 (1798).

Belleau contends here that application of the State's GPS tracking law to him violates the constitutional ban on ex post facto laws because it amounts to further punishment for the crimes he committed more than twenty-five years ago. To prevail on his claim, Belleau must show that the GPS tracking statute applies retroactively with respect to his convictions and that it constitutes punishment.

## A. Retroactive Application

Though it does not address the issue in its brief in support of its own motion, the State argues in its response to Plaintiff's motion for summary judgment that the application of the GPS tracking law to Belleau is not "retroactive" punishment for his crimes because what triggered its application to him was his discharge from his civil commitment under Wis. Stat. § 980.09(4), not his criminal conduct in the late 1980s. State's Resp. Br. 5–6, ECF No. 83-1. The State notes that the law became effective on July 1, 2007, and is triggered only by events that occur after January 1, 2008. Wis. Stat. § 301.48(2)(a). In addition to convictions after that date, the law also applies

12

to individuals placed on probation, released from prison to parole or extended supervision, or released by the DOC upon completion of their sentences for serious child sex offenses after January 1, 2008. Because Belleau completed his sentences years earlier, the State contends it was neither his criminal convictions nor his release on supervision that triggered application of the GPS tracking law to him. What made Belleau subject to the law, the State contends, was the fact that he was discharged from a Chapter 980 commitment pursuant to Section 980.09(4). Wis. Stat. § 301.48(2)(b)2. Because Belleau's discharge occurred on February 7, 2010, some two-and-a-half years after the effective date of the law, the State argues it cannot be considered retroactive as to him, and thus no ex post facto violation can be found.

Of course, as Belleau points out, even if it was the discharge from his civil commitment that made him subject to lifetime GPS monitoring, it was his previous criminal convictions that made him eligible for civil commitment in the first place. Pl.'s Reply 6, ECF 100. While the State also needed to prove that he had a mental disorder that made it likely he would commit one or more acts of sexual violence in order to commit him, the State stipulated that it could no longer prove that he had such a disorder in July 2010. The Supreme Court has held that the initial offense conduct is the trigger for Ex Post Facto Clause purposes even when an additional penalty is imposed because of conduct that occurred after the law at issue was enacted. *Johnson v. United States*, 529 U.S. 694, 700–01 (2000). Here, the fact that there was no subsequent misconduct but simply a discharge of his commitment would seem to make it even more clear that the trigger is Belleau's underlying criminal conduct. This is also clear from the fact that offenders whose convictions occurred before the effective date of the statute, but who completed their sentences afterwards, are likewise required to submit to GPS tracking, even though they were never committed under Chapter 980. Wis. Stat.

13

§ 301.48(2)(a)3, 3m. The legislature clearly intended the GPS tracking law to apply retroactively to at least those individuals who were still serving their sentences or commitments at the time the law became effective, even though their convictions occurred earlier.

Moreover, an order discharging one from a Chapter 980 commitment based on the State's stipulation that it could not prove he was a sexually dangerous person, by itself, would hardly seem to justify subjecting him to lifetime GPS tracking. If accepted, the State's argument would merely shift the inquiry from whether lifetime GPS tracking amounts to punishment to whether it deprives one of a liberty interest in violation of the Due Process Clause of the Fourteenth Amendment. Compelling one to wear a GPS tracking device would certainly implicate a liberty interest within the meaning of the Due Process Clause. *See Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action."); *see also Schepers v. Comm'r*, 691 F.3d 909 (7th Cir. 2012) (holding that mislabeling person sexually violent predator on State's sex offender registry implicate liberty interest protected by Due Process Clause). And discharging a person from a civil commitment because he does not meet the criteria for involuntary commitment would hardly seem sufficient to satisfy the demands of due process for infringement of such an interest.

The State cites *Connecticut Department of Public Safety v. Doe*, 538 U.S. 1 (2003), for the proposition that Belleau received all the process that was due in the prior Chapter 980 proceeding in which he was found to be a sexually violent offender. But *Doe* dealt with a due process challenge to Connecticut's sex offender registry which was published on the Department of Public Safety (DPS) Website. The Second Circuit had held that the Due Process Clause entitles persons convicted of sexual assault to a hearing "to determine whether or not they are particularly likely to

14

be currently dangerous before being labeled as such by their inclusion in a publicly disseminated registry." *Id.* at 6 (internal quotes omitted).  In reversing the Second Circuit's decision, the Supreme Court held that no hearing was necessary because the DPS Website published only the fact of a prior conviction, not present dangerousness. Since the mere fact of the previous conviction had already been established in a proceeding meeting all of the requirements for due process, the Court held no further procedural safeguards were required. *Id.* at 7.

Here, in contrast, the State is not simply publishing the fact that Belleau was previously committed under Chapter 980; the State is forcing Belleau to wear a GPS tracking device on his ankle, and endure the burdens that go with it, for the rest of his life.  In order to restrain his liberty in this way, there must be some justification offered by the State and an opportunity for Belleau to contest it. The conclusion reached by the State psychologist that Belleau did not meet the definition of a sexually violent person and the resulting court order discharging Belleau from the civil commitment provided neither.

It is perhaps for these reasons that the State offers this argument only in response to Belleau's motion for summary judgment and fails to raise it in support of its own motion.  Instead, the State's argument in support of its own motion seeking summary judgment on Belleau's ex post facto claim focuses entirely on whether lifetime GPS tracking amounts to punishment.  For all of these reasons, I reject the State's argument that application of its GPS tracking law to Belleau is not retroactive.  Given that Belleau committed his crimes in the late 1980s, it follows that the application of Wisconsin's 2006 GPS tracking law to him is an unlawful ex post facto law if it imposes a "punishment," and it is to that question that I now turn.

15

**B. Punishment**

The framework for determining whether a regulatory scheme imposes a punishment was set out in *Smith v. Doe*, 538 U.S. 84 (2003), which addressed the constitutionality of requiring compliance with Alaska's sex offender registry law by persons who committed offenses before it became law. In determining whether such a law constitutes punishment, the first question to be decided is what the legislature intended: If the intent was to impose a punishment, the retroactive application of the law is invalid. If the intent was to enact a regulatory scheme that is "civil and nonpunitive," however, the court must dig deeper to determine "whether the statutory scheme is so punitive either in purpose or effect as to negate [the] intention to deem it civil." *Smith v. Doe*, 538 U.S. 84, 92 (2003) (quotations omitted).

