No. 12-2383

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

RILEY J. WILSON, ON BEHALF OF HIMSELF
AND ALL OTHERS SIMILARLY SITUATED,

                                        PLAINTIFF-APPELLANT,

                    v.

CAREER EDUCATION CORPORATION,

                                        DEFENDANT-APPELLEE.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, No. 11-CV-5453
THE HONORABLE **GERALDINE SOAT BROWN**, MAGISTRATE JUDGE, PRESIDING.

———————

## BRIEF OF DEFENDANT-APPELLEE CAREER EDUCATION CORPORATION

———————

SARI M. ALAMUDDIN
ANDREW SCROGGINS
MORGAN, LEWIS & BOCKIUS LLP
77 WEST WACKER DRIVE, 5TH FLOOR
CHICAGO, ILLINOIS 60601
(312) 324-1000

**COUNSEL OF RECORD FOR DEFENDANT-APPELLEE CAREER EDUCATION CORPORATION**

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No. 12-2383

Short Caption:  *Wilson v. Career Education Corporation*

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first.  Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):  Career Education Corporation

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:  Morgan, Lewis & Bockius LLP

(3) If the party or amicus is a corporation:
    i)  Identify all its parent corporations, if any: Career Education Corporation - None
    ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:
        Career Education Corporation - None

Attorney's Signature:  _____/s/ Sari M. Alamuddin_____          Date: October 12, 2012

Please indicate if you are *Counsel of Record* for
the above listed parties pursuant to Circuit Rule 3(d).          **Yes** _X_          **No** ___

Address:                    Morgan, Lewis & Bockius LLP
                            77 West Wacker Drive, Fifth Floor, Chicago, IL  60601
Phone Number:               (312) 324-1000
Fax Number:                 (312) 324-1001
E-Mail Address:             salamuddin@morganlewis.com

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No. 12-2383

Short Caption: *Wilson v. Career Education Corporation*

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3): Career Education Corporation

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court: Morgan, Lewis & Bockius LLP

(3) If the party or amicus is a corporation:
   i)   Identify all its parent corporations, if any: Career Education Corporation - None
   ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:
        Career Education Corporation - None

Attorney's Signature: _____ /s/ Andrew Scroggins _____     Date: October 12, 2012

Please indicate if you are *Counsel of Record* for
the above listed parties pursuant to Circuit Rule 3(d).          **Yes** ___     **No** _X_

Address:              Morgan, Lewis & Bockius LLP
                      77 West Wacker Drive, Fifth Floor, Chicago, IL  60601
Phone Number:         (312) 324-1000
Fax Number:           (312) 324-1001
E-Mail Address:       ascroggins@morganlewis.com

# TABLE OF CONTENTS

**Page**

JURISDICTIONAL STATEMENT ................................................................. 1

COUNTER-STATEMENT OF ISSUES PRESENTED FOR REVIEW ..................................... 3

STATEMENT OF THE CASE.................................................................... 3

STATEMENT OF THE FACTS .................................................................. 3

SUMMARY OF THE ARGUMENT ................................................................. 5

ARGUMENT ................................................................................ 7

I.      STANDARD OF REVIEW ............................................................... 7

II.     Minnesota Law Governs Wilson's Claims ............................................ 8

III.    The District Court Properly Dismissed Wilson's Breach Of Contract Claim .................. 9

        A.      The Reservation Of Rights Clause Renders The ARSC Plan
                An Unenforceable, Illusory Contract .................................... 10

        B.      If The ARSC Plan Is Enforceable, CEC Committed No Breach Because It
                Acted In A Manner Consistent With The Plan Terms When It Terminated
                The Plan And Declined To Pay Wilson For Unearned Bonuses ........................ 12

                1.      The District Court Correctly Concluded That The Plan
                        Unambiguously Reserved To CEC The Right To Terminate
                        At Any Time For Any Reason .............................. 12

                2.      The District Court Correctly Concluded That CEC's
                        Changes Were Not "Retroactive." .......................... 17

        C.      CEC Did Not Breach The Implied Covenant Of Good Faith And Fair
                Dealing By Terminating The Contract In Advance Of New Government
                Regulations That Would Have Made Such Payments Illegal .......................... 21

IV.     The District Court Properly Dismissed Wilson's
        Implied Contract / Unjust Enrichment Claim ................................. 26

        A.      If Wilson Is Correct That The ARSC Plan Is A Valid Express Contract,
                He Is Precluded From Obtaining The Equitable Relief He Seeks ...................... 26

        B.      Wilson Has Not Alleged That CEC Engaged In Unlawful Or Illegal
                Conduct Or Improperly Benefitted From His Labors  Such That He Has
                A Viable Equitable Claim .................................................. 26

CONCLUSION .............................................................................. 31

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*A.P. Properties, Inc. v. Rattner,*
  960 N.E.2d 618 (Ill.App.Ct.2011) ..........................................................................26

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)..................................................................................................25

*Ass'n Ben. Services, Inc. v. Caremark RX, Inc.,*
  493 F.3d 841 (7th Cir. 2007) ...................................................................................12

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)..................................................................................................25

*Bennett v. Spear,*
  520 U.S. 154 (2002)....................................................................................................8

*Bielskis v. Louisville Ladder, Inc.,*
  663 F.3d 887 (7th Cir. 2011) .....................................................................................1

*BP Prods. N. Am. Inc. v. Twin Cities Stores, Inc.,*
  534 F.Supp.2d 959 (D. Minn. 2007)............................................................16, 23, 25

*Brookfield Trade Center, Inc. v. County of Ramsey,*
  584 N.W.2d 390 (Minn. 1998)..................................................................................21

*Brooks v. Ross,*
  578 F.3d 574 (7th Cir. Ill. 2009) ................................................................................8

*Brozo v. Oracle Corp.,*
  324 F.3d 661 (8th Cir. 2003) ...............................................................13, 14, 16, 23

*Cady v. Bush,*
  283 Minn. 105, 166 N.W.2d 358 (1969)..................................................................27

*Carey v. Richards Building Supply Co.,*
  856 N.E.2d 24 (Ill. App. 2006) ................................................................................21

*Cenveo Corporation v. CelumSolutions Software GMBH,*
  504 F.Supp.2d 574 (D.Minn. Mar. 27, 2007) .........................................................22

*Chambers v. Metro. Prop. & Cas. Ins. Co.,*
  351 F.3d 848 (8th Cir. 2003) ..............................................................................28, 29

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Cleary v. Philip Morris Inc.*,
   656 F.3d 511 (7th Cir. 2011) .................................................27

*CRI, Inc. v. Watson*,
   608 F.2d 1137 (8th Cir.1979) ................................................10

*Cromeens, Holloman, Sibert, Inc v. AB Volvo*,
   349 F.3d 376 (7th Cir. 2003) ...................................16, 22, 29

*Cruz v. Lawson Software, Inc.*,
   No. 08-5900, 2010 WL 890038 (D. Minn. Jan. 5, 2010).........................9

*Cunningham Charter Corp. v. Learjet, Inc.*,
   592 F.3d 805 (7th Cir. 2010) ..................................................2

*Curia v. Nelson*,
   587 F.3d 824 (7th Cir. 2009) .................................................12

*First National Bank v. Ramier*,
   311 N.W.2d 502 (Minn.1981)....................................................27

*Foxfield Realty, Inc. v. Kubala*,
   678 N.E.2d 1060 (Ill. App. 1997) ............................................21

*Galbraith v. U.S. Premise Networking Servs., Inc.*,
   2004 WL 1049042 (Minn. Ct. App. May 11, 2004)................................24

*Gallinger v. North Star Hosp. Mut. Assur., Ltd.*,
   64 F.3d 422 (1995)............................................................27

*Garcia v. Kankakee Housing Authority*,
   279 F.3d 532 (7th Cir. 2002) .................................................10

*Gentieu v. Tony Stone Images/Chicago, Inc.*,
   255 F.Supp.2d 838 (N.D. Ill. 2003) ..........................................16

*Gould v. Artisoft, Inc.*,
   1 F.3d 544 (7th Cir. 1993) ...................................................24

*Gray v. Abbott Laboratories, Inc.*,
   No. 10-6377, 2011 WL 3022274 (N.D. Ill. July 22, 2011) .......................9

*Gunderson v. N. Am. Life & Cas. Co.*,
   78 N.W.2d 328 (Minn. 1956)....................................................24

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Hecker v. Deere & Co.*,
  556 F.3d 575 (7th Cir.2009) ...................................................7

*Hegel v. Brunswick Corp.*,
  No. 09-C-882, 2011 WL 1103825 (E.D. Wis. Mar. 23, 2011) ............................11, 21, 22, 30

*Hess v. Kanoski & Associates*,
  668 F.3d 446 (7th Cir. 2012) ..................................................26

*Hinc v. Lime-O-Sol Co.*,
  382 F.3d 716 (7th Cir. 2004) ..................................................8

*HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*,
  545 N.E.2d 672 (1989)........................................................27

*Hughes v. Standard Chartered Bank, PLC*,
  No. 09 Civ. 4595(PKC), 2010 WL 1644949 ........................................30

*Hunt v. IBM Mid. Am. Employees Fed. Credit Union*,
  384 N.W.2d 853 (Minn. 1986)....................................................6, 9, 22

*Igbanugo v. Cangemi*,
  No. A10-202, 2011 WL 2519205 (Minn.App. June 27, 2011)....................................22

*Int'l Mktg., Ltd. v. Archer-Daniels-Midland Co.*,
  192 F.3d 724 (7th Cir.1999) ...................................................7

*Jespersen v. Minnesota Mining & Mfg. Co.*,
  681 N.E.2d 67 (Ill.App.3d 1997) ...................................................16, 22