**1. Legislative intent**

In determining the legislature's intent in enacting a regulatory scheme, the court first looks to the "statute's text and its structure." *Smith*, 538 U.S. at 92. "The court 'must first ask whether the legislature, in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other.'" *Id.* at 93 (quoting *Hudson v. United States*, 522 U.S. 93, 99 (1997)). Section 301.48 contains no express statement of legislative intent or disavowal of punitive intent. It only applies, however, to persons who have previously been criminally charged with serious child offenses, all or almost all of whom have been convicted of such offenses.[5] Wis. Stat. § 301.48(2). Moreover, the GPS monitoring statute is codified in Chapter 301 of the Wisconsin Statutes, which governs corrections, and the task of implementing the GPS tracking

---

[5] The statute also applies to persons who have been charged but not guilty by reason of mental disease or defect. Wis. Stat. § 301.48(2)(a)4, 5.

system the statute creates, including contracting with the hardware and software vendor, establishing inclusion and exclusion zones, monitoring the offenders, and assessing and collecting the costs, is placed on the DOC. In this respect, individuals subject to the GPS tracking statute differ from those serving commitments under Chapter 980, whose control, care, and treatment are provided by the Wisconsin Department of Health Services. Wis. Stat. §§ 980.01(1h), 980.06. As its name implies, the purpose of the DOC is provide "correction" to people who engage in criminal conduct. Persons sentenced to probation are placed in the custody of the DOC, and those sentenced to prison are likewise subject to the rules and regulations promulgated and enforced by the DOC. Wis. Stat. §§ 301.03, 973.10(1).

The legislative history also indicates that originally, the bill that became Act 431 provided for GPS tracking for individuals on probation, parole or extended supervision as part of their criminal sentences, or as a condition of supervised release from a Chapter 980 commitment. When the proposed law was expanded to apply to those who had already been sentenced, an attorney for the Legislative Reference Bureau (LRB) raised the issue that application to such persons might be viewed as increasing their penalty in violation of the Ex Post Facto Clause. Noting that other states had enacted similar laws, the sponsors of the legislation decided to proceed with the expanded version. Decl. of Laurence J. Dupuis, Exs. D & E, ECF Nos. 70-4 & 70-5.

Notwithstanding these facts, I am unable to conclude that the intent of the Wisconsin legislature in enacting Section 301.48 was to punish persons previously convicted of sexually assaulting a child. "The location and labels of a statutory provision do not by themselves transform a civil remedy into a criminal one." *Smith*, 538 U.S. at 94. Wisconsin's sex offender registry law, Wis. Stat. § 301.45, which has previously been found not to be punitive, *Doe v. Raemisch*, 895

17

F. Supp. 2d 897, 906 (E.D. Wis. 2012), *aff'd in part and rev'd in part sub nom, Mueller v. Raemisch*, 740 F.3d 1128 (7th Cir. 2014), is also located in Chapter 301 of the Wisconsin Statutes and is administered by the DOC. And like the GPS tracking statute, the sex offender registry also applies to those previously convicted of a crime. Likewise, the fact that an attorney for the LRB alerted the sponsors of the bill to the possibility that it could be challenged as an ex post facto law does not mean that the legislature intended the GPS tracking law to punish those subject to it.

On the other hand, the State credibly argues that the legislature's primary purpose in enacting Section 301.48 was the protection of the public, and its secondary purpose, also non-punitive, was to help law enforcement investigate crime (i.e., by enabling it to check whether a GPS wearer was at a crime scene). These purposes are reflected in the law. *E.g.*, Wis. Stat. §§ 301.48(6)(h) (court may grant certain offenders' petition to terminate lifetime tracking upon finding "lifetime tracking is no longer necessary to protect the public") & 301.48(1)(b) (defining GPS tracking as monitoring a person's presence in exclusion/inclusion zones or "near or at a crime scene").

Of course, the fact that the State's primary purpose is to protect the public does not mean that the regulatory scheme it created does not constitute punishment. What the State actually does to a person must matter more than its intent, whether stated or unstated. The primary form of punishment that sentencing courts impose for serious criminal offenses today is deprivation of the offender's liberty, usually by incarceration but sometimes in lesser ways like probation or parole. Depriving an offender of his liberty not only serves as punishment, it also insures that the public is protected from him. In fact, protection of the public is one of the central purposes all courts consider in imposing a sentence for a crime. *See* 18 U.S.C. § 3553(a)(1)(2); Wis. Stat.

18

§ 973.017(2)(ad). Whether a deprivation of liberty is motivated by an intent to punish for a crime or an intent to protect the public makes no difference to the person whose liberty is restrained. It is for that reason that courts do not stop with intent but also consider the effects of the regulatory scheme on the offender.

### 2. Effects of regulatory scheme

Belleau's case, then, turns on the "effects" of the law. As an initial matter, the Supreme Court has stated that only the "clearest proof" that a law's effects are punitive "will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty[.]" *Smith*, 538 U.S. at 92 (quotations omitted). The GPS tracking law has not been "denominated" civil. Whether such a high standard applies here is thus at least questionable. *See id.* at 107 (Souter, J., concurring in the judgment) ("[T]his heightened ['clearest proof'] burden makes sense only when the evidence of legislative intent clearly points in the civil direction. This means that for me this is a close case, for I not only agree with the Court that there is evidence pointing to an intended civil characterization of the Act, but also see considerable evidence pointing the other way." (citation omitted)); *see also Commonwealth v. Cory*, 911 N.E.2d 187, 194 (Mass. 2009) ("Because this is not a case where we are asked to reject the legislature's manifest intent, or negate [the State's] intention to deem [the statutory scheme] civil, we evaluate the punitive effects of the GPS requirement without placing a heightened burden on the defendant." (internal quotations and citations omitted)). Nevertheless, in this case, I find the punitive effects of the law are sufficiently clear even if Plaintiff faces the "clearest proof" burden.