*Johnson v. U.S. Bancorp*,
  2003 WL 22015838 (Minn. Ct. App. Aug. 26, 2003) ...........................................14

*Karmilowicz v. The Harford Fin. Svs. Group*,
  No. 11 Civ. 539 (CM)(DCF), 2011 WL 2936013 .................................................30

*Knudsen v. Transport Leasing/Contract, Inc.*,
  672 N.W.2d 221 (Minn. Ct.App. 2003)............................................16

*Kosek v. The American Express Company*,
  No. 08-426, 2008 WL 4057534 (D.Minn. Aug. 26, 2008)....................................14

*Kulins v. Malco, A Microdot Co., Inc.*,
  459 N.E.2d 1038 (Ill. App. 1984) ...................................................24

iv

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Ladd v. Mohawk Carpet Distrib., L.P.,*
No. 08-6470, 2010 WL 2541651 (D.Minn. April 1, 2010) ...................................22

*Laitinen v. Per Mar Sec. & Research Corp.,*
No. 11-3120, 2012 WL 695897 (D.Minn. Mar. 5, 2012) .....................................22

*Lee v. Metro. Airport Comm'n,*
428 N.W.2d 815 (Minn.App.1988)........................................................................22

*Levion v. Societe Generale,*
2011 WL 4549458 ................................................................................................30

*Levion v. Societe Generale,*
822 F.Supp.2d 390 (S.D.N.Y. Sept. 30, 2011) .....................................................21

*Lewitton v. ITA Software, Inc.,*
585 F.3d 377 (7th Cir.2009) .................................................................................12

*M.M. Silta, Inc. v. Cleveland Cliffs, Inc.,*
616 F.3d 872 (8th Cir. Minn. 2010).....................................................................26

*MC Baldwin Fin. Co. v. DiMaggio, Rosario & Veraja, LLC,*
364 Ill.App.3d 6, 300 Ill.Dec. 601, 845 N.E.2d 22 (2006) ..................................12

*Midwest Transit, Inc. v. Hicks,*
79 Fed. App'x 205 (7th Cir. 2003) .........................................................................1

*Midwest Transit, Inc. v. Hicks,*
79 Fed. Appx. 205 (7th Cir. 2003).........................................................................1

*Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc.,*
666 N.W.2d 320 (Minn. 2003)..............................................................................14

*Olson v. McKesson Corp.,*
No. CV-04-2428-PHX-FJM, 2006 WL 2355393 (D.Ariz. Aug. 14, 2006)............20

*Palmer v. Beverly Enters.,*
823 F.2d 1105 (7th Cir. 1987) ...............................................................................8

*Parkhill v. Minn. Mut. Life Ins. Co.,*
174 F.Supp.2d 951 (D.Minn. 2000)......................................................................12

*Pastor v. State Farm Mut. Auto. Ins. Co.,*
No. 05-1459, 2005 WL 2453900 (N.D. Ill. Sept. 30, 2005) ...................................9

v

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Piper Jaffray & Co. v. SunGard Sys. Int'l, Inc.*,
　No. 04-2922, 2007 WL 541679 (D.Minn. Feb. 16, 2007) .......................................................26

*Quensell v. Bank One Corp.*,
　2002 WL 500506 (Ohio App. Apr. 4, 2002) (Pl. Br. at 29)...............................................27, 28

*Quiello v. Reward Network Establishment Services, Inc.*,
　420 F.Supp. 2d 23 (D.Conn. 2006)...............................................................................20, 21

*Regensburger v. China Adoption Consultants, Ltd.*,
　138 F.3d 1201 (7th Cir. 1998) ...........................................................................................10

*Reger Development, LLC v. National City Bank*,
　592 F.3d 759 (7th Cir. 2010) .................................................................................................7

*Remus v. Fios, Inc.*,
　No. C 11–01264 CRB, 2012 WL 707477 (N.D. Cal. Mar. 5, 2012) ......................................22

*Rudolph v. Int'l Bus. Machines Corp.*,
　No. 09 C 00428, 2009 WL 2632195 (N.D. Ill. Aug. 21, 2009)..............................................11

*Shukh v. Seagate Tech., LLC*,
　No. 10-404, 2011 WL 1258510 (D.Minn. Mar. 30, 2011) .....................................................22

*Tatom v. Ameritech Corp.*,
　305 F.3d 737 (7th Cir. 2002) ...............................................................................................14

*Taylor Inv. Corp. v. Weil*,
　169 F.Supp.2d 1046 (D. Minn. 2001) ....................................................................................26

*Tymshare, Inc. v. Covell*,
　727 F.2d 1145 (D.C.Cir. 1984) .......................................................................................15, 23

*U.S. Fire Ins. Co. v. Minn. State Zoological Bd.*,
　307 N.W.2d 490 (Minn. 1981)...............................................................................................26

*United States v. Barnett*,
　415 F.3d 690 (7th Cir. 2005) ................................................................................................21

*United States v. Kelly*,
　18 F.3d 612 (8th Cir. 1994) ..................................................................................................16

*Utility Audit, Inc. v. Horace Mann Service Corp.*,
　383 F.3d 683 (7th Cir. 2004) ................................................................................................26

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Vallone v. CNA Financial Corp.*,
  375 F.3d 623 (7th Cir.2004) ................................................. 14

*Winthrop Res. Corp. v. Eaton Hydraulics, Inc.*,
  361 F.3d 465 (8th Cir. 2004) ................................................. 12

**STATUTES**

28 U.S.C. § 1291 ................................................................. 2

28 U.S.C. § 1332(a), (d) ......................................................... 1

28 U.S.C. § 1653 ................................................................. 1

**OTHER AUTHORITIES**

Fed.R.Civ.P. 12(b)(6) ............................................................ 7

75 Fed. Reg. 66832-66975 (Oct. 29, 2010) ...................................... 5, 24

Black's Law Dictionary (9th ed. 2009) ......................................... 18

## JURISDICTIONAL STATEMENT

Plaintiff-Appellant Riley J. Wilson ("Wilson" or "Plaintiff-Appellant") submitted a jurisdictional statement that is correct but not complete. Pursuant to 28 U.S.C. § 1653, Career Education Corporation ("CEC," the "Company" or "Defendant-Appellee") will supplement the jurisdictional statement in order to clearly establish the Court's jurisdiction over this matter.

Wilson filed a two-count complaint against his former employer, CEC. Both counts are based on state law: (1) breach of contract; and (2) implied contract and unjust enrichment. As set forth below, the district court had original jurisdiction under 28 U.S.C. § 1332(d).

First, Plaintiff is a citizen of a State different from CEC. At the time the complaint was filed and continuing through the present, CEC was and is incorporated in the State of Delaware, with its principal place of business in Illinois. Plaintiff-Appellant Wilson's Appendix ("App.") 20 (Complaint ¶ 3). *See* 28 U.S.C. § 1332(a) ("a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business"); *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 891 (7th Cir. 2011) (finding diversity jurisdiction where plaintiff was an Illinois citizen and defendant a Delaware corporation with its principal place of business in Louisville, Kentucky).

By contrast, Wilson is a citizen of Minnesota. To determine citizenship for diversity purposes, courts look to domicile. *Midwest Transit, Inc. v. Hicks*, 79 Fed. App'x 205, 208 (7th Cir. 2003) (citing *Dakuras v. Edwards*, 312 F.3d 256, 258 (7th Cir. 2002)). Domicile has two elements – physical presence or residence in a state and intent to remain in the state. *Midwest Transit, Inc. v. Hicks*, 79 Fed. Appx. 205, 208 (7th Cir. 2003). Intent to remain in a state, in turn, is ascertained from a number of factors, including current residence, voting registration, voting history, location of personal and real property, driver's license, automobile registration, and tax payments. *Id.*

1

Wilson has pled that he resided, negotiated his compensation from CEC, and performed his work for CEC in Minnesota.  App. 19 (Complaint ¶2); *id*. at 20 (¶¶4, 6).[1]  In his Supplemental Jurisdictional Statement and again in his Opening Brief, Wilson has represented that he is a citizen of Minnesota.  Dkt. 3, ¶ 2 (Appellant's Supp. Jurisdictional Statement); Dkt. 15 at 1 (Appellant's Opening Brief).[2]  Thus, at least one member of the putative class is a citizen "of a State different from any defendant."  *See* 28 U.S.C. § 1332(d)(2)(A).

Second, Wilson pled estimated damages of over $5 million for a putative class (App. 26 (Complaint ¶¶ 35, 37)), and the number of putative class members is well in excess of 100 people.  App. 23-24 (Complaint ¶ 22).  *See* 28 U.S.C. § 1332(d)(2) and (d)(5).  While CEC disputes that Wilson could obtain class certification, "jurisdiction attaches when a suit is filed as a class action" and is not divested by failure to obtain a class certification order.  *Cunningham Charter Corp. v. Learjet, Inc*., 592 F.3d 805, 806 (7th Cir. 2010).

The Court's appellate jurisdiction arises under 28 U.S.C. § 1291, as the district court's orders dismissing Wilson's claims with prejudice and entering judgment in favor of CEC constituted a final decision.  App. pp. 1-2.

---

[1] "App." refers to Appellant's Appendix, which was attached to Appellant's opening brief in this appeal.  The citation to the Appellant's Appendix is followed by a short description of the document cited.

[2] CEC has undertaken its own investigation which confirms that Wilson was a citizen of Minnesota at the time he filed his Complaint.  For example, Wilson maintained a Minnesota driver's license.  Furthermore, during his employment, Wilson completed various forms evidencing domicile in Minnesota, including a Form W-4 Employee Withholding Allowance Certificate that placed Wilson's residence in Minnesota for tax purposes.  Records of the Office of the Minnesota Secretary of State also indicate that Wilson is eligible to vote in Minnesota.  CEC will submit this and other evidence if the Court desires to have additional evidence of Wilson's citizenship.