In determining whether a regulatory scheme effectively imposes a punishment, courts generally consider the seven factors set out in *Kennedy v. Mendoza–Martinez*, 372 U.S. 144,

19

168–169 (1963). In *Smith*, the Supreme Court considered five of those factors in determining whether the Alaska Sex Offender Registration Act imposed a retroactive punishment on persons who had been convicted before its enactment. The five factors the Court found most relevant to its analysis included: "whether, in its necessary operation, the regulatory scheme: [1] has been regarded in our history and traditions as a punishment; [2] imposes an affirmative disability or restraint; [3] promotes the traditional aims of punishment; [4] has a rational connection to a nonpunitive purpose; or [5] is excessive with respect to this purpose." *Smith*, 358 U.S. at 97. No one inquiry, the Court held, is determinative. *Id.*

Upon consideration of these factors, *Smith* held that the effects of the Alaska statute were not so punitive as to override the legislature's non-punitive intent. *Id.* at 97–105. Analyzing GPS tracking laws similar to the one at issue in this case, other courts have applied these factors and reached different results. *Compare Doe v. Bredesen*, 507 F.3d 998 (6th Cir. 2007) (finding GPS tracking law not sufficiently punitive in effect and thus not a punishment for purposes of the Ex Post Facto Clause), *and North Carolina v. Bowditch*, 700 S.E.2d 1 (N.C. 2010) (same), *with Riley v. New Jersey State Parole Bd.*, 98 A.3d 544 (N.J. 2014) (finding GPS tracking law punitive in effect and thus holding retroactive application of law invalid under Ex Post Facto Clause); *and Cory*, 911 N.E.2d 187 (same). Upon my consideration of these same five factors here, I conclude that Wisconsin's GPS tracking requirement constitutes additional punishment.

### a. History and tradition

The first two factors, on which I place the greatest weight, support a finding that Wisconsin's GPS tracking law is punitive in effect. With respect to whether the measure has been regarded in our history and traditions as punishment, it is true that GPS tracking has not been

20

traditionally considered punishment. But that is because the technology is relatively new. What the technology makes possible—the State's supervision of individuals—has indeed been regarded as a traditional form of punishment, whether in the form of probation, parole, supervised release, or other variations of the same. *See, e.g., Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987) ("Probation, like incarceration, is a form of criminal sanction imposed by a court upon an offender after verdict, finding, or plea of guilty." (internal quote omitted)); *United States v. Knights*, 534 U.S. 112, 119 (2001) ("Probation is one point . . . on a continuum of possible punishments ranging from solitary confinement in a maximum-security facility to a few hours of mandatory community service." (internal quote omitted)). In *Smith*, the Supreme Court stated that the argument that the sex offender registration law resembles probation or supervision had "some force," but the Court ultimately rejected the analogy because offenders were "free to move where they wish . . . *with no supervision*." 538 U.S. at 101 (emphasis added). With GPS tracking, supervision is the whole point. As the New Jersey Supreme Court observed, GPS tracking "looks like parole, monitors like parole, restricts like parole, serves the general purpose of parole, and is run by the Parole Board. Calling this scheme by another name does not alter its essential nature." *Riley*, 98 A.3d at 558. Indeed, the contractor through whom DOC purchases the hardware and software it uses to implement the law has described GPS tracking technology as "prison without walls." Decl. of Laurence J. Dupuis, Ex. I, ECF No. 70-9.

      The State argues that, unlike probation or parole, a person subject to the GPS tracking law is not subject to anything like conditions of probation or the State's power to revoke. But that is not so. Belleau was required to submit to DOC agents returning him to the jail and attaching to his ankle a GPS tracking device without his permission or consent. He is now required to wear the

21

device twenty-four hours a day, seven days a week even while bathing or sleeping. If he fails to recharge the device or simply inserts cardboard between the device and his ankle to relieve the rubbing, DOC agents and/or law enforcement officers appear at his home. He is likewise required to make himself available when a technician needs to change the batteries for the device or perform repairs. Though he has not done so, should Belleau refuse to comply with these requirements and cut the device off of his ankle, he can be charged with a Class I felony, punishable by up to three and one-half years in prison and a $10,000 fine. Wis. Stat. § 946.465. But even aside from the threat of jail should he fail to comply with the State's demands, Belleau is subject to constant surveillance by the DOC for the rest of his life. In this respect, GPS tracking is more intrusive than probation or parole since, unlike those forms of supervision as traditionally implemented, it allows DOC agents to monitor Belleau's whereabouts at all times for the remainder of his life. Historically, government supervision of this intensity was only possible when a person was confined to a prison serving a sentence for a crime or in a mental health institution receiving care and treatment because of severe mental illness and the resulting loss of his faculties.

The State's GPS tracking system resembles historic forms of punishment in another way as well. In *Smith* the Court noted that public shaming, humiliation, branding and banishment were forms of punishment used in colonial times and in the early years of the republic. 538 U.S. at 97–98. *Smith* rejected the plaintiffs' arguments that Alaska's sex offender registry operated in a similar manner, noting that "[p]unishments such as whipping, pillory, and branding inflicted physical pain and staged a direct confrontation between the offender and the public." *Id.* at 98. "Even punishments that lacked the corporal component, such as public shaming, humiliation, and banishment," the Court observed, "involved more than the dissemination of information. They

22

either held the person up before his fellow citizens for face-to-face shaming or expelled him from the community." *Id.* Alaska's sex offender registry, the Court noted by contrast, involved only "the dissemination of accurate information about a criminal record, most of which is already public." *Id.*

In contrast to the sex offender registry at issue in *Smith*, the State's GPS tracking law requires Belleau to wear a device that in several respects does operate like the older forms of punishment referenced in *Smith*. As the New Jersey Supreme Court noted in *Riley*:

> Even though [the GPS tracking law]'s purpose is not to shame Riley, the "effects" of the scheme will have that result. If Riley were to wear shorts in a mall or a bathing suit on the beach, or change clothes in a public locker or dressing room, or pass through an airport, the presence of the device would become apparent to members of the public. The tracking device attached to Riley's ankle identifies Riley as a sex offender no less clearly than if he wore a scarlet letter. His parole officer may also send audible messages to Riley on the tracker that he may receive in a public place.

98 A.3d 559. *See also Corey*, 911 N.E.2d at 196 n.18 ("To the extent that the ankle bracelet portion of the GPS device is potentially visible to the public, it may have the additional punitive effect of exposing the offender to persecution or ostracism, or at least placing the offender in fear of such consequences.").

Moreover, as the Plaintiff argues, "the 'information' imparted when a member of the public hears or sees the [GPS] unit cannot be characterized as 'accurate.'" Pl.'s Br. in Supp. 24, ECF No. 67. Instead, "it conveys an ambiguous message that the wearer is a dangerous or despicable person who committed a crime that justifies constant surveillance." *Id.* Such a message can result in more than embarrassment. "A number of sex offenders have been beaten, and some sex offenders have been murdered by vigilantes." Catherine Wagner, *The Good Left Undone: How To Stop Sex*

23

*Offender Laws From Causing Unnecessary Harm At The Expense Of Effectiveness*, 38 AM. J. CRIM.

L. 263, 273 (2011). Belleau has reported that a person who discovered his status brandished a gun

at him.