**COUNTER-STATEMENT OF ISSUES PRESENTED FOR REVIEW**

1.      Whether the district court correctly held that Wilson failed to state a claim for breach of contract where the terms of the Admission Representative Supplemental Compensation Plan ("ARSC Plan" or "Plan") allowed CEC to "terminate or amend the terms of this Plan at any time, for regulatory compliance purposes or for any other reasons that CEC determines, in its sole discretion?"

2.      Whether the district court correctly held that Wilson failed to state a claim for unjust enrichment where CEC acted for lawful reasons and with nearly three months' notice to Plan participants and obtained no improper benefit, and Wilson received a salary for performing the same work that he claims entitles him to supplemental compensation?

**STATEMENT OF THE CASE**

Appellant's Statement of the Case is complete and correct.

**STATEMENT OF THE FACTS**

CEC is a global education company, based in Schaumburg, Illinois, that offers high-quality education to a diverse student population in a variety of career-oriented disciplines.  App. 20 (Complaint ¶ 3).

Wilson, a resident of Minnesota, worked for CEC from October 6, 2008 through May 18, 2011, and held the positions of High School Admissions Representative and Inside Sales Representative. App. 19 (Complaint ¶¶ 2, 6, 14, 20, 22).  In both positions, he was responsible for recruiting high school students to attend CEC's Le Cordon Bleu culinary arts college in Mendota Heights, Minnesota.  *Id.* 20-22 (Complaint ¶¶ 6-15).

As an Admissions Representative, Wilson was a participant in the ARSC Plan.  App. 20-21 (Complaint ¶ 7).  Under the ARSC Plan, Admissions Representatives were required to satisfy quarterly thresholds (known as Minimum Performance Goals, or "MPG") for enrolling students

to start at a CEC school.  *Id.* p. 21 (Complaint ¶ 10); p. 29 (ARSC Plan).  These thresholds were

set on a school-by-school basis.  *Id.*  Admissions Representatives who exceeded the quarterly

thresholds were eligible to receive incentive compensation under the ARSC Plan (*id.*), which

was earned when:

- The student successfully completed either his or her academic program or one academic year of his or her program, whichever is shorter (*id.*); and

- The student attained one of the above benchmarks within a nine month evaluation period that commences six months after the end of the quarter during which the student starts attendance at the school and that ends fifteen months after the student starts attendance at the school (*id.*, p. 32 (ARSC Plan)).

Certain other conditions and limitations also applied, including:

- The Admissions Representative could earn supplemental compensation only after reaching a threshold number of student placements (the Minimum Performance Goal, or "MPG") set by the Company.

- Any given student could be counted only one time, regardless of the number of different academic programs the student may enroll in (*id.*, p. 30 (ARSC Plan)).

- No supplemental compensation could be earned from placing a student who is also a CEC employee or a dependent of a CEC employee who is using the CEC National Education Assistance Grant Program (*id.*, p. 31 (ARSC Plan)).

- The supplemental compensation had to be earned prior to the resignation or termination of the Admissions Representative (*id.*, p. 32 (ARSC Plan)).

The express language of the ARSC Plan gave CEC the right to terminate the Plan at any

time and for any reason:

> If CEC determines at any time that this Plan should be modified due to the requirements or standards of the U.S. Department of Education or any state agency or accrediting commission, then CEC may be obligated to modify this Plan.  *CEC reserves the right to terminate or amend the terms of this Plan at any time, for regulatory compliance purposes or for any other reasons that CEC determines, in its sole discretion.  Any interpretation of any provision of this Plan or of any regulatory authority may be made by CEC in its sole discretion.*

App. 31 (ARSC) (emphasis added).

4

On October 29, 2010, the United States Department of Education ("DOE") published final regulations affecting educational institutions that participate in federal student financial aid programs. Program Integrity Issues, Final Rule, 75 Fed. Reg. 66832-66975 (Oct. 29, 2010) (to be codified at 34 C.F.R. pts 600, 602, 603, 668, 682, 685, 686, 690, 691). Through the new regulations, DOE sought, among other things, to ensure that "admissions compensation practices do not provide any commission, bonus, or other incentive payment based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid to any person or entity engaged in any student recruitment or admission activity[.]" *Id.* at 66873.

Following publication of the new regulations, on December 9, 2010, Wilson and other Admissions Representatives in the Culinary business unit were advised that the ARSC Plan would be discontinued and that Admissions Representatives would cease to earn incentive compensation after February 28, 2011. App. 23 (Complaint ¶ 19); p. 33 (Announcement of Compensation Changes). Admissions Representatives continued to earn supplemental compensation under the Plan until the cut-off date. *Id.*

## SUMMARY OF THE ARGUMENT

The district court properly dismissed Wilson's claims for breach of contract and implied contract / unjust enrichment, both of which are premised on Wilson's contention that he is entitled to payments he would have received had CEC not discontinued its supplemental compensation plan for qualified admissions representatives.

First, under choice of law principles, the Court should apply Minnesota law, as that state has the most significant contacts with the parties and events that form the basis for Wilson's claims. Nonetheless, while there are differences between the applicable Minnesota and Illinois law, the result (dismissal) is the same under either.

Second, the district court correctly held that Wilson's breach of contract claim fails as a matter of law because the plain language of the ARSC Plan permits CEC to unilaterally terminate or amend the plan at any time, for any reason, at its sole discretion.  App. pp. 10-13 (District Court Opinion), 29-32 (ARSC Plan applicable to Wilson).  This unequivocal reservation of rights either (1) mean there was no enforceable contract in the first place, or (2) expressly confer to CEC the necessary authority to terminate the ARSC Plan and decline to pay Wilson for unearned bonuses.

Wilson's contention that the ARSC Plan did not allow CEC to make changes "retroactively" is a non-starter.  Again, the reservation of rights clause is clear and unambiguous and allows CEC to amend or terminate the plan "at any time" and for "any … reason."  And, in any event, Wilson's mischaracterization of the changes as "retroactive" hinges on the incorrect notion that he was entitled to supplemental compensation even for students who admittedly had not yet met the Plan benchmarks that triggered supplemental compensation.  As the district court correctly observed, because all of the conditions necessary to entitle Wilson to a bonus had not yet been satisfied, the changes were not "retroactive."

Third, Wilson has no viable claim for a breach of the covenant of good faith and fair dealing implicit in every contract.  To start with, this argument is not available to him, because the Supreme Court of Minnesota "ha[s] not read an implied covenant of good faith and fair dealing into employment contracts."  *Hunt v. IBM Mid. Am. Employees Fed. Credit Union*, 384 N.W.2d 853, 858 (Minn. 1986).  Regardless, as the district court correctly observed, a party cannot violate the covenant by doing what the express terms of the agreement plainly allow.

Finally, Wilson's implied contract / unjust enrichment claim also fails to state a claim upon which relief can be granted.  CEC's decision to terminate the ARSC Plan was prompted by

6

changes in federal regulations and not some unlawful purpose that would invite the Court to imply a contract in order to remedy an injustice.  Moreover, CEC was not unjustly enriched by Wilson's efforts, since Wilson had no entitlement to supplemental compensation and he earned a salary for performing the same work that was the subject of the ARSC Plan.

Accordingly, for the reasons more fully set forth below, the Court should affirm the district court's order granting CEC's motion and dismissing Wilson's Complaint in its entirety, and grant Appellee such other relief as the Court deems just and equitable.

## ARGUMENT

### I.    STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Reger Development, LLC v. National City Bank*, 592 F.3d 759, 763-4 (7th Cir. 2010) (affirming district court dismissal of contract claims) (*citing Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).   The Court also considers documents attached to, or integral to, the complaint as part of the complaint itself and may determine from such documents that the plaintiff is not entitled to judgment.  *Int'l Mktg., Ltd. v. Archer-Daniels-Midland Co.*, 192 F.3d 724, 729 (7th Cir.1999); *Hecker v. Deere & Co.*, 556 F.3d 575, 588 (7th Cir.2009).

When the district court grants a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the Court's review is *de novo*.  *Reger Development*, 592 F.3d at 763.  The Court construes the complaint in the light most favorable to the nonmoving party, accepts well-pleaded facts as true, and draws all inferences in plaintiff's favor.  *Id*.  "A court need not, however, accept the plaintiff's legal conclusions."  *Id*., (citing *Rogers v. Lincoln Towing Service, Inc.*, 771 F.2d 194, 197 (7th Cir.1985)).  Moreover, the Court "may affirm on any ground contained in the record."

*Brooks v. Ross*, 578 F.3d 574, 578 (7th Cir. Ill. 2009) (*citing Bennett v. Spear*, 520 U.S. 154, 166 (2002)).

## II.     MINNESOTA LAW GOVERNS WILSON'S CLAIMS.

Wilson's Complaint is based on diversity jurisdiction (App. 20 (Complaint ¶ 4)), so the law that governs is determined by looking to the conflict-of-law rules of the state in which the federal court sits. *Hinc v. Lime-O-Sol Co.*, 382 F.3d 716, 719 (7th Cir. 2004). Illinois has adopted the "most significant contacts" test of the Restatement (Second) of Conflicts (1971) in deciding choice-of-law questions. *Id.* Under the "most significant contacts" test, the Court may consider "the place of contracting, negotiation, performance, location of the subject matter of the contract and the domicile, residence, place of incorporation, and business of the parties." *Id.* (citations omitted).