And while wearing a GPS device does not inflict the same kind of immediate but relatively

brief pain that branding did, Belleau reports that the GPS device has rubbed against and caused

discomfort and occasional blistering on his skin. At 72 years of age, Belleau's skin is not the same

as that of a 27-year-old. The hard case of the device has caused pain to his ankle and lower leg by

digging in to his skin or pressing on his bones. Belleau Decl. ¶¶ 12, 13, ECF No. 71.

Finally, the fact that Belleau is required to pay $50 per month to offset the State's costs in

monitoring him also has the effect of a fine, another traditional form of punishment imposed by the

State on criminal defendants. The monthly assessment amounts to $600 per year, more than $3,000

for the five plus years Belleau has been subject to the law. Though the assessment is intended to

pay for the costs incurred by the State in monitoring him, the amount assessed, like most fines, is

set after considering the offender's financial circumstances and his household expenses. In *Mueller*

*v. Raemisch*, the Seventh Circuit rejected the argument that a $100 annual fee charged those subject

to Wisconsin's sex offender registration law was a fine, concluding instead that it was a fee:

> The fee is intended to compensate the state for the expense of maintaining the sex
> offender registry. The offenders are responsible for the expense, so there is nothing
> "punitive" about making them pay for it, any more than it is "punitive" to charge a
> fee for a passport. If there were no passports, there would be no passport office, and
> no expenses of operating such an office. The state provides a service to the
> law-abiding public by maintaining a sex offender registry, but there would be no
> service and hence no expense were there no sex offenders. As they are responsible
> for the expense, there is nothing punitive about requiring them to defray it.

740 F.3d at 1135. The same rationale applies here to the extent that lifetime GPS tracking, like a

sex offender registry, is viewed as a non-punitive service to the public. But to the extent that *Smith*

24

instructs courts to consider the effects of the regulatory scheme, this aspect of the law would also support the conclusion that the measure is punitive. Indeed, the assessment is in essence a means of making Belleau pay for his crimes or, in other words, retribution.

In sum, while the technology is new, I conclude that GPS tracking does indeed resemble traditional methods of punishment in several respects.

### b. Affirmative disability or restraint

With respect to the second factor, whether the law imposes an "affirmative disability or restraint," there is little question that GPS tracking does so. The State is forcing Belleau to wear, and thus necessarily denying him the freedom to remove, a device attached to his person twenty-four hours a day, seven days a week, for the rest of his life. The State can point to no class of persons, other than those serving sentences for crimes or civilly committed because they lack control of their faculties, on whom it claims the authority to impose such a disability or restraint.

But it is not only the requirement that Belleau wear and not remove the device that amounts to affirmative disability or restraint. Belleau is required to tether himself to an electrical outlet for an hour every day in order to keep the device charged. This amounts to more than two weeks per year that Belleau is tied to an electrical outlet in his home in order to comply with the DOC's requirements. Over the five years he has worn the device, the total comes to 75 days. That Belleau can recharge the batteries in his own home and at his convenience does not eliminate the coercive character of the restraint. The fact remains that the State is forcing him to do so, whether it is convenient for him or not. Home detention, even when only for periods of the day when the person so detained is not at work or engaged in other pre-authorized activities, has long been considered a form of punishment that can be substituted for prison in appropriate cases. *See* U.S.S.G.

25

2a3dfad99f9a3105

§ 5C1.1(e)(3) ("One day of home detention for one day of imprisonment"). Additionally, Belleau must also remain at home, wait for technicians to arrive, and allow them to enter his home to repair or replace the device when it malfunctions.

The law also authorizes a more substantial form of restraint on Belleau's freedom. Even though the DOC has not created inclusion or exclusion zones for Belleau, it is authorized to do so under Section 301.48. Indeed, it is required to do so if the DOC determines that it is necessary to protect public safety. The law states that the DOC "shall create individualized exclusion and inclusion zones . . . if necessary to protect public safety." Wis. Stat. § 301.48(3)(c). An "exclusion zone" is "a zone in which a person . . . is prohibited from entering except for purposes of traveling through it to get to another destination" and an "inclusion zone" is "a zone in which a person . . . is prohibited from leaving." *Id.* § 301.48(1)(a), (c). In determining whether a statutory scheme amounts to punishment, the relevant factors "must be considered in relation to the statute on its face." *Mendoza–Martinez*, 372 U.S. at 169, *Hudson*, 522 U.S. at 100. On its face, Section 301.48 clearly authorizes DOC to restrain Belleau in where he can and cannot go. Restraint of this nature and extent is generally considered punitive in a free society, absent an individualized determination that the person restrained poses a substantial threat to public safety. *See Doe v. City of LaFayette*, 377 F.3d 757 (7th Cir. 2004) (*en banc*); *Brown v. City of Michigan City*, 462 F.3d 720 (7th Cir. 2006).

The State argues the law clearly imposes less of a restraint than involuntary commitment to an institution, which the Supreme Court found to be non-punitive in *Kansas v. Hendricks*, 521 U.S. 346 (1997). But the commitment allowed in *Kansas v. Hendricks* followed a civil proceeding in a court of law which afforded the person who the State sought to commit the procedural

26

protections of a criminal defendant. Additionally, to obtain the commitment the State was required to prove beyond a reasonable doubt that the person it sought to commit not only had previously committed a violent sexual offense, but that he suffered from a mental disorder or abnormality that made it "difficult if not impossible for the person to control his dangerous behavior. . . ." 521 U.S. at 358. In *Kansas v. Crane*, the Court clarified that while the State was not required to prove that the mental disorder causes a "complete lack of control" before it could civilly commit a sex offender, it must prove that the disorder caused "serious difficulty in controlling behavior." 534 U.S. 407, 413 (2002). The requirement of showing a lack of control was necessary, the Court stated, so as to maintain the distinction between "a dangerous sexual offender subject to civil commitment 'from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings.'" *Id.* at 420 (quoting *Hendricks*, 521 U.S. at 360). "That distinction is necessary," the Court explained, "lest 'civil commitment' become a 'mechanism for retribution or general deterrence'—functions properly those of criminal law, not civil commitment." *Id.* In other words, absent a mental disorder causing at least "serious difficultly controlling behavior," the restraint imposed becomes punishment.

Here, the State stipulated that it could not prove that Belleau met the standard set by the Court in *Crane* and therefore discharged him from the civil commitment. The State's sole justification for subjecting Belleau to this restraint—that he continues to pose a greater risk of sexually assaulting a child than a member of the general public—is not one he's been afforded an opportunity to challenge, and even if true, has never been held to constitute a sufficient justification for imposing such restraint.