The State of Minnesota has the most significant contacts related to Wilson's individual claims. Wilson is domiciled and resides in Minnesota. App. 19-20 (Complaint ¶¶ 2, 4). He was in Minnesota when he asserts that he negotiated with CEC about his employment with the company. *Id.*, p. 21 (Complaint ¶ 9). The work that Wilson claims entitled him to incentive compensation under the ARSC Plan – his recruitment of students to CEC's Le Cordon Bleu culinary arts college in Mendota Heights, Minnesota – occurred in Minnesota. *Id.*, pp. 20, 22, 25-26 (Complaint ¶¶ 6, 14-17, 32, 34). In contrast, Illinois's contacts with the people and events related to this litigation are more limited – namely that is where CEC's headquarters is located, and where some plan administration occurred. *Id.*, p. 20 (Complaint ¶¶ 3-4). Because Minnesota has the most significant contacts with this dispute, its laws should govern Wilson's claims. *See Palmer v. Beverly Enters.*, 823 F.2d 1105, 1107 (7th Cir. 1987) (holding California law would govern breach of employment contract claim where the employment relationship

centered in California and the employee performed the majority of his work in California, and

therefore "California ha[s] the greatest interest in regulating this employment relationship").

Wilson contends that the Court should apply laws of Illinois rather than Minnesota

because CEC has conceded there is "no substantive difference between the law of the two

states." Dkt. 15 at 14 (Appellant's Opening Brief). In fact, while CEC has argued that the same

outcome (dismissal) is appropriate under either state's law, there are substantive differences

among the law of the two states.[3] For example, Wilson argues that the ARSC Plan contains an

implied covenant of good faith and fair dealing (Pl. Br. at 20-23), but this argument is not

available if Minnesota law applies. *See* Section III.C, below (citing *Hunt*, 384 N.W.2d at 858

("[W]e have not read an implied covenant of good faith and fair dealing into employment

contracts.")). Thus, application of Minnesota law is warranted here.

## III.   THE DISTRICT COURT PROPERLY DISMISSED WILSON'S BREACH OF CONTRACT CLAIM.

Wilson's contract claim founders on the plain language of the ARSC Plan, by which

"CEC reserves the right to terminate or amend the terms of this Plan *at any time*, for regulatory

purposes or *for any other reason that CEC determines*, *at its sole discretion*." Dkt. 18-1 at 9

(emphasis added). This unequivocal reservation of rights either (1) mean there was no

enforceable contract in the first place, or (2) expressly confer to CEC the necessary authority to

---

[3] Courts in Illinois and Minnesota have noted differences in the law of contracts and unjust enrichment at issue here. *See, e.g., Pastor v. State Farm Mut. Auto. Ins. Co.*, No. 05-1459, 2005 WL 2453900 *9 (N.D. Ill. Sept. 30, 2005) (noting that "differences in states' breach of contract laws are important and may be outcome-determinative."); *see also Gray v. Abbott Laboratories, Inc.*, No. 10-6377, 2011 WL 3022274 *3 (N.D. Ill. July 22, 2011) (dismissing plaintiff's unjust enrichment claim and noting differences in the governing state laws applicable to such claims); *Cruz v. Lawson Software, Inc.*, No. 08-5900, 2010 WL 890038 *6, 9 (D. Minn. Jan. 5, 2010) (noting that "there are material conflicts among many of the unjust enrichment laws of the various states").

terminate the ARSC Plan and decline to pay Wilson for unearned bonuses.  Under either reading,

the clause is fatal to Wilson's breach of contract claim.

### A.     The Reservation Of Rights Clause Renders The ARSC Plan An Unenforceable, Illusory Contract.

The ARSC Plan clearly and unambiguously grants CEC the sole and complete discretion

and authority to amend or terminate the Plan, or any of its terms, *at any time and for any reason*:

> CEC reserves the right to terminate or amend the terms of this Plan at any
> time, for regulatory compliance purposes or for any other reasons that
> CEC determines, in its sole discretion.

App. 29 (ARSC Plan).  The same clause continues to give CEC the sole right to interpret the

Plan:

> Any interpretation of any provision of this Plan or of any regulatory
> authority may be made by CEC in its sole discretion.

*Id*.

Because the plain reading of these terms confers to CEC the unfettered right to amend or

terminate all or any part of the Plan at any time for any reason, and "sole discretion" to *interpret*

the meaning of the termination provision, the contract is illusory.  *See CRI, Inc. v. Watson*, 608

F.2d 1137, 1142 (8th Cir.1979) (applying Minnesota law) (ability to repudiate "on whim" would

render contract illusory); *Regensburger v. China Adoption Consultants, Ltd*., 138 F.3d 1201 (7th

Cir. 1998) ("An illusory promise appears to be a promise, but on closer examination reveals that

the promisor has not promised to do anything…  An illusory promise is also defined as one in

which the performance is optional" ) (applying Illinois law); *Garcia v. Kankakee Housing

Authority*, 279 F.3d 532, 536 (7th Cir. 2002) (employee handbook did not create legal rights

where the employer reserved "the right to amend, modify and/or revoke any of its policies,

practices, procedures and standards[.]").

As the district court correctly observed (App. 11), the facts here are analogous to those in *Hegel v. Brunswick Corp*., No. 09-C-882, 2011 WL 1103825 (E.D. Wis. Mar. 23, 2011).  In *Hegel*, plaintiff's employer faced financial troubles and offered bonus payments to managers in exchange for attaining cost savings goals.  *Id*. at *1.  The bonus plan included a management rights clause which stated that "the company reserves the right to revise, discontinue or cancel this plan or any awards associated with the plan at any time."  *Id*. at *2.  Although several managers performed under the plan and anticipated bonuses of about $70,000 apiece, the CEO decided against paying the bonuses because the company's financial problems had grown worse. *Id*. at *3.  The court upheld the employer's decision on the grounds that there was no valid contract in the first place.  *Id*. at *5.  As the court explained, the management rights clause meant the employer "promised to render future performance if it decided to do so.  Such a promise cannot ripen into a valid contract."  *Id*.  *See also Rudolph v. Int'l Bus. Machines Corp*., No. 09 C 00428, 2009 WL 2632195  at *3 (N.D. Ill. Aug. 21, 2009) ("Courts have consistently held as a matter of law that a compensation plan does not create an enforceable contract if the language of the plan explicitly provides an employer the right to modify or terminate the plan at any time.") (collecting cases).

Like the contracts which the *Hegel* and *Rudolph* courts found unenforceable, the ARSC Plan reserved to CEC the right to terminate or amend the Plan, at any time, for any reason, and at CEC's sole discretion.  Since the reservation of rights rendered the promise illusory under Eighth Circuit and Seventh Circuit precedent, there was no agreement for CEC to breach.  Accordingly, Wilson's breach of contract claim fails on the pleadings.

**B.    If The ARSC Plan Is Enforceable, CEC Committed No Breach Because It Acted In A Manner Consistent With The Plan Terms When It Terminated The Plan And Declined To Pay Wilson For Unearned Bonuses.**

Wilson disputes that the ARSC Plan is an illusory contract and argues that rules of contract construction favor "an interpretation that renders an agreement legally enforceable… over an interpretation that renders a contract void." Pl. Br. at 15. As explained below, however, dismissal is also the correct outcome if the ARSC Plan is deemed an enforceable contract.

**1.    The District Court Correctly Concluded That The Plan Unambiguously Reserved To CEC The Right To Terminate At Any Time For Any Reason.**

Plaintiff must prove four elements in order to establish a breach of contract claim: "(1) a valid contract; (2) performance by plaintiff of any conditions precedent; (3) a material breach of any conditions precedent; and (4) damages." *Parkhill v. Minn. Mut. Life Ins. Co.*, 174 F.Supp.2d 951, 961 (D.Minn. 2000). *See also Ass'n Ben. Services, Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 849 (7th Cir. 2007) ("Under Illinois law, the elements of a breach of contract cause of action are '(1) offer and acceptance, (2) consideration, (3) definite and certain terms, (4) performance by the plaintiff of all required conditions, (5) breach, and (6) damages.'") (citing *MC Baldwin Fin. Co. v. DiMaggio, Rosario & Veraja, LLC*, 364 Ill.App.3d 6, 300 Ill.Dec. 601, 845 N.E.2d 22, 30 (2006), leave to appeal denied, 218 Ill.2d 542, 303 Ill.Dec. 3, 850 N.E.2d 808 (2006)). When the contract is unambiguous, "the court cannot consider anything other than the contract." *Winthrop Res. Corp. v. Eaton Hydraulics, Inc.*, 361 F.3d 465, 470 (8th Cir. 2004) (applying Minnesota law). *See also Curia v. Nelson*, 587 F.3d 824, 829 (7th Cir. 2009) (applying Illinois law and stating that "if a contract is unambiguous, the court will enforce it as written, without resorting to extrinsic evidence."); *Lewitton v. ITA Software, Inc.*, 585 F.3d 377, 380-81 (7th Cir.2009) (applying Illinois law and observing that "extrinsic evidence cannot be used to create ambiguity where none otherwise exists[.]").

12

Wilson alleges that the ARSC Plan constituted an express contract with CEC and that his purported right to incentive compensation was governed by the Plan.  App. pp. 25-26 (Complaint ¶¶ 31-33).  Wilson concedes that CEC announced the termination of the ARSC plan on December 9, 2010 (*id.*, p. 23 (Complaint ¶ 19); p. 33 (Announcement of Compensation Changes)), and that consistent with that announcement he was paid incentive compensation through February 2011 (*id.*, pp. 23, 26 (Complaint ¶¶ 19, 33)).  His claims relate only to money he might have received in March, April or May 2011, had CEC not exercised its right to terminate the ARSC Plan.  *Id.*, p. 26 (Complaint ¶¶ 35-36).[4]

The express terms of the agreement, however, clearly and unambiguously assign CEC the sole right to terminate or amend the ARSC Plan at any time, for any reason:

> If CEC determines at any time that this Plan should be modified due to the requirements or standards of the U.S. Department of Education or any state agency or accrediting commission, then CEC may be obligated to modify this Plan.  *CEC reserves the right to terminate or amend the terms of this Plan at any time, for regulatory compliance purposes or for any other reasons that CEC determines, in its sole discretion.  Any interpretation of any provision of this Plan or of any regulatory authority may be made by CEC in its sole discretion.*

App. 31 (ARSC Plan) (emphasis added).