27

### c. Traditional aims of punishment

The third factor is whether the law "promote[s] the traditional aims of punishment—retribution and deterrence[.]" *Mendoza–Martinez*, 372 U.S. at 168; *Smith*, 538 U.S. at 97. The State argues that the GPS tracking law does not promote the traditional aims of punishment because "GPS monitoring is not retribution." Defs.' Br. in Supp. 15, ECF No. 75. But why isn't it retribution? Because the State says it does not intend it as such? Here, however, we are considering its effects. To the extent the law imposes a significant restraint on Belleau's freedom as a consequence of his previous crimes, it would appear to meet the definition of retribution, i.e., recompense for a crime. Moreover, retribution is not the only aim of punishment. The State argues this law is aimed at public safety in part because a person subject to GPS supervision is believed to be less likely to re-offend since he knows he will be caught. But this is simply deterrence by another name. It is true that deterrence alone is not enough to render a law punitive in effect. *See Smith*, 538 U.S. at 102 (noting that "[a]ny number of governmental programs might deter crime without imposing punishment"). But GPS monitoring does more than deter crime. To the extent it resembles parole or other forms of court-ordered supervision, GPS monitoring "necessarily embodies aims commonly associated with punishment, including deterrence." *Riley*, 98 A.3d at 559. It is difficult to see how this factor favors the State.

### d. Rationally related and proportional to non-punitive purpose

The fourth and fifth factors are related. The court must ask whether the law is rationally related to a non-punitive purpose and whether it is excessive in light of that purpose. Here, there is little doubt that the law is rationally related to the purpose of protecting the public from people who have committed sex offenses. But it is difficult to see how this factor helps in determining

28

whether the law is punitive. Prison incarceration, for example, is also rationally related to the non-punitive purpose of protecting the public. Yet, no one would seriously contend that incarceration, when imposed after conviction for a crime, does not constitute punishment.

Is requiring that Belleau submit to lifetime GPS tracking excessive in light of its non-punitive purpose? To answer that question we would have to know whether and how likely Belleau is to commit another offense without GPS monitoring and whether GPS tracking would prevent him from doing so if he tried. Here, the State emphasizes the percentages drawn from studies and its actuarial assessments but, as noted above, the studies and actuarial risk assessment tools do not tell us about what Belleau will or will not do. Belleau is a human being, and we are talking about human behavior. Unlike material objects, the behavior of a human being is not determined by rules of statistical probability. The fact that other individuals who have certain characteristics in common with Belleau have gone on to commit other offenses does not tell us whether Belleau will. Further, should he elect to commit another crime, the GPS tracking the State has imposed will not prevent him from doing so, though it may allow law enforcement to more quickly apprehend him if he does commit another offense and the child promptly reports it.

Of course, one could make the argument, as the State does here, that sexual assault of a child is such a horrible crime that requiring a person like Belleau to submit to lifetime GPS tracking is justified if he is at all more likely than others in the general population to commit such an offense and there is any chance GPS tracking would prevent him from doing so. But a psychologist's opinion that a particular person is more likely than others to commit a serious crime has never in our nation's past been held a sufficient justification for the State to restrain one's liberty in such a fashion. The problem with such an argument is that there is no reason to limit its application to

29

individuals who we believe are more likely than others to commit crimes of child sexual assault. As horrifying as such crimes are, there are other horrifying crimes from which the public also demands protection, such as adult sexual assault, armed robbery, murder, or terrorism. To accept the argument that the unquestionably good end of preventing despicable crimes against children justifies the State imposing such restraint upon those it thinks more likely to commit such crimes in the future has dangerous implications for the liberty of all. It is the kind of reasoning that can turn a nation with a limited government into a police state. Under these circumstances, I conclude that the State's application of its lifetime GPS tracking law to Belleau is excessive as a regulatory measure.

It is important to note, however, that this does not mean lifetime GPS tracking would be excessive if imposed as a punishment. The State contends that "[t]he societal question of how to handle people like Belleau is not an easy one." Defs.' Br. in Supp. 21, ECF No. 75. In fact, however, it appears that the legislature has now equipped the State's courts with the tools needed to impose just punishment and protect the public from further crimes of people like Belleau. If a person, like Belleau, is convicted of a serious sex offense, Wisconsin courts can, in addition to sentencing such person to prison, place him on lifetime supervision with GPS tracking. Wis. Stat. §§ 939.615, 301.48(2)(a)6. What the State seeks to do here is to require Belleau to submit to its lifetime GPS tracking even though that was not a punishment the law allowed at the time Belleau committed his crimes. This is one of the very things the Ex Post Facto Clause is intended to prohibit. *Calder v. Bull*, 3 U.S. at 389; *Weaver v. Graham*, 450 U.S. at 28–29.

It is true that a divided panel of the Sixth Circuit rejected an ex post facto challenge to a similar law enacted by the Tennessee legislature in *Doe v. Bredesen*, which involved a GPS device

30

D-A App. 032

that was larger and imposed more restrictions on the plaintiff than the device Belleau is required to wear. The GPS tracking law at issue in *Bredesen* required the plaintiff to carry with him at all times when not at his residence a box (6 inches by 3.25 inches by 1.75 inches) which contained the electronics necessary for the monitoring to take place. The box had to be worn on the outside of the plaintiff's clothing and allegedly required the plaintiff to wait several minutes before going into a building so that it could reset, and then leave every hour so monitoring could occur. The device was not waterproof, so plaintiff was not allowed to swim or participate in other water activities. Despite these restrictions, the *Bredesen* majority concluded that "the effects of the Registration Act and Monitoring Act are not so punitive as to negate the State's clearly expressed intent to create a civil regulatory scheme." 507 F.3d at 1007.

      With all due respect, I find the *Bredesen* majority's analysis of the issue less persuasive than that of the majorities of the supreme courts of Massachusetts and New Jersey in *Cory*, 911 N.E.2d 187, and *Riley*, 98 A.3d 544, which concluded that similar laws were punitive. It should also be noted that in *Bredesen* the GPS tracking requirement was imposed as an additional condition of probation while the defendant was still serving his sentence instead of, as in this case, long after the sentence had been completed. 507 F.3d at 1000. It is perhaps for this reason that the *Bredesen* majority did not discuss the degree to which requiring a person to comply with a GPS monitoring statute resembles probation or parole. Instead, the majority in *Bredesen* emphasized the Supreme Court's rejection of the ex post facto challenge to the Alaska Sex Offender Registration Act in *Smith* and other cases without acknowledging the significant way in which requiring a person to wear a GPS tracking device twenty-four hours a day and seven days a week differs from filing a registration form. 507 F.3d at 1005, 1007.