The district court held that "the terms of the Plan are clear that CEC could terminate it at any time and for any reason, and it cannot be read to require ongoing payments after termination occurred and the Plan was no longer in effect."  App. 13 (District Court Opinion).  The district court's conclusion was undeniably correct.  In *Brozo v. Oracle Corp.*, 324 F.3d 661 (8th Cir. 2003), the Eighth Circuit (applying Minnesota law) reviewed a claim of breach of contract arising from a commission compensation plan.  The plan terms provided that "[t]he Company

---

[4] App. 23, 26 (Complaint ¶¶ 21, 36).  Wilson resigned his employment at CEC on May 18, 2011.  App. 19 (Complaint ¶ 2).

shall make the final and binding determination of any amount payable under the Plan, and [the Company] reserves the right to change the Plan at any time, during or after the close of the fiscal year." *Id*. at 666. The court concluded that with this reservation of rights, "the Plan unambiguously gave [the employer] the discretion to reduce [the employee's] commissions[.]" *Id*. at 668. *See also Kosek v. The American Express Company*, No. 08-426, 2008 WL 4057534 *2 (D.Minn. Aug. 26, 2008) ("grant of discretion to a party with regard to a particular term is ordinarily valid and effective: When a contract term leaves a decision to the discretion of one party, that decision is virtually unreviewable.") (citing *Brozo* and *Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc*., 666 N.W.2d 320, 323 (Minn. 2003)).[5]

Although Minnesota law applies, the result is no different under Illinois law. In *Tatom v. Ameritech Corp*., 305 F.3d 737, 742-44 (7th Cir. 2002), this Court (applying Illinois law) rejected the notion that any bonus was due where one of the parties "reserves the right to reduce, modify, or withhold awards based on such factors as regulatory events, changes in business conditions, or individual performance," as well as the final right "to decide all questions and issues arising under" the compensation plan. 305 F.3d at 743. The Court held that such a document did not "set forth a promise in terms clear enough to cause an employee to reasonably believe that an offer of a bonus had been made." *Id*. *See also Vallone v. CNA Financial Corp*., 375 F.3d 623, 634 (7th Cir.2004) (reservation-of-rights clause trumped the promise of "lifetime" health benefits in an early-retirement package).

---

[5] A similar principle also has been applied in the employment context, when an employer reserves the right not to follow its policies. *See, e.g., Johnson v. U.S. Bancorp*, 2003 WL 22015838 (Minn. Ct. App. Aug. 26, 2003), citing *Simonson v. Meader Distrib. Co*., 413 N.W.2d 146, 147-48 (Minn. App. 1987) (holding that a handbook's language may reserve an employer's discretion not to follow its policy manual).

Faced with this unambiguous Plan language and clear precedent, Wilson can only argue that the ARSC Plan "is silent on retroactivity." Pl. Br. at 9. As a result, he claims, because the Plan was designed to pay bonuses in the next calendar year for students enrolled during the current calendar year, it is "clear that the ARSC Plan granted CEC a right to alter its employees' compensation terms only *prospectively*." *Id*. (emphasis in original). But his argument cannot be reconciled with a plain reading of the ARSC Plan, which confers to CEC not only the right to amend or terminate all or any part of the Plan at any time for any reason, but also the "sole discretion" to *interpret* the meaning of the termination provision. App. 31 (ARSC Plan) ("CEC reserves the right to terminate or amend the terms of this Plan at any time, for regulatory compliance purposes or for any other reasons that CEC determines, in its sole discretion. Any interpretation of any provision of this Plan or of any regulatory authority may be made by CEC in its sole discretion.").

Read together, these clauses clearly allowed CEC the "right" to eliminate bonuses for students who were "in the pipeline." Indeed, that is exactly what the district court found: "when read with the Plan as a whole, it is clear that interpreting the termination clause as CEC did is consistent with the other Plan terms." App. 13 (District Court Opinion).

*Tymshare, Inc. v. Covell*, 727 F.2d 1145 (D.C.Cir. 1984), a case Wilson cites in support of his covenant of good faith contention as "particularly apposite" to this case (Pl. Br. at 21) only underscores the flaw in his breach of contract argument. In *Tymshare*, the court considered a compensation plan which included a clause by which "management reserve[d] the right to change the quota plan and individual quota and reserve payments at any time during the quota year within their sole discretion." *Id*. at 1148. The court considered "whether the contract permits retroactive quota increases" and concluded that "it does," *even though the word*

15

*"retroactive" did not appear in the contract.  Id.* at 1150.  As the court explained, the reservation

of rights was unqualified and "the permissibility of such adjustment is the most plausible

estimation of the contract's intent." *Id.*

Likewise, the meaning of the reservation of rights clause in the ARSC Plan is not open to

"more than one reasonable interpretation," and there is no ambiguity in the Plan.  As Wilson

acknowledges, where the meaning of a clause is unambiguous, the court need not make any

further inquiry.  See *Brozo*, 324 F.3d at 667 (discretionary authority to interpret the plan was

unambiguous and render interpretations "virtually unreviewable"); *Cromeens, Holloman, Sibert,*

*Inc v. AB Volvo*, 349 F.3d 376, 395-96 (7th Cir. 2003) (holding that an "unfettered right to

termination" does not create ambiguity, as "Illinois law holds that parties to a contract are

entitled to enforce the terms to the letter[.]" (citing *The Northern Trust Co. v. VIII South*

*Michigan Assoc.*, 657 N.E.2d 1095, 1104 (Ill.App.1st 1995); *Jespersen v. Minnesota Mining &*

*Mfg. Co.*, 681 N.E.2d 67, 71 (Ill.App.3d 1997).[6]

---

[6] *See also Knudsen v. Transport Leasing/Contract, Inc.*, 672 N.W.2d 221, 223 (Minn. Ct.App.
2003) ("Absent ambiguity, the terms of a contract will be given their plain and ordinary meaning
and will not be considered ambiguous solely because the parties dispute the proper interpretation
of the terms."); *BP Prods. N. Am. Inc. v. Twin Cities Stores, Inc.*, 534 F.Supp.2d 959, 962 (D.
Minn. 2007) (holding that contract clause granting one party "sole discretion" to set gasoline
prices conferred unlimited discretion to that party and was not open to multiple interpretations);
*United States v. Kelly*, 18 F.3d 612, 617 (8th Cir. 1994) (affirming decision for government in
plea agreement dispute where government retained sole discretion to determine whether detainee
"cooperated" such to warrant government filing a mitigating motion on detainee's behalf, as fact
that "cooperation" was not defined did not render clause ambiguous because "[t]he government
did not… commit itself to file [the motion] in this case.  To the contrary, the decision of whether
or not to file [the motion] remained in the sole discretion of the government."); *Gentieu v. Tony
Stone Images/Chicago, Inc.*, 255 F.Supp.2d 838, 869 (N.D. Ill. 2003) (holding that contract
clause which granted defendant "sole discretion" to set terms and conditions of licenses was
"unambiguous" and precluded plaintiff's claim that "that the way [defendant] set terms or
conditions of its licenses breached" the contract).

**2.    The District Court Correctly Concluded That CEC's Changes Were Not "Retroactive."**

Even apart from the Plan's clear and unambiguous reservations of rights clause, there is no support for Wilson's contention that the ARSC Plan did not allow CEC to "retroactively terminate the incentive pay arrangement" for students already in the "pipeline," *i.e.*, "those who had enrolled but not completed their studies until after the Plan's termination." Pl. Br. at 11. Indeed, the term "retroactive" does not even accurately describe what occurred.

The termination of the Plan was announced on December 9, 2010 and effective more than two months later on February 28, 2011. App. 23 (Complaint ¶ 19); p. 33 (Announcement of Compensation Changes). As CEC pointed out to the district court below: "Wilson does not allege that CEC failed to pay bonuses for students who successfully completed their academic programs during evaluation periods before CEC terminated the Plan. Rather, he has alleged only that he was not paid for bonuses *he might have earned* between February 28, 2011 and June 30, 2911, had the Plan not been discontinued." (App. 13) (emphasis in original).

The ARSC Plan explicitly defines when compensation is deemed to have been "earned:"

> An employee is considered to have "earned" supplemental compensation under this Plan for the evaluation period during which his/her employment ends if, as of the employee's termination date, the employee has exceeded his/her MPG Threshold for that evaluation period for students who have successfully completed either their academic program or one academic year of their program. The employee will only be entitled to supplemental compensation under this Plan based on those students who have successfully completed their academic program or one academic year of their program, whichever is shorter, as of the employee's termination date, and not for any students who successfully complete their academic program or one academic year of their program after the employee's termination date.

App. 30 (ARSC Plan).

Thus, under the Plan, an Admissions Representative earns supplemental compensation only when he or she has (1) exceeded his/her threshold for recruiting students; (2) the students

have successfully completed their academic program or one academic year of their program,

whichever is shorter; and (3) the student benchmarks are achieved *during the eligibility period*.