31

In sum, I conclude that the effects of the law are so punitive in effect that they negate the legislature's non-punitive intent. Application of that law to Belleau therefore violates the Ex Post Facto Clause of the United States Constitution. For this reason alone, Belleau is entitled to the relief he seeks.

## II.    Fourth Amendment Claim

Belleau also asserts subjecting him to lifetime GPS tracking violates his rights under the Fourth Amendment. The Fourth Amendment prohibits "unreasonable" searches and seizures. U.S. CONST. amend IV. The Supreme Court recently addressed the issue of whether GPS monitoring of sex offenders is a "search" for Fourth Amendment purposes in *Grady v. North Carolina*, 135 S. Ct. 1368 (2015) (per curiam). In its brief five-page opinion, the Court vacated the decision of Supreme Court of North Carolina, which had denied review of a lower state court ruling that GPS monitoring of a person was not a search. The United States Supreme Court held: "The State's program is plainly designed to obtain information. And since it does so by physically intruding on a subject's body, it effects a Fourth Amendment search." 135 S. Ct. at 1371. In so ruling, the Court relied on its decision in *United States v. Jones*, in which it held that attaching a GPS tracking device to an automobile and the subsequent use of the device to monitor the vehicle's movements on public streets constituted a search within the meaning of the Fourth Amendment. 132 S. Ct. 945 (2012).

The Court's conclusion in *Grady* that GPS monitoring of a person was a search within the meaning of the Fourth Amendment did not resolve the case, however. Noting that "[t]he Fourth Amendment prohibits only unreasonable searches and that "[t]he reasonableness of a search depends on the totality of the circumstances, including the nature and purpose of the search and the

32

extent to which the search intrudes upon reasonable privacy expectations," the Court remanded the case for further proceedings. 135 S. Ct. at 1371. In its decision remanding the case to the North Carolina courts for a determination of whether the search was reasonable, the *Grady* Court cited *Samson v. California*, 547 U.S. 843 (2006), and *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646 (1995), for their consideration.

Where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, reasonableness generally requires the obtaining of a judicial warrant. *Acton*, 515 U.S. at 653. To obtain a warrant, law enforcement must make a showing to a judge that probable cause exists to believe that the person to be seized committed a crime or that the place to be searched contains evidence of a crime. *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 619 (1989). In *United States v. Jones* the government was held to have acted unlawfully in attaching a GPS tracking device to an automobile without a warrant and then using the device to monitor the vehicle's movements on the public streets over a period of 28 days. 132 S. Ct. at 948–49. Here, the State claims the authority to attach a GPS tracking device not to Belleau's car but to his ankle, and not for just 28 days but for the rest of his life, so that it can monitor his movements not just on the public streets but throughout the State, all without a warrant. In *Jones*, the government had probable cause to believe that the car to which it attached the device was being used to commit a crime. *Id.* at 954. Here, the State concedes it lacks probable cause to believe Belleau committed a crime for which he has not already been punished, but claims the authority to attach the device directly to Belleau's person because he might commit a crime in the future. Obviously, if *Jones* controls the issue, application of Section 301.48 to Belleau violates his rights under the Fourth Amendment.

33

Belleau contends that *Jones* controls and a warrant should be required. He notes that Wisconsin defines GPS tracking as a "means of tracking using a system that actively monitors and identifies a person's location and timely reports or records the person's presence near or at a crime scene or in an exclusion zone or the person's departure from an inclusion zone." Wis. Stat. § 301.48(1)(b). Since the DOC states Belleau has no inclusion or exclusion zones, the only remaining statutory purpose for monitoring him is to report or record his presence near or at a crime scene. A person's presence near or at a crime scene can be evidence of the commission of a crime. Moreover, though requests are rare, the DOC does share information obtained through its GPS tracking system with law enforcement. Second Aff. of Katherine Mears ¶ 9, ECF No. 88. Based on these facts, Belleau argues that the State's GPS tracking system is intended to help law enforcement gather evidence for a crime and a warrant should therefore be required.

But the State argues that this case is controlled by the "special needs" exception to the warrant requirement. As noted above, the Fourth Amendment prohibits only "unreasonable searches and seizures," and while the general rule is that a warrant supported by probable cause is required, that is not true in all cases. "A search unsupported by probable cause can be constitutional," the Court has held, "'when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.'" *Acton*, 515 U.S. at 653 (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987)). The State argues that such a special need exists here.

The more general question whether a particular search is reasonable under the Fourth Amendment requires a balancing of the individual privacy interests at stake against the needs of the public:

34

> [T]he totality of the circumstances [are examined] to determine whether a search is reasonable within the meaning of the Fourth Amendment. Whether a search is reasonable is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.

*Samson*, 547 U.S. at 848 (citation and quotations omitted). In *Samson*, the Court upheld a warrantless and suspicionless search of a parolee under a California statute that explicitly required every prisoner eligible for release on state parole to "agree in writing to be subject to search or seizure by a parole officer or other peace officer at any time of the day or night, with or without a search warrant and with or without cause." *Id.* at 846. Samson agreed and was later stopped by a police officer as he was walking down a public street. In the course of a search of his person, a plastic baggie containing methamphetamine was found in his pocket. Charged with criminal possession of the drug, Samson move to suppress on the ground that the search was conducted without probable cause or even a reasonable suspicion that he was committing a crime.

In rejecting Samson's argument that the search violated his rights under the Fourth Amendment, the Court acknowledged the high levels of recidivism in California and the State's strong interest in reducing that rate and promoting reintegration of people released from prison into the community. But the Court relied primarily upon the severely diminished expectation of privacy that parolees have under California law. *Id.* at 852. The Court noted that a California inmate was allowed to serve his parole period either in physical custody, or complete his sentence out of physical custody and subject to certain conditions, including the requirement that he submit to suspicionless searches by a parole officer or other peace officer at any time. "Under the latter option, an inmate-turned-parolee remains in the legal custody of the California Department of Corrections through the remainder of his term, . . . and must comply with all of the terms and

35

conditions of parole, including mandatory drug tests, restrictions on association with felons or gang members, and mandatory meetings with parole officers . . . ." *Id.* Given this diminished expectation of privacy, the fact that the parolee was made aware of the search condition, and the State's strong interest in effectively supervising parolees to reduce recidivism and promote reintegration, the Court concluded that the search was reasonable under the Fourth Amendment.