App. 30-32 (ARSC Plan).  Further, these criteria remain subject to certain other exclusions, such

as requiring Admissions Representatives to first place a number of students equal to a threshold

set by the Company (and for which no supplemental compensation was earned); not counting

students who had previously counted toward supplemental compensation when pursuing other

academic programs; not including students also employed by CEC or who are dependents of a

CEC employee.  *Id*.  Thus, as the district court correctly observed, "[d]espite Wilson's

characterization that the termination applied 'retroactively' to those students, it was not, in fact,

retroactive, because under the Plan's terms, Wilson had not yet earned those bonuses."  App.

at 13.

      Recognizing his dilemma, Wilson would have this Court dismiss the term "earn" as

merely equivalent to being "paid" compensation already due, and read into the Plan that an

Admissions Representative would "vest in a right to supplemental compensation under the 2010

Plan by enrolling a student."  Pl. Br. at 16.  But this tortured interpretation cannot be reconciled

with the plain meaning of the Plan's terms.  As Black's Dictionary defines the term, "earn"

means "[t]o do something that *entitles* one to a reward or result, whether it is received or not."

Black's Law Dictionary (9th ed. 2009) (emphasis added).  And nowhere does the Plan suggest

that Admissions Representatives' right to incentive compensation "vests" simply upon

enrollment of a student.  To the contrary, there are multiple other conditions: students must

successfully complete either their academic program or one academic year of their program

within the evaluation window; the student must not have been counted under the Plan on some

other occasion; the student must not be an employee or dependent of an employee of CEC; the

total number of students satisfying these conditions must exceed thresholds established by CEC; and the Admissions Representative must be employed by CEC at the time all conditions are satisfied.  App. 31 (ARSC Plan).  Indeed, Wilson's interpretation would defeat the whole purpose of the Plan:  tying eligibility for supplemental compensation to timely and successful achievement by enrolled students.  *See* App. 29-32 (ARSC Plan) (referring seven times to the requirement that students "successfully complete" their programs or one academic year before they count toward an Admission Representative's targets to earn supplemental compensation).

Undeterred, Wilson claims that the "district court's interpretation of the ARSC Plan – that supplemental compensation is not vested until earned – conflicts with the remainder of the Plan."  Pl. Br. at 16.  He contends that if supplemental compensation did not vest until after completion of educational milestones, "it is unlikely Admissions Representatives would *ever* receive supplemental compensation, since the 2010 Plan was only operative from January 1, 2010 through December 31, 2010, and most educational milestones took a year or longer to reach."  Pl. Br. at 16 (emphasis in original).

The fact that CEC's incentive compensation plans were reviewed and renewed on an annual basis, however, is unremarkable.   If anything, it is Wilson's interpretation that "conflicts with the remainder of the Plan."  CEC's business is to provide private, for-profit postsecondary education (App. 20 (Complaint ¶ 3)), so there are always students "in the pipeline."  Thus, under Wilson's interpretation, CEC never would be able to end its supplemental compensation plan, which is an illogical reading of the Plan that produces an absurd result.  Furthermore, Wilson's interpretation would require the Court to disregard terms which are repeated throughout the Plan and which state that supplemental compensation is earned only upon satisfaction of multiple

conditions *in addition to* performance by the Admissions Representative.  App. 29-32 (ARSC Plan).

Wilson's reliance on two district court decisions from outside this Circuit does not dictate a contrary result.  *Olson v. McKesson Corp.*, No. CV-04-2428-PHX-FJM, 2006 WL 2355393 (D.Ariz. Aug. 14, 2006), which applies Arizona state law, is also factually distinguishable because it concerns a true retroactive change to earned money.  The *Olson* plaintiff performed her job as a sales executive and substantially exceeded her sales quota, entitling her to $400,000 in commissions.  *Id.* at *1.  Following the close of the fiscal year and completion of all of her sales, the defendant's Compensation Committee retroactively capped her commissions at $187,500.  *Id.*  That is a far cry from Wilson's allegation that he should receive compensation even though, by his own admission, all of the necessary prerequisites were not yet satisfied.  Pl. Br. at 18 ("Mr. Wilson enrolled his students in LCB's program, vesting him in a right to payment under the ARSC Plan *if* he remained employed at LCB *when* the student reached the educational milestone set forth in the Plan.") (emphasis added).

*Quiello v. Reward Network Establishment Services, Inc.*, 420 F.Supp. 2d 23 (D.Conn. 2006), which applies Connecticut law, also is distinguishable on its facts.  In *Quiello*, the issue was whether the commission rate applicable to sales vested at the time the sale was made or at the time the commission was posted to the salesman's account.  *Id.* at 29.  The contract "contain[ed] no language that specifically addresses when commissions are earned."  *Id.* at 30.  As a result, the court had to resort to extrinsic evidence, which favored the salesman's interpretation that the commission rate was earned when he performed his work and not when all conditions for payment were satisfied.  That is in stark contrast with the instant case, where the ARSC Plan explicitly states when compensation is earned.

As the Plan terms make clear, and unlike in *Quiello*, it is not enough for Wilson's "own performance" to have been done (Pl. Br. at 18): all of the conditions described above must be satisfied before the compensation is "earned."[7]  In other words, as the district court correctly observed:

> The rationale in Quiello might apply to this case if CEC had changed the bonus rate from $400 to some other figure for students Wilson had already enrolled.  But that would only become an issue at the point Wilson actually earned the bonus for those students.  Because CEC's termination of the Plan only applied to as yet unearned bonuses, it was not a "retroactive" action at all.

App. 14 (District Court Opinion).[8]

### C.  CEC Did Not Breach The Implied Covenant Of Good Faith And Fair Dealing By Terminating The Contract In Advance Of New Government Regulations That Would Have Made Such Payments Illegal.

Wilson next argues that, even if the Court concludes that the terms of the Plan expressly authorized CEC's actions, CEC breached an implicit covenant of good faith and fair dealing.  Resp. p. 11.  Of course, if "there was merely an illusory promise, not a valid contract," the employer "owed no contractual duty of good faith and fair dealing."  *Hegel*, 2011 WL 1103825 at *8.  See also  *Levion v. Societe Generale*, 822 F.Supp.2d 390, 405 (S.D.N.Y. Sept. 30, 2011)

---

[7] For this reason, Wilson's criticism of the lower court's treatment of *Quiello* is misplaced.  Pl. Br. at 19.  In *Quiello*, there were *no* requirements in the applicable plan other than the employee's own performance before his right to incentive compensation vested.  That is not the case here.

[8] Wilson cites other decisions (Pl. Br. at 15), but only *Foxfield Realty, Inc. v. Kubala,* 678 N.E.2d 1060 (Ill. App. 1997), is even remotely on point, and there the Court rejected plaintiff's argument for a commission payment, concluding that her reading was an absurd interpretation of the agreement which no reasonable person would accept.  *Id.* at 525.  *Carey v. Richards Building Supply Co.*, 856 N.E.2d 24 (Ill. App. 2006) concerns whether a party understand its agreement to arbitrate.  *Brookfield Trade Center, Inc. v. County of Ramsey*, 584 N.W.2d 390 (Minn. 1998) merely states without analysis the principle that contracts should not be read in a manner that creates absurd results.  *United States v. Barnett*, 415 F.3d 690 (7th Cir. 2005) construes a plea agreement.

("in order to make a claim for breach of the covenant of good faith and fair dealing, there must be a contract in the first place.").

In any event, even if there was an enforceable contract, Wilson's theory is not available to him under Minnesota law because the state's highest court has "not read an implied covenant of good faith and fair dealing into employment contracts." *See Hunt*, 384 N.W.2d at 858.[9]  And under either Minnesota or Illinois law, where "the contracting party complains of acts of the other party which are specifically authorized by their agreement, a breach of the duty of good faith is not established." *Hegel*, 2011 WL 1103825 at *8; *Cromeens*, 349 F.3d at 395-96 ("Illinois law holds that parties to a contract are entitled to enforce the terms to the letter and an implied covenant of good faith cannot overrule or modify the express terms of a contract.").[10] *See also Jespersen v. Minnesota Mining & Mfg. Co*., 681 N.E.2d 67, 71 (Ill.App.3d 1997) ("the

---

[9] Plaintiffs cite *Igbanugo v. Cangemi*, No. A10-202, 2011 WL 2519205 (Minn.App. June 27, 2011) for the contrary position, but the decision by the appellate court is at odds with the pronouncement by the Minnesota Supreme Court in *Hunt*, which remains good law.  *Hunt* was recently reiterated by a court sitting in Minnesota.  *Laitinen v. Per Mar Sec. & Research Corp*., No. 11-3120, 2012 WL 695897, *4 (D.Minn. Mar. 5, 2012) ("Minnesota courts, however, do not recognize an implied covenant of good faith and fair dealing in employment contracts. *See Hunt*[.]").  *See also Cenveo Corporation v. CelumSolutions Software GMBH*, 504 F.Supp.2d 574, 577 (D.Minn. Mar. 27, 2007) ("The Minnesota Supreme Court has squarely held that there is no implied covenant of good faith and fair dealing in Minnesota employment contracts."); *Shukh v. Seagate Tech., LLC*, No. 10-404, 2011 WL 1258510 *9 (D.Minn. Mar. 30, 2011) (citing *Hunt* and dismissing breach of contact claim because Minnesota does not recognize covenant of good faith and fair dealing in employment contracts); *Ladd v. Mohawk Carpet Distrib., L.P.*, No. 08-6470, 2010 WL 2541651 *15 (D.Minn. April 1, 2010) (plaintiff alleged defendant "violated the implied covenant of good faith and fair dealing. But Minnesota law does not imply this covenant into employment contracts. . . This argument is without merit."); *Lee v. Metro. Airport Comm'n*, 428 N.W.2d 815, 822 (Minn.App.1988) ("Implied covenants of good faith and fair dealing are not favored in Minnesota, and courts have not read an implied covenant of good faith and fair dealing into employment contracts.").