In *Vernonia School Dist. 47J v. Acton,* the Court upheld a school district's policy of requiring students participating in interscholastic athletics to submit to random drug testing against a Fourth Amendment challenge. In upholding the District's policy, the Court again emphasized the reduced privacy interests of those who were subject to the policy, namely, students participating in interscholastic athletics: "Central, in our view, to the present case is the fact that the subjects of the Policy are (1) children, who (2) have been committed to the temporary custody of the State as schoolmaster." 515 U.S. at 654. The Court noted that unemancipated minors do not have the same rights as adults, explaining that they "lack some of the most fundamental rights of self-determination—including even the right of liberty in its narrow sense, i.e., the right to come and go at will." *Id.* And while acknowledging that it had never held that the authority of public school officials over students is identical to that of their parents, the Court noted that it had emphasized "that the nature of that power is custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults." *Id.* at 655 (citing *New Jersey v. T.L.O.,* 469 U.S. 325, 339 (1985)). Further, the Court observed that "[l]egitimate privacy expectations are even less with regard to student athletes" since the activities they engage in are usually preceded or followed by undressing, dressing and showering in school locker rooms that afford little privacy. *Id.* at 657. Finally, the Court noted that student athletes' expectation of

36

privacy is reduced further by the fact that in "choosing to 'go out for the team,' they voluntarily subject themselves to a degree of regulation even higher than that imposed on students generally." *Id.*

Having assessed the privacy interest of the student athletes, the Court then turned to the character of the intrusion their lawsuit challenged. Although it acknowledged that collecting urine samples from students for drug testing "intrudes upon an excretory function traditionally shielded by great privacy," *id.* at 658, the Court noted that the circumstances in which the production of the sample was produced and the manner in which it was monitored, i.e., males standing fully clothed at a urinal; females in a stall with a monitor outside, minimized the intrusion resulting from the process of obtaining the sample: "Under such conditions, the privacy interests compromised by the process of obtaining the urine sample are in our view negligible." *Id.* And while the students also had a privacy interest in the state of their body and what they had ingested, the Court noted that the tests were only for the presence of drugs, not other health conditions, and the results were disclosed to only a limited class of school personnel who had a need to know, not law enforcement or for any internal disciplinary function. *Id.* In light of all of these considerations, the Court concluded that "the invasion of privacy was not significant." *Id.* at 660.

Finally, the Court turned to "the nature and immediacy of the governmental concern at issue here, and the efficacy of this means for meeting it." *Id.* Here, the Court focused on the district's interest in deterring drug use by schoolchildren, which it found to be substantial if not compelling. The Court cited studies showing that "[s]chool years are the time when the physical, psychological, and addictive effects of drugs are most severe." *Id.* at 661. The Court further noted that "the effects of a drug-infested school are visited not just upon the users, but upon the entire student body and

37

faculty, as the educational process is disrupted." *Id.* at 662.  Finally, the Court noted that the program was directed to drug use by school athletes, "where the risk of immediate physical harm to the drug user or those with whom he is playing his sport is particularly high." *Id.*  Based on the "District Court's conclusion that 'a large segment of the student body, particularly those involved in interscholastic athletics, was in a state of rebellion,' that '[d]isciplinary actions had reached "epidemic proportions,"' and that 'the rebellion was being fueled by alcohol and drug abuse as well as by the student's misperceptions about the drug culture,'" *id.* at 663 (quoting 796 F. Supp. 1354, 1357 (D. Ore. 1992)), the Court concluded in *Acton* that the District's policy did not violate the Fourth Amendment: "Taking into account all the factors we have considered above—the decreased expectation of privacy, the relative unobtrusiveness of the search, and the severity of the need met by the search—we conclude Vernonia's Policy is reasonable and hence constitutional." *Id.* at 664–65.

Applying these same considerations here, I conclude that application of the State's GPS tracking statute violates Belleau's Fourth Amendment right against unreasonable searches and seizures.  Looking first at the nature and extent of the intrusion, I note that unlike the parolee in *Samson* or the students in *Acton*, Belleau's expectation of privacy is not diminished by the fact that he continues to serve a sentence for a crime or by the fact that he is a child "committed to the temporary custody of the State as schoolmaster."  Belleau, who is now 72 years old, completed the sentences imposed for his crimes more than ten years ago, and his civil commitment to the custody of the State as a sexually violent person was terminated more than five years ago.  It is true, of course, that even after a person convicted of a felony has completed his sentence, he remains subject to certain prohibitions: "Felons likewise are subject to limits on ownership of weapons and

38

participation in certain occupations (including law)." *Green v. Berge*, 354 F.3d 675, 680 (7th Cir. 2004) (Easterbrook, J., concurring). But the prohibitions that result from a felony conviction are not the kind of matters that fall within the protection of the Fourth Amendment. No court has held that a person who has fully served his sentence for a crime has a diminished expectation of privacy by virtue of his prior conviction. Police still need probable cause to arrest a felon, and probable cause is likewise needed to obtain a warrant to search a felon's home. *Trask v. Franco*, 446 F.3d 1036, 1043–44 (10th Cir. 2006) ("Ms. Bliss's probation, however, had already been discharged when the probation officers visited her home in June 2001. Thus, she enjoyed the full protection of the Fourth Amendment, including the clearly established right to be free from warrantless searches of her home.").

This case also differs from *Samson* and *Acton* in that the intrusion into Belleau's privacy is much greater in both its duration and extent. In *Samson*, the plaintiff agreed as a condition of his release from prison that he would be subject to search of his person when confronted by his parole agent or a police officer. And in *Acton*, student athletes were required to produce urine samples periodically for drug testing as a condition of participating in interscholastic athletics. Belleau, in contrast, has been forced to wear a GPS tracking device strapped to his ankle constantly for the rest of his life under a threat of prison if he cuts it off. He has no say in the matter and was presented with no other options. If he even inserts a piece of cardboard between his leg and the device to relieve the rubbing on his skin, a tamper alarm goes off and law enforcement may come to his door. He must tether himself to an electrical outlet one hour a day to keep the device charged. Finally, DOC agents have a minute-by-minute record of his whereabouts. Arguably, this fact by itself constitutes a violation of Belleau's rights under the Fourth Amendment. "Prolonged GPS

surveillance, like a surreptitious wiretap, intrudes upon an individual's reasonable expectation of privacy by revealing information about her daily trajectory and patterns that would, as a practical matter, remain private without the aid of technology." *United States v. Cuevas-Perez*, 640 F.3d 272, 294 (7th Cir. 2011) (Wood, J., dissenting), *vacated, Cuevas-Perez v. United States*, 132 S. Ct. 1534 (2012); *see also Doe v. Prosecutor, Marion County, Ind.*, 566 F. Supp. 2d 862, 878 (S.D. Ind. 2008) (noting in connection with a provision requiring persons previously convicted of sex offenses to consent to search of personal computers, "[t]he parties have not cited, and the court has not found, any American law that attempts to authorize such a broad intrusion on personal privacy and security, without a warrant, probable cause, or even reasonable suspicion, for persons not in prison or subject to parole, probation, or other court supervision").