[10] As one court observed, "[w]e are aware of no reported case in which a court has held the covenant of good faith may be read to prohibit a party from doing that which is expressly permitted by an agreement.  On the contrary, as a general matter, implied terms should never be read to vary express terms."  *Remus v. Fios, Inc.*, No. C 11–01264 CRB, 2012 WL 707477, *8 (N.D. Cal. Mar. 5, 2012) (citations omitted, emphasis in original).

duty of good faith and fair dealing does not override the clear right to terminate at will, since no obligation can be implied which would be inconsistent with and destructive of the unfettered right to terminate at will.").  Wilson cannot rely on an implied covenant to overcome the express terms of the ARSC Plan, which reserve to CEC the right to terminate the Plan at any time and for any reason.

Moreover, "the substantial weight of authority is that the covenant is breached only by conduct that is dishonest or malicious or otherwise in subjective bad faith."  *BP Prods.*, 534 F.Supp.2d at 965 ("the substantial weight of authority is that the covenant is breached only by conduct that is dishonest or malicious or otherwise in subjective bad faith").  *See also Brozo*, 324 F.3d at 667 (holding that, where an agreement grants one party broad and sole discretion, the courts will not interfere with the exercise of that discretion, or, "*[a]t most*, courts will step in when the party who would assume the role of sole arbiter is charged with fraud, bad faith, or a grossly mistaken exercise of judgment") (emphasis in original, internal quotation marks omitted).  Wilson's Complaint is completely devoid of any allegations that CEC acted dishonestly, with malice or in bad faith.

Plaintiff relies on *Tymshare* (Pl. Br. at 21), a decision that is easily distinguishable.  In *Tymshare*, the plaintiff earned commissions in one period only to have the company later adjust the commissions downward, and in a second period the plaintiff was terminated without cause in advance of his collecting the full commissions to which he was due.  The appellate court, applying Virginia state law, remanded the case for further proceedings because there was evidence from which a jury could conclude that the company conspired to terminate the plaintiff *in order to* avoid paying the commissions due him.  *Id.* at 1155.[11]

---

[11] The other cases Wilson cites likewise involve similar evidence of opportunistic behavior or bad faith on the part of the party exercising its discretion, facts that are neither present nor

There are no allegations of similar conduct here.  The decision to terminate the ARSC

Plan was made in response to final regulations issued by DOE on October 29, 2011 which made

bonuses like those in the ARSC Plan illegal because they were "based in any part, directly or

indirectly, upon success in securing enrollments or the award of financial aid to any person or

entity engaged in any student recruitment or admission activity."[12]  The rationale was

communicated to Wilson and others in a December 9, 2010 memorandum, which stated:

> [I]n late October the DOE issued revised regulations that significantly limit how
> schools can compensate their admissions and financial aid employees. Those new
> regulations, which take effect in 2011, eliminate the option for a school to
> compensate Admissions Representatives/ Advisors based on students who
> successfully complete the shorter of their educational programs or one academic
> year. As a result, CEC will be discontinuing the [ARSC] plans.

App. 33 (Announcement of Compensation Changes).  Wilson even acknowledges this rationale

in his Complaint.  *See id.*, p. 23 (Complaint ¶¶ 19-20) ("In a document dated December 9, 2010

(the 'December Termination'), Defendant announced it was ending the bonus program;" "[t]he

December Termination explained that the reason for ending the ARSC Plan was a federal

regulation.").

---

alleged here.  *See generally Gould v. Artisoft, Inc.*, 1 F.3d 544 (7th Cir. 1993) (employer that
conditioned employment agreement on plaintiff's execution of an "enclosed" non-compete
agreement, but neither enclosed nor later provided plaintiff with such agreement, could not later
discharge plaintiff and argue plaintiff's employment was at-will because he never executed the
non-compete agreement); *Gunderson v. N. Am. Life & Cas. Co.*, 78 N.W.2d 328, 332 (Minn.
1956) (after insurance agent negotiated and won underwriting contract for defendant, defendant
substituted new agent on account and denied original agent commissions); *Galbraith v. U.S.
Premise Networking Servs., Inc.*, 2004 WL 1049042 (Minn. Ct. App. May 11, 2004) (employer
terminated three employees for refusing to accept new commission plan and argued that, having
been terminated, employees were no longer eligible to receive previously earned but unpaid
commissions under old plan).  Wilson also cites *Kulins v. Malco, A Microdot Co., Inc.*, 459
N.E.2d 1038 (Ill. App. 1984) as holding that a good faith and fair dealing clause was violated by
the retroactive imposition of a new benefits plan.  Resp. p. 12.  The decision is distinguishable
because, unlike the instant case, the severance plan at issue in *Kulins* did not contain any
language granting sole discretion to the employer to modify the previous agreement.

[12] *See* DOE Program Integrity Issues, Final Rule, 75 Fed. Reg. 66832-66975 (Oct. 29, 2010) (to
be codified at 34 C.F.R. pts 600, 602, 603, 668, 682, 685, 686, 690, 691).

Implicitly acknowledging that CEC unquestionably had a good faith basis to terminate the ARSC Plan, Wilson complains that "the Plan should not have terminated until June 30, 2011, not February 28, 2011." Pl. Br. at 22. In short, Wilson is dissatisfied that CEC did not wait until the last day before the new regulations were effective to amend and terminate the Plan. Even if CEC was subject to an implicit covenant of good faith and fair dealing, such an obligation requires only that action be taken without malice or ulterior motive, not in a manner "most beneficial to plaintiff" or even "reasonable." *BP Prods.*, 534 F.Supp.2d at 966 (citing *United States v. Basin Elec. Power Coop.,* 248 F.3d 781, 796 (8th Cir. 2001)). CEC terminated the ARSC Plan only *after* the DOE announced the regulations were changing, giving Wilson nearly three months' notice of the change, during which he and other Admissions Representatives continued to earn supplemental compensation.[13] As the district court correctly observed (App. 15), this "grace period" does not plausibly suggest bad faith or ulterior motives. *Twombly*, 550 U.S. at 555, 570; *Iqbal*, 556 U.S. at 679 (allegations must be sufficient to raise a right to relief above the speculative level, and the complaint must state a claim for relief that is plausible on its face).

In sum, Wilson's contract claim fails because the acts he complains of were consistent with and permitted by the express terms of the ARSC Plan, and evidenced no ulterior motive. Accordingly, the district court properly dismissed Wilson's breach of contract claim.

---

[13] The announcement also advised Admissions Representatives that CEC was studying base pay programs that would comply with the new regulations while remaining equitable and competitive in the marketplace. App. 33 (Announcement of Compensation Changes).

**IV.    THE DISTRICT COURT PROPERLY DISMISSED WILSON'S IMPLIED CONTRACT / UNJUST ENRICHMENT CLAIM.**

   **A.    If Wilson Is Correct That The ARSC Plan Is A Valid Express Contract, He Is Precluded From Obtaining The Equitable Relief He Seeks.**

Wilson disputes that the ARSC Plan is an illusory contract. Pl. Br. at 24. If, as Wilson apparently believes, the ARSC Plan is an express contract, then he has no unjust enrichment claim under either Minnesota or Illinois law. This is because "equitable relief cannot be granted where the rights of the parties are governed by a valid contract." *M.M. Silta, Inc. v. Cleveland Cliffs, Inc.*, 616 F.3d 872, 880 (8th Cir. Minn. 2010), quoting *U.S. Fire Ins. Co. v. Minn. State Zoological Bd.*, 307 N.W.2d 490, 497 (Minn. 1981) (existence of valid contract terminates equitable claim of unjust enrichment); *Hess v. Kanoski & Associates*, 668 F.3d 446, 455 (7th Cir. 2012) (same) (citing *A.P. Properties, Inc. v. Rattner*, 960 N.E.2d 618, 621 (Ill.App.Ct.2011)). "The reason for prohibiting a claim of unjust enrichment between contracting parties is to prohibit a party whose expectations were not realized under the contract from nevertheless recovering outside the contract. *Utility Audit, Inc. v. Horace Mann Service Corp.*, 383 F.3d 683, 689 (7th Cir. 2004). *See also Cengage Learning, Inc.*, 2008 WL 4857938 at *5 (courts "cannot use an equitable doctrine to set aside the unambiguous terms of the parties' agreement." ); *Piper Jaffray & Co. v. SunGard Sys. Int'l, Inc.*, No. 04-2922 (DWF/JSM), 2007 WL 541679 *7 (D.Minn. Feb. 16, 2007) (dismissing unjust enrichment claims where the parties alleged and admitted the existence of valid agreements); *Taylor Inv. Corp. v. Weil*, 169 F.Supp.2d 1046, 1060 (D. Minn. 2001) (same.).

   **B.    Wilson Has Not Alleged That CEC Engaged In Unlawful Or Illegal Conduct Or Improperly Benefitted From His Labors Such That He Has A Viable Equitable Claim.**

While the unjust enrichment theory is available to Wilson if the ARDC Plan is an illusory contract, Wilson's Complaint has failed to state such a claim. A claim of unjust enrichment

under Minnesota law requires the plaintiff to show that "one party benefit[ed] from the efforts or obligations of others" and also "that a party was unjustly enriched in the sense that the term 'unjustly' could mean illegally or unlawfully… or that the circumstances were such that it would be morally wrong for one party to [be allowed to] enrich himself at the expense of another." *Gallinger v. North Star Hosp. Mut. Assur., Ltd.*, 64 F.3d 422, 426 (1995) (internal quotation marks omitted) (citing *First National Bank v. Ramier*, 311 N.W.2d 502, 504 (Minn.1981) (en banc ) and *Cady v. Bush*, 283 Minn. 105, 166 N.W.2d 358, 361-62 (1969) (en banc)).  Similarly, under Illinois law, a claim for unjust enrichment arises from "unlawful or improper conduct as defined by law" and requires allegations by the plaintiff that "the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience."  *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 518 (7th Cir. 2011) (holding that plaintiffs failed to state a claim for unjust enrichment) (citing *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 678 (1989)).

Wilson's Complaint is utterly devoid of allegations of illegal or unlawful conduct by CEC.  Indeed, the most Wilson can say is that CEC terminated the Plan at a time when "there was no legal impediment" to continue paying supplemental compensation.  App. 23 (Complaint ¶ 20).  Even accepting that allegation as true, it is a far cry from alleging the Company refused to pay supplemental compensation for illegal or unlawful reasons.  Consequently, CEC's actions cannot give rise to an unjust enrichment claim.  *Gallinger*, 64 F.3d at 426.[14]

---

[14] Plaintiff's reliance on *Quensell v. Bank One Corp.*, 2002 WL 500506 (Ohio App. Apr. 4, 2002) (Pl. Br. at 29) is misplaced.  The decision rests on Ohio law (*id*. at *5), which is not at issue in this case.  Moreover, the case concerns a highly specific fact pattern that is not analogous to the present situation.  Quensell had been working for the employer for several years, when she received a significant promotion (skipping a grade level) to a new position. *Id*. at *2.  While she transitioned into her new role, she continued to perform her prior role as

Moreover, CEC was not unjustly enriched by terminating the ARSC Plan, because Wilson had no right to unearned supplemental compensation in the first place. *See Chambers v. Metro. Prop. & Cas. Ins. Co.*, 351 F.3d 848 (8th Cir. 2003). In *Chambers*, an employer maintained an employee handbook that included a severance plan, then changed the plan to drop payment of relocation expenses. As a result, plaintiff did not receive payment for relocation expenses. The plaintiff filed suit for both breach of contract and unjust enrichment. The breach of contract claim failed because of an express reservation of rights that rendered the agreement illusory. The plaintiff then argued that the absence of a valid contract supported his unjust enrichment claim, positing that if the plan was not a contract, then the details of his compensation had not been expressly laid out, and, therefore, it would be unjust for the company to keep some of the value of his services and not pay him relocation and other bonuses he had lost when he was terminated. The Eight Circuit rejected that argument and affirmed the district court's decision, on the grounds that the defendant "could not have been unjustly enriched by denying [plaintiff] the benefits of relocation expenses, an incentive bonus, or adequate time for his stock options to fully vest, where, as a matter of law, [plaintiff] was not entitled to those benefits." *Id*. at 854-55.

In his brief, Wilson misreads *Chambers*, claiming the Eighth Circuit "held that as a matter of law the plaintiff was not entitled to these benefits because there was no evidence of

---

well. *Id*. Because the roles were compensated under different plans, there were difficult fact questions to resolve about which covered her employment. At least some of those facts, however, indicated that Quensell had been promised compensation under one plan which she was later denied with the express purpose of reducing the amount of compensation she was otherwise owed. *Id*. at *7. This fact situation is vastly different from the one present here, where there is no dispute about the Plan at issue and Wilson has not pled any improper purpose for the termination of the ARSC Plan. In any event, the *Quensell* court ultimately concluded, as CEC has argued here, that the employer's reservation of rights rendered the contracts illusory. *Id*. at *9.

injustice, *not* that he had to establish he was contractually entitled to the benefits in the first place

to prove injustice." Pl. Br. at 27 (emphasis in original). But as the passage Wilson cites makes

clear, there was no evidence of injustice *precisely* because the *Chambers* plaintiff was not

entitled to the benefits he sought. *Chambers*, 351 F.3d at 855. Thus, as the district court

correctly concluded:

> CEC was not *unjustly* enriched by work Wilson performed but for which he never
> received a bonus if the Plan did not guarantee him a bonus in the first place. *See
> Chambers v. Metro. Prop. & Cas. Ins. Co*., 351 F.3d 848, 855 (8th Cir. 2003)
> (holding an employer was not "enriched" by benefits to which an employee was
> not, as a matter of law, entitled). Wilson's expectation of a bonus was based only
> on the Plan, which could be terminated in CEC's sole discretion. It cannot then
> be said that CEC was unjustly enriched by doing so.

App. 16-17 (District Court Opinion) (emphasis in original)

While acknowledging that "one party's written disclaimer of obligation *could*

demonstrate that the other party was not unjustly enriched absent contrary evidence," (Pl. Br. at

27-28) (emphasis in original), Wilson argues that this is not "necessarily the case" here, because

the "parties' prior course of dealings demonstrate CEC had always paid compensation for

enrolled students in the past, and that the Plan had only been amended prospectively." Pl. Br. at

27. But this Court rejected the same argument in *Cromeens*, , 349 F.3d at 395-96. In *Cromeens*,

the defendant invoked a clause that allowed it to terminate an agreement without cause. The

Court found this action to be permitted by the express terms of the agreement. *Id*. at 394.

Nonetheless, the plaintiffs argued that the defendant should be foreclosed from invoking the

termination clause because it had never done so before. The Court held that a party's decision

not to invoke a particular clause "did not preclude [defendant] from using that provision later."

*Id*. at 394-95. The Court noted further that one would not necessarily expect to see a course of

conduct related to termination clauses, because by their nature they need not be invoked often or

at all. *Id*. at 395.

29

Furthermore, the premise of Wilson's claim is that he furnished valuable services to CEC by recruiting students, CEC accepted the benefit of those recruiting services, and CEC was unjustly enriched when it terminated the ARSC Plan and ceased bonus payments.  App. 27 (Complaint ¶¶ 41-43).  Wilson admits, however, that he was employed by and received compensation from CEC for his work as an Admissions Representative responsible to *recruit students*.  *Id*., pp. 19-20 (Complaint ¶¶ 1, 6).  Indeed, CEC never issued a 2011 ARSC Plan, yet Wilson's job continued to be to recruit students to his assigned school, even in the absence of a supplemental compensation plan.  As the *Hegel* court held, it is not unfair for an employer to retain the benefit of an employee's services for which a regular salary is paid.  2011 WL 1103825 at *9.[15]

Wilson seeks to distinguish *Hegel* on the grounds that here, unlike in *Hegel*, his supplemental compensation was "part of the deal when he accepted a position with CEC."  Pl. Br. at 28.  According to Wilson, while recruiting students may have been part of his job description, enrolling students "above threshold" was the part of his job "for which he reasonably expected supplemental compensation."  *Id*. at 29.  But even if that were true, Wilson has failed to allege how he would have gone about his work any differently, or stated a different way, that CEC received the benefit for services *beyond* those "for which a regular salary is paid."

---

[15] Other courts have reached the same result.  *See, e.g., Karmilowicz v. The Harford Fin. Svs. Group*, No. 11 Civ. 539 (CM)(DCF), 2011 WL 2936013, **11-12 (S.D.N.Y. July 14, 2011) (defendant paid plaintiff a salary and so "did not benefit unfairly from Plaintiff's work."); *Hughes v. Standard Chartered Bank, PLC*, No. 09 Civ. 4595(PKC), 2010 WL 1644949, **8-9 (S.D.N.Y. Apr. 14, 2010) (unjust enrichment claim dismissed where plaintiff's work was within scope of duties compensated by salary); *Levion v. Societe Generale*, 2011 WL 4549458 at *13 (same); *Rionda*, 2010 WL 5476725 at *9 ("equitable relief is not available where the plaintiff has provided a defendant with no more than that which he was hired to do and for which he was paid his salary.") (citations omitted).

Finally, Wilson's unjust enrichment claim fails for the additional reason that he has not alleged that CEC engaged in fraud or any other actionable wrongdoing. Nor could he: CEC discontinued its ARSC Plan because the new DOE regulations prohibited it from continuing to offer this type of incentive compensation plan, and gave its employees nearly three months' notice. App. 33 (Announcement of Compensation Changes).

In sum, Wilson has pled no basis from which the district court could discern a plausible claim for unjust enrichment, and his Complaint was properly dismissed.

## CONCLUSION

For the foregoing reasons, Defendant-Appellee Career Education Corporation respectfully requests the Court affirm the Order by Magistrate Judge Brown dismissing Plaintiff's Complaint.

Respectfully submitted,

By:   /s/ Sari M. Alamuddin
One of Its Attorneys

Sari M. Alamuddin
Andrew Scroggins
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive, Fifth Floor
Chicago, Illinois 60601
(312) 324-1000
(312) 324-1001 (fax)

Counsel of Records for Defendant-Appellee Career
Education Corporation

31

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Sari M. Alamuddin, an attorney, pursuant to Fed. R. App. P. 32(a)(7)(C)(i), certify that the foregoing Brief of Defendant-Appellee Career Education Corporation complies with the type-volume limitations of Rule 32(a)(7)(B). The Brief contains 10,554 words, excluding the parts of the Brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), and was prepared using Microsoft Word 2007.

/s/ Sari M. Alamuddin
Sari M. Alamuddin

## **<u>CERTIFICATE OF SERVICE</u>**

I, Sari M. Alamuddin, an attorney, certify that I served the foregoing Brief of Defendant-Appellee Career Education Corporation by causing three true and correct copies of the same – two in hard copy format and one electronic copy – to be mailed, by United States mail, with proper postage prepaid, to:

>Douglas L. Micko
>Schaefer Law Firm, LLC
>400 South Fourth Street,Suite 202
>Minneapolis, MN 55415
>Telephone:     612-294-2600
>Facsimile:      612-294-2640
>dmicko@schaeferlaw.com

on this 12th day of October, 2012.            /s/ Sari M. Alamuddin
                                                    Sari M. Alamuddin