The State seeks to minimize the intrusion on Belleau's freedom, noting that the device comes with a lengthy charging cord and he can recharge the device at any outlet, including his car, if he obtains an adapter; that Belleau receives no verbal messages on his device but only a low audible signal if the battery is low, and even then only briefly; and that needed repairs are performed at pre-arranged times by the vender's technicians, and not by DOC personnel or law enforcement. The fact remains, however, that forcing a person to keep attached to his leg a GPS device for the rest of his life, under penalty of imprisonment if he does not, so that his whereabouts can be continually monitored constitutes a search within the meaning of the Fourth Amendment and a substantial intrusion upon one's reasonable expectation of privacy.

Lastly, the State seeks to justify the intrusion by again noting the important interest the government has in preventing him from reoffending:

> [T]he special need in this case—to reduce recidivism of the worst sex offenders—is, if anything, more compelling than the special needs discussed in the cases noted

40

above. Offenses like Belleau's are uniquely harmful to society because they involve children, and his untreated mental condition is one that elevates that risk to reoffend. The intrusion on Belleau is limited to serve the purpose of reducing recidivism—by simply providing a dot showing his general location—and is otherwise reasonably limited, allowing him to travel.

Defs.' Br. in Supp. 31, ECF No. 75.

No one denies the importance of protecting children from sexual assault or the devastating effects of such crimes. But as the Court observed in *City of Indianapolis v. Edmond*, "the gravity of the threat alone cannot be dispositive of questions concerning what means law enforcement officers may employ to pursue a given purpose." 531 U.S. 32, 42 (2000). The Court also noted in *Edmond* its particular reluctance "to recognize exceptions to the general rule of individualized suspicion where governmental authorities primarily pursue their general crime control ends." *Id.* at 43. Protection of the public, deterrence, and assisting in the investigation of crime clearly constitute crime control ends.

I conclude from the foregoing that subjecting Belleau to lifetime GPS tracking under Section 301.48 violates his rights under the Fourth Amendment. Again, it is important to note that this would not prevent the State from compelling a person convicted of sexual assault to lifetime GPS tracking as punishment for a crime. One serving a sentence for a crime has a "severely diminished expectation of privacy," *Sampson*, 547 U.S. at 852, and there is no constitutional impediment to imposing a life sentence for sexual assault of a child. The Constitution prohibits only sentences that are cruel and unusual, U.S. Const. amend. VIII, and the length of a sentence is not a feature that has generally been found to render a sentence cruel and unusual. *See Ewing v. California*, 538 U.S. 11 (2003) (holding that sentence of 25 years to life for theft of three golf clubs pursuant to state's three strikes law not grossly disproportionate and thus did not violate Eighth Amendment's prohibition

41

2a3dfad99f9a3105

against cruel and unusual punishment). Thus, there would appear to be no constitutional

impediment to imposing lifetime GPS tracking as a component of a sentence for serious crimes.

Unfortunately, the law at the time Belleau committed his crimes did not permit such a

sentence. It is understandable that the legislature would nevertheless want to compel Belleau to

submit to lifetime GPS tracking. But for the reasons set forth above, the Fourth Amendment does

not permit such surveillance absent a warrant issued upon a showing of probable or special

circumstances not present here. I therefore conclude that the Fourth Amendment, like the Ex Post

Facto Clause, prevents the State from subjecting Belleau to lifetime GPS tracking under Section

301.48.[6]


## CONCLUSION

More than twenty-five years ago, Michael Belleau committed terrible crimes for which he

richly deserved to be punished. But he has served his sentences, and the State is not entitled to add

to his punishment because it now believes the sentences imposed at the time were too lenient or

provided insufficient protection to the public. Nor may the State force Belleau to wear a GPS

tracking device around his ankle so that it can record his movement minute-by-minute for the rest

of his life because it believes he might commit another crime in the future.

The State's authority over the individual is not unlimited. The law has traditionally

recognized three circumstances in which the State may deprive a citizen of his freedom in a

---

[6] Although Belleau also argues that the State's lifetime GPS tracking law violates his right
to equal protection of the law under the Fourteenth Amendment, it is not necessary to address that
issue, especially since the answer likely rises or falls with my analysis of his claims that the law
violates his rights under the Ex Post Facto Clause and the Fourth Amendment.

significant way for more than a brief period of time: (1) pending trial upon a judicial determination that there is probable cause to believe the person committed a serious crime and such limitation is required to protect the public or assure the defendant's appearance in court, *United States v. Salerno*, 481 U.S. 739, 755 (1987); (2) as punishment after conviction for a crime in a court of law, *Rummel v. Estelle*, 445 U.S. 263, 268 (1980); and (3) where the individual suffers from a severe mental illness and is found by a court to be dangerous to himself or others, *Foucha v. Louisiana*, 504 U.S. at 80. To these three, a fourth has in recent years been added: where the person has been previously convicted of a sexually violent offense and a court determines that he is likely to commit a sexually violent offense in the future because he suffers from a mental disorder that causes serious difficulty in controlling his behavior. *Hendricks*, 521 U.S. at 358; *Crane*, 534 U.S. 413.

The temptation to grant the State additional power to restrain individuals who are perceived, rightly or wrongly, as dangerous is strong, especially where the danger we wish to guard against is to children, and the individuals we wish to restrain are persons with disordered sexual desires who have committed despicable crimes in the past. But as explained above, the tools needed to provide such protection are now available to the courts of Wisconsin and can be used as a component of the punishment imposed for such crimes going forward. To hold that the State may use those same tools to restrain the liberty of individuals it believes to be dangerous, not as punishment for a crime or as part of the care and treatment of the dangerous mentally ill, but as a civil regulatory scheme for the protection of the public, would significantly expand the power of the State. To grant this additional power to the State requires more than enactment of a statute; it requires an amendment to the Constitution. We should think long and hard about more than people like Belleau before we move in that direction.

43

For the reasons set forth, Belleau's motion for summary judgment is therefore granted on his ex post facto and Fourth Amendment claims, and the State's motion is denied. It follows that Belleau is entitled to the declaratory and injunctive relief he seeks. The Clerk is directed to place this matter on the court's calendar to discuss the form of the judgment and whether a stay should be entered.

**SO ORDERED** at Green Bay, Wisconsin this 21st day of September, 2015.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court

44

D-A App. 